IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| WHITE BUFFALO CONSTRUCTION, INC.<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 99-961C<br><br>Consolidated with No. 00-415<br><br>(Senior Judge Smith)<br><br>**NOTICE OF SUBMISSION OF CLAIMS FOR JUDICIAL NOTICE UNDER FED. R. EVID. 201** |

Under Federal Rule of Evidence 201, White Buffalo reports to the Court for judicial notice the earlier filing each of the following with the government:

1. Certified Form 1436, including Appendix B "Request for Profit and Justification for Profit," filed January 13, 2005.
2. Revised Settlement Proposal, including Appendix on "claimed lost profits on uncompleted work," filed October 16, 2006.
3. Certification of Revised Settlement Proposal, filed November 10, 2006.

Each of these previously filed documents seeks, among other relief, profits lost on uncompleted work based upon assertions of failures to cooperate, interference, and lack of good faith by the government.

DATED: April 20, 2007.

STOEL RIVES, LLP

Richard E. Alexander, OSB No. 69002
Attorney of Record for Plaintiff White Buffalo Construction, Inc.

Stoel Rives, LLP
900 SW Fifth Avenue, Suite 2600
Portland, OR 97204
Tel. (503) 224-3380
Fax. (503) 220-2480

CONTRACT # DTFH70-98-C-00027

TERMINATION FOR CONVENIENCE

FORM 1436 SETTLEMENT PROPOSAL (TOTAL COST METHOD)

REQUEST FOR COSTS TO COMPLETE SETTLEMENT PROPOSAL

REQUEST FOR PROFIT
AND
JUSTIFICATION FOR PROFIT

*Submitted By:*

White Buffalo Construction Inc.
P. O. Box 1310
Aumsville, OR 97325
503.749.1861

**WHITE BUFFALO CONSTRUCTION INC.**
**P.O. BOX 1310**
**6653 SHAW HWY S.E.**
**AUMSVILLE, OR 97325**
**ph# 503-749-1861**
**fax# 503-749-1684**

January 13, 2005

Mr. William Parsons
Terminating Contracting Officer
Western Federal Lands Highway Division
Federal Highway Administration, USDOT
610 East Fifth Street
Vancouver, WA 98661-3801

re: DTFH70-98-C-00027. Termination for Convenience. Settlement Proposal.

Enclosed please find the following:

1. Contractor's request for profit in the amount of $925,834.91 .(Appendix B)
2. Contractor's justification for profit. (Appendix B)
3. Contractor's Form 1436 (Total Cost Basis) including an attached Subcontractor Statement and a Form 1436 (Total Cost Basis) for Subcontractor McBride Construction Inc.
4. Contractor's request for reimbursement of costs associated with the preparation of its Settlement Proposal in the amount of $41,793.21. (Appendix A)
5. An additional copy of our submission dated November 2, 2004 volumes 1 & 2 for direct job costs in the amount of $365,788.41 which was previously delivered to you and which is included in this Settlement Proposal.
6. An additional copy of our submission dated March 19, 2004 for surety costs in the amount of $276,768.29 which was previously transmitted to you and which is included in this Settlement Proposal.

Our request for reimbursement of costs associated with the preparation of our Settlement Proposal (see #4 above) does not include costs that we will incur in negotiating this settlement. It also does not include costs which have been incurred but may not yet have been invoiced.

If you have any questions please contact me and I will be happy to assist you.

Sincerely,

Luther L. Clevenger
President

*enclosures: appendices A and B, form 1436 (WBC) including Subcontractor Statement, form 1436 (McBride), Nov 2, 2004 submission and March 19, 2004.*

## SETTLEMENT PROPOSAL (TOTAL COST BASIS)

OMB No.: 9000-0012
Expires: 05/31/98

Public reporting burden for this collection of information is estimated to average 2.5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the FAR Secretariat (MVR), Federal Acquisition Policy Division, GSA, Washington, DC 20405.

FOR USE BY A FIXED-PRICE PRIME CONTRACTOR OR FIXED-PRICE SUBCONTRACTOR

THIS PROPOSAL APPLIES TO *(Check one)*
[X] A PRIME CONTRACT WITH THE GOVERNMENT
[ ] SUBCONTRACT OR PURCHASE ORDER

SUBCONTRACT OR PURCHASE ORDER NO(S).

COMPANY: WHITE BUFFALO CONSTRUCTION INC.

STREET ADDRESS: 6653 Shaw Hwy S.E.

CITY AND STATE *(Include ZIP Code)*: Aumsville, OR. 97325

CONTRACTOR WHO SENT NOTICE OF TERMINATION

NAME

ADDRESS *(Include ZIP Code)*

NAME OF GOVERNMENT AGENCY: FHWA/WFLD, VANCOUVER, WA.

GOVERNMENT PRIME CONTRACT NO.: DTFH 70-98-C-00027

CONTRACTOR'S REFERENCE NO.

If moneys payable under the contract have been assigned, give the following:

NAME OF ASSIGNEE

ADDRESS *(Include ZIP Code)*

EFFECTIVE DATE OF TERMINATION: 12-1-1998

PROPOSAL NO.: 1

CHECK ONE: [ ] INTERIM [ ] FINAL

SF 1439, SCHEDULE OF ACCOUNTING INFORMATION [X] IS [ ] IS NOT ATTACHED *(If not, explain below)*

### SECTION I - STATUS OF CONTRACT OR ORDER AT EFFECTIVE DATE OF TERMINATION

| PRODUCTS COVERED BY TERMINATED CONTRACT OR PURCHASE ORDER (a) | | FINISHED: PREVIOUSLY SHIPPED AND INVOICED (b) | FINISHED, ON HAND: PAYMENT TO BE RECEIVED THROUGH INVOICING (c) | FINISHED, ON HAND: PAYMENT NOT TO BE RECEIVED THROUGH INVOICING (d) | UNFINISHED OR NOT COMMENCED: SUBSEQUENTLY COMPLETED AND INVOICED* (e) | UNFINISHED OR NOT COMMENCED: NOT TO BE COMPLETED (f) | TOTAL COVERED BY CONTRACT OR ORDER |
|---|---|---|---|---|---|---|---|
| | QUANTITY | | | | | | |
| | $ | | | | | | |
| | QUANTITY | | | | | | |
| | $ | | | | | | |
| | QUANTITY | | | | | | |
| | $ | | | | | | |

### SECTION II - PROPOSED SETTLEMENT

| NO. | ITEM (a) | TOTAL PREVIOUSLY PROPOSED (b) | INCREASE OR DECREASE BY THIS PROPOSAL (c) | TOTAL PROPOSED TO DATE (d) | FOR USE OF CONTRACTING AGENCY ONLY (e) |
|---|---|---|---|---|---|
| | | (Use Columns (b) and (c) only where previous proposal has been filed) | | | |
| 1 | ~~DIRECT MATERIAL~~ JOB COSTS | | | 128,342.91 | |
| 2 | DIRECT LABOR | | | 167,761.28 | |
| 3 | INDIRECT FACTORY EXPENSE *(from Schedule A)* | | | | |
| 4 | SPECIAL TOOLING AND SPECIAL TEST EQUIPMENT *(SF 1432)* | | | | |
| 5 | OTHER COSTS *(from Schedule B)* EQUIP/SURETY | | | 395,598.05 | |
| 6 | GENERAL AND ADMINISTRATIVE EXPENSES *(from Schedule C)* | | | 47,375.79 | |
| 7 | TOTAL COSTS *(Items 1 thru 6)* | | | 739,078.03 | |
| 8 | PROFIT *(Explain in Schedule D)* | | | 925,834.91 | |
| 9 | TOTAL *(Items 7 and 8)* | | | 1,664,912.94 | |
| 10 | DEDUCT FINISHED PRODUCT INVOICED OR TO BE INVOICED* | | | | |
| 11 | TOTAL *(Item 9 less Item 10)* | | | 1,664,912.94 | |
| 12 | SETTLEMENT EXPENSES *(from Schedule E)* | | | 41,793.21 | |
| 13 | TOTAL *(Items 11 and 12)* | | | 1,706,706.15 | |
| 14 | SETTLEMENTS WITH SUBCONTRACTORS *(from Schedule F)* | | | 105,795.67 | |
| 15 | GROSS PROPOSED SETTLEMENT *(Items 13 thru 14)* | | | 1,812,501.82 | |
| 16 | DISPOSAL AND OTHER CREDITS *(from Schedule G)* | | | | |
| 17 | NET PROPOSED SETTLEMENT *(Item 15 less 16)* | | | 1,812,501.82 | |
| 18 | ADVANCE, PROGRESS & PARTIAL PAYMENTS *(from Schedule H)* | | | 376,768.29 | |
| 19 | NET PAYMENT REQUESTED *(Item 17 less 18)* | | | 1,435,733.53 | |

*Column (e), Section I, should only be used in the event of a partial termination, in which the total cost reported in Section II should be accumulated to date of completion of the continued portion of the contract and the deduction for finished product (Item 10, Section II) should be the contract price of finished product in Column (b), (c), and (e), Section I.

NOTE: File inventory schedules (SF 1426, 1428, 1430, and 1432) for allocable inventories on hand at date of termination (See 49.206).

(When the space provided for any information is insufficient, continue on a separate sheet.)

SCHEDULE A - INDIRECT FACTORY EXPENSE *(Item 3)*

| DETAIL OF EXPENSES | METHOD OF ALLOCATION | AMOUNT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

NOTE: Individual items of small amounts may be grouped into a single entry in Schedules B, C, D, E, and G.

SCHEDULE B - OTHER COSTS *(Item 5)*

| ITEM | EXPLANATION | AMOUNT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|---|
| Surety Expense | See 3-19-04 Submission | 276,768.29 | |
| Apportionment of Equipment & vehicle ownship costs | see 11-2-04 Submission | 34,206.52 | |
| OTHER EQUIPment & vehicle costs | see 11-2-04 Submission | 84,623.24 | |
| | | | |

SCHEDULE C - GENERAL AND ADMINISTRATIVE EXPENSES *(Item 6)*

| DETAIL OF EXPENSES | METHOD OF ALLOCATION | AMOUNT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|---|
| G & A expense | see 11-2-04 Submission | 47,375.79 | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

SCHEDULE D - PROFIT *(Item 8)*

| EXPLANATION | AMOUNT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|
| Profit - please see 1-13-05 Submission (Attached) | 925,834.91 | |
| | | |
| | | |
| | | |
| | | |

(Where the space provided for any information is insufficient, continue on a separate sheet.)

SCHEDULE E - SETTLEMENT EXPENSES *(Item 12)*

| ITEM | EXPLANATION | AMOUNT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|---|
| Costs to produce | | 41,793.21 | |
| Settlement proposal | see 1-13-05 submission Attached | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

SCHEDULE F - SETTLEMENTS WITH IMMEDIATE SUBCONTRACTORS AND SUPPLIERS *(Item 14)*

| NAME AND ADDRESS OF SUBCONTRACTOR | BRIEF DESCRIPTION OF PRODUCT CANCELED | AMOUNT OF SETTLEMENT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|---|
| McBride Construction | Blasting | | |
| 19515 Baker Road | *includes interest claim | 105,795.67 | |
| Bend, OR. 97702 | see 11-2-04 submission | | |
| | | | |
| | | | |
| | | | |
| | | | |

SCHEDULE G - DISPOSAL AND OTHER CREDITS *(Item 16)*

| DESCRIPTION | AMOUNT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

(If practicable, show separately amount of disposal credits applicable to acceptable finished product included on SF 1428.)

(Where the space provided for any information is insufficient, continue on a separate sheet.)

SCHEDULE H - ADVANCE, PROGRESS AND PARTIAL PAYMENTS *(Item 19)*

| DATE | TYPE OF PAYMENT | AMOUNT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|---|
| 1-29-04 | Withheld Liquidated Damages | 100,000.00 | |
| 4-30-04 | Surety Costs | 276,768.29 | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

(Where the space provided for any information is insufficient, continue on a separate sheet.)

CERTIFICATE

his is to certify that the undersigned, individually, and as an authorized representative of the Contractor, has examined this rmination settlement proposal and that, to the best knowledge and belief of the undersigned:

(a) AS TO THE CONTRACTOR'S OWN CHARGES. The proposed settlement (exclusive of charges set forth in Item 14) and ipporting schedules and explanations have been prepared from the books of account and records of the Contractor in accordance ith recognized commercial accounting practices; they include only those charges allocable to the terminated portion of this contract; ey have been prepared with knowledge that they will, or may, be used directly or indirectly as the basis of settlement of a rmination settlement proposal or claim against an agency of the United States; and the charges as stated are fair and reasonable.

(b) AS TO THE SUBCONTRACTORS' CHARGES. (1) The Contractor has examined, or caused to be examined, to an extent it nsidered adequate in the circumstances, the termination settlement proposals of its immediate subcontractors (exclusive of oposals filed against these immediate subcontractors by their subcontractors); (2) The settlements on account of immediate bcontractors own charges are fair and reasonable, the charges are allocable to the terminated portion of this contract, and the ttlements were negotiated in good faith and are not more favorable to its immediate subcontractors than those that the Contractor ould make if reimbursement by the Government were not involved; (3) The Contractor has received from all its immediate bcontractors appropriate certificates with respect to their termination settlement proposals, which certificates are substantially in e form of this certificate; and (4) The Contractor has no information leading it to doubt (i) the reasonableness of the settlements th more remote subcontractors or (ii) that the charges for them are allocable to this contract. Upon receipt by the Contractor of nounts covering settlements with its immediate subcontractors, the Contractor will pay or credit them promptly with the amounts so ceived, to the extent that it has not previously done so. The term "subcontractors," as used above, includes suppliers. See ttached Subcontractor Statement.

)TE: The Contractor shall, under conditions stated in FAR 15.403, be required to submit a Certificate of Current Cost or Pricing ita (see FAR 15.406-2 and 15.408 Table 15-2).

| ME OF CONTRACTOR | BY *(Signature of authorized official)* | |
|---|---|---|
| White Buffalo Construction Inc. | [signature] | |
| | TITLE President | DATE 1-13-2005 |
| ME OF SUPERVISORY ACCOUNTING OFFICIAL Julie A. Clevenger | TITLE Secretary | |



1.7

Attachment to Total Cost Settlement Proposal Form

SUBCONTRACTOR STATEMENT.

1. Subcontractor McBride Construction (hereinafter McBride) performed blasting on this project.
2. I believe that I have an obligation to McBride to pass through to FHWA all claims of McBride.
3. Attached is the signed Standard Form 1436 of McBride.
4. I have discussed the claim several times with a representative of McBride.
5. Based on the information available, I cannot determine with any certainty whether and to what extent McBride is entitled to payment.

# SETTLEMENT PROPOSAL (TOTAL COST BASIS)

OMB No.: 9000-0012
Expires: 05/31/98

Public reporting burden for this collection of information is estimated to average 2.5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the FAR Secretariat (MVR), Federal Acquisition Policy Division, GSA, Washington, DC 20405.

## FOR USE BY A FIXED-PRICE PRIME CONTRACTOR OR FIXED-PRICE SUBCONTRACTOR

THIS PROPOSAL APPLIES TO *(Check one)*

☐ A PRIME CONTRACT WITH THE GOVERNMENT ☒ SUBCONTRACT OR PURCHASE ORDER

SUBCONTRACT OR PURCHASE ORDER NO(S).

COMPANY: McBride Construction Inc

STREET ADDRESS: 19585 Baker Rd

CITY AND STATE *(Include ZIP Code)*: Bend OR 97702

### CONTRACTOR WHO SENT NOTICE OF TERMINATION

NAME: White Buffalo Construction

ADDRESS *(Include ZIP Code)*: P.O. Box 810 Aumsville, OR 97325

NAME OF GOVERNMENT AGENCY: Federal Highway

GOVERNMENT PRIME CONTRACT NO.

CONTRACTOR'S REFERENCE NO.

If moneys payable under the contract have been assigned, give the following:

NAME OF ASSIGNEE

EFFECTIVE DATE OF TERMINATION

ADDRESS *(Include ZIP Code)*

PROPOSAL NO.

CHECK ONE: ☐ INTERIM ☐ FINAL

SF 1439, SCHEDULE OF ACCOUNTING INFORMATION ☐ IS ☐ IS NOT ATTACHED *(If not, explain below)*

## SECTION I - STATUS OF CONTRACT OR ORDER AT EFFECTIVE DATE OF TERMINATION

| PRODUCTS COVERED BY TERMINATED CONTRACT OR PURCHASE ORDER (a) | | FINISHED: PREVIOUSLY SHIPPED AND INVOICED (b) | FINISHED: ON HAND: PAYMENT TO BE RECEIVED THROUGH INVOICING (c) | FINISHED: ON HAND: PAYMENT NOT TO BE RECEIVED THROUGH INVOICING (d) | UNFINISHED OR NOT COMMENCED: SUBSEQUENTLY COMPLETED AND INVOICED* (e) | UNFINISHED OR NOT COMMENCED: NOT TO BE COMPLETED (f) | TOTAL COVERED BY CONTRACT OR ORDER |
|---|---|---|---|---|---|---|---|
| Invoices 98058A, 98058B 98058C, 98058D | QUANTITY | | | | | | |
| | $ | 39645.44 | | | | | |
| Unbilled work 11/19/98 | QUANTITY | | | | | | |
| | $ | 315.00 | | | | | |
| Billed Interest (to protection) | QUANTITY | | | | | | |
| | $ | 66268.23 | | | | | |

## SECTION II - PROPOSED SETTLEMENT

| NO. | ITEM (a) | TOTAL PREVIOUSLY PROPOSED (b) | INCREASE OR DECREASE BY THIS PROPOSAL (c) | TOTAL PROPOSED TO DATE (d) | FOR USE OF CONTRACTING AGENCY ONLY (e) |
|---|---|---|---|---|---|
| | | (Use Columns (b) and (c) only where previous proposal has been filed) | | | |
| 1 | DIRECT MATERIAL | | | | |
| 2 | DIRECT LABOR | | | | |
| 3 | INDIRECT FACTORY EXPENSE *(from Schedule A)* | | | | |
| 4 | SPECIAL TOOLING AND SPECIAL TEST EQUIPMENT *(SF 1432)* | | | | |
| 5 | OTHER COSTS *(from Schedule B)* | | | | |
| 6 | GENERAL AND ADMINISTRATIVE EXPENSES *(from Schedule C)* | | | | |
| 7 | TOTAL COSTS *(Items 1 thru 6)* | | | | |
| 8 | PROFIT *(Explain in Schedule D)* | | | | |
| 9 | TOTAL *(Items 7 and 8)* | | | | |
| 10 | DEDUCT FINISHED PRODUCT INVOICED OR TO BE INVOICED* | | | | |
| 11 | TOTAL *(Item 9 less Item 10)* | | | | |
| 12 | SETTLEMENT EXPENSES *(from Schedule E)* | | | | |
| 13 | TOTAL *(Items 11 and 12)* | | | | |
| 14 | SETTLEMENTS WITH SUBCONTRACTORS *(from Schedule F)* | | | | |
| 15 | GROSS PROPOSED SETTLEMENT *(Items 13 thru 14)* | | | | |
| 16 | DISPOSAL AND OTHER CREDITS *(from Schedule G)* | | | | |
| 17 | NET PROPOSED SETTLEMENT *(Item 15 less 16)* | | | | |
| 18 | ADVANCE, PROGRESS & PARTIAL PAYMENTS *(from Schedule H)* | | | | |
| 19 | NET PAYMENT REQUESTED *(Item 17 less 18)* | | | | |

*Column (e), Section I, should only be used in the event of a partial termination, in which the total cost reported in Section II should be accumulated to date of completion of the continued portion of the contract and the deduction for finished product (Item 10, Section II) should be the contract price of finished product in Column (b), (c), and (e), Section I.

NOTE: File inventory schedules (SF 1428, 1429, 1430, and 1432) for allocable inventories on hand at date of termination ( See 49.206).

(When the space provided for any information is insufficient, continue on a separate sheet.)

### SCHEDULE A - INDIRECT FACTORY EXPENSE *(Item 3)*

| DETAIL OF EXPENSES | METHOD OF ALLOCATION | AMOUNT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

NOTE: Individual items of small amounts may be grouped into a single entry in Schedules B, C, D, E, and G.

### SCHEDULE B - OTHER COSTS *(Item 5)*

| ITEM | EXPLANATION | AMOUNT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

### SCHEDULE C - GENERAL AND ADMINISTRATIVE EXPENSES *(Item 6)*

| DETAIL OF EXPENSES | METHOD OF ALLOCATION | AMOUNT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|---|
| Document Preparation | | $3328.00 | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

### SCHEDULE D - PROFIT *(Item 8)*

| EXPLANATION | AMOUNT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

(Where the space provided for any information is insufficient, continue on a separate sheet.)

**SCHEDULE E - SETTLEMENT EXPENSES *(Item 12)***

| ITEM | EXPLANATION | AMOUNT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**SCHEDULE F - SETTLEMENTS WITH IMMEDIATE SUBCONTRACTORS AND SUPPLIERS *(Item 14)***

| NAME AND ADDRESS OF SUBCONTRACTOR | BRIEF DESCRIPTION OF PRODUCT CANCELED | AMOUNT OF SETTLEMENT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**SCHEDULE G - DISPOSAL AND OTHER CREDITS *(Item 16)***

| DESCRIPTION | AMOUNT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

(If practicable, show separately amount of disposal credits applicable to acceptable finished product included on SF 1428.)

(Where the space provided for any information is insufficient, continue on a separate sheet.)

**SCHEDULE H - ADVANCE, PROGRESS AND PARTIAL PAYMENTS *(Item 19)***

| DATE | TYPE OF PAYMENT | AMOUNT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

(Where the space provided for any information is insufficient, continue on a separate sheet.)

**CERTIFICATE**

This is to certify that the undersigned, individually, and as an authorized representative of the Contractor, has examined this termination settlement proposal and that, to the best knowledge and belief of the undersigned:

(a) AS TO THE CONTRACTOR'S OWN CHARGES. The proposed settlement (exclusive of charges set forth in Item 14) and supporting schedules and explanations have been prepared from the books of account and records of the Contractor in accordance with recognized commercial accounting practices; they include only those charges allocable to the terminated portion of this contract; they have been prepared with knowledge that they will, or may, be used directly or indirectly as the basis of settlement of a termination settlement proposal or claim against an agency of the United States; and the charges as stated are fair and reasonable.

(b) AS TO THE SUBCONTRACTORS' CHARGES. (1) The Contractor has examined, or caused to be examined, to an extent it considered adequate in the circumstances, the termination settlement proposals of its immediate subcontractors (exclusive of proposals filed against these immediate subcontractors by their subcontractors); (2) The settlements on account of immediate subcontractors own charges are fair and reasonable, the charges are allocable to the terminated portion of this contract, and the settlements were negotiated in good faith and are not more favorable to its immediate subcontractors than those that the Contractor would make if reimbursement by the Government were not involved; (3) The Contractor has received from all its immediate subcontractors appropriate certificates with respect to their termination settlement proposals, which certificates are substantially in the form of this certificate; and (4) The Contractor has no information leading it to doubt (i) the reasonableness of the settlements with more remote subcontractors or (ii) that the charges for them are allocable to this contract. Upon receipt by the Contractor of amounts covering settlements with its immediate subcontractors, the Contractor will pay or credit them promptly with the amounts so received, to the extent that it has not previously done so. The term "subcontractors," as used above, includes suppliers.

NOTE: The Contractor shall, under conditions stated in FAR 15.403, be required to submit a Certificate of Current Cost or Pricing Data (see FAR 15.406-2 and 15.408 Table 15-2).

| NAME OF CONTRACTOR | BY *(Signature of authorized official)* | |
|---|---|---|
| McBride Construction Inc | [signature] | |
| | TITLE President | DATE 1/11/05 |
| NAME OF SUPERVISORY ACCOUNTING OFFICIAL | TITLE | |

Appendix A
Settlement Proposal Costs

| | | |
|---|---|---|
| **Legal - Stoel Rives** | | |
| 5/17/04 | 38634 | $ 255.86 |
| 5/17/04 | 38634 | $ 750.00 |
| 5/17/04 | 38634 | $4,175.00 |
| 5/17/04 | 38634 | $2,070.00 |
| 9/17/04 | 38947 | $6,566.17 |
| 9/30/04-11/30 | billed | $2,953.00 |
| **Joe Chapin** | | |
| 5/17/04 | 38632 | $ 854.00 |
| 6/16/04 | 38669 | $2,511.80 |
| 8/31/04 | 38878 | $ 653.15 |
| **Terry Kuenzi, CPA** | | |
| 5/31/04 | | $ 400.00 |
| **Landmark Surveying** | | |
| 4/30/04 | 38596 | $ 300.00 |
| **Trip to Powers jobsite w/ Joe Chapin** | | |
| Jacks Fountain 4/9/04 | | $ 23.00 |
| Fast Stop 4/9/04 | | $ 3.09 |
| Mileage, Dodge 1-ton 2004, diesel 432 miles x $ .375 per mile | | $ 162.00 |
| **Trip to Powers jobsite w/ D. Alexander** | | |
| The Fountain 4/21/04 | | $ 16.10 |
| Mileage, Dodge 1-ton 2004, diesel 432 miles x $ . 375 per mile | | $ 162.00 |
| **Trip to Bend to meet with R. McBride:** | | |
| The Riverhouse 4/3/04 | | $ 97.90 |
| The Riverhouse 4/4/04 | | $ 18.00 |
| The Pine Tavern Restaurant 4/3/04 | | $ 62.00 |
| Mileage 269 miles x $.375 | | $ 100.88 |
| **Trip to San Diego to meet with ICW:** | | |
| Comfort Inn 3/5/04 | | $109.34 |
| Alaska Airlines (coach) | | $476.40 |
| Alaska Airlines (upgrades) | | $200.00 |
| Casa de Pico | | $ 28.93 |
| Thrifty Parking (partial) | | $ 12.30 |
| National (partial) | | $ 38.47 |

| | | |
|---|---|---|
| Chevron (partial) | | $ 9.69 |
| Less cash back bonus from credit card (credit) | | -$ 34.68 |

Other mileage: Trips to FHWA, Stoel Rives, office supply store, ect.)

| | |
|---|---|
| Julie Clevenger 1,195 miles @ $.375 | $448.13 |
| Luther Clevenger 597 miles @ $.375 | $223.88 |

Outside Printing & Binding:

Photocopying

| | | |
|---|---|---|
| 3/26/04 | Office Max | $ 13.96 |
| 11/3/04 | Office Max | $ 559.10 |

Thompson-West

| | | |
|---|---|---|
| 4/30/04 | 38605 | $ 55.32 |
| 5/28/04 | 38652 | $171.50 |
| 7/29/04 | 38770 | $358.80 |
| 9/16/04 | 38929 | $171.50 |
| 10/19/04 | 39023 | $171.50 |
| 11/22/04 | 39089 | $171.50 |
| 12/12/04 | 39122 | $171.50 |

| Postage & Delivery: | Recipient | |
|---|---|---|
| 5/22/04 | Randy McBride | $ 3.95 |
| 3/27/04 | R. Alexander | $4.75 |
| 1/23/04 | Randy McBride | $ 1.65 |
| 1/20/04 | Land Mark Surveying | $3.85 |
| 3/27/04 | William Parsons | $6.30 |
| 9/4/04 | Joe Chapin | $23.38 |

Parking:

| | | |
|---|---|---|
| 5/19/04 | Portland | $1.50 |
| 5/19/04 | Portland | $1.50 |
| 5/24/04 | Portland | $1.50 |
| 3/18/04 | Smart Park | $1.90 |
| 5/18/04 | SmartPark | $6.80 |
| 5/18/04 | SmartPark | $2.85 |
| 5/17/04 | Smart Park | $6.80 |
| 5/17/04 | Smart Park | $12.00 |
| 5/20/04 | Smart Park | $3.80 |

Office Supplies:

| | | |
|---|---|---|
| 3/18/04 | Office Max | $10.67 |
| 3/25/04 | Office Max (credit) | -$ 2.69 |

| | | |
|---|---|---|
| 3/22/04 | Office Max | $41.94 |
| 3/25/04 | Office Max (credit) | -$27.96 |
| 1/12/05 | Office Max | $ 7.99 |

Food:

| | | |
|---|---|---|
| 5/17/04 | Paradise Bakery | $20.75 |
| 5/18/04 | Paradise Bakery | $28.00 |
| 5/19/04 | Paradise Bakery | $ 8.25 |

Telephone:

$ 4.29
$ 54.29

Photocopying, in-house: ( *the rate of $.10 is the same as the rate charged by FWHA*)

| | | |
|---|---|---|
| January 15 thru February 28: 166x $.10 | | $ 16.60 |
| March 2004. (Includes Surety Costs Proposal.) 1765 pgs x $.10 | | $176.50 |
| April 2004. 157 pgs x $.10 | | $ 15.70 |
| May 2004. 721 pgs x $.10 | | $ 72.10 |
| August 2004. 993 pgs x $.10 | | $ 99.50 |
| November 2004. Direct Costs Proposal. | 205 x $.10 | $ 20.50 |
| Db sided | 660 x $.15 | $ 99.00 |

Payroll: Settlement Proposal.

Julie Clevenger:
285.75 hrs @ $16.00 plus $573.11 in payroll costs $5,145.11

Luther Clevenger:
190. 5 hrs @ $42.00 plus $834.15 in payroll costs $8,835.15

Total $41,793.21

APPENDIX B

**TERMINATION FOR CONVENIENCE**
**CONTRACT # DTFH70-98-C-00027**

**REQUEST FOR PROFIT**
**AND**
**JUSTIFICATION FOR PROFIT**
**January 13, 2005**

**REQUEST FOR PROFIT**

White Buffalo Construction Inc. is requesting profit in the amount of $925,834.91. This sum is the amount that it would have made and is based on the difference between project costs and revenues on all major projects (over $50,000) commenced during the period of 1996 thru 2000. The average project profit is 47.45%.

We have calculated a total modified contract value of $1,951,180.00. Therefore, when we multiply our total contract value of $1,951,180.00 by our average project profit margin of 47.45% we obtain the sum of $925,834.91.

JUSTIFICATION FOR REQUEST FOR PROFIT

The FHWA failed to cooperate with the Contractor by not allowing the Contractor to commence work until September 15, 1998 and by not providing the required additional contract time due to the Contractor because of the late Notice To Proceed. The FHWA erred in its belief that the Contractor could not commence work on September 1, 1998 due to environmental restrictions.

The Contract states at C-12 in section 52.211-10 that ***"the completion date is based on the assumption that the successful offeror will receive the notice to proceed by September 1. The completion date will be extended by the number of calendar days after the above date that the Contractor receives***

*the notice to proceed, except to the extent that the delays in issuance of the notice to proceed results from the failure of the Contractor to execute the contract and give the required performance and payment bonds within the time specified in the offer."*

The contract was executed and the performance and payment bonds were timely tendered to the Contracting Officer (hereinafter CO). The FHWA did not issue a full NTP on September 1, 1998 and did not consider or give the Contractor the required additional time as mandated by the Contract. WBC was entitled to extensions of time that would have altered the interim completion date because of the late NTP. The FHWA erred in both the Cure Notice and the Notice of Termination for Default because the interim completion date of January 23, 1999 would have been extended because of the late NTP.

The contract contains environmental restrictions that prohibit commencement of work until September 15, 1998 for four of the ten sites on FDR 33 because clearing and grubbing was required at these sites. However, work could have started September 1, 1998 on six of the sites on FDR 33 but the FHWA did not allow this.

When he was asked why the NTP had not been issued Area Engineer Rettinger (hereinafter Rettinger) informed Project Superintendent Clevenger (hereinafter Clevenger) that there was no site where work could be performed due to contract environmental restrictions. Clevenger informed Rettinger that the contract allowed work to be performed without any restriction at MP 46.2. After Rettinger confirmed this he then informed Clevenger that he would not receive a NTP because he did not have an approved schedule. Project Engineer Aftab (hereinafter Aftab) told Clevenger to just submit another schedule and that they (the FHWA) would allow WBC to start on September 15. WBC was given a NTP dated September 15, 1998 even though WBC's schedule was still not approved.

Due to the failure of the FHWA to issue the NTP on September 1, 1998 WBC lost 25% of its work window for "wetted perimeter" work at MP 46.2. The days not utilized were dry summer days that were essential to completing the sub-grade work on FDR 33 prior to both the onset of the heavy rain season in late October and the first interim completion date of January 23,

1999. The Contractor had mobilized his equipment to FDR 33 MP 46.2 in anticipation of starting the work at that site on September 1, 1998.

The FHWA concealed from the Contractor the fact that it had discovered that the "excess" material that it had directed the Contractor to remove from MP 46.2 was actually needed at that site to complete the fill as shown in the drawings and as previously argued by the Contractor.

Rettinger informed Clevenger and Mark Heiberger (the survey subcontractor) that native material at MP 46.2 above the culvert inlet was excess material and would have to be excavated and hauled to a disposal site. WBC immediately began hauling the material to the disposal site. Eventually a Modification was agreed to adding another section of culvert at MP 46.2 under the assumption that this would allow on site use of the excess material and speed up the installation.

While this work was being performed Rettinger discovered that he was in error and that the material was actually needed at the same location at MP 46.2 for fill and that it should never have been removed. In fact, additional material would have to be hauled back to MP 46.2 to replace the material that was hauled way and to fill in the section of culvert that had been added.

When Rettinger discovered that the material being hauled away was actually needed at MP 46.2, he failed to inform WBC and he failed to correct his mistake. At the time of termination the FHWA was aware that Rettinger had mistakenly directed material to be hauled away and had entered into a Modification. The FHWA also knew that it was going to cost approximately $50,000 to correct this error but failed to take in into consideration and failed to take corrective action. The FHWA still required this needless and additional work of the Completion Contractor (hereinafter referred to as Tidewater) which was performed at WBC's expense.

The FHWA concealed from the Contractor that it had decided not to seek any extension from the permitting agencies to work in the "wetted perimeter". The FHWA deliberately misled the Contractor by informing it that the permitting agencies had refused to grant any extension. When the Contractor directly approached the permitting agencies and obtained permission from them to continue work the FHWA refused to allow the Contractor to continue

any installation and, instead, directed the Contractor to perform only winterization work and stopped all work at the culvert at MP 46.2.

WBC requested that FHWA obtain a time extension for the permits to work in water. Rettinger said it was too early and to wait until it was closer to the permit expiration date to make the request. When WBC again made the request Rettinger said that WBC had now waited too long. Rettinger's letter to WBC stated that they had consulted with the permitting agencies and an extension would not be granted. This letter was duplicitous and concealed the real truth – prior to the permit expiring FHWA had already decided not to seek any extension to the permit because they did not want WBC to continue on this project.

FHWA stopped WBC from working at the site one day before the permits actually expired thus depriving WBC of one day of time to work. At that time all culvert sections originally specified were installed and only the additional culvert section added under Modification was left uninstalled. Of course, this Modification had been based on the erroneous assumption made by Rettinger that there was an abundance of unneeded and excess material at this site which necessitated adding another culvert section in order to consume more material as fill. The additional culvert section was actually unnecessary and should have been deleted from the contract.

Clevenger decided to try to find a way to continue to work and went ahead and contacted the permitting agencies directly and easily obtained a one week extension to work. The extension was granted because the endangered salmon had not yet started their migration up the rivers. When FHWA was informed of the extension Rettinger chastised Clevenger for seeking an extension to "their" permit. After delaying for several days FHWA informed WBC that it could not perform any contract work during the permit extension and would only be allowed to "winterize" the site.

Several weeks later, on November 13, 1998, FHWA, in its Cure Notice, tasked WBC to obtain an extension to the permit to work in water even though by that time the endangered salmon were in the river and any extension was virtually unobtainable. The Cure Notice states that providing evidence that WBC can obtain a new permit which will allow "in-stream

work" after November 6, 1998 was key to WBC providing an acceptable written plan.

Prior to the permits original expiration date for sites on FDR 33 of November 1, 1998 CO Jacoby e-mailed Rettinger and said that they would not be applying for permit extension because they did not want WBC to complete the job. Also, before the permits expired another FHWA employee contacted Rettinger about obtaining an extension and was told by him in an e-mail that there he did not know why they would seek an extension of time since the Contractor (WBC) was not working and had not even started up his equipment that day. This was untrue and was a blatant fabrication.

The Contractor was highly concerned about the actions of Rettinger which appeared to be counterproductive and hindering the completion of the project. In an attempt to try to improve the situation Clevenger requested a meeting with the CO Parsons. CO Parsons informed Clevenger in this telephone call and in the meeting that he was unaware of any problems with the project and really had not heard much about it. CO Parsons stated that he would see that matters were investigated and straightened out. In fact, CO Parsons and other FHWA personnel had secretly started planning to terminate the Contractor.

The FHWA unnecessarily restricted the Contractor's operations by using the term "wetted perimeter" and defining areas within the "wetted perimeter" as any area which it arbitrarily determined could be reached by high water.

FHWA used the unusual term "wetted perimeter of any stream" to indicate areas which would be subject to the restrictions of the permit even though the permit and the permitting agencies use the term "in-water work". When asked, FHWA was unable to supply WBC with a clear definition of "wetted perimeter". However, in practice FHWA restricted the Contractor's operations in any area which it arbitrarily determined could be reached by high water. In the case of the critical repair at MP 46.2 the Contractor was prohibited after November 1, 1998 from working on installations in areas which were clearly well out of the stream including working on the fill at the top of the culvert. In fact, FHWA stopped **all** work at MP 46.2 culvert site after November 6. This stopped the Contractor from performing any more work at this location.

FHWA changed the term to "in-water work" in 1999 for the completion contract. This cooperation with the Completion Contractor significantly reduced the work area subject to permit restrictions and was not a benefit available to WBC.

The FHWA refused to address the changed condition at FDR 33 MP 46.7. This failure to act resulted in WBC incurring delays and additional costs due to the unstable overburden at the rock cut at MP 46.7. Multiple failures of the overburden at this site occurred after the first shot when the changed condition was evident. This significantly impeded the course and prosecution of the work and increased the costs to WBC.

Rettinger would not allow WBC to correct the large amount of unstable overburden at the rock cut at MP 46.7 stating that another contractor would do the work later after WBC's contract was over. Rettinger was steadfast despite the protests of Clevenger, USFS Siskiyou National Forest geologist Donna Mickley and a consulting geologist named Frank Toors who was hired by WBC. Both Mickley and Toors warned FHWA that slope failure was imminent and foreseeable and would occur as soon as the rainy season started within days or possibly weeks. There was no way that WBC or any other Contractor could complete the work as designed and yet the FHWA failed to take any action. In fact, the FHWA failed to act the entire time that WBC was on the project. As soon as the seasonal rains commenced multiple large slides occurred at this site which continued throughout the Winter and early Spring.

Rettinger required WBC to continue work at the rock cut despite the deteriorating safety conditions. Material was starting to slide down from the top at intermittent intervals on a daily basis and safety spotters had to be used. Work at MP 46.7 as well as equipment and traffic on FDR 33 servicing other ERFO sites was frequently halted in order to avoid falling dirt, rocks and other debris. Clevenger informed Rettinger that the falling material was a safety hazard and was causing significant delays to the entire project. Rettinger informed Clevenger that in order to prosecute the work without being delayed by the falling material he could excavate the overburden above the rock cut and remove it at his own cost. As the slumping overburden above the rock face extended well above and outside the original clearing

limits for the ERFO repair Rettinger required WBC to have the area surveyed and to submit a plan for removal. WBC finally ceased all work at MP 46.7 and the adjacent work below because of safety concerns just prior to being terminated.

As soon as WBC was terminated FHWA had Kerr Contractors and start removal of the slide. Within a week USFS Geologist Mickley met with FHWA and determined that conditions were unsafe and ordered FHWA to cease work and to prepare a re-design for the site at MP 46.7.

FHWA personnel entered into a conspiracy and told WBC, ICW and the completion contract bidders that there would be no changes or redesigns to the contract and that the work would be completed as per the WBC Contract. FHWA position was that the problems were caused by WBC and that the Completion Contractor would propose corrections or changes but that FHWA would not be providing them. This implied that any costs to make the corrections would have to be included in the completion contractor's bids and they were so informed by WBC's surety. In fact, FHWA had already commenced work on redesigning MP 46.7 as well as several other sites. As soon as the Completion Contractor started Rettinger negotiated a modification which essentially re-designed the entire project. It also paid the Completion Contractor to correct the changed condition at MP 46.7 even though these costs had been included in the Completion Contractor's bid to WBC's surety.

Clevenger made repeated requests for the FHWA re-designs but FHWA claimed that there were none despite evidence that they existed. WBC filed a FOIA action and the redesign for MP 46.7 was eventually provided and FHWA paid WBC's legal costs. Clevenger discovered later in discovery that there were additional redesigns for several other sites that were not provided in the earlier FOIA request. The FOIA Officer, Rettinger and others at FHWA conspired to withhold these documents from WBC despite repeated requests and FHWA's own FOIA policy.

The Contractor was notified in a telephone call from CO Jacoby in November 1998 that it would be terminated on December 1, 1998. CO Jacoby had proclaimed before the permit expiration that they did not want WBC back. True to her word WBC received from CO Parsons the Notice of

Termination for Default dated December 1, 1998. CO Parsons failed to make an independent decision concerning termination.

FHWA refused to address the small slump by the front gate at MP 47.25 which occurred because of the heavy rains and the over steep design. WBC notified FHWA verbally and by a letter and Rettinger wrote back directing WBC not to repair the slump. This inaction resulted in a small slide onto FDR 33. At that time minor work was required at this site so that we could continue to have access to the project. Rettinger directed that no work was to be done on this slide and it continued to enlarge until WBC was terminated approximately 20 days later. Kerr Contractors arrived on the project and immediately after WBC was terminated and was required to start emergency work on this slide. This work was performed at substantial expense to WBC. To finally correct the problem the cut slope at MP 47.25 was eventually laid back and riprap was installed – a major redesign by FHWA.

No payments were made by FHWA to WBC prior to termination. FHWA finally made a single payment to WBC's surety. This payment was calculated for CO Parsons by Rettinger and was less than half the amount of the progress payment previously calculated by Aftab prior to WBC's termination.

Under the Completion Contract FHWA relaxed specifications for Tidewater and sought and obtained relaxed environmental restrictions from other agencies. Under the Completion Contract work previously performed by WBC which had been deemed unacceptable prior to termination was accepted by FHWA without any additional work or modification by Tidewater. FHWA also paid Tidewater for additional quantities of work at several sites that they did not perform. CO Parsons recommended to WBC's surety that Tidewater be paid for work at WBC's expense under Tidewater's contract with the surety despite the fact that FHWA had already paid Tidewater for this same work under a contract modification.

FHWA would not accept the WBC blasting plan and, instead, required WBC to follow a FHWA recommended blasting plan which required multiple shots and resulted in oversize material on the second shot at the rock face. As a result of their actions FHWA bore responsibility for the additional costs.

CONTRACT #DTFH70-98-C-00027

TERMINATION FOR CONVENIENCE

REVISED SETTLEMENT PROPOSAL

&

ATTACHMENTS #A, B, C, D, E, F

October 16, 2006

Submitted by:

White Buffalo Construction Inc.
P.O. Box 1310
6653 Shaw Hwy SE
Aumsville, OR 97325
503-749-1861

# Table of Contents

Contractor's revised settlement proposal....................................page 1 - 19

List of attachments...........................................................page 20

Prior Settlement Proposal...................................................Appendix A
*Surety Costs dated March 19, 2004*
*Direct Costs dated November 2, 2004*
*Settlement proposal costs and request for profit dated January 13, 2005*

DCAA Audit Report.........................................................Appendix B

Estimate for Repairs Link Belt LS- 3400 Excavator.......................Appendix C

Estimate of Value of Link Belt LS- 3400 Excavator.......................Appendix C

Justification for Anticipatory Profit and a Summary
of Facts Supporting Bad Faith...........................................Appendix D

Settlement Related Legal Invoices.........................................Appendix E

Estimate of Cost to Repair 1996 Dodge Pickup.............................Appendix F

**WHITE BUFFALO CONSTRUCTION INC.**
**P.O. Box 1310**
**6653 SHAW HWY S.E.**
**AUMSVILLE, OR. 97325**
**ph# 503-749-1861**
**fax# 503-749-1684**

October 16, 2004

Ms. Elizabeth Firestone
Terminating Contracting Officer
Western Federal Lands Highway Division
Federal Highway Administration, USDOT
610 East Fifth Street
Vancouver, WA 98661-3801

RE: Termination for convenience of White Buffalo Construction Inc. FHA Powers project contract number DTFH70-98-C-00027. Revised Settlement Proposal – Request for Final Decision.

The following is White Buffalo Construction's revised settlement proposal in response to the DCAA audit report dated May 12, 2006. White Buffalo Construction (hereinafter WBC) incorporates by reference and includes as Appendix A its prior settlement proposal submissions:

1. Surety Costs dated March 19, 2004
2. Direct Costs dated November 2, 2004
3. Settlement proposal costs and request for profit dated January 13, 2005

The DCAA Audit Report dated May 12, 2006 is included as Appendix B.

The total net proposed settlement amount in the DCAA Audit Report is $896,596 before credit for $479,085 in prior payments. White Buffalo (hereinafter WBC) believes that there are settlement costs which have been excluded by the auditor and which should fairly be included in this settlement.

Please note that, at WBC's request, all questions, requests and responses during the audit process were required to be in writing. This method was followed by both parties throughout the audit process. Although the audit report includes some of the written correspondence, the auditor failed to include a number of other correspondence documents. There are arguments presented by White Buffalo that have been included in this audit report. However, some arguments have only been presented in part, while other arguments either have been completely mischaracterized in the audit report or are arguments which the auditor is aware that WBC has revised for one reason or another during the course of the process. In the spirit of settlement, WBC will not attempt in this document to correct or challenge every item in the audit record. WBC will instead

present its revised settlement proposal and, wherever it deems necessary at this time, correct misstatements of its positions.

**Direct Labor: Payroll and Taxes**

WBC requested (exclusive of the amount requested for Luther Clevenger which has previously been withdrawn and which we will discuss below) $128,478.00. The DCAA allowed $127,463.00 in pre and post termination payroll and taxes. The difference of $1,015.00 represents the payroll costs for WBC employee Jim Heigh which were not allowed by the auditor due to the fact that he felt that this post termination labor was unnecessary and unproductive. The DCAA did not question that WBC incurred these costs. (DCAA audit report pages 5 and 6, note #2).

The auditor includes WBC's response to Issue Resolution # 2 in the audit report. WBC still believes that the nominal cost for Mr. Heigh to be present on the project site overseeing WBC owned equipment and at the WBC project office in Powers, Oregon during the post termination period was a reasonable and prudent business decision and that the cost of such services should be reimbursed under the settlement.

The auditor comments that "*WBC did not have to leave its equipment onsite nor loan it for use by other contractors, but WBC did so for its own reasons*". In fact, this action by WBC was taken for two reasons. The first reason was cost. WBC was attempting to reduce costs and mitigate damages which continues to benefit both the government and WBC to this day. The cost of another contractor supplying the equipment and trucks for what was, at that time, necessarily a cost reimbursement arrangement, would have been much greater. This is due to the fact that another contractor would not have charged actual book costs for its equipment and trucks as WBC has been required to do under the termination. Rather, the other contractor would have used much higher commercial rates for its equipment and vehicles. Also, another contractor using its own trucks and equipment would have had to charge a considerable sum for additional mobilization and demobilization costs. These additional costs were never incurred in this instance due to the fact that WBC's equipment was already onsite. WBC's action in loaning its own equipment eventually resulted in a substantial savings for the government.

The second reason was time. WBC decided to loan its equipment due to the actions of FHWA that required that Kerr Contractors be present on the project site and ready to work by the very next morning. Although WBC had known for over a week prior to December 1, 1998 that it would be terminated, it did not know that FHWA was planning to bring in Tidewater Construction[1] on a cost plus basis at WBC's expense to perform what FHWA termed winterization work. WBC objected to the use of Tidewater for this work due to the relationship that Tidewater appeared to have with Rettinger. WBC immediately had its surety propose Kerr for this work because WBC had a history of working successfully with Kerr. The use of Kerr was subject to FHWA approval. WBC had only a few hours to establish Kerr onsite after FHWA finally approved Kerr with the FHWA condition that Kerr had to be onsite and present to work the next morning. As

---

[1] Tidewater later became the completion contractor for this project.

there were already multiple pieces of construction equipment and trucks already on site belonging to WBC and, as there was no time for Kerr to haul equipment to Powers and still meet the FHWA deadline, the obvious decision was for WBC to loan its equipment.

The auditor states that "*it would be unreasonable for an equipment rental company to charge a customer for constant monitoring of its rented equipment*". WBC is not an equipment rental company and it had never loaned almost its full complement of equipment to another contractor. The evening before Kerr was required by FHWA to start, and only minutes after WBC heard that FHWA had agreed that Kerr could go onsite, WBC turned over equipment costing hundreds of thousands of dollars to Kerr with only a handshake agreement between the two contractors. Time was in very short supply and there was no time for rental agreements, insurance certificates, bids or price agreements, or credit checks. It also was a reasonable business decision for WBC to dispatch an employee to assist Kerr and monitor the equipment as the project was in a remote area and Kerr was unaware of the condition of WBC's equipment and the scope of materials, fuel, parts, tools, and supplies onsite.

The termination for default did not stop WBC from incurring additional costs. Other post termination labor costs were supported by the audit. WBC believes that this cost is reimbursable under the settlement agreement and it requests reimbursement in the amount of $128,478.00 for Direct Labor: Payroll and Taxes which includes $1,015.00 it paid to its employee for work on this contract which was not supported by the DCAA audit report.[2]

The settlement proposal requested, and WBC has withdrawn, $39,283.00 for payroll and costs for work performed by Luther Clevenger in the direct labor category. However, in WBC's response to Issue Resolution #1, it is WBC's position that even though it concurs that the amounts disbursed to Luther Clevenger do not qualify as "allowable costs" under FAR 31.205-6, the government has an obligation to compensate it in some manner under this settlement for the efforts of Mr. Clevenger, "whether as payroll under a jury verdict approach or as profit".

## Other Direct Job Costs

WBC requested $128,343.00 and the DCAA Audit Report supported $94,523.00 in other direct job costs. The total amount questioned by the auditor is $33,820.00. From the amount that the auditor questioned, WBC has withdrawn the following items and is not requesting payment in the total amount of $2,159.56.

| | | |
|---|---|---|
| Liberty Northwest Insurance | withdrawn | $ 384.45[3] |
| Liberty Northwest Insurance | withdrawn | $ 68.28 |
| Liberty Northwest Insurance | withdrawn | ($ 4.29) |

---

[2] DCAA audit report appendix 1, page 33, WBC response to IR #1

[3] The first four withdrawn items in this section were withdrawn by WBC and reported to the auditor prior to his review.

| | | |
|---|---|---|
| Columbia Pacific | withdrawn | $ 100.00 |
| Landmark Surveying (math error) | withdrawn | $1,100.00 |
| OROSHA (fine) | withdrawn | $ 475.00 |
| Auditor's pre-term "low dollar items" | withdrawn | $ 36.12[4] |
| Total withdrawn items | | $2,159.56 |

WBC feels that the following items were unreasonably excluded by the auditor and should fairly be included in any settlement award:

| | | |
|---|---|---|
| Jed Peterson | Owner Operator | $1,843.25 |
| Burris Backhoe Service | Owner Operator | $5,152.50 |
| Mike McWilliam | 998 dozer rental | $3,753.53 |
| David Montgomery | Owner Operator | $1,921.25 |
| Joe Eisenhart | Owner Operator | $3,442.50 |
| Rick Koser | Owner Operator | $2,000.00[5] |
| | Total | $18,113.03 |

Again, the DCAA does not contest that these payments were made by WBC. However, he does choose to characterize them as unsupported. (DCAA audit report pages 8 thru12, note #4).

Vendors Jed Peterson, Burris Backhoe Service, Mike McWilliam, David Montgomery, Joe Eisenhart, and Rick Koser all provided equipment and or dump trucks and labor on this project and the auditor acknowledges that there is some evidence that supports these costs. (page 11, e(1). The auditor comments in e (1) that only the government log for October 1998 was "present for his review". All government inspection logs covering the entire pre-termination period which were previously turned over to WBC by FHWA were present at the audit site for DCAA review during the entire duration of the audit (3 weeks). Also present for review were the dailies and all other project/contract documentation. WBC offered 19 boxes of documents and 7 boxes of accounting data at audit. Unfortunately, the auditor waited until the last day of the audit to review the contents of most of these boxes. The auditor had the option of making a written request either at the time of the audit or some later date for copies of inspection reports and dailies (as he did for other items) and he failed to do so. A general inventory of the boxes was compiled by Stoel Rives prior to audit review and it lists daily records (dailies) and logs in several boxes.

WBC did respond to the auditor in its response to Issue Resolution No. 11.[6] Cancelled checks were issued to these owner operators by WBC within a month before or after the termination date. Project records compiled by FHWA and WBC which monitored the work include references to these vendors and were available to the auditor for review and

---

[4] The auditor fails to explain why this small amount has been questioned. However, in order to facilitate the settlement process WBC will agree to withdraw it.

[5] Because the check was dated 12-9-98, the auditor classifies this payment as "post-termination" however the work paid for was performed prior to termination.

[6] DCAA audit report, page 33, WBC response to IR#11.

request. Additionally, WBC did not have any other business operations other than the subject contract during this period in the geographic area of southwest Oregon. Finally, none of the vendors questioned have ever been engaged by WBC at any other time except on this project. The auditor had access to several years of WBC's general accounting & financial records compiled both before, during and after 1998, and none of these vendors appear in these records in any other context other than for this project.

There is ample evidence that these costs are reimbursable under the settlement agreement. FHWA does have all of the documents and can easily verify that these vendors were working on the project. WBC requests reimbursement in the amount of $18,113.03 for sums it paid to the aforementioned owner operators for work on this contract.

WBC is also requesting reimbursement under the settlement agreement for the following three costs which were not supported by the auditor under the other direct job costs item:

| | | |
|---|---|---|
| Stoel Rives | *McBride Legal Costs* | $3,116.84 |
| Landmark Surveying | *Subcontractor, extra work* | $1,085.00 |
| Landmark Surveying | *Subcontractor, extra work* | $1,017.00 |
| Landmark Surveying | *Subcontractor, legal expenses* | $1,272.24 |
| Landmark Surveying | *Subcontractor, contract work* | $7,056.00 |
| Total | | $13,547.08 |

The cost in legal fees and expenses in the amount of $3,116.84 for Stoel Rives is a reimbursable cost under the settlement. The auditor did not support this cost. In the audit report, Note 4, the auditor indicates that he will discuss the requested McBride legal costs in Note 4, (6). However, when this reference is reviewed it is apparent that he (the auditor) is discussing another item entirely[7]. Therefore, WBC has no clarification as to why the legal fees, in this instance, have not been supported. One of the key arguments that the auditor has employed in questioning all of WBC's legal costs and expenses for settlement in the audit report is rendered moot in this case due to the fact that unredacted copies of these billings were included for review in WBC's direct cost proposal dated 11-2-2004.

WBC incurred this cost in litigation with subcontractor McBride as a direct result of the termination. When the government terminates a contract, the prime contractor not merely "may", but instead must "[s]ettle outstanding liabilities and proposals arising out of terminations of subcontracts". FAR 49.1049(g). See also FAR 49.108(1) ("Upon termination of a prime contract, the prime contractor and each subcontractor are responsible for the prompt settlement of the settlement proposals of their immediate subcontractors"); FAR 49.108-2(a) ("[T]he prime contractor shall***terminate all subcontracts to the extent that they relate to the performance of prime contract work terminated.")

[7] DCAA audit report, page 11, note 4(6)

The termination expenses which a prime contractor may recover include the reasonable cost of terminating subcontracts. FAR 49.108-3. The TCO must, in considering the reasonableness of subcontractor expense, apply the same FAR standards that apply to pricing the settlement amounts for the prime contract. FAR 49.108-3(c). Recoverable costs include fees expended in procuring attorneys' services. FAR 31.205-33.

Prior to termination, Landmark Surveying, a subcontractor on the project, performed extra work above and outside the original scope of work in the amounts of $1,085.00 and $1,017.00 which sums WBC paid to Landmark in two separate payments after termination. The auditor states that, since the "extra work" is for work performed in replacing and re-staking several times at MP 46.2 and 46.7 and "including changes in the design", that this work should not be considered "extra work" due to the fact that MP 46.2 and 46.7 are locations within the original scope of work. He also questioned the amounts requested for extra work because he determined that the subcontract agreement does not require WBC to pay Landmark for work which was outside the original scope of work unless "the owner (i.e., the government) adjusts the contract price". [8]

There is no requirement that there be a specific agreement for the extra work. It is enough if there was, in fact, extra work. In the instance of extra work, FAR subpart 43.2 pervasively, and FAR 52.243-1 in particular for Fixed Price Contracts, require the government to pay through equitable adjustments for changes the government causes in the work. Whether a government change is formal or constructive, increased costs flowing from a change are compensable. *Sauer v. Danzig*, 224 F2d 1340, 1348 (Fed Cir 2000).

Both WBC and FHWA were aware that Landmark performed extra work at MP 46.2 and 46.7. In fact, WBC acted in a fair manner by compensating Landmark for its work. As stated in much greater length in WBC'S response to Issue Resolution No. 8, the extra work that Landmark performed was outside the original scope of work. This was due to defects in FHWA's design which were ultimately corrected and redesigned by FHWA after termination but before the completion contract was commenced. However, at the time that Landmark performed this extra work, FHWA was still insisting that WBC was responsible and was directing WBC to provide a redesign to FHWA <u>at its own cost</u>. WBC had no other option but to comply and incur this cost. Furthermore, FHWA utilized the extra work that Landmark performed by partially basing its redesign upon Landmark's work. When the FHWA caused such changes and, indeed, benefited from such "extra work", both WBC and Landmark became entitled to an equitable adjustment. Under the settlement WBC is requesting reimbursement for sums paid to Landmark Surveying for extra work in the amount of $2,102.00[9].

The auditor also questioned WBC's request for reimbursement for $1,272.24 in legal fees incurred by subcontractor Landmark Surveying. In a convenience termination, the contractor is obligated to settle with subcontractors. WBC believes that it properly

---

[8] DCAA audit report page 10, Note 4(4b)
[9] $1085.00 plus $1017.00 questioned by DCAA audit report. (note 4).

reimbursed Landmark for this expense after the termination was converted and that it, in turn, deserves reimbursement for FHWA under the settlement.

Landmark incurred its legal expenses after termination in its attempts to receive payment. The auditor states that he "*questioned the legal and profession fees because they are for Landmark's collection efforts, and since the government did not cause this expense and does not have privity with the contract between WBC and Landmark, we believe the government should not have to pay for these costs*".[10] *(emphasis added)* In fact, the actions taken by FHWA in terminating WBC as well as by failing to make any attempt whatsoever to compensate WBC for its work for a period of nine months[11], had a direct impact on Landmark and created a situation in which Landmark reasonably chose to seek legal help.

The audit report also questions the difference between what the auditor terms an 85% completion paid by WBC to Landmark for contract work and the arbitrary figure of 50% completion[12] which he (the auditor) supports[13]. The auditor states that he is using a judgmental completion percentage of 50% but that there is "*significant doubt as to the actual percent of completion*". The auditor goes on to state that he was "*unable to identify a February 22, 1999 internal FHA memorandum in our audit file that shows 50 percent completion; however, we used 50 percent to calculate questioned costs*"[14]. After the termination was converted, WBC and Landmark engaged in negotiations and agreed upon a settlement amount. WBC then properly paid Landmark the agreed upon sum. In its response to Issue Resolution No.8, WBC wrote that the "*contract artificially manipulates the amount due for the surveying pay item. It links the percentage to be paid for surveying on any pay estimate to the percentage of the total amount paid to date for the contract*". This was written in response to the auditor's initial conclusion that the surveying was only 25% complete. [15]

Now comes the audit report which arbitrarily supports a 50% (see above) completion percentage to the base subcontract which sum is based upon a document that he seems to be saying that he is now either unable to find or otherwise identify. However, he ignores the relevant issue which is "*following a termination for convenience, the contractual relationship converts to a cost-reimbursement contract. The contractor is entitled to recover the costs if incurred.*"[16] WBC determined that Landmark had installed slope, center line, and clearing limit stakes on all road sections except the Rock Creek Bridge section and had completed the cross sections and staked the majority of the culvert pipes. Volumes using measured cross section data and design criteria had been calculated and

---

[10] DCAA audit report page 10, paragraph (c).

[11] A period of 9 months: September 1998 thru May 1999 when pay estimate 1 was issued. WBC argues that even this pay estimate was defective and was for a grossly reduced amount.

[12] DCAA audit report page 10, 4(c).

[13] DCAA audit report page 12, note 4, paragraph e(4).

[14] DCAA audit report page 12, note 4, paragraph 3(4).

[15] Issue resolution 8, page 2, paragraph 3.

[16] WBC response to Issue resolution 8, page 2, paragraph 3.

notes submitted and accepted by FHWA. WBC requests that $7,056.00 that it paid to Landmark and which was unsupported by the auditor be included in this settlement .[17]

When WBC responded to Issue Resolution #8, it notified the DCAA that Landmark had advised WBC that it should have included interest in its claim and that a request for interest would be made. Under FAR standards, the only interest expense for which recovery is not required is money expended as a cost of the contractor itself borrowing funds. In particular, FAR 31.205-20 limits recovery only of interest on borrowings to raise capital as opposed to interest payments generally. Lockheed v Widnall, 113 F3d 1225, 1227 (Fed Cir 1997). Consequently, since the "interest" requested by White Buffalo for Landmark was not for borrowings to raise capital, those costs are recoverable.

The following is WBC's additional request for interest on the total sum of $19,238.00 paid to Landmark for contract work and extra or additional work for the period beginning December 1, 1998 thru March 9,1999 interest calculated at the published post judgment interest rate. WBC is also requesting interest for Landmark on the balance of $13,113.00 from March 10, 1999 thru January 20, 2004 interest calculated at the published post judgment interest rate. The total amount requested for interest for Landmark is $2,415.00. Rates for interest claimed were obtained by visiting the following web site address: http://www.utd.uscourts.gov/documents/judgpage.html

WBC withdraws its previous request for $128,343 for Other Direct Job Costs and requests $128,598.08 for settlement.

| | |
|---|---|
| Amount supported for ODJC by DCAA audit report | $94,523.00 |
| Amounts paid to owner operators | $18,113.00 |
| Legal costs paid to Stoel Rives LLP for subcontractor McBride | $ 3,116.84 |
| Amounts paid to subcontractor Landmark for extra work | $ 2,102.00 |
| Amounts paid to Landmark for contract work | $ 7,056.00 |
| Amount paid to Landmark to reimburse it for legal expense | $ 1,272.24 |
| Request for interest for Landmark | $ 2,415.00 |
| Total ODJC | $128,598.08 |

**Equipment, Vehicle, Fuel**

WBC proposed a total of $34,207.00 in equipment, vehicle and fuel costs and the auditor supported $26,985.00. WBC withdraws its prior request for $34,207 and hereby requests a total of $26,985.00 for Equipment, Vehicle, Fuel settlement.

**Other Equipment/ Vehicle Costs**

WBC proposed $84,623 and the audit supported $65,808 for other equipment and vehicle costs. The audit questioned costs for repairs to equipment that have not been performed

[17] There was a math error of $1100.00 in the payment to Landmark which WBC has previously withdrawn from this settlement.