as well as owner labor for repairs that were made on the service truck crane. The auditor does not dispute that the damage to the LS-3400 excavator and the theft of the truck tires occurred.

The audit also does not dispute that Luther Clevenger performed the labor to repair the crane on the service truck which was damaged. However, the auditor does not agree that either WBC or Mr. Clevenger should receive any compensation for this labor under this settlement agreement, either through direct reimbursement or by additional profit. In this instance, due to the fact that Mr. Clevenger was never directly paid payroll by WBC for this crane repair, WBC must reluctantly withdraw its request for $155.00 for crane repair labor. As discussed in the prior section of this document dealing with payroll and taxes, and in WBC's response to Issue Resolution #1, it is WBC's position that the government has an obligation to compensate it in some manner under this settlement for the efforts of Mr. Clevenger, whether as payroll under a jury verdict approach or as profit.[18]

The equipment repairs to the LS-2400 excavator and the 8 stolen truck tires were questioned in the audit report "*because there is no certain evidence that these costs will be incurred*".[19] The audit report ignores the very obvious fact that, as soon as the damage or loss occurred, the costs of such damage or loss were incurred by WBC. The amount of loss or damage experienced by WBC, and the reasonableness of any reimbursement to WBC for its losses, is unaffected by whether or not the damage is ever repaired. The amount of loss is measured in the diminished or lost value of the property or asset and commonly is quantified by the cost to replace the item or repair it to a pre loss condition.

In the course of performing excavation work on this project, White Buffalo employed its LS-3400 Link Belt crawler excavator. When White Buffalo brought the LS-3400 excavator to the project, it had a replacement value of $27,500.00 and a copy of the appraisal is attached in Appendix C. After the LS-3400 excavator was employed on the project, it would have cost $ 32,738.77 to restore the LS-3400 excavator to the condition it was in prior to being used on the project and a copy of the estimate for the repairs is attached in Appendix C. The salvage value of the LS-3400 excavator was $2,500 in 1998 which shows a loss of $25,000 which is the amount that is requested by White Buffalo in the revised settlement proposal. WBC hereby withdraws its previous request for $17,500 for damage to the LS-3400 excavator and, instead requests $25,000.00 under this settlement.

Under the Federal Acquisition Regulation, loss of useful value through use of contractor's equipment is compensable. 1 K. Manos, Government Contract Costs and Pricing, sec. 49:B:3 at 502-03 (West 2004). In particular, loss of useful value is not limited to special tooling, special machinery, or test equipment, but may also include general purpose tooling and equipment. *Southland Manufacturing Corp.*, 75-1 BCA P 11,272 at 53,735 (ASBCA 1975). See also *Metered Laundry Servs., Inc.*, 78-2 BCA P 13,451 at 65-727-28 (ASBCA 1978).

---

[18] WBC response to Issue Resolution #1.
[19] DCAA audit report page 14, note 6 (a).

There also is no requirement under the FAR that, in order to recover from the government for consumption of equipment's useful life, a contractor must have first expended monies to restore the useful life which has been consumed on the project. In *American Electric, Inc*., 76-2 BCA P 12,151 at 58,482-83 ( ASBCA 1976), the Board rejected the government's argument that a contractor was entitled to recover loss of useful value only if the costs had been charged directly to the client prior to its termination.

In its prior settlement proposal WBC requested $1,160.00 for used value replacement for 8 stolen truck tires that were stolen after the termination and after WBC's employee Jim Heigh was removed from the project by Rettinger. The auditor failed to support any reimbursement for WBC for the lost tires. As discussed above, the auditor believes that WBC has not actually sustained a loss unless and until it (WBC) replaces the items that were stolen.[20]

Because the tires had sustained some use at the time that they were stolen WBC could not ask for new replacement cost for the tires. In November 2004 WBC consulted Les Schwab Tire Center and established a value for the tires of 85% of new replacement cost. In October 2006 WBC again called Les Schwab and determined that today the cost of 8 new tires ranges from $2,272.00 to $2,644.00. WBC feels that $1,160 is a reasonable request and requests reimbursement for $1,160 for the stolen tires.

WBC hereby withdraws $84,623 that it previously proposed for Other Equipment and Vehicle Costs and, instead, requests reimbursement under the settlement for $91,968.

| | |
|---|---|
| Amount from prior proposal supported by audit report | $65,808 |
| Value of damaged excavator Link Belt LS-3400 | $25,000 |
| Value of 8 stolen truck tires | $ 1,160 |
| Total requested Other Equipment/Vehicle Costs | $91,968 |

**Surety Expense**

WBC requested $276,768.00 for surety expenses and the auditor supported $261,646.00. The difference, $15,122.00, is the interest that the surety has charged WBC. It is the position of WBC that surety interest expense is a cost for which it should legitimately be reimbursed in the settlement. [21] In its response to Issue Resolution #7, WBC states that fair compensation includes reimbursement for amounts it has paid to its surety. In Issue Resolution No. 4, the auditor asserted on July 7, 2005 that he would question "interest expense in its entirety." The auditor also challenged interest due the surety. WBC responded with Federal Circuit authority holding the limitation is only on interest on borrowings to raise capital as opposed to interest payments generally. The auditor has

[20] DCAA audit report page 14, note 6 (a).

[21] DCAA audit report, page 22, WBC response to IR #7

failed to concede his error and has continued to claim that the interest incurred with the surety (ICW) is interest on borrowings[22].

After the termination for default WBC was bound to indemnify its surety (ICW). ICW, an insurance company, insured WBC and indemnified it against any liabilities to third persons. The fact that WBC eventually reimbursed ICW for the bulk of its expenses after the termination for convenience does not make the financial arrangement between WBC and ICW a loan nor do the sums paid constitute "borrowings". Under FAR standards, the only interest expense for which recovery is not required is money expended as a cost of the contractor itself borrowing funds. In particular, FAR 31.205-20 limits recovery only of interest on borrowings to raise capital as opposed to interest payments generally. Lockheed v Widnall, 113 F3d 1225, 1227 (Fed Cir 1997).

Consequently, since the "interest" requested by White Buffalo for its surety was not for borrowings to raise capital, those costs are recoverable. It is the position of WBC that interest expense incurred through its surety relationship is an allowable cost. WBC requests a total of $276,768.00 for surety expense under this settlement and does not concur with the audit report that $15,122.00 for surety interest should be unsupported.

**G&A Expense**

WBC requested $ 47,376.00 for G&A expense and the auditor supported $28,183.00 of this amount. WBC hereby withdraws its request for $47,376.00 and requests $28,183.00.

**Subcontractor[23]**

WBC's subcontractor, McBride, originally requested $105,796.00 as its (McBrides's) share of the settlement. During the audit and after negotiation with WBC, McBride decreased its request from $105,796.00 down to $ 39,222.35. The auditor supported the sum of $29,528.00. The difference between what McBride wants under the settlement and what the auditor supported is $9,694.35.

McBride has requested $29,528.00 for work performed plus $9,694.35 for interest for a total of $39,222.35. WBC's position is that it has an obligation to present McBride's settlement proposal in its entirety. An examination of McBride's stated calculations for interest of 77 months at an annual rate of 4.52% gives a different product of $ 8,564.11. However, the number of months which elapsed from the date of termination to the date of the audit report is actually 89 months. When you recalculate by multiplying the number of 89 months times the requested interest rate, the new product is slightly greater than the amount that has been requested by McBride.

Under FAR standards, the only interest expense for which recovery is not required is money expended as a cost of the contractor itself borrowing funds. In particular, FAR 31.205-20 limits recovery only of interest on borrowings to raise capital as opposed to

[22] DCAA audit report page 18, Note 7(e)

[23] We have ddressed this item out of its original order in the DCAA audit report.

interest payments generally. Lockheed v Widnall, 113 F3d 1225, 1227 (Fed Cir 1997). Consequently, since the "interest" requested by White Buffalo for McBride was not for borrowings to raise capital, those costs are recoverable.

WBC is requesting $39,222.35 for subcontractor McBride's settlement.

**Prior Payments**

WBC agrees that the government should receive full credit under this settlement for all prior payments that it has made. WBC agrees with he auditor that those prior payments total $479,085.00.

**Profit**[24]

In its January 2004 settlement proposal, WBC requested $925,835 for profit based upon a modified contract value of $1,951,180 multiplied by its historical job profit margin of 47.45%. This amount represents profit on work (including extra work) that WBC performed as well as the profit on the work the WBC would have performed if not for the termination for default and the bad faith of the government. The audit report supported a profit amount of $253,211.

The FHWA has stated, from the outset, that it would fully consider all information submitted by WBC on all issues including the lost profit issue. WBC has seen no analysis of the facts by FHWA as to whether or not WBC is entitled to lost profits on uncompleted work.

As discussed at our last meeting, WBC has included in more detail its justification for anticipatory profit and a summary of the facts supporting bad faith with this revised settlement proposal. This justification is part of this revised settlement proposal and can be found in Appendix D.

WBC continues to believe that the profit calculation is proper. However, a credit should be given to the government for two items dealing with unallocated costs which WBC requested elsewhere in this revised settlement proposal. Those items are G&A in the amount of $28,183 and Equipment/Vehicle/Fuel in the amount of $26,985. Therefore, WBC is adjusting its request for profit under this revised settlement proposal by deducting the amounts of $28,183 and $26,985 and is hereby requesting the revised sum of $870,667 for profit.

**Settlement Costs**

WBC requested $41,793 for settlement expenses through January 13, 2005. However, the auditor supported only $9,249 in settlement expenses. The difference is $32,544 and, of that sum, WBC has withdrawn $1,593.90 for a math error. The auditor refused to support

[24] In the DCAA audit report the section "Profit" follows "G&A Expense".

the requested costs for settlement attorney fees paid to Stoel Rives in the amount of $16,770, first class airfare upgrades for WBC employees in the amount of $200.00, and the cost of payroll in the amount of $13,980 (all settlement payroll was questioned) which was paid to WBC employees Luther and Julie Clevenger for settlement related labor. [25]

The auditor opines that "WBC's job cost records for the proposed payment total up to one number; the claim proposes another number; the altered copies of invoices from WBC's attorneys total up to a third number". [26] In fact, the auditor is aware that WBC has costs in its job cost records which it has not claimed under this settlement. Also, it should be pointed out that WBC's records pertaining to settlement expenses which include its settlement legal expenses have never been kept in the job cost records file. The title of the job cost records file is "FHA, Powers FDR 33". Settlement expenses are maintained, and have been maintained since they started to accrue in January 2004, in a completely separate file in WBC's records titled "FHA, Powers Settlement" and are not co-mingled with the job cost records. In fact, there are numerous and much larger legal expense entries in the "FHA, Powers FDR 33" job cost file dealing with the termination for default and the current case with the Court of Claims which the auditor has reviewed and referenced, but those entries do not relate to this settlement agreement and are not part of this request. Given these circumstances, whether or not these unrelated non-settlement legal expenses total the same as the legal expenses requested in the January 13, 2005 settlement proposal (they do not) is immaterial.

The auditor questioned the entire amount proposed for legal expenses on the basis that he personally was not permitted to inspect the original invoices. He also failed to properly consider the fact that provision of copies redacted to remove confidential matter was endorsed by the Court of Federal Claims in *White Buffalo, Inc. v. United States* , 52 Fed Cl 1, 13 (2002). In its response to Issue Resolution No. 6, WBC states that it feels that the auditor's demands are unreasonable, but that it wishes to cooperate with the TCO in evaluating the proposed legal expenses. WBC also offers, without a waiver of any privilege, to make available to government counsel, Mr. Tim Binder, original unredacted legal invoices.[27] It is the position of WBC that the government is obligated to reimburse it for its settlement related legal expenses under this settlement.

Prior to turning over the legal invoices at audit, WBC determined that it wished to provide the auditor with the additional invoices for settlement legal expenses which were incurred after the January 13, 2005 settlement proposal and which it also claims[28]. WBC realized at that time that there were some costs which needed to be removed from the invoices as well as some billing entries which violated the principles of privileged communication between attorney and client. A few of the invoices were redacted to remove privileged material and non settlement related entries and the invoices were provided to the auditor. These additions and changes obviously changed the total

---

[25] DCAA audit report page 25, note 10(c).
[26] DCAA audit report page 33, issue Resolution No. 6.
[27] DCAA audit report, page 33, response to Issue Resolution No 6.
[28] WBC is including all of its settlement expenses with this revised settlement proposal.

amounts requested in the January 13, 2005 settlement proposal. Finally, WBC typically pays its invoices from Stoel Rives with one check that serves as total payment for all legal matters invoiced during that billing period.

In rejecting the entire fee request without allowing review by government counsel, the auditor failed, as required by DCAM ¶ 1-504.5a, to make reasonable efforts to resolve record access problems in a timely manner at the lowest DCAA and contractor management levels. The invoices that had not been redacted were available to the auditor in their entirety. Additionally, WBC expressly offered the unredacted copies of the redacted invoices for review by government counsel. In conclusion, there is nothing reasonable, fair, or objective in the auditor's complete denial of legal costs and fees in these circumstances.

Legal expenses have continued to accrue during and after the audit including a substantial amount for dealing with this very issue. Therefore, in this revised settlement proposal, WBC wishes to request all of its settlement related legal fees as well an estimated amount for anticipated legal expense through and until the TCO has rendered a final decision on the settlement amount. WBC wishes to withdraw its prior request of $16,770.03 and, instead, requests a new total of $79,265.68 for settlement related legal expense. This sum includes $75,765.68 in expenses already invoiced and $3,500 in estimated legal expense through the date of the TCO's final decision. WBC asked Stoel Rives LLP to review all invoices, whether redacted or not, and to make any additional corrections or clarifications so that all parties to this settlement could access the data without violating any privleged communications. Copies of these invoices are included in Appendix E.

The auditor failed to support any portion of the $ 13,980 in payroll costs requested in January 2005 for Luther and Julie Clevenger to prepare and work on this settlement even though it was demonstrated at audit through cancelled checks, pay stubs, and time cards that this payroll had been paid to these employees during 2004 and 2005. In the opinion of the auditor, it was appropriate to question all owner labor costs, wherever found in the settlement proposal, because "*WBC does not pay wages or salary to its owners "so consistently as to imply, in effect, an agreement to make payment" as required by FAR 31.205-6.*"[29] The auditor equates all payroll costs for both Luther and Julie Clevenger that are requested under the settlement proposal with the specific request that WBC initially made, and subsequently withdrew, for payroll earned in 1998 and later paid in 2004. WBC, however, has never withdrawn its request for payroll paid to Luther and Julie Clevenger for work associated with the settlement proposal.

In this case the payroll was paid and time records were kept. For example, in the period commencing January 2004 (the month of conversion) and ending May 15, 1005 (just prior to start of audit) WBC paid Luther Clevenger a total of $153,651.00 in direct payroll exclusive of his benefits such as health insurance and pension. This period was not covered during the audit. The sums paid to Mr. Clevenger included the $ 39,283 paid to Mr. Clevenger in 2004 for work performed on this project in 1998 and discussed elsewhere in this document.

[29] DCAA audit report page 6, note 3(a).

All wages requested under this settlement have been paid to the referenced employees and were incurred in working on the settlement. It is reasonable for WBC to receive reimbursement under this settlement for payroll and costs paid to employees working on the settlement.

In its settlement proposal dated January 13, 2005, WBC requested $8,835.15 for payroll costs for Luther Clevenger and $5,145.11 for payroll costs for Julie Clevenger for a total of 13,980.26. Since that date, WBC has incurred an additional $21,993.82 in payroll expenses for three employees to prepare for audit, respond to auditor's requests, prepare for and attend audit, prepare for and respond to draft audit report and telephone exit interview, review and respond to audit report, attend and conduct meetings with legal counsel, and government personnel and compose this revised audit report. These are payroll costs that have been incurred and paid. Finally, WBC estimates that it will incur another $2,500.00 in settlement related payroll costs through the date of TCO final decision.

The auditor also failed to support the $200.00 requested in first class airfare upgrades stating that airfare in excess of standard or coach airfare is unallowable. [30] It is WBC's position that the auditor's interpretation of FAR 31.205-46(b) is flawed and that, in this instance, this is an allowable cost.

At this time WBC is requesting below other and additional miscellaneous additional settlement costs that either were incurred after January 13, 2005 or which were otherwise not requested in its settlement proposal dated January 13, 2005 and which are primarily associated with the costs of audit. Those costs are:

| | |
|---|---|
| Thompson West (Westlaw) subscription, February 2005 through October 2006 | $3,670.39[31] |
| Parking fees for audit and other appointments | $ 102.26 |
| Mileage, audit, 1,812 x .375 | $ 679.50 |
| Mileage, other, 1452 x .375, (trip to Powers and other appointments) | $ 544.50 |
| Food, audit | $ 258.44 |
| Lodging, audit | $ 147.38 |
| Clerical supplies (blank writable cd disks) | $ 8.45 |
| Photocopy, audit, 1485 x .10 | $ 148.50 |
| Photocopy, audit, 336 x .15 | $ 50.40 |
| Photocopy, audit, color copies | $ 70.08 |
| Photocopy and binding | $ 415.52 |
| Laptop, Hewlett Packard | $1,899.99 |
| Additional licensed copy of accounting program | $ 198.00 |
| Damage to 1996 Dodge pickup | $3.638.55 |
| Rental vehicle replacement for pickup during repairs, 1.5 weeks | $ 600.00 |
| Subtotal additional miscellaneous costs request | 12,431.96 |

[30] DCAA audit report page 25, note 10, C (2).

[31] Monthly charges will continue to accrue at the rate of $192.70 per month until TCO final decision.

WBC purchased a laptop computer and another licensed copy of its accounting software for use in composing its settlement proposal and conducting the audit. This computer and software was used for numerous meetings and throughout the audit.

The requested damage to the 1996 Dodge pickup is for damages to this vehicle which occurred during project work and prior to termination. A copy of the repair estimate has been attached in Appendix F. Since the repairs will necessitate a 1.5 week period where WBC will lose the use of this vehicle, WBC is requesting an amount to pay for a rental replacement. The weekly cost is $400.00 per week from United Rental for a ¾ ton pickup with 4 wheel drive and a towing package.

WBC requests a total of $137,120.46 in settlement costs discussed in this section titled "Settlement Costs" for the following amounts:

| | |
|---|---|
| Amount supported by auditor from January 13, 2005 proposal | $ 9,249.00 |
| All settlement related payroll for WBC employees | $38,473.82 |
| All settlement related legal expense invoiced | $75,765.68 |
| Estimated additional legal expense thru date of TCO final decision | $ 3,500.00 |
| Airfare first class upgrades | $ 200.00 |
| Additional miscellaneous costs (see above) | $12,431.96 |
| Total request section "Settlement Costs" | $139,620.46 |

This sum includes the amount previously requested on January 13, 2005 of $41,793.21 less the math error of $1,593.90. The math error is has been withdrawn by WBC from its proposal.

**Interest**

WBC is entitled to interest under the Prompt Payment Act, 31 USCA 3902, for the amount earned under the pay estimate which was prepared and approved by Project Engineer Aftab in November 1998 but which was never finally approved by FHWA and paid to WBC. As discussed in WBC's justification for anticipatory profit found in Appendix D, this pay estimate was far greater than the pay estimate which was eventually prepared by Rettinger in May 1999 and paid to the surety ICW[32].

At the time that the unpaid November 1998 estimate was prepared, Rettinger first refused to allow payment because he would not allow Aftab to give Clevenger one of the signed Daily Record of Miscellaneous Items[33] which were required and had to accompany the pay request. Rettinger then refused to process the pay estimate because WBC did not have an approved schedule.[34]

[32] FHWA retained approximately 50% of this estimate for liquidated damages which it refunded to WBC, along with interest, in January 2004.

[33] Clevenger was forced to later obtain this document through a FOIA request.

[34] Although WBC submitted several schedules and even hired a scheduling consultant, it was unable to get any schedule other than its base line schedule approved by Rettinger.

WBC requests that interest be granted to it under this settlement on the amounts which were earned and approved in November 1998. The interest should start at the date of termination and should run until payment is made to WBC. However, the government should receive a credit and should deduct the interest it previously paid to WBC along with the withheld liquidated damages in January 2004.

**Conclusion**

In general, the audit report is erroneous in several respects and fails to follow applicable law. A threshold problem is the relationship between what the FAR commands be done in settling terminations for convenience and the DCAA Contract Audit Manual ("DCAM") directive in such cost settlements. DCAM ¶ 12-104a states that the "contract cost principles contained in FAR 8 and 31, in effect as of the date of the contract, shall be used in settling terminations for convenience." This directive is qualified by FAR 49.113. which mandates that "the cost principles of part 31 [are] subject to the general principles of 49.201(a)", while FAR 49.201(a) commands that "Fair compensation is a matter of judgment and cannot be measured exactly 'and that [t]he use of business judgment, as distinguished from strict accounting principles, is the heart of a settlement." Additionally, "costs and accounting data may provide guides but are not rigid measures for ascertaining fair compensation." FAR 49.201(c).

Here, the potential for a disconnect between rigid application of cost principles and the "fair compensation" which the FAR commands, is compounded then ultimately realized through the approach taken by this audit. Under Government Auditing Standards 7.39 and 7.41 respectively, an audit report must be "fair, complete, and objective" while the auditor must "objectively evaluate" a contractor's comments. Moreover, "The audit report should be fair and not misleading and should place the audit results in perspective. This means presenting the audit results impartially and guarding against the tendency to exaggerate." GAS 7.57. Finally, every auditor is subject to a standard of due professional care "which requires, among other things, things, that the auditor maintain an "independent and objective mental attitude" with respect to all aspects of his audit work.***[And] he is to approach the audit with "judicial impartiality" and is not to assume the "attitude of a prosecutor."

Based upon both the draft and the final audit findings, WBC is concerned that the auditor has assumed the role of an advocate and has failed to provide the fair, complete and objective assessment which the law compels. WBC requests that the TCO review this revised proposal along with all of the relevant documentation whether directly included with this document or not.

A side by side comparison of all items, including disputed items, is as follows:

**CONTRACTOR'S TERMINATION SETTLEMENT PROPOSAL**
**Contract No. DTFH70-98-C-00027**
**October 13, 2006**

| | WBC Original Proposal(s) | DCAA Audit Supported | **WBC Revised Proposal** |
|---|---|---|---|
| Direct Labor | $167,761 | $127,463 | **$ 128,478.00**[35] |
| Other Direct Job Costs | $128,343 | $ 94,523 | **$ 128,598.08**[36] |
| Equipment/Vehicle/Fuel | $ 34,207 | $ 26,985 | **$ 26,985.00**[37] |
| Other Equipment/Vehicle | $ 84,623 | $ 65,808 | **$ 91,968.00**[38] |
| Surety Expense | $276,768 | $261,646 | **$ 276,768.00**[39] |
| G&A Expense | $ 47,376 | $ 28,183 | **$ 28,183.00**[40] |
| Subcontractor McBride | $105,796 | $ 29,528 | **$ 39,222.35**[41] |
| Profit | $925,835 | $253,211 | **$ 870,667.00**[42] |
| Settlement Expense | $ 41,793 | $ 9,249 | **$ 139,620.46**[43] |
| Net Settlement | $1,812,501 | $896,596 | **$1,730,489.89**[44] |
| Payments Received | (376,768) | ($479,085) | **($ 479,085.00)**[45] |
| Net Payment | | $417,511 | **$1,251,404.89** |

[35] Revised Settlement Proposal, pages 2 & 3
[36] Revised Settlement Proposal, pages 3, 4, 5, 6, 7, 8
[37] Revised Settlement Proposal, page 8
[38] Revised Settlement Proposal, pages 8,9,10
[39] Revised Settlement Proposal, pages 10, 11
[40] Revised Settlement Proposal, pages 11,12
[41] Revised Settlement Proposal, pages 11, 12
[42] Revised Settlement Proposal, page 12
[43] Revised Settlement Proposal, page 12, 13, 14, 15, 16
[44] WBC's request for interest under the Prompt Payment Act, discussed on pages 16 & 17 of this document, is an amount in addition to this total and has not been quantified by WBC in this proposal
[45] Revised Settlement Proposal, page 12

Thank you for considering the revised settlement proposal. At this time WBC would like to request a Terminating Contracting Officer's final decision on the settlement.

Luther L. Clevenger
White Buffalo Construction Inc.

## LIST OF ATTACHMENTS

Prior Settlement Proposal........................................................Appendix A
*Surety Costs dated March 19, 2004*
*Direct Costs dated November 2, 2004*
*Settlement proposal costs and request for profit dated January 13, 2005*

DCAA Audit Report..........................................................Appendix B

Estimate for Repairs Link Belt LS- 3400 Excavator........................Appendix C

Estimate of Value of Link Belt LS- 3400 Excavator........................Appendix C

Justification for Anticipatory Profit and a Summary
of Facts Supporting Bad Faith.............................................Appendix D

Settlement Related Legal invoices..........................................Appendix E

Estimate of Cost to Repair 1996 Dodge Pickup.............................Appendix F

## APPENDIX D

## INTRODUCTION

WBC has, from the outset, claimed lost profits on uncompleted work. WBC is convinced that if FHA takes the time to review the facts and background, it will conclude this claim has merit. WBC thought it would be helpful if it again summarized its position.

A properly motivated and conducted termination affords to the government a limitation on its liability, even if its declaration of default is later found wanting. Specifically, a default termination that merely is a mistake will be converted to a termination for convenience. Additionally, the government may, in certain circumstances, unilaterally and lawfully terminate for convenience outright. In either circumstance, the measures of recovery under a convenience termination shield the government from the liability it would face if subject to the standard measure of liability for common-law breach of contract.

The limited liability of a convenience termination can, however, evaporate, exposing the government to liability for common-law breach, including lost profits. As set forth below, the evidence here is more than sufficient to obliterate the shield of limited liability.

First, the presumption of good faith in government action, and the requirement of specific intent to harm the particular contractor, does not apply at

all when the wrongdoing centers on the government's failure to cooperate with, and to facilitate the performance of, its contractor's performance.

Second, even if a presumption of good faith applied here, and it does not, "well-nigh irrefragable proof" requires only clear and convincing evidence of acts taken with specific intent to harm White Buffalo. Such evidence abounds here.

## DISCUSSION

### A. In Proving Bad-Faith Termination, White Buffalo Is Required Only to Prove that the Government Breached Its Implied Contract Good-Faith Duties to Cooperate and Not Interfere

Until 2002, courts typically began their analysis of "bad faith" by analyzing the issue under a framework that included a "presumption of good faith," and defeating that presumption required "well nigh irrefragable proof" of specific intent to harm the particular contractor. That has changed, beginning with *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234 (Fed. Cir. 2002). There the U.S. Federal Circuit Court of Appeals considered the extent of proof required to demonstrate that the government acted in bad faith. The court modernized the language of the "well-nigh irrefragable proof" standard, and determined that "clear and convincing" most adequately describes the proper standard. *Id.* at 1239.

Following after *Am-Pro,* the Court of Federal Claims then recognized that there are limited circumstances in which the "good faith" presumption even applies. In *Tecom, Inc. v. United States*, 66 Fed. Cl. 736 (2005), the U.S. Court of

Federal Claims further clarified the proper application of "clear and convincing" standard. The court in *Tecom* held:

> When a government official acts under a duty to employ discretion, granted formally by law, regulation, or contract, and a lack of good faith is alleged that does not sink to the level of fraud or quasi-criminal wrongdoing, *clear and convincing evidence is not needed to rebut the presumption*. Instead, this may be inferred from a lack of substantial evidence, gross error, or the like. *Id.* at 769(emphasis added).

As established in *Tecom*, the "clear and convincing" standard does not apply here. The very heart of FHA's wrongful conduct toward White Buffalo, which is detailed below, centers in FHA's pervasive failure to cooperate with, and indeed its actual interference with, White Buffalo's performance. The evidence is substantial that FHA breached its implied contractual duty of good faith and fair dealing, which, among other duties, requires FHA to cooperate in, and not interfere with, White Buffalo's performance. That strips FHA of any right to avoid full liability for common-law breach, including facing liability for lost profits.

*Tecom* is also instructive here with respect to the aggregated conduct that establishes that the government violated its duty of good faith by its pattern of failing to cooperate in, and actively interfering with, White Buffalo's performance. Specifically, "[w]hen it is not a single discrete decision by one official, but a number of acts that are alleged to constitute a lack of good faith, the acts must be judged in the aggregate, and not on the basis of any particular individual's bad

faith. . . . If the aggregate of the actions of all of the agents would, if all done by one individual, fall below the standard of good faith, the entity for whom the various agents acted should be held to have violated that standard." *Id.* (internal quotation marks and citation omitted); see *Struck Constr. Co. v. United States*, 95 Ct. Cl. 186, 221, 1942 WL 4411 (1942).

**B. There Is Clear and Convincing Evidence of Specific Intent to Harm White Buffalo**

Even if FHA were here entitled, and it is not, to invoke the presumption that the government is assumed to have acted in good faith, FHA still cannot shield itself behind the liability limits afforded by a lawful termination for convenience. Evidence is "clear and convincing" when it renders highly probable the proposition that the evidence is offered to establish. *Am-Pro*, 281 F.3d at 1240 (citation omitted). Here, as set forth below, the evidence renders it highly probable that, principally through the actions of Area Resident Engineer Rettinger and through FHA's actions in the aggregate, FHA acted with the specific intention of harming White Buffalo.

**C. The Government Prevented the Contractor from Starting Work on Time and Did Not Extend the Contract Completion Date**

From the very beginning, the government failed to cooperate with the contractor. Specifically, the government refused to allow the contractor to commence work until *September 15*, 1998, then failed to provide required

additional contract time due the contractor because of the late notice to proceed. The government additionally erred in its unreasonable belief that the contractor could not commence work on September 1, 1998 due to environmental restrictions.

The contract states at C-12 in section 52.211-10 that "*the completion date is based on the assumption that the successful offeror will receive the notice to proceed by September 1. The completion date will be extended by the number of calendar days after the above date that the Contractor receives the notice to proceed, except to the extent that the delays in issuance of the notice to proceed results from the failure of the Contractor to execute the contract and give the required performance and payment bonds within the time specified in the offer.*"(Emphasis _____.)

The contract was executed and the performance and payment bonds were timely tendered to the Contracting Officer (the "CO") and accepted. The government did not issue a full notice to proceed on September 1, 1998 and did not give the contractor the extension as mandated by the contract. WBC was entitled to extensions of time that would have altered the interim completion date because of the late notice to proceed. The government erred in both the Cure Notice and the Notice of Termination for Default, because the interim completion date of January 23, 1999 should have been extended because of the late notice to proceed.

The contract contains environmental restrictions that prohibited commencement of work until September 15, 1998 at four of the 10 sites on FDR 33 (because clearing and grubbing were required at these sites). Work could have been started on September 1 at six of the sites on FDR 33, but the government unreasonably refused.

When he was asked why the notice to proceed had not been issued, Area Engineer Rettinger ("Rettinger") informed Project Superintendent Clevenger ("Clevenger") that there was no site where work could be performed due to contract environmental restrictions. Clevenger informed Rettinger that the contract allowed work to be performed without any restriction at MP 46.2. After Rettinger confirmed this, he informed Clevenger that White Buffalo still would not receive a notice to proceed, because it did not have an approved schedule. Project Engineer Aftab ("Aftab") told Clevenger to just submit another schedule and that the government would allow WBC to start on September 15. WBC was given an unrestricted Notice to Proceed dated *September 15*, 1998, even though WBC's schedule was still not approved.

Rettinger's initial unreasonable behavior presaged what proved to be an ongoing pattern of interference or refusals to cooperate—in which Rettinger remained a central figure. Indeed, as set forth below, Rettinger's misconduct continued even into the litigation following the contractor's termination.

Almost from the beginning of the project, WBC received numerous letters signed by Aftab that directly contradicted earlier verbal discussions and agreements. Aftab finally admitted to Clevenger that these letters were, in fact, not written by him, but by Rettinger, and that Aftab had been forced to sign them. Clevenger and Aftab would agree to pay estimates, items of work, and other items demanding attention, only to have Rettinger overrule Aftab later. After only a few weeks on the project under Rettinger, Aftab asked to be assigned to another project away from Rettinger. One of the inspectors working on the project left largely because he had never seen Rettinger treat a contractor so harshly. This inspector had worked on several projects with Rettinger and commented that he had never seen him act in this manner. Another inspector who was fired from the project indicated that Rettinger was deliberately trying to rid the government of what he termed "problem contractors." This comment was made in reference to WBC's ongoing litigation with USFS concerning the Salt Creek Falls Viewpoint project. At that time, litigation had been ongoing for approximately a decade.

Due to the failure of the government to issue the notice to proceed on September 1, 1998, WBC lost 25 percent of its work window for "wetted perimeter" work at MP 46.2. The days not used were dry summer days that were essential to completing the subgrade work on FDR 33 before both the onset of the heavy rain season in late October and the first interim completion date of

January 23, 1999. The contractor had mobilized his equipment to FDR 33 MP 46.2 and had hired additional personnel in anticipation of starting the work at that site on September 1, 1998.

**D. The Government Improperly Instructed the Contractor to Remove Material at MP 46.2, but the Impropriety Was Not Disclosed to the Contractor or Corrected After Rettinger Discovered His Error**

The government, principally through Rettinger, then concealed from the contractor that the government had discovered that the "excess" material it had directed the contractor to remove from MP 46.2 was actually needed at that site to complete the fill as shown in the drawings and as previously argued by the contractor.

Rettinger informed Clevenger and Mark Heiberger (the survey subcontractor) that native material at MP 46.2 above the culvert inlet was excess material and would have to be excavated and hauled to a disposal site. WBC immediately began hauling the material to the disposal site. Eventually Mod #01 was agreed to, adding a section of culvert at MP 46.2 under the assumption that this would allow on-site use of the excess material and speed up the installation.

While this work was being performed, Rettinger discovered that he was wrong, that the material was actually needed at MP 46.2 for fill, and that it should never have been removed. In fact, material had to be hauled back to MP 46.2 to replace what had been hauled away and to fill in the additional section of culvert

that had been added. (Completion Contractor Tidewater claims to have hauled in all material because the fill that WBC placed had become so saturated with moisture that it was unusable.)

Although Rettinger had discovered that the material being hauled away was actually needed at MP 46.2, he failed to inform WBC of that fact, and he failed to correct his mistake. At the time of termination, the government was aware that Rettinger had mistakenly directed that material be hauled away and had entered into Mod #01 with WBC. The government also knew that it was going to cost approximately $50,000 to correct this error, but failed to take this fact into consideration and, additionally, failed to take corrective action. The government still required this needless and additional work of the completion contractor, which work was performed at WBC's expense.

### E. The Government Did Not Obtain Proper Environmental Permit Extensions to Allow the Contractor to Continue Work

Next, the government, again through Rettinger, concealed from the contractor that it had decided not to seek any extension from the permitting agencies to work in the "wetted perimeter." The government deliberately misled the contractor by informing it that the permitting agencies had *refused* to grant any extension. The contractor then directly approached the permitting agencies and obtained permission from them to *continue work*. The government nevertheless continued to refuse to allow the contractor to continue any installation. Instead, the

government directed the contractor to perform only winterization work and stopped all work at the culvert at MP 46.2.

WBC requested in a timely manner that FHWA obtain a time extension for the permits to work in water. Rettinger said it was too early and that WBC should wait to make the request until it was closer to the permit expiration date. When WBC again made the request, Rettinger then said that WBC had now waited too long. Rettinger's letter to WBC stated that the government had consulted with the permitting agencies, and an extension would not be granted. This letter was duplicitous and concealed the real truth: before the permit's expiration, FHWA had already decided not to seek any extension for the permit, because it did not want WBC to continue on this project.

FHWA stopped WBC from working at the site one day before the permits actually expired, thus depriving WBC of one day of work. At that time, all culvert sections originally specified were installed, and only the additional culvert section added in Mod #01 was left uninstalled. Of course, Mod #01 was based on Rettinger's erroneous assumption that there was an abundance of unneeded and excess material at the site that necessitated adding another culvert section in order to consume more material as fill. The additional culvert section was actually unnecessary and should have been deleted from the contract.

Clevenger decided to try to find a way to continue to work. He contacted the permitting agencies directly and easily obtained a one-week extension to work. The extension was granted because the endangered salmon had not yet started their migration up the rivers. When FHWA was informed of the extension, Rettinger chastised Clevenger for seeking an extension to "their" permit. After delaying for several days, and despite the fact that by then FHWA had independently confirmed Clevenger's agreement with the permitting agencies, FHWA then informed WBC that it could not perform any contract work during the permit extension and would only be allowed to "winterize" the site.

Several weeks later, on November 13, 1998, FHWA, in its Cure Notice, asked WBC to obtain a new permit from the permitting agencies to work in water beyond November 6, even though—by that time—the endangered salmon were in the river, and any new permit or extension was virtually unobtainable. The Cure Notice states that providing evidence that WBC could obtain a new permit that would allow "in-stream work" after November 6, 1998 was key to WBC providing an acceptable written plan.

Before the permit's original expiration date for sites on FDR 33, November 1, 1998, CO Jacoby emailed Rettinger and said that they would not be applying for a permit extension because they did not want WBC to complete the job. Also, before the permits expired, another FHWA employee contacted

Rettinger about obtaining an extension. Rettinger responded by email that he did not know why they would seek an extension of time given that WBC was not working and had not even started up any equipment that day. This was completely untrue.

The contractor was highly concerned about Rettinger's counterproductive actions, which were hindering completion of the project. In an attempt to improve the situation, Clevenger requested a meeting with CO Parsons. CO Parsons informed Clevenger in a telephone call and in the meeting that he was unaware of any problems with the project and really had not heard much about it. CO Parsons stated that he would see that matters were investigated and straightened out. In fact, CO Parsons and other FHWA personnel had already started planning to terminate WBC.

**F. Contrary to the Permit's Language and Customary Practice, the Government Restricted the Contractor's Work in the Stream Area**

The government unnecessarily restricted the contractor's operations by using the term "wetted perimeter" and defining areas within the "wetted perimeter" as any area that it arbitrarily determined could be reached by high water.

FHWA used the unusual term "wetted perimeter of any stream" to indicate areas that would be subject to the restrictions of the permit in the contract, even though the permit, the permitting agencies, and FHA personnel who worked on obtaining the permits use the term "in-water work." When asked, FHWA was

unable to supply WBC with any clear definition of "wetted perimeter." However, in practice, FHWA (Rettinger) restricted the contractor's operations in any area that it arbitrarily determined could be reached by high water.

In the case of the critical repair at MP 46.2, the contractor was prohibited after November 1, 1998 from working on contract work in areas that were clearly well out of the stream, including working on the fill at the top of the culvert. In fact, FHWA stopped all work at the MP 46.2 culvert site after November 6, 1998. This stopped the contractor from performing any more work at this location.

Cynically, FHWA changed the term to "in-water work" in 1999 for the completion contract. This cooperation with the completion contractor significantly reduced the work area subject to permit restrictions and was not a benefit available to WBC.

## G. The Government Refused to Acknowledge the Changed Condition and Safety Problems at MP 46.7

The government also unreasonably refused to address the changed condition at FDR 33, MP 46.7, again violating its duty of good-faith cooperation. This failure to act resulted in WBC incurring delays and additional costs due to the unstable overburden at the rock cut at MP 46.7. Multiple failures of the overburden at this site occurred after the first shot, when the changed condition was evident. This significantly impeded the course and prosecution of the work and increased the costs to WBC.

Rettinger would not allow WBC to correct the large amount of unstable overburden at the rock cut at MP 46.7, stating that another contractor would do the work after WBC's contract was over. Rettinger was steadfast, despite the protests of Clevenger, USFS Siskiyou National Forest geologist Donna Mickley ("Mickley"), and Frank Toors ("Toors"), a consulting geologist hired by WBC. Both Mickley and Toors warned FHWA that slope failure was imminent and foreseeable and would occur as soon as any rain or the impending rainy season started, within days or possibly weeks. There was no way that WBC or any other contractor could complete the work as designed; yet despite repeated warnings, the government failed, on the advice of Rettinger, to take any action. As soon as the seasonal rains commenced, multiple large slides occurred at this site and continued throughout the winter and early spring.

Rettinger unreasonably required WBC to continue work at the rock cut despite the deteriorating safety conditions. Material was starting to slide down from the top at intermittent intervals on a daily basis, and safety spotters had to be used continuously. Work at MP 46.7, as well as equipment and traffic on FDR 33 servicing other ERFO sites, was frequently halted in order to avoid falling dirt, rocks, and other debris. Clevenger informed Rettinger that the falling material was a safety hazard and was causing significant delays to the entire project. Rettinger informed Clevenger that in order to prosecute the work, without being delayed by

the falling material, WBC could excavate the overburden above the rock cut and remove it at its own cost. As the slumping overburden above the rock face extended well above and outside the original clearing limits for the ERFO repair, Rettinger required WBC to have the area surveyed and to submit a plan for removal. Just before being terminated, WBC ceased all work at MP 46.7 and the adjacent work below because of safety concerns.

As soon as WBC was terminated, FHWA had Kerr Contractors start removal of the slide. *Within a week*, Mickley met with FHWA and determined that conditions were not as assumed in the FHWA design and that the area was unsafe. She requested that FHWA cease work and prepare a redesign for the MP 46.7 site.

**H. The Government Lied About Design Changes**

FHWA personnel, including the CO, told WBC, ICW (the surety), and the completion contract bidders that there would be no redesigns or changes to the contract and that the work would be completed as per the WBC contract. FHWA's position was that the problems were caused by WBC and that the completion contractor could propose corrections or changes, but that FHWA would not be providing them. This implied that any costs to make the corrections would have to be included in the completion contractors' bids, and the bidding contractors were so informed by WBC's surety. In fact, FHWA had already commenced work on redesigning MP 46.7 as well as several other sites.

As soon as the completion contractor started, Rettinger negotiated a modification that essentially redesigned the entire project. It also paid the completion contractor to correct the changed condition at MP 46.7, even though these costs had been included in the completion contractor bid to WBC's surety as a separate bid item based on the CO's letter.

Clevenger made repeated requests for the FHWA redesigns, but FHWA claimed that there were none, despite evidence that they existed. After WBC filed an FOIA action, the redesign for MP 46.7 was eventually provided, and FHWA paid WBC's legal costs for the action. Clevenger discovered later (in discovery) that there were additional redesigns for several other sites that were not provided in the earlier FOIA request. The FOIA officer, Rettinger, and others at FHWA deliberately withheld these documents from WBC despite repeated requests and FHWA's own FOIA policy.

It is not simply that FHWA concealed its redesigns from ICW and WBC; FHWA made a conscious decision to withhold this information. ICW informed FHWA that it would increase costs. On February 2, 1999, CO Parsons wrote a letter to ICW stating that none of the completion contractor bidders were informed about any redesigns or openings to the permit window and that WBC was responsible for the current condition at MP 46.7. CO Parsons added that it would be up to the completion contractor to propose a slope redesign if he felt it was

necessary. It is well established in the FHWA record that the CO knew that the original slope design in the contract was defective and that design changes were going to have to be made. In fact, FHWA work on the redesign had already started.

**I. The Government Terminated the Contractor**

The contractor was notified in a telephone call from CO Jacoby during the week of November 23, 1998 that WBC would be terminated on December 1, 1998. True to CO Jacoby's word, WBC received from CO Parsons the Notice of Termination for Default dated December 1, 1998. CO Parsons has testified that he made the decision to terminate WBC on his own on December 1, after having returned from a vacation. In fact, CO Parsons not only failed to independently decide to terminate WBC, he was directed to terminate WBC.

Before termination, CO Parsons met with WBC and stated that he did not know anything about the project and that he would look into WBC's concerns. He also stated that Rettinger had a reputation for being "vicious." However, both FHWA and the CO were already considering termination.

**J. The Government Refused to Let the Contractor Fix the Slide at MP 47.25**

FHWA refused to address the small slump by the front access gate at MP 47.25, which occurred because of the heavy rains and the oversteep design. WBC notified FHWA verbally and by letter, and Rettinger wrote back directing

WBC not to repair the slump. This inaction resulted in a small slide onto FDR 33. At that time, minor work was required at this site so that WBC could continue to have access to the project. Rettinger directed that no work was to be done on this slide, and it continued to grow until WBC was terminated approximately 20 days later. Kerr Contractors arrived on the project and, immediately after WBC was terminated, was required to start emergency work on this slide. This work was performed at substantial expense to WBC. To finally correct the problem, the cut slope at MP 47.25 was eventually laid back, and riprap was installed, which was a major redesign by FHWA.

**K. The Government Failed to Compensate WBC for Its Work**

FHWA failed to make any payments to WBC for its work before termination (a period of four months). The sole payment allowed (approximately six months after termination) was less than half the amount of the payment approved by Aftab before termination. This pay estimate failed to compensate WBC for items of work and quantities of work that were accepted by FHWA before termination. It also failed to properly compensate WBC for significant quantities of extra or additional work, some of which was covered by contract modification. The majority of the extra work performed by WBC, however, was not covered by modification. For example, at the time that pay estimate #1 was issued, FHWA was continuing to claim that it had no responsibility to compensate WBC for

substantial extra work that it had performed at MP 46.7, when, in fact, it had already redesigned the work at the site and had decided to pay the completion contractor for performing this work.

**L. The Government Improperly Paid the Completion Contractor**

FHWA paid Completion Contractor Tidewater for substantial work that was never performed. One example is work certified and paid for at MP 46.7—a survey commissioned by WBC after project completion showed this work had never been performed. Moreover, both the completion contractor and FHWA personnel certified the work and the quantities for payment. This resulted in substantial additional and unnecessary cost to WBC and its surety. FHWA was previously notified of this, and a copy of the survey report has been provided.

**M. The Government Engaged in Disparate Treatment**

FHWA relaxed environmental restrictions for the completion contractor, which materially and substantially changed and enlarged the window in which the work could be prosecuted in 1999. In considering termination, FHWA failed to consider how such changes could affect WBC and its prosecution of this contract.

**N. The Government Engaged in Additional Actions That Harmed WBC**

FHWA certified and paid Completion Contractor Tidewater for work that was performed by WBC before termination. WBC and ICW were deprived of legitimate earnings and incurred illegitimate and unnecessary expenses in the course of the completion contract due to the actions of FHWA.

FHWA encouraged surety ICW to pay Tidewater for work for which FHWA had already paid Tidewater, under modification to the completion contract, thus resulting in additional and unnecessary cost to WBC and ICW. FHWA wrote a letter to ICW strongly supporting Tidewater's claim against ICW for $50,000, even though Tidewater had received payment for the same work directly from FHWA.

## CONCLUSION

The evidence here suffices—indeed is overwhelming—to establish bad faith. That conclusion results whether the standard is (i) the now-outdated test of intent to harm the individual contractor or (ii) the current test of breaching the standards of good-faith cooperation and noninterference. Consequently, the government is no longer shielded by the limits on recovery that apply in a lawful convenience termination. Instead, the government now faces liability for basic common-law damages for breach of contract, including lost profits.

# SETTLEMENT PROPOSAL (TOTAL COST BASIS)

OMB No.: 9000-0012
Expires: 05/31/98

Public reporting burden for this collection of information is estimated to average 2.5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the FAR Secretariat (MVR), Federal Acquisition Policy Division, GSA, Washington, DC 20405.

## FOR USE BY A FIXED-PRICE PRIME CONTRACTOR OR FIXED-PRICE SUBCONTRACTOR

THIS PROPOSAL APPLIES TO *(Check one)*

☒ A PRIME CONTRACT WITH THE GOVERNMENT
☐ SUBCONTRACT OR PURCHASE ORDER

SUBCONTRACT OR PURCHASE ORDER NO(S).

COMPANY: WHITE BUFFALO CONSTRUCTION INC.

STREET ADDRESS: 6653 SHAW HWY SE

CITY AND STATE *(Include ZIP Code)*: Aumsville, OR 97325-1310

### CONTRACTOR WHO SENT NOTICE OF TERMINATION

NAME

ADDRESS *(Include ZIP Code)*

NAME OF GOVERNMENT AGENCY: FHWA/WFLD (VANCOUVER, WA.)

GOVERNMENT PRIME CONTRACT NO.: DTFH70-98-C-00027

CONTRACTOR'S REFERENCE NO.: N/A

If moneys payable under the contract have been assigned, give the following:

NAME OF ASSIGNEE

ADDRESS *(Include ZIP Code)*

EFFECTIVE DATE OF TERMINATION: 12-01-1998

PROPOSAL NO.: 2

CHECK ONE: ☐ INTERIM ☐ FINAL

SF 1439, SCHEDULE OF ACCOUNTING INFORMATION ☐ IS ☐ IS NOT ATTACHED *(If not, explain below)*

## SECTION I - STATUS OF CONTRACT OR ORDER AT EFFECTIVE DATE OF TERMINATION

| PRODUCTS COVERED BY TERMINATED CONTRACT OR PURCHASE ORDER (a) | | FINISHED: PREVIOUSLY SHIPPED AND INVOICED (b) | FINISHED: ON HAND: PAYMENT TO BE RECEIVED THROUGH INVOICING (c) | FINISHED: ON HAND: PAYMENT NOT TO BE RECEIVED THROUGH INVOICING (d) | UNFINISHED OR NOT COMMENCED: SUBSEQUENTLY COMPLETED AND INVOICED* (e) | UNFINISHED OR NOT COMMENCED: NOT TO BE COMPLETED (f) | TOTAL COVERED BY CONTRACT OR ORDER |
|---|---|---|---|---|---|---|---|
| | QUANTITY | | | | | | |
| | $ | | | | | | |
| | QUANTITY | | | | | | |
| | $ | | | | | | |
| | QUANTITY | | | | | | |
| | $ | | | | | | |

## SECTION II - PROPOSED SETTLEMENT

(Use Columns (b) and (c) only where previous proposal has been filed)

| NO. | ITEM (a) | TOTAL PREVIOUSLY PROPOSED (b) | INCREASE OR DECREASE BY THIS PROPOSAL (c) | TOTAL PROPOSED TO DATE (d) | FOR USE OF CONTRACTING AGENCY ONLY (e) |
|---|---|---|---|---|---|
| 1 | ~~DIRECT MATERIAL~~ JOB COSTS | 128,342.91 | 255.17 | 128,598.08 | |
| 2 | DIRECT LABOR | 167,761.28 | 39,283.28 | 128,478.00 | |
| 3 | INDIRECT FACTORY EXPENSE *(from Schedule A)* | | | | |
| 4 | SPECIAL TOOLING AND SPECIAL TEST EQUIPMENT *(SF 1432)* | | | | |
| 5 | OTHER COSTS *(from Schedule B)* SURETY, EQUIPMEN | 395598.05 | 122.95 | 395,721.00 | |
| 6 | GENERAL AND ADMINISTRATIVE EXPENSES *(from Schedule C)* | 47,375.79 | 19,192.79 | 28,183.00 | |
| 7 | TOTAL COSTS *(Items 1 thru 6)* | 739,078.03 | 58,097.95 | 680,980.08 | |
| 8 | PROFIT *(Explain in Schedule D)* | 925,834.91 | 55,167.91 | 870,667.00 | |
| 9 | TOTAL *(Items 7 and 8)* | 1,664,912.94 | 113,265.86 | 1,551,647.08 | |
| 10 | DEDUCT FINISHED PRODUCT INVOICED OR TO BE INVOICED* | | | | |
| 11 | TOTAL *(Item 9 less Item 10)* | 1,664,912.94 | 113,265.86 | 1,551,647.08 | |
| 12 | SETTLEMENT EXPENSES *(from Schedule E)* | 41,793.21 | 97,827.25 | 139,620.46 | |
| 13 | TOTAL *(Items 11 and 12)* | 1,706,706.15 | 15,438.61 | 1,691,267.54 | |
| 14 | SETTLEMENTS WITH SUBCONTRACTORS *(from Schedule F)* | 105,795.67 | 66,573.32 | 39,222.35 | |
| 15 | GROSS PROPOSED SETTLEMENT *(Items 13 thru 14)* | 1,812,501.82 | 82,011.93 | 1,730,489.89 | |
| 16 | DISPOSAL AND OTHER CREDITS *(from Schedule G)* | | | | |
| 17 | NET PROPOSED SETTLEMENT *(Item 15 less 16)* | 1,812,501.82 | 82,011.93 | 1,730,489.89 | |
| 18 | ADVANCE, PROGRESS & PARTIAL PAYMENTS *(from Schedule H)* | 376,768.29 | 102,316.71 | 479,085.00 | |
| 19 | NET PAYMENT REQUESTED *(Item 17 less 18)* | 1,435,733.53 | 184,328.64 | 1,251,404.89 | |

*Column (e), Section I, should only be used in the event of a partial termination, in which the total cost reported in Section II should be accumulated to date of completion of the continued portion of the contract and the deduction for finished product (Item 10, Section II) should be the contract price of finished product in Column (b), (c), and (e), Section I.

NOTE: File inventory schedules (SF 1426, 1428, 1430, and 1432) for allocable inventories on hand at date of termination (See 49.206).

(When the space provided for any information is insufficient, continue on a separate sheet.)

SCHEDULE A - INDIRECT FACTORY EXPENSE *(Item 3)*

| DETAIL OF EXPENSES | METHOD OF ALLOCATION | AMOUNT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

NOTE: Individual items of small amounts may be grouped into a single entry in Schedules B, C, D, E, and G.

SCHEDULE B - OTHER COSTS *(Item 5)*

| ITEM | EXPLANATION | AMOUNT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|---|
| SURETY EXPENSE | see 10-16-2006 Submission | 276,768.00 | |
| Apportionment of equipment And vehicle ownership costs | See 10-16-2006 Submission | 26,985.00 | |
| OTHER EQUIPMENT & vehicle costs | see 10-16-2006 Submission | 91,968.00 | |
| | subtotal | 395,721.00 | |

SCHEDULE C - GENERAL AND ADMINISTRATIVE EXPENSES *(Item 6)*

| DETAIL OF EXPENSES | METHOD OF ALLOCATION | AMOUNT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|---|
| G&A EXPENSE | see 10-16-2006 Submission | 28,183.00 | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

SCHEDULE D - PROFIT *(Item 8)*

| EXPLANATION | AMOUNT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|
| Profit - see 10-16-2006 Submission. | 870,667.00 | |
| Includes profit for all work completed | | |
| by White Buffalo Construction And, under our bad faith claim, | | |
| profit on All other work required to | | |
| Complete the contract. | | |

(Where the space provided for any information is insufficient, continue on a separate sheet.)

SCHEDULE E - SETTLEMENT EXPENSES *(Item 12)*

| ITEM | EXPLANATION | AMOUNT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|---|
| SETTLEMENT EXPENSES | SEE 10-16-2006 Submission | 139,620.46 | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

SCHEDULE F - SETTLEMENTS WITH IMMEDIATE SUBCONTRACTORS AND SUPPLIERS *(Item 14)*

| NAME AND ADDRESS OF SUBCONTRACTOR | BRIEF DESCRIPTION OF PRODUCT CANCELED | AMOUNT OF SETTLEMENT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|---|
| McBride Construction | Blasting<br>see 10-16-2006 Submission | 39,222.35 | |
| | | | |
| | | | |
| | | | |
| | | | |

SCHEDULE G - DISPOSAL AND OTHER CREDITS *(Item 16)*

| DESCRIPTION | AMOUNT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

(If practicable, show separately amount of disposal credits applicable to acceptable finished product included on SF 1428.)

(Where the space provided for any information is insufficient, continue on a separate sheet.)

SCHEDULE H - ADVANCE, PROGRESS AND PARTIAL PAYMENTS *(Item 19)*

| DATE | TYPE OF PAYMENT | AMOUNT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|---|
| MAY 1999 | PAY ESTIMATE | -102,316.71 | |
| JAN 29, 2004 | REFUND WITHHELD LIQUIDATED DAMAGES | 100,000.00 | |
| April 30, 2004 | Surety Costs | 276,768.29 | |
| | subtotal | 479,085.00 | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

(Where the space provided for any information is insufficient, continue on a separate sheet.)

CERTIFICATE

This is to certify that the undersigned, individually, and as an authorized representative of the Contractor, has examined this termination settlement proposal and that, to the best knowledge and belief of the undersigned:

(a) AS TO THE CONTRACTOR'S OWN CHARGES. The proposed settlement (exclusive of charges set forth in Item 14) and supporting schedules and explanations have been prepared from the books of account and records of the Contractor in accordance with recognized commercial accounting practices; they include only those charges allocable to the terminated portion of this contract; they have been prepared with knowledge that they will, or may, be used directly or indirectly as the basis of settlement of a termination settlement proposal or claim against an agency of the United States; and the charges as stated are fair and reasonable.

(b) AS TO THE SUBCONTRACTORS' CHARGES. (1) The Contractor has examined, or caused to be examined, to an extent it considered adequate in the circumstances, the termination settlement proposals of its immediate subcontractors (exclusive of proposals filed against these immediate subcontractors by their subcontractors); (2) The settlements on account of immediate subcontractors own charges are fair and reasonable, the charges are allocable to the terminated portion of this contract, and the settlements were negotiated in good faith and are not more favorable to its immediate subcontractors than those that the Contractor would make if reimbursement by the Government were not involved; (3) The Contractor has received from all its immediate subcontractors appropriate certificates with respect to their termination settlement proposals, which certificates are substantially in the form of this certificate; and (4) The Contractor has no information leading it to doubt (i) the reasonableness of the settlements with more remote subcontractors or (ii) that the charges for them are allocable to this contract. Upon receipt by the Contractor of amounts covering settlements with its immediate subcontractors, the Contractor will pay or credit them promptly with the amounts so received, to the extent that it has not previously done so. The term "subcontractors," as used above, includes suppliers.

NOTE: The Contractor shall, under conditions stated in FAR 15.403, be required to submit a Certificate of Current Cost or Pricing Data (see FAR 15.406-2 and 15.408 Table 15-2).

| NAME OF CONTRACTOR | BY *(Signature of authorized official)* | |
|---|---|---|
| WHITE BUFFALO CONSTRUCTION INC. | [signature] | |
| | TITLE: PRESIDENT | DATE: 11-10-2006 |
| NAME OF SUPERVISORY ACCOUNTING OFFICIAL | TITLE | |

## CERTIFICATE OF FILING

I hereby certify that a copy of the foregoing **Notice of Submission of Claims for Judicial Notice Under Fed. R. Evid. 201** was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

DATED: April 20, 2007.

STOEL RIVES LLP
Richard E. Alexander
by Charles F. Adams

Richard E. Alexander, OSB No. 69002
Attorney of Record

Of Counsel:
Charles F. Adams, OSB No. 75402

Telephone: (503)-224-3380

Attorneys for Plaintiff