IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| WHITE BUFFALO CONSTRUCTION, INC.<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 99-961C<br><br>Consolidated with No. 00-415<br><br>(Senior Judge Smith)<br><br>**MEMORANDUM OF ADDITIONAL AUTHORITY** |

Attached is a copy of the Court of Federal Claims' decision of April 18, 2007, by Judge Wheeler in *Moreland Corporation and Las Vegas VAI LLC v. United States*, No. 03-2154C. The case is relevant here to White Buffalo's certified claim previously submitted to the government seeking lost profits arising from breaches of the duty of good faith. The case also is relevant to the obligation of good faith as it is at issue in the motions and briefing currently before this court.

The government announced here its intent to convert the default to one of convenience in January 2004 only after being aware of White Buffalo's claim for lost profits arising from lack of good faith. The government also has since argued that in a convenience termination, award of lost future profits is not allowed. An issue therefore exists under *Moreland* whether the belated conversion action was motivated by an intent to use conversion as a device to cut off White Buffalo's lost profits claim.

DATED: April 20, 2007.

STOEL RIVES, LLP

Richard E. Alexander by Charles J. Adams

Richard E. Alexander, OSB No. 69002
Attorney of Record for Plaintiff White Buffalo Construction, Inc.

Stoel Rives, LLP
900 SW Fifth Avenue, Suite 2600
Portland, OR 97204
Tel. (503) 224-3380
Fax. (503) 220-2480

# In the United States Court of Federal Claims

No. 03-2154C

(Filed: April 18, 2007)

| | |
|---|---|
| MORELAND CORPORATION and LAS VEGAS VA1 LLC, Plaintiffs, v. THE UNITED STATES, Defendant. | Contract Disputes Act; Default Termination of Building Lease; Agency's Failure to Allow Lessor to Make Repairs; Agency's Failure to Show Constructive Eviction or Denial of Beneficial Use or Enjoyment; Contracting Officer Abuse of Discretion; Agency's Bad Faith Conduct; Effect of Statements in Different Lawsuit; Damages; No Restriction From Termination for Convenience Clause. |

*Robert J. Symon*, with whom was *Eric A. Frechtel*, Bradley Arant Rose & White LLP, Washington, D.C., for Plaintiffs.

*Brian S. Smith*, with whom were *Peter D. Keisler*, Assistant Attorney General, *David M. Cohen*, Director, and *Donald E. Kinner*, Assistant Director, United States Department of Justice, Commercial Litigation Branch, Civil Division, Washington, D.C., for Defendant.

## OPINION AND ORDER

WHEELER, Judge.[1]

## Introduction

This case involves a timely appeal by the Moreland Corporation ("Moreland") under the Contract Disputes Act, 41 U.S.C. § 601 et seq., from the Contracting Officer's default termination of a Government building lease in Las Vegas, Nevada. The Department of Veterans Affairs ("VA") contracted with Moreland in September 1995 to construct a two-

---

[1] This case was transferred to Judge Thomas C. Wheeler on December 9, 2005, pursuant to Rule 40.1(b) of the Rules of the Court of Federal Claims ("RCFC").

story building in Las Vegas to be used as a VA medical clinic. After Moreland completed construction of the building in 1997, the VA took occupancy and began its monthly rental payments under a 15-year lease. Moreland financed the design and construction costs of the building with the expectation that those costs would be recouped through the VA's monthly rental payments under the Lease.

The VA terminated the Lease for default on September 12, 2002, but continued to occupy the building until June 30, 2003. At that point, the VA ceased its monthly rental payments to Moreland, and moved to other facilities. Moreland filed suit in this Court on September 11, 2003 within the one-year period for appeal under 41 U.S.C. § 609(a)(3), requesting *de novo* review of the default termination. Moreland asserts a wrongful termination under a number of legal theories, and claims the value of the remaining monthly payments under the Lease, less operating expenses, plus the value of the building that it lost through foreclosure after termination. Adding the net unpaid rent of $17,992,215.85 and the lost asset value of $20,000,000, Moreland's total claim is $37,992,215.85, plus interest and attorneys' fees.

The Contracting Officer terminated the Lease for default because Moreland allegedly failed to repair structural deficiencies in a timely manner, and because the VA's engineering consultant found the building unsafe for continued occupancy. Defendant contends that the facility as originally constructed did not meet applicable building code requirements, and in this regard, relies upon admissions against interest that Moreland made in a 2002 Nevada lawsuit against its general contractor and others. Moreland Corp. et al. v. RMA, Inc. et al., No. CV-S-02-1259-JCM-PAL (D.Nev., filed Sept. 26, 2002). Defendant also maintains that, even if the default termination was improper, a "Termination for Convenience of the Government" clause incorporated by reference in the Lease prevents Moreland from recovering unpaid monthly rent.

The Court conducted an eight-day trial in Washington, D.C. during September 18-27, 2006. The parties filed post-trial briefs on December 18, 2006. Plaintiffs and Defendant filed reply briefs on January 29, 2007 and February 13, 2007 respectively. The Court heard closing arguments on February 21, 2007. The Court's evidentiary record consists of the testimony of nine witnesses, 288 exhibits, and 2,994 transcript pages.[2]

---

[2] The nine trial witnesses in order of appearance were: George Szwarcman, a VA contracting officer; Kharaiti Abrol, a VA structural engineer; Anthony Principi, former Secretary of the VA; David Malone, a structural engineer; Terry Moreland, Chief Executive Officer of the Moreland Corporation; Dudley Schadeberg, a VA contracting officer; Lowell Bridwell, a real estate appraiser; Paul Wilkins, Director of the Las Vegas City Building Department; and John A. Martin, Jr., a structural engineer.

For the reasons explained below, the Court concludes that the VA's default termination was improper. Although the building was not perfectly constructed and experienced certain exterior cracks, the Court finds that the defects were largely cosmetic and easily could have been repaired if the VA had permitted Moreland to do so. Indeed, certain omitted "gusset plate" welds on lateral steel bracing could have been repaired upon being identified, but the VA did not allow Moreland to perform this work until after termination. Alleged design deficiencies concerning structural loading capacity appear to have been isolated, minor, or nonexistent. In considering the competing testimony of the structural engineers on these issues, the Court affords the greatest weight to Plaintiffs' expert, Dr. David Malone of Exponent Failure Analysis ("Exponent").[3] Based upon Dr. Malone's testimony and other evidence of record, the Court finds that the building was not unsafe for the VA's occupancy. Despite pronouncements from the VA and its consulting engineer that the building was unsafe, the VA used and occupied the building without interruption for more than five years, and remained in the building for nine months after termination.

As importantly, the Court finds that the VA breached its duty of good faith and fair dealing with Moreland. The VA initially used alleged building deficiencies in late 2000 as a pretext to have Moreland bear the expense of conducting a structural loading study that the VA would later use to add a roof-mounted air conditioning system to the building. Separately, the VA's Contracting Officer, acting upon the advice of agency counsel, denied approximately $300,000 in Moreland's construction-related claims. While the Contracting Officer thought the claims were justified and should be paid, counsel advised that the claims should be denied as a means of gaining leverage over Moreland. Furthermore, when welding omissions and exterior cracks surfaced, the VA repeatedly imposed upon Moreland the requirement for "a comprehensive plan" before it would allow Moreland to make repairs. The Lease, however, contained no such obligation, and Moreland owned the building. Even when Dr. Malone and his associates proposed a reasonable repair plan on behalf of Moreland in 2002, the VA violated the Lease by not permitting Moreland to make repairs until after the VA had terminated the Lease for default.

The Court finds that Moreland is entitled to damages for the net unpaid rent in the amount of $17,992,215.85, plus interest as allowed under the Contract Disputes Act. In the circumstances of this Lease, the "Termination for Convenience of the Government" clause does not prevent Moreland's recovery of unpaid rent. This is not a typical Government contract where an improper default is treated as a termination for convenience. Rather, the VA employed other provisions that governed during the lease term. The applicable default clause, "Default by Lessor During the Term," cited by the Contracting Officer in the default notice, does not convert an improper default termination to a termination for convenience.

[3] Exponent is a highly regarded structural engineering firm that the United States retained to investigate the collapse of the World Trade Center after September 11, 2001.

Moreover, before signing the agreement, the parties clearly manifested their mutual intent to delete the clause entitling the Government to terminate the Lease for convenience.

Moreland, however, is not entitled to recover the value of the building that it lost through foreclosure. The record does not support a finding that the default termination necessarily caused the foreclosure. The Court does not have before it Moreland's bank loan agreement(s), and thus cannot say whether Moreland had any recourse against the bank after the VA's default termination, whether Moreland could have refinanced the balance of the loan, or whether Moreland had the means to repay the loan balance to retain its asset. The record also does not indicate whether Moreland was entitled to any offsetting recovery from the bank upon the later sale or lease of the building. Without sufficient evidence of causation, the claim for the lost building asset must fail.

## Findings of Fact[4]

### A. The Lease Agreement

On September 19, 1995, the VA and Moreland entered into Lease No. 084B-001-94 ("the Lease") for Moreland to design, construct, and lease back to the VA an Ambulatory Care Center in Las Vegas, Nevada ("the Medical Clinic"). (Exh. 1).[5] The Medical Clinic became known as the Addelair F. Guy III Ambulatory Care Center. (Stip. 1). The VA agreed to lease the Medical Clinic for a fixed term of 15 years, from March 1, 1997 through February 28, 2012. (Exh. 1, ¶ 2). The Lease contains an option for the VA to extend the term for five additional years. (Exh. 1, ¶ 5).

The Lease provides that the Medical Clinic would consist of "a two-story building containing approximately 148,260 net usable square feet of space, plus 801 parking spaces, to be constructed in accordance with specifications set forth in Solicitation for Offers No. 084B-001-94 and addenda thereto, on approximately 14.9 acres of land at the corner of Martin Luther King Boulevard and Las Vegas Drive, Las Vegas, NV." (Exh. 1, ¶ 1; Stip. 2). The Lease further provides that the United States is obligated to pay Moreland during the 15-

---

[4] This statement of the facts constitutes the Court's principal findings of fact under RCFC 52(a). Other findings of fact and rulings on mixed questions of fact and law are set forth in the later analysis.

[5] In this opinion, the Court will refer to the trial transcript by witness and page as "Name, Tr. __," and to the evidentiary exhibits as "Exh. __." For lengthy exhibits, a page or paragraph reference is provided where necessary. The parties agreed upon a single continuous set of exhibits, and thus no distinctions are made between Plaintiffs' exhibits and Defendant's exhibits. The parties' pretrial stipulations of fact are referred to as "Stip. __."

year term annual rent of $2,139,391.80, or $14.43 per square foot, at the rate of $178,282.65 per month. (Exh. 1, ¶ 3; Stip. 3). The Lease states that, of the annual rent of $14.43 per square foot, $0.82 is attributed to operating expenses, and $13.61 is the net rent. (Exh. 1, ¶ 7; Stip. 4).

The Lease is an 831-page document consisting of multiple forms, clauses, schedules and amendments compiled by the VA. (Exh. 1 at 2, Contents of Lease Document). The Lease combines various requirements and specifications relating to the construction of the facility, with provisions that apply to the lease term after the VA begins its occupancy. For example, a section entitled "General Clauses (Acquisition of Leasehold Interests in Real Property)" (GSA Form 3517), applies to the lease term. (Exh. 1 at 259-79). The provisions in that section use the terms "lease" and "lessor," among others, that indicate specific applicability to lease, rather than to construction issues. Id. Other clauses in the Lease apply to the construction phase.

The Lease contains a provision entitled "Adjustment for Vacated Premises." This provision states:

> If the Government fails to occupy any portion of the leased premises or vacates the premises in whole or in part prior to expiration of the firm term of the lease, the rental rate shall be reduced as follows:
>
> The rate shall be reduced by that portion of the cost per square foot of operating expenses not required to maintain the space. Said reduction shall occur after the Government gives 30 days prior notice to the lessor, and shall continue in effect until the Government occupies the premises or the lease expires or is terminated.

(Exh. 1, Solicitation For Offers, ¶ 3.19).

The first two pages of the Lease on Standard Form 2 (February 1965 edition) contain a paragraph that would have allowed the VA to terminate the Lease at any time by giving 180 days' advance notice. This provision states:

> The Government may terminate this lease at any time by giving at least 180 days' notice in writing to the Lessor and no rental shall accrue after the effective date of termination. Said notice shall be computed commencing with the day after the date of mailing.

(Exh. 1, ¶ 4). However, the VA and Moreland deleted this paragraph from the Lease by lining through the entire text prior to signing. (Szwarcman, Tr. 446-47; Moreland, Tr. 1749-

51). The concluding paragraph on Standard Form 2, directly above the parties' signatures, states: "The following changes were made in this lease prior to its execution: Paragraph 4 was deleted in its entirety." (Exh. 1, ¶ 9).

Mr. Moreland explained at trial that "our bank said that they would not agree to a lease that had a termination clause in it[,]" and that the clause "was struck from the beginning, that [the VA] did not have a right to terminate the lease after the lease went into effect." (Moreland, Tr. 1749). He further testified that his company had invested $17,000,000 in constructing the "single-purpose building," and that it "wouldn't make good business sense" to allow the Government out of the Lease upon 180 days' notice, leaving his company "holding the bag" for the amount of the investment. (Moreland, Tr. 1750-51).

The Lease contains a provision entitled "Maintenance of Building and Premises – Right of Entry (AUG 1992)" which states:

> Except in case of damage arising out of the willful act or negligence of a Government employee, Lessor shall maintain the premises, including the building and all equipment, fixtures, and appurtenances furnished by the Lessor under this lease, in good repair and condition so that they are suitable in appearance and capable of supplying such heat, air conditioning, light, ventilation, access and other things to the premises, without reasonably preventable or recurring disruption, as is required for the Government's access to, occupancy, possession, use and enjoyment of the premises as provided in this lease. For the purpose of so maintaining the premises, the Lessor may at reasonable times enter the premises with the approval of the authorized Government representative in charge.

(Exh. 1, General Clauses, ¶ 14, Section 552.270-12).

The Lease contains a provision entitled "Inspection of Construction (FAR 52.246-12) (JUL 1986)" which states in part:

> (f) The Lessor shall, without charge, replace or correct work found by the Government not to conform to contract requirements, unless in the public interest the Government consents to accept the work with an appropriate adjustment in contract price. The Lessor shall promptly segregate and remove rejected material from the premises.
>
> (g) If the Lessor does not promptly replace or correct rejected work, the Government may (1) by contract or otherwise, replace or correct the

> work and charge the cost to the Lessor or (2) terminate for default the Lessor's right to proceed.
>
> (h) Unless otherwise specified in the contract, the Government shall accept, as promptly as practicable after completion and inspection, all work required by the contract or that portion of the work the Contracting Officer determines can be accepted separately. Acceptance shall be final and conclusive except for latent defects, fraud, gross mistakes amounting to fraud, or the Government's rights under any warranty or guarantee.

(Exh. 1, Solicitation For Offers, ¶ D.32).

The Lease contains a provision entitled "Guaranty (VAAR 852.236-75) (APR 1984)" which provides in part:

> (b) If defects of any kind should develop during the period such guarantees are in force, the contracting officer shall immediately notify the Lessor in writing of such defects. The Government thereupon shall have the right, by a written notice to that effect, to require the Lessor to repair or replace all inferior or defective work, material, or equipment or permit it to remain in place and assess the Lessor the costs he/she (the Lessor) would have incurred had he/she been required to effect repair or replacement.
>
> * * *
>
> (e) Should the Lessor fail to proceed promptly, after notification by the contracting officer, to repair or replace any inferior or defective work, material, or equipment, or damage to the site, buildings, or contents thereof, caused by inferior or defective work, or the use of inferior or defective materials, or equipment, the Government may have such work, material, equipment, or damage repaired or replaced and charge all costs incident thereto to the Lessor.

(Exh. 1, Solicitation For Offers, ¶ D.35).

The Lease contains a provision entitled "Warranty of Construction (FAR 52.246-21) (APR 1984)" which provides in part:

> (c) The Lessor shall remedy at the Lessor's expense any failure to conform, or any defect. In addition, the Lessor shall remedy at the

> Lessor's expense any damage to Government-owned or controlled real or personal property, when that damage is the result of –
>
> (1) The Lessor's failure to conform to contract requirements; or
>
> (2) Any defect of equipment, material, workmanship, or design furnished.
>
> * * *
>
> (f) If the Lessor fails to remedy any failure, defect, or damage within a reasonable time after receipt of notice, the Government shall have the right to replace, repair, or otherwise remedy the failure, defect, or damage at the Lessor's expense.
>
> * * *
>
> (j) This warranty shall not limit the Government's rights under the Inspection and Acceptance clause of this contract with respect to latent defects, gross mistakes, or fraud.

(Exh. 1, Solicitation For Offers, ¶ D.48).

The Lease contains a provision entitled "Failure in Performance (AUG 1992)" which states:

> The covenant to pay rent and the covenant to provide any service, utility, maintenance, or repair required under this lease are interdependent. In the event of any failure by the Lessor to provide any service, utility, maintenance, repair or replacement required under this lease the Government may, by contract or otherwise, perform the requirement and deduct from any payment or payments under this lease, then or thereafter due, the resulting cost to the Government, including all administrative costs. If the Government elects to perform any such requirement, the Government and each of its contractors shall be entitled to access to any and all areas of the building, access to which is necessary to perform any such requirement, and the Lessor shall afford and facilitate such access. Alternatively, the Government may deduct from any payments under the lease, then or thereafter due, an amount which reflects the reduced value of the contract requirement not performed. No deduction from rent pursuant to this clause shall constitute a default by the Government under this lease. These

> remedies are not exclusive and are in addition to any other remedies which may be available under this lease or at law.

(Exh. 1, General Clauses, ¶ 15, Section 552.270-17).

The next paragraph of the Lease, "Default by Lessor During the Term (AUG 1992)" states:

> (a) Each of the following shall constitute a default by Lessor under this lease:
>
> > (1) Failure to maintain, repair, operate or service the premises as and when specified in this lease, or failure to perform any other requirement of this lease as and when required provided any such failure shall remain uncured for a period of thirty (30) days next following Lessor's receipt of notice thereof from the Contracting Officer or an authorized representative.
> >
> > (2) Repeated and unexcused failure by Lessor to comply with one or more requirements of this lease shall constitute a default notwithstanding that one or all such failures shall have been timely cured pursuant to this clause.
>
> (b) If a default occurs, the Government may, by notice to Lessor, terminate this lease for default and if so terminated, the Government shall be entitled to the damages specified in the Default in Delivery – Time Extensions clause.

(Exh. 1, General Clauses, ¶ 16, Section 552.270-33).

B. <u>VA Occupancy and Lease Commencement</u>

The principal entities engaged in the design and construction of the Medical Clinic were: Design Collaborative Southwest, Inc. ("DCSW"), the project architect; RMA, Inc., the general contractor; Design Engineering Associates of Nevada, Inc. ("DEA"), the principal engineering consultant to DCSW; Lucchesi, Galati Architects, Inc., the VA's architectural consultant; and Martin & Peltyn, the VA's design engineering consultant. (Stip. 7; Moreland, Tr. 1606-09, 1619-20).

The VA approved the design of the Medical Clinic prior to occupying the building. (Abrol, Tr. 731-32; Moreland, Tr. 1617). Thereafter, beginning in March 1997, the VA took

occupancy of portions of the Medical Clinic, and on June 1, 1997, the VA occupied the entire building and began making payments to Moreland under the Lease. (Stip. 8). More than a month later, on July 11, 1997, the City of Las Vegas issued a temporary occupancy permit for the Medical Clinic, and a final Certificate of Occupancy on February 8, 1998. (Exh. 7; Wilkins, Tr. 2270-71; Stip. 9).

According to Mr. Paul Wilkins, Director of the Building Department for the City of Las Vegas, the Medical Clinic complied with the Uniform Building Code and City of Las Vegas Ordinances beginning in 1998 when the Certificate of Occupancy was issued. (Wilkins, Tr. 2270-72, 2301, 2312-14). Mr. Wilkins at all times thought that the Medical Clinic was safe as constructed. (Wilkins, Tr. 2312).

C. Questionable VA Conduct Relating to Building Matters

On July 17, 2000, the VA's Contracting Officer, Dudley Schadeberg, issued final decisions denying two claims by Moreland relating to the construction of the Medical Clinic. Based upon the advice of VA counsel, Mr. Schadeberg denied Moreland's claims for extended supervision and labor costs, despite his conclusion that Moreland was entitled to approximately $300,000. Mr. Schadeberg had prepared a draft final decision allowing the added labor cost claim on the merits. (Exh. 12). He testified that he also would have allowed the extended supervision cost claim. (Schadeberg, Tr. 2209). VA Counsel advised Mr. Schadeberg, however, that the VA would use the denial of the claims as leverage in trying to settle other disputed claims. (Exh. 11, 13; Schadeberg, Tr. 2209-10, 2236).

Separately, on June 30, 1999, the VA's Office of Inspector General ("OIG") issued a report on its Combined Assessment Program Review of the Southern Nevada Veterans Healthcare System. (Exh. 10). The OIG reported on the discovery of certain "deficiencies" at the Medical Center that "prevented the activation" of the Surgery Suite. Id. at 17. The OIG noted that the VA "was responsible for correcting the deficiencies because the accepted construction work had been substantially in compliance with contract specifications." Id. at 18.

Kharaiti Abrol served as the Principal Structural Engineering Consultant to the VA. (Exh. 17 at 3). In November 2000, the VA instructed Mr. Abrol to conduct a "limited structural study" of the Medical Clinic, and report his findings. (Exh. 17, 18). On December 13, 2000, Mr. Abrol issued a two-page memorandum listing structural concerns with the Medical Clinic. (Exh. 17 at 2-3). On December 19, 2000, Mr. Schadeberg forwarded a copy of Mr. Abrol's report to Grant Richardson, the VA's Southern Nevada Healthcare System Facility Manager. (Exh. 17 at 1). Mr. Schadeberg's transmittal letter notes that Mr. Abrol's report "should provide the necessary justification for you to request that the Lessor, Moreland Corporation, contract for and have conducted a comprehensive structural study of the

[Medical Clinic], at no cost to the Government." Id. Mr. Schadeberg testified that he asked Mr. Abrol to prepare the report because he wanted Moreland to pay for a comprehensive study. (Schadeberg, Tr. 2214-15). On January 9, 2001, the VA issued such a demand on Moreland. Citing the "structural deficiencies" identified in Mr. Abrol's report, Contracting Officer David Goodman informed Terry Moreland that the VA "now requests that Moreland, at its own expense, conduct a comprehensive independent structural study" of the Medical Clinic. (Exh. 18 at 1; Stip. 10).

Moreland requested DCSW, the project architect, and DEA, the principal engineering consultant, to review Mr. Abrol's report. DCSW and DEA informed Moreland that they disagreed with Mr. Abrol's findings and conclusions. (Exh. 22, 24; Moreland, Tr. 1654-60). Moreland provided to the VA the DCSW and DEA response to the Abrol report, and indicated that Moreland would not conduct the comprehensive structural study requested by the VA. (Moreland, Tr. 1660, 1662-63).

D. Discovery of Building Defects

On May 24, 2001, the VA retained the services of John A. Martin & Associates, Inc. ("JAMA"), a professional engineering firm, to conduct a structural analysis of the Medical Clinic, and to "[p]rovide [a] solution to any problem" and "[p]rovide an estimate of cost to remove and/or correct deficiencies." (Stip. 12; Exh. 125, 258).

In January 2002, Moreland attempted to correct certain cracks on a concrete column on the exterior of the Medical Clinic, which DEA and Moreland attributed to thermal expansion and contraction of the precast panels. (Exh. 51; Moreland, Tr. 1671-73). The VA prevented Moreland from making the repairs pending review and approval by JAMA. (Exh. 83).

JAMA issued a preliminary report to the VA in March 2002, identifying potential structural issues that required further analysis. (Stip. 13; Exh. 56, 70, 88; Martin, Tr. 2965). In this preliminary report, JAMA stated in part:

> As we have indicated to your office, we are concerned about the overall structural capacity and stability of the building. While we do not believe that this is a matter for immediate evacuation, we do believe there are many structural issues that must be addressed . . . . We recommend these concerns be addressed and resolved in the next six months. We have also indicated to your office that we do not believe the building could be occupied during any remedial action taken to upgrade any deficient areas. We also do not believe that any work, of

> any kind, should be done at the facility without a comprehensive approved plan.

(Exh. 70 at 5-6). JAMA's recommended six-month time period to repair structural deficiencies was not related to any immediate safety concerns, but was arbitrarily set to encourage the VA not to "sit" on the issue. (Martin, Tr. 2818, 2873-74).

On March 26, 2002, the VA issued a Cure Notice to Moreland stating in part:

> This letter is to notify you that the Las Vegas [Medical Clinic] has numerous structural deficiencies as identified in the report prepared by *John A. Martin & Associates, Inc. Structural Engineers* (Martin) that affect the safety of VA employees and patients. The report, dated March 2002, is enclosed for your reference and action.
>
> * * *
>
> Please provide to this office by close of business April 4, 2002, a written statement declaring whether you intend to remedy all of the deficiencies noted in the Martin report, a tentative timeline for completion of the remedial repairs, and a statement that you will reimburse VA for all expenses incurred as a result of these deficiencies. Further, by close of business April 15, 2002, please provide this office with the proposed repairs for each deficiency noted in the Martin report.

(Stip. 14, 15; Exh. 70) (emphasis in original).

In March 2002, the VA began exploring options to move its clinical operations from the Medical Clinic to other locations in the Las Vegas area. (Exh. 59, 60, 61, 62, 66, 68, 74). In considering various options, VA Secretary Anthony Principi contacted the Secretary of the Air Force to inquire about locating an outpatient clinic at Nellis Air Force Base, northeast of Las Vegas. (Principi, Tr. 926-27).

In an April 4, 2002 letter to the VA, Moreland responded to the Cure Notice, stating in part:

> In summary, LVVA[6] will conduct an initial investigation of Martin's allegations but cannot fully respond to them, much less engage in a

[6] "LVVA" refers to "Las Vegas VA1 LLC," the co-plaintiff in this action. LVVA is the owner of the real property on which the Medical Clinic is located.

> comprehensive investigation, until such time as Martin completes and documents its charges. Please provide us with a copy of Martin's final report when it becomes available. Even if Martin does not provide a final report, LVVA will immediately retain an expert and have it conduct an independent investigation to determine the validity of Martin's alleged defects. We can discuss the timing of the disclosure of reports and remedial plans once additional information is obtained.

(Stip. 16; Exh. 87 at 7).

On April 12, 2002, representatives of the VA, JAMA, Moreland, DEA, and DCSW met at the Medical Clinic to discuss JAMA's March 2002 report. At this meeting, JAMA's Mr. Martin indicated that the report was based "solely on information at [JAMA's] disposal," and that he had not had the benefit of input from DEA and other critical information. Mr. Martin stated that he would issue a supplemental report after he received pertinent information and materials from Moreland. (Exh. 88 at 2; Moreland, Tr. 1680-84; Stip. 17). In a follow-up letter dated April 19, 2002, the VA's General Counsel stated to Moreland's Las Vegas counsel that "[i]n no event, however, will any remediation be undertaken until the Martin report, as supplemented, is presented to VA with VA then determining the most appropriate course of action." (Exh. 88).

JAMA and Mr. Martin determined in April 2002 that the alleged structural deficiencies at the Medical Clinic were not as serious as originally thought. (Exh. 83, 89). The VA Secretary's Chief of Staff, Chris Yoder, reported to Secretary Principi on April 19, 2002:

> According to our consultant (Martin) initial fears that the building is unsafe and should be expidiciously [sic] evacuated are no longer supported by the evidence. The building has structural defects and must be expiditiously [sic] repaired – but there is less life-safety-driven urgency than we had feared.

(Exh. 89 at 2; Principi, Tr. 942).

In April 2002, Moreland attempted to repair a missing gusset plate weld in the dental area of the Medical Clinic, and a missing "embed" in an exterior panel in the patio area, but the VA prevented Moreland from correcting those deficiencies pending JAMA's review and approval. (Exh. 138).

On May 28, 2002, JAMA issued a supplement to its March 2002 report, identifying three primary areas of concern that required further analysis: (1) precast panels; (2) steel

columns; and (3) lateral bracing. (Martin, Tr. 2894). In its supplemental report, JAMA stated in part:

> As we have indicated to your office we have concern for the overall structural capacity of the building. As we have previously stated, we do not believe that this is a matter for immediate evacuation; we do believe there are many structural issues that must be addressed. If this structure were not occupied, we would recommend that it not be occupied until the structural issues have been resolved. Our calculations indicate and we believe that the structure, as constructed, did not structurally meet the minimum standards required by code.
>
> * * *
>
> We do not believe that the entire structure is an immediately life safety hazard. If there were to be a code level earthquake, or severe windstorm, we would expect local portions of the building to perform very poorly, with partial collapse being possible.
>
> We wish to emphasize again that we do not believe that any work, of any kind, should be done at the facility without a comprehensive plan.

(Stip. 18; Exh. 113 at 2).

E. <u>Events Culminating in Default Termination</u>

On June 7, 2002, due in substantial part to JAMA's supplemental report, the VA issued a Show Cause Notice to Moreland stating that the VA was considering terminating the Lease for default based upon the VA's allegation that the Medical Clinic did not meet the minimum structural building code requirements. (Stip. 19; Exh. 125; Szwarcman, Tr. 133-34). On June 17, 2002, Moreland responded to the Show Cause Notice stating in part that it had "every intention of fixing structural defects that . . . are shown to be the product of work performed by contractors hired to build the facility." (Exh. 131; Stip. 20). Moreland also proposed a meeting to discuss the structural issues and to set "an appropriate timetable" for resolution of the issues. (Exh. 131 at 6).

Three days later, on June 20, 2002, VA officials recommended to Secretary Principi that the Lease be terminated for default, and that the Medical Clinic be relocated to new space. (Exh. 137 at 2; Principi, Tr. 940-41).

On June 21, 2002, the VA issued a letter to Moreland stating in part:

> This is to notify you that it is VA's position that the [Medical Clinic] has significant structural defects and does not meet the building code standards required by the provisions of the lease. This conclusion is based on the reports provided VA by its consultant, John A. Martin & Associates (JAMA), Structural Engineers. JAMA further advises that proper remediation cannot safely be performed while the facility is occupied nor can VA operate a medical facility in which such extensive structural remediation is being performed.
>
> Consequently, VA intends to vacate the facility in an orderly fashion as soon as it is reasonably practicable. At that time, VA will cease making lease payments under the current lease.
>
> * * *
>
> VA intends to move back to [the Medical Clinic] provided all structural deficiencies are corrected and the building is brought up to code and meets all other lease provisions, all within a reasonable time. Please note, however, that if the required remediation to the building is not comprehensive and completed within a reasonable time, VA will terminate this lease for Default and seek an alternate permanent facility.

(Stip. 21; Exh. 140).

On July 8, 2002, Moreland and VA representatives met in Washington, D.C. to discuss the structural issues noted in the JAMA report. (Stip. 22; Exh. 146; Szwarcman, Tr. 243-44). At this meeting, the parties agreed that Moreland would perform a structural investigation of the Medical Clinic and remediate any identified structural deficiencies. (Exh. 150; Moreland, Tr. 1715-17). The parties' agreement required Moreland to: (1) present a "comprehensive plan" for the inspection of the Medical Clinic by July 25, 2002; (2) conduct an inspection of the Medical Clinic after the VA approved the inspection plan; (3) submit a "detailed" remediation plan to the VA within two weeks of the inspection; and (4) submit "design documents for the remediation project" within 30 days after the VA's approval of the remediation plan. (Exh. 150).

On July 9, 2002, Moreland retained Exponent to inspect the Medical Clinic and to design remedial work for any required repairs. (Malone, Tr. 1096). On July 10, 2002, Exponent's Dr. David Malone traveled to Las Vegas to begin this assignment. (Malone, Tr. 1101). Dr. Malone met with DEA's Dan Campbell, the structural engineer of record, reviewed drawings and building details, and conducted a site inspection. Id. Dr. Malone attempted to obtain information from JAMA's Mr. Martin, including engineering

calculations and analyses pertinent to the JAMA March and May 2002 reports, but JAMA did not provide this information to Dr. Malone. (Malone, Tr. 1121-23).

On July 11, 2002, representatives of Moreland, Exponent, JAMA, and the VA met in Las Vegas to prepare a plan of action and a schedule to inspect and repair, if necessary, the deficiencies identified by JAMA. (Stip. 23; Malone, Tr. 1102-1105; Moreland, Tr. 1718-19). The parties agreed to a two-pronged plan to inspect and repair the alleged structural deficiencies. (Szwarcman, Tr. 108-09; Malone, Tr. 1106). In the first stage, Exponent and Moreland would focus on the three areas deemed critical by the VA and JAMA: (1) precast panels; (2) steel columns, and (3) lateral bracing. After addressing these three issues, Exponent and Moreland would turn to the remaining issues identified in the JAMA reports, and develop a comprehensive plan for inspecting the entire facility. (Stip. 23; Exh. 154, 156; Szwarcman, Tr. 109; Malone, Tr. 1106).

Moreland's counsel sent a letter to the Contracting Officer after the July 11, 2002 meeting to confirm the agreed upon plan for investigation. (Exh. 151). This letter noted that "today's meeting was very productive under a cooperative spirit." Id. at 2. Dr. Malone testified that he, too, noted the cooperative environment at the meeting. (Malone, Tr. 1105-06). Counsel's letter requested that Moreland be provided access to the building "on Monday, July 15 and Tuesday, July 16 during non-operating hours to review interior and exterior issues associated with the precast panels which are cracked at several locations." (Exh. 151 at 2).

The Contracting Officer did not participate in the July 11, 2002 meeting, but responded to Mr. Moreland in a July 12, 2002 letter stating "VA has determined that your plan is insufficient as it does not provide sufficient detail nor a comprehensive approach to investigating all of the structural deficiencies specified in the JAMA report." (Exh. 152). The Contracting Officer's letter further stated that "you may not initiate your inspection of the [Medical Clinic] until a more detailed and comprehensive plan is provided for review and approval," and that "you may not initiate inspection on Monday, July 15." Id.

On July 17, 2002, after being denied access to the Medical Clinic, Moreland submitted to the VA a renewed request to inspect the building, reflecting the two-pronged approach the parties had discussed at the July 11, 2002 meeting. (Exh. 156). The VA approved Moreland's inspection plan on July 19, 2002, and demanded that the inspection be completed within two weeks. (Exh. 158 at 3). Exponent conducted its inspection of the Medical Clinic from July 22 to August 1, 2002. (Exh. 164; Malone, Tr. 1199).

On August 9, 2002, Exponent issued a preliminary report which Moreland's counsel sent to the VA on August 12, 2002. (Stip. 25; Exh. 166). Exponent confirmed the existence of three structural deficiencies identified in JAMA's May 2002 supplemental report relating

to the lateral bracing system, the steel columns, and the precast panels, and described detailed protocols to repair those deficiencies. (Exh. 164; Malone, Tr. 1198-1209). Exponent's plan was "comprehensive" and presented a course of action for remedying all known and potential defects at the Medical Clinic. (Malone, Tr. 1211-12, 1244-45). Exponent stated that, in the course of conducting repairs, it would "continually inspect concealed areas opened for repair for other design or construction issues." (Exh. 164 at 7). Exponent further explained:

> While we conclude that repair of certain conditions is required, as discussed below, based on our field observations, review of the design drawings and calculations, review of recent analytical work by others, and our own analyses, we conclude that none of the conditions investigated poses a threat to the continued safe occupancy of the building in the near-term.

(Exh. 164 at 1).

In August 2002, Exponent's Dr. Malone contacted Mr. Martin to discuss various engineering issues. Dr. Malone wanted to address JAMA's concerns relating to the steel columns and precast panels, and he wanted to explain Exponent's column analysis. However, due to Mr. Martin's unavailability, Dr. Malone was unable to arrange a meeting, and ultimately he resorted to mailing Exponent's column analysis to Mr. Martin on August 23, 2002. (Exh. 161; Malone, Tr. 1192-94, 1201-02).

On August 15, 2002, Moreland requested the VA's permission to repair missing gusset plate welds on the lateral bracing. Moreland requested to schedule this repair work for August 24, 2002, noting the need for at least four days' notice to mobilize its crews. (Exh. 168, 171). On August 22, 2002, the VA approved Moreland's request, leaving Moreland just two days to mobilize its crews. Additionally, the VA conditioned its approval on Moreland's execution of an Indemnification and Reimbursement agreement relating to the contemplated repair work. (Exh. 172). Moreland objected to the indemnity agreement, and postponed its repairs until receiving notice that the VA would not insist upon an indemnity provision. (Exh. 178; Moreland, Tr. 1729).

On September 3, 2002, the VA abandoned the condition that Moreland sign the indemnity agreement, and authorized Moreland to perform welding repairs during the weekend of September 7-8, 2002. (Exh. 179). Since Moreland could only access the Medical Clinic on nights and weekends, Moreland scheduled the welding repair work for September 14-15, 2002, the first weekend after the four-day notice needed to schedule a crew. (Malone, Tr. 1210; Szwarcman, Tr. 433).

On September 9, 2002, JAMA issued a letter to the VA stating as follows:

> JAMA would like to summarize our current position on the [Medical Clinic] in two statements.
>
> 1. It is our opinion that the building, as constructed, did not and does not meet the minimum standards as set forth in the 1994 Uniform Building Code (1994 UBC). We understand that the 1994 UBC was the design code for the [Medical Clinic].
>
> 2. It is our opinion that the structure, as it stands, is unsafe for continued occupancy.

(Exh. 180 at 2; Stip. 27). Unlike JAMA's March 2002 preliminary report, the September 9, 2002 letter did not contain a Professional Engineer's stamp showing that Mr. Martin produced and would be professionally liable for statements made therein. (Compare Exh. 78 at 4 with Exh. 180; Malone, Tr. 1218-19).

On September 12, 2002, the VA notified Moreland that it was terminating the Lease for default and vacating the Medical Clinic. (Exh. 182; Szwarcman, Tr. 157; Stip. 28). In this seven-page letter, the Contracting Officer stated in part:

> This letter advises you that the Department of Veterans Affairs (VA) is terminating the above-referenced lease for **DEFAULT**, as the Moreland Corporation (Moreland) has failed to make satisfactory progress to repair and remediate the structural deficiencies in the building that houses the [Medical Clinic]. Further, Moreland has failed to provide VA with the oft-time-requested comprehensive remediation plan that both VA and Moreland agreed is the mandatory first step in order for Moreland to carry out its obligation to repair and remediate the structural deficiencies in the [Medical Clinic]. Moreland's failure to make satisfactory progress to remediate the deficiencies has compromised the integrity of the structure and has rendered the structure **"unsafe for continued occupancy,"** as stated emphatically by VA's structural engineering consultant, John A. Martin & Associates, Inc. (JAMA), in a September 9, 2002 letter to the VA Contracting Officer. Consequently, VA has been constructively evicted, being deprived of the beneficial enjoyment of the [Medical Clinic].
>
> * * *
>
> Your breach of the provisions of the lease, rendering the premises unsafe for continued occupancy, warrants the Contracting Officer's

> decision to terminate this lease, having been constructively evicted from the [Medical Clinic], and to vacate the premises within a reasonable period. **See <u>Richard Richardson v. The United States</u>, 17 Cl. Ct. 355 (July 11, 1989); <u>Appeal of David Kwok</u>, 90-1 BCA 22,292 (August 31, 1989).**

(Exh. 182 at 1-2; Stip. 28) (emphasis in original). As authority for issuing the default notice, the Contracting Officer cited lease clause 552.270-33, "Default by Lessor During the Term." <u>Id.</u> at 6.

The Contracting Officer testified that, at the time of default termination, he was not aware of the specific anticipated cost of moving the VA's clinical operations to other locations, pointing out that he was not responsible for procuring new space for the VA. (Szwarcman, Tr. 427). He learned later that the rental cost of moving the Medical Clinic operations to other locations in Las Vegas was approximately $4,000,000 more per year than the rental cost under the Lease with Moreland. <u>Id.</u> The VA has not claimed any of these costs against Moreland as damages or excess costs of reprocurement.

F. <u>Post-Termination Events</u>

Moreland completed the repair work on the gusset plates, each of which was missing one out of seven welds, on September 14-15, 2002, and it completed finish work (sheetrocking and repainting) by September 22, 2002. (Szwarcman, Tr. 433; Moreland, Tr. 1733; Stip. 32). By certification dated December 9, 2002, Kleinfelder, Inc., an inspection firm retained by Moreland, issued a City of Las Vegas Special Inspector Final Report certifying that Moreland had successfully performed the gusset plate repairs in accordance with the approved plans, specifications, and the applicable workmanship provisions of the Uniform Building Code. (Exh. 228 at 8; Stip. 37).

On September 16, 2002, Moreland's counsel sent a letter to the VA describing a schedule for the remaining repair work concerning the steel columns and precast panels. (Exh. 184). This letter indicated that Exponent would complete its analysis and conceptual design for the steel column repairs by September 27, 2002, and that Moreland "believes this work can reasonably be completed within 30 days from finalization of the design by Exponent." (<u>Id.</u> at 3; Szwarcman, Tr. 437). The letter also stated that Exponent would complete the same analysis and conceptual design work for the precast panel repairs by September 27, 2002, and that Moreland "believes this work can reasonably be completed within 60 days from finalization of the design by Exponent." (Exh. 184 at 3; Stip. 33).

After termination, Moreland repeatedly requested the VA to rescind its termination and remain in the building, given that the Medical Clinic posed no life-safety threats to its