occupants, and that all outstanding repairs would be made expeditiously. (Exh. 222, 227, 234, 235, 238, 245; Moreland, Tr. 1736-37). On October 28, 2002, JAMA stated that the Medical Clinic was safe for occupancy during the work week while Moreland performed repairs on nights and weekends. (Exh. 218 at 2; Martin, Tr. 2958-59). Moreland completed the repairs to the steel columns by November 30, 2002, and the repairs to the precast panels by December 7, 2002. (Exh. 230 at 4; Malone, Tr. 1226; Stip. 36).

On June 30, 2003, the VA moved out of the Medical Clinic and terminated all rent payments as of that date. (Exh. 248; Moreland, Tr. 1744-45; Stip. 39).

On September 26, 2002, Moreland filed suit against its general contractor, RMA, Inc., and others in the U.S. District Court for the District of Nevada. Moreland Corp. et al. v. RMA, Inc. et al., No. CV-S-02-1259-JCM -PAL (D.Nev., filed Sept. 26, 2002). (Exh. 285). Among the named defendants were: Steel Encounters, Inc. ("SEI"), Boman & Kemp Steel & Supply Company ("B&K"), CNA Insurance ("CNA"), and Royal Insurance Company of America ("Royal"). Id. According to the Complaint, SEI was RMA's steel erection subcontractor, B&K was a structural steel supplier, CNA provided general liability insurance to RMA, and Royal provided general liability insurance to SEI. Id. Moreland alleged that the defendants failed in their obligations to remediate deficiencies in the Medical Clinic, asserting legal theories of breach of contract, breach of warranty, and breach of an implied covenant of good faith and fair dealing. Id. Moreland also alleged that, if the VA's default termination of the Lease were upheld, the defendants would be liable to Moreland for damages caused by the default termination. Id. The parties settled this case by payment to Moreland of $1,100,000 in October 2003. (Exh. 286).

G. Expert Testimony

Dr. David W. Malone testified as an expert witness for Moreland. Dr. Malone has a Bachelor's Degree in Civil Engineering, a Master's Degree in Structural Engineering and Structural Mechanics from the University of California at Berkeley, and a PhD in Civil Engineering from the Massachusetts Institute of Technology. (Malone, Tr. 1091-92). He is a licensed professional engineer in the states of Washington and Maryland. (Malone, Tr. 1093-94). He has investigated "dozens" of building failures during his professional career. (Malone, Tr. 1096).

After Moreland's counsel retained Dr. Malone on July 9, 2002, Dr. Malone and his colleagues at Exponent immediately began an examination of the Medical Clinic, focusing first on the three areas of concern to the VA and JAMA: (1) exterior cracking and spalling on the second floor exterior wall panels; (2) missing welds on gusset plates used to connect diagonal braces to the steel beams and columns of the building; and (3) allegations that the columns were overstressed or under-designed. (Malone, Tr. 1096-1101; Exh. 164). Dr.

Malone determined early that this project "was certainly the kind of thing that I'd done before, and I was ready to look into it further." (Malone, Tr. 1098).

Dr. Malone is trained to examine a building with "a forensic eye." (Malone, Tr. 1116). He looks for evidence that an untrained observer may not notice, such as signs of movement or distress in a building. Id. Such evidence might include for example an area that has been patched, cracking in walls or concrete, or indications of leaks. Id. The evidence varies depending upon whether the structure is steel, concrete, or wooden. Id.

Dr. Malone examined each of the 60 exterior wall panels on the second floor of the Medical Clinic. (Malone, Tr. 1127). The concrete panels were approximately 27 feet wide, ten or eleven feet tall, and six inches thick, weighing 25,000 pounds each. (Malone, Tr. 1133, 1136-37). Dr. Malone observed the existence of cracks in the wall panels, some of them severe, and noted "to the untrained eye, this would look very alarming." (Malone, Tr. 1129; Exh. 259, photo 15). From the inside of the building, Dr. Malone and his staff examined how each panel was fastened to the steel structure. (Malone, Tr. 1135-36). Each panel was fastened to a steel beam at three locations, and a "kicker brace" was utilized at the lower portion of the panel to provide added stability. Id. Dr. Malone found that the bolts securing the kicker braces were loose in some cases, but that the fasteners bearing the vertical weight of the panel were secure. (Malone, Tr. 1159-61; Exh. 164 at 6). Dr. Malone described that tightening the kicker brace bolts was a "maintenance item," and simple to accomplish. (Malone, Tr. 1159).

The concrete wall panels were not structural elements of the building. (Malone, Tr. 1137). The cracks in the panels were purely cosmetic, and were caused by the wall panels rubbing against or resting on architectural column covers below. (Malone, Tr. 1138-39). The architectural covers also are non-structural members, and are placed around the structural steel columns to enhance the building's appearance, and to keep water away from the steel columns. (Malone, Tr. 1130-31). Dr. Malone opined that the architectural covers should not have been installed until the concrete wall panels had been braced and released. (Malone, Tr. 1139). Concrete has a tendency to settle or "creep" by fractions of an inch after being released. Id. In this case, the concrete wall panels made contact with the architectural column covers and caused the cracking. (Malone, Tr. 1140). However, because the architectural column covers are not designed to carry any load, Dr. Malone did not regard any of the cracking as a structural concern or a life-safety issue. (Malone, Tr. 1140; Exh. 164 at 6). Most of the repair work on the panels could be performed from the exterior of the building without disrupting the VA's normal operations in the building. (Exh. 164 at 6).

The general contractor employed gusset plates to attach diagonal structural bracing to steel columns and beams. (Malone, Tr. 1167). On each gusset plate, there were seven welds. (Malone, Tr. 1178). Each gusset plate was welded to a diagonal member in the shop,

and delivered to the construction site already in place. (Malone, Tr. 1174). Once at the site, each gusset plate was to have additional welds applied to secure the diagonal bracing to the column and beam. (Malone, Tr. 1174, 1178; Exh. 164 at 10).

Dr. Malone found that one vertical weld had been omitted on 34 gusset plates on the second floor. (Malone, Tr. 1167-69) (See also Exh. 259, photo 1). Dr. Malone concluded that these gusset plate welds should be repaired, but that the absence of one of the seven gusset plate welds in these 34 cases was not of serious concern. (Malone, Tr. 1173, 1179; Exh. 164 at 2). Dr. Malone testified that:

> [T]his missing weld doesn't mean there's no welding on that gusset plate, because there is. The missing weld there does not mean that this lateral bracing system is not functioning. It is. But the missing weld does two things. It causes the joint connection to be a little eccentric, and it causes it to be a little more flexible than it would otherwise. It's still functioning. Safety is not a risk for the building to collapse.

(Malone, Tr. 1173). Dr. Malone proposed that Moreland inspect and repair the gusset plate welds by using up to six crews over a weekend, or two consecutive weekends. (Exh. 164 at 3-4).

Dr. Malone and his staff performed an analysis of the column stresses in the building. (Malone, Tr. 1125, 1183-1206; Exh. 164 at 4-5, 11). Initially, Dr. Malone visited Chavez-Grieves, an architectural firm retained by one of the insurance carriers in Albuquerque, New Mexico, and reviewed that firm's column stress data. (Malone, Tr. 1124-25). Dr. Malone also attempted to review column stress data prepared by the VA's consultant, JAMA, but Dr. Malone was not given access to such data until the weekend prior to trial. (Malone, Tr. 1181).

The Medical Clinic facility was designed using hand calculations. (Malone, Tr. 1186). In reviewing the adequacy of the column design, Chavez-Grieves, JAMA, and Exponent used relatively comprehensive computer models that became available later for such purposes. (Malone, Tr. 1195). In determining whether a column's load-bearing capacity meets building code requirements, a rating of 1.0 or less is considered satisfactory, or "code compliant." Id. A rating slightly above 1.0 also might be acceptable in some cases. A rating of 1.10, for example, means that the actual demand under the analytical conditions is 10 percent more than the code-specified capacity. (Malone, Tr. 1196). In Dr. Malone's experience, some engineers would accept a rating of 1.10 or 1.20, even though such ratings technically would fail to satisfy code requirements. Id. Ratings above 1.20 generally would not be acceptable. Id.

Dr. Malone found that Chavez-Grieves used conservative default parameters in its computer analysis, which produced results indicating that some of the columns would be overstressed if loaded eccentrically and asymmetrically. (Exh. 164 at 4). Dr. Malone stated that the overstress condition reported by Chavez-Grieves "is an artifact of simplified modeling assumptions programmed into the computer, and using inappropriate or incorrect code specified coefficients in the column combined stress calculations." Id. Based upon Exponent's analysis of columns where the reported degree of overstress was high, Dr. Malone concluded that any problem was "of marginal non-compliance with the code, and not a life-safety issue." Id.

When Dr. Malone was able to review Mr. Martin's analysis of the building's structural condition, Dr. Malone was surprised to learn that JAMA found only seven of 107 structural members (columns, beams, braces) examined to be overstressed. (Malone, Tr. 1185-86; Exh. 58 at JAMA 00493-JAMA 00501). Dr. Malone did not understand how Mr. Martin could find the building "unsafe for continued occupancy" as he had stated on September 9, 2002 (Exh. 180), when Mr. Martin himself had identified such a small number of allegedly overstressed members earlier that year. (Malone, Tr. 1186).

Dr. Malone's analysis revealed that only one column in the building exceeded a stress rating of 1.10. (Exh. 164 at 11). Dr. Malone therefore concluded that the building was not in any structural danger, but that out of utmost caution, some isolated repairs could be made. (Malone, Tr. 1204-05). Of approximately 300 columns in the building, Dr. Malone recommended a "sistering" repair procedure for nine columns, and "filling" 30 other columns with high-strength cable grout. (Malone, Tr. 1203-04).

Dr. Malone summarized Exponent's work on the Medical Clinic project in three reports dated August 9, 2002, December 9, 2002, and January 17, 2003. (Exh. 164, 230, 236). In the final report, dated January 17, 2003, Dr. Malone observed that:

> Some of JAMA's concerns had been based on the assumption of 100 pounds per square foot (psf) corridor loadings, whereas the contract specified 60 psf. This resolved some of the beam and joist overload concerns.

(Exh. 236 at 1). Dr. Malone concluded by stating that "[i]t has always been [Exponent's] position that some of the issues raised needed to be remedied, but those conditions were never life-threatening." Id. at 3.

Two other structural engineers testified at trial: the VA's Kharaiti Abrol and the VA's consultant, John A. Martin of JAMA. Mr. Abrol spent only limited time reviewing structural design issues, and his only work product was a two-page memorandum dated December 13,

2000. (Abrol, Tr. 742-43; Exh. 16). The Court declines to give any weight to Mr. Abrol's memorandum because of the VA's ulterior motive in having this document prepared. The VA used Mr. Abrol's memorandum as a pretext to have Moreland perform a structural analysis at no cost to the VA. (Exh. 17). The Contracting Officer did not rely upon Mr. Abrol's analysis in the default termination notice. (Exh. 182).

The Court finds that Mr. Martin's testimony, as well as his contemporaneous correspondence and records created during the project, are largely consistent with Dr. Malone's assessment of the Medical Clinic. A significant inconsistency, however, is Mr. Martin's September 9, 2002 statement that the building "is unsafe for continued occupancy." (Exh. 180 at 2). This statement precipitated the Contracting Officer's default termination of the Lease, yet Mr. Martin reversed his position on October 28, 2002, stating that the Medical Clinic again was safe for occupancy. (Exh. 218 at 2). Mr. Martin did not explain how the building suddenly was "unsafe" on September 9, 2002, but "safe" at all other times. The Court found Mr. Martin generally to be a competent structural engineer, but suspects that some of his professionalism may have been compromised to satisfy the desires of his client, the VA. Mr. Martin also had a conflict of interest because of his association with Martin & Peltyn, the firm retained by the VA to perform structural analyses in other Las Vegas buildings where the VA might relocate. (Martin, Tr. 2890, 2907). The Court therefore does not accord Mr. Martin's testimony the same weight as Dr. Malone's.

H. Moreland's Damages Claim

Moreland submitted a certified claim to the Contracting Officer on June 9, 2006 for the net unpaid rent for the balance of the VA's lease term. (Exh. 263). Moreland calculated the net unpaid rent by multiplying the net useable square feet (148,260) by the net annual rent per square foot ($13.61). Id. Moreland then converted this amount to an amount per month and multiplied that figure by the number of months remaining on the lease after June 30, 2003. Id. Moreland's total claim was $17,824,064.30, although it appears to have miscounted the number of remaining months, using 106 instead of 107. (Exh. 282). The Contracting Officer denied the claim on July 25, 2006. (Exh. 265).

At trial, Moreland also presented evidence of the value of the building which it lost through foreclosure. The claimed value of that lost asset is $20,000,000, based upon a November 9, 2005 appraisal by Bridwell & Company. (Exh. 2; Bridwell, Tr. 2246-51). The Court finds that the appraisal is reasonable, but that Moreland did not present evidence of causation. The notice of commencement of foreclosure proceedings is dated November 4, 2003, more than a year after the default termination. (Exh. 251). The record does not indicate whether Moreland had opportunities during this time to sell, refinance, or re-rent the facility, or whether it had the means to repay its bank loan to retain the facility. Moreland did not include this damages item in the certified claim to the Contracting Officer. In view

of the Court's disposition of this item, the Court need not address whether Moreland failed to submit this claim to the Contracting Officer for a final decision.

## Discussion

### A. Burden of Proof and Applicable Standards

Under the Contract Disputes Act, the Court conducts a *de novo* review of a contracting officer's default termination. 41 U.S.C. § 609(a)(3); Seaboard Lumber Co. v. United States, 903 F.2d 1560, 1562 (Fed. Cir. 1990). When a contractor challenges a default termination of its contract, the Government bears the burden of proof to show the propriety of the termination. See Lisbon Contractors, Inc. v. United States, 828 F.2d 759, 765 (Fed. Cir. 1987). See also Aptus Co. v. United States, 61 Fed. Cl. 638, 646 (2004) ("When a contractor challenges the government's default termination of his contract, the government bears the burden of proof as to the propriety of said termination."). The Government therefore must establish by a preponderance of the evidence that the default termination was justified. Id. These principles apply with equal force where the Government has terminated a lease. See, e.g., Oscar Narvaez Venegas, ASBCA No. 49291, 98-1 BCA ¶ 29,690 at 147,142 (Where Government relies upon constructive eviction to justify its termination of a lease, it bears the burden to prove that the living or operating conditions were so "egregious" as to constitute "substantial interference with the tenant's beneficial use and enjoyment of the leased premises.").

Default termination is a "drastic sanction" and should be imposed or sustained on review only on the basis of "solid evidence." J.D. Hedin Constr. Co. v. United States, 187 Ct. Cl. 45, 57, 408 F.2d 424, 431 (1969) (citing Schlesinger v. United States, 182 Ct. Cl. 571, 584, 390 F.2d 702, 709 (1968)). When considering a default termination, the contracting officer is obligated to apply reasonable discretion. See Federal Acquisition Regulation ("FAR") § 49.402-3, "Procedure for default;" see also McDonnell Douglas Corp. v. United States, 182 F.3d 1319, 1325-26 (Fed. Cir. 1999), and cases cited therein. Thus, where the Government proves that a default exists, such occurrence grants the contracting officer the *right* to terminate for default if in the best interests of the Government, but it does not *require* that a default termination be issued. See Darwin Constr. Co. v. United States, 811 F.2d 593, 598 (Fed. Cir. 1987); Schlesinger, 390 F.2d at 706-07. Moreover, where a contracting officer in his or her discretion terminates a contract for default, the decision to terminate must be "honestly rendered." If, however, the decision to terminate is "arbitrary or capricious, or rendered in bad faith, the courts have power to review it and set it aside." Darwin Constr. Co., 811 F.2d at 598.

B. Moreland Was Not in Default of Any Lease Provisions.

As the record indicates, there were three categories of deficiencies that concerned the VA at the Medical Clinic: (1) the missing gusset plate welds on the second-floor lateral bracing; (2) exterior cracking on the precast panels, and on architectural covers around steel columns; and (3) the overstress, or under-design, of the structural steel columns. The parties were not aware of these deficiencies at the time Moreland completed construction, or when the VA began occupying the building. Mr. Wilkins, on behalf of the City of Las Vegas, issued a temporary occupancy permit for the Medical Clinic on July 11, 1997, and a Certificate of Occupancy on February 8, 1998, without knowledge of these deficiencies. Accordingly, the initial step in the Court's analysis is to determine which Lease clauses apply to these three categories of deficiencies.

The described deficiencies most closely fit the definition of "latent defects." The FAR defines "latent defect" to mean "a defect that exists at the time of acceptance but [which] cannot be discovered by a reasonable inspection." FAR § 2.101. Certainly, upon performing their reasonable inspections of the building at completion of construction, the parties were unaware of these deficiencies. The VA and Moreland began the lease term in 1997 without any knowledge that these problems existed. The parties did not become aware of the deficiencies until well into the lease term, in early 2002.

Although the missing gusset plate welds probably could have been identified by trained inspectors specifically looking for them, the fact is that the parties were not aware of these omissions at the completion of construction. The structural loading capacity of the steel columns could have been evaluated at any time, but apparently that was not a concern until sometime after completion of the building. The loading capacity presents a "theoretical" issue involving calculations by structural engineers. None of the Medical Clinic's steel columns exhibited any actual stress or buckling during the VA's occupancy. The cracks in the precast panels were not observed until at least four years after the VA's occupancy.

The VA's remedies for latent defects are contained in the "Warranty of Construction" clause, FAR ¶ 52.246-21. (Exh. 1, Solicitation For Offers, ¶ D.48). The VA also could rely upon the "Guaranty" clause, VAAR ¶ 852.236-75. Id. ¶ D.35. In addition, the "Inspection of Construction" clause, FAR ¶ 52.246-12, provides that "[a]cceptance shall be final and conclusive except for latent defects." Id. ¶ D.32, subparagraph (h). The warranties of construction generally apply for one year, beginning at the time of acceptance or occupancy. FAR ¶ 52.246-21(b). However, the one-year warranty is not applicable to latent defects discovered after acceptance. Id. subparagraph (j). Under these provisions, Moreland is responsible for the repair of latent defects whenever they are identified.

The "Warranty of Construction" clause, FAR ¶ 52.246-21 (APR 1984), affords the VA two alternative remedies when latent defects are discovered. First, upon notice from the VA, Moreland was required to repair the defects at its own expense. Subparagraph (c) of the clause provides that "[t]he Lessor shall remedy at the Lessor's expense any failure to conform, or any defect." Second, if Moreland failed to repair the defects within a reasonable time after receipt of notice, the VA could arrange for the repair of any defects itself, at Moreland's expense. Subparagraph (f) of the clause states that "[i]f the Lessor fails to remedy any failure, defect, or damage within a reasonable time after receipt of notice, the Government shall have the right to replace, repair, or otherwise remedy the failure, defect, or damage at the Lessor's expense."

The "Guaranty" clause, VAAR ¶ 852.236-75 (APR 1984), contains the same two remedies described above, but adds a third remedy, by which the VA may permit the defective work to remain, and assess Moreland the costs that would have been incurred in making the repairs. Subparagraph (b) provides that the Government may "permit [the inferior or defective work] to remain in place and assess the Lessor the costs [Lessor] would have incurred had [Lessor] been required to effect repair or replacement."[7]

Most importantly, the above provisions *do not afford the VA the right to terminate the Lease for default.* Instead, the Lease continues in effect, with clear procedures in place governing the repair or replacement of defective work. The Lessor, Moreland, remains responsible for the cost of the repairs, but is not subject to default termination. To have a basis for default termination, the Government must show a constructive eviction. Richardson v. United States, 17 Cl. Ct. 355, 357 (1989) (To establish a constructive eviction, the Government must show that acts or omissions of the landlord "substantially interfered with the beneficial use or enjoyment of the premises[.]"); David Kwok, GSBCA No. 7933, 90-1 BCA ¶ 22,292, (Common law principle of constructive eviction applies where the landlord has either "rendered the leased premises unfit for the purpose leased" or "deprived the tenant of the beneficial enjoyment of the premises.") aff'd 918 F.2d 187 (Fed. Cir. 1990) (Table).[8]

In contrast, the "Inspection of Construction" clause in the Lease, FAR ¶ 52.246-12 (JUL 1986), applicable to *pre-acceptance* inspections of construction, does contain a default remedy. (Exh. 1, Solicitation For Offers, ¶ D.32). Subsection (g) of that clause states that

---

[7] The "Failure in Performance (AUG 1992)" clause, General Clauses, ¶ 15, Section 552.270-17, permits the Government to deduct from rent any costs for maintenance or repairs that it incurs when such costs are the responsibility of the Lessor.

[8] The Contracting Officer cited the Richardson and Kwok decisions in his default termination notice, but failed to acknowledge that the facts presented here failed even to approach a "constructive eviction." (Exh. 182 at 2).

"[i]f the Lessor does not promptly replace or correct rejected work, the Government may (1) by contract or otherwise, replace or correct the work and charge the cost to the Lessor or (2) *terminate for default the Lessor's right to proceed.*" (Emphasis added). The existence of the default remedy in the pre-acceptance Inspection clause, contrasted with the omission of the default remedy in the post-acceptance Warranty and Guaranty clauses, provides a clear road map of the VA's remedies. The VA could not terminate Moreland's Lease unless it established a constructive eviction, or a substantial interference with the beneficial use or enjoyment of the premises. Moreland was not in default of the Lease due to the discovery of latent defects.

The parties have discussed in their briefs the potential application of the "Maintenance of Building and Premises – Right of Entry (AUG 1992)" clause, General Clauses, ¶ 14, Section 552.270-12, but the Court finds that this clause does not apply to the repair of latent defects. This clause applies to the Lessor's duty to keep the facility "in good repair and condition," and "capable of supplying . . . heat, air conditioning, light, [and] ventilation[.]" Id. The term "building maintenance" is separate and distinct from "repairs" concerning construction deficiencies.

C. Moreland Did Not Cause a Constructive Eviction or Interfere With the VA's Beneficial Use or Enjoyment of the Premises.

The Contracting Officer asserted in the default termination notice that the Medical Clinic was "unsafe for continued occupancy," that the VA "has been constructively evicted," and "deprived of the beneficial enjoyment" of the facility. (Exh. 182 at 1). These assertions, however, are not supported by the record. Preliminarily, the Court notes that the VA's use and occupancy of the Medical Clinic never was impacted or interrupted during the lease term, and that the VA remained in the Medical Clinic for a full nine months, until June 30, 2003, following the default termination. (Exh. 248; Stip. 39). Indeed, Defendant's counsel conceded during trial that the VA always was able to conduct its business in a normal fashion:

> There isn't and has never been a contention by the VA or the government in this case that the VA was prevented from conducting its business in a general fashion during the time between discovery of the structural defects and the termination.

(Smith, Tr. 1074). The Contracting Officer also conceded that the VA was able to use the facility at all times. (Szwarcman, Tr. 183).

Only one document from a structural engineer asserts that the Medical Clinic ever was unsafe for occupancy. (Exh. 180). In this document, JAMA's Mr. Martin reported to the

Contracting Officer on September 9, 2002 that "the structure, as it now stands, is unsafe for continued occupancy." Id. at 2. There are many indications in the record that Mr. Martin's assertion is incorrect and unreliable. Mr. Martin himself issued other pronouncements during his Medical Clinic work in 2001-2003 to the effect that the building did not present a safety concern. In a March 2002 preliminary report, identifying nine potential structural issues, Mr. Martin stated "we do not believe that this is a matter for immediate evacuation." (Exh. 70 at 5). In a May 28, 2002 supplemental report, Mr. Martin repeated "we do not believe that this is a matter for immediate evacuation," and added "[w]e do not believe that the entire structure is an immediate life safety hazard." (Exh. 113 at 2). On October 28, 2002, approximately six weeks after termination, Mr. Martin stated that the Medical Clinic was safe for occupancy, provided certain precautions were taken during repairs. (Exh. 218 at 2). There is nothing to explain why Mr. Martin thought the Medical Clinic was "unsafe" on September 9, 2002, but "safe" at all other times.

Moreland's structural expert, Dr. Malone, provided convincing evidence that the three categories of deficiencies did not represent serious structural defects. Dr. Malone stated in an August 9, 2002 preliminary report that "none of the conditions investigated poses a threat to the continued safe occupancy of the building in the near-term." (Exh. 166 at 3). He carefully explained in his trial testimony that each of the three deficiencies ought to be repaired, but that none of them was a life safety issue. (Malone, Tr. 1173, 1202-09). Dr. Malone reiterated in his final report, dated January 17, 2003, that "[i]t has always been [Exponent's] position that some of the issues raised needed to be remedied, but those conditions were never life-threatening." (Exh. 236 at 3).

Other evidence also casts doubt on Mr. Martin's September 9, 2002 statement that the Medical Clinic was unsafe for occupancy. Unlike the March 2002 preliminary report, Mr. Martin's September 9, 2002 letter did not contain a Professional Engineer's stamp. (Exh. 78, 180; Malone, Tr. 1219). Further, one of Mr. Martin's affiliate companies, Martin & Peltyn, had a contract with the VA to perform structural analyses in other Las Vegas buildings where the VA might relocate. (Martin, Tr. 2890, 2906-07). If Mr. Martin could encourage the VA to terminate the Moreland lease, Martin & Peltyn would realize additional business – an obvious conflict of interest.

Confronted with conflicting evidence and a sudden reversal of Mr. Martin's position, prudence would have dictated that the Contracting Officer carefully review all of the circumstances before terminating the Lease. The Contracting Officer had not visited the Medical Clinic himself in connection with the alleged deficiencies. (Szwarcman, Tr. 112). He might have inquired why Mr. Martin had changed his position. He might have convened a meeting of all the structural engineers to assess Mr. Martin's significant new allegation. He might have requested Mr. Wilkins of the City of Las Vegas, a disinterested party with a paramount interest in public safety, to provide his opinion. He might have weighed the cost

to the VA to make the repairs itself, the time needed for the repairs, and the cost for the VA to relocate to other facilities.

The Contracting Officer did not make these inquiries, but instead acted precipitously to issue a default termination just three days after Mr. Martin's September 9, 2002 letter. In the default termination notice, the Contracting Officer relied heavily on Mr. Martin's assertion that the Medical Clinic was unsafe for occupancy, quoting this finding in bold print in the first paragraph. (Exh. 182). The evidence, however, refutes Mr. Martin's conclusion. Perhaps the most telling evidence of building safety is that the VA remained in the building for nine months after the default termination before relocating.

This Court has established a two-part test to determine whether the Government has been constructively evicted from a leased facility: (1) Whether the landlord's acts or omissions "substantially interfered with the beneficial use or enjoyment of the premises" by the tenant; and (2) if so, whether the tenant abandoned the premises within a reasonable time. Richardson, 17 Cl. Ct. at 357. The overwhelming evidence here demonstrates that the VA cannot show constructive eviction. According to J.H. Millstein et al., GSBCA Nos. 7665, 7904, 86-3 BCA ¶ 19,025 at 96,084, the Government must show "something of a grave and permanent nature" to support a constructive eviction theory for terminating a lease. Similarly, in Oscar Narvaez Venegas, ASBCA No. 49291, 98-1 BCA ¶ 29,690 at 147,142, the Board held that, where the Government relies upon constructive eviction to justify its termination of a lease, it must show that the living or operating conditions were so "egregious" as to constitute "substantial interference with the tenant's beneficial use and enjoyment of the leased premises." By using the building for more than five years without interruption, and by not moving from the facility for nine months after termination, the Government has not satisfied the requirements to show constructive eviction.

Moreover, the precedent cited in the Contracting Officer's default termination notice is easily distinguishable. In Richardson, for example, the Court found that the tenant government agency was "plagued with persistent and recurring problems due to plaintiff's inadequate maintenance and repair of the leased premises." Richardson, 17 Cl. Ct. at 356. The Court found that the lessor's "failure to maintain the premises . . . interfered with [the government's] beneficial use of the office space and *seriously impeded* [the government's] ability to conduct business in a normal fashion." Id. at 357 (emphasis added). The operational problems in Richardson included:

> [B]eing forced to mount computer equipment necessary to the daily operation of the office on boards to protect it from flooding; soaked and slippery carpets; mildewed walls; water-damaged supplies; having to vacate offices due to dampness; and employees being forced to mop water during business hours.

Id. at 356. Further, the landlord in Richardson had not taken steps to repair the roof leaks. Id. This is a far different set of circumstances than those present at the VA's Medical Clinic in Las Vegas.

Similarly, the facts in David Kwok, 90-1 BCA ¶ 22,292, are much different from the circumstances of this case. In David Kwok, the Board found many problems that impacted the operations of the Social Security Administration ("SSA"):

> The record is rife with references to serious, as well as minor, deficiencies in appellant's performance. SSA asserts that the health and safety of its employees and the public . . . were imperiled continuously during appellant's entire thirty-two month tenure as landlord under the lease in question. Every time it rained, the roof leaked in different spots, requiring SSA to move personnel constantly, catch water in buckets, and move desks and files. Carpets were inundated by the leaks, creating a danger of electrocution. In addition to the roof, many other deficiencies persisted, frequently uncorrected by appellant for long periods of time, contributing to vermin infestation and unsanitary conditions.
>
> * * *
>
> The evidence reflects that the toilets in the various restrooms used by the SSA employees as well as the public were blocked up on the average of at least two to three times per month, resulting in water with urine and fecal matter flowing throughout the offices. Employees throughout the office reported they were bitten by fleas or other insects, at times requiring medical attention. The premises were described as "infested" by fleas and roaches. Mice ran through the offices and employees complained of being sickened by the stench of dead mice. Evidence of rats was found in various offices. One memo referenced an SSA telephone call complaining of the presence of a dead mouse in the lunch room that had not been removed in three days.

Id. at 111,957-58, 111,959-60. Obviously, conditions in the David Kwok case are not comparable to those at the VA's Las Vegas Medical Clinic. As Plaintiffs note, the VA's Secretary Principi described the VA Medical Clinic as a "beautiful" building in February 2002, just one month before Mr. Martin issued his preliminary report. (Exh. 271 at 6; Principi, Tr. 903).

The circumstances here are more like those in Oscar Narvaez Venegas, ASBCA No. 49291, 98-1 BCA ¶ 29,690. In that case, the Contracting Officer terminated a lease for

default, citing evidence of a water leak, air conditioning failures, insufficient electrical capacity, roof leaks, and concerns about the structural integrity of the building's support beams. Despite these conditions, the Board found that the Government's default termination was improper. The Board distinguished the Richardson and Kwok decisions, stating "[i]n the appeal at bar, no such egregious conditions were shown to have resulted from the water problems in the leased residence[,]" and concluding "Respondent did not establish a constructive eviction." Oscar Narvaez Venegas, 98-1 BCA at 147,142.

The Government in this case also did not abandon the premises within a reasonable time, thus failing to satisfy the second part of the constructive eviction test. Remaining in the Medical Clinic for nine months after the termination notice cannot be regarded as an abandonment within a reasonable time.

D. The VA Breached the Lease by Failing to Allow Moreland to Repair Latent Defects.

The Contracting Officer criticized Moreland in the default termination notice for failing "to make satisfactory progress to repair and remediate the structural deficiencies in the building[.]" (Exh. 182). The evidence does not support this attack. Instead, the record shows that the VA prevented Moreland from repairing its own building in 2002 until after the September 12, 2002 default termination. The VA notified Moreland of structural concerns requiring repair, but then demanded a "comprehensive remediation plan" from Moreland before allowing the repairs to go forward. No provision of the Lease required a "comprehensive remediation plan" from Moreland, nor was it clear what the VA regarded as a "comprehensive remediation plan."

Under the Warranty and Guaranty provisions of the Lease, when the VA provided notice to Moreland of defects requiring repair, the VA was required by contract to afford Moreland access to its own building to make the repairs. The Lease did not allow the VA to notify Moreland of the defects, prevent Moreland from making the repairs, and then terminate the Lease for default for Moreland's failure to make repairs. The extra-contractual demand for a "comprehensive remediation plan" was inappropriate because the VA used this demand as a means of preventing Moreland from fulfilling its obligations under the Warranty and Guaranty provisions of the Lease. This VA action excused Moreland of its duty to make the repairs within a reasonable time. The requirement that Moreland cure these deficiencies within 30 days under the "Default by Lessor During the Term" clause became unenforceable when the VA prevented Moreland from making repairs.

The VA prevented Moreland from performing repairs from as early as January 2002. When Moreland attempted to correct certain cracks on the exterior of a concrete column, which Moreland attributed to the precast panels, the VA prevented Moreland from making

the repairs pending review and approval by JAMA. (Exh. 51, 83). Later, after the VA had issued a Cure Notice to Moreland, the VA's General Counsel stated to Moreland's Las Vegas counsel that "[i]n no event, however, will any remediation work be undertaken until the Martin report, as supplemented, is presented to VA with VA then determining the most appropriate course of action." (Exh. 88).

Even when Moreland retained an eminently qualified structural expert, Dr. David Malone, the VA still would not accept Dr. Malone's proposed plan as a reasonable means of moving ahead. Following an apparently productive July 8, 2002 meeting in Washington, D.C., and a July 11, 2002 meeting in Las Vegas, the parties appeared to be on track toward a plan for repairs. However, the Contracting Officer responded that "your plan is insufficient as it does not provide sufficient detail nor a comprehensive approach to investigating all of the structural deficiencies specified in the JAMA report." (Exh. 152). This letter added "you may not initiate your inspection of the [Medical Clinic] until a more detailed and comprehensive plan is provided for review and approval." Id.

Thereafter, Dr. Malone submitted another plan on August 9, 2002 addressing all of the VA's concerns. (Exh. 164). Dr. Malone testified that this report was "comprehensive" and provided a detailed repair protocol for the missing gusset welds, the steel column loadings, and the cracks in the precast panels. (Malone, Tr. 1198-99, 1202-12). Even this plan did not satisfy the VA's consultant, Mr. Martin, who notified the VA of his reservations about Dr. Malone's report. (Exh. 170). The Contracting Officer then gave Moreland two days' notice of authorization to proceed, but only if Moreland executed an Indemnification and Reimbursement agreement. (Exh. 172 at 2). Such an agreement was not a requirement under the Lease, and the VA should not have proposed it as a condition to Moreland's entry to the building.

Ultimately, Moreland did not have access to the building to perform the repairs until after the VA's default termination. Dr. Malone testified that all of the "essential" repairs could have been made within 30 days, with repair work performed on nights and weekends during the VA's hours of non-operation. (Malone, Tr. 1247). The VA retained the right to arrange for the repairs itself under the Warranty and Guaranty provisions, but apparently did not consider this alternative approach.

E. The Contracting Officer Abused His Discretion by Terminating the Lease for Default.

Even if the VA could demonstrate that Moreland was in technical default under the Lease, the Contracting Officer abused his discretion in deciding to terminate the Lease for default. If a contractor is in default, that fact affords the Government the *right* to consider whether to terminate for default, but it does not *require* the Government to terminate for

default. The case law and applicable regulations mandate that a contracting officer must apply *reasoned discretion* in making a decision. See FAR § 49.402-3, "Procedure for default;" see also Darwin Constr. Co., Inc. v. United States, 811 F.2d 593, 596 (Fed. Cir. 1987) (citing Schlesinger v. United States, 182 Ct. Cl. 571, 581, 390 F.2d 702, 709 (1968)). Moreover, a default termination will be set aside if it is arbitrary, or capricious, or constitutes an abuse of the contracting officer's discretion. McDonnell Douglas Corp. v. United States, 182 F.3d 1319, 1326 (Fed. Cir. 1999) (citing Darwin, 811 F.2d at 598).

In the present case, the VA continuously occupied the Medical Clinic from the day that the lease term began. As noted above, Dr. Malone credibly testified that, if the VA had permitted, Moreland could have performed all of the necessary repairs quickly and without interrupting any of the VA's operations. (Malone, Tr. 1247). The building was entirely safe for occupancy. Faced with this relatively simple and painless option to move forward under the existing Lease, the Contracting Officer opted instead to terminate the Lease for default and move to other facilities nine months later. In so doing, the cost to the VA was approximately *$4,000,000 per year greater than if the VA had remained in the Medical Clinic facility*. (Szwarcman, Tr. 427). Thus, instead of paying approximately $2,140,000 per year at the Medical Clinic, the record suggests that the VA paid more than $6,000,000 per year in relocating to other facilities. This was an irrational decision by any measure, and one that cannot have resulted from the exercise of reasoned discretion. The VA has not claimed any of these increased costs against Moreland.

Plaintiffs have argued that the VA's real motive was to move eventually to a new facility better able to accommodate the rapid population growth in the Las Vegas area. Plaintiffs offered evidence of many statements and press releases from 2002 in which Nevada Congresswoman Shelley Berkley, Secretary Principi, and others spoke negatively of the Medical Clinic, and of a desire and to move to a new and larger facility. See, e.g., Exh. 80, 109, 271, 277, 278. Plaintiffs state that the VA actually made the decision to terminate Moreland for default on June 20, 2002, which would explain why the VA would not thereafter permit Moreland to make any repairs. (Exh. 137 at 2; Principi, Tr. 941). While factual findings concerning the VA's longer term expansion and relocation plans in Las Vegas are unnecessary to the Court's decision, it may be that Plaintiffs' assessment of the VA's motive is correct. Certainly, the Court can see no other explanation from the record, except perhaps bureaucratic ineptitude, to account for such a senseless decision.

### F. The VA Breached the Covenant of Good Faith and Fair Dealing.

If there were any doubt of the impropriety of the VA's default termination, the VA still could not prevail in this case because of its breach of the covenant of good faith and fair dealing. An implied term of every contract, including Government contracts, is that each party will act in good faith toward the other, and that a party may be found to have breached

the contract by acting in bad faith. See, e.g., Centex Corp. v. United States, 395 F.3d 1283, 1304 (Fed. Cir. 2005); Link v. Dept. of Treasury, 51 F.3d 1577, 1582 (Fed. Cir. 1995). A breach of the covenant of good faith occurs when there has been "sharp dealing," such as taking "deliberate advantage of an oversight by your contract partner concerning his rights under the contract." Mkt. St. Assocs. L.P. v. Frey, 941 F.2d 588, 594 (7th Cir. 1991). See also North Star Alaska Housing Corp. v. United States, 2007 WL 1041442 (Fed. Cl. Apr. 2, 2007). The Federal Circuit has stated that a party must establish a breach of this covenant by clear and convincing evidence. Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1239-40 (Fed. Cir. 2002); but see Tecom, Inc. v. United States, 66 Fed. Cl. 736, 771 (2005) ("[t]he presumption of good faith conduct of government officials has no relevance" with respect to "claims that the duties to cooperate and not hinder performance of a contract have been breached," and in such cases, proof of a violation need not be by clear and convincing evidence).

In the present case, the conduct of certain VA officials was deplorable by any measure, be it "clear and convincing" or some lesser standard.

The first instance of VA bad faith arose when Moreland submitted contract claims to the VA relating to construction of the facility. One claim, dated May 4, 1998, was for $153,614.07 for added labor cost from April through August 1997. (Exh. 12, 13). A second claim, dated August 21, 1998, was for $235,800.40 for the added costs of project supervision from April 1997 through January 1998. (Exh. 11). The second claim amended and superseded an earlier claim by Moreland for extra supervisory costs, dated April 22, 1998. Id. These claims together totaled $389,414.47.

The Contracting Officer, Dudley Schadeberg, testified at trial that he reviewed these Moreland claims and found that they had merit. (Schadeberg, Tr. 2208-09; Exh. 12). He prepared a draft final decision that would have allowed $131,345.51 of the added labor cost claim. (Exh. 12 at 3). He testified that he would have allowed approximately $165,000 for the added supervisory cost claim. (Schadeberg, Tr. 2209). In total, Mr. Schadeberg was prepared to allow nearly $300,000 in a final decision for these claims. Id.

Mr. Schadeberg explained at trial why he did not grant these claims, even though he had determined that they ought to be paid:

> Q. So at the time that you issued your final decisions with respect to both claims on July 17, 2000, you had already made a decision that Moreland was due in total for both of those claims approximately $300,000? If you take $165,000 plus the $131,000?
>
> A. If it's a rounded number, I'd agree with your statement.

> Q. Okay. Do you recall why you did not issue a final decision or a unilateral modification for the amounts that you determined were due and owed Moreland Corporation for those particular two items?
>
> A. To the best of my recollection, I was working with VA general counsel, and they were working on trying to arrive at a settlement with Moreland. And we were also within the window of going to the Board of Veterans' Appeals on some or all of these different claims, and it was upon the advice of counsel that we did not grant any relief at that time.
>
> Q. Just so we're clear, government counsel directed you not to grant any entitlement to the dollars you found were due and owed on the basis of other claims that were pending for purposes of negotiations, correct?
>
> A. I think they were trying to get a global settlement of all of the claims. I'm not really sure about the details because it was never told, but I deferred to their counsel.

(Schadeberg, Tr. 2209-10). Thus, instead of granting Moreland's meritorious claims, the Contracting Officer followed the advice of agency counsel to deny the claims so that the agency would have greater leverage in negotiating other claims.

Under the Contract Disputes Act, a contracting officer's review of certified claims submitted in good faith is not intended to be a negotiating game where the agency may deny meritorious claims to gain leverage over the contractor. The law requires contractors to certify that their claims are "made in good faith," that all "supporting data are accurate and complete to the best of [the contractor's] knowledge and belief," and that the amount requested "accurately reflects the contract adjustment for which the contractor believes the government is liable." 41 U.S.C. § 605(c)(1). Certainly, a reciprocal obligation to act in good faith should apply to the Government. As the Court noted recently in Lavezzo v. United States, a contracting officer is obligated to "put his own mind to the problems and render his own decisions." Such decisions must be "personal [and] independent," and "even the appearance of coercion [must] be avoided." 74 Fed. Cl. 502, 509 (2006). The Contracting Officer's outright denial of meritorious contractor claims to gain some advantage over the contractor will not be condoned by this Court.

A second instance of the VA's bad faith occurred when the VA attempted to impose upon Moreland the obligation to perform a structural loading study to determine whether the VA could safely install an auxiliary heating ventilating and air conditioning ("HVAC")

system on the roof of the facility. The VA's Office of Inspector General ("OIG") issued a report in June 1999 addressing deficiencies involving the Medical Clinic's HVAC system. (Exh. 10 at 17-19). The OIG sought to determine why the Ambulatory Surgery Suite had not been put into service, and whether the HVAC system should be upgraded. Id. at 17. The OIG recognized that the HVAC deficiencies were the VA's responsibility "because the accepted construction work had been substantially in compliance with contract specifications." Id. at 17-18. The OIG recommended that the VA "award a contract to identify, conclusively and comprehensively analyze, and correct the deficiencies." Id. at 17.

Rather than taking responsibility for the desired study, as the OIG had recommended, the VA attempted to have Moreland undertake this study at no cost to the VA. In a May 2001 internal memorandum, the VA explained why it dispatched Mr. Kharaiti Abrol (a VA engineer) to Las Vegas in November 2000:

> As an offshoot to the Ambulatory Surgery Study completed last year, questions arose regarding the ability of the structure of the [Medical Clinic] to support the additional weight of additional mechanical equipment required to correct heating, ventilating and air conditioning (HVAC) deficiencies should a decision be made to proceed with correction of the deficiencies identified in the study . . . . After discussion with Peter Verdoljak of the VISN office in early October, 2000, a decision was made to request a site visit by the Headquarters (HQ) structural engineer, Kharaiti Abrol.

(Exh. 33 at 1).

After visiting the Medical Clinic in November 2000, Mr. Abrol prepared a two-page set of "Structural review comments" on the facility. (Exh. 17 at 2-3). Although Mr. Abrol explained that "a thorough review was not possible," he described in his report "many structural deficiencies" in the building. Id. at 2. Upon receipt of Mr. Abrol's December 13, 2000 report, the Contracting Officer, Mr. Schadeberg, forwarded the report to VA officials in Las Vegas, stating:

> The attached memo contains the comments & conclusions by our VACO Kharaiti Lal Abrol. I instructed him earlier today to send it to you via E-mail also. *This should provide the necessary justification for you to request that the lessor, Moreland Corporation, contract for and have conducted a comprehensive structural study of the [Medical Clinic], at no cost to the Government.*

Id. (emphasis added). Sure enough, the VA forwarded Mr. Abrol's two-page report to Moreland on January 9, 2001, requesting Moreland to "conduct a comprehensive independent structural study including seismic and wind analysis." (Exh. 18). The VA also asked for a timeline for the completion of the study, the right to sanction the scope of work, and the right to approve the firm selected by Moreland. Id. After consulting with its project architect and engineer, Moreland declined to perform the requested study. In the course of these consultations, Moreland's engineer described the Abrol report as "extremely inflammatory and unsubstantiated." (Exh. 23). Moreland's architect was even more incensed, asserting that the VA had engaged in "libel, slander, business defamation, tortuous interference with contractual relations, potential unfair trade practice violations . . . and potential conspiracy to damage our professional reputation and ability to do business with the federal government." (Exh. 24). The VA's bad faith conduct preceded the contentious exchanges between the parties in 2001 and 2002.

Even if Moreland were in technical default of its obligations under the Lease, the Court would not uphold a default termination where the agency has acted in bad faith in the administration of the Lease. See Libertatia Assocs., Inc. v. United States, 46 Fed. Cl. 702, 712 (2000) ("In view of the court's finding of bad faith on the part of the government, it is difficult – if not impossible – to assess whether the administration of the contract and the resulting termination for default was arbitrary and capricious because the evidence of default itself is tainted by bad faith."). Similarly here, the agency's bad faith compels the Court to overturn the termination for default.

G. Moreland's Statements in the Nevada Lawsuit Do Not Constitute Admissions Against Interest.

Much of Defendant's position is centered upon statements that Moreland made in the 2002 lawsuit against its general contractor and others in the U.S. District Court for the District of Nevada. Moreland Corp. et al. v. RMA, Inc. et al., No. CV-S-02-1259-JCM -PAL (D.Nev., filed Sept. 26, 2002). (Exh. 285). Two weeks after the VA terminated the Lease for default, Moreland filed the Nevada suit to recover the costs of investigating and repairing the structural damages at the Medical Clinic, as well as damages that may result from the lease termination. (Exh. 285). Apparently recognizing their contractual obligation to compensate Moreland for the costs of repairing the defects, the defendants settled the lawsuit with Moreland with a payment of $1,100,000 in October 2003. The proceeds of that settlement did not cover any of Moreland's losses from the VA's termination of the Lease.

The pleadings from the Nevada lawsuit generally do not contain statements by Moreland that are inconsistent with its position in this case. There is nothing in the Nevada lawsuit to substantiate Defendant's position that Moreland acknowledged the validity of the default termination. More accurately, Moreland asserted in the Nevada lawsuit that, if the

VA's allegations regarding termination were correct, then the contractors and insurers were contractually liable to Moreland for any resulting damages. Moreland made no representations as to whether the termination was proper or improper, or whether Moreland had timely responded to the VA's demands regarding inspection and repair.

Principally, Defendant contends that Moreland's statements in the Nevada lawsuit concede that the Medical Clinic was not code-compliant. Defendant essentially asserts that Moreland has been in default since the inception of the Lease because of these alleged code violations. However, because Moreland is the owner and lessor of the building, and the agency is the lessee, this is not a case where the Government determines if the facility is code-compliant. Moreland was required to follow all building codes, ordinances, and inspection criteria mandated by the City of Las Vegas. Once the local building authority completed its inspections and issued a Certificate of Occupancy, the VA had no legal rights to terminate the Lease by asserting its own interpretations of code compliance. The Lease provided that the "[s]pace offered must have a current occupancy permit issued by the local jurisdiction" (exh. 1 at 154, sec. 9.1), that the "space must be . . . constructed in accordance with . . . local code requirements (id at 110, sec. 1.3), and that "[l]essor shall . . . be responsible for obtaining any necessary licenses and permits, and for complying with any Federal, State, and municipal laws, codes, and regulations applicable[.]" Id. at 43, sec. D.25.

Moreland delivered to the VA a building that complied with the requirements of the Uniform Building Code, as evidenced by the Certificate of Occupancy issued by the Las Vegas City Building Official, Paul Wilkins. (Exh. 7). Mr. Wilkins issued this certificate after a process in which Las Vegas Building Department officials examined the plans, issued construction permits, conducted inspections during construction, and determined that Moreland was in compliance with "the various ordinances of the city regulating building construction." (Wilkins, Tr. 2271-73; Malone, Tr. 1247-48). The City of Las Vegas never revoked this certificate. (Wilkins, Tr. 2281, 2302). Mr. Wilkins testified unequivocally that "[a]s far as I am concerned, I need to tell you that I thought and still think that the building is a safe building." (Wilkins, Tr. 2281).

Defendant emphasizes a Moreland interrogatory answer in the Nevada litigation stating that in August 2002, Moreland "did not have the financial resources to move forward." (Exh. 287, response to Interrogatory 16). Mr. Moreland explained at trial that the company, though in some financial distress, was able to borrow or rely upon its credit to obtain the necessary resources to correct the defects. (Moreland, Tr. 1824, 1846, 1856). This time period, August 2002, is when Moreland had already retained Exponent's Dr. Malone. With his guidance, Moreland was preparing to make the necessary repairs. There is no evidence that Moreland's financial condition prevented it from performing the required tasks or repair work. Placed in context, the Court does not regard Moreland's interrogatory response from the Nevada suit as an inconsistent statement.

Moreover, the doctrine of judicial estoppel does not apply to this case. The Court has described the necessary elements for judicial estoppel as follows:

> First, a party's later position must be "clearly inconsistent" with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled. Finally, [a] third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

Cuyahoga Metropolitan Housing Authority v. United States, 65 Fed. Cl. 534, 556 (2005) (citing New Hampshire v. Maine, 532 U.S. 742, 751 (2001)).

Here, Moreland's statements in the two actions are not clearly inconsistent. In the Nevada suit, Moreland described the problems at the Medical Clinic in terms of the VA's allegations, or JAMA's allegations. In the present suit, Moreland has at all times acknowledged that defects existed which required repairs. The Court sees nothing inconsistent in Moreland claiming the costs of investigation and repair in the Nevada suit, and in challenging the VA's default termination in this Court.

A further point is that judicial estoppel does not apply where a party settles the claim in which it is alleged to have made an inconsistent statement. Water Technologies Corp. v. Calco, 850 F.2d 660, 665-66 (Fed. Cir. 1988) (in such cases, judicial estoppel cannot be "invoked to preclude [the party] from taking a position inconsistent with its earlier pleading or interrogatory answer" because "there has been no judicial acceptance of the asserted inconsistent position."); First Nationwide Bank v. United States, 56 Fed. Cl. 438, 444 (2003) (judicial estoppel cannot be invoked where litigation was settled because "[t]he court cannot go behind the settlement in an attempt to reconstruct which positions merit judicial endorsement.").

Finally, even if Defendant could identify an inconsistent statement by Moreland in the Nevada litigation, Moreland should not be placed in a position of having to choose at its peril which legal action to pursue – suing its general contractor and associates for failing to make building repairs, or suing the United States to challenge the VA's default termination. Parties are free to make alternative fact allegations in cases of doubt, provided the allegations are made in good faith:

> Alternative fact allegations made in good faith and based on genuine doubt are not admissions against interest so as to be admissible in evidence against the pleader. The pleader states the facts in the alternative because he is uncertain as to the true facts. Therefore, he is not "admitting" anything other than his uncertainty.

Douglas Equip. Inc. v. Mack Trucks, Inc., 471 F.2d 222, 224 (7th Cir. 1972). These words have direct application here. In addition to the costs of repair, Moreland essentially was seeking indemnification from the defendant companies in Nevada if the VA prevailed in its default termination. In order to preserve its rights, Moreland had to assume and plead that the default termination might be upheld. Moreland should not be penalized here for pleading a valid cause of action in Nevada.

H. Damages

The Court finds that Moreland is entitled to recover the net unpaid rent that it would have received during the remainder of the 15-year term of the lease. The rent due, less operating costs, is $13.61 per square foot per year. (Exh. 1 at 4). The rental period under the 15-year term began on June 1, 1997 and extended until May 31, 2012. (Exh. 1 at 5; Moreland, Tr. 1752-53, 1758). The beginning date for calculating damages is July 1, 2003, the date on which the VA no longer occupied the building. (Stip. 39). Of the total of 180 monthly rental payments to be made under the 15-year lease, the VA made 73 of those payments, leaving 107 months unpaid. (Moreland, Tr. 1759). The monthly payment can be calculated by multiplying $13.61 (net rent per square foot), by 148,260 square feet, divided by 12 months, for a total of $168,151.55. (Exh. 282; Moreland, Tr. 1759). The total unpaid rent for 107 months is $168,151.55 times 107, or $17,992,215.85.

This calculation is consistent with the approach followed in J.H. Millstein, 86-3 BCA at 96,084 (in a lease wrongfully terminated by the Government, the Board awarded the lessor the rental payments called for by the lease through "the earliest date on which the Government could have legally terminated the lease in question."). The calculation above grants Moreland the amount of rent it would have received if the VA had occupied the Medical Clinic for the required 15-year term. There is no indication that Moreland received any revenue from re-renting the building, or that it will receive any rental revenue in the future, and thus there is no credit to apply against the Government's payment of net rental damages.[9] Similarly, the amount for which Moreland settled its Nevada lawsuit against the general contractor and others did not compensate Moreland for lost rent, and should not be

---

[9] Evidence suggests that VA representatives ransacked the building to some extent upon departure. (Moreland, Tr. 1745-46). Also, the building had been customized for the VA as a single-purpose facility. These factors among others hampered Moreland's attempts to re-rent or sell the facility after termination. (Moreland, Tr. 1747-49).

considered a credit to the Government. This amount was to reimburse Moreland for the costs of investigating and repairing the building.

Defendant's argument that the standard "Termination for Convenience of the Government" clause, FAR ¶ 52.249-2, prevents Moreland from recovering unpaid future rent is without merit. Defendant cites the standard "Default" clause, FAR ¶ 52.249-8(g), which states:

> If, after termination, it is determined that the Contractor was not in default, or that the default was excusable, the rights and obligations of the parties shall be the same as if the termination had been issued for the convenience of the Government.

FAR ¶ 52.249-8(g). While the standard "Default" and "Termination for Convenience of the Government" clauses were incorporated in the Lease by reference in Schedule F, Section C, "Contract Clauses," (Exh. 1 at 26), it is necessary to examine all of the Lease clauses to determine the agreement as a whole. Hunt Constr. Group, Inc. v. United States, 281 F.3d 1369, 1372 (Fed. Cir. 2002) ("The contract must be considered as a whole and interpreted to effectuate its spirit and purpose, giving reasonable meaning to all parts."); Dravo Corp. v. United States, 202 Ct. Cl. 500, 504, 480 F.2d 1331, 1333 (1973) ("All provisions of the contract should be read together and so as to make none inoperative, and specific provisions should be given precedence over general ones.").

In the Moreland/VA Lease, certain clauses applied to the construction of the facility before the VA began its occupancy, and other clauses applied to the lease term after the VA occupied the facility and began making rental payments. With regard to a termination for convenience provision that would have afforded the VA the right to terminate during the lease term "by giving at least 180 days' notice in writing to the Lessor" (Exh. 1 ¶ 4), the parties specifically deleted that right before signing the agreement. The only way to harmonize that action with the standard "Termination for Convenience of the Government" clause (FAR ¶ 52.249-2), listed by reference in the Lease, is to acknowledge that the VA could have terminated for convenience during the construction phase, but not after the VA took occupancy and began making rental payments.

This interpretation is supported strongly by the existence of a separate "Default by Lessor During the Term" provision, governing the VA's right to terminate for default after the VA began the lease term. (Exh. 1, General Clauses, ¶ 16, Section 552.270-33). The Contracting Officer cited this clause, *not* the standard "Default" clause from FAR ¶ 52.249-8, as the basis for the default termination on September 12, 2002. The "Default by Lessor During the Term" provision does not refer to the standard "Termination for Convenience of the Government" clause (FAR ¶ 52.249-2), and therefore does not convert an improper default termination into a termination for convenience.

Thus, we have an agreement in which the VA could have terminated for convenience during construction under FAR ¶ 52.249-2, paying Moreland its incurred costs of construction, but in which the VA relinquished that right after the lease term began. Similarly, the VA could have terminated Moreland for default during construction under FAR ¶ 52.249-8 (if, for example, Moreland failed to construct the building). After the lease term began, however, the applicable default clause was the "Default by Lessor During the Term" provision. This latter clause does not convert an improper default termination into a termination for convenience. The Contracting Officer acted consistently with this interpretation in citing the "Default by Lessor During the Term," rather than the "Default" clause from FAR ¶ 52.249-8, as the basis for his September 12, 2002 termination notice. (See Exh. 182). Defendant's counsel is in error in basing the Government's defense on the FAR ¶ 52.249-8 "Default" clause, which no longer applied after the lease term began.

Moreland, however, is not entitled to recover the value of the building that it lost through foreclosure. While the Court may logically surmise that Moreland was adversely impacted by the VA's default termination, the record does not support a conclusion that the termination caused the foreclosure. The Court does not have before it Moreland's or LVVA's bank loan agreement(s), and therefore cannot say what the terms of the loan(s) were, what Moreland's rights under the agreement(s) may have been, or whether Moreland had any recourse against the bank(s) following the VA's default termination. The Court also does not know whether Moreland had the means to pay the balance of the loan(s), or to refinance the loan(s) to retain the asset. Although Moreland's witnesses have testified about the effect of the foreclosure, and have offered appraisals of the property, the absence of probative evidence prevents the Court from finding that the VA's default termination caused the foreclosure.

## Conclusion

Based upon the foregoing, the Clerk of the Court is instructed to enter judgment for Plaintiffs in the amount of $17,992,215.85, plus interest as allowed under the Contract Disputes Act from the date the Contracting Officer received Plaintiffs' certified claim until the date of payment. See 41 U.S.C. § 611. Depending upon the date of payment, Defendant should pay interest only on the lease payments that should have been made as of that date. Defendant also should receive a discount for paying the balance of the lease payments earlier than required under the Lease. The parties may request the Court's assistance if they cannot agree on the appropriate interest or discount calculations.

Pursuant to RCFC 54(d), costs are awarded to Plaintiffs. The Court will consider an application for attorneys' fees from Plaintiffs under 28 U.S.C. § 2412 if they believe they are eligible to apply.

IT IS SO ORDERED.

s/Thomas C. Wheeler
THOMAS C. WHEELER
Judge

## CERTIFICATE OF SERVICE

I certify that I served a copy of MEMORANDUM OF ADDITIONAL AUTHORITY by United States first class mail to the following named person(s) below:

Mr. Timothy P. McIlmail
US Department of Justice
Commercial Litigation Branch
Civil Division
Attn: Classification Unit
8th Floor
1100 L Street NW
Washington, DC 20530

DATED: April 20, 2007

STOEL RIVES, LLP

Richard E. Alexander by Charles J. Adams

Richard E. Alexander, OSB No. 69002
Attorney of Record for White Buffalo

Stoel Rives, LLP
900 SW Fifth Avenue, Suite 2600
Portland, OR 97204
Tel. (503) 224-3380
Fax. (503) 220-2480