CELEBRATING 100 YEARS
1907 STOEL RIVES 2007

SCOTT J. KAPLAN
*Direct (503) 294-9186*
sjkaplan@stoel.com

February 22, 2008

VIA FACSIMILE AND EMAIL

Mr. Timothy P. McIlmail
U.S. Department of Justice
Civil Division - Commercial Litigation Branch
1100 L Street, NW, 8th Floor
Washington, D.C. 20530

**Re: *White Buffalo Construction, Inc. v. U.S.*, Consolidated Under Court of Federal Claims Case No. 99-961C**

Dear Tim:

We have received Defendant's Response to Plaintiff's First Request for Production of Documents. White Buffalo Construction, Inc. ("WBC") is disappointed that the government appears to have taken a "hide the ball" approach to discovery rather than the full and frank disclosure necessary for a fair and efficient resolution of this dispute.

However, WBC understands that the government believes there are legal theories entitling it to summary judgment, in particular the statute of limitations and WBC's alleged failure to present portions of its bad-faith claim to the contracting officer. First, WBC is convinced that the government is not entitled to summary judgment. Second, the government puts the summary judgment cart before the discovery horse. If the government is entitled to summary judgment, it would only be after WBC has the opportunity for full discovery. An alleged entitlement to summary judgment is not a reason to duck discovery. Consequently, please consider this the start of WBC's effort to meet and confer pursuant to RCFC 37 prior to filing a motion to compel.

We will discuss the government's failure to provide discovery by subject area.

**1. The Government's Arguments that It Need Not Provide Discovery Because It Believes It Will Prevail on the Merits**

The government refuses to provide documents related to WBC's bad-faith claim in response to, at a minimum, Request Nos. 3, 4, 8, 9, 10, 11, 12 and 13. As noted above, the government cannot both assert entitlement to a summary judgment on a claim and refuse to respond to

discovery on the claim. No additional argument is necessary, and WBC expects the government to produce responsive documents.

Moreover, as should be clear from a review of WBC's response to the government's Request for Admissions, the government's reasoning on the merits is suspect. For example, WBC pointed out with specificity where and when the bad faith was not presented to the contracting officer, including the claim for bad-faith conversion. WBC also explained how the six-year statute of limitations is inapplicable to the bad-faith claim. We understand the government disagrees, but this will be an issue for the Court to decide on summary judgment—after discovery.

The government's argument that it is immunized from discovery for events after termination because there is allegedly "no privity" is, if possible, even more suspect. On what basis did the government backcharge WBC and its surety for the TWC bills if there was no privity? Indeed, the government itself admitted there is no support for this theory in the enclosed email exchange between FHA representatives Zotter and Parsons. Zotter makes very clear that the termination decision "does not terminate the contract. It merely terminates the contractor's right to proceed with the work."

Setting aside the privity issue, one of the major themes of WBC's bad-faith claim is the disparate treatment of TWC (at WBC's expense) and WBC. It is the difference between design changes and payments made to TWC and those refused to WBC that *evidences* the government's bad faith. Plainly, evidence of the contrasting actions taken by the government as to TWC and WBC is reasonably calculated to lead to the discovery of admissible evidence. RCFC 26(b)(1).

**2. Witness Statements**

In Request No. 2, WBC asked for witness statements that may have been obtained by the government. While such statements may or may not be protected by the work product privilege, we at least need to see a privilege log identifying the statements before that determination can be made. *Fiduccia v. U.S. Dept. of Justice*, 185 F.3d 1035 (9th Cir. 1998).

**3. Reitinger and Aftab Performance Evaluations**

In its bad-faith claim, WBC offered copious evidence of an animus toward it by Reitinger and of Aftab's difficulties working with Reitinger. Given the subsequent design changes made for the benefit of WBC and Aftab's request to be removed from the job, whether either was disciplined for their performance on the project is reasonably calculated to lead to the discovery of admissible evidence. The government must produce documents in response to Request No. 4.

To alleviate the government's concerns about privacy, WBC will stipulate to the entry of an acceptable protective order.

**4. Documents Related to WBC's Costs**

The government reduced WBC's termination settlement proposal for attorneys' fees and travel expenses, asserting that these were excessive. Consequently, WBC asked in Request Nos. 6 and 7 for documentation of the government's costs. Presumably, the government would not contend its own costs were excessive. The documents are reasonably calculated to lead to the discovery of admissible evidence as, for example, in a fee-petition dispute where the nonmoving party's attorneys' fees are relevant to reasonableness.

**5. Document Retention/Destruction Policies**

WBC does not understand the government's objection to reasonable and commonplace requests such as Request Nos. 14 and 15. Particularly where litigation relates to events of several years past, there are often issues related to document preservation. Plainly, such documents are discoverable and routinely discovered. *See, e.g.*, *U.S. v. British American Tobacco (Investments) Ltd.*, 387 F.3d 884 (D.C. Cir. 2004) (government moving to compel company's document-retention policies); *U.S. Fire Ins. Co. v. Bunge North America, Inc.*, 244 F.R.D. 638 (D. Kan. 2007) (requiring production of document-retention policies). As to the government's contention that "there has been no claim or allegation in this action that the Government has not preserved documents relevant to this action," how can WBC and the Court evaluate the government's document retention until it provides discovery on the subject?

**6. Objections to the Form of Questions**

Finally, the government objects to the form of questions in every request. Please clarify whether these are "just for the record" or whether the government is actually withholding documents based on an alleged uncertainty about what is being requested. If so, we would be happy to provide clarification. For example, in response to the government's objection that it does not know what "costs" are referenced in Request No. 5 for "documents relating to any audit of plaintiff's costs," the cost audit referenced is the one performed by the DCAA in May 2006. We hope this clears up any confusion.

7. **Electronic Production**

I understand that the government is refusing both to produce emails and other electronic information in their native form and to permit its documents to be scanned so that they can be managed electronically. On the former issue, WBC's Request for Production (Instruction 12) was very clear that electronic information was to be produced in its native format. On the latter issue, there can be no basis for the government's conduct other than a desire to obstruct WBC's discovery and increase its costs. I trust you will instruct your client about the realities of modern discovery and that they will be more cooperative with WBC's efforts to handle discovery effectively, including producing scanned documents rather than paper copies (for the same cost).

I am available on Wednesday, February 27, 2008, for a telephone meet and confer before WBC files a motion on any areas in which we are unable to agree. Please let me know what time works best for you.

Very truly yours,

Scott J. Kaplan

SJK:dmv
Enclosure
cc: Mr. Luther Clevenger
Mr. Richard E. Alexander

**From:** James F. Zotter
**To:** FHFL17DO.FHFL17PO(HPRETTINGER, JFTRAFFALIS), WLPAR...
**Date:** 12/3/98 3:43pm
**Subject:** Completion of Work Following T/D - Installment #1 -Reply -Reply

Bill,

You didn't misunderstand. At that time, I was mistakenly under the impression that a T/D did terminate the contract. It was only later after I had the chance to do some reading that I realized that it only terminated the T/D contractor's right to perform the work.

>>> W.L. Parsons 12/03/98 08:30am >>>
Jim-- appreciate the clarification on whether the T for D terminated the contract or not. I may have misunderstood earlier when we were discussing and I came away thinking it did terminate the contract.

>>> James F. Zotter 12/02/98 05:55pm >>>
This is to share with you my current knowledge re the completion of the work following a T/D and payment of the contract proceeds for the worked already performed. I will revise and update this as I learn more:

- The Government is only obligated to pay for the costs of acceptable work. Conversely, the Government is not required to pay for unacceptable work. In reviewing the work that was completed prior to the T/D, Paul will have to determine what work was acceptable and to be paid for, and what work was unacceptable and not to be paid for.

- T/D does not terminate the contract. It merely terminates the contractor's right to proceed with the work. The Government has under the contract the right to have the surety indemnify it for any costs in excess of the contract price for the completion of the work as well as the liquidated damages for any delay in completion of the work beyond the contract completion date.

- There are three alternatives for getting the work completed:

1. The surety requests the right to take over and complete the work under the existing contract. If it does so, it is generally granted the right to do so long as the contractor whom it plans to use to actually complete the work is deemed acceptable by the Government. If the parties are agreeable to having the surety complete the work, the enter into a "takeover agreement which spells out their respective rights and responsibilities. Some of the things that are spelled out are:
   a. the surety's rights to any unpaid earnings for the work performed,
   b. the Government's right to liquidated damages,
   c. Government's agreement to pay the balance of the contract price unpaid at default, but not in excess of the surety's costs and expenses of completion.

2. The surety can tender to the Government another contractor to complete the work. If the contractor is considered satisfactory, the Government enters into a new construction contract with the tendered contractor for the balance of the contract price. The completion contractor agrees to correct any defective work and to complete the balance of the work in accordance with the plans and specs. To the extent the costs are greater than the remaining contract proceeds, the completion contractor looks to the sponsoring surety for payment. The completion contractor provides a second set of payment and performance bonds under the new contract.

3. The surety elects not to do either (1) or (2). The Government enters into a new contract with a contractor of its choice, either through negotiations or sealed bids. The Government bills the surety for the difference in costs of the original contract and the new contract plus liquidated damages. The Government has a duty to mitigate the costs through timely and competitive reprocurement of the work.

That's it for now. Adios, Amigos!!

CC: FHFL17DO.FHFL17PO(HCROCKETT, TJHILDRETH),

EXHIBIT 2
Page 5 of 5