U.S. Department of Transportation
**Federal Highway Administration**

Western Federal Lands Highway Division

610 East Fifth Street
Vancouver, WA 98661-3801
(360) 619-7700 FAX: (360) 619-7846

August 30, 2007

In Reply Refer To:
DTFH70-98-C-00027

Mr. Luther Clevenger
White Buffalo Construction, Inc.
6653 Shaw Hwy SE
P.O. Box 1310
Aumsville, OR 97325

Dear Mr. Clevenger:

Enclosed please find a copy of the Contracting Officer's Decision on your Settlement Proposal dated June 26, 2007, which you submitted in response to the Government's January 15, 2004 termination for convenience. I also have reviewed your claim of bad faith and addressed the facts, analysis, and my findings of the same within the Contracting Officer's Decision.

I am willing to make payment of the amounts I found were due White Buffalo because of the Government's termination for convenience. Under FAR 49.112-2(b), before I can make payment, you will need to submit a voucher in the amount set forth in the Contracting Officer's Decision. If you decide to appeal, you may submit a voucher for the amounts that are not directly involved with the portion being appealed.

If you submit a voucher, please direct it to my attention. I currently have funds available to make payment. If I receive a voucher and the requisite banking information on or before September 18, 2007, I should be able to get payment to you 30 days thereafter. After September 18, 2007, the Government's payment system closes down for the end of the fiscal year and any payment consequently may be delayed until the new fiscal year system is operating.

If you have any questions, please contact me.

ORIGINAL SIGNED BY

Elizabeth M. Firestone
Contracting Officer

MOVING THE AMERICAN ECONOMY

EXHIBIT 6
Page 1 of 7

ec: Richard E. Alexander, Stoel Rives, 900 SW 5th Avenue Suite 2600, Portland, OR 97204
Timothy P. McIlmail, United States Department of Justice
Timothy J. Binder, Division Counsel, WFLHD
Elizabeth M. Firestone, Contracting Officer, WFLHD
Clara H. Connor, Division Engineer. WFLHD
Robert B. Lale, III, Director of Project Delivery, WFLHD
Brent L. Coe, Construction Engineer, WFLHD
Jane F. Traffalis, Contract Administration Engineer, WFLHD
Howe T. Crockett, Construction Operations Engineer, WFLHD
H. Paul Rettinger, Project Engineer, WFLHD
Curtis R. Scott, Assistant Claims Analyst, WFLHD
Central Files

**4) Paul Rettinger overturning agreements between Sajid Aftab and Luther Clevenger**
WBC makes a general allegation that there were verbal agreements made between Mr. Aftab and Mr. Clevenger concerning "pay estimates, items of work, and other items demanding attention," only to have Mr. Rettinger overrule Mr. Aftab later. WBC does not provide any specifics to support this claim. I only found one situation where one of the multitudes of miscellaneous pay item tickets was signed by Mr. Aftab and afterwards rejected by Mr. Rettinger because the ticket was not according to contract specifications. Tr, Aftab, 80:21-81:6.

**5) Sajid Aftab requesting to be assigned to another project away from Rettinger**
In his October 21, 1998 diary entry, Mr. Aftab specifically recounts a conversation between himself and Mr. Crockett, the Government's Construction Operations Engineer. The excerpt from the diary stated the following:

> I told Paul my frustrations on this job. I am Project Engineer on this job, I am not making any decisions. I am not informed in which I expected has to come or go. I am only signing letters & feel that I am out of loop. I don't know why I am Project Engineer.
>
> Howe Crockett called (COE). I express my great displeasure regarding this job. I told him also that I am not being performing my duties as a P.E. Although Contractor's operations & performance is below average but we are also not helping to complete the job. I also asked Howe if he can pull me out of this job as I cannot perform my duties as Project Engineer. Inspectors are frustrated. Wayne told me that he don't agree w/ Paul's attitude towards Contractor & Paul is putting all effort is to stop this job. I told Wayne that's not true. I will talk to Paul but again I cannot promise you anything as I don't have authority on any issue.

On October 30, 1998, Mr. Aftab expressed his frustration again on the project in his diary. His diary states the following:

> Told Paul again I need training in T&A & Estimate.

| Facts | Comments: |
|---|---|
| Arrived at the project around 10:00 am. Contractor is still placing the pipe & preparing bedding material for the last section of the pipe observe contractors operations.<br><br>Bob Gietz told me that Jim told him that tomorrow on Oct. 31, they would be out of wetted perimeter & he is going to use riprap material which hasn't been approved for his energy dissipater. I told bob I will be here at job site tomorrow.<br><br>EXHIBIT 6<br>Page 3 of 7 | Bob Gietz keep on insisting that he should inform Paul about the situation. I told him I can handle it but he keep insisting. Maybe Paul has given him some specific direction to contact him rather than me. I told him okay go head & tell Paul.<br>Again, I am frustrated as I am not given an opportunity to get involved in project, writing letters, making decisions, scheduling inspectors at the job or even making spreadsheets for my job.<br>When I came to this job as Project Engineer with understanding that Resident Engineer is there to help me not to run my job. Resident Engineer in the starting has given me an opportunity & slowly took over my job.<br>I am not even being consulted regarding scheduling inspectors. If inspectors has any |

| | |
|---|---|
| | problem, they now go to Resident Engineer than I.<br>I have not been trained or helped as a Project Engineer. I was always on the project. Spend very little time in office. So I have not achieved or not been able to get help from Resident Engineer to prepare myself for the future projects. |

In his deposition, Mr. Aftab was questioned if he asked to be transferred because of his problems with WBC, Mr. Clevenger personally, or Mr. Rettinger. Mr. Aftab answered, "There was no personal issue between you and me. All it was, was that you are the Contractor. We are seeing that this Contractor is not going to be done or completed. It was frustration on both sides, which always comes down – and again, this was my first project. That's why I wrote that statement in my diary. It frustrated me why the Contractor was not performing what he is supposed to perform according to the contract. That was my frustration. That's why I asked them to remove me from the project." He was asked specifically what problems he was having with Mr. Rettinger. Mr. Aftab replied, "Paul was not assigning me the assignment of a Project Engineer. That was a big frustration that I can tell you – these are all combinations of all these. The job was not going good. My boss is not giving me those assignments – which he's suppose to give me those assignments. That's how it, you know, happened." Tr, Aftab, 20:3-21:18

**6) Inspectors' statements regarding Paul Rettinger's administration style or comments**
WBC claims that inspectors working on the project for the Government had made disparaging comments regarding Paul Rettinger's actions on the contract.

**a) Wayne Lowell**
WBC claims that one of the inspectors left the project largely because he had never seen Rettinger treat a contractor so harshly. Clarification was sought from WBC regarding the identity of this inspector they claim left under these circumstances, which they replied to identify him as Wayne Lowell.

According to the Inspector Daily Reports, Mr. Lowell was on project from September 18, 1998 to October 29, 1998. The information within the Inspector Daily Reports do not relate to the statements as depicted by WBC. However, as identified by WBC in their email response for clarification, the Deposition for Mr. Aftab discusses Mr. Lowell's reasons for leaving. When asked why Mr. Lowell left the project, Mr. Aftab replied, "His wife was having some problems and she needed an operation." Mr. Aftab also stated, "He was also frustrated on the job and the real reason was because of his wife." When asked if Mr. Lowell said anything about Mr. Rettinger's conduct, Mr. Aftab answered, " He said that, "I don't know why Paul is so strict on the is job, while he was not so strict on other jobs." He has been with Paul for the last four or five years, so that's why." Tr, Aftab, 76:19-77:12

**b) Mike Barber**
WBC also claims another inspector who was fired from the project indicated that Rettinger was deliberately trying to rid the Government of what he termed "problem contractors." This employee was identified by WBC as Mike Barber in a response to a request for clarification.

In response to another request for clarification on this issue, WBC provided information they received from Mr. Barber's employer, CMTS, as Mr. Barber was a consultant inspector on the project, not an employee of the Government. In the information provide by CMTS, there is a letter to the file written by Mr. Barber to reflect his displeasure with his removal from the project, which is included as follows:

As we discussed on 9-10-98, and in our following discussions, Paul Rettinger, FHWA, unlawfully voided my CMTS contract with the Federal Highway Administration on 9-10-98 without any warning or reason. He oddly asked me to return to the FHWA Office from my field assignment; and he was leaving the Office in his vehicle as I arrived when he suddenly voided the CMTS contract. He asked me to be gone by the end of the day. I asked for an explanation to his bizarre statement, and he said that Luther Clevenger, Construction Contractor, had told him "everything" that I said during our 9-8-98 meeting arranged by Mr. Rettinger. Since I had done nothing wrong during this 9-8-98 meeting, Mr. Rettinger's decision was still irrational. He refused any specific explanation. After Mr. Rettinger had quickly disappeared, I learned that he had maliciously slandered both Mr. Clevenger and I with his fabricated scenario of –He said, I said-. I arranged a meeting with Mr. Rettinger for the following morning to receive documentation of his decision, but the following day Mr. Rettinger only continued his insane behavior. No dismissal documentation from anyone has been delivered to me yet, nearly four months later.

Retrospectively, Mr. Rettinger's comment to the FHWA Office in mid-July, 1998 shortly after I had been assigned to work for him in Nesika Beach, Oregon that he would vindictively volunteer to be the project engineer on any construction project with a specific contractor which the FHWA had not liked in the past; and that he would make sure this contractor would never work for the FHWA again. This typified his inappropriate, hostile attitude towards my CMTS Contract with the FHWA. I am preparing a summary of Mr. Rettinger's unlawful actions from 7-6-98 to 9-11-98 in case the investigators need it per the following paragraph describing the 1998 U.S. Government Crime Case before the Ninth Circuit U.S. Court of Appeals.

I am involved as a key witness in a June, 1996 legal action exposing criminal activity by the U.S. Government. My Fall of 1996, Summer of 1997, and Summer of 1998 Construction Inspection Assignments for the FHWA have been generally unaffected by this multi-million dollar legal action. After I was assigned to Mr. Rettinger in early July, 1998, he prejudicially performed his duties regarding my position in repetitiously malicious efforts to damage us. He has intimate knowledge of this extensive 1996 to 1998 U.S. Government legal action, and he repeatedly used this information in mocking, insulting statements and actions against me. I remained professional, prudent, and positive in my contractual duties throughout the projects minimizing any of his harm to the success of the construction projects. Although Mr. Rettinger's unlawful actions against me may seem to be employment discrimination; he has exposed himself as a criminal accomplice to the aforementioned criminal activity by the U.S. Government. I suspect that our construction contracting's involvement will be minimal, with the Judicial Authorities probably just including Mr. Rettinger's unlawful actions into their crime case investigation.

I respect CMTS's decision of legal action regarding the FHWA contract violation. I don't have the time or money to correct this defamatory action against me; and would agree with you in not pursuing Mr. Rettinger's unlawful activities in a civil case.

We need to decide how to contact Mr. Rettinger's superiors, and Mr. Clevenger about Mr. Rettinger's unlawful actions during his public service. I am still requesting documentation of my dismissal; and would like to request access to Mr. Rettinger's Project Files and Daily Reports on the 1998 ERFO 18(1) and ERFO 18(2) Projects.

Mr. Rettinger does not recall this discussion with Mr. Barber. Also, Mr. Barber does not provide any information regarding the context of the discussion. Further, Mr. Rettinger did not know about the litigation between WBC and U.S. Forest Service until after the termination of the contract with WBC.

## ANALYSIS – SUBPART 1

### 1) Prevention of Contractor's Start of Work

The contract was awarded on August 20, 1998. The preconstruction conference was held on August 27, 1998. Under FP-96, subsection 155.02, WBC was required to provide three copies of the preliminary construction schedule at least 7 days before the preconstruction conference. Given the short time frame involved, the Government, in a letter dated August 21, 1998, allowed WBC to have until the preconstruction conference to provide the preliminary construction schedule. In that same letter, the Government requested certain other information and submittals to be provided. WBC did not submit a preliminary construction schedule at the August 27, 1998 preconstruction meeting. Nor did WBC provide the Accident Prevention Plan or the Quality Control Plan. Both of these had been requested by the Government and the submission of the Quality Control Plan in accordance with FP-96, subsection 153.02. was required to be made before work could begin. At the meeting, the Government fully discussed with WBC the contractual consequences that flowed if these documents were not provided.

In accordance with FAR Clause 52.211-10, the Notice to Proceed was issued by the Government with an effective date of September 1, 1998. This is the date established by FAR Clause 52.211-10 of the contract. In the Notice to Proceed, the Government again reminded WBC of its obligations under the contract to provide certain required submittals prior to beginning certain work under the contract.

The contract expressly provided that WBC could not begin construction activities until it had submitted a Hazardous Spill Plan, SCR 107.10; could not begin work until it has submitted a written Quality Control Plan, FP-96, subsection 153.02; and could not begin work, except for mobilization, traffic control and Section 637 work, without an accepted preliminary construction schedule, FP-96, subsection 155.02.

WBC did not submit the first Preliminary construction schedule until August 31, 1998. The same day it was submitted, the Government reviewed the submittal and rejected it for non-conformance with the contract requirements. The submittal was simply a one page roughly drawn schematic. It did not meet the requirements of a "written narrative with a detailed breakdown of all contract activities for the first 45 days." FP-96, subsection 155.02. The contract was detailed as to what was required in the written narrative. FP-96, subsection 155.05. This first submission was not a good faith attempt on the part of WBC to comply with the contract requirements. The Government attempted to assist the Contractor by providing the Contractor a sample schedule. Not only was the Government's review within the 7-day

# Conclusion

Based upon the termination settlement proposal submitted by WBC on June 26, 2007, the DCAA audit of the proposal, and the project records, I conclude, based upon the above analysis of the costs claimed and the bad faith allegation, that WBC is owed $240,178.61.[40]

This is the final decision of the Contracting Officer. You may appeal this decision to the agency board of contract appeals. If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the agency board of contract appeals and provide a copy to the Contracting Officer from whose decision this appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract by number. With regard to appeals to the agency board of contract appeals, you may, solely at your election, proceed under the board's small claim procedure for claims of $50,000 or less or its accelerated procedure for claims of $100,000 or less. Instead of appealing to the agency board of contract appeals, you may bring an action directly in the United States Court of Federal Claims (except as provided in the Contract Disputes Act of 1978, 41 U.S.C. 603, regarding Maritime Contracts) within 12 months of the date you receive this decision.

Executed on August 30, 2007

ORIGINAL SIGNED BY

Elizabeth M. Firestone
Contracting Officer



[40] See page 11 for a summary detail of this amount.