U.S. Department of Transportation
**Federal Highway Administration**

Western Federal Lands Highway Division

610 East Fifth Street
Vancouver, WA 98661-3801
(360) 619-7700 FAX: (360) 619-7846

August 30, 2007

Mr. Luther Clevenger
White Buffalo Construction, Inc.
6653 Shaw Hwy SE
P.O. Box 1310
Aumsville, OR 97325

In Reply Refer To:
DTFH70-98-C-00027

Dear Mr. Clevenger:

Enclosed please find a copy of the Contracting Officer's Decision on your Settlement Proposal dated June 26, 2007, which you submitted in response to the Government's January 15, 2004 termination for convenience. I also have reviewed your claim of bad faith and addressed the facts, analysis, and my findings of the same within the Contracting Officer's Decision.

I am willing to make payment of the amounts I found were due White Buffalo because of the Government's termination for convenience. Under FAR 49.112-2(b), before I can make payment, you will need to submit a voucher in the amount set forth in the Contracting Officer's Decision. If you decide to appeal, you may submit a voucher for the amounts that are not directly involved with the portion being appealed.

If you submit a voucher, please direct it to my attention. I currently have funds available to make payment. If I receive a voucher and the requisite banking information on or before September 18, 2007, I should be able to get payment to you 30 days thereafter. After September 18, 2007, the Government's payment system closes down for the end of the fiscal year and any payment consequently may be delayed until the new fiscal year system is operating.

If you have any questions, please contact me.

Elizabeth M. Firestone
Contracting Officer

MOVING THE AMERICAN ECONOMY

# Introduction

On August 20, 1998, the Federal Highway Administration (FHWA or the Government) entered into Contract Number DTFH70-98-C-00027, FS ERFO 97-18(2) - FDR 33 (MP 44.5 – MP 47.3), FDR 3347, FDR 3367020 with White Buffalo Construction, Inc. (WBC) in the amount of $1,370,480.00. The type of construction to be performed consisted of riprap, embankment, surfacing, retaining walls, and drainage for several sites damaged by the 1997 floods.

The Government terminated WBC for default on December 1, 1998, and later converted the termination to a termination for convenience on January 15, 2004, based on overburden at MP 46.7 that appeared to provide an independent reason why the road could not be opened by the contractually required due date.

WBC submitted their first settlement proposal on January 13, 2005. The Government audited the settlement proposal. WBC did not allow the auditor access to its materials at its business, but required the audit to be performed at the office of WBC's attorney. WBC did not provide its records until June 21, 2005. Data and records requested by the Defense Contract Audit Agency (DCAA) months earlier were continuing to be provided by WBC in late October. On January 18, 2006, WBC still had not provided answers to requests from DCAA. Thereafter, WBC asked for additional time to review the draft audit before holding the exit conference. The audit was completed on May 12, 2006 by the DCAA and provided to WBC on May 25, 2006.

On October 16, 2006, WBC submitted a revised settlement proposal. As part of this proposal WBC included an appendix that contained its "Justification for Anticipatory Profit and a Summary of Facts Supporting Bad Faith". This revised settlement proposal was provided to the auditor for review. On March 29, 2007, WBC notified the Government that it would be providing a third settlement proposal by the end of April. It provided its third settlement proposal on June 26, 2007. For purposes of this Contracting Officer's decision the analysis is based on this third settlement proposal.

WBC is asking for its costs on the project and lost profit on the work it was not able to perform. Its lost profit argument is based on an allegation that the Government acted in bad faith in administering and terminating the contract. This analysis will address first the termination settlement proposal and then the bad faith claim.

**Page Intentionally Left Blank**

# Termination Settlement Analysis

In its third proposal, WBC requests $1,274,854.71. This is broken down into 10 categories (including payments received). In the following paragraphs, I analyze each category separately and determine the costs that I believe should be paid.

## Direct Labor

WBC proposed $128,478.00 in direct labor costs. The audit supported $127,463.00. The difference ($1,015.00) is the cost of an onsite supervisor after the termination. The audit did not question the amount of the direct labor, but rather the validity of it being charged to the project.

I concur with the auditor's findings, and disallow the $1,015.00. I will allow $127,463.00 for direct labor.

## Other Direct Job Costs

WBC proposed $128,598.08 in other direct job costs. The audit supported $94,523.00. The difference ($34,075.00) is broken down into six areas: Owner Operators, McBride Legal Costs, Landmark Extra Work, Landmark Legal Costs, Landmark Contract Work and Landmark Interest.

### Owner Operators

The audit questioned $18,113.00 of owner operator costs due to insufficient support. The auditor noted that WBC was unable to produce invoices supporting the amount of time worked, the item of equipment, the agreed-to rates, or the amount billed to this job. The auditor noted that without invoices or other independent corroboration, there was no evidence of the purpose and applicability of the cost to the termination. Despite repeated requests, WBC did not provide this information during the initial audit or with the second and third settlement proposals. Instead WBC continued to state that the information was in the boxes provided to the auditor during the initial audit. Without some proper invoices or other independent corroboration, I cannot tie these costs to this project.

Accordingly, this portion of the Other Direct Job Costs will be disallowed.

### McBride Legal Costs

The audit questioned $3,117.00 of legal costs. I will allow this cost in the amount of $3,117.00.

### Landmark Extra Work

The audit questioned $2,102.00 of extra work by the surveyor on the project. I will allow this cost in the amount of $2,102.00.

### Landmark Legal Costs

The audit questioned $1,272.00 for legal costs claimed by the surveyor on the project. I will allow this cost in the amount of $1,272.00.

**Landmark Contract Work**
The audit questioned $7,056.00 of contract work by the surveyor on the project. The Government estimated that no more than 50% of the survey work on the project was performed by the time the contract was terminated. A settlement should compensate the contractor fairly for the work done on the project. In this case, no more than 50% of the survey work was performed. Accordingly, WBC should receive no more than 50% of the bid price for the survey bid item.

The questioned amount of $7,056.00 represents the amount in excess of 50% of the survey bid price. I conclude that the amount over 50% should be denied. Accordingly, I will disallow this amount.

**Landmark Interest**
The audit questioned $2,415.00 for interest for work by the surveyor on the project. Under FAR 31.205-20, "interest on borrowings (however represented)" are not allowable. This interest charge is an interest on borrowings financed by Landmark. Radcliffe Const. Co., Inc., 90-2 BCA P 22,651, ASBCA Nos. 39252, 39253 (Jan. 26, 1990). Furthermore, WBC did not provide any evidence that it has paid the interest or is obligated to pay the interest. The proposal does not even provide a breakdown of the how the interest was calculated. The proposal gives a total amount of interest requested ($2,415.00), provides the dates and amounts for which interest is due and provides a reference to a website from the U.S. District Court for the District of Utah that provides rates for post judgment interest.

Accordingly, I will disallow this amount.

## Summary of Other Direct Job Costs
I will allow all of the costs that the audit allowed. In addition, I will allow $6,491.00 in costs the audit questioned for a total amount allowed for Other Direct Job Costs of $101,014.00.[1]

## Equipment, Vehicle and Fuel Costs
WBC proposed $26,985.00 in Equipment, Vehicle and Fuel costs. The audit supported $26,985.00. I will allow $26,985.00 for Equipment, Vehicle and Fuel costs.

## Other Equipment and Vehicle Costs
WBC proposed $91,968.00 in Other Equipment and Vehicle Costs. The audit supported $65,808.00. The difference ($26,160.00) is broken down into two categories: LS 3400 and Truck Tires.

[1] $94,523.00 + $3,117.00 + $2,102.00 + $1,272.00 = $101,014.00

**LS 3400**
WBC proposed $25,000.00 for repairs to the LS 3400 Excavator. The audit questioned the full amount because the repairs were never performed. The LS 3400 Excavator had been fully depreciated before the beginning of the fiscal year that ended on March 31, 1999. Any remaining capital value of the equipment could not be charged against the project. Any new value given to the equipment by a major repair would need to be depreciated. However, until such repair is made, there is no further value of that equipment that can be charged to the project. I note that in the nearly 9 years since the damage occurred, it has not been fixed. Thus, when major segments of the equipment fails after full depreciation, such failure does not become a cost of the project, unless they are repaired and then, for major repairs that appreciably prolong its intended life, only the new depreciation can be charged.

WBC claims that the equipment had $25,000.00 less residual value after the incident than before, based on appraisals conducted in 2006. I do not conclude under the cost principles of FAR Part 31 that this loss of value is allocable to the project. To allow this loss would be to allow WBC to depreciate more than the full value of the equipment.

WBC claims that under FAR 31.205-24, in effect at the time of this contract but since removed, extraordinary repair costs are allowable. WBC has performed no repairs so this provision is not applicable.

In addition, the FAR 31.205-24 provision allowed extraordinary maintenance and repair costs for property only as long as such repair costs did not add to the permanent value of the property or appreciably prolong its intended life. In this case, the intended life of the equipment already had expired, as it was fully depreciated. The repair would have added to its value and would have prolonged its intended life. I do not find that the loss of value attributed to the Link Belt 3400 excavator is reasonably allocable to this project.

I will disallow this portion of the Other Equipment and Vehicle Costs.

**Truck Tires**
WBC proposed $1,160.00 for the value of tires that were taken from a truck on the project. The audit questioned the full amount because the tires were not replaced so the expense was not incurred. The audit also questioned charging the full cost to this project as this project only used the truck for 2 months of its life. It is more appropriate to recover the costs from WBC's insurance company if the tires were stolen or from the winterization contractor (Kerr) if it was using the truck at the time the tires were removed.

I will disallow this portion of the Settlement proposal.

## Summary of Other Equipment and Vehicle Costs
I concur with the audit on the questioned amount of $26,160.00 and I will allow $65,808.00 for Other Equipment and Vehicle Costs.

### Surety

WBC proposed $276,768.00 for Surety expenses. The audit supported $261,646.00. The difference ($15,122.00) is for the portion of payments WBC made to the surety for interest on monies due to the surety. WBC claims its interest payments to the surety are an allowable expense. FAR 31.205-20 specifically disallows interest on borrowings. The interest WBC paid to the surety was paid because WBC did not pay the surety timely for what it owed the surety. I agree with the audit that this interest payment is not allowed; therefore I deny this portion of the proposal.

I concur with the audit and will disallow the $15,122.00. I will allow $261,646.00 for Surety costs.

### G&A Expenses

WBC proposed $28,183.00 in G&A expenses. The audit supported $28,183.00. I will allow $28,183.00 for G&A expenses.

### Subcontractor Claim

WBC proposed $39,222.35.00 in Subcontract Claim costs. The audit supported $29,528.00. The difference ($9,694.00) is for interest. As stated above, interest is not allowable. Furthermore, WBC did not provide any evidence that it has paid the interest or is obligated to pay the interest. The proposal does not even provide a breakdown of the how the interest was calculated.

Accordingly, the interest amount will be disallowed. I will allow $29,528.00 for Subcontractor Claim costs.

### Profit

WBC proposed $870,667.00 in "profit." The audit supported $253,211.00, qualified by the fact that the auditor was required to perform the audit on documents WBC made available at its attorney's office. The auditor was not able to view the documents at WBC's place of business. WBC also restricted access to documents it claimed were privileged. Based on the historical records provided, the auditor supported "profit" in the amount of $253,211.00. This amount, however, is not true profit, as it includes G&A and depreciation. Further, this historical figure, to the extent that it is valid, is not definitive under the FAR in the determination of profit for this project.

Under FAR 49.203(a), I am not authorized to allow profit when it appears that the contractor would have incurred a loss had the entire project been completed. Based upon the Profit / Loss Analysis at the end of this decision, I determined WBC would have incurred a loss if the entire project had been completed. Accordingly, profit will be disallowed.

### Anticipatory profit

Anticipatory Profit addressed following the Bad Faith Claim analysis.

**Settlement Expenses**
WBC proposed $163,070.28 in Settlement Expenses. The audit supported $11,674.00. The difference ($151,396.28) is broken down into five categories: Legal – Stoel Rives, Airfare Upgrade, Owner Labor, Miscellaneous Settlement Costs, and Third Party Review of Proposal.

**Legal – Stoel Rives**
WBC proposed $91,014.24 for incurred legal expenses and $2,500.00 for estimated additional legal expense that will be needed. The audit disallowed these costs per FAR 31.205-47 "Costs related to legal and other proceedings". Further, only actual incurred costs will be reimbursed. Estimated future costs are not eligible for payment. Therefore, this portion of the settlement expenses is denied.

Legal expenses are allowable expenses when such expenses are reasonably necessary for the preparation and presentation of settlement claims to the contracting officer. FAR 31.205-42(g)(1)(i). When settlement expenses are significant, the contractor is required to establish a cost account or work order to separately identify and accumulate them. FAR 31.205-42(g)(2).

In the present situation, WBC has established no cost account or work order, even though its settlement expenses are stated to be $163,070.28, over a quarter of its total costs sought in its settlement proposal.

Further, WBC refused to provide its original invoices to the auditor. WBC offered to allow the Government's in-house counsel to review its invoices. The Government's in-house counsel, however, is not an auditor; nor does he have expertise to audit records. Further, any audit performed by Government counsel of such records may subject Government counsel to being called as a witness in subsequent litigation. This is not a proper role for Government counsel. Accordingly, WBC's offer was never accepted by the Government.

WBC, in its first settlement proposal, requested $16,770.03 in legal costs. The auditor questioned WBC's legal costs because he was not allowed to review the original invoices and the invoices it had did not support the claimed costs. WBC responded by submitting a second settlement proposal asking for $79,265.68 in legal costs. WBC stated that a "substantial portion" was represented by research into the very issue of whether an auditor can require original invoices. Expending a substantial portion of $62,495.65 to research this single issue does not seem reasonable.

In its third settlement proposal, WBC again increased its claim for attorney fees, this time to $93,514.24. It is uncertain what these additional fees represent, as the invoices provided by WBC are very vague.

In reviewing the invoices provided, I note that there are some entries for items that are not allowable under the FAR. For instance, there is work for WBC's bad faith claim. A bad faith claim is not a settlement proposal, but rather falls under FAR 31.205-47(f)(1). Also, there is work on deemed denial, which also is not a cost allocable or allowable to the settlement proposal, as such relates to claims.

However, trying to discern how much of the legal costs relate to such issues is not easy, as most of the descriptions contained in the invoices provide no linkage to issues or claims. A further complication is that there is no set rate for the attorneys or the paralegals. For instance, in dividing the amount billed by the hours stated, the rates for the two main attorneys who worked on this case range from a low of $246.87 in February 2006 to a high of $400.00 in March 2004. No two months have the same rate. Also, I could find no correlation between a specific attorney and a higher or lower rate. The average rate is $308.16. I will use this rate in my calculations. I also will use the rate of $160.50 for the paralegal's rate.

Using the information provided, I find that the following amounts are not permitted as being related to the bad faith claim: $1,201.81[2] for REA, $4,961.33[3] for CFA, and $465.45[4] for the paralegal time, for a total of $6,628.59[5]. I am unable to determine how much of the rest of the legal fees relate to the bad faith claim. Because the burden of proof is on WBC to support its costs, and because WBC does not differentiate these costs, I believe that assigning another $5,000.00 to the work on this item appears appropriate. Accordingly, of the $91,041.24, I assign $11,628.59 to the lost profit claim, and find this amount to be unallowable as being legal costs for a claim under FAR 31.205-27(f)(1).

Further, WBC includes legal costs relating to research done on deemed denial. Such research is for the purposes of determining whether WBC can bring a direct claim to the court without waiting for a COD. I do not find that these costs are reasonably related to the settlement proposal. These amounts include $421.79 of the legal fees.

I also subtract out the cost of a meal on February 6, 2004 in the amount of $261.00. There is no support for this cost other than the invoice. The invoice does not say what the two charges ($206.00 and $55.00) represent, other than that they are meals for a luncheon. I cannot determine how this luncheon cost relates to the settlement proposal. There is no attorney time or fees noted for that date. Given these facts, I deny this cost.

Further, the legal costs, besides being allowable and allocable, must be reasonable. While the cost associated with a site visit by the attorney may be reasonable for purposes of litigation, I do not find that such costs are reasonable in relation to the settlement proposal. Accordingly, I subtract out the $2,927.52[6] associated with this trip.

The remaining amount of $78,275.34[7] must be analyzed in terms of the settlement proposal to determine whether it is a reasonable amount. Reasonable is defined as being a cost that does not exceed what would be incurred by a "prudent person in the conduct of competitive business." FAR 31.201-3. There is no presumption that costs are reasonable or unreasonable. FAR 31.201-3(a). When a contracting officer challenges a specific cost, the burden is on the contractor to prove that the cost is reasonable. FAR 31.201-3(a).

---

[2] 3.9 hours x $308.16 = $1,201.81
[3] 16.1 hours x $308.16 = $4,961.33
[4] 2.9 hours x $160.50 = $465.45
[5] $1,201.81 + $4,961.33 + $465.45 = $6,628.59
[6] 9.1 hours x $308.16 = $2,927.52
[7] $93,514.24 - $11,628.59 - $421.79 - $261.00 - $2,927.52 = $78,275.34

In determining what a prudent person would do in the conduct of competitive business, I find that one factor is the ratio of the legal cost to the value of the matter in issue. A prudent contractor would not expend a large sum of legal costs to address an issue involving a small dollar amount. Another factor is whether the legal costs significantly affect the settlement proposal. A prudent contractor would not expend legal costs for research into merely hypothetical matters.

In the present situation, the auditor questioned $239,887.71[8] of the costs, of which $163,070.28 were settlement expenses, composed mostly of the $93,514.24 in claimed attorney fees and $43,321.90 in claimed payroll for WBC employees. The claimed payroll was merely a matter of the consistent practices of WBC and I am at a loss to determine why legal assistance was needed on this issue. Also, I do not understand how significant legal work would be needed to determine allowability of legal fees. Outside of the attorney fees and claimed payroll, the auditor questioned $102,051.57[9] of the costs. While it is very difficult to discern anything with certainty from the invoices, comparing the dates of the audit with the invoices leads me to conclude that apparently WBC incurred nearly $50,000.00 in legal fees on and after it began working on the audit. Taking into account the relatively small amount of issues and the small amount of dollars at stake, spending $50,000.00 in legal fees for $102,051.57 in challenged costs is not prudent. I note in Tagarelli Bros. Const. Co., Inc., ASBCA No. 34793, 88-1 BCA P 20363 (November 24, 1987), the Board concluded that legal fees in the amount of 1/3rd of the claim were not reasonable. In this case, I believe that legal fees in the amount of nearly one-half of the amount in dispute is not reasonable.

In determining reasonableness, I consider the amount actually at issue, the issues raised, the need for legal assistance, and the value of that assistance to the process. In this case, the amount actually at issue is small, the issues raised (salary of owners, lack of invoices, equipment damage, interest, airfare upgrade, and legal costs) are not complex, and I do not find that the legal input provided much assistance to the auditor or this office. Accordingly, I find that a prudent contractor given these factors would not have expended more than the approximate $15,000.00 in legal costs that WBC expended to prepare the settlement proposal, and would not have expended more than an equal amount in responding to the audit. Accordingly, I find that a prudent contractor would not have expended more than $30,000.00 in legal fees associated with the settlement. I will allow $30,000.00 for legal costs.

**Airfare Upgrade**

WBC proposed $200.00 for the cost of an upgraded airfare. The audit disallowed this cost per FAR 31.205-46(b) "Travel Costs" as the upgrade represents the portion of the airfare in excess of customary standard or coach airfare. I agree with the audit determination and thus this portion of the settlement expense will be disallowed.

[8] This number is the difference between what DCAA supported and WBC's third proposal.
[9] $ 239,887.71 - $93,514.24 - $43,321.90 = $102,051.57

**Owner Labor**
WBC proposed $43,321.90 for incurred payroll expenses and $1,200.00 for estimated additional payroll expenses that will be needed. Only actual incurred costs are eligible for payment, so estimated future costs are not eligible for payment. I will allow $43,321.90 in Owner Labor.

**Miscellaneous Settlement Costs**
In its first settlement proposal, WBC proposed $9,249.00 in miscellaneous settlement costs that the audit supported. In its second settlement proposal, WBC proposed an additional $12,431.96 in miscellaneous settlement costs beyond the first proposal amount. Of this the auditor indicated $2,425.03 was allowable. In its third settlement proposal WBC proposed an additional $13,835.14 in miscellaneous settlement costs beyond the first proposal amount[10]. The auditor did not review the portion of these additional settlement costs that were not in the second proposal. The additional miscellaneous settlement costs can be broken down into 11 categories: Westlaw subscription, parking fees, mileage, food, lodging, clerical supplies, photocopying, laptop, software, damage to pickup, rental vehicle.

**Allowable costs**
All the costs contained in the parking fees, mileage, food, lodging, clerical supplies and photocopying are allowable settlement costs. Therefore, I allow $2,864.71[11] for these costs.

**Unallowable costs**
*Westlaw subscription*: WBC proposed $4,633.89 for a subscription of Thompson West (Westlaw) from February 2005 through April 2007. This cost does not seem to be reasonable given the scope of the settlement proposal and extensive involvement of legal counsel; therefore I will disallow this cost.

*Laptop and software:* WBC proposed $1,899.99 for a laptop computer and $198.00 for an additional copy of its accounting software that it used for composing its settlement proposal and conducting the audit. The audit did not support the full cost of the laptop and software being allocated to this project. The laptop and software should be capitalized and depreciated and the appropriate portion of the depreciation could be charged to this project. I do not know WBC's standard capitalization and depreciation process so can not determine the appropriate portion allocable to this project. Assuming the computer and software have a three year life, I will allow one year of depreciation of $700.00.[12]

*Damage to pickup and rental vehicle*: WBC proposed $3,638.55 for damage to the 1996 Dodge pickup and $600.00 for costs of a rental vehicle that would be needed during the repair of the pickup. The audit did not support these costs as the repair work has not been completed; the rental vehicle has not been used, so no cost has been incurred. These costs are not allocable to the settlement proposal, and should have been covered under insurance. Accordingly, these costs will be disallowed.

[10] This amount includes all the additional miscellaneous settlement costs in proposal two and proposal three.
[11] $102.26 + $679.50 + $544.50 + $258.44 + $147.38 + $8.45 + $148.50 + $50.40 + $70.08 + $855.20 = 2,864.71
[12] $1899.99 + $198.00 = $2,097.99. $2,097.99/3 = $699.33 round to $700.00

**Summary of Miscellaneous Settlement Expenses**
I will allow $3,564.71[13] for the Miscellaneous Settlement Expenses.

**Third Party Review of Proposal**
In its third proposal WBC proposed $1,750.00 for costs related to having an independent third party review its settlement proposal. The auditor did not review this cost. I will allow $1,750.00 for Third Party Review of Proposal.

## Summary of Settlement Expenses
Based on the above analysis, I will allow a total of $78,636.61[14] for Miscellaneous Settlement Costs.

## Prior Payments
WBC proposed $479,085.00 as the amount of payments that it has received to date from the Government in relation to this project. The audit supports $479,085.00 in prior payment.

I agree that the Government previously has paid $479,085.00 to WBC.

## Overall Summary of Allowed Amounts
Based on the above analysis, I conclude that WBC is due $240,178.61as its termination costs and profit. This amount is the sum of the above approved amounts, which are summarized here:

| | |
|---|---:|
| Direct Labor: | $127,463.00 |
| Other Direct Job Costs: | $101,014.00 |
| Equipment, Vehicle and Fuel: | $ 26,985.00 |
| Other Equipment and Vehicle Costs: | $ 65,808.00 |
| Surety: | $261,646.00 |
| G&A Expenses: | $ 28,183.00 |
| Subcontractor Claim: | $ 29,528.00 |
| Profit: | $ 0.00 |
| Settlement Expenses: | $ 78,636.61 |
| **Subtotal:** | **$719,263.61** |
| Payments Received: | ($479,085.00) |
| **Allowed Amount:** | **$240,178.61** |

[13] $2,864.71 + $700.00 = $3,564.71
[14] $30,000.00 + $43,321.90 + $3,564.71 + $1,750.00 = $78,636.61

**Page Intentionally Left Blank**

# BAD FAITH CLAIM

WBC has submitted a claim that the Government acted in bad faith in the administration and termination of the contract. The bad faith claim is relevant to the extent that if bad faith exists, such would constitute a breach of the contract and may entitle the contractor to recover lost profits it would have earned on uncompleted work under the contract. In the absence of bad faith, the contractor is restricted to its termination for convenience costs and any profit associated with such costs. WBC has listed several incidents that it alleges show bad faith on the part of the Government. These will be considered to determine whether bad faith existed on the contract

However, preliminarily, I note that the long-standing standard for reviewing claims of bad faith has been called into question by WBC. Citing Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234 (Fed.Cir. 2002), and Tecom, Inc. v. United States, 66 Fed.Cl. 736 (2005), WBC asserts that the standard for evaluating bad faith claims has changed, and that at the heart of the Government's "wrongful conduct" is the Government's "failure to cooperate with, and indeed its actual interference with, WBC's performance," thus breaching the implied duty of good faith and fair dealing. This, according to the claim, allows WBC to claim lost profits.

I do not read Am-Pro to do anything more than state that the standard of proof in cases where bad faith is alleged is the clear and convincing standard. The court stated that this standard most closely aligns with the "well-nigh irrefragable" proof required by the courts. Am-Pro, 281 F.3d at 1239-1240. The Am-Pro court does not purport to lessen the standard of proof, but to place the standard into one of the three generally accepted standards of proof, namely, the clear and convincing standard. Although Tecom argued for a different standard, it is hard to square that case with the long precedence established for claims of bad faith. See, North Star Alaska Housing Corporation v. United States, 76 Fed.Cl. 158, n. 34 (2007). Further, subsequent courts have not followed Tecom's lead. North Star, 76 Fed.Cl. at 187-188 (requirement to show clearly and convincingly animus on the part of the Government); L.P. Consulting Group, Inc. v. United States, 66 Fed.Cl. 238 (2005) (specific intent to injure the plaintiff is required).

In any event, the issue of bad faith arises only if the Government acted inconsistently with its obligations under the contract. The covenant of good faith and fair dealing is linked ultimately to the contract, and the manner in which the Government carried out its discretion under the contract. The covenant does not serve to place on the Government a requirement that the contract places on the contractor, nor to impose on the Government obligations not contemplated under the contract. With this framework in mind, I turn to a consideration of WBC's allegations.

# SUBPART 1

## Government Prevented the Contractor from Starting Work on Time and Did Not Extend the Contract Completion Date

### CLAIM SUMMARY – SUBPART 1

**Primary Issue - Prevention of Contractor's Start of Work**
WBC claims the Government failed to issue an unrestricted Notice to Proceed on September 1, 1998, which resulted in them not being allowed to perform full construction operations until

September 15, 1998. It also claims that the Government did not issue a time extension as allowed under FAR Clause 52.211-10. They further contend that commencement was initially not allowed due to an unreasonable belief that the contractor could not begin on September 1, 1998 due to environmental restrictions; only to later be changed to failure to provide an approved schedule. Due to this late issuance of notice to proceed, WBC contends the Government erred in issuance of both the Cure Notice and the Notice of Termination for Default.

**Secondary Miscellaneous Issues**
Under this subpart, WBC also claims a pattern of interference on behalf of Henry "Paul" Rettinger, III throughout the project. Some of the claimed assertions by WBC include the following:

- Agreements between WBC and Sajid Aftab for pay estimates, items of work, and other items demanding attention, that were later overruled by Mr. Rettinger.
- Many letters were written by Mr. Rettinger, and Mr. Aftab was forced to sign them.

## FINDINGS OF FACTS – SUBPART 1

### 1) Prevention of Contractor's Start of Work

#### a) Contract FAR Clauses

The contract included the following Federal Acquisition Regulation (FAR) clauses pertinent to Subpart C of the claim: FAR Clause 52.211-10, Commencement, Prosecution, and Completion of Work (APR 1984) Alternate 1 (APR 1984); FAR Clause 52.236-13, Accident Prevention (NOV 1991) Alternate 1 (NOV 1991); and FAR Clause 52.236-15, Schedules for Construction Contracts (April 1984). FAR Clause 52.211-10 is included below for reference.

***FAR Clause 52.211-10, COMMENCEMENT, PROSECUTION, AND COMPLETION OF WORK (APR 1984) ALTERNATE 1 (APR 1984)***

The Contractor shall be required to (a) commence work under this contract within 10 calendar days after the date the Contractor receives the notice to proceed, (b) prosecute the work diligently, and (c) complete the entire work ready for use not later than **October 29, 1999** subject to such extensions as may be authorized. The time stated for completion shall include final cleanup of the premises.

The completion date is based on the assumption that the successful offeror will receive the notice to proceed by **September 1, 1998.** The completion date will be extended by the number of calendar days after the above date that the contractor receives the notice to proceed, except to the extent that the delay in issuance of the notice to proceed results from failure of the contractor to execute the contract and give the required performance and payment bonds within the time specified in the offer.

#### b) Standard Specifications (FP-96) and Special Contract Requirements

The contract included the following Standard Specifications in accordance with the *Standard Specifications for Construction of Roads and Bridges on Federal Highway Projects* (FP-96) as amended by the *Special Contract Requirements* (SCR) applicable to this Subpart: Section 107 – Legal Relations and Responsibilities to the Public; Section 108 – Prosecution and Progress; Section 153 – Contractor Quality Control; and Section 155 – Schedules for Construction Contracts. These Sections, or portions thereof, are included below for reference.

## Section 107 – LEGAL RELATIONS AND RESPONSIBILITIES TO THE PUBLIC

(Text Omitted)

**107.10 Environmental Protection**

(Text Omitted)

***Submit a Hazardous Spill Plan, prior to construction, stating what actions will be taken in case of a spill.*** (Emphasis Added) This plan will also incorporate preventative measures to be implemented, such as the placement of refueling facilities, storage and handling of hazardous materials, etc. Immediately notify the CO of all hazardous spills.

(Text Omitted)

## Section 108 – PROSECUTION AND PROGRESS

**108.01 Commencement, Prosecution, and Completion of Work.** FAR Clause 52.211-10, Commencement, Prosecution, and Completion of Work is supplemented as follows.

A preconstruction conference will be held after the contract is awarded and prior to notice to proceed is issued. **Seven days before the preconstruction conference, furnish three copies of the preliminary construction schedule according to Section 155.** (Emphasis Added)

(Text Omitted)

## Section 153 – CONTRACTOR QUALITY CONTROL

(Text Omitted)

**153.02 Contractor Quality Control Plan.** ***Before start of the work, submit a written quality control plan for acceptance.*** (Emphasis Added) With prior approval, submission of a quality control plan for items of work not immediately scheduled to begin may be deferred.

(Text Omitted)

## Section 155 – SCHEDULES FOR CONSTRUCTION CONTRACTS

(Text Omitted)

**155.02 General.** Submit 3 copies of a preliminary construction schedule at least 7 days before the preconstruction conference.

A preliminary construction schedule is a written narrative with a detailed breakdown of all contract activities for the first 45 days after the notice to proceed is issued. Within 7 days after the preconstruction conference, the preliminary construction schedule will be accepted or rejected. If rejected, submit a revised schedule within 3 days. ***Do not begin work, except mobilization, traffic control, and Section 637 work, without an accepted preliminary construction schedule.*** (Emphasis Added)

Use the Critical Path Method (CPM) described below to develop the construction schedule for the total contract work.

(Text Omitted)

**155.05 Written Narrative.** The following applies to the written narrative:

(a) Estimate starting and completion dates of each activity.
(b) Describe work to be done within each activity including the type and quantity of equipment, labor, and material to be used.
(c) Describe the location on the project where the activity occurs.
(d) Describe planned production rates by pay item quantities (e.g., cubic meters of excavation per day/week).
(e) Describe work days per week, holidays, number of shifts per day, and number of hours per shift.
(f) Estimate any periods during which an activity is idle or partially idle. Show the beginning and end dates for reduced production or idle time.
(g) Describe expected and critical delivery dates for equipment or material that can affect timely completion of the contract.
(h) Describe critical completion dates for maintaining the construction schedule.
(i) Identify the vendor, supplier, or subcontractor to perform the activity. State all assumptions made in the scheduling of the subcontractor's or supplier's work.

(Text Omitted)

## c) Initial Contract Award Documentation

### i) Contract Award

On August 20, 1998, WBC was awarded the contract in the amount of $1,370,480.00.

### ii) Preconstruction Conference Package

The Preconstruction Conference Package Letter, written by Howe T. Crockett, Construction Operations Engineer, was sent to WBC on August 21, 1998. The Preconstruction Package Letter identified a list of items to be provided by the Contractor at or prior to the Preconstruction Conference, which included the following:

a) Submit three copies of a preliminary construction schedule. [See Standard Specification 155.]
b) Submit a written Quality Control Plan. [See Standard Specification 153.]
c) Identify your Traffic and Safety Supervisor. [See Standard Specification 156.08]
d) If you elect to subcontract a portion of the work, submit SF 1413, Statement and Acknowledgement, and WFLHD 130, Subcontracting Statistics. [See Standard Specification 108.02]
e) Submit a written proposed plan for implementing Accident Prevention. [See FAR 52.236-13, Standard Specification 107.08, and WFLHD-28, Guide for Contractor's Accident Prevention Plan.]
f) Designate the Contractor's authorized representatives on the project and define the extent of each representative's authority. Complete WFHLD-298, Statement of Authorized Signatures.
g) Identify your EEO officer. [See FAR 52.222-27(n).]
h) Submit Electronic Funds transfer information if you have not already done so. [See FAR 52.232-28]

i) Submit "certificates of insurance" for Worker's Compensation, Bodily Injury Liability, and Property Damage Liability if you have not already done so. [See Standard Specification 107.05.]

**iii) Delegation of Authority (Government)**
The Delegation of Authority letter was issued by William L. Parsons, Contracting Officer, on August 24, 1998, which identified the appropriate levels of contract authority applicable to this contract. The authority to issue the Notice to Proceed was specifically delegated to Mr. Crockett, Construction Operations Engineer.

The authority to approve/disapprove contractor shop drawings and other submittals (including CPM schedules and QC plans), and the authority to evaluate a contractor's progress with respect to approved progress schedule and request updated schedules when necessary were delegated both to Mr. Rettinger, Resident Engineer, and Mr. Aftab, Project Engineer.

## d) Preconstruction Conference

The preconstruction conference was held on August 27, 1998, with many key project personnel in attendance, some of whom include:

- Howe T. Crockett, Construction Operations Engineer, WFLHD
- Paul Rettinger, Resident Engineer, WFHLD
- Sajid Aftab, Project Engineer, WFHLD
- Luther Clevenger, President, WBC
- Julie Clevenger, Secretary/Treasurer, WBC.
- Robin McAlpine, District Engineer, U.S. Forest Service

At the preconstruction conference, the importance of the completion of this project was expressed by the Forest Service. Robin McAlpine reiterated the importance of the schedule as the roads to be repaired are the main access roads to the town of Powers through Gold Beach and nearby towns; and the public is very anxious for this road to be repaired. Mr. McAlpine stated that when this is accomplished and the road is again open, tourism will increase as will job development in the area.

At the time of the Preconstruction Conference, WBC had not provided the Government the preliminary construction schedule according to Mr. Aftab's notes from the meeting. The Government expressed the importance of providing the preliminary construction schedule on four separate occasions during the preconstruction conference. The notes also stated, "Luther responded that he couldn't understand the amendment to the solicitation on various dates (E-10) and expressed concern about the schedule he had to abide by. Paul then explained the schedule (the third time)."

## e) Notice to Proceed

The Notice to Proceed letter dated August 27, 1998 from Mr. Crockett was issued with an effective date of September 1, 1998 with a fixed completion date of October 29, 1999. According to a fax from Mr. Crockett to Mr. Aftab and Mr. Rettinger, this letter was faxed and mailed to WBC on August 28, 1998.

The Notice to Proceed was issued with stipulations requiring the Contractor to perform specific actions prior to commencing work as specified in the original contract. The letter stated the following:

> You are hereby notified to begin construction effective on September 1, 1998, on Siskiyou N.F., FDR 33 (MP 44.5-47.3), FDR 3347, FDR 3347020, awarded to you on August 20, 1998, under contract number DTFH70-98-C-00027. The Notice to Proceed is granted subject to the following stipulations:
>
> 1) The Contractor's CPM schedule and Quality Control Plan are submitted to the Project Engineer by August 31, 1998, and approved by him.
> 2) All other documentation or requirements contained in our August 21, 1998, letter to your office, and not supplied by you at the Preconstruction Conference, has been received by the Project Engineer by August 31, 1998.
>
> In accordance with your contract you will be allowed until October 29, 1999, in which to complete the contract.

Each of the items identified in the Notice to Proceed letter were requirements of the original contract. Details of the events surrounding the preliminary construction schedule, accident prevention plan, and quality control plans are as follows:

**f) Preliminary Construction Schedule**
The following summarizes the preliminary construction schedule submittals provided by WBC and reviewed by the Government.

At the time of submitting its bid, WBC understood that it was required to submit several plans and have an approved schedule before it could begin work on the project. Transcript (Tr), Clevenger, 52:23-53:11.

**i) Submittal No. 1**
WBC brought a schedule to the pre-construction meeting on August 27, 1998, but decided at the meeting that the schedule would not meet the contract requirements and accordingly never submitted that schedule. Tr, Clevenger, 64:3-65:14. Four days later, on August 31, 1998, WBC faxed to the Government's field office the preliminary construction schedule no. 1, a one-page roughly drawn schematic, referenced in the fax as "Preliminary Critical Path Schedule." This schedule did not contain a written narrative nor did it have a detailed breakdown of all contract activities for the first 45 days, as required by the contract. The Government faxed and mailed a letter to WBC on August 31, 1998 rejecting the construction schedule based on the format submitted and overall content not meeting the contract requirements under Section 155. Included with the rejection letter was an example schedule the Contractor could follow. In this letter, the Government granted permission for WBC to begin some work, specifically silt fence and straw bale operations. The letter specifically stated that no other work would be allowed until the schedule was re-submitted in the proper format.

In the September 1, 1998 diary entry of Mr. Aftab, his telephone conversation with Mr. Clevenger is noted as follows:

> The schedule submittal by White Buffalo is very bad condition (as mentioned earlier). It doesn't include any narrative summary & operations shown on or before September 15th were not allowed according to specifications. Luther again apologized & told me he will redo it. Luther also in a joking way told me if he is incompetent? I told him I won't comment on that.

This discussion was followed up on September 3, 1998, where the diary entry of Mr. Aftab relates the following regarding a conversation between Mr. Aftab, Mr. Rettinger, and Mr. Clevenger:

> Sajid: When I will be expecting your schedule?
> Luther: He is still working on it & delivered to us on 9/4/98.
> Paul (FHWA) asked him if he is working on first 45 days schedule or the whole project schedule?"
> Luther: I am working on whole project schedule.
> Luther: As my first schedule was not approved, can I still start doing some clearing and others?
> Sajid: I allowed you to do mobilization, survey & staking, silt fence & straw bales operation, other than that, no other operation will begin until the proper schedule submitted and approved by us.
> Luther: I understand that.
>
> (Text Omitted)
>
> The meeting concluded with a promise from Luther that he will provided all necessary documents as soon as possible.

The revised schedule was not received on September 4, 1998 as indicated by WBC.

**ii) Submittal No. 2**
On September 8, 1998, WBC resubmitted the preliminary construction schedule. This resubmission was faxed, and included a CPM of the work, along with a work plan for the first 45 days.

Mr. Aftab's diary for September 8, 1998 states the following:

> @ 6:45 am I arrived at the office. Contractor (White Buffalo) schedule was sent to me thru fax. After initial reviewing the schedule & discussing with Paul Rettinger, we decided not to accept this schedule in the format as it does not include narrative/written with a detailed breakdown of all contract activities for the first 45 days. Then I called Luther (White Buffalo) told him that I won't be able to meet him @ the job site today as I have to write some letters & review his plans/schedule. Mike Barber (CI) will be @ job site to collect all the forms & dailies from him.

Luther asked me again if he can do excavation as he had sent me schedule thru FAX. I told him no. I need 7 work days to review your schedule before approval. He can not work until his schedule get approved.

(Text Omitted)

Luther called me back around 2:30 pm. He asked me the following questions:

1. Is my schedule look okay?
2. Can I start any other operations?
3. He is asking for waiver of USFS as project falls under Level II.
4. He told me that he is sending 3 copies of schedule to our office.

I replied:

1. Open your FP-96 check 152.02 & 152.05 that what we need to satisfy the requirement for acceptable schedule.
2. He cannot start work while & unless his schedule has been approved by us.
3. He told me he understand what we want.
4. I asked if he had any other questions. He replied no.

The second submittal was rejected by letter dated September 8, 1998 because it lacked a written narrative as required by the contract and as the Government had reminded WBC after the first submittal.

**iii) Submittal No. 3**

On September 10, 1998, WBC again submitted the preliminary construction schedule; this time including a written narrative. The written narrative however lacked four of the nine elements required under the contract. The specific deficiencies were identified in the rejection letter from the Government to WBC dated September 10, 1998.

**iv) Submittal No. 4**

The final submission of the preliminary construction schedule was faxed to the Government on September 11, 1998, but not received until September 14, 1998. The specific elements from the previous letter were addressed. A note in the file states that the preliminary construction schedule was verbally accepted on September 14, 1998. WBC was allowed to begin all construction work on September 15, 1998.

**g) Accident Prevention Plan**

As identified in the Preconstruction Conference Package letter, an accident prevention plan was required in accordance with FAR Clause 52.236-13. The accident prevention plan was received by the Government on August 31, 1998, and required no subsequent submittal. FAR Clause 52.236-13, Accident Prevention required submission of the accident prevention plan "before commencing the work."

**h) Quality Control Plan**

As identified in the Preconstruction Conference Package letter, a quality control plan was required in accordance with Standard Specification 153. The quality control plan dated September 2, 1998 was not received by the Government until September 8, 1998. It was determined to be acceptable and approved on September 8, 1998.

Section 153, Contractor Quality Control and Quality Assurance, required submission of the quality control plan "before start of the work." By this contract requirement, work contractually could not begin until the quality control plan for that portion of work was provided and accepted. As stated under subsection 153.02, with prior approval, submission of a quality control plan for items of work not immediately scheduled to begin may be deferred.

Nevertheless, in an effort to aid the contractor, the Contractor's Daily Record of Construction Operations (Contractor daily) verify the Government allowed work items such as mobilization, preliminary surveying, and installation of silt fence and straw bales to begin prior to receipt and acceptance of the quality control plan.

**i) Hazardous Spill Plan**

The contract required WBC to submit a Hazardous Spill Plan prior to construction under subsection 107.10 of the Special Contract Requirements. WBC submitted a Hazardous Spill Plan on September 15, 1998.

**j) Contract work performed prior to September 15, 1998**

From the Contractor's Daily Record of Construction Operations, Form WFLHD 465, work was performed prior to September 1, and throughout the period of time in dispute.

- Mobilization of equipment to the project site
  - August 29 thru September 2, 1998

- Laborers installing silt fence and straw bales
  - September 2 thru September 15, 1998

- Survey Subcontractors performing preliminary surveying from
  - August 31 thru September 4, 1998
  - September 9 and September 12, 1998

Starting September 15, 1998, WBC was allowed to begin full construction operations as allowed under the contract.

### 2) Environmental Restriction Error by Paul Rettinger

Mr. Clevenger stated in his deposition that during a call when he complained to Mr. Rettinger about not getting an approved schedule, Mr. Rettinger stated that WBC could not begin work at Milepost (MP) 46.2 prior to September 15 because no clearing was allowed. Tr, Clevenger, 104:12-20. The contract did not allow clearing operations at MP 46.7 or between MP 47.07 and 47.25 on Forest Development Road (FDR) 33 during the time between August 6 and September 15. The contract did not restrict work at MP 46.2 during these dates.

### 3) Sajid Aftab was forced to sign letters written by Paul Rettinger

As identified in Mr. Aftab's daily diary entries, there are several entries where he identifies letters written by Mr. Rettinger; however he indicates in many of the entries that the letters were discussed with him prior to his signature. For instance, on September 24, 1998, his diary states, "Paul wrote & discussed with me serial letter no. 017 & I signed it."

**4) Paul Rettinger overturning agreements between Sajid Aftab and Luther Clevenger**
WBC makes a general allegation that there were verbal agreements made between Mr. Aftab and Mr. Clevenger concerning "pay estimates, items of work, and other items demanding attention," only to have Mr. Rettinger overrule Mr. Aftab later. WBC does not provide any specifics to support this claim. I only found one situation where one of the multitudes of miscellaneous pay item tickets was signed by Mr. Aftab and afterwards rejected by Mr. Rettinger because the ticket was not according to contract specifications. Tr, Aftab, 80:21-81:6.

**5) Sajid Aftab requesting to be assigned to another project away from Rettinger**
In his October 21, 1998 diary entry, Mr. Aftab specifically recounts a conversation between himself and Mr. Crockett, the Government's Construction Operations Engineer. The excerpt from the diary stated the following:

> I told Paul my frustrations on this job. I am Project Engineer on this job, I am not making any decisions. I am not informed in which I expected has to come or go. I am only signing letters & feel that I am out of loop. I don't know why I am Project Engineer.
>
> Howe Crockett called (COE). I express my great displeasure regarding this job. I told him also that I am not being performing my duties as a P.E. Although Contractor's operations & performance is below average but we are also not helping to complete the job. I also asked Howe if he can pull me out of this job as I cannot perform my duties as Project Engineer. Inspectors are frustrated. Wayne told me that he don't agree w/ Paul's attitude towards Contractor & Paul is putting all effort is to stop this job. I told Wayne that's not true. I will talk to Paul but again I cannot promise you anything as I don't have authority on any issue.

On October 30, 1998, Mr. Aftab expressed his frustration again on the project in his diary. His diary states the following:

> Told Paul again I need training in T&A & Estimate.

| Facts | Comments: |
|---|---|
| Arrived at the project around 10:00 am. Contractor is still placing the pipe & preparing bedding material for the last section of the pipe observe contractors operations.<br><br>Bob Gietz told me that Jim told him that tomorrow on Oct. 31, they would be out of wetted perimeter & he is going to use riprap material which hasn't been approved for his energy dissipater. I told bob I will be here at job site tomorrow. | Bob Gietz keep on insisting that he should inform Paul about the situation. I told him I can handle it but he keep insisting. Maybe Paul has given him some specific direction to contact him rather than me. I told him okay go head & tell Paul.<br>Again, I am frustrated as I am not given an opportunity to get involved in project, writing letters, making decisions, scheduling inspectors at the job or even making spreadsheets for my job.<br>When I came to this job as Project Engineer with understanding that Resident Engineer is there to help me not to run my job. Resident Engineer in the starting has given me an opportunity & slowly took over my job.<br>I am not even being consulted regarding scheduling inspectors. If inspectors has any |

| | |
|---|---|
| | problem, they now go to Resident Engineer than I.<br>I have not been trained or helped as a Project Engineer. I was always on the project. Spend very little time in office. So I have not achieved or not been able to get help from Resident Engineer to prepare myself for the future projects. |

In his deposition, Mr. Aftab was questioned if he asked to be transferred because of his problems with WBC, Mr. Clevenger personally, or Mr. Rettinger. Mr. Aftab answered, "There was no personal issue between you and me. All it was, was that you are the Contractor. We are seeing that this Contractor is not going to be done or completed. It was frustration on both sides, which always comes down – and again, this was my first project. That's why I wrote that statement in my diary. It frustrated me why the Contractor was not performing what he is supposed to perform according to the contract. That was my frustration. That's why I asked them to remove me from the project." He was asked specifically what problems he was having with Mr. Rettinger. Mr. Aftab replied, "Paul was not assigning me the assignment of a Project Engineer. That was a big frustration that I can tell you – these are all combinations of all these. The job was not going good. My boss is not giving me those assignments – which he's suppose to give me those assignments. That's how it, you know, happened." Tr, Aftab, 20:3-21:18

**6) Inspectors' statements regarding Paul Rettinger's administration style or comments**
WBC claims that inspectors working on the project for the Government had made disparaging comments regarding Paul Rettinger's actions on the contract.

**a) Wayne Lowell**
WBC claims that one of the inspectors left the project largely because he had never seen Rettinger treat a contractor so harshly. Clarification was sought from WBC regarding the identity of this inspector they claim left under these circumstances, which they replied to identify him as Wayne Lowell.

According to the Inspector Daily Reports, Mr. Lowell was on project from September 18, 1998 to October 29, 1998. The information within the Inspector Daily Reports do not relate to the statements as depicted by WBC. However, as identified by WBC in their email response for clarification, the Deposition for Mr. Aftab discusses Mr. Lowell's reasons for leaving. When asked why Mr. Lowell left the project, Mr. Aftab replied, "His wife was having some problems and she needed an operation." Mr. Aftab also stated, "He was also frustrated on the job and the real reason was because of his wife." When asked if Mr. Lowell said anything about Mr. Rettinger's conduct, Mr. Aftab answered, " He said that, "I don't know why Paul is so strict on the is job, while he was not so strict on other jobs." He has been with Paul for the last four or five years, so that's why." Tr, Aftab, 76:19-77:12

**b) Mike Barber**
WBC also claims another inspector who was fired from the project indicated that Rettinger was deliberately trying to rid the Government of what he termed "problem contractors." This employee was identified by WBC as Mike Barber in a response to a request for clarification.

In response to another request for clarification on this issue, WBC provided information they received from Mr. Barber's employer, CMTS, as Mr. Barber was a consultant inspector on the project, not an employee of the Government. In the information provide by CMTS, there is a letter to the file written by Mr. Barber to reflect his displeasure with his removal from the project, which is included as follows:

> As we discussed on 9-10-98, and in our following discussions, Paul Rettinger, FHWA, unlawfully voided my CMTS contract with the Federal Highway Administration on 9-10-98 without any warning or reason. He oddly asked me to return to the FHWA Office from my field assignment; and he was leaving the Office in his vehicle as I arrived when he suddenly voided the CMTS contract. He asked me to be gone by the end of the day. I asked for an explanation to his bizarre statement, and he said that Luther Clevenger, Construction Contractor, had told him "everything" that I said during our 9-8-98 meeting arranged by Mr. Rettinger. Since I had done nothing wrong during this 9-8-98 meeting, Mr. Rettinger's decision was still irrational. He refused any specific explanation. After Mr. Rettinger had quickly disappeared, I learned that he had maliciously slandered both Mr. Clevenger and I with his fabricated scenario of –He said, I said-. I arranged a meeting with Mr. Rettinger for the following morning to receive documentation of his decision, but the following day Mr. Rettinger only continued his insane behavior. No dismissal documentation from anyone has been delivered to me yet, nearly four months later.
>
> Retrospectively, Mr. Rettinger's comment to the FHWA Office in mid-July, 1998 shortly after I had been assigned to work for him in Nesika Beach, Oregon that he would vindictively volunteer to be the project engineer on any construction project with a specific contractor which the FHWA had not liked in the past; and that he would make sure this contractor would never work for the FHWA again. This typified his inappropriate, hostile attitude towards my CMTS Contract with the FHWA. I am preparing a summary of Mr. Rettinger's unlawful actions from 7-6-98 to 9-11-98 in case the investigators need it per the following paragraph describing the 1998 U.S. Government Crime Case before the Ninth Circuit U.S. Court of Appeals.
>
> I am involved as a key witness in a June, 1996 legal action exposing criminal activity by the U.S. Government. My Fall of 1996, Summer of 1997, and Summer of 1998 Construction Inspection Assignments for the FHWA have been generally unaffected by this multi-million dollar legal action. After I was assigned to Mr. Rettinger in early July, 1998, he prejudicially performed his duties regarding my position in repetitiously malicious efforts to damage us. He has intimate knowledge of this extensive 1996 to 1998 U.S. Government legal action, and he repeatedly used this information in mocking, insulting statements and actions against me. I remained professional, prudent, and positive in my contractual duties throughout the projects minimizing any of his harm to the success of the construction projects. Although Mr. Rettinger's unlawful actions against me may seem to be employment discrimination; he has exposed himself as a criminal accomplice to the aforementioned criminal activity by the U.S. Government. I suspect that our construction contracting's involvement will be minimal, with the Judicial Authorities probably just including Mr. Rettinger's unlawful actions into their crime case investigation.
>
> I respect CMTS's decision of legal action regarding the FHWA contract violation. I don't have the time or money to correct this defamatory action against me; and would agree with you in not pursuing Mr. Rettinger's unlawful activities in a civil case.

> We need to decide how to contact Mr. Rettinger's superiors, and Mr. Clevenger about Mr. Rettinger's unlawful actions during his public service. I am still requesting documentation of my dismissal; and would like to request access to Mr. Rettinger's Project Files and Daily Reports on the 1998 ERFO 18(1) and ERFO 18(2) Projects.

Mr. Rettinger does not recall this discussion with Mr. Barber. Also, Mr. Barber does not provide any information regarding the context of the discussion. Further, Mr. Rettinger did not know about the litigation between WBC and U.S. Forest Service until after the termination of the contract with WBC.

## ANALYSIS – SUBPART 1

### 1) Prevention of Contractor's Start of Work

The contract was awarded on August 20, 1998. The preconstruction conference was held on August 27, 1998. Under FP-96, subsection 155.02, WBC was required to provide three copies of the preliminary construction schedule at least 7 days before the preconstruction conference. Given the short time frame involved, the Government, in a letter dated August 21, 1998, allowed WBC to have until the preconstruction conference to provide the preliminary construction schedule. In that same letter, the Government requested certain other information and submittals to be provided. WBC did not submit a preliminary construction schedule at the August 27, 1998 preconstruction meeting. Nor did WBC provide the Accident Prevention Plan or the Quality Control Plan. Both of these had been requested by the Government and the submission of the Quality Control Plan in accordance with FP-96, subsection 153.02. was required to be made before work could begin. At the meeting, the Government fully discussed with WBC the contractual consequences that flowed if these documents were not provided.

In accordance with FAR Clause 52.211-10, the Notice to Proceed was issued by the Government with an effective date of September 1, 1998. This is the date established by FAR Clause 52.211-10 of the contract. In the Notice to Proceed, the Government again reminded WBC of its obligations under the contract to provide certain required submittals prior to beginning certain work under the contract.

The contract expressly provided that WBC could not begin construction activities until it had submitted a Hazardous Spill Plan, SCR 107.10; could not begin work until it has submitted a written Quality Control Plan, FP-96, subsection 153.02; and could not begin work, except for mobilization, traffic control and Section 637 work, without an accepted preliminary construction schedule, FP-96, subsection 155.02.

WBC did not submit the first Preliminary construction schedule until August 31, 1998. The same day it was submitted, the Government reviewed the submittal and rejected it for non-conformance with the contract requirements. The submittal was simply a one page roughly drawn schematic. It did not meet the requirements of a "written narrative with a detailed breakdown of all contract activities for the first 45 days." FP-96, subsection 155.02. The contract was detailed as to what was required in the written narrative. FP-96, subsection 155.05. This first submission was not a good faith attempt on the part of WBC to comply with the contract requirements. The Government attempted to assist the Contractor by providing the Contractor a sample schedule. Not only was the Government's review within the 7-day

limitation provided by the contract (see FP-96, subsection 155.02), but it was the very same day, and it represented an attempt by the Government to go beyond the contract and assist WBC.

According to the contract, once its schedule was rejected, WBC had 3 days in which to submit a revised preliminary construction schedule. FP-96, subsection 155.02. WBC failed to meet this contract requirement. It finally provided a revision on September 8, 1998, eight days later.

Although this schedule provided more detail, it completely lacked a written narrative of the first 45 days as required by the contract. Again, the Government reviewed the submittal the same day and provided a letter documenting the deficiencies and rejected the preliminary construction schedule that same day, stating that WBC needed to provide a "preliminary construction schedule in a written narrative form." The Government also emphasized the time constraints for the contract.

Two days later, on September 10, 1998, WBC provided another revision. By letter that same day, the Government rejected that schedule, expressly stating the specific contract requirements that the schedule did not provide. Finally, in a submittal dated September 11, 1998, but not received by the Government until September 14, 1998, WBC provided a written narrative that was substantially expanded from its prior submission and contained the items required by the contract. WBC was authorized to begin work the next day, on September 15, 1998.

These facts do not show a lack of cooperation on the part of the Government. None of the first three schedules were close to meeting the contract requirements. The Government promptly reviewed the schedules and provided feedback and assistance to WBC in preparing the schedules. Mr. Clevenger testified at his deposition that as far as the paperwork was concerned, the Government did an adequate job of trying to help WBC. Tr, Clevenger, 642:1-9. To the extent there was any breach of a duty to cooperate, it was on the part of WBC in not meeting time requirements or contract substantive requirements.

Further, I note that WBC did not submit its Hazardous Spill Plan until September 15, 1998. The contract forbade WBC from performing any construction prior to the submission of this Plan. SCR subsection 107.10. I find that it was WBC's failure to meet clear contract requirements, not Government hindrance of performance, which prevented the Contractor from starting full construction work before September 15, 1998.

WBC contends that they were allowed to proceed even without an approved schedule. However, the facts show that WBC was allowed to perform only limited work until it submitted a proper preliminary schedule. Thereafter, WBC had difficulties submitting an acceptable full construction schedule which was due within 30 days following issuance of the Notice to Proceed. FP-96, subsection 155.02. This submittal required a Critical Path Method (CPM) schedule of all construction operations, along with a written narrative similar to the preliminary construction schedule, however including all of the construction operations. However, the failure to furnish an acceptable full schedule, though a contract breach, was not an express condition to the performance of work under the contract.

During the period of time between issuance of the Notice to Proceed and September 15, 1998, the Government permitted WBC to perform silt fence and straw bale installation, and preliminary surveying, in addition to the mobilization allowed by the contract. FP-96, subsection 155.02. By allowing WBC to perform this work, even though it was not permitted under the

terms of the contract without an approved preliminary schedule and a submitted Hazardous Spill Plan, the Government shows a willingness to go beyond what it was required to do pursuant to the contract. This is further evidence that the Government was trying to work with WBC to get this contract completed.

## 2) Miscellaneous Issues

### a) Environmental Restriction Error By Paul Rettinger

WBC alleges that Mr. Rettinger was confused about environmental restrictions and did not believe that work could begin at MP 46.2 until September 15. This allegation appears to relate to a telephone call Mr. Clevenger made to Mr. Rettinger in which Mr. Clevenger remembers Mr. Rettinger stating that WBC could not start work at MP 46.2 because of clearing restrictions. Tr, Clevenger, 104:12-105:2. Since the isolated and oral statement did not purport to amend the contract and given the fact that WBC's own breaches prevented it from beginning work before September 15, 1998, I do not see how this statement could be viewed as hindering WBC's performance in any way.

### b) Sajid Aftab forced to sign letters written by Paul Rettinger

WBC alleges that Mr. Aftab was forced to sign letters written by Mr. Rettinger. The subject contract was the very first contract for Mr. Aftab as a project engineer. While it is clear from reading through the diaries that Mr. Aftab experienced some frustration about not having more responsibility on the project, there is no evidence that Mr. Aftab was "forced" to sign letters. Mr. Aftab explained that most letters were drafted by Mr. Rettinger and signed by Mr. Aftab. Tr, Aftab, 18:20-19:15. Mr. Aftab explained the reason was that Mr. Rettinger spent most of his time in the office while Mr. Aftab was on the project. Mr. Aftab further states that they discussed the letters first and then he would sign them. It is not unusual for the Resident Engineer to assist a new Project Engineer in the paperwork and provide guidance and direction. I do not find that Mr. Rettinger's scrivener role provides a basis for concluding that the Government operated in bad faith.

### c) Paul Rettinger overturning agreements between Sajid Aftab and Luther Clevenger

When the Government asked for clarification, WBC provided only one example relating to this allegation, a pay item ticket for the installation of an energy dissipator that was signed by both Mr. Clevenger and Mr. Aftab. Mr. Rettinger reviewed the ticket and refused to return it to WBC because the energy dissipator had been installed using material for which test results were not provided. <u>See</u>, SCR Section 251; FP-96, subsection 251.02, and subsection 705.02. To be accepted, the energy dissipator was required to have values within the specification limits identified in subsection 705.02. WBC had not provided the test results to show that the installed energy dissipator complied with the contract requirements. Accordingly, the miscellaneous pay item should not have been signed. I find Mr. Rettinger's actions in rejecting this signed miscellaneous pay item to be proper under the contract. I have found no evidence to support WBC's implied allegations that Mr. Rettinger routinely overturned agreements or that Mr. Rettinger's actions were a breach of the covenant of good faith and fair dealing. Mr. Rettinger's action in this one incident did not make it more difficult for WBC to meet the terms of the contract. Rather, it simply required WBC to comply with contract requirements.

### d) Sajid Aftab requesting to be assigned to another project away from Rettinger

WBC alleges that Mr. Aftab asked to be assigned to another project away from Mr. Rettinger. I find that Mr. Aftab, indeed, asked to be reassigned at one point because of his

frustrations. He explained that he was frustrated because the job was not going well and he felt that Mr. Rettinger was not giving him the independence he desired. Tr, Aftab, 21:11-18. I do not see the relevance of this issue to the issue of bad faith. If this frustration somehow hindered WBC in carrying out its contractual duties, then I could see some relevance to the matter. When questioned about the matter, Mr. Clevenger stated that the "deception" with regard to Mr. Aftab's role was a big impact to WBC. However, when asked how this impacted WBC, the only specific example Mr. Clevenger named was with the schedules. Tr, Clevenger, 674:11-675:4. As I have previously analyzed above, I find that the impact with respect to the schedules was due to WBC's breach, not to any breach on the part of the Government.

**e) Inspectors' statements regarding Paul Rettinger's administration style or comments**
WBC alleges that one inspector left "largely because he had never seen Rettinger treat a contractor so harshly" and another inspector who was fired indicated that Mr. Rettinger was deliberately trying to rid the government of problem contractors. When asked for additional information, WBC named the two inspectors as Mr. Lowell and Mr. Barber. Mr. Lowell, at one point, questioned why Mr. Rettinger was being so strict on this project. However, Mr. Lowell did not leave because of this. Rather, he left because of his wife's illness. Mr. Barber alleges that Mr. Rettinger stated on a different project that he, Mr. Rettinger, would volunteer for any project where there was a contractor the Government had not liked in the past and he would make sure the contractor did not work for the Government again. Mr. Rettinger does not remember any such conversation. Reading through Mr. Barber's letter does not give me a great deal of confidence in his statement. His comments are directed towards his own loss of position.

Nevertheless, I have reviewed closely Mr. Rettinger's actions through this initial contract period. I note that Mr. Barber was removed from the project by September 10, 1998, before WBC even began substantial work on the project. My review of the records does not disclose any indication that Mr. Rettinger was not working with the contractor to try to get the project going. To the contrary, as explained above, Mr. Rettinger was providing prompt turn-around on submittals, and assisted in the schedule issue by providing a sample schedule.

## DECISION – SUBPART 1

### 1) Prevention of Contractor's Start of Work

The covenant of good faith and fair dealing is applicable to both parties of the contract. In looking at the facts relevant to WBC's allegations, what is apparent to me is that WBC was in breach of the contract provisions concerning submission of a preliminary construction schedule. The first scheduled prepared by WBC was admittedly inadequate and ultimately was never submitted to the Government. The second schedule, the first submission, was a one-page crude chart that lacked even the basics of what was required. The Government provided a sample schedule immediately. Nevertheless, WBC breached the contract in waiting 8 days to resubmit a schedule. That resubmission represented another breach in that it totally failed to include a written narrative. The third submitted schedule omitted nearly half of the items required in the written narrative. Finally, on September 14, 1998, WBC submitted an acceptable schedule. On September 15, 1998, WBC submitted the required Hazardous Spill Plan. Both submissions were prerequisites to beginning construction work on the project. Apparently, WBC was hoping that the Government would simply waive contract requirements. The lengthy delay by WBC in providing these preliminary documents is inexplicable, given the short duration of the work

windows for this contract. In contrast, the same day responses by the Government, the provision of a sample schedule, the identification of the specific problems in the response letters, and the willingness of the Government to allow WBC to perform some preliminary work during this time, all lead me to conclude that if there was any bad faith, it was not on the part of the Government.

## 2) Miscellaneous Issues

### a) Environmental Restriction Error By Paul Rettinger

I do not find that the alleged error by Mr. Rettinger in the single phone call as to what work could be done before September 15 rises to the level of bad faith. The error appears to have been made in a conversation as a simple comment. It was not a direction, nor did it have any delay impact on WBC. As noted above, WBC was delayed by its own breach of the contract provisions.

### b) Sajid Aftab forced to sign letters written by Paul Rettinger

I do not find that any evidence to support a position that Mr. Aftab was forced to sign letters written by Mr. Rettinger. As explained by Mr. Aftab, Mr. Rettinger was the main office person who drafted the letters. Mr. Rettinger also had the role of helping to guide Mr. Aftab in Mr. Aftab's first job as a project engineer. Correspondence drafted by Mr. Rettinger was discussed with Mr. Aftab before it was sent. I do not find this practice to be wrong, a breach of any covenant, or to support a claim of bad faith.

### c) Paul Rettinger overturning agreements between Sajid Aftab and Luther Clevenger

The only evidence I could find in support of this allegation is a single miscellaneous pay item ticket. In that situation, it appears that Mr. Aftab's acceptance of the ticket was contrary to the contract requirements. Mr. Aftab did not have any contracting authority to change the contract requirements. WBC does not contend that Mr. Rettinger's rejection of the ticket was wrong under the contract. The Government has the right to reject work not done in conformance with the contract. I do not find the rejection of this pay ticket to be evidence of bad faith.

### d) Sajid Aftab requesting to be assigned to another project away from Rettinger

As explained above, Mr. Aftab's request to be assigned to another project does not seem to have impacted WBC in any tangible way. The only impact identified by Mr. Clevenger in his deposition dealt with the schedules. My analysis of the schedules does not show any lack of cooperation on the part of the Government. I do not find that Mr. Aftab's request supports a finding of bad faith on the part of the Government.

### e) Inspectors' statements regarding Paul Rettinger's administration style or comments

Mr. Lowell's statement concerning Mr. Rettinger's strictness on the project leads me to examine more closely whether there was a lack of cooperation on the part of Mr. Rettinger. My review of the records does not reveal that Mr. Rettinger overall hindered WBC's performance on the project. Rather, I find situations where Mr. Rettinger worked with WBC to ease some contract requirements to enable the project to proceed. The main problem seems to have been with WBC's failure to plan, execute, manage, and complete the project. I do not find a breach of the covenant of good faith and fair dealing, and nothing I find raises to the level of bad faith.

**SUMMARY**
Based upon the above analysis, I conclude that the facts do not support bad faith on the part of the Government as it pertains to WBC's delayed start of work.

# SUBPART 2

## The Government Improperly Instructed the Contractor to Remove Material at MP 46.2, but the Impropriety Was Not Disclosed to the Contractor or Corrected After Rettinger Discovered His Error

### CLAIM SUMMARY – SUBPART 2

**Primary Issue – Material Removal Error**
WBC maintains its position that they were directed by the Government to remove excess material from the site at MP 46.2, only to later determine that this material was needed at this site after it was hauled away. They contend the Government concealed this information from the Contractor after determining this directive was an error.

**Secondary Issue – Completion Contractor Work**
WBC claims that because of this error, the follow-on Contractor had to replace the hauled away material with suitable material from another site; thereby incurring additional costs that were subsequently back charged against WBC.

### FINDINGS OF FACTS – SUBPART 2

1) **Material Removal Error**
   a) **Contract Requirements**
      i) **Plan Sheet D.3**
      The work for the site at FDR 33, MP 46.2 is depicted on Plan Sheet D.3; which includes the plan and profile drawings, summary of quantities table for each contract bid item, and the "Upstream Cross-Section" for the stream channel.

      The plan view depicts the horizontal alignment, culvert and silt fence installation, rip rap to be placed, and a note for the work in the upstream stream channel. This note states, "Clean debris in the upstream and recontour stream channel and match with upstream channel width under Section 622."

      The profile view displays the vertical profile, existing ground, and location of culvert along centerline. At the bottom of this view, the estimated excavation and embankment quantities are shown. The estimated excavation quantities are 3,281 cubic meters, and the estimated embankment quantities are 3,760 cubic meters. The embankment quantities included a footnote reference which states, "Haul 479 m3 of borrow material from rock excavation at MP 46.7." This quantity makes up the difference between the excavation and embankment quantities to provide adequate material for this site.

      The pertinent bid items to this discussion include the following:

| ITEM | DESCRIPTION | QUANTITY |
|---|---|---|
| 20401A | Roadway excavation | 3281 m3 |
| 62201B | Hydraulic excavator, crawler mounted, 1.1 m3 minimum capacity | 8 hour |
| 62201C | Loader/backhoe, wheel type tractor, 35 kw minimum | 4 hour |
| 62201D | Tractor, crawler (dozer), universal blade, 85 kw minimum | 4 hour |
| 62201E | Truck, highway, dump body, rear, 7.6 m3 minimum capacity | 4 hour |
| 62301 | General labor | 8 hour |

**ii) Standard Specifications (FP-96) and Special Contract Requirements**

The work for Item 20401A is specified under Section 204. – Excavation and Embankment. The work for the various Item 62201 pieces of equipment is specified under Section 622. – Rental Equipment. The work for Item 62301 is specified under Section 623. – General Labor. Applicable portions of these sections are included below for reference:

**Section 204. – EXCAVATION AND EMBANKMENT**

**Description**

**204.01**This work consists of excavating material and constructing embankments. This includes furnishing, hauling, stockpiling, placing, disposing, sloping, shaping, compacting, and finishing earthen and rocky material.

***

204.02 Definitions.

(a) Excavation. Excavation consists of the following:

(1) Roadway excavation. All material excavated from within the right-of-way or easement areas, except subexcavation covered in (2) below and structure excavation covered in Sections 208 and 209. Roadway excavation includes all material encountered regardless of its nature or characteristics.

(Text Omitted)

**Construction Requirements**

**204.04 Preparation for Roadway Excavation and Embankment.** Clear the area of vegetation and obstructions according to Sections 201 and 203.

Submit plans for CO approval for equipment access methods at MP 46.0 and MP 46.2 on FDR 33. Provide plans which do not construct access ramps outside the clearing limits or on ground which was not disturbed during the roadway failure. Include containment methods of any proposal to end dump materials. A fully engineered plan may not be required depending on methods proposed; the intent is to avoid improperly undercutting slopes to remain in place. Do not implement slope repair access without CO Approval.

(Text Omitted)

**204.14 Disposal of Unsuitable or Excess Material.** Dispose of unsuitable or excess material legally off the project. Where there is a pay item for waste, shape and compact the waste material in its final location. Do not mix clearing or other material not subject to payment with the waste material.

Material may be disposed of at Rock Creek Disposal Area, MP 0.5 on FDR 3347, as shown on the plans.

**Section 622. – RENTAL EQUIPMENT**

**Description**

**622.01** This work consists of furnishing and operating equipment for the construction work as ordered by the CO and listed below. Work under this Section does not include equipment time used to perform work provided for under any other pay item shown in the bid schedule. The work anticipated under this Section includes:

(a) Upstream of the culvert at MP 46.2 on FDR 33, clean out debris and recontour 70 meters of the channel to a 17% grade.

(Text Omitted)

**Section 623. – GENERAL LABOR**

**Description**

**623.01** This work consists of furnishing workers and hand tools for the work listed in Subsection 622.01

The excavation work at MP 46.2 was part of pay item 20401A. See Plan Sheet B.1 incorporating the quantity from MP46.2 into this pay item. This work was measured by using the volume shown in the plan column on the summary of quantities sheet. SCR 204.16.

The 622 work was part of pay items 62201A, 62201B, 62201C, 62201D, and 62201E, as well as 62301.

### iii) Cross Sections

The cross sections from stations 0+150 to 0+155 at MP 46.2 include lines depicting the original ground, and to-be-constructed ground. The culvert is also shown in the cross section at 0+153.03. At the culvert, the cross sections show that a substantial portion of the inlet work would be included in the roadway excavation item. The 17% gradient required under Section 622 is flatter than the back slope line of the excavation shown at this cross section. From all indications, the volume of the material between the 17% gradient and the backslope was the volume of the material to be removed under Section 622 work.




**b) Work at MP 46.2 on FDR 33**

**i) Initial Section 622 work**

The staking of the culvert and cross section of the FDR 33, MP 46.2 site was performed by the surveying subcontractor, and notes were provided to the Government on September 10, 1998.

On September 15, 1998, WBC started constructing the access road at the FDR 33, MP 46.2 site. A discussion was held that day with Mr. Aftab, Mr. Clevenger, and Gene Van Cauteren (the Government's Consultant Inspector) regarding the work to be performed. An excerpt from Mr. Aftab's September 15, 1998 diary documents this discussion and states, "Remove all the debris as specified in the plans @ FDR 33 MP 46.2. If incorporate the good material he should send us a letter. He told me if he has to haul all the material it will take him more than 2 days as he planned to do in his preliminary schedule." This discussion was also documented by Mr. Van Cauteren in his September 15, 1998 diary stating, "Talked with Luther about the material excavated under the 622 item on 33 MP 46.2 I told him if he chooses (sp) to use some of the material in the fill instead of removing it to the disposal area he would have to submit (sp) his wishes in writing. I also informed him this material was not included in the excavation quantities. Luther said he would think about it."

Mr. Rettinger also informed Mr. Clevenger that the excavation and the 622 work were separate quantities. Tr, Clevenger, 135:5-10.

In Mr. Clevenger's deposition, he states he was directed by Mr. Lowell to perform the 622 work so that he could use the native rock for riprap. Tr, Clevenger, 145:2-146:1. When asked further about this conversation, Mr. Clevenger stated that Mr. Lowell did not use the word "directive," but rather stated "if I sorted that material out, it would save hauling that off and we could use it as riprap."

On September 16, 1998, it was decided by Mr. Aftab to adjust the slope of the upstream grade from 17% to 22% in an effort to minimize the number of equipment hours necessary to perform the work.

According to the signed pay item tickets for Pay Item 62201E, Truck, the hours associated with the upstream grade excavation under Section 622 was performed on the following dates:

| **Date** | **Hours** | **Estimated No. of Truck Loads**[15] | **Quantity**[16] |
|---|---|---|---|
| September 16, 1998 | 14 | 32 Loads | 163.2 cubic meters |
| September 20, 1998 | 30 | 60 Loads | 306.0 cubic meters |
| September 21, 1998 | 30 | 60 Loads | 306.0 cubic meters |
| September 24, 1998 | 30 | 60 Loads | 306.0 cubic meters |
| September 25, 1998 | 26 | 13 Loads | 66.3 cubic meters |
| | | | |
| **TOTALS** | | **225 Loads** | **1,147.5 cubic meters** |

On September 21, 1998, Mr. Rettinger visited the site and told Mr. Clevenger that he would look over a proposal from WBC for the MP 46.2 site if Mr. Clevenger wanted to submit one. Lowell, Daily for September 21, 1998. This offer was followed by a letter dated September 22, 1998 advising WBC that any proposal must be in writing. Serial Letter No. 008 dated September 22, 1998. By Serial Letter No. 009, dated that same date, WBC was informed the Government would be paying for additional Section 622 work under a contract modification.

On September 22, 1998, FHWA responded to the Contractor's request to extend the culvert at MP 46.2 determining it was not a cost effective change.

On September 24, 1998, WBC sent a letter in response to Serial Letter 008 and requested an equitable adjustment to cover the costs and impacts associated with this work. The letter states the following:

> We are working under a changed condition. Sheet D.3, item 62201E shows 4 hours for the dump truck. We have over run those hours by a considerable amount and we still have several days work left to complete this work. As a result of this changed condition I am incurring additional costs that I am requesting you to consider paying for. I will identify them as best I can at this time and they are as follows"
>
> 1) Flagging.
> 2) Haul road maintenance.
> 3) Disposal site maintenance.
> 4) Disruption of contract work at MP 46.7.
> 5) Additional work for the surveyors outside the scope of contract work.
>
> As you are aware the miscommunication and delays at this point are going to put us in a very

[15] "Estimated No. of Truck Loads" based on 30 minute round trips for trucks (i.e., if a truck worked 10 hours, this would equate to approximately 20 loads.)
[16] "Quantity" based on 2/3 full loads of 7.6 cubic meter capacity trucks, or 5.1 cubic meters per load.

serious position when we get the wet weather. I am not requesting that you waive any contract requirements but rather that you work with me to get by these critical work items before it is to late. From my stand point, it appears that getting the job done is secondary. I am bound to work with you for timely completion or I will not reap any financial gain and that is my number one reason for being here. I want to do a good job for you but I need your assistance.

On September 25, 1998, the Government directed WBC to discontinue hauling waste from MP 46.2 to the disposal area. Mr. Aftab's diary for that day states, "Received a call from Paul Rettinger to shut the operation @ 46.2 (hourly work) down. Called bob told him to shut them down @ hauling material to the waste area from 46.2."

On the same day, WBC sent a letter to the Government requesting approval to use the native onsite rock at FDR 33 MP 46.2 and FDR 3347 MP 0.61 as class 5 riprap at each site. The reasons given by WBC in the letter include:

- It would save FHWA the cost of hauling about 14 truck loads from MP 46.2 and 11 truck loads from 0.61 or approximately $20,000.00.
- It would save WBC from having to buy the riprap and haul it which would offset the additional cost of having to handle it several times.
- It would allow for faster completion of the work.

On September 27, 1998, the Government sent to WBC a letter acknowledging that there had been a change in work covered under Section 622, resulting in an overrun in several of the Section 622 pay items. It further stated the Government's intent to address the impacts of the change through the issuance of a Contract Modification.

The Government agreed to WBC's request for the culvert extension and included it in Contract Modification 001.

### ii) Contract Modification 001

Bilateral Contract Modification 001 was signed by Mr. Clevenger for WBC on September 29, 1998, and later signed by David Heckman for the Government on October 14, 1998. The wording from Contract Modification 001 is included below:

This agreement provides for payment of additional hours under existing items covered under Section 622, for the removal of material from Mile Post 46.2 to the designated disposal area in the contract. Additional hours for maintenance of the disposal area and haul road are also agreed to under this modification. Payment for one load of crushed aggregate for the haul road are included in this agreement. An extension of 6 meters on the 2250 mm culvert at MP 46.2 is included under this agreement. This agreement allows for use of additional rock excavation from the site at MP 46.7 into the embankment at MP 46.2 for any embankment necessary to extend the culvert and complete the fill. Construction of a 5 foot high berm (false cut) will be constructed at MP 46.2, utilizing material from the rock cut at MP 46.7. The berm shall be topped with top soil material, conserved from the roadway excavation, and seeded/mulched. All berm work will be as directed by the CO. The berm will be constructed on the widened area afforded by the culvert extension. Native rock material at MP 46.2, suitable to the CO, may be placed on the interior portion of the riprap section, adjacent to the geotextile fabric, to a width of about 1 meter. Finally, this agreement allows for payment of additional flagging, under existing Item 63509, used during the haul through the work at MP 46.7.

This agreement establishes a new Item for the 6 meter extension of the culvert at the inlet. New Item 60201D will change the unit price only. The new unit price is shown below. All associated work will remain unchanged.

Payment for the placement of the berm material at MP 46.2 is included in the excavation item, and will not be paid for directly. Additional seeding and mulching for the culvert extension and berm will be paid for under the existing Items 62503 & 62506.

Native rock material at MP 46.2, about 200 cubic meters, will be paid for under the existing riprap item, 25101A. There is no change to the method of measurement for this material. There will be no change to the estimated contract quantity for this item, as a result of this change.

Payment for the work under this agreement will be as follows:

| Existing Item | New Item | Description | Unit Price | Unit | Quantity | Amount |
|---|---|---|---|---|---|---|
| 30802 | | Roadway aggregate | $20.00 | T | 5.0 | +$100.00 |
| | 60201D | 2250 mm pipe culvert | $2000.00 | LS | 6 m | +$2,000.00 |
| 62201A | | Grader. motor, 90 kw min. | $95.00 | hr | 3.0 | +$285.00 |
| 62201B | | Hydraulic excavator | $100.00 | hr | 56.0 | +$5,600.00 |
| 62201C | | Loader/backhoe | $75.00 | hr | 20.0 | +$1,500.00 |
| 62201D | | Tractor, crawler(dozer) | $75.00 | hr | 49.0 | +$3,675.00 |
| 62201E | | Truck, highway. dump | $65.00 | hr | 126.0 | +$8,190.00 |
| 62503 | | Seeding | $195.00 | slry unit | 1.0 | +$195.00 |
| 62506 | | Mulching | $250.00 | slry unit | 1.0 | +$250.00 |
| 63509 | | Flagger | $40.00 | hr | 34.0 | +$1,360.00 |

This agreement increases the total contract amount by $23,155.00. There will be no change to the contract time as a result of this agreement. There will be no change to any contract specifications, as a result of this agreement, other than specified herein. There will be no additional payment, except as specifically detailed herein, for any other associated work effected by this agreement.

The modification contained the following release language: "By signature in Block 15B below, the Contractor agrees that payments in accordance with this supplemental agreement constitute full and complete compensation for all costs, both direct and indirect, arising out of the work covered by this supplemental agreement, and releases and discharges the Government from all such costs except as provided herein."

## ANALYSIS – SUBPART 2

WBC claims that Mr. Rettinger informed Mr. Clevenger that the native material at MP 46.2 above the culvert inlet was excess material and would need to be hauled to a disposal site. WBC further claims that while the work was being performed, Mr. Rettinger discovered that he was wrong, and that the material was not excess to the embankment material needed at MP 46.2. WBC then claims that Mr. Rettinger failed to inform WBC of this error and failed to correct "his mistake," and that the Government knew about this error and failed to take corrective action.

The contract required 3281 cubic meters of excavation and 3760 cubic meters of embankment. The contract contemplated that all 3281 cubic meters of excavation would be used to construct

the embankment. An additional 479 cubic meters of borrow material from MP 46.7 would be needed to complete the 3760 cubic meters of embankment.

Other work at this site included grading the inlet end of the stream to achieve a 17 % grade. This work was to be performed using approximately 4 truck hours under Section 622.

During his deposition, Mr. Clevenger stated that Mr. Rettinger had made a mistake in that he thought that all of the excavation material had to be taken out as Section 622 work. Tr, Clevenger, 138:12-139:22.

During construction, WBC spent approximately 130 truck hours hauling material from the inlet end of the stream to the disposal area. The record does not identify the area from which this material was excavated; that is, above or below the backslope line.[17] I cannot determine whether the additional hours used for Section 622 work was due to a mistake in the design, a changed condition, or was the result of excavating Item 20401A work as Section 622 work. In any event, the record shows that the Government paid for this work.

Upon realizing that there was a problem, the Government worked with WBC to resolve the problem by issuing Contract Modification 001. In Contract Modification 001, the Government paid for all of the Section 622 hours and other items as detailed in the facts set forth above. At the time of the modification, all of the Section 622 work at this site was completed. Both parties could fully see what material had been removed and what material remained, and they fully knew the impacts at that time. The Contract Modification contained a standard release that both parties signed. I find no evidence that Mr. Rettinger made any statements to WBC that were in error or could be seen as deceptive with respect to this issue.

I note that the extension of the culvert was something that WBC requested. When the Government wanted to exclude the culvert extension because its price was too high, WBC offered to lower the price. Tr, Clevenger, 166:1-7.

Going most directly to the issue of bad faith, I do not find any evidence that Mr. Rettinger did anything other than try to work with WBC on this issue. When Mr. Rettinger realized that there was an error in the 622 work at MP 46.2, he approached WBC and stated that the Government would entertain a request for an adjustment. The parties, with equal knowledge of the site and the contract, entered into negotiations and executed Contract Modification 001. This Contract Modification resolved the issues relating to the removal of material at MP 46.2. There was no Government directed 622 work at MP 46.2 after the Contract Modification was signed.

WBC alleges that the replacement contractor had to bring in replacement material for embankment at this site. The record shows that WBC, and later TCI (the replacement contractor), brought suitable material to the site to do the embankment, but not because of a lack of material at the site. WBC's own trouble using the on-site material for embankment is well documented. For instance, on October 20, 1998, Mr. Clevenger stated that the compaction tests had failed because the material was too wet. He was going to try to get other material from another source. Meeting minutes dated 10/20/98. Likewise, the replacement contractor found the material at the site to be saturated and unsuitable for use.

[17] All indications show that above the backslope line was Item 20401A work and below the backslope line was Section 622 work.

## DECISION – SUBPART 2

Based upon the above analysis, I find that the actions of the Government were reasonable in resolving the issues at MP 46.2. Mr. Rettinger openly discussed the matter with WBC and demonstrated a willingness to work with WBC to resolve the issue in a mutually acceptable manner. In fact, the parties did resolve the issue and executed Contract Modification 001. I find no evidence to support a conclusion that the Government deliberately withheld information from WBC or otherwise breached any duty under the contract, nor do I find any evidence to support a bad faith conclusion. I conclude that there is no bad faith shown with respect to the removal of material at MP 46.2.

# SUBPART 3

## The Government Did Not Obtain Proper Environmental Permit Extensions to Allow the Contractor to Continue Work

## CLAIM SUMMARY – SUBPART 3

It is WBC's position the Government failed to obtain an environmental permit extension to allow work to be performed within the wetted perimeter outside the work window. They also contend the Government deliberately misled the Contractor by informing them that the permitting agency refused to grant any extension; however, the contractor was able to work directly with the agencies and obtained permission for an extension. After receipt of the permit extension, WBC states that the Government nevertheless continued to refuse to allow the contractor to continue any installation, as they were only allowed to perform winterization work.

## FINDINGS OF FACTS – SUBPART 3

### 1) Contract Requirements

#### a) Standard Specifications (FP-96) and Special Contract Requirements

The contract included the following Standard Specifications in accordance with the *Standard Specifications for Construction of Roads and Bridges on Federal Highway Projects* (FP-96) as amended by the Special Contract Requirements (SCR) applicable to this Subpart: Section 107 – Legal Relations and Responsibilities to the Public; and Section 108 – Prosecution and Progress. These Sections, or portions thereof, are included below for reference.

**Section 107 – LEGAL RELATIONS AND RESPONSIBILITY TO THE PUBLIC**

**107.01 Laws to be Observed.** FAR Clause 52.236-7 – Permits and Responsibilities is supplemented as follows.

Comply with all applicable laws, ordinances, safety codes, regulations, orders, and decrees. Protect and indemnify the Government and its representatives against any claim or liability arising from or based on the alleged violation of the same. Comply with the terms and conditions included in the Erosion Control Plan (See Section I).

All permits and agreements obtained by the Government for performing the work are included in the Contract. Comply with the requirements of these permits and/or agreements. Obtain all additional permits or agreements and modifications to Government obtained permits or agreements that are required by the Contractor's methods of operations. **Permits obtained by the Government for work on this contract are included in Section H, Permits.** (Emphasis Added)

(Text Omitted)

**107.10 Environmental Protection.**

(Text omitted)

Work within the wetted perimeter of any stream will only be permitted between August 6 and October 1 for sites at MP 0.61 and MP 1.18 on FDR 3347.

Work within the wetted perimeter of any steam will only be permitted between August 6 and November 1 for the site at MP 46.2 and the sites from MP 47.07 to MP 47.25 on FDR 33.

(Text Omitted)

**Section 108 – PROSECUTION AND PROGRESS**

**108.01 Commencement, Prosecution, and Completion of Work.** FAR Clause 52.211-10, Commencement, Prosecution, and Completion of Work is supplemented as follows.

(Text Omitted)

Perform work under this contract according to the following:

(a) Limit work as provided in the following table:

| Location | Work/time Limitations | Date |
|---|---|---|
| FDR 33:<br>MP 46.2 and MP 47.07 to MP 47.25 | Work allowed within wetted perimeter of any stream | August 6 to November 1 |
| FDR 3347:<br>MP 0.61 and MP 1.18 | Work allowed within wetted perimeter of any stream | August 6 to October 1 |
| FDR 33: MP 44.5 and MP 46.2<br>FDR 3347: MP 1.18 | Only work allowed is staking, striping, signing, and turf establishment | March 1 to March 31 |
| All sites | No work allowed | April 1 to July 4 |
| All sites | Only work allowed is staking, striping, and signing | July 5 to August 5 |
| All sites | Perform work during time from 2 hours after sunrise to 2 hours before sunset | August 6 to September 15 |
| All sites | No blasting is allowed | April 1 to September 15 |
| FDR 33:<br>MP 46.7 and MP 47.07 to MP 47.25 | No clearing is allowed | April 1 to September 15 |

(b) Complete work according to the following table:

| Location | Work/time Limitations | Date |
|---|---|---|
| FDR 33:<br>MP 46.2 to MP 46.7 and MP 47.07 to MP 47.25 | Complete all repairs up to subgrade | By November 30, 1998 |
| FDR 33:<br>MP 46.7 | Complete rock slope stabilization work | Prior to beginning construction of the geogrid wall |
| FDR 33 | Complete all repairs up to subgrade and | By January 23, 1999 |

| | | |
|---|---|---|
| | place at least 100 mm aggregate base | |
| FDR 33 | Open FDR 33 to public traffic | By January 24, 1999 |
| FDR 3347: MP 0.3 | Complete all repairs up to subgrade | By December 31, 1998 or after August 6, 1999 and before October 29, 1999* |

* Note: If the Contractor elects to start work at MP 0.3 on road 3347 during 1998, the work up to subgrade on this site must be completed by December 31, 1998.

(c) Accommodate traffic according to the schedule in Subsection 156.03

(Text Omitted)

**2) Permits**

**a) 404 Permit – U.S. Army Corps of Engineers, Permit No. 98-370**

The Contract included the U.S. Army Corps of Engineers issued 404 Permit under section H on Page H-21 of the Special Contract Requirements. This permit was issued in accordance with Nationwide Permit Number 03 which the general permit language is included below for reference.

**Nationwide Permit 3** authorizes the repair, rehabilitation, or replacement of any previously authorized, currently serviceable, structure or fill, or of any currently serviceable structure or fill authorized by 33 CFR 330.3, provided that the structure or fill is not to be put to uses differing from those uses specified deviations in the structure's configuration or filled area including those due to changes in materials, construction techniques, or current construction codes or safety standards which are necessary to make repair, rehabilitation, or replacement minimal. Currently, serviceable means useable as is or with some maintenance, but not so degraded as to essentially require reconstruction. This nationwide permit authorizes the repair, rehabilitation, or replacement of those structures destroyed by storms, floods, fires or other discreet events, provided the repair, rehabilitation, or replacement is commenced or under contract to commence within two years of the date of their destruction or damage. In cases of catastrophic events, such as hurricanes or tornadoes, this two-year limit may be waived by the District Engineer, provided the permittee can demonstrate funding, contract, or other similar delays. Maintenance dredging and beach restoration are not authorized by this nationwide permit.

The permit includes Qualification Conditions and Implementation Conditions specific to this particular permit. Under the Implementation Conditions on page H-25, the work period is specified as, "All in-water work shall occur between July 1 and September 15, in accordance with Oregon Department of Fish and Wildlife's recommended in-water work period."

This was subsequently amended by the June 25, 1998 letter from the U.S. Army Corps of Engineers, also included in the Special Contract Requirements on Page H-59 as follows:

As requested, we have amended Special Condition "1." of the Implementation Conditions of permit as follows:

1. Work Period. All in-water work for Site FDR 3347 shall occur between July 1 and October 1, Site FR 33 mp 46.2 & 47.07 shall occur between June 15 and November 1, and Site 33 no in-water timing restrictions in accordance with Oregon Department of Fish and Wildlife's recommended in-water work period.

The Corp of Engineers consider this change minor and hereby amend your permit as reflected in the above special condition.

All other terms and conditions of the original permit remain in full force and effect.

**b) Oregon's Removal/Fill Permit – Division of State Lands, Permit No. RF-15114**

The Contract also included the Division of State Lands issued Oregon's Removal/Fill Permit under Section H on Page H-37 of the Special Contract Requirements. The Oregon's Removal/Fill Permit authorized, in accordance with ORS 196.800 and 196.990, to perform operations described in the application presented by Government. The permit included General Conditions, and Special Condition applicable to the specific permitted activities. Relevant excerpts of the Special Conditions for Removal/Fill Permit No. 15114 are included below:

This permit authorizes the removal of 2231 cubic yards and placement of up to 986 cubic yards of riprap in Section 18 and 19, T33S, R11W (various locations on Rock Creek and Shale Creek, tributaries of the South Fork of the Coquille River) to repair failed stream crossings as outlined in the attached permit application, map and drawings.

(Text Omitted)

6. Removal or filling in the permit area shall be conducted between July 1 and September 15.

(Text Omitted)

**c) The Government' Joint Permit Application**

During the design phase of this contract, the Government applied for both the 404 Permit and Oregon's Removal/Fill Permit using the Joint Permit Application Form, which meets the requirements of both agencies.

In the application, the Government identified 10,443 cubic yards of fill for the entire project, and 986 cubic yards of fill material to be placed in a wetland or below the ordinary high water or high tide line. The material identified for fill included riprap, gravel, and concrete. The Government also identified 14,975 cubic yards of removal, 2,231 cubic yards below the ordinary high water or high tide line. The material identified for removal included riprap, rock, gravel, organics, and streambed material.

Under the Proposed Project Purpose & Description, the Government identified the project purpose and need, along with providing a general description of the scope of work and individual site descriptions. Each of the individual site descriptions identifies the approximate total quantity of excavation and embankment, and quantity of each below the estimated ordinary high water mark.

The contract required the headwall to extend under the inlet side of the culvert, requiring the inlet portion of the culvert to be set before the headwall was formed.

3) **Activities relating to permit extension issue at MP 46.2**

In its approved preliminary schedule, WBC provided a schedule diagram and a written narrative. Dates and durations for culvert activities at MP 46.2 were inconsistent between the two schedule components.

| Approved Preliminary Schedule | | |
|---|---|---|
| | Schedule Diagram | Written Narrative |
| Remove old pipe culvert | October 18 | 1 day |
| Place new culvert | October 17 – 19 | September 22 – 29* |
| Install energy dissipators | October 20 – 21 | |
| Concrete headwall | October 20 – 26 | October 2 - 15 |
| Place riprap | October 10 – 16 | |

* The written narrative does not state the installation will take 8 days, however the activities associated with culvert installation add up to 8 days (4 days to excavate, 2 days to prepare bed, and 2 days to install).

| Baseline Schedule (October 19, 1998) | | |
|---|---|---|
| | Schedule Diagram | Written Narrative |
| Remove old pipe culvert | | |
| Place new culvert | September 27 – October 3 (E)<br>September 29 - October 5 (L) | October 12 - 21 |
| Install energy dissipators | September 21 (E)<br>September 28 (L) | |
| Concrete headwall | October 12 – 18 (E)<br>October 21 – 29 (L) | October 12 - 29 |
| Place riprap | October 5 – 11 (E)<br>October 16 – 22 (L) | |
| | | |

In the above table, "(E)" designates the earliest dates an activity could start given the schedule logic and the activities predecessors. "(L)" designates the latest an activity could start and still allow the project to be completed on time.

On October 5, 1998, the Government's environmental specialist consultant, Kris Reichenbach at the request of Ed Hammontree, ERFO Program Manager, contacted the permit agencies to inquire about the possibility of obtaining a permit extension. According to an email from Ms. Reichenbach, the Oregon Department of State Lands told the environmental specialist to wait until closer to the end of October so that weather and fish activity could be better predicted.

The 2250 millimeter culvert was delivered to the site on October 6, 1998. On October 9, 1998, the Government discovered rust on the coil splice of the pipe. On October 11, 1998, the Government notified WBC by letter that the pipe had rust showing through the coating material and that the applicable culvert section was not acceptable. The Government would not allow installation of a new culvert pipe that is already showing signs of deterioration. On

October 14, 1998, WBC met with the Government at the site and proposed a repair. WBC worked on the repair on October 22, 1998 and completed it on October 23, 1998. The Government accepted the repaired section of culvert.

Also, on October 9, 1998, the Government requested WBC to install the pipe with a camber. Mr. Clevenger refused to do so and directed his quality control person to install it "as per the contract." The contract, at Plan Sheet E.3, note 2, required the culvert to be installed with a camber when directed by the Government. On October 15, 1998, the Government again requested WBC to install the pipe at MP 46.2 with camber. This time, Mr. Clevenger agreed when he was shown the contract requirements. At 12:30 pm, WBC placed bedding material with the camber figured in. At 6:30 that day, WBC placed the first section of pipe.

On Friday, October 16, 1998, WBC continued work at MP 46.2, but without a Quality Control person present and without any surveyors. The workers were simply rough grading the bed for the culvert.

On October 20, 1998, WBC has a note in its Contractor daily that the culvert at 46.2 was being delayed due to equipment failure.

According to meeting minutes for October 20, 1998, Mr. Clevenger stated that its compaction tests at MP 46.2 had failed, that the material is too wet, and that he is trying to get material from another source. Those minutes also state, "Luther Clevenger asked if he could have an extension on in-stream work? Paul said "no". Paul further stated that we would contact the agencies concerning a permit extension, but they were not likely to act until the permit expired. He stated that it would probably come down to a day by day situation where the agency's representatives would have to assess the situation."

On October 21, 1998, WBC notes that it intended to move the 3400 to MP 46.2 to work on the culvert, but the starter burned out on the SH 300 which blocked the road. That Contractor daily stated that a new starter had been ordered from Seattle and will be flown to North Bend tonight.

On October 21, 1998, the Government's lead environmental specialist, Brian Allen, sent an email to Mr. Rettinger informing him of the following:

> Howe Crockett stopped by to visit about the project. He was curious about the potential of an extension for the in-stream work.
>
> I told him we are planning to ask for an extension closer to the end of the month so that the permit agencies could better assess the weather and what the fish are doing. I also told him that the work window we have is an extension compared to what the permit agencies generally allow. Also, with rain forecast for the weekend, I really doubt that an extension will be granted. However, we will ask for an extension and we will emphasize the importance of opening the road to traffic next spring.
>
> Paul, early next week, I will need a construction update on the remaining in-stream work necessary to ensure that the 33 Road opens in the spring and how long it will take, beyond November 1, to complete the in-stream work.

On October 21, 1998, Mr. Rettinger responded to Mr. Allen with an email, stating:

> Brian, thanks for the mail and update. I will speak with you next week.
>
> It doesn't look good for being even marginally close to completion by the end date 10/31. The last two days have been absolutely perfect weather, but the contractor hasn't even started the equipment to do any work.
>
> I spoke with Kris this morning and brought her up to date on the current situation. We also agreed to wait until we were closer to the end of the permit window, as the permitting agencies will not want to make a determination until then anyway.
>
> Kris also advised me that the existing permit was well beyond the "normal" permit windows, and that with the fish runs and now official listing of the Coho, it was unlikely that an extension would be granted.
>
> I am sure that the tremendous amount of work (and therefore time) needed to get out of the channel, mixed with the apparent lack of effort and the dismal performance of the contractor to protect the resource (silting the river and blasting rock into the channel) that the governing agencies won't be very open to the extension.
>
> I will be in touch…..paul

On October 22, 1998, WBC was able to fix the SH 300 and move the 3400 to MP 46.2 to continue the culvert installation. Also, on that date, WBC's grade checker and Project Superintendent discovered that the culvert grade was incorrect. It was not placed in accordance with the contract. WBC requested the Government to allow them to leave the culvert as it was placed. The Government denied this request, as it would affect the rest of the culvert as well.

On October 23, 1998, WBC reports that the survey crew was having problems with the camber. There is a further note that the culvert grades were checked and found to be incorrect. It rained most of Friday, October 23, 1998, night and Saturday, October 24, 1998. WBC finished placing the first section of culvert on Saturday.

On Sunday, October 25, 1998, WBC worked on getting the bedding ready for the second section of the culvert.

On Monday, October 26, 1998, WBC's quality control person quit. In a statement, he complained about "no schedule or linear program as to priorities of which sites are to be started or finished." He states that WBC did not believe in grade checkers, and had assigned the job to a new laborer who knew "nothing about gradechecking slopes or metrics." He further stated: "I wish to thank the inspectors on the Powers project. They are the most competent, courteous and helpful that I have encountered in my entire construction career."

Also, on Monday, October 26, 1998, WBC placed the second section of the culvert on bedding material that had not been tested to see if it met contract specifications. The joint between the first and second sections of culvert left a gap of 1.5 to 2 cm at the bottom, but the pipes were touching at the top.

On Monday, October 26, 1998, the Government sent WBC a letter stating that the gap was not acceptable and the bedding used was not what had previously been sampled and tested by the Government.

On Tuesday, October 27, 1998, Mr. Clevenger acknowledged that the bedding material being used was not within specification. He took Mr. Rettinger to see some material stored at the beginning of the project and Mr. Rettinger told him that the material looked good, but it would need to be sampled. Also, on that date WBC asked if the Government had a night crew. The Government responded "that we will work with their work schedule if they decide to do that." Later that day, the Government traveled with WBC to the bedding material to obtain a sample. When the Government asked WBC who would run (test) the sample, Mr. Clevenger stated that he was not going to run one.

On October 27, 1998, WBC sent a letter requesting a time extension for the in-stream work, as they had had a number of problems and noting that the present deadline was November 1, 1998. The request stated if they did not get this culvert in, they would have no chance of getting FDR 33 open this year. Also, in that letter, WBC proposed grouting the gap in the joint. The Government accepted this proposal.

On Wednesday, October 28, 1998, WBC brought in some different bedding material and began to use it at the site, without providing any test results of the material to the Government. The contract required the Contractor to provide test reports for gradation and moisture density prior to use in the work in accordance with Table 209-1 of the SCRs. At 1:45 pm, the Government shut down the bedding operation until the Government received the test results. Prior to the shutdown, WBC had worked on setting the third section of the culvert on the non-approved bedding. At the same time, Mr. Rettinger contacted the Forest Service for WBC to check on whether the proposed material source would meet the requirements of being free of a Port Orford Root Rot disease in accordance with subsection 105.02(a) of the SCRs.

Also, on October 28, 1998, Mr. Rettinger sent an email to Mr. Allen to follow up on a previous phone conversation as follows:

Brian, per out phone conversation on the request for an extension for the in stream work permit on this project, you requested a summary of the work on the project as follows:

1. Work remaining to be completed under the existing permit – There are two work areas that are restricted as of the end of this month. The major site, at MP 46.2, is the critical work. The second site, at MP 47.14, will also not be done, but public traffic could be facilitated at this site until the work was completed next year.
   The site at MP 46.2, a 2250 mm culvert installation, with riprap and a concrete headwall, WILL NOT BE COMPLETE by the end of this month. That is the contractor has today and three more working days left under the contract permit.
   Currently, the contractor has two sections of culvert in place on the class B bedding, at the outlet end not embanked, just placed on the bedding). He is working on placing an

additional pipe section today. He changed material sources, and is waiting for the testing firm to sample the new bedding material, run the T99 and provide their results to us. At best, this could mean that he is able to continue with the other sections of pipe by Friday. There are 5 more sections to be placed. His production is about one section per 5 working days. The embankment material is saturated. There is approximately 2,000 m3 of embankment needed at this installation. He will not be able to embank the roadway excavation, due to the over optimum moisture, and will not be able to dry it out. Rock borrow may be hauled in from MP 46.7 site, but will not solve the "mushy" material on which it must be placed. Blasting and sorting will be required at the rock cut, MP 46.7, to obtain borrow material for the embankment.
The concrete headwall will take at least one week to form, place the steel and concrete. We do not have an approved mix design for the concrete.
Reinforcing steel is not on the job.
The riprap source has not been approved, since he changed material suppliers. The riprap, 2,893 m3, will take at least 5 working days to complete, if the geotextile material is in place and the work progresses smoothly.
If an extension were considered, it would take him at least another 4 weeks to do the work. Based on this contractors performance to date, I don't think 4 weeks is realistic.

NOTE: the rains are coming, in fact overdue. Once the channel starts flowing more (it is running water through the diversion channel now) the diversion channel will fail. The contractor will then have to work in the flowing stream channel in order to do the work. Even with an extension, this is totally undesirable from a siltation aspect. When the heavy rains occur, the water will build up behind the "dam" at the inlet, top and we will have an environmental disaster.
As soon as I hear the decision, and I assume that an extension will not be granted, then I will direct the contractor to remove the dam, open the channel, and prep the area for the winter flow. This must be done before close of business Saturday.

Bottom Line: this contractor cant complete the work within the permit window (already extended from Sept 30 to Oct 31 under our contract). Not that it couldnt have been done, but this company has failed. IF an extension is granted, it should take another 4 weeks, but again, that time frame is unlikely with the performance by this contractor to date. The increase in the stream flow will end the operation before it can be completed, extension or not. The USFS has been kept up to date on the project status. They are aware of the unsatisfactory performance by this contractor. Given the choice, the USFS would rather have a delay with the road opening, than have to live with a poor quality project. Their expectation is that even if we default this contractor, it is better than allowing substandard work and future maintenance problems.

Work Needed to Open the road:

The following sites on the FDR 33 road will need to be completed in order to open the road.

MP 44.5 – no work done here, other than survey.
MP 46.0 – no work done here, other than survey.
MP 46.2 – see above.
MP 46.7 – Contractor has completely failed at this site. Besides blowing material over the roadway into Rock Creek, he has at least 3 weeks of secondary blasting and haul to remove the material on the existing roadway bench. This does not take into account

the approximately 700 m3 of rock that is still hung on the pre-split fact. The contractor will be proposing a fix to this situation, which will entail having to re access the top of the cut, take additional clearing and overburden material to create a workable bench (20' +/-) and then work the 700 m3 of material off the face and take the material off the point on the south end of the cut. This work can be done during the winter, but will be slow and will cause delays to the upper (south) sites for delivery of material and access.

There is no work done yet on the geogrid walls. The submittal has been sent to Rich Barrows, and will be returned to the contractor due to lack of compliance with the contract provisions. This work will have to be performed after the rock cut work is completed and safe for the workers under the cut area.

MP46.75 – clearing and grubbing and 85% of the roadway excavation has been done here. The culvert has not been installed.

MP 47.07 to 47.75 – Geogrid walls are not started. Culverts are not installed. (Permit runs out in 4 days for the culvert @ MP 47.07, as noted above)

Roadway excavation is 85% complete. Seeding was not done, but permit window closes in 4 days.

Riprap blanket and embankment work is not done. Permit to construct the rock borrow embankment at MP 47.07, below the culvert, runs out in 4 days.

MP 47.31 – No work has been done here, other than survey, which has not been approved.

Status of other sites, not necessary to open the road:

FDR 3347 – No work has been done on any sites on this road. Only haul to the disposal area, which has caused a muddy mess.

Resident Engineer Opinion: An extension should not be granted to this contractor. Once the stream flow increases, extensions will be futile. The USFS is aware and will support our efforts to obtain a quality project, even if it means not getting the road open by the Contract deadline. This contractor should be terminated under the default clause.

On October 28, Ms. Reichenbach began contacting Oregon Department of State Lands (DSL) and Oregon Department of Fish and Wildlife (ODFW) regarding an extension to the permits. On October 29, Mr. Allen informed Ms. Reichenbach that the Government decided not to request an extension to the permits.

On Thursday, October 29, 1998, WBC sent a letter to the Government stating that it would test the bedding material it placed yesterday and that it planned to get the culvert in before the deadline. Based on test results it provided the Government, the Government promptly approved the bedding material and allowed work to continue at the bedding site. WBC asked for the Government to accompany WBC to test more material. The Government accompanied WBC to perform the tests. On that date, WBC installed the fourth section of the culvert.

On October 29, 1998, the Government sent a letter to WBC stating that material from the Bracelen-Yeager source appeared to meet the gradation requirements and that the material was cleared for contamination from the Port Orford Root Rot disease and noxious weeds, and the source was approved for class B bedding material. That letter also stated that WBC was expected to construct the energy dissipators, the riprap, the embankment, and the concrete

headwall for MP 46.2 according to the contract. The letter noted that WBC had three days to complete the work, covered under the permit, at the MP 46.2 site and further noted that it did not seem possible to do this. In response to WBC's request to use non-conforming riprap material at the pipe installation, the Government stated such was not acceptable. Finally, the letter noted that, "FHWA has consulted with the permitting agencies on the current status of the work at MP 46.2, and your letter, dated October 27, 1998, requesting an extension to your permit. The permit closing date will not be extended."

In a separate letter dated that same date, the Government stated that the "non specification bedding material, referred to under Serial Letter No. 048, placed under the first two sections will be accepted…"

WBC installed the fourth section of the culvert on October 29, 1998.

On Friday, October 30, 1998, the Government sent a letter to WBC noting that the Government had not yet received a concrete mix design as necessary for the concrete headwalls.

Also, on that date WBC informed a Government inspector that it would be out of the wetted perimeter by the next day. When asked about whether they would be using specification riprap, WBC responded saying that it was not stating that. Jim Heigh, an employee of WBC, indicated that he had been given direction to push until given a written shutdown. The Government's inspector stated that this would not be beneficial to either party. WBC placed the fifth section of the pipe.

WBC understood that at some point it needed to move the diversion channel back into the channel and through the culvert, and this would require in-stream work. Tr, Clevenger 280:4-281:10. Accordingly, it needed to have everything done with the culvert by November 1, 1998 so that it could divert the channel back to the culvert.

On Saturday, October 31, 1998, it was raining hard. WBC tried to place embankment, but it was over the limits for optimal moisture. The Government notified WBC that they could not place embankment that was so wet, but the Government stated that they could use sand. WBC requested permission to work until midnight. The Government granted the permission. WBC worked until about 7:15 pm when WBC's person in charge decided the rain and darkness made the situation unsafe.

In Mr. Aftab's October 31, 1998 diary entry, he discusses the events associated with embankment of the culverts at MP 46.2 as follows:

Heavy Rain
Bob Gietz & Dan Quist on the job.
(Last working day in the wetted perimeter of any stream.)
Reviewing location & lift measurement area proposed to continue native soil embankment is at the top of trench. Reviewed requirement as max 6" lift below 300 mm over top of soil. Soil material required to be +/- 2% of optimum. Density tests showed 19% (18.8 vs. 15%) optimum @ 9:15 am.
At 10:15 I went down to talk w/ Jim Heigh Assistant Superintendent & told him that his moisture content is too high & out of spec, to use in embankment. Jim (in the presence of Bob Gietz & Dan Quist) asked him if I am issuing a Stop Order. I told him no, but I am putting him on notice

> & directed him to not use a wet (out of spec) native material for embankment. Jim again asked me if I am stopping his work. I told him again No. He told me that he is going to use out of spec native material. Asked him you will be willfully disregarding Contracting Officer direction. I asked him again if he understood what I just said. He told me yes. I also told him if he can provide to me native material moisture content within spec, he is free to use it for embankment. I told him that I cannot allow him to knowingly out of spec (too wet material) to be placed in embankment.

On November 1, 1998, Mr. Aftab's diary includes a discussion between him and WBC which states, "Called Luther at 7:10 am & asked if he is going to work today he said no we decided to take a day off."

The Government estimated that it would take three weeks of work to get the pipe finished, the riprap placed, and the concrete wall constructed at MP 46.2.

## 4) Permit Extension

On November 2, 1998, Mr. Clevenger contacted four of the permitting agencies and was told he needed to talk to a Mr. Muck. Tr, Clevenger, 333:20-334:24. He did so, and told Mr. Muck that he thought he could, within the week get the last piece of culvert in. Tr, Clevenger, 334:1-9; 336:6-337:7. Mr. Muck stated that he would allow WBC to work through the end of business on Friday. Tr, Clevenger, 334:18-24. Mr. Clevenger knew that he still needed to get the Government's permission to work in the stream. Tr, Clevenger, 335:12-336:5.

On November 1, 1998, the wet season had begun, with a lot of water coming down the creek and it only got worse. Tr, Clevenger, 337:12-20.

Around 4:30 on November 2, 1998, Mr. Clevenger contacted Mr. Parsons, Contracting Officer, letting the CO know that WBC had contacted the permitting agencies and that they had given him verbal permission to complete the culvert installation. Mr. Clevenger wanted permission to be allowed to finish the culvert installation.

In a letter dated November 2, 1998 and faxed to the Government on November 3, 1998, WBC again requested an extension of time from October 31, 1998 to November 6, 1998 to install the culvert at M.P. 46.2. WBC's letter states the following:

> Pursuant to my earlier requests to you I am again requesting an extension of time from October 31, 1998 to November 6, 1998 to install the culvert at M.P. 46.2. I am aware that you have denied my requests, however, on my own I have contacted all four permitting agencies listed on page H-55 of the contract and they have all given me verbal permission to complete the culvert installation. My reason for requesting this extension are as follows:
>
> Presently the water level is still very low and there are no fish in the tributary.
> Only one length of culvert, the inlet, remains to be installed in place.
> Our diversion channel is only designed to be a temporary measure and will not handle heavy water flow in the tributary. It is likely that the partially installed culvert sections will wash out during the winter and spring months along with a substantial amount of rock, mud, sand and other material. Aside from the damage to the culvert sections and our installation, this material will be carried down

stream.

Failure to complete the culvert at this time will certainly prevent FDR 33 from being opened by the date specified in the contract.

The permitting agencies that I contacted are as follows:

1. Mr. Jim Muck, Oregon Department of Fish & Wildlife. He stated that he felt it was important to complete the installation at this time and that he would give us through November 6 in which to complete it.

2. Ms. Christine Valentine, Department of Land Conservation and Development. She said that they would defer to the decision of Mr. Jim Muck. I informed her that he had agreed to give us through November 6.

3. Mr. Steve Mosier, Division of State Lands. I called for Mr. Mike McCave but he was not in. Mr. Steve Mosier took the call and stated that he would leave a note for Mr. McCave but that he felt certain that they would defer to Jim Muck.

4. Mr. Ron Marg, US Army Corps of Engineers. He also deferred to Mr. Muck.

When I spoke to you today concerning resumption of work on the culvert you stated that the contract specified that the culvert must be in by November 1, 1998 and that it was a contract issue. When I informed you that the permitting agencies had given me verbal permission to complete the culvert installation you informed me that it didn't matter what they said and that you were not going to permit me to continue. However, you did state that I could send you a letter requesting permission to continue work on the culvert and you would respond to me tomorrow. It is our position that any failure to promptly act to mitigate damages at this time would be unreasonable.

As you are aware I have contacted the Contracting Officer concerning this matter. I did so because I feel that it is an urgent matter and immediate action must be taken.

Saturday, October 31, 1998, we were prevented from using the on-site granular material for embankment around the culvert because the moisture content was out of spec. This is a result of rainy weather which is not getting any drier. Our request at this time is either for you to grant us a winter shut-down or discuss ways that we can continue the installation of the culvert so that the road can be opened on schedule and the tributary and river can be protected.

On November 3, 1998, the Government responded with a letter stating that WBC had not taken advantage of time to prepare the channel for winter, had not completed the culvert installation, the riprap placement, the embankment, the concrete head wall construction, and the energy dissipator work. The letter informed WBC that the Government was in the process of re-consulting with the permitting agencies and that the Government shared the concern about the potential to discharge material into Rock Creek. The letter notified WBC that any extension would be to prepare the site for winter.

In a second letter dated that same day, the Government notified WBC that it would not be allowed to incorporate material into the project that does not meet specifications. The letter further noted that WBC's Quality Control Supervisor had not been on the project since October 27, 1998.

Also, on November 3, 1998, Mr. Rettinger talked to Mr. Muck of the Oregon Dept. of Fish & Wildlife. Mr. Muck stated that he had verbally given WBC a tentative extension, because he was uncertain if he had all of the facts.

On that same day, it was raining. WBC began embanking sloppy, loose, non-specification material at the culvert.

Around 2:30 pm, Mr. Clevenger and Ms. Clevenger met with Mr. Parsons and stated that Mr. Rettinger was a problem and that the Government employees are "afraid of Paul."

That same day, Paul Relmers with the Oregon Department of Fish and Wildlife wrote a letter to the Government stating that it was extending the work period through November 6, 1998 as requested to stabilize the site for the winter. This was based on the Government's information that the site could not be completed in a timely manner and would need to be completed the next summer.

Ms. Reichenbach's November 4, 1998 email regarding permit status states the following:

Background
Original permit for instream work from state and fed was set to expire November 1.
On October 5, per Ed's request, I contacted DSL regarding potential need to request an extension. DSL recommended waiting until closer to the end of the permit to evaluate weather and fish situation.
On October 12 & 13, Brian and I had further discussed the situation and provided permit contacts to Paul Rettinger.
On October 28, Paul Rettinger provided a status report to Brian indicating project status.
On October 28, per Brian's request, I began contacting DSL and ODFW regarding an extension to the permit.
On October 29, Brian informed me that FHWA decided not to request an extension on the permit. At that point it was expected that the contractor would "winterize" the site by November 1. I called the agencies and informed them that FHWA was NOT going to request an extension.
On November 2 I received a voicemail from the contractor asking about the permit for the project. I referred the call to Paul Rettinger.
Sometime between October 29 and November 3, the contractor contacted the permitting agencies directly, requested and was verbally granted an extension on the grounds that the culvert could be installed and winterized by the end of Friday, November 6. I notified Brian of the new development.
On November 3 & 4 I followed up with ODFW and DSL to obtain clarification.

Status
ODFW provided a written response that allows for work to continue at MP 46.2 through November 6, 1998 in order to stabilize the site to protect the stream from sediment delivery. ODFW recommends close coordination with Max Yager at the FS district office. DSL concurs with the ODFW recommendation for an extension to November 6. Work beyond that date will require an additional extension which will depend on the location of fish in the river and the weather.

According to her email, Ms. Reichenbach continued to obtain clarification from DSL and ODFW on November 3 & 4, 1998. By November 4, 1998, ODFW provided a written response that allows for work to continue at MP 46.2 through November 6, 1998 in order to stabilize the site to protect the stream from sediment delivery. DSL concurred with the ODFW recommendation for an extension to November 6.

The Government sent a letter to WBC dated November 4, 1998 allowing for the permit extension until November 6, 1998, with the ODFW letter attached. The letter from the Government states, "The ONLY work allowed under this extension will be to remove the excavation material from the inlet of the culvert, shape the channel to direct the flow into the culvert, and remove the material stacked on the channel side slopes to prevent sliding into the channel and causing siltation and possibly blocking the culvert."

Rain continued on November 4, 5, and 6, 1998.

## ANALYSIS – SUBPART 3

WBC alleges that the Government did not obtain proper environmental permit extensions to allow WBC to continue to work. WBC alleges that the Government "concealed from the contractor that it had decided not to seek any extension from the permitting agencies and had "mislead the contractor by informing it that the permitting agencies had *refused* to grant any extension."

The decision to seek a permit extension depended on the work needing to be done by WBC within the wetted perimeter. Work within the wetted perimeter included placing and backfilling the culvert, construct the headwall, placing the riprap, and removing the diversion channel. From the start, WBC's operation was plagued with poor scheduling and prosecution. WBC posed inconsistent dates and unrealistic production rates relative to this work in both the preliminary and baseline schedules. The dates forecasted for completion of the culvert were October 19, 1998 in the preliminary schedule diagram, September 29, 1998 in the preliminary schedule narrative, October 3, 1998 for early completion or October 5, 1998 for late completion of the baseline schedule diagram, and October 21, 1998 in the baseline schedule narrative. Dates for other activities were equally inconsistent. A properly thought through schedule would have been consistent with these dates.

Significantly, WBC was forecasting in the baseline schedule that it would take seven days to install the culvert and seven days to construct the headwall, and seven days to install the riprap. There were two days of concurrent work between these operations; therefore the overall duration would be nineteen days.

The culvert was actually delivered to the site on October 6, 1998, however WBC did not begin installing the culvert until October 15, 1998. One of the issues with the culvert installation involved camber. The contract required the contractor to install camber when directed by the Government. On October 9, 1998, the Government directed WBC to install the pipe with camber. WBC refused to do so, even though it knew that this was what the Government wanted and it was required to do so pursuant to the contract. On October 15, 1998, the Government again reiterated to WBC that the contract required the camber, when directed by the Government. On that date, WBC agreed to place the pipe with a camber.

They set the bedding with a camber by around noon and placed the first section of the pipe by 6:30 pm.

In meeting minutes from October 20, 1998, WBC stated that its backfill material was too wet and it was seeking another source for material for MP 46.2. On October 22, 1998, WBC was still working on the first section of the pipe. On that date, WBC discovered that the first section of pipe had been placed at an incorrect grade. It took WBC three more days to reinstall the first section.

On October 25, WBC began working on the second section and placed that section on October 26 on bedding material that had not been tested to see if it met contract gradation specifications. This was in violation of the contract. The material, when tested, did not meet the contract specifications. Nevertheless, in an effort to assist the contractor, the Government agreed to accept this material.

In the meantime, back on October 5, 1998, the Government had contacted the permitting agencies to determine whether it may be possible to obtain an extension to the permits. The Government was told at that time to wait until closer to the November 1, 1998 date, so that weather and fish activity could be better assessed. On October 20, 1998, before WBC began working on installing the culvert, WBC asked if it could get an extension of the permits. Mr. Rettinger told WBC that it would need to wait until the November 1, 1998 date was closer. This was in line with what the permitting agencies had said, since it was not possible on October 20 to predict what the weather and fish activity would be on November 1. Rain was forecasted for the upcoming weekend.

On Tuesday, October 27, 1998, WBC again asked for a time extension. On this date, WBC had already spent 13 days installing two sections of a seven section culvert. In its schedule, it had anticipated spending two to four days to install the entire culvert.

On October 28, 1998, WBC placed the third section of pipe. All of these first three sections of pipe were placed on material that had not been tested as required by the contract at FP-96, Section 209.

On October 28, 1998, the Government began contacting the permitting agencies about a possible extension of time. As part of this effort, Mr. Rettinger was asked to summarize the work on the project. Mr. Rettinger noted that WBC did not have an approved material source for the bedding material since WBC had changed material sources. Mr. Rettinger noted that the embankment material was saturated. He noted that it would take at least a week to build the headwall and there was no approved mix design for the concrete. Further, there was no reinforcing steel on the site. WBC did not have any approved riprap source since he had changed material suppliers. He estimated that it would take at least 5 working days to complete the riprap. Altogether, he estimated that it would take another 4 weeks to complete the wetted perimeter work. Finally, he noted that the rains were overdue and were coming. The diversion channel would not be able to hold the water once the rains started. This would create a great deal of siltation in an environmentally sensitive stream. The Government was concerned about getting the stream redirected into the culvert and averting an environmental disaster. Based on WBC's performance to date, Mr. Rettinger submitted his opinion that WBC should be terminated under the default clause.

The contractual problem for WBC was that it was required to have the road completed up to subgrade at the MP 46.2 site by November 30, 1998. The culvert, the riprap, the two energy dissipators, the embankment, and the concrete headwall were all items that were below subgrade. Under the contract, "subgrade" is defined as "[t]he top surface of a roadbed upon which the pavement structure, shoulders, and curbs are constructed." FP-96, subsection 101.04. The energy dissipators and concrete headwall had to be completed in the dry; that is, without water running through the culvert, as both involved work below the flowing water level. Work was not allowed in the wetted perimeter of the stream after November 1, 1998. Thus, if the energy dissipators and the concrete headwall were not installed on or before November 1, 1998, there was no way the contractor could get the road up to subgrade by November 30, 1998. Further complicating the factor was that the embankment material at the site was saturated already by October 27, 1998. It could not be used for embankment. Other material would need to be obtained to complete the embankment. And the weather did not get any drier.

Based on the Government's estimate of the work remaining to be done and the pending shift in the weather, the Government decided there would be no benefit to the project to seek a further permit extension. On October 29, 1998, the Government made the decision not to seek a further extension to the permit. The Government conveyed its decision to the WBC by simply stating that the Government had consulted with the permitting agencies and that the permit closing date will not be extended.

Although having decided not to seek an alteration in the permit dates, nor a change in the contract requirements, nevertheless, the Government continued to work with WBC in seeking to get as much of the work performed as possible. The Government traveled with WBC to look at other potential sources for bedding material. The Government promptly contacted the Forest Service to see if the Bracelen-Yeager source was cleared for Port Orford Cedar root rot disease and noxious weeds. The Government promptly approved the use of that site for bedding material. And, as previously noted, the Government accepted the non-conforming bedding material that previously had been placed.

On October 29, 1998, WBC installed the fourth section of the pipe. On October 30, WBC installed the fifth section of the pipe, and stated that it would be out of the wetted perimeter by October 31, 1998. When asked about whether it would be placing specification riprap, WBC stated that it was not stating that. In fact, it did not have a source approved for riprap. In CM 001, WBC was authorized to use native rock material for "about 200 cubic meters" of the riprap. The contract required a total of 2898 cubic meters of riprap at this site. WBC also had not begun work on the headwall or the two energy dissipators.

On October 31, 1998, it rained hard. WBC tried to place embankment, but it was significantly over the limits for optimal moisture. The Government offered in an effort to assist WBC that it could use sand. WBC requested permission to work until midnight, and the Government granted the permission.

WBC did not work on Sunday, November 1, 1998. Apparently, both parties were under the mistaken impression that work within the wetted perimeter was not allowed on November 1, 1998. In fact, the contract permitted work up through November 1, 1998. Both parties had access to the same contract language. All of the contemporary documents from both sides speak of October 31, 1998 as being the deadline.

Despite the Government's statement to WBC that the permit closing date would not be extended, WBC, on its own, contacted the permitting agencies. It is not altogether clear what facts WBC conveyed to those agencies. Mr. Muck of the Oregon Dept. of Fish & Wildlife told the Government that he had verbally given WBC a tentative extension, because he was uncertain he had all of the facts. In any event, WBC was given verbal assurance that it could continue work under the permit by the permitting agencies. This extension, however, would require also a change in the contract, since the contract included the November 1, 1998 cutoff. A breach of the covenant of good faith and fair dealing cannot be based on a decision not to hold to contact terms. From the Government's perspective, there was little benefit and a great deal of exposure to extending the contract time period for work. The rains had started. It was imperative to get the stream into the culvert before the volume of water exceeded the capacity of the diversion channel.

When told by WBC that the permitting agencies were willing to extend the contract, the Government contacted the agencies and explained the situation. Mr. Relmers then wrote a letter stating that it was extending the work period through November 6, 1998 in order to stabilize the site for the winter. The Government forwarded this letter to WBC.

Contrary to WBC's assertion, there is no indication that the Government purposely withheld information from WBC. On October 5, the Government had sought an extension. As late as October 28, the Government was pursuing seeking extensions of the permit time windows. It was only after an assessment on October 29 that the Government decided not to seek an extension. While the Government did not explicitly tell WBC that it had decided on that date not to seek an extension, I do not read something nefarious into that omission. The Government did convey that the permit closing date would not be extended. This was both truthful and not misleading. At that time, the Government had no plans to extend that date under the contract.

When WBC, on its own, on November 2, 1998, contacted the permitting agencies, it was given a verbal permission to work until November 6, 1998. WBC understood that it also needed the Government's permission and that the Government would need to get the permits extended before the work could be done. WBC contacted the Government late on November 2, 1998. In good faith, the Government contacted the permitting agencies on November 3 and 4, and was able to obtain a written extension on November 4 to November 6. The Government promptly conveyed this extension to WBC by letter sent on November 4, 1998. Pursuant to that letter, WBC was able to work through November 6 in preparing the site for winter.

These facts do not support a claim that the Government was not working with the contractor, that the Government violated the covenant of good faith and fair dealing, or that the Government acted in bad faith. To the contrary, they show a Government responding immediately to concerns, approving sources, even waiving some contract requirements, to work with the contractor.

Further, I find that the Government was reasonable in not wanting to allow an extension of the contract period in this situation. WBC had not shown an ability to get things done in a timely manner. WBC had spent sixteen days placing a culvert that it anticipated in its schedule doing in four days. And it still was not finished. With the impending rain, there

was an urgency to get the project winterized before the fish returned to the stream. It was not unreasonable for the Government to conclude that further extending the work window was not to be preferred.

In my review of the facts related to this claim, I do not find any situation where the Government did anything more than attempt to work with WBC in accordance with the terms of the contract. Where the contract granted discretion, and even sometimes when it did not, the Government exercised that discretion in favor of the contractor. It appears that WBC's big concern is that the Government should have been more generous in waiving the contract requirements, especially the closing date for work in the wetted perimeter. However, I find that the Government is not required to waive its contractual requirements. The doctrine of the covenant of good faith and fair dealing does not mean that one is to rewrite the contract. What both the Government and WBC are required to do is not to hinder the other's performance under the contract.

WBC's performance in installing the culvert was less than stellar. What it anticipated in its schedule taking two to four days to install, it spent from October 15 to October 31 doing (17 days), and it still was not done installing the culvert. It never began working on the headwall. It did not have any approved source of riprap. It installed the culvert on bedding that did not meet the contract requirements. It began placing embankment that was too wet and continued placing the embankment when the material was saturated. In the face of this, the Government waived some contract requirements, promptly responded to WBC's last-minute changes in sources, and though deciding not to seek a permit extension, promptly worked with the permitting agencies when WBC obtained oral concurrence. These are not the actions of bad faith.

I do not find that the Government hid information relating to the permit window extension from WBC, nor do I find evidence that Mr. Rettinger told WBC that the permitting agencies had refused to grant a window extension. The Government had sound reasons not to extend the contract date for wetted perimeter work. I find nothing herein to support an allegation of bad faith.

WBC claims that the Cure Notice on November 13, 1998 somehow supports a claim of bad faith because the Government placed on WBC the obligation to obtain a new permit in order to continue work after November 6, 1998. I also do not see this as bad faith. The purpose of the cure notice was to notify the contractor that it appeared that it would not be able to complete MP 46.2 by the interim fixed completion date of November 30, 1998 in the contract. The cure notice gives the contractor the right to respond to show how it was going to meet that date. The only way that WBC could meet that date was if it could get back into the stream, finish the culvert, construct the headwall, and install the dissipators and the riprap. To do this, WBC needed a permit. I do not find it to be the responsibility of the Government to get a permit to allow WBC to proceed with work outside of the contract windows. If WBC wanted to show why it should not be defaulted, the burden was on WBC to show how it could complete the site by November 30.

WBC claims that another Government employee contacted Mr. Rettinger about obtaining an extension and that Mr. Rettinger responded by email that he did not "know why they would seek an extension of time given that WBC was not working and had not even started up any equipment that day." This allegation addresses an email sent by Mr. Rettinger on October

21, 1998, which was an email dealing with a permit extension for MP 46.2. Mr. Rettinger's comment about equipment was in relation to that site. The contractor's own Daily Record shows no equipment was used at MP 46.2 on that date, and only a compressor and service truck used at that site the day before. Read in context, Mr. Rettinger's statement was correct.

Finally, WBC alleges that he called the contracting officer and the contracting officer told him that he was unaware of any problems on the project, when in fact the contracting officer had already started planning to terminate WBC. The evidence reveals that WBC contacted Mr. Parsons, the contracting officer on November 2, 1998 at around 4:30 pm. Mr. Parsons was not aware of what was happening and contacted Mr. Rettinger. After talking to Mr. Rettinger, Mr. Parsons informed Mr. Clevenger that he needed to provide his proposed course of action to Mr. Rettinger. I have found no evidence that Mr. Parsons, on this date, was even contemplating terminating the contract. While others in the office had broached the subject, I have found no evidence that Mr. Parsons was involved. Rather, it seemed that the matter was being handled mainly in the Construction Branch of the office up to that time. Mr. Parsons testified in his deposition that the first he was aware of problems on the project was in the Hildreth memorandum. Tr, Parsons, 29:22-25. That memorandum was an undated memorandum, Tr, Parsons 29:15-16, that referenced a meeting held on November 5, 1998, and therefore had to be sent after that date. The allegation that Mr. Parsons, at the time he talked to Mr. Clevenger on November 2, 1998, was already planning to terminate WBC, is not supported by the record.

WBC alleges in its claim that on November 1, 1998, Carol Jacoby sent an email to Mr. Rettinger stating the Government would not be applying for a permit extension because it did not want WBC to complete the job. After a complete review of the records, I have not been able to locate this document. I requested WBC to provide me this document. To date WBC has been unable to locate and provide this document.

## DECISION – SUBPART 3

Based on the analysis set forth above, I do not find anything that approaches bad faith on the part of the Government. The Government did not lie to WBC about its intentions. The Government sought a work window extension on October 5, 1998. When told by the permitting agencies to wait, the Government waited until the end of October. On October 27, it again began to seek an extension, but then decided based upon the above facts that such extension was not appropriate. The issue of stopping WBC from working one day before the permits expired also does not support bad faith. It appears from the record that both parties viewed October 31, 1998 as the last date work could be done, even though the contract plainly stated November 1, 1998. I find no evidence that WBC ever requested to be able to work on November 1 and was told it could not. The issue seems to be a mutual mistake of the parties in reading the contract. There is no evidence of animus or bad faith on the part of either party in this mistaken reading. Further, the issue of the Government delaying by several days obtaining a permit extension is not supported by the record. In fact, once WBC informed the Government that it had contacted the permit agencies, the Government immediately worked at getting an extension approved, and obtained the extension two days later. The Government had to work through the agencies to get the extension. It did not delay in doing so. Also, as noted above, there is no discrepancy between placing the burden on WBC to obtain a permit to work in late November and requesting WBC go through the

Government for the permit extensions on the Government's permit. Finally, the allegation against Mr. Parsons is simply not supported by the record.

Accordingly, for the reasons set forth above, I do not find any evidence to support an allegation of bad faith in relation to the seeking of a permit extension.

# SUBPART 4

## Contrary to the Permit's Language and Customary Practice, the Government Restricted the Contractor's Work in the Stream Area

### CLAIM SUMMARY – SUBPART 4

WBC asserts the Government unnecessarily restricted the contractor's operations by defining "wetted perimeter" as any area that could be reached by high water, which they contend is different than the permit language and customary practice. WBC further asserts that the Government defined it as any area that it arbitrarily determined could be reached by high water. In doing so, WBC was prevented from performing work well out of the stream, including working on the fill at the top of the culvert at MP 46.2. Finally, WBC claims that the Government changed the term to "in-water work" in 1999 for the completion contract.

### FINDINGS OF FACTS – SUBPART 4

1) **Contract Requirements**
   a) **Standard Specifications (FP-96) and Special Contract Requirements**

The contract included the following Standard Specifications in accordance with the *Standard Specifications for Construction of Roads and Bridges on Federal Highway Projects* (FP-96) as amended by the Special Contract Requirements (SCR) applicable to this Subpart: Section 107 – Legal Relations and Responsibilities to the Public; and Section 108 – Prosecution and Progress. These Sections, or portions thereof, are included below for reference.

**Section 107 – LEGAL RELATIONS AND RESPONSIBILITY TO THE PUBLIC**

**107.01 Laws to be Observed.** FAR Clause 52.236-7 – Permits and Responsibilities is supplemented as follows.

Comply with all applicable laws, ordinances, safety codes, regulations, orders, and decrees. Protect and indemnify the Government and its representatives against any claim or liability arising from or based on the alleged violation of the same. Comply with the terms and conditions included in the Erosion Control Plan (See Section I).

All permits and agreements obtained by the Government for performing the work are included in the Contract. Comply with the requirements of these permits and/or agreements. Obtain all additional permits or agreements and modifications to Government obtained permits or agreements that are required by the Contractor's methods of operations. Permits obtained by the Government for work on this contract are included in Section H, Permits.

(Text Omitted)

**107.10 Environmental Protection.**

(Text omitted)

Work within the **wetted perimeter** of any stream will only be permitted between August 6 and October 1 for sites at MP 0.61 and MP 1.18 on FDR 3347. (Emphasis Added)

Work within the **wetted perimeter** of any steam will only be permitted between August 6 and November 1 for the site at MP 46.2 and the sites from MP 47.07 to MP 47.25 on FDR 33. (Emphasis Added)

(Text Omitted)

**Section 108 – PROSECUTION AND PROGRESS**

**108.01 Commencement, Prosecution, and Completion of Work.** FAR Clause 52.211-10, Commencement, Prosecution, and Completion of Work is supplemented as follows.

(Text Omitted)

Perform work under this contract according to the following:

(d) Limit work as provided in the following table:

| Location | Work/time Limitations | Date |
|---|---|---|
| FDR 33:<br>MP 46.2 and MP 47.07 to MP 47.25 | Work allowed within **wetted perimeter** of any stream (Emphasis Added) | August 6 to November 1 |
| FDR 3347:<br>MP 0.61 and MP 1.18 | Work allowed within **wetted perimeter** of any stream (Emphasis Added) | August 6 to October 1 |
| FDR 33: MP 44.5 and MP 46.2<br>FDR 3347: MP 1.18 | Only work allowed is staking, striping, signing, and turf establishment | March 1 to March 31 |
| All sites | No work allowed | April 1 to July 4 |
| All sites | Only work allowed is staking, striping, and signing | July 5 to August 5 |
| All sites | Perform work during time from 2 hours after sunrise to 2 hours before sunset | August 6 to September 15 |
| All sites | No blasting is allowed | April 1 to September 15 |
| FDR 33:<br>MP 46.7 and MP 47.07 to MP 47.25 | No clearing is allowed | April 1 to September 15 |

(e) Complete work according to the following table:

| Location | Work/time Limitations | Date |
|---|---|---|
| FDR 33:<br>MP 46.2 to MP 46.7 and MP 47.07 to MP 47.25 | Complete all repairs up to subgrade | By November 30, 1998 |
| FDR 33:<br>MP 46.7 | Complete rock slope stabilization work | Prior to beginning construction of the geogrid wall |
| FDR 33 | Complete all repairs up to subgrade and place at least 100 mm aggregate base | By January 23, 1999 |
| FDR 33 | Open FDR 33 to public traffic | By January 24, 1999 |
| FDR 3347: MP 0.3 | Complete all repairs up to subgrade | By December 31, 1998 or after August 6, 1999 and before October 29, 1999* |

* Note: If the Contractor elects to start work at MP 0.3 on road 3347 during 1998, the work up to subgrade on this site must be completed by December 31, 1998.

(f) Accommodate traffic according to the schedule in Subsection 156.03

(Text Omitted)

## 5) Permits

### a) 404 Permit – U.S. Army Corps of Engineers, Permit No. 98-370

The Contract included the U.S. Army Corps of Engineers issued 404 Permit under section H on Page H-21 of the Special Contract Requirements. This permit was issued in accordance with Nationwide Permit Number 03 which the general permit language is included below for reference.

**Nationwide Permit 3** authorizes the repair, rehabilitation, or replacement of any previously authorized, currently serviceable ,structure or fill, or of any currently serviceable structure or fill authorized by 33 CFR 330.3, provided that the structure or fill is not to be put to uses differing from those uses specified deviations in the structure's configuration or filled area including those due to changes in materials, construction techniques, or current construction codes or safety standards which are necessary to make repair, rehabilitation, or replacement minimal. Currently, serviceable means useable as is or with some maintenance, but not so degraded as to essentially require reconstruction. This nationwide permit authorizes the repair, rehabilitation, or replacement of those structures destroyed by storms, floods, fires or other discreet events, provided the repair, rehabilitation, or replacement is commenced or under contract to commence within two years of the date of their destruction or damage. In cases of catastrophic events, such as hurricanes or tornadoes, this two-year limit may be waived by the District Engineer, provided the permittee can demonstrate funding, contract, or other similar delays. Maintenance dredging and beach restoration are not authorized by this nationwide permit.

The permit includes Qualification Conditions and Implementation Conditions specific to this particular permit. Under the Implementation Conditions on page H-25, the work period is specified as, "All in-water work shall occur between July 1 and September 15, in accordance with Oregon Department of Fish and Wildlife's recommended in-water work period."

Prior to the contract going to advertisement, the contract was subsequently amended by the June 25, 1998 letter from the U.S. Army Corps of Engineers, also included in the Special Contract Requirements on Page H-59, as follows:

As requested, we have amended Special Condition "1." of the Implementation Conditions of permit as follows:

2. Work Period. All in-water work for Site FDR 3347 shall occur between July 1 and October 1, Site FR 33 mp 46.2 & 47.07 shall occur between June 15 and November 1, and Site 33 no in-water timing restrictions in accordance with Oregon Department of Fish and Wildlife's recommended in-water work period.

> The Corp of Engineers consider this change minor and hereby amend your permit as reflected in the above special condition.
>
> All other terms and conditions of the original permit remain in full force and effect.

**b) Oregon's Removal/Fill Permit – Division of State Lands, Permit No. RF-15114**

The Contract also included the Division of State Lands issued Oregon's Removal/Fill Permit under Section H on Page H-37 of the Special Contract Requirements. The Oregon's Removal/Fill Permit authorized, in accordance with ORS 196.800 and 196.990, to perform operations described in the application presented by the Government. The permit included General Conditions, and Special Condition applicable to the specific permitted activities. Relevant excerpts of the Special Conditions for Removal/Fill Permit No. 15114 are included below:

> This permit authorizes the removal of 2231 cubic yards and placement of up to 986 cubic yards of riprap in Section 18 and 19, T33S, R11W (various locations on Rock Creek and Shale Creek, tributaries of the South Fork of the Coquille River) to repair failed stream crossings as outlined in the attached permit application, map and drawings.
>
> (Text Omitted)
>
> 6. Removal or filling in the permit area shall be conducted between July 1 and September 15.
>
> (Text Omitted)

**c) The Government's Joint Permit Application**

During the design phase of this contract, the Government applied for both the 404 Permit and Oregon's Removal/Fill Permit using the Joint Permit Application Form, which meets the requirements of both agencies.

In the application, the Government identified 10,443 cubic yards of fill for the entire project, and 986 cubic yards of fill material to be placed in a wetland or below the ordinary high water or high tide line. The material identified for fill included riprap, gravel, and concrete. The Government also identified 14,975 cubic yards of removal, 2,231 cubic yards below the ordinary high water or high tide line. The material identified for removal included riprap, rock, gravel, organics, and streambed material.

Under the Proposed Project Purpose & Description, the Government identified the project purpose and need, along with providing a general description of the scope of work and individual site descriptions. Each of the individual site descriptions identifies the approximate total quantity of excavation and embankment, and quantity of each below the estimated ordinary high water mark.

**6) Contractor's understanding of Requirements**

WBC understood that the wetted perimeter meant that the contractor could not work in the water. Tr, Clevenger, 277:12-24; 279:5-6. Thus, as understood by WBC, the culvert, the concrete

headwall, some riprap, the energy dissipaters, and the removal of the diversion channel were all "in-stream," that is "wetted perimeter," work. Tr, Clevenger, 304:21-306:4

## ANALYSIS – SUBPART 4

The wetted perimeter language only becomes applicable after November 1, 1998. Until that date, WBC was allowed to work within the wetted perimeter. After that date, WBC could not work in the wetted perimeter. The problem, after that date, was not with a restrictive reading of the language, but rather with WBC's failure to complete the work that everyone agreed was in the wetted perimeter. WBC understood that the culvert, the concrete headwall, some riprap, the energy dissipators, and the removal of the diversion channel were all prohibited after the end of the work window.

WBC's allegation appears to be that after November 1, 1998, the Government would not let WBC work on the fill on top of the culvert. WBC alleges that the Government stopped all work at MP 46.2 after November 6, 1998. The record, as set forth in the previous section analyzing the work window, does not support this contention. The problem with placing the fill on top of the culvert after November 6, 1998, was not due to the Government's definition of "wetted perimeter," but was due to the saturation of the embankment material. WBC had no material it could use to embank the culvert that would meet contract requirements. The material WBC had placed already around the culvert did not meet contract requirements. All of this material had to be removed the following year.

Further, even using WBC's definition of wetted perimeter, there was little or no work that they could have performed at this site after the close of the permit window. Finishing of the culvert, the riprap, the energy dissipators, and the headwall were all wetted perimeter work. There was not much other work to be done at MP 46.2. By November 1, 1998, the embankment material on site was heavily saturated by the rains and could not be used for backfilling the pipe or constructing the embankment. I conclude that any difference in interpretation of "wetted perimeter" had no practical effect after November 1, 1998.

In any event, a disagreement over the meaning of a term does not support a finding of bad faith. Much more would be needed.

WBC asserts, as support, that the Government "[c]ynically" changed the term to "in-water work" in 1999, signifying allegedly cooperation with the completion contractor that significantly reduced the work area subject to permit restrictions. In fact, there was no change in the term. The contract language remained precisely the same. Nor does it appear that the Government changed the way it administered the term. In any event, as noted above, any change would not have benefited WBC. Under any definition of the term, WBC was restricted from working on the culvert, the riprap, the energy dissipators, and the headwall. And, as previously noted, the problem with the embankment was not some restrictive interpretation of the term, but the lack of suitable embankment material.

## DECISION – SUBPART 4

Based on the analysis above, I conclude that there is no support for a bad faith determination based on the alleged restriction of WBC by the Government relating to the "wetted perimeter" issue.

# SUBPART 5

## The Government Refused to Acknowledge the Changed Condition and Safety Problems at MP 46.7

### CLAIM SUMMARY – SUBPART 5

It is the position of WBC the government acted in bad faith by unreasonably refusing to address the changed condition at FDR 33, MP 46.7. They claim these actions resulted in delays and increased cost.

### FINDINGS OF FACTS – SUBPART 5

**1. Contract Requirements**
At the MP 46.7 site on FDR 33, the contract required the removal of 7,502 cubic meters of material perched above the roadway under pay item 20401B, Roadway Excavation (MP 46.7). Following the excavation of this material, WBC was required to shotcrete a portion of the area to stabilize the remaining rock face, install a geogrid reinforced retaining wall to stabilize the road, and complete all repairs up to subgrade prior to November 30, 1998.

Of the 7,502 cubic meters, the contract required 479 cubic meters of material to be hauled to MP 46.2 as borrow material to provide the remaining material to balance the excavation and embankment. Footnote 1 on plan sheet D.3 states, "Haul 479 m3 of borrow material from rock excavation at MP 46.7."

The work at this site required careful sequencing to maintain the access to the site at MP 46.2, as this was the most direct access available.

Due to environmental concerns and the need for protection at this site, the contract required WBC to take specific precautions to prevent any of the excavated material from spilling over FDR 33 to the roadway below and into Rock Creek. A containment area directly below the excavation existed to aid in preventing material during the rock blasting operations from leaving the site.

**a. Contract Requirements**
Subsection 204.06 (d) of the Special Contract Requirements states the following:

**(d) Rock cut at FDR 33, MP 46.7.** Blast rock according to Section 255. Do not construct equipment pioneer roads or access ramps outside the clearing limits. Use of a helicopter or crane may be necessary to access the top of the cut with equipment. Contain all excavated material on the roadway within the construction limits. Do not allow excavated material to spill over the side of the road.

The work under Section 205.– Rock Blasting was not paid under a separate pay item, as it was incidental to the work under other contractual pay items.

## 2. Blasting Plan Submittals

A blasting plan was submitted by WBC on behalf of McBride Construction Inc. Due to the sensitivity of the area and complexity of the blast, the Government hired Blasting and Vibration Consultants, Inc. (BVC) to review the blasting plan for adequacy and conformance with the contract requirements. In their review, BVC did not support the blasting techniques as proposed in the blasting plan. Their report states the following:

> I have reviewed the blast plan submitted by the subcontractor, McBride Construction, Inc. The blast plan shows a full height cut after pioneering for the upper sandstone material, approximately 70-80 feet. The quantity of material generated by a cut of this height can not be contained on the roadway below. There is a specification that no material will be allowed to go over the bank. This is going to be difficult because of the road width. Preventative measures of large riprap material stacked at the outside edge of the road will help contain the blasted muck spill from the shots. (See attached cross section) Near 0+245 to 0+255 a large portion of the outside edge of roadway has collapsed and formed a steep erosional chute. The outside edge of the roadway through this entire area is showing evidence of settling. This is probably caused by the original logging road alignment and construction techniques used at that time. The erosion has diminished the size of the platform for shot material in this area and will ensure that material is directed to the lower roadway (Forest Rd. #3347) via this chute. This should be filled in with large riprap material prior to blasting to help control and contain the rock spill over the road (#33) during the blasting in this immediate area. Filling the chute will stabilize that location, and make access for the construction of the retaining wall safer and more easily constructed. However, in the area where the chute is there is not enough room to properly contain the material even using riprap blocks at the roadway edge in this preventative method. McBride Construction has indicated concern regarding collapse of the existing roadway under the weight of the blasted material. This however would be another reason to limit the cubic yardage per shot by designing 25-30 ft. lifts.
>
> After the pioneering has been accomplished for drilling access the highest part of the cut (0+245 – 0+260) blasting can be accomplished in 3 lifts. The 0+260 to 0+270 area may be taken in two lifts. Lift heights of 25-30 ft. will allow for much better control of the shot material, as well as lessening the chance of spill over the roadway.
>
> The aspect of multiple lifts indicated that the design for the back slope will need to be modified with offsets for the pre-split drilling for the 2nd and 3rd lift. If 2 ft. drill offsets are used on the ¼:1 slope, then the back of the slope at the contact bench will be reduced by 4 ft. less working width. This should still be an acceptable working width at that elevation. The designed 3m (10 ft.) bench to be left at that contact can be adjusted to 2 m to fit the lower slope final profile or whole lower final slope design line can be adjusted out an additional 4 ft. to leave a full 10 ft. bench at the contact bench. The 15 ft. width of the ditch was designed for use of a crane on the project, if necessary. The 15 ft. was not a necessary design to accommodate future rock fallout at this cut, but is a nice safety feature as a result of the alternative access design.
>
> The McBride blast plan indicated various production patterns. The 6X6 ft. pattern in 2 1/2" holes loaded with ANFO in 25-30 ft. lifts in the more competent sandstone, will produce excellent fracture and good movement at powder factors of 0.8 to 0.9 lbs. per cubic yard. If the 1st lift is not as good a quality of sandstone (as the exposed overhanging zone), a wider pattern and spacing could produce the desired results with much lower powder factors. The outer edge

of the existing overhanging sandstone zone will probably produce large block/oversize material. It is not prudent to expect the blasting contractor to place drill holes and load explosives so close to the existing face for complete elimination of oversize in the muck pile at the expense of creating dangerous fly rock or excessive face movement. Some secondary blasting may be necessary.

The pre-split loading of ¼ lb./ft. in a 30' spacing should produce excellent results. I might expect some back-break because of the jointing alignment to the design slope. This may be unavoidable in some areas and should be acceptable.

An additional concern is the softness of the zone that is undercutting the sandstone. It would be less distressing to that zone if the pre-split and production loading were held about 2 ft. above that contact.

On September 23, 1998, the Government sent a letter to WBC stating the blasting plan could not be approved as submitted. In the letter the Government stated that a revised blast plan could incorporate recommendations from the BVC report, but other blasting plan proposals would also be evaluated.

A second blasting plan submittal was faxed to the Government by WBC on September 25, 1998 with revisions to the plan with some of the elements identified in the BVC report incorporated. However, under Containment of the Material, it specifically stated, "Specific measures will be taken to help contain the material that is blasted. This plan and the blasting operation will attempt to minimize the amount of material that will go beyond the road below. It is inevitable that some material will go beyond the road during the blasting operations. On the face of the rock cut a lighter powder factor will be used. Precautions on the road will be made by the prime contractor. Those choices will be made specifically by the prime contractor." In addition, the submittal states that 30-foot high lifts would be used, providing 2 overall lifts, not three as recommended in the BVC report.

On September 27, 1998, the Government accepted the second blasting plan submittal with comments, requiring the Contractor to address the following:

1. You will need to address, specifically, your method of containment for the rock material. The consultant report, should you wish to follow the recommendations, advised that use of large rock to form a berm would be an acceptable containment method. Your contract required that you not allow material to spill over the side of the roadway. Please address this issue in writing.

2. Your first blast will be considered your Test Blast. Reference Subsection 205.06 Test Blasting.

3. Your plan does not address a set back distance for the bottom of the first bench. FHWA is not concerned, however if the final cut slope face is 300 millimeters toward the roadway centerline, as was discussed with you over the phone, but it is critical that the slope inclination be as designed.

4. You will need to keep and make available to FHWA the blasting log for the blast.

> The actual drilled dimensions of the shot including blast hole depths, burden, spacing, subdrilling, stemming, powder loads, and timing. Reference is made to Subsection 205.09 Blasting Log.

On September 29, 1998, WBC sent a letter to the Government responding to the items identified in their acceptance letter, stating the following:

> Containment of the shoot rock will be done by excavating out as much of the lower area as possible and building a berm with the large rock at the base of the cut. As of 9-28-98 we have done most of this work but I will have a larger excavator here on 10-1-98 and will excavate more of the lower area just prior to the shot. I believe that with the revised blasting plan and the removal of the lower area we can contain the material. We plan to fire off the first shot on 10-1-98 at 7:00 PM. I will keep you updated on our daily progress.
>
> I concur with item #2.
>
> We will maintain the slope inclination as designed and will review the set back distance with the surveyor.
>
> We will comply with item #4.

The Government accepted the proposed containment methods in a letter dated September 30, 1998, and allowed the Contractor to proceed with the blasting operations.

## 3. Rock Blasting Operations

### a. Overburden Excavation

The clearing and grubbing operations at the top of the cut started on September 19, 1998 and were completed on September 20, 1998.

On September 20, 1998, the Government inspector Mr. Van Cauteren talked to Mr. Clevenger about the 6-foot vertical cut on the bench of mostly dirt material. Mr. Clevenger asked for Mr. Rettinger or Mr. Aftab to look at this area, but they had left the site. Mr. Clevenger was advised to contact Mr. Rettinger or Mr. Aftab directly to discuss. Mr. Clevenger indicated he thought he might need more right-of-way to correct this issue. Mr. Rettinger permitted the slope to be laid back and it helped. Tr, Clevenger, 622:18-21. WBC laid back the top five to six feet. Tr, Clevenger, 624:22-23.

On September 21, 1998, the Government inspector Mr. Lowell noted at 6:00 am a dozer and hand tools were preparing top of cut for driller. He and Mr. Clevenger met at the top of cut to observe problems with the area to work for the drillers. After discussions and checking the site, the problems were determined not be major, as there was sufficient room to work, with minor encroachment on clearing limits for the drilling operations.

The drill and compressor were hoisted to the top of cut on September 24, 1998, while pioneering operations continued. These operations included removal of additional overburden material.

On September 25, 1998, Mr. Clevenger talked with the Government's inspector Mr. Gietz regarding trees at the top of cut posing a safety concern. It was agreed that these trees should be removed to eliminate the safety risk of them falling on workers.

Excavation operations at the top of cut were completed by September 28, 1998. The drilling operations started on September 29, 1998 at the top of the cut.

**b. Subcontract between WBC and McBride Construction, Inc.**

Based on information contained in a "Proposal For Bid" from McBride Construction, Inc. to WBC dated September 30, 1998, the subcontract for the blasting work had not been signed between the two parties. This is further supported by a copy of a fax sent by WBC on September 30, 1998 which only has McBride Construction, Inc.'s signature dated September 23, 1998.

Mr. Clevenger stated the excavation of material without having to blast did not save money because he had entered into a contract with McBride to blast the full quantity. Tr, Clevenger, 620:24-622:17

**c. First Blast – Test Blast**

The first blast took place on October 2, 1998. The blaster made four attempts that day, and finally achieved a satisfactory shot at 4:15 p.m. As noted in an inspector's diary, "some large rocks @ lower side but most appears well broken. Rich McBride says about as anticipated. Let material settle & start pushing off tomorrow. Material volume about filled catchment area. Only nominal amount, possibly brush & stumps < 5 c.m. went down "chute." Not on lower road as viewed from above."

Excavation of material from the first shot continued in conjunction with drilling operations through October 8, 1998.

On October 6, 1998, Donna Mickley, a geologist with the Forest Service, visited the site and observed the overburden. She spoke with Mr. Rettinger and he explained that because the road remained closed, the slope would not create an immediate safety risk. Under the contract plans, once WBC finished excavating the rock area, there would be a 15 foot catch basin between the inside of the road and the cutslope that would capture any material that may come down. Mr. Rettinger proposed bringing in a separate contractor at a later date to stabilize the slope.

**d. Second Blast**

Mr. Clevenger testified in his deposition that while WBC was loading for the second blast, it had to employ someone almost full time as a looker because of the overburden. Clevenger, Tr, 624:18-625:3. According to WBC's dailies, WBC drilled for 1.5 hours on October 9, 1998 and then began loading for the second blast that occurred that afternoon. In the days between October 2 (the date of the first blast) and October 9, WBC details in the Contractor dailies the personnel working at MP 46.7. On none of those dates is there a person designated as a spotter, or who was available to perform as a spotter. The Government's dailies are consistent with showing no spotter was on the project during this time.

On October 9, 1998, before the second shot, the Government discussed the upcoming blast with Mr. McBride, where he expressed frustration that he had requested WBC remove additional material from the previous blast to afford additional capacity of the containment area. He also indicated WBC did not help construct a berm at MP 46.2 and other items. He indicated these problems delayed his operations due to the non-cooperative attitude by WBC. He also raised concerns regarding blasting in wet weather.

He further expressed his opinion to the Government's inspector Mr. Gietz that there was a risk of material exceeding containment capacity. To clarify this issue, Mr. Rettinger and Mr. Gietz asked Mr. Clevenger if the containment area has enough material removed from shot site. Mr. Clevenger stated yes there is adequate shot room. This discussion was noted in the Contractor Daily submitted by WBC for October 9, 1998.

The second blast was shot at 2:45 p.m. on October 9, 1998. As stated in Mr. Aftab's diary, "Second shot did not go well. As it did not presplit completely, the berm did not contain the blasting material. The material went down the cut slope and to FDR 3347 into the creek. There is a lot of material accumulated on FDR 3347 & into creek."

The Government immediately sent a letter to WBC identifying several deficiencies with the daily operations, paramount being the rock blasting at MP 46.7. The letter iterated the problems with the blast and identified the damage that occurred to FDR 3347, directly below the blast site. The blast resulted in many large blocks that did not break, and would require secondary blasting. Also, the presplit line on the north end of the blast area, near station 0+245 did not detonate, resulting in a large dangerous overhang situation. The letter specifically stated that no work on the rocks was to be performed prior to WBC submitting a corrective action proposal.

From October 10 to October 31, WBC worked only sporadically at MP 46.7. On October 10, WBC had three employees work 3.5 to 4 hours at the site. No work was done at the site on October 11. On October 12, according to WBC's record, it had three employees working about a half of a day at the site. On October 13, three employees worked a full day at the site. On October 14, three employees worked less than half of a day at the site. On October 15, three employees worked a full day. On October 16, three employees worked a full day, and four others worked less than 3 hours each. On October 17, five employees worked a full day on the site, and four employees worked a full day on October 18. Six employees worked a full day at the site on October 19, with one additional employee working two hours. On October 20, WBC shows six employees working a full day with two additional working part days. On October 21, there were 3 employees who worked all day at the site and three who worked 2.5 hours or less. On October 22, WBC's Contractor daily shows three employees at the site, each for 1 hour. On October 23, there was no work at the site. On October 25, there were three employees who were removing trees at the site. On October 26-28, no work is shown at the site. On October 29, two laborers worked each one hour at the site. On October 30, two laborers worked two hours each at the site. According to WBC's own record, WBC worked only 15 days at the site during this time frame, and six of those days involved very little time actually worked.

**e. Corrective Action**

On October 12, 1998, the Government sent a letter to WBC regarding WBC dragging some of the boulders from outside the construction limits back onto FDR 33, potentially damaging additional roadway that had not been scheduled for repair. This work was performed prior to the Government receiving a corrective action proposal. A second letter was sent by the Government to WBC requiring a blast plan for any additional blasting to be performed.

The Government also recommended that WBC determine the stability of the overhang material above the work area prior to allowing employees to work under the potential rock fall.

**f. Changed Condition Assertion - Overburden**

On October 14, WBC sent a letter to the Government responding to previous correspondence regarding the blast. In this letter, WBC contends that the errant blast was the result of poor breakage. They state that there were several rocks with ANFO still in the drill holes, and several rocks with drill holes and no indication of blast damage. They also contend three or four holes appear to have blown out through the bottom of the hole, and a good portion of the bench was gone from the blast.

WBC also reiterated its oral allegation earlier that day that MP 46.7 involved a changed condition. It stated that first there was about thirty feet of overburden. WBC does not contend that this overburden imposed safety concerns, or required other action, except that WBC expected rock. WBC stated that the material at the bench level may have been too weak to withstand the blast, and may have been weakened by the first blast. By it prematurely falling away, the energy from the second blast was dissipated.

A letter from the Government to WBC dated October 14, 1998 recounts a telephone conversation between Mr. Clevenger and Mr. Rettinger. One of the items discussed was WBC's verbal indication that they intend to claim on the work covering the rock blasting at MP 46.7. This letter specifically stated, "FHWA does not recognize any responsibility for the results of your blasting operations."

Excavation of blast material and subsequent secondary blasting were performed following the second blast. In addition, remedial repair work was performed to address damage the occurred as a result of the errant blast.

On October 19, 1998, an OHSA inspector visited the site and his "only real concern" was the leaning trees above 46.7, according to WBC's Contractor daily. WBC felled the trees on October 25, 1998.

On October 23, 1998, the Government faxed a note to WBC regarding a telephone conversation where WBC requested help on the rock cut. The Government's Geologist came to the site on October 27, 1998 where he met with the Engineering Geologist, Frank Toors hired by WBC to review the site.

Mr. Clevenger testified that it was not until the rains started that the impact of the overburden became severe. Tr, Clevenger, 625:8-626:6. WBC's records show work at MP 46.7 on November 2, with no spotter and no indication of concern about the

overburden. WBC's dailies next show work at MP 46.7 on November 5, with no indication spotters or of work or concern relating to the overburden. The first indication that the overburden was impacting the project came on November 9, when WBC spent 2.25 hours removing material that had fallen over the previous weekend. According to its records, WBC worked only about 5 hours at the site that day. On November 6, WBC worked about 4 hours at the site, again with no spotter or expression of concern or work regarding the overburden.

On November 6, 1998, WBC provided to the Government a report written by Frank Toors regarding the MP 46.7 site. One of the recommendations of the report was to remove the soil/decomposed rock overburden material at the top of the cut on a 1H:1V slope ratio due to the landslide potential. The original contract indicated this material could be excavated on a 1H:4V slope ratio. Mr. Toor's report indicates the dissipation of energy along the natural bedding and joint pattern planes did not allow for breaking of the rock between the natural bedding and joint pattern planes.

The rains increased, and on November 7, 1998 a small landslide occurred within the overburden due to the additional moisture. According to the Government's inspector Mr. Gietz, approximately 5-10 cubic yards of material came down at the overburden area.

The Government's inspector Daniel Quist noted in his November 9, 1998 diary entry that approximately 4 cubic yards of material fell from the rock cut to the roadway. Later discussions that day indicated 60-80 cubic yards came down over the previous weekend (November 7 and 8), with a number of 4-5 foot diameter boulders.

In a letter from WBC to the Government dated November 11, 1998, WBC advises the Government of two-foot diameter falling rocks from the overburden material that is posing a safety hazard to the project. Because of this problem, WBC positioned a spotter at the bottom of the cut to observe falling material and notify workers below. The spotter would perform daily inspections of the overburden area to identify new cracks or expansion of existing cracks.

On November 17, 1998, WBC submitted a proposal to address the overburden at MP 46.7. By letter dated November 23, 1998, the Government responded to the proposal, noting problems, but asking WBC to notify the Government when slope stakes were in place so that the Government and the Forest Service could review the proposal on the ground, agree to it, and a contract modification could be issued.

A subsequent landslide occurred at the site during the weekend of November 21 – 22, 1998. According to a letter from WBC to the Government on November 23, 1998, approximately 250-300 cubic meters of debris came down at this site.

Ms. Mickley, the Forest Service geologist, did not believe that the overburden created an unsafe condition until the ground became saturated. Tr, Mickley, 38:7-9. By December 7, 1998, Ms. Mickley thought that the site was unsafe. Tr, Mickley, 38:15-29:1.

In its updated schedule submitted on November 6, 1998, WBC shows that the work at MP 46.7 was not on its critical path for this project.

WBC's dailies show no work with respect to safety spotters, and express no concerns about the overburden prior to November 9, 1998.

## ANALYSIS – SUBPART 5

WBC alleges that the Government refused to address the changed condition at MP 46.7 resulting in WBC incurring delays and additional costs due to the unstable overburden. WBC alleges that multiple failures of the overburden occurred after the first shot, impeding WBC's prosecution of the work. The presence of the overburden was discovered in September 1998. At that time, WBC, according to its preliminary schedule, was projecting to be finished at MP 46.7, except for the paving, by October 29, 1998. None of the parties expressed concern about the overburden being a safety concern during this period. WBC asked, and the Government allowed WBC to lay back the top five to six feet of the overburden in September. The overburden, thereafter, according to project records, never becomes a factor in the project until November 9, 1998. While WBC mentions the overburden in its October 14, 1998 letter, there is no indication that the concern is safety, but rather it seems to be tied to WBC's view that excavating the overburden, rather than the material as rock, was a disadvantage to WBC.

On Saturday, November 7, a small amount of material came down from the overburden. By Monday, November 9, when WBC next worked on the project, somewhere between 60 and 80 cubic yards had come down. On November 9, WBC made an oral request to be granted permission to go up above the cut and deal with the overburden. Because this would be outside of the project limits, the Government said "no" to the oral request but offered to entertain a written proposal for that site. On November 17, WBC submitted a written proposal. The Government responded to this proposal on November 23, requiring certain changes and asking WBC to stake the proposed new project limits on the ground, detail how it would obtain access to the top, and provide a plan to keep material from going into the creek. WBC never provided this information. In the meantime, the Government had issued a cure letter on November 13, 1998.

Finally, I note that in none of WBC's schedule submissions, including its updated schedule on November 6, 1998, is MP 46.7 shown to be on the critical path of the project. Without any delay affecting the critical path of the project, I do not find a basis for concluding that the problems with the overburden later in November caused an overall delay for WBC.

I do not find that the Government actions with respect to the overburden support a conclusion that the Government was refusing to deal with the overburden issue or delayed WBC on this project. When WBC asked on November 9 to be able to deal with the issue, the Government requested WBC to submit a proposal. WBC submitted a proposal on November 17. The Government reviewed this proposal and responded on November 23. Thereafter, it appears that the proposal was overtaken by the default termination. I found no evidence that WBC ever sought to meet the conditions the Government requested in its November 23 letter. If WBC had not been terminated, I have no basis for concluding that the overburden would have delayed the overall completion of the project.

Further, these facts do not support the allegation that the Government "refused" to address the changed condition. To the contrary, the Government viewed the situation as being outside the construction limits, and not a differing site condition. The Government believed that the situation could be dealt with at a later time. In its November 23 letter, the Government stated

that it viewed this situation as needing a contract modification because it required work outside of the construction limits. Accordingly, the Government notified WBC that if it wished to perform this work, it needed to submit a proposal. I also note that the overburden did not contribute to the delay that led ultimately to WBC's termination. The overburden began to impact the project only after the work window for work in the wetted perimeter was past, and only after WBC had failed to perform the work required within that work window. At that time, the Government was working with WBC to address the issue. These are not the actions of bad faith.

WBC alleges that there were multiple failures of the overburden after the first shot. These failures, according to WBC, impeded the course of the work and increased the cost. As stated above, I do not find that the facts support these claims. There was no recorded failure of the overburden until November 7. Such failure did not impede WBC's work with respect to the culverts at MP 46.2 and 47.05-47.25, the critical path items on the project. I do not find that MP 46.7 was on the critical path or otherwise impeded WBC in the course of its work. As for an increase in cost, any increase was minor, given the small amount of work WBC did after the overburden became an issue. Finally, whatever those costs were, they will be compensated for by this COD.

WBC alleges that Mr. Rettinger would not allow WBC to correct the overburden, stating that another contractor would do that after WBC's contract was over. The documents show that Mr. Rettinger not only did not refuse WBC's request, but actually entertained it. There is some indication that back in October, Mr. Rettinger was thinking that the overburden could be handled by a separate contractor and would not impact WBC's operations. Ultimately, however, when it became obvious that the overburden would impact WBC's operations, Mr. Rettinger worked with WBC to come up with a solution. These are not the actions of bad faith.

WBC alleges that both Ms. Mickley and Mr. Toors warned the Government that slope failure was imminent and would occur within days or possibly weeks. WBC alleges that despite multiple warnings, the Government failed to take any action. The facts do not support this allegation. Ms. Mickley's report was on October 7, 1998 and it did not warn of imminent failure. Ms. Mickly testified that the overburden would not become a problem until it became saturated. Tr, Mickley, 38:7-9. She stated that at the time of her visit, the overburden did not create a safety concern. Id. She also did not take issue with Mr. Rettinger's proposal on handling the overburden issue, as she detailed in her report on October 7. Mr. Toor's report was not provided to the Government until Friday, November 6, 1998. On Monday, November 9, WBC talked to the Government and the Government indicated that it would entertain a proposal to address the overburden. The Government did not delay in reacting to Mr. Toor's concerns. I find that the Government, when presented with Mr. Toors' concern, acted in good faith in seeking a proposal from WBC and responding positively to the proposal. These are not the actions of bad faith.

WBC alleges that Mr. Rettinger acted unreasonably in requiring WBC to continue to work at the site despite deteriorating safety conditions. WBC alleges that material was starting to come down on a daily basis, and that safety spotters had to be used continuously, that traffic on the road had to be halted frequently to avoid falling material. WBC alleges that Mr. Clevenger informed Mr. Rettinger of the safety hazard and that Mr. Rettinger responded that WBC could excavate the overburden and remove it at its own costs. As stated above, the time when material started to come down was on November 7, and did not affect WBC until November 9, when

WBC came back to the job site. The record does not show that Mr. Rettinger ordered WBC to continue working at the site despite deteriorating safety conditions. The record shows that because of safety concerns, WBC made its own decisions not to work at the site. For instance, according to the Contractors daily for November 20, 1998, WBC suspended work because of safety concerns. I do not find that Mr. Rettinger ordered WBC to continue to work despite the safety concerns.

Further, I found no records to support the allegation that Mr. Rettinger stated that WBC could excavate the overburden at its own costs. Mr. Rettinger did allow WBC to propose a correction. In any event, there is a legal provision for WBC to argue about who should bear the costs. It is not bad faith for the Government to deny costs that later may be determined to be owed. Thus, whether or not the statement was made, I find that Mr. Rettinger was willing to work with WBC to develop a solution to the overburden. I do not find evidence of bad faith.

WBC alleges that as soon as WBC was terminated, the Government had Kerr Contractors start removal of the slide, which action continued until Ms. Mickley determined that the conditions were unsafe. I fail to see how this supports an allegation of bad faith. In the last days of WBC's contract, the Government was working with WBC to resolve the overburden issue. Once WBC was terminated, there was still a need to resolve the overburden issue. It is not bad faith for the Government to seek another contractor to do that which it previously was working with WBC to do.

What WBC fails to mention in their claim is that the excavation of the overburden should have resulted in substantial savings over the cost of rock blasting. WBC alleges that because it had a lump sum contract for blasting, that it did not realize any cost savings. Tr, Clevenger, 620:24-622:17. The record shows that the blasting subcontract was not executed until after all of the overburden had been removed. This gave WBC the opportunity to address the reduction in the blasting quantity.

## DECISION – SUBPART 5

Based upon the above analysis, I conclude that the actions of the Government do not constitute bad faith. While there may be decisions that in hindsight might have been made differently, I find that at the time each of the decisions had a rationale basis. I find many of WBC's allegations to be contrary to the facts, or imply matters that are not supported by the facts. The overburden issue arose with significance in this contract only after WBC's dismal performance in October, its failure to come close to meeting its schedule, the rains arrived, and the material began to fall during the weekend of November 7. Thereafter, the Government worked with WBC to entertain a proposal to address the issue. When WBC was terminated, the Government continued to try to address the issue. I do not find the actions of the Government to constitute bad faith.

# SUBPART 6

## The Government Lied About Design Changes

### CLAIM SUMMARY – SUBPART 6

WBC claims the Government notified WBC, ICW, and the competing completion Contractors bidding on the work that there would be no redesigns or changes to the contract and that the work would be completed as per the WBC contract. WBC further contends that at the same time The Government had already commenced work to redesign several of the sites, including MP 46.7.

### FINDINGS OF FACTS – SUBPART 6

**1. Show-me Tour with potential completion contractors**

**a. Lakey and Clifton Corporation**

On December 29, 1998, Mr. Aftab's diary depicts discussions he had with a potential completion contractor, George Montey of Lakey and Clifton Corporation during a "show-me" tour of the project. During the discussions, the Mr. Montey asked, "At MP 46.7 (Big Rock) what are we going to do about that, and who is responsible for hauling material from this site to disposal area." Mr. Aftab responded, "Right now it's unsafe to work under this rock cut. There is approx. 3500 cu. yard of the material are lying on the roadway. My approx. estimate is that 85% of this material has to be hauled to disposal area in contract work not done by White Buffalo and left unblasted material in the roadway. 15% of the material came down due to slide may be considered as ours." Mr. Montey said, "The Bonding Company told me that FHWA wants contractor to bench it again." Mr. Aftab replied, "Right now it's unsafe to work underneath it. Our Geotechnical person & design person are gonna evaluate the situation and may come up with new idea as what to do about it. Please contact Bonding Company for any other questions."

Mr. Montey asked about 47.07 to 47.25, wanting to know how much work is completed here and what is extra work. Mr. Aftab responded, "The work at this site is not been completed as contractor has failed (White Buffalo) to do rounding of slope. In some area where slope cave in our designers will come up with something like buttress wall (example not sure yet) that could be considered as extra work. Please contact Bonding Company for a complete answer to your question."

Later in the discussion, Mr. Montey asked, "Do all windows (permits) still exist & include liquidated damages." Mr. Aftab responded, "As far as my understanding we have defaulted the contractor & not the contract so everything in the contract remain the same."

**b. Roy Garren Corporation**

On December 30, 1998, Mr. Aftab's diary depicts discussions he had with a potential completion contractor, Roy Garren and Albert Niemi of Roy Garren Corporation during a "show-me" tour of the project. Mr. Garren asked, "How much work is done on the rock cut (from MP 47.07 to 47.25) & is slopes which are cave in are contract work or will be

extra work?" Mr. Aftab responded, "We have provided all information regarding this site work. I am not gonna tell what % is complete but @ this site we don't consider the work is completed as no rounding of slope were done & yes it will be considered as extra work maybe come up under contract modification."

Later in the discussion, Mr. Garren asked, "What you guys are going to do with big rock cut MP 46.7 & material." Mr. Aftab replied, "We are going to redesign this rock cut & work may be done under different contract modification. 85% of the material on the site is blasted material need to be hauled to disposal area is contract work. 15% of the material haul to disposal area may be done under contact modification."

**c. Discussion with Luther Clevenger, WBC**

During the meeting with Mr. Garren Corporation at the MP 46.2 site, Mr. Clevenger of WBC arrived on site. Events of this exchange are also included in Mr. Aftab's diary entry for December 30, 1998, and subsequently reiterated in an email from Mr. Aftab to Mr. Crockett. Mr. Aftab's diary entry states the following:

> At 46.2 when I was showing project to Mr. Roy Garren & Albert, Luther showed up & start taking pictures of pipe. I asked Luther what he is doing at the project. I told him he don't have equipment or material on the job so he is trespassing. I will advise him to leave. If he has any questions please call my office to take appointment. He told me he came here to pick up all construction signs. I told him I will advise against it & strongly advise him not to do that as all signs belong to Federal Highway Administration. He told me he agree, took some pics, & ask me what we are doing with big rock cut @ 46.7 (as Kerr's Construction told him that) FHWA are going to redesign that Big Rock Cut. I told Luther contact your bonding company & I will not give you any answer. Luther left the job & then I left the job.

**d. Tidewater Contractors, Inc.**

On December 30, 1998, Mr. Aftab's diary depicts a phone discussion he had with a potential completion contractor, Scott Darger of Tidewater Contractors, Inc. after completing the "show-me" tour to Mr.Garren Corporation. According to Mr. Aftab's diary, Mr. Darger called and told him they were also going to bid the job and he is going to go to the project the following day. Mr. Darger asked, "Is there any change in the contract window." Mr. Aftab replied, "No, not to my knowledge." Mr. Aftab then told Mr. Darger, "If he want to come to our office he can. I will be happy to give him any answers to the questions he has." Mr. Darger replied, "Thanks, I already know the job."

## 2. Letter to the Government from ICW regarding potential design changes

In a letter from ICW to the Government dated January 15, 1999, ICW iterates their intent to tender a completion contractor for completion of the contract. This letter continues to ask for clarification regarding discussions between Mr. Aftab and the potential completion contractors regarding the potential for a redesign at MP 46.7 and permit extensions to allow work to commence in June. An excerpt from the letter is included below:

> (Text Omitted)
>
> To facilitate a complete and thorough bid, it has come to my attention that Mr. Sajid Aftab with the U.S. Department of Transportation has notified the various completion contractors during various site walks that it will be the Government's intention to redesign the slope work at MP

46.7 which would include any necessary benching and above slope excavation. Additionally, Mr. Aftab has advised the completion contractors that the scope work (window) will be opened up. This will allow the work to commence in June due to the extra work at the rock slide location. Please advise ICW of the Government's intentions so that appropriate estimates can be completed for the completion work.

(Text Omitted)

### 3. Response Letter to ICW from the Government regarding design changes

A letter dated February 2, 1999 from the Government to ICW responds to ICW's intent to tender a completion contractor, and the requirements for performing such. It also addresses the work to be performed by the completion contractor. The letter states the following:

Your letter of January 15, 1999 advises that the Insurance Company of the West anticipate tendering a completion contractor to complete the above referenced contract. Upon deciding to tender a completion contractor, please do so in writing providing the name of the contractor. We will consider the contractor's ability to perform the work and, if capable, we will advise you of our acceptance.

It is my position that the contract with a completion contractor will be based on the original plans and specifications and provided that the completion contractor will correct any defective work as well as the balance of the uncompleted work in strict accordance with the contract requirements. The contract should incorporate the original contract's items of work and unit prices with the original quantities adjusted due to work previously performed. The contract should be for the balance of the original contract proceeds. New payment and performance bonds will be required on the new completion contract.

Any changes in the original contract requirements will be done by contract modifications to the completion contract after award so that any associated additional costs can be segregated from the cost of the original contract. At this time we are pursuing the possibility of the permitting agencies allowing the in-stream work to begin earlier in 1999 than the current contract allows. This relaxation of the work window restriction may or may not occur, and we may not know the final determination until sometime in March or later.

I spoke with Project Engineer Sajid Aftab and Resident Engineer Paul Rettinger regarding your contention that Sajid notified the potential completion contracts that the Government intends to redesign the slope at MP 46.7 and that the window of time during which to perform the work will be 'opened up.' Sajid advised me that he did not notify nor advise the potential completion contractors as noted in your letter. Paul also advised me that he did not. Sajid records in his daily diary the contacts and the significance of discussions he has with contractor and agency representatives on project matters. The diary contains entries for the contacts that occurred on the days potential completion contractors were on the project site. The diary does not include reference to slope redesign at MP 46.7 or that the performance window will be opened up.

Regarding the slope at MP 46.7, it remains the Government's position that White Buffalo is responsible for the current condition of the grading work at this location. The excavation and grading at this location must be performed in accordance with the original contract requirements. If corrective work is require because of the previous efforts by White Buffalo, Inc., the completion contractor may propose a slope redesign under the completion contract.

I hope this provides a better understanding of my expectations regarding a completion contract being contemplated for our original contract DTFH70-98-C-00027 with White Buffalo Construction, Inc.

As late as March 16, 1999, the Government was still working on designing a solution to the overburden site, coordinating with the United States Forest Service to expand the construction limits.

### 4. Depositions relating to the "redesign" of MP 46.7 on FDR 33

In the depositions, Mr. Aftab was specifically asked about redesigns by the Government. Within the deposition, Mr. Aftab explained that he was not aware of the potential for the redesign at MP 46.7 until about a week before he left the project at the end of December, when he talked to Betty Chon, the Government's designer.

Ms. Chon testified that she did not work on the design until after David Lofgren, the Government's geologist, completed the design analysis. Mr. Lofgren stated in his deposition that he did not perform his analysis for the corrective design until February or March. This timeframe was confirmed by the Deposition of Ms. Chon when she said that she performed the changes to the design at this site in January or February of 1999.

### 5. Other "redesigned" sites

Based on the deposition by Mr. Lofgren, only two other sites were "redesigned" in an effort to address problems. The locations of these two sites were MP 47.25 on FDR 33 and MP 0.43 to 0.46 on FDR 3347.

The failure at MP 47.25 on FDR 33 was explained by Mr. Lofgren in his deposition as a slope that was over-steepened for the type of material that the slope was cut in. There was rock in the lower part of the cut. When asked if the major contributing factors to that failure were the heavy rains, Mr. Lofgren answered, "Yes."

Mr. Lofgren explained that the failure on FDR 3347 was the result of the existing embankment failing, which WBC had not started work at this location, therefore the failure could not have resulted from their actions.

### 6. Agreements between ICW and TCI

#### a. Tender Agreement Request from ICW to the Government

In a letter dated February 8, 1999 from Insurance Company of the West (ICW) to the Government, the surety asked the Government to consider execution of a Tender Agreement to establish a new contract with Tidewater Contractors, Inc. (TCI or Completion Contractor). Attached to the letter was a copy of the Tender Agreement from ICW. Within the Tender Agreement, item number 2 specifically addresses change orders, and states, "Any Change Orders issued under TCI's contract shall be a matter between TCI and the Government and shall not affect Surety." This statement demonstrates an understanding by ICW that Change Orders were possible during the completion contract, and demonstrates that TCI was aware of this possibility.

This proposal for executing a Tender Agreement was declined by the Government by letter dated February 22, 1999. In this letter, it stated, "3. We are willing to pay ICW, pursuant to a takeover agreement, or Tidewater, under a new contract for the correction of defective work and completion of the remaining work in accordance with the terms and conditions of the original contract, the remaining balance of the original contract price adjusted for contract modifications previously made to the contract."

b. **Completion Subcontract between TCI and ICW**

A letter from ICW to the Government dated June 1, 1999, included a copy of the agreement for completion of construction contract between ICW and TCI. On page 3 of the, item 5 specifically addresses contract modifications as follows:

> 5. Tidewater will undertake to perform any additional work required by the Department on the Project as a result of modifications to the Completion Contract, upon terms to be agreed upon by Tidewater and the Department. Tidewater will retain any additions to the contract amount that result from such modifications, and ICW will have not obligation to pay Tidewater for such work or for any reductions in the contract amount resulting from such modifications.

Dave Baldwin, the superintendent for the completion contractor, when asked about whether the Government provided any redesign drawings for the rock cut area, answered "no." When asked how he knew what to lay back, his answer was a question: "The rock face?" Mr. Clevenger then clarified that he was talking about the area above the rock cut. Tr, Baldwin, 20:4-12.

Scott Darger, an employee with the replacement contractor, stated that the $50,000 amount bid for work at MP 46.7 was for the material that was shot and not for the overburden work. Tr, Darger, 21:25-26:24. It was for work that the Government was not going to pay for. Tr, Darger, 37:17-21. Mr. Darger was clear that it did not include work that was outside the clearing limits. Tr, Darger, 39:9-21.

## ANALYSIS – SUBPART 6

For purposes of a bad faith analysis, bad faith is important only to the extent that it can be considered to be a breach of the contract. Such is the only basis for allowing a breach claim and consequent loss of anticipatory profits. Once the contract is terminated, it is impossible thereafter to breach the contract. Stated another way, it is not logically possible for subsequent events to have breached a previously terminated contract. Such events are only potentially relevant to the extent that they may shed light on ambiguous events happening before the termination. While WBC alleges that the alleged lie concerning the design changes impacted it because it increased its costs to the surety for the reprocurement contract, which is a separate issue from whether the action was a breach of the WBC contract. Once the contract was terminated, neither WBC nor the Government was able thereafter to breach the contract. While the Government may have continued to have responsibilities towards WBC, the breach of such responsibilities would not constitute a breach of the terminated contract and would not support a claim for lost anticipatory profits.

In reviewing the facts, I find that most likely Mr. Aftab told some potential contractors that there would be a redesign of the rock cut at the MP 46.7 area, notwithstanding the fact that he represented later that he did not do so. I believe his contemporary diary provides the best evidence of what he said. I also find that the Government was uncertain what it would do, if

anything, concerning the MP 46.7 area. At that site, there were two issues. One involved the overburden, and one involved the rock. The Government did not believe that it had responsibility for the rock, the large boulders, or the hanging rock left on the rock face. The Government had no plans to redesign the rock cut at that location and in fact did not do so. As stated in the February 2, 1999 letter to the surety, the Government had no plans to redesign the slope but stated that the "grading work" remained the responsibility of the contractor. The "excavation and grading" was required to be performed as per the original contract. The Government left open the possibility that the completion contractor could propose a slope redesign. And in fact, the Government never provided a re-design for the rock face, as Mr. Baldwin testified. Tr, Baldwin, 20:4-11.

I read the February 2, 1999 letter as dealing with the desire of the Government to have the area excavated out to the lines set forth in the original contract, including the removal of rock that remained on the face of the wall. The Government left open the possibility that the completion contractor could submit a proposal for a slope redesign at this location, but such would not be proposed by the Government. This was the position of the Government, as represented by the contracting officer in the February 2, 1999 letter. The Government did not waiver from this position and never redesigned that rock slope.

The second issue involved the overburden. The overburden represented added work. It was not part of the original contract requirements. It was outside of the project limits. It did not represent a redesign of existing work, but a new design of added work. The Government had to deal with the problem of the unstable overburden. The Government did not place that burden on either WBC or on the completion contractor. The Government could have hired a separate contractor to remove the overburden. A second option was for the Government to add the work by way of contract modification to the completion contractor. In either event, the cost would be the Government's, not the contractor's. Neither WBC, nor the completion contractor, had either the responsibility, or the ability (given the contract project limits) to deal with the overburden issue. In fact, the Government later dealt with the overburden issue by executing a contract modification with the completion contractor.

The Government's decision of how to handle the overburden was not made until sometime in February, 1999. On February 5, 1999, Mr. Aftab sent survey data to Ms. Chon, the designer on the project. Sometime thereafter, Ms. Chon sent the survey data to Mr. Lofgren, the Government's geologist. Depositions of both Ms. Chon and Mr. Lofgren confirm that the Government had not formally determined what to do with the overburden issue until February, 1999.

WBC's allegations that the Government had already commenced work on redesigning MP 46.7 in early February is not supported by the facts. The Government never redesigned the rock slope at that location. Its decision with respect to the overburden was made after the February 2, 1999 letter to the surety. And that decision added work that otherwise was not part of the contract requirements, was outside of the project limits, and was always solely the responsibility of the Government.

The allegations that the Government redesigned "several other sites" and "redesigned the entire project" is also not supported by the facts. Under Contract Modification 001 to the completion contract, the Government provided a redesign of the MP 47.25 site and the MP 0.43-0.46 on the FDR 3347 road. This is in accordance with the deposition testimony of Mr. Lofgren. Tr,

Lofgren, 108, 4-19. Each of these was done by contract modification and was based on work done by the Government in February or March of 1999. Tr, Lofgren, 112:4-9. The redesign of the MP 47.25 site was due to a slide caused by heavy rains in November, 1998. Tr, Lofgren, 56:18-58:20. The redesign of MP 0.43-0.46 was due to a fill failure. Tr, Lofgren, 109:4-23. And, again, Mr. Lofgren testified that he began working on these sites in February or March of 1999. Tr, Lofgren, 112:4-9. If find no evidence that the Government began work on redesigning these sites prior to the February 2, 1999 letter to the surety.

WBC alleges that the Government paid the completion contract to correct the overburden at MP 46.7 even though the completion contractor had included the costs in its contract with the surety. It is true that the completion contractor included an Alternative bid item for work at MP 46.7 in the amount of $50,000.00. However, it is not true that such item was for work that duplicated work the completion contractor included in his contract. When Mr. Clevenger took the deposition of the completion contractor's personnel, he pressed this very question. Mr. Darger made it clear that the $50,000.00 was for cleaning up the mess left in the road and below the road by the blast. It did not include work for the overburden.

WBC alleges that it made repeated FOIA requests for the Government's redesigns, but the Government claimed that there were none and did not provide them. The Government did not provide the redesigns based upon advice from counsel that the redesigns were not responsive to the wording of the FOIA requests. Tr, Lofgren, 97:11-98:8. Once WBC brought suit on November 16, 1999 to get the documents, the Government decided that there was no reason to fight over what was or was not viewed as being within the terms of the request. Since the documents were not secret, and in fact were part of the Contract Modification 001 to the completion contractor that was finalized on June 25, 1999, the Government resolved the suit by providing the requested documents. What WBC viewed as a deliberate withholding, Government counsel viewed as not requested. This difference in legal views does not support a bad faith claim.

Further, in reviewing these matters, I do not find that the decision by counsel to withhold the documents as non-responsive sheds any light on actions of the Government prior to the default termination. The decision as to which documents are responsive to a FOIA request provides no evidence of the way a contract was administered. The individuals involved in the redesign and the FOIA are different people than those involved in construction and contracts. The FOIA request does not show whether or not the contract was administered in bad faith.

## DECISION – SUBPART 6

Because I do not find that the Government lied, and because the alleged lie was after the default termination, I find no basis for concluding that the Government breached a covenant under the contract or was guilty of bad faith.

# SUBPART 7

## The Government Terminated the Contractor

### CLAIM SUMMARY – SUBPART 7

WBC contends that the Government acted in bad faith during the termination of the contract. They assert the CO failed to independently decide to terminate WBC; he was directed to do so.

### FINDINGS OF FACTS – SUBPART 7

Mr. Parsons testified in his deposition that the first he was aware of problems on the project was in the Hildreth memorandum. Tr, Parsons, 29:22-25. That memorandum was an undated memorandum, Tr, Parsons 29:15-16, that referenced a meeting held on November 5, 1998, and therefore had to be sent after that date. In that memorandum, Mr. Hildreth recommended that WBC's contract be terminated.

On November 9, 1998, Mr. Parsons met with Mr. Zotter, legal counsel, Mr. Hildreth, and Mr. Crockett concerning the situation. On November 10, 1998, Mr. Rettinger provided input to Mr. Parsons on certain items Mr. Zotter wanted addressed. Mr. Parsons asked Mr. Zotter to review Mr. Rettinger's response. On November 10, 1998, Mr. Parsons asked Ms. Traffalis for more information. Also, in the evening on that date, Mr. Parsons sent to Mr. Zotter a draft Notice of Termination for Default. Thereafter, Mr. Parsons left the office to attend an award ceremony in Washington, D.C.

While he was gone, on November 13, 1998, Carol Jacoby, a higher contracting officer, concluded that the Government should first issue a cure notice. She issued one on that date.

On Friday, November 20, 1998, Mr. Parsons met with Ms. Jacoby and others to go over the response to the cure notice. The next week Mr. Parsons was not in the office.

On November 25, 1998, while Mr. Parsons was out of the office, Ms. Jacoby telephoned WBC and informed WBC that its response to the cure notice was not adequate. Tr, Jacoby, 41:3-25.

On November 30, 1998, Mr. Parsons returned to the office. Tr, Parsons, 59:23-60:1. On that day, Ms. Jacoby sent a memorandum to a group of people, including Mr. Parsons, recommending termination for default. Mr. Parsons reviewed that memorandum, assessed the facts and determined that the contract should be terminated for default. Tr, Parsons, 63:3-15; 86:9-11.

Ms. Jacoby did not tell Mr. Parsons to terminate WBC for default. Tr, Jacoby, 36:10-37:3.

On December 1, 1998, Mr. Parsons issued his decision to terminate WBC for default.

## ANALYSIS – SUBPART 7

WBC alleges that it was informed by Ms. Jacoby during the week of November 23, 1998 that it would be terminated on December 1, 1998. WBC alleges Mr. Jacoby directed Mr. Parsons to terminate WBC. Ms. Jacoby called WBC on November 25, 1998 and notified it that its response to the cure notice was not adequate. Ms. Jacoby did not remember stating that WBC would be terminated. Ms. Jacoby testified that it was not her decision to terminate WBC and that she did not tell Mr. Parsons to terminate WBC. Ms. Jacoby issued a memorandum on November 30 that recommended termination for default. Mr. Parsons testified that he reviewed the facts and decided on November 30, 1998 to terminate WBC. I do not find evidence that Mr. Parsons' decision to terminate WBC was anything other than his independent determination. This does not mean that others had not reached that conclusion first, but there is no evidence that Mr. Parsons did not independently review the evidence and reach his own conclusion on the matter.

WBC alleges that before termination, Mr. Parsons had met with WBC and stated that he did not know anything about the project and that he would look into WBC's concerns. WBC alleges, however, that Mr. Parsons was already considering termination. As pointed out in the analysis under Subpart 3, this is simply not true. Mr. Parsons fielded a call from WBC on November 2, 1998. On November 3, 1998, Mr. Parsons met with Mr. Clevenger, Julie Clevenger, Tom Hildreth, and Mr. Crockett. Mr. Hildreth promised to visit the project and see what was happening. Mr. Parsons did not begin to consider termination until after November 5, 1998, after Mr. Hildreth had come back from the project and recommended termination.
WBC alleges that Mr. Parsons stated that Mr. Rettinger had a reputation for being "vicious." I have not been able to verify whether Mr. Parsons in fact stated this. However, I note that when Mr. Clevenger asked Mr. Lofgren of Mr. Rettinger's reputation, Mr. Lofgren replied that he was held in very high esteem in the office, that he was considered to be an outstanding project engineer, an "excellent project engineer." In any event, it is not the reputation, but the actions that determine whether the Government has violated a covenant of good faith and fair dealing, or has acted in bad faith. I do not find that either Mr. Rettinger, or the Government, violated that covenant or acted in bad faith in terminating the contractor.

I further note that besides the problems with MP 46.2, there was also a culvert at MP 47.07 to MP 47.25 that had to be installed and the road completed up to subgrade by November 30, 1998. SCR 108.01; Plan Sheets B1-B2, E1. This culvert was in the wetted perimeter. Tr, Clevenger, 458:3-17. WBC never did any work on this culvert. When asked what actions he had taken to complete that culvert, Mr. Clevenger stated: "I forgot about it." Tr, Clevenger, 459:11-16. The culvert was never even delivered to the site. Tr, Clevenger, 459:17-460:14.

## DECISION – SUBPART 7

Based upon the above analysis, I do not find facts that support WBC's allegations. There is no basis for concluding that Mr. Parsons' decision to terminate was not his own decision, nor do the fact support that Mr. Parson's was duplicitous when telling WBC on November 2, 1998 that he did not know anything about the project and his beginning to contemplate termination sometime after November 5, 1998, based on a recommendation by project personnel in the office. In any event, I find that there was ample basis for concluding that WBC was not prosecuting the work in a manner that would allow it to complete the work on time, and in fact, WBC's approach to the work was disjointed and shoddy at best. I find no bad faith in the termination actions of the Government.

# SUBPART 8

## The Government Refused to Let the Contractor Fix the Slide at MP 47.25

### CLAIM SUMMARY – SUBPART 8

WBC claims that the Government would not allow them to repair a slide at MP 47.25 that they contend was caused by heavy rains and an over-steep design. By not allowing them to correct the problem, they allege the slide continued to grow until it eventually resulted in a small slide onto FDR 33. Immediately following the termination, the interim Contractor, Kerr Contractors, was brought on to perform corrective action at this site, at a substantial cost to WBC.

### FINDINGS OF FACTS – SUBPART 8

On Wednesday, November 11, 1998, WBC notified the Government that it had noticed the slope at MP 47.25 was cracking and starting to slide.

On November 12, 1998, the Government sent a letter to WBC stating that they would be reviewing the slide and would inform WBC of what action should be taken.

On November 12, 1998, a Government inspector looked at the site and noticed that a large area of the cutslope at MP 47.25 was starting to slide.

On November 18, 1998, a meeting was held at the site to determine what to do about the slide. Among the attendees were Mr. McAlpine and Ms. Mickley of the Forest Service, and Mr. Aftab, Mr. Rettinger and Mr. Lofgren of the Government. The decision was made that the sliding material had to be excavated and a rock blanket needed to be placed to alleviate the problem. However, the redesign of the site was not performed until February or March of the following year, as stated above in Subpart 6.

On November 19, 1998, WBC made no mention of MP 47.25 in its Contractor daily and notes no activity taking place at that site. On that day, WBC had eight persons on site, with three of them working less than 2 hours each. WBC worked that day at MP 46.7 digging out material, drilling, and blasting rock, and at MP 0.61. On Friday, November 20, 1998, WBC had one laborer spend one hour cleaning the ditches at MP 47.25. WBC had a total of four persons on the site and they all worked four hours, mostly at MP 46.7.

On Saturday, November 21, 1998, and Sunday, November 22, 1998, WBC performed no work at the site, except to repair the plastic lining at MP 46.2 and remove some slide material at MP 47.25. WBC spent only 2 hours, each day, on the project site. On November 22, 1998, WBC sent the Government an email noting that the material was continuing to slide and that WBC had to remove the material to get to the project.

On November 23, 1998, WBC put in a letter that it needed to continue removing the material in order to have access to the project.

On that same day, November 23, 1998, WBC sent a message to Mr. Aftab that a slide had come down at MP 47.25 and blocked the road. WBC also called Mr. Crockett and noted that there

were high winds and saturated material that made working hazardous. WBC did not work that day.

On the next day, November 24, 1998, WBC only had its quality control person and one laborer on site for 1 hour and they inspected erosion control. They attempted no work on the project. On the following day, November 25, only the quality control person and the superintendent were on the project, each for one hour. The visually inspected the site at MP 46.7 and decided to leave the situation alone. No work was done on November 26, which was Thanksgiving Day. The next work done on the project was done on November 30. On that day, only the Superintendent was on the site. He stated that he attempted to move some of the material at MP 46.7, but then called Mr. Aftab and Mr. Rettinger. They told him to leave the site alone because of safety reasons, until he came up the following day to look the situation over.

On the following day, WBC was terminated.

## ANALYSIS – SUBPART 8

WBC alleges that the Government refused to address the slide and that Mr. Rettinger instructed WBC in writing not to repair the slide. I have not been able to find any evidence, other than WBC's statement, that Mr. Rettinger directed WBC not to repair the site.

The facts show that the Government was made aware of the slide on November 11, 1998. On November 13, 1998, the Government sent WBC a cure notice. On November 18, 1998, Government personnel met at the site with Mr. Lofgren, the Government's geologist, and with Ms. Mickley, the Forest Service geologist. They determined on that day how to address the slide. From November 19, 1998 to the date of termination, WBC performed very little work on the project, and spent less than 5 hours total working at the site to remove material. If the Government had issued a change order in relation to the site, it is not likely that WBC could have accomplished the work, given the scarcity of work that WBC otherwise accomplished during that time period.

Based on the above, I conclude that the slide had only minor impact on WBC's operations. Further, the Government did not have a redesign of the site at any time prior to WBC's termination. Finally, with the situations at MP 46.7 and 46.2, it was evident that the road could not be opened until the following year in any event. Given these facts, it was not a breach of the covenant of good faith and fair dealing, nor was it bad faith, for the Government not to offer this work to WBC.

WBC alleges that the Government would not let WBC do the emergency repairs at this site, but after the termination had Kerr Contractors do the emergency work at substantial expense to WBC. I have not been able to find any evidence that the Government made a conscious decision not to have WBC do emergency work at this site. However, given WBC's failure to install the culvert at MP 46.2, its failure to install the culvert at MP 47.07 to 47.25, and the small amount of work WBC was able to accomplish during the period from November 19 to December 1, 1998, the Government, if it had made such a decision as alleged by WBC, was not without reason to believe that asking WBC to repair the slide was not a good idea. Once WBC was terminated, the Government had a right to look to another contractor to do this work.

Finally, I note that the Government has reimbursed WBC for the expenses attributed to this work.

### DECISION – SUBPART 8

Based on the above facts, I do not find any evidence that would support bad faith on the part of the Government concerning the repair work at MP 47.25.

# SUBPART 9

## The Government Failed to Compensate WBC for Its Work

### CLAIM SUMMARY – SUBPART 9

WBC asserts the Government failed to make any payments to WBC prior to termination for the work performed over the course of four months. Once payment was made, it was for less than half the amount of the payments approved by Mr. Aftab prior to the termination. They also claim the Government failed to compensate them for significant quantities of extra or additional work, some of which was covered under contract modification.

### FINDINGS OF FACTS – SUBPART 9

1) **Payments to WBC**

a) **Contract FAR Clauses**

The contract included FAR Clause 52.232-5, Payments under Fixed-Price Construction Contracts (May 1997) and FAR Clause 52.232-27, Prompt Payment for Construction Contracts. The contract also included FAR Clause 52.222-7, Withholding of Funds (February 1998), which required the contracting officer to withhold funds to ensure payment to laborers and mechanics.

b) **Standard Specifications (FP-96) and Special Contract Requirements**

The contract included the following Standard Specifications in accordance with the *Standard Specifications for Construction of Roads and Bridges on Federal Highway Projects* (FP-96) as amended by the *Special Contract Requirements* (SCR) applicable to this Subpart: Section 109.- Measurement and Payment. The excerpt from subsection 109.08 relating to Progress Payments is included below for reference.

**109.08 Progress Payments.** Delete the text of this Subsection and substitute the following:

FAR Clauses 52.232-5 – Payments under Fixed-Price Construction Contracts and 52.232-27 – Prompt Payment for Construction Contracts are supplemented as follows.

**(a) General.** Only invoice payments will be made under this contract. Invoice payments include progress payments made monthly as work is accomplished and the final payment made upon final acceptance. Only one progress payment will be made each month. No progress payment will be made in a month when the work accomplished results in a net payment of less than $1,000. Partial progress payment will be withheld according to Section

155 until a construction schedule or schedule update is submitted to and accepted by the CO.

**(b) Closing date and invoice submittal date.** The closing date for progress payments will be designated by the CO. Include work performed after the closing date in the following month's invoice. For work performed between September and July of any year, submit invoices to the designated billing office by the 7th day after the closing date. Invoices received by the designated billing office after the 16th day following the closing date, for work included in the September through July invoices, will not be accepted for payment processing that month. For work included in the August invoice, submit the invoice to the designated billing office by the 5th day after the closing date. Invoices received by the designated billing office after the 5th day following the closing date, for work included in the August invoice, will not be accepted for payment processing that month. Include late, unprocessed invoice submittals in the following month's invoice.

**(c) Government's Receiving Report.** The Government's receiving report will be developed using the measurement notes received and accepted by the CO according to Subsection 153.04A. Within 4 days after the closing date, the CO will be available by appointment at the Government's project office to advise the Contractor of quantities and unit prices appearing on the Government's receiving report.

**(d) Invoice requirements.** Submit two copies of the invoice to the government's designated billing office. Include the following items in the invoice:

**(1)** The information required in FAR Clause 52.232-27(a)(2)(i) through (a)(2)(x).

**(2)** A tabulation of total quantities and unit prices of work accomplished or completed on each pay item as of the monthly closing date. Do not include any quantities unless field note documentation for those quantities was submitted by the closing date. Do not include any work involving material for which test reports required under Sections 153 or 154 or certifications required by Subsection 106.03 are past due as of the closing date.

**(3)** The certification required by FAR Clause 52.232-5(c) and, if applicable, the notice required by FAR Clause 52.232-5(d). Provide an original signature on the certification. Facsimiles are not acceptable.

**(4)** If applicable, a copy of the notices that are required by FAR Clause 52.232-27(e)(5) and (g).

**(5)** The amount included for work performed by each subcontractor under the contract.

**(6)** The total amount of each subcontract under the contract.

**(7)** The amounts previously paid to each subcontractor under the contract.

**(8)** Adjustments to the proposed total payment which relate to the quantity and quality of individual items of work. Adjustments for the following may be made by the Government after validation of the invoice:

*(a)* Retent resulting from a failure to maintain acceptable progress.

*(b)* Retent resulting from violations of the labor provisions.

*(c)* Retent pending completion of incomplete work, other "no pay" work, and verification of final quantities.

*(d)* Obligations to the Government such as excess testing cost or the cost of corrective work pursuant to FAR Clause 52.246-12(g).

*(e)* Liquidated damages for failure to complete work on time.

**(d) Government's receiving report.** The Government's receiving report will be developed using the measurement notes received and accepted by the CO. Within 4 days after the closing date, the CO will be available by appointment at the Government's designated billing office to advise the Contractor of quantities and unit prices appearing on the Government's receiving report.

**(e) Processing progress payment requests.** No payment will be made for work unless field note documentation for the work was provided by the closing date.

**(1) Invoices received by the 7th day following the closing date.**

*(a) Proper invoices.* If the invoice meets the requirements of Subsection 109.08(c), and the quantities and unit prices shown on the contractor's invoice agree with the corresponding quantities and unit prices shown on the Government's receiving report, the invoice will be paid.

*(b) Defective invoices.* If the invoice does not meet the requirements of Subsection 109.08(c), or if any of the quantities or unit prices shown on the contractor's invoice exceed the corresponding quantities and unit prices shown on the Government's receiving report, the invoice will be deemed defective and the Contractor so notified according to FAR Clause 52.232-27(a)(2). Defective invoices will not be corrected by the Government and will be returned to the contractor within 7 days after the Government's designated billing office receives the invoice.

Revise and resubmit returned invoices by the 18th day following the closing date. The CO will evaluate the revised invoice. If the invoice still does not meet the requirements of Subsection 109.08(c), the contractor will be so notified according to FAR Clause 52.232-27(a)(2), and no progress payment will be made that month. Correct the deficiencies and resubmit the invoice the following month.

If the revised invoice meets the requirements of Subsection 109.08(c), but still has quantities or unit prices exceeding the corresponding quantities and unit prices shown on the Government's receiving report, the Government's data for that item of work will be used. The contractor's invoice, as revised by the Government's receiving report, will be forwarded for processing by the 23rd

day following the closing date. The contractor will be notified by the 23rd day following the closing date of the reasons for any changes to the invoice.

**(2) Invoices received between the 8th and 16th day following the closing date.**

*(a) Proper invoices.* If the invoice meets the requirements of Subsection 109.08(c), and the quantities and unit prices shown on the Contractor's invoice agree with the corresponding quantities and unit prices shown on the CO's receiving report, the invoice will be deemed proper and forwarded for processing within 7 days of receipt.

*(b) Defective invoices.* If the invoice does not meet the requirements of Subsection 109.08(c), the invoice will be deemed defective, the Contractor so notified according to FAR Clause 52.232-27(a)(2), and no progress payment will be made that month. Correct the deficiencies and resubmit the invoice the following month.

If the invoice meets the requirements of Subsection 109.08(c), but has quantities or unit prices exceeding the corresponding quantities and unit prices shown on the Government's receiving report, the Government's data for that item of work will be used. The contractor's invoice, as revised by the Government's receiving report, will be forwarded for processing within 7 days after receiving the invoice. The contractor will be notified, within 7 days of the Government's receipt of the invoice, of the reasons for any changes to the invoice.

**Section 155 – SCHEDULES FOR CONSTRUCTION CONTRACTS**

(Text Omitted)

**155.02 General.**

(Text Omitted)

No progress payment will be made for any work until a construction schedule has been submitted to the CO and accepted by the CO.

**155.06 Schedule Updates.**

(Text Omitted)

No progress payment will be made for any work until an updated construction schedule has been submitted to and accepted by the CO.

2) **Invoice related submittals**

a) **Correspondence**

On October 2, 1998, the Government sent a letter to WBC in regards to the non-compliance with the contract requirements for providing a CPM and failure to furnish certified payrolls. The letter states the following:

FHWA has not received your construction schedule. Reference Subsection 155.02 General "Submit 3 copies of the construction schedule within 30 days after the notice to proceed is issued." The notice to proceed was issued on September 1, 1998. Your CPM was due on October 1, 1998.

You are not in compliance with the contract requirements.

Your continued non compliance with contract requirements such as:

- Failure to provide daily records within the time frames set forth in the contract,
- Failure to compete the traffic control signing and installation of the gates,
- Failure to provide the CPM,
- Furnishing notification is complete and your quality control review performed, when it is found to be incomplete and in error,
- Failure to furnish subcontractor forms,
- Failure to furnish certified payrolls,
- Failure to immediately clean up oil spills until told to do so by FHWA staff,
- Failure to furnish records on completed work within the time frames set forth in the contract.

These deficiencies are causing serious problems with this project and are unsatisfactory.

FWHA does not want to suspend operations and withhold progress payments. It is our mutual goal to complete the project within the time frames for the work. Continued non-compliance will leave FHWA little choice except to take such drastic action.

FHWA expects to receive your CPM within the next 24 hours.

On October 6, 1998, the Government issued another letter to WBC identifying a number of deficiencies on the project, including deficiencies in the CPM and again reiterating the Contractor's failure to furnish the certified payrolls. This letter concludes with a statement regarding the potential impacts to the progress payments as, "Progress payments can not be made until the certified payrolls are complete and up to date. Please resubmit an updated CPM construction schedule to this office immediately. No progress payment will be made for any work until an updated construction schedule has been submitted to and accepted by the CO. Reference Subsection 155.06 of the Special Contract Requirements (SCRs)."

On October 12, 1998, the Government sent another letter to WBC regarding the need for pay notes in order to make payment, as pay notes become the documentation to support progress estimate invoices.

**b) Invoice Submittal #1**
On October 13, 1998, the Government received the first invoice from WBC for work performed in September. This invoice included items and quantities that were not supported with documentation, did not follow the contract method of measurement and payment, did

not contain the subcontractor information required by the contract, and the certification provided deviated from the FAR prescribed language.

On October 14, 1998, the Government deemed the invoice defective in a letter to WBC. This letter stated the following:

> We are in receipt of your Submittal for Progress Estimate No. 1, received today on the project site by the Project Engineer.
>
> Your submittal does not comply with the contract requirements for progress estimate. You are referred to Subsection 109.08(d) of the Special Contract Requirements. The invoice is deemed defective for the following reasons:
>
> 1. Quantities are not supported with documentation.
> 2. The invoice does not show support for mobilization, survey & staking, testing, construction schedule per the contract method of measurement and payment.
> 3. The invoice does not contain the subcontractor information.
> 4. The invoice does not have the required certification (FAR 52.232-5)
>
> FHWA has provided you with a sample progress estimate submittal. FHWWA has met with you on several occasions to provide specific clarification on the contract requirements. FHWA remains available to meet with you at the Governments office, by appointment, to discuss your re-submittal.
>
> All items for payment on any invoice must be supported by field note documentation, as required under Section 153.
>
> FHWA still has not received your updated CPM construction schedule for approval. Progress payment can not be made until you have complied with Subsection 155.06 Schedule Updates as prescribed in the Special Contract Requirements.

**c) Additional non compliance correspondence**

On October 20, the Government finally received a construction schedule sent by WBC asking that it be accepted as the baseline schedule. It was reviewed by the Government and accepted as a baseline schedule in a letter dated October 23, 1998. This letter indicated WBC was still expected to submit the updated schedule. Under the contract, an updated schedule was due every four weeks, when a delay occurs in the completion of a critical activity, when a delay occurs which causes a change in the critical path, when the actual prosecution of the work is different from that represented on the current construction schedule, or when there is a change in schedule logic. FP-96, subsection 155.06.

The Government sent a letter to WBC on October 22, 1998 identifying discrepancies in the certified payrolls #1 through #4 covering the work period from August 31, 1998 to September 27, 1998. These discrepancies were serious. Repeatedly, laborers shown as working on the dailies or in the miscellaneous pay tickets were not paid on the certified payrolls, or were paid for substantially less hours than shown. This happened on August 31 through September 6, September 14, 15, 16, 17, 18, 21, 23, 24, 25, 26, and 27. In some instances, WBC showed more hours of pay to the employees than what was shown in the project records. This happened on September 16, with two employees on September 17, with three employees on September 18, with two employees on September 22, with four

employees on September 23, with three employees on September 24, and with two employees on September 25. The Government in its letter also noted that the Government had not received certified payrolls from the rock drilling subcontractor. The letter states, "Immediate resolution of these discrepancies and timely reporting of your certified payroll in the future is required. Failure to rectify these matters will result in withholding of progress payments and the matter will be referred to the Department of Labor." This letter identified in excess of 60 specific deficiencies with the certified payrolls submitted by WBC. Many of the deficiencies related to the number of hours shown on the Contractor daily not matching the number of hours the employees were paid for on the certified payrolls.

On that same day, October 22, 1998, the Government received WBC's amended payroll # 5. That payroll had similar discrepancies, appearing to substantially underpay employees on September 28, 29, 30, October 1, 2, 3, and 4.

On October 29, 1998, the Government received WBC's payroll #s 6 & 7. These payrolls continued with similar discrepancies, appearing to substantially underpay employees on October 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, and 16.

On November 3, 1998, the Government sent another letter to WBC informing them that their schedule update had still not been received by the Government. Again, it referenced subsection 155.06 Schedule Updates and previous correspondence.

On November 3, 1998, WBC faxed a single copy of an updated construction schedule, but the faxed copy was illegible with respect to the diagram. There was no way of determining logic or critical path on the submitted schedule.

On November 4, 1998, the Government sent a letter to WBC in regards to the faxed copy of the construction schedule update. The letter noted that the fax as received was illegible and could not be reviewed. This letter references a phone conversation with WBC to discuss the need for readable schedule submissions.

The revised updated narrative and schedule were received on November 6, 1998 from WBC. This schedule was woefully inaccurate and inconsistent as an updated schedule. For instance, in its diagram (critical path) submission, it showed the culvert at MP 46.2 as being installed by October 5, 1998, and the headwall at that site being finished by October 29, 1998. The culvert had not been installed by October 5, 1998, and was never completely installed by WBC. The headwall had not even been started. In the narrative portion of the schedule, WBC noted that the culvert was not yet installed and stated that the headwall would take 13 days to be installed in 1999, a statement more realistic but that contradicted its graphic chart. The diagram showed that it would take only 7 days to install the headwall. The narrative stated nothing about how long it would take to place the riprap at MP 46.2. The diagram stated that it would take 7 days, but showed a late finish of October 22, 1998, a date long past by the November 6, 1998 submittal.

By November 9, 1998, WBC had not responded to the Government's October 22, 1998 letter concerning payroll submission problems. On that date, the Government sent another letter to WBC, detailing a list of over 80 discrepancies in the more recently submitted Certified Payrolls. The letter states, "This matter will now be turned over to the Dept. of Labor for resolution."

In a letter dated November 10, 1998 from the Government to WBC in regards to the updated construction schedule, the Government again deemed the schedule as "not acceptable." This letter identified the following deficiencies:

1. Fails to show finish dates of completed activities.
2. Fails to show remaining durations of uncompleted activities.
3. Fails to show how the critical path is changed by any delays.
4. Fails to show impacts due to change in schedule logic.

**d) Invoice Submittal #2**

The second invoice submittal was made during a meeting held on November 12, 1998 between the Government and WBC. This was the last invoice WBC submitted during the course of the contract. At this meeting, the Government spent a considerable amount of time working with WBC to get sufficient documentation for an acceptable invoice. The Government quantities and support tickets were reviewed, one by one, with the Government generating and signing most of the missing tickets.

In a letter dated November 17, 1998 from the Government to WBC, the Government iterates resolution of a pay item issue with payment on the 2250 mm culvert at MP 46.2 and Energy Dissipator. That letter also referenced the meeting on November 12, 1998 where the Government assisted WBC with its estimate. The letter states, "WBC still did not have an acceptable invoice. The quantities and support tickets were reviewed one by one, and the Government generated and signed most of the missing tickets at that time. These tickets will bear the stamped date of November 12, 1998. Subcontractor and supplier information was not complete. The estimate was returned to WBC for re-submission. The Government again furnished WBC with a sample estimate to use. The Government spent 4 hours going over the quantities and requirements in order to assist WBC. In addition, WBC still has not provided the required updated schedule. Payment can not be made until that schedule has been received and accepted. Finally, certified payroll problems have not been resolved by WBC. That matter has been referred to the US Dept. of Labor."

Due to WBC's failure to respond to the issue regarding the Certified Payrolls, a letter was written to the Department of Labor on December 8, 1998 to reflect the discrepancies mentioned above. The issues with the certified payrolls were substantiated by discussions with WBC's former office clerk, Ms. Nancy Roger. As stated in the letter from the Government to the Department of Labor, "Additionally, the Government was contacted by Ms. Nancy Roger, former office clerk for White Buffalo at the Powers project office. Mrs. Rogers indicated to me that she had witnessed Luther Clevenger changing payroll records/time cards for employees."

**3) Payment following Termination for Default of WBC**

By letter dated December 4, 1998, the surety requested that no funds be paid to WBC, but that all funds be held as trust funds for the surety to cover payments for outstanding labor or material suppliers, as well as potential completion costs.

In June, 1999, ICW was paid $102,371 by the Government, based on the estimated unpaid earnings of $202,371. The contract had a provision for interim liquidated damages to be assessed for each day beyond January 23, 1999 that repair work on all sites on FDR 33 was not complete for public traffic under subsection 108.04 of the SCRs. Pursuant to that provision, the

Government assessed $100,000.00[18] based on the projection of interim liquidated damages from January 24, 1999 through September 30, 1999.

**4) Payment following Conversion to Termination for Convenience**
After converting the Termination for Default to Termination for Convenience, the Government remitted the interim liquidated damages to WBC. On February 2, 2004, it was paid $100,000 for the withheld interim liquidated damages, plus $22,766.10 for interest calculated in accordance with the Contract Disputes Act.

## ANALYSIS – SUBPART 9

WBC contends that the Government failed to make any payments to WBC for its work before termination "(a period of four months)." From the notice to proceed on September 1, 1998 to the termination on December 1, 1998 is only three months. During that time period, WBC submitted two invoices, one on October 13, 1998 and one on November 12, 1998. Prior to the October 13, 1998 invoice, the Government had provided WBC a sample invoice and had repeatedly raised the issue of not providing support documentation for work performed, problems with payroll, and failure to provide schedules. Despite the Government's repeated attempts to obtain some measure of contract compliance from WBC, WBC continued to fail badly on its submissions. WBC continued to submit payrolls with major discrepancies between hours shown as worked on Contractor daily reports and payments made to laborers. WBC failed to provide a base-line schedule by October 1, 1998, as required by the contract, and did not supply one until October 29, 1998. WBC failed to submit an acceptable schedule update, and its one attempt was substantially inaccurate and failed to show a critical path the corresponded to the change in WBC's operations at MP 46.2 and MP 46.7.

Further, the invoices submitted did not comply with the contract requirements, despite the Government's examples and the Government's efforts to work with the contractor to bring the invoices into compliance. The Government cannot pay on invoices that do not have supporting documentation. There is a reason why the Government began communicating early with WBC about the need to get the support tickets submitted. WBC appears to have ignored the Government's plea.

The contract provided that payment would not be made if there was not a proper invoice and if there was not a proper schedule update submitted. WBC, at no time, presented either. The problems with both the invoices and the schedule update were not minor. They failed in the essence of why such submissions are even required. This was despite the Government's efforts to assist WBC with these documents.

Whatever the case, without a contractually acceptable schedule update and invoice, no funds were due under the contract. The lack of payment to WBC during the contract duration was what was required under the contract, and stemmed solely from WBC's failure to meet the payment terms of the contract. This was not bad faith on the part of the Government. If there was a contract breach, it was on the part of WBC, who repeatedly and substantially failed to provide the Government with the work required under the contract.

[18] 250 days x $400 per day = $100,000

WBC alleges that the sole payment allowed was less than half the amount that had been approved by Mr. Aftab prior to termination. As stated previously, actions that occurred after the contract termination cannot support a bad faith breach of the contract.

Further, the Government fully paid for all items under the contract to the surety or to the completion contractor. This was what the Government was obligated to do following termination. Any additional costs, above what the Government paid for the work, was the responsibility of WBC under a termination for default. If the Government's completion contractor had unreasonable prices, that fact would serve to reduce WBC's exposure to liability. In this situation, however, it was not the Government, but the surety, that selected the completion contractor and entered into a contract with the completion contractor. As part of the agreement, the Government paid to the surety and the completion contractor the full cost of the contract, minus the liquidated damages. Whether WBC or the completion contractor did the work did not affect the fact that the Government owed the funds to the surety, not WBC, upon the default and the surety's agreement to take over the project. I find no basis for concluding that the Government acted in bad faith towards WBC by paying the surety and the completion contractor.

WBC claims that it was required to do extra work for MP 46.7 for which it was not paid, even though the Government already had redesigned the work at the site and decided to pay the completion contractor for this work. Again, the facts do not support this allegation. As noted Subpart 6 above, there was no redesign of MP 46.7. The Government added work outside of the project limits by contract modification 001 to the completion contractor, but this work was not designed until February or March, 1999. It was not designed at any time during WBC's contract. Further, the major problem for WBC at MP 46.7 was not the overburden, but the poor blast and the remaining overhanging rock. I do not see this work as being additional work, but rather was work within the contract requirements. The overburden did not become a major problem until the rains arrived in November. Tr, Clevenger, 625:7-626:9. Any significant additional work was after the rains arrived. However, as noted above, upon notification by the surety, any payment for such work was due the surety, not WBC. Thereafter, the work to clean up the falling overburden could be seen as additional work. Ultimately, however, once the contract was terminated, any amounts due WBC for that work became due the surety. The Government fully satisfied its obligations to the surety.

Finally, I note that upon converting the termination for default to one for convenience of the Government, the Government takes on itself the responsibility for all costs reasonably expended by WBC in performance of the work. Such costs will be paid under this decision.

I do not find the decision to pay the surety and the completion contractor all funds owed under the contract was made in bad faith.

## DECISION – SUBPART 9

Based upon the above analysis, I conclude that there was no bad faith on the part of the Government in not paying WBC and in making payment to the surety and to the completion contractor. Payment to WBC was never owed under the terms of the contract. After the surety takeover, payment thereafter was owed to the surety and to the completion contractor. There is no evidence of bad faith in the decisions made by the Government not to pay WBC and to pay the surety and the completion contractor. I conclude that the Government did not act in bad faith with respect to these allegations.

# SUBPART 10

## The Government Improperly Paid the Completion Contractor

### CLAIM SUMMARY – SUBPART 10

WBC claims the Government paid the completion contractor for substantial work that was never performed, which resulted in substantial additional and unnecessary cost to WBC and its surety.

### FINDINGS OF FACTS – SUBPART 10

**1. Survey Report Comparing Design Plan to As-Constructed**
As part of their overall claim, WBC provided *Survey Report Comparing Design Plan to As-Constructed* written by Landmark Surveying, Inc. based on their re-survey performed around November, 2002 at the request of WBC. This report reflects their findings of the various construction sites comparing the original design as bid by WBC to the work performed by the completion contractor. The report is summarized as follows:

Road 33. Site MP47.07—47.25

Review of the site reveals slide repair and placed riprap from Sta. 0+320 to 0+350. The attached detail shows differences between the design and the final construction in this area. Although there is insufficient information to determine actual amount of material removed to repair the slide and accommodate riprap placement, it is obvious that substantial quantities were moved. The entire area has been laid back to flatten the cut slope. This area also included slope rounding while the remainder of the site did not.

The remainder of the area appears to conform substantially to the construction drawings. Original survey stakes and clearing flagging were found with no evidence of additional surveying.

Road 33. Site MP46.75

The notable difference is the additional riprap 0+105 to 0+180 right. There is no slope rounding on cut slopes or evidence of additional surveying within the site.

Road 33. Site MP 46.7 (Rock Cut)

Discrepancies include the omission of the fallout area under the rock cut as shown on the construction drawing detail. The quantity of material that was not removed to accommodate the fallout is approximately 2226 cubic meters. The site is substantially larger than the limits on the design. The large rock over hang that appears to be unstable was always intended to be outside the cut.

Road 33. Site MP 46.2 (2250mm Culvert)

Culvert was generally built according to plan with the largest discrepancy being 60mm (2-1/2 inches) with some high and some low. Any additional excavation due to the differences in grade is negligible and should average out. The length of culvert exceeds that shown on the construction drawings. The excavation of material to accommodate the additional length cannot be determined due to insufficient data on the original ground

prior to construction. Visual inspection of the inside of the culvert reveals large gaps at some of the seams.

Road 3347. Site 0.43 — 0.46

There are substantial differences between the design drawings and the constructed roadway. The road appears to be in the original location with an asphalt overlay raising the grade. Additional riprap was added on the lower side protecting the roadbed from creek erosion and within the limits of an apparent slide on the uphill side of the road. The quantities of the placed riprap or required excavation to accommodate the riprap were not considered under the scope of this report. Materials not removed in this section include 1118 cubic meters of excavation and approximately 0.23 hectares of clearing. Evidence of the original staking including site stakes and clearing flagging remain. There is no evidence that the revised roadway was surveyed.

**2. Amended Quantities for Completion Contract**

Following the termination of the contract with WBC, the completion contract was tendered to TCI to complete the remainder of the work not completed under the original contract. Under Amendment A003 several of the item quantities in the completion contract were amended to reflect the quantities performed by WBC for the completion contractors to properly bid on the remaining work.

The items amended in the completion contract are included below with the original contract quantities shown to reflect the work performed by WBC under their contract:

| Amend Code[19] | Item No. | Description | Original Contract Quantity | Amended Quantity (Completion Contract) | Difference |
|---|---|---|---|---|---|
| 3c | 15201 | Construction Survey and Staking | $23,000 Lpsm | $23,000 Lpsm | $0.00 |
| 3a, 3c | 15703 | Silt fence | 1,200 m | 519 m | -681 m |
| 3a | 15708 | Bales, straw | 100 ea | 60 ea | -40 ea |
| 3c | 15718 | Diversion Channel | 160 m | 160 m | 0 |
| 3a | 20101 | Clearing and grubbing | 1.1 ha | 2 ha | +0.9 ha |
| 3a | 20401A | Roadway Excavation | 17,000 m3 | 12,330 m3 | -4,670 m3 |
| 3a, 3c | 20401B | Roadway Excavation (MP 46.7) | 7,600 m3 | 5,141 m3 | -2,459 m3 |
| 3b | 60201D | 2250 millimeter pipe culvert extension (CM 001) | (added by CM 001) | Lpsm | Same |
| 3c | 61902 | Gate | 1 ea | 1 ea | 0 |
| 3a | 62201B | Hydraulic excavator | 40 hours | 100 hours | +60 hours |
| 3a | 62201C | Loader/Backhoe | 24 hours | 20 hours | - 4 hours |
| 3a | 62201D | Tractor, crawler (dozer) | 16 hours | 12 hours | -4 hours |
| 3a | 62201E | Truck | 24 hours | 20 hours | -4 hours |
| 3a | 62301 | General Labor | 50 hours | 42 hours | -8 hours |
| 3b | 62503 | Seeding | 16 slry units | 17 slry units | +1 slry unit |
| 3b | 62506 | Mulching | 16 slry units | 17 slry units | +1 slry unit |

[19] 3a = Quantity adjusted for work performed;
3b = Revised by CM 001;
3c = Corrective work required

**3. Contract Modification 001 (Completion Contract)**
After the completion contract was awarded, the Government entered into Contract Modification 001 with the completion contractor to reflect several changes to the contract as required addressing additional landslides that occurred over the course of the winter. This modification was executed by both parties as of June 25, 1999. The items changed under the contract include the following:

1. Additional excavation and disposal of material above the rock cut at Mile Post 46.7 on the FDR 33 road.
2. Additional excavation and disposal of material at Mile Post 47.25 on the FDR 33 road.
3. Disposal of excavated rock material, into the rock chute, below the rock cut and wall at Mile Post 46.7 on the FDR 33 road.
4. Placement of riprap to stabilize the roadway at Mile Post 0.43 thru 0.46 on the FDR 3347 road.
5. Removal and disposal of minor slide material in the ditches on FDR 33 road.
6. Re-shaping and compaction of previously dumped material at the disposal site off the FDR 3347 road.
7. Revision of the work restrictions listed under Subsection 108.01 of the Special Contract Provisions.

The contract modification specifically states "All work shall be in accordance with the specifications under the contract or as specifically addressed in this agreement."

This modification incorporated the design changes to the sites at MP 46.7 and 47.25 on FDR 33 and MP 0.43 thru 0.46 on FDR 3347. All work at these sites was specified to be performed under Section 622, Rental Equipment, as each item was added to the list of anticipated work under subsection 622.01.

4. **Site Specific Work**

**1. Road 33, Site MP 47.07—47.25**
Corrective work at this site was defined under Contract Modification 001 of the completion contract. The issues identified in the report by Landmark Surveying for Road 33, Site MP47.07—47.25 are consistent with the modification as it states, "Additional excavation and disposal of material at Mile Post 47.25 on the FDR 33 road." The corrective repair work is included on Contractors daily reports and applicable Section 622 pay item notes for September 16, 1999 thru September 29, 1999. The pay notes identify the work as "placing "rock borrow" on the corrected slope at FDR 33, MP 47.25," or similar.

**2. Road 33. Site MP 46.75**
At this site, additional riprap installation was installed to correct slope failures at this site. There are pay item tickets under Section 622 for work to perform this corrective work from September 14, 1999 to September 20, 1999.

**3. Road 33. Site MP 46.7 (Rock Cut)**
As discussed above, there was a new design for work beyond the construction limits at the MP 46.7 site on FDR 33. The new design was incorporated into Contract Modification 001 of the completion contract.

The Government performed a survey of the site after the termination. In April, 1999, Ms. Chon used this data to calculate the remaining excavation quantities at the sites WBC had worked. According to this calculation, 5,043 cubic meters of roadway excavation still needed to be removed. Subtracting this from the original contract quantity of 7,502 cubic meters reveals that WBC had only completed 2,459 cubic meters.

The report generated by Landmark Surveying, Inc. calculates the quantities for the portion of work performed adjacent to the roadway section and does not take into account any of the excavation performed above the point where the "design" limits cross the "as-built" limits. Since Landmark Surveying did not have the original ground information, to include in Landmark Surveying's analysis, the program is unable to calculate the quantities relative to the total work performed.

Based on the Government's cross sections at this location, the total quantities are as follows:

**a. Original Quantity (Item 20401B, Roadway Excavation (MP 46.7)):**
Original Excavation Quantity: 7,502 cubic meters
Actual work performed by WBC based on re-survey: 2,459 cubic meters[20]

**b. Revised Quantity (Item 20401B, Roadway Excavation (MP 46.7)):**
Revised Excavation Quantity: 5,043 cubic meters
Quantity paid to TCI: 5,043 cubic meters[21]

**4. Road 33. Site MP 46.2 (2250mm Culvert)**
The length of culvert at MP 46.2 represents the additional length of culvert pipe installed in accordance with Contract Modification 001 from the original contract. This Contract Modification became part of the completion contract by inclusion under Amendment No. A003. TCI was paid for 40 meters of pipe as required under the original contract, and subsequently paid $2000.00 for the culvert extension as required under the Contract Modification.

**5. Road 3347. Site 0.43 - 0.46**
As identified in Landmark Survey, Inc.'s report, this site experienced a slide that required additional work. To correct this slide, Contract Modification 001 of the completion contract added the following work: Excavate slide material, haul to waste, and replace with Class 5 riprap. The quantity in Landmark Surveying, Inc.'s report for this site is 1,117.919 cubic meters, and the quantity of riprap as identified in the revised design is estimated at 1,106 cubic meters.

## ANALYSIS – SUBPART 10

I have looked at all of the sites contained in the survey report provided by WBC. It appears, if the survey is correct, that the completion contractor did not remove as much material at MP 46.7 as was required by the contract. The Government has not independently verified the survey data.

[20] Work performed by WBC based on comparing Original topography with re-survey results. Results based on comparison of earthwork quantities between original survey and post termination survey.
[21] Quantity paid to the completion contractor was based on Plan Quantity, as actual measurements were not performed.

Nor have I have not found any evidence that there was substantial work elsewhere on the project that was not performed.

While this issue may have been a reason to reduce payments to the completion contractor, it provides no basis for concluding that there was bad faith in the way the Government administered the WBC contract. The completion contract activities took place after the termination for default. When considering whether one side or the other breached a contract, one must first find that there was a contract in existence. Following the termination, there was no contract between WBC and the Government. Thus, these subsequent activities cannot be the basis for finding a breach of the covenant of good faith and fair dealing, or bad faith in the administering of the contract.

In any event, it appears that much of this problem may have stemmed back to the blasting at MP 46.7 performed by WBC. From pictures of the site, it is clear that the completion contractor took out all of the material that was blasted. According to WBC's blasting plan, the two blasts were supposed to deal with the rock material at the site. In fact, if WBC's survey is correct, its rock blasts came up short of reaching all of the rock material that needed to be removed from the site.

I do not know why the Government did not require the completion contractor to bring in a new blasting company and remove the material that WBC failed to remove. But I cannot see how this failure can be viewed as bad faith, or how it relates back to the way the Government administered WBC's contract.

WBC alleges that this resulted in substantial additional and unnecessary cost to WBC and the surety. I do not find this to be the case. The allegation is not that the Government paid more for the work called for in the contract than it should have, but rather that the Government did not get what it bargained for in the contract. If any party is damaged, it is the Government, not WBC. WBC was required to take out the material at MP 46.7. When it failed to do so, the completion contractor was required to take it out. Both WBC, and later the completion contractor, had a contract quantity pay item for this excavation work. The Government was obligated to pay this price and the contractors were obligated to perform the work. There was no additional expense or cost to WBC. If the survey is correct, the Government simply did not get its bargain. Any correction would be to require the completion contractor to finish the work. It would not be to refund WBC.

Further, in this contracting officer's decision, the Government is covering all of the costs of WBC for work on the project. I do not find any basis for concluding that the Government acted in bad faith towards WBC.

## DECISION – SUBPART 10

Based upon the above analysis, I conclude that the Government did not administer its contract with WBC in bad faith based upon the allegation that the Government improperly paid the completion contractor. Even if the Government did make a mistake in not holding the completion contractor to blast and excavate out the cut at MP 46.7 to the limits required by the contract, I find no evidence that such was in bad faith, and, even if such bad faith existed, it does not change my assessment of the Government's administration of the WBC contract. I do not find bad faith stemming from these allegations.

# SUBPART 11

## The Government Engaged in Disparate Treatment

### CLAIM SUMMARY – SUBPART 11

WBC asserts it was not afforded the same opportunities the follow-on contractor was given in regards to the relaxation of the environmental restrictions in the completion contract. They contend the language in the completion contract enlarged the work window in 1999, and the Government failed to consider how these changes could affect WBC and its prosecution of its contract.

### FINDINGS OF FACTS – SUBPART 11

**1) Completion Contract Permit Restrictions**

**a) Contract Requirements**

**i) Standard Specifications (FP-96) and Special Contract Requirements**

The completion contract was issued under the same Standard Specifications in accordance with the *Standard Specifications for Construction of Roads and Bridges on Federal Highway Projects* (FP-96) as amended by the Special Contract Requirements (SCR) as defined in Subpart 3.

**b) Permits**

**i) 404 Permit – U.S. Army Corps of Engineers, Permit No. 98-370**

The completion contract included the same U.S. Army Corps of Engineers issued 404 Permit under section H on Page H-21 of the Special Contract Requirements as the original contract, also included in Subpart 3 for reference.

**ii) Oregon's Removal/Fill Permit – Division of State Lands, Permit No. RF-15114**

The completion contract also included the same Division of State Lands issued Oregon's Removal/Fill Permit under Section 3 on Page H-37 of the Special Contract Requirements as the original contract, which is included in Subpart 3 for reference.

**c) Permit Work Window Relaxation**

The Government met with the permitting agencies and discussed the possibility of relaxing the work windows to allow an earlier start. The permitting agencies were willing to allow work in the wetted perimeter to begin on June 14 at certain sites, including the MP 46.2 site, and on June 30 at other sites.

**2) Contract Modification 001 (Completion Contract)**

Contract Modification 001 was executed on June 25, 1999 between TCI and the Government. The contract modification made the following changes to the completion contract:

1. Additional excavation and disposal of material above the rock cut at Mile Post 46.7 on the FDR 33 road.

2. Additional excavation and disposal of material at Mile Post 47.25 on the FDR 33 road.
3. Disposal of excavated rock material, into the rock chute, below the rock cut and wall at Mile Post 46.7 on the FDR 33 road.
4. Placement of riprap to stabilize the roadway at Mile Post 0.43 thru 0.46 on the FDR 3347 road.
5. Removal and disposal of minor slide material in the ditches on FDR 33 road.
6. Re-shaping and compaction of previously dumped material at the disposal site off the FDR 3347 road.
7. **Revision of the work restrictions listed under Subsection 108.01 of the Special Contract Provisions.**

The changes to the environmental restrictions under Section 108.– Prosecution and Progress from Contract Modification 001 are shown below:

**Section 108 – PROSECUTION AND PROGRESS**

**108.01 Commencement, Prosecution, and Completion of Work.** FAR Clause 52.211-10, Commencement, Prosecution, and Completion of Work is supplemented as follows.

(Text Omitted)

Perform work under this contract according to the following:
(a) Limit work as provided in the following table:

ALL SITES:
- Construction related activities that do not alter habitat, do not involve work in live streams, and are not above ambient noise levels are not "disturbance" and may occur at any time.
- No blasting on any sites from 4/1 to 9/15.

| Site | NO INSTREAM WORK ON THESE DATES | WILDLIFE RESTRICTIONS no disturbance these dates | WILDLIFE RESTRICTIONS no disturbance between 2 hours before sunset and until 2 hours after sunrise |
|---|---|---|---|
| FDR 33: MP 46.7, 46.2, 47.07 to 47.25 | 11/1 – 6/14 | 4/1 – 5/31 | 6/1 – 9/15 |
| FDR 33; MP 44.5, 46, 47.31 | 11/1 – 6/14 | 4/1 – 8/5 | 8/6 – 9/15 |
| FDR 3347: MP 0.43, and MP 0.46 | 10/1 – 6/30 | 4/1 – 5/31 | 6/1 – 9/15 |
| FDR 3347; MP 0.3, 0.61, and 1.18 | 10/1 – 6/30 | 4/1 – 8/5 | 8/6 – 9/15 |
| FDR 3347020; MP 0.1 | 10/1 – 6/30 | 4/1 – 8/5 | 8/6 – 9/15 |

On Page 4 of Contract Modification 001, it addresses contract time as it relates to the permit restrictions. It states the following:

TIME
The contract time will not be increased as a part of this agreement. The final completion date remains October 29, 1999. Permit restrictions will be amended as shown in the following table. Additional time for the added work contained in this agreement will, therefore, be covered by allowing work to be performed in previously non-work periods.

## ANALYSIS – SUBPART 11

WBC claims the Government relaxed the permit requirements for the completion contract, and failed to consider how the changes to the environmental restrictions could affect WBC and their prosecution of the contract, when the Government was considering termination. WBC is correct in that both the environmental restrictions were relaxed and the Government did not consider how such changes could affect WBC when it was considering termination.

The restrictions were only relaxed by opening up an earlier work window. This change actually worked to WBC's advantage in a termination for default scenario, because it allowed the completion contractor to finish earlier, thus lessening the amount of interim liquidated damages. Ultimately, because the termination for default was converted to one for convenience, and because the liquidated damages were refunded, the change neither benefited nor was a detriment to WBC. I do not find that the Government's working with the permit agencies to relax the work windows shows bad faith on the part of the Government.

Further, to the extent that the WBC alleges that the Government did not consider such changes when it was considering termination, this allegation, though true, is meaningless. What the Government considered, given the default of WBC, was whether another contractor could complete the work in a more timely manner. The Government concluded, given WBC's tepid performance in 1998, that another contractor could complete in a more timely manner than WBC. The time when a contractor was able to begin in 1999 did not affect this analysis. There is no bad faith in not considering whether the work window could be opened to determine whether WBC should be terminated by default. At the time of the termination, WBC was in repeated material breaches of the contract, both with respect to the various work sites on the project, and with respect to submissions, certified payrolls, and general cooperation. Thus, the question during the end of November 1998 was not whether WBC was in default, but whether another contractor would likely do a better job at completing the contract. I do not see how the date one can start will likely affect that evaluation. This was not bad faith.

Further, ultimately the decision to seek and obtain permission from the permitting agencies to relax the permit work windows occurred after WBC was terminated. Therefore, as with the similar situations in the above subparts, these events cannot form the basis for finding bad faith in the administration or termination of the contract. Only events that occurred before the termination are directly relevant to the issue of whether the Government acted in bad faith such that it constitutes a breach of its contract with WBC, so as to allow profits based on that breach. I do not see how this can be seen as bad faith.

Finally, the allegation that the Government engaged in disparate treatment is not well supported. For there to be disparate treatment, the Government would need to treat one contractor different than another. In this case, I do not find any evidence of this. The willingness to open an earlier work window for the completion contractor corresponds with the willingness of the Government to seek an extension of the work window for WBC. The Government was willing to seek such an extension, and, in fact, asked the permitting agencies for such an extension on October 5, 1998. The permitting agencies denied the extension, wanting to wait until the window date was closer so that they could assess the water and the fish. When the window date was closer, the Government could see that there was no opportunity for WBC to complete the culvert installation, the riprap, the energy dissipators, and the headwall before there would be substantial water flowing in the creek. It was for this reason that the Government decided not to seek a

window extension late in October 1998. These situations were not present in the summer of 1999, the time into which the Government sought to extend the permit. It is not bad faith to treat disparate situations disparately.

## DECISION – SUBPART 11

For the reasons set forth above, I do not find that the Government engaged in disparate treatment, or acted in bad faith when it sought an extension of the work windows for wetted perimeter work, and modified the contract to allow work to begin on June 14, 1999, rather than the August 6 date that was in the original contract.

# SUBPART 12

## The Government Engaged in Additional Actions That Harmed WBC

## CLAIM SUMMARY – SUBPART 12

WBC claims that the Government certified and paid TCI for work performed by WBC before termination of the contract, thereby depriving WBC and ICW of legitimate earnings and then incurring illegitimate and unnecessary expenses during the completion contract. It is also claimed that the Government encouraged ICW to pay TCI for work they were already paid by the Government under Contract Modification.

## FINDINGS OF FACTS – SUBPART 12

1) **Primary Issue – the Government paid TCI for work performed by WBC before termination of the contract.**

In June, 1999, ICW was paid $102,371 by the Government, based on the estimated unpaid earnings of $202,371 due to WBC minus an amount to cover the estimated interim liquidated damages. The estimated interim liquidated damages amount of $100,000[22] was based on the projection of interim liquidated damages from January 24, 1999 through September 30, 1999. The contract required under subsection 108.04 of the Special Contract Requirements that road work on all sites on FDR 33 be complete for public traffic; including repair work up though subgrade and a minimum of 100 millimeters of aggregate base placed over the full roadway width on October 3, 1999. It was anticipated that work would be completed by October 3, 1999, and therefore interim liquidated damages would cease on that date.

The $202,371 amount was based on the following breakdown:

| Pay Item | Description | Qty | Unit | Unit Price | Price |
|---|---|---|---|---|---|
| 15101 | Mobilization[23] | 5% | lpsm | $ 1,370,480.00 | $ 68,524.00 |
| 15401 | Contractor Testing | 25% | lpsm | $ 12,000.00 | $ 3,000.00 |

[22] 250 days x $400 per day = $100,000

[23] Mobilization based on 5% of original contract amount ($1,370,480.00), not bid amount of $175,000.00 based on FP-96, subsection 151.03(b).

| | | | | | |
|---|---|---|---|---|---|
| 15501 | Construction Schedule | 50% | lpsm | $ 5,0002,500.00 | $ 1,250.00 |
| 15703 | Silt Fence | 681 | m | $ 9.00 | $ 6,129.00 |
| 15708 | Bales, straw | 40 | ea | $ 20.00 | $ 800.00 |
| 20101 | Clearing and Grubbing | 0.9 | Ha | $ 5,000.00 | $ 4,500.00 |
| 20401A | Roadway Excavation | 4670 | m3 | $ 12.00 | $ 56,040.00 |
| 20401B | Roadway Excavation (MP 46.7) | 2459 | m3 | $ 16.00 | $ 39,344.00 |
| 62201B | Hydraulic Excavator | 8 | hr | $ 100.00 | $ 800.00 |
| 62201C | Loader, backhoe | 4 | hr | $ 75.00 | $ 300.00 |
| 62201D | Tractor, crawler (dozer) | 4 | hr | $ 75.00 | $ 300.00 |
| 62201E | Truck, highway | 4 | hr | $ 65.00 | $ 260.00 |
| 62301 | General Labor | 8 | hr | $ 45.00 | $ 360.00 |
| CM1 30802 | Roadway Aggregate | 5 | t | $ 20.00 | $ 100.00 |
| CM1 62201A | Grader, motor, 90 kw min. | 3 | hr | $ 95.00 | $ 285.00 |
| CM1 62201B | Hydraulic Excavator | 56 | hr | $ 100.00 | $ 5,600.00 |
| CM1 62201C | Loader/Backhoe | 20 | hr | $ 75.00 | $ 1,500.00 |
| CM1 62201D | Tractor, crawler (dozer) | 49 | hr | $ 75.00 | $ 3,675.00 |
| CM1 62201E | Truck, highway, dump | 126 | hr | $ 65.00 | $ 8,190.00 |
| CM1 63509 | Flagger | 34 | hr | $ 40.00 | $ 1,360.00 |
| | | | | | |
| | | | | **Total** | **$ 202,317.00** |

After converting the Termination for Default to Termination for Convenience, the Government remitted the interim liquidated damages to WBC. On February 2, 2004, WBC was paid $100,000 for the withheld interim liquidated damages, plus $22,766.10 for interest calculated in accordance with the Contract Disputes Act.

The Government calculated the amount of estimated unpaid earnings based on the pay item tickets that were signed for work that complied with the contract requirements. In those pay items where there was a significant discrepancy between tickets and amounts the Government estimated was due for work performed by WBC, there appears to be a reasoned basis for the discrepancy.

1. Item 15101 – Mobilization

No pay item tickets were submitted to account for this item. The amount accounts for partial work performed by WBC, but ultimately completed by TCI.

Under the contract, WBC was entitled to 50% of its mobilization amount, not to exceed 5% of the original contract amount, once WBC performed 5% of the original contract amount, excluding mobilization and bond premium costs. FP-96, subsection 151.03(b). Accordingly, the Government credited WBC with 5% of the original contract amount. However, as a result of the termination, the completion contractor was going to require a full mobilization for their operations to complete the remaining work.

2. Item 15401 – Contractor Testing

No pay item tickets were received for work WBC performed. Based on a review of the work remaining for this bid item amount, the Government allowed 25% for work performed under this bid item.

3. Item 15703 – Silt Fence

WBC submitted tickets to account for 1,375 meters of silt fence. These tickets were approved by the Government. However, the contract requirements for silt fence still required maintenance of the silt fence and removal upon completion of the work. As an incidental requirement for all erosion control requirements, inspections were required during storm events to assure that they were functioning properly. Because of these requirements, the contract at FP-96, subsection 157.16, Payment, allowed for progress payments for erosion control measures as follows:

a. 50 percent of the unit bid price for each item will be paid upon installation.
b. 25 percent of the unit bid price for each item will be paid following completion of 50 percent of the contract amount.
c. Payment for the remaining portion of the unit bid price for each item will be paid when the temporary erosion control measures are removed from the project.

Based on the progress payment structure under this bid item, WBC should have been allowed payment on 50% of $9.00 per meter for the 1375 meters of silt fence installed, or $6,187.50. Since the Government only paid $6,129.00 for the work performed, WBC was under-paid by $58.50.

The pay item tickets submitted by TCI for Item 15703 were for installations performed by TCI that were in addition to those installed previously by WBC. This work is included in the Contractor daily for the work items performed or included in the narratives as support documentation. TCI was also required to perform inspections, maintenance and removal of the silt fence installed previously by WBC.

4. Item 15708 – Bales, straw

The straw bales are also an erosion control device governed by the payment requirements of subsection 157.16, Payment. The pay item tickets support 91 straw bales being installed by WBC, which based on 50% of the $20.00 bid price would equate to $910. The payment due for work performed by WBC was estimated to be $800. Therefore, WBC was under-paid by $110.00

The pay item tickets submitted by TCI for Item 15708 were also for installations performed by TCI that were in addition to those previously installed by WBC. This work is included in the Contractor daily for the work items performed or included in the narratives as support documentation. TCI was also required to perform inspections, maintenance and ultimately removal of the straw bales installed previously by WBC.

5. Item 15718 – Diversion Channel

Pay Item tickets were not submitted for the installation of the diversion channel by WBC. WBC diverted the flows into the new culvert before it left the site. However, since it had not completed the culvert work, in 1999 TCI was required to redivert the water around the culvert to complete the culvert work at MP 46.2. As a result, TCI reestablished the diversion

channel, and relined the channel as the plastic lining performed by WBC was no longer adequate. Similar to the other erosion control items, the diversion channel also required maintenance, inspection and ultimately removal upon completion of the culvert by TCI. Accordingly, WBC was not credited with completion of the Diversion Channel work.

6. Item 20101 – Clearing and Grubbing
The only pay item ticket submitted by WBC for this item was for 0.18 ha for the installation at 46.75. In the June, 1999 payment, the Government estimated 0.9 ha for clearing and grubbing, giving WBC credit for work estimated to have been performed, but not supported with pay item tickets. To date, the Government has not received proper documentation to support the work performed by WBC. Based on the approved pay item ticket, WBC was over-paid for 0.72 ha, or $3,600.00.

The pay item tickets for the work performed by TCI were based on different locations than that identified on the pay item ticket by WBC. Also, final quantity for payment to TCI was calculated based on the summation of the individual plan quantities for each specific site, and subtracting the total quantity estimated to have been performed by WBC, which as noted above, was not supported with proper pay item ticket documentation.

7. Item 25109B – Energy dissipator, type 2
The pay item ticket for this item was originally submitted by WBC and approved by the Government. However, after subsequent review of the actual riprap materials utilized in the installation, the Government determined that there was no supporting documentation showing that the riprap met the quality requirements as defined in the specifications. To date WBC has not provided any submission showing that the riprap materials met the contract quality requirements.

The work performed by TCI during the completion contract included the removal and replacement of the work performed previously by WBC. The work by TCI was performed with riprap supplied to the contract by a source meeting the quality requirements as specified.

8. Work under CM 001
In the June, 1999 payment to WBC, the Government paid WBC for only the items performed by WBC.

**2) Secondary Issue – the Government encouraged ICW to pay TCI for work previously paid by the Government under Contract Modification**

Following the termination of WBC, TCI put together its proposal to complete the work. According to Mr. Darger of TCI, TCI's bid to ICW to complete the work was based on adjusting TCI's original bid of the solicitation to reflect the quantities completed by WBC. After adjusting its quantities, TCI included $50,000 to cover the costs associated with correcting problems such as the errant blast at MP 46.7, removing saturated material at MP 46.2, and numerous other deficiencies that were left following the work performed by WBC.

Mr. Darger stated that the $50,000 amount bid for work at MP 46.7 was for the material that was shot and not for the overburden work. Tr, Darger, 21:25-26:24. It was for work that the Government was not going to pay. Tr, Darger, 37:17-21. Mr. Darger was clear that it did not include work that was outside the clearing limits. Tr, Darger, 39:9-21.

Contract Modification 001 issued under the completion contract specifically addressed only the removal of the overburden material above the rock cut at MP 46.7 and other added work. It did not address the removal of material from the errant blast, nor address the perched rock outcrops that remained following said blast. According to TCI, its bid for $50,000 was intended to cover these specific instances, and not address the overburden work.

## ANALYSIS – SUBPART 12

**1) Primary Issue – the Government paid TCI for work performed by WBC before termination of the contract**

WBC claims that as support for its bad faith claim, the Government paid the completion contractor for work WBC performed. My review of the facts does not support this claim.

Several items were completed by WBC; however it failed to meet the contract requirements. Examples of this include the outlet energy dissipator that was the focus of an earlier discussion. Specifically, this installation was performed by WBC; however it failed to provide test reports to adequately determine that the riprap used actually met the contract requirements. In this situation, TCI was required to remove and replace the outlet energy dissipator with material that met the specifications. Other discrepancies include work that was partially performed by WBC, which was later completed by TCI. Since the work was not completed by WBC in accordance with the contract, the Government could not make payment to WBC for that work. After completion of the work by TCI, payment was made as the work requirements were satisfied under the contract.

It was the responsibility of TCI to adjust their bid prices to account for the work performed by WBC, to prevent duplication of costs. The Government paid for work completed on the contract only after it was completed within reasonable conformance with the contract and with the proper support documentation. If work existed where TCI had to remove work previously performed by WBC as a result of non-conformance with the contract, payment was not made until it was corrected.

I note that WBC provides no specifics to support its general allegation on this issue. Nevertheless, I have reviewed the various pay items to see if there is any basis to support WBC's allegations. On some items, WBC was under-paid for work it performed, and on other items it was over-paid for work performed. Overall it appears that WBC was paid more than the support documentation indicates. Based on my review, I do not find any wholesale errors that would indicate the Government, in bad faith, was trying to shortchange WBC in favor of the completion contract.

**2) Secondary Issue – the Government encouraged ICW to pay TCI for work previously paid by the Government under Contract Modification**

WBC also again alleges that the Government encouraged the surety to pay the completion contractor for work which the Government had paid the completion contractor under a contract modification. WBC links this to the $50,000 pay item for the work at MP 46.7. Again, as stated previously, WBC is in error on this point. The completion contractor expressly stated that such amount was for cleaning up the blast and other contractually required work at MP 46.7. It did not cover the work added by Contract Modification 001 of the completion contract.

### DECISION – SUBPART 12

Based upon the above analysis, I do not find that the Government acted in bad faith with respect to its estimates of work performed by WBC, or its payments to the completion contractor. My review shows that the amount estimated as work performed by WBC was based on the Government's review of the project records. I do not find any significant fault with that estimate. My review also shows that the payments made to the completion contractor were for work the completion contractor actually performed. I do not find any evidence that the Government, in bad faith, underestimated the amount of work performed by WBC and subsequently paid the completion contractor for work performed by WBC.

Further, with respect to the claim that the Government encouraged the surety to pay the completion contractor for work that was also paid under contract modification, there is no basis for this claim. The two items cover different work. I find no basis to conclude that the payment was either wrong, or that it would support a finding of bad faith.

# Overall Conclusion of Bad Faith Claim

Based upon the above analysis of the bad faith allegations, I conclude that none of the allegations individually support a finding of bad faith. Further, in evaluating all of the allegations together, I do not find that they rise anywhere close to a level supporting a bad faith conclusion. None of the allegations individually support a finding that the Government officials acted unreasonably. Together, they cannot add up to unreasonableness either. With the lack of bad faith, there is no basis for finding a breach of contract such as is needed to support a claim for anticipatory profit. Accordingly, I will disallow the claim for anticipatory profits.

# Profit/Loss Analysis

Even if I could conclude that WBC's claim of bad faith was supported, WBC still would not be entitled to anticipatory profits. Bad faith only supports a breach claim. Under a breach, WBC is entitled to be placed in no better position than if it had fully performed under the contract. Thus, if WBC's bid and performance was such that it would have lost money on the project if it had been allowed to fully perform, it would not be entitled to profit.

My determination of the value of work completed at the time of the termination is $359,441.50 based on full mobilization. This is based on the following table.

| Pay Item | Description | Qty | Unit | Unit Price | Price |
|---|---|---|---|---|---|
| 15101 | Mobilization[24] | 100% | lpsm | $ 175,000.00 | $175,000.00 |
| 15201 | Construction survey and staking | 50% | Lpsm | 23,000.00 | 11,500.00 |
| 15401 | Contractor Testing | 25% | lpsm | $ 12,000.00 | $ 3,000.00 |
| 15501 | Construction Schedule | 50% | lpsm | $ 2,500.00 | $ 1,250.00 |
| 15703 | Silt Fence[25] | 1375 | m | $ 4.50 | $ 6,187.50 |
| 15708 | Bales, straw[26] | 91 | ea | $ 10.00 | $ 910.00 |
| 15718 | Diversion Channel | 160 | m | $ 40.00 | $ 6,400.00 |
| 20101 | Clearing and Grubbing | 0.9 | ha | $ 5,000.00 | $ 4,500.00 |
| 20301 | Removal of Pipe Culvert[27] | 1 | ea | $ 400.00 | $ 400.00 |
| 20401A | Roadway Excavation[28] | 4760 | m3 | $ 12.00 | $ 57,120.00 |
| 20401B | Roadway Excavation (MP 46.7)[29] | 2459 | m3 | $ 16.00 | $ 39,344.00 |
| 25109B | Energy Dissipator, Type 2[30] | 0 | ea | $ 2,000.00 | $ 0.00 |
| 60201C | 2250 millimeter pipe culvert[31] | 40 | M | $ 750.00 | $ 30,000.00 |
| 61902 | Gate[32] | 0 | ea | $ 800.00 | $ 0.00 |
| 62201B | Hydraulic Excavator | 8 | hr | $ 100.00 | $ 800.00 |
| 62201C | Loader, backhoe | 4 | hr | $ 75.00 | $ 300.00 |
| 62201D | Tractor, crawler (dozer) | 4 | hr | $ 75.00 | $ 300.00 |

[24] Mobilization based on 5% of original contract amount ($1,370,480.00), not bid amount of $175,000.00.
[25] See discussion in Subpart 12. Bid price was reduced by 50% to reflect remaining work in accordance with FP-96, subsection 157.16(a).
[26] See discussion in Subpart 12. Bid price was reduced by 50% to reflect remaining work in accordance with FP-96, subsection 157.16(a).
[27] Removal of pipe culvert at MP 46.2 was performed by WBC. In the completion contract, TCI was paid for the removal of the temporary culverts installed by WBC for the temporary diversion.
[28] Pay Item Tickets indicate 6964 m3, but after resurvey of each site, the quantity was reduced to reflect actual quantity of work performed.
[29] Pay Item Tickets indicate 3976 m3, but after resurvey of each site, the quantity was reduced to reflect actual quantity of work performed.
[30] Pay Item Ticket indicates installation not in accordance with the contract specifications. Riprap used may not meet quality specifications.
[31] WBC did not complete the culvert installation as per the contract. Bid price was reduced by 25% to reflect remaining work.
[32] WBC removed the existing Gate and reset it at a location to facilitate WBC operations. The removal and disposal of the existing gate were incidental to the construction of the new gate. WBC had proposed to remove this gate and transport it to a stockpile location at the USFS at the completion of the project. Removal and stockpiling of the relocated existing gate, along with installation of the new gate were performed by TCI.

| | | | | | |
|---|---|---|---|---|---|
| 62201E | Truck, highway | 4 | hr | $ 65.00 | $ 260.00 |
| 62301 | General Labor | 8 | hr | $ 45.00 | $ 360.00 |
| 63507 | Construction Signs[33] | 22 | m2 | $ 50.00 | $ 1,100.00 |
| CM1 30802 | Roadway Aggregate | 5 | t | $ 20.00 | $ 100.00 |
| CM1 62201A | Grader, motor, 90 kw min. | 3 | hr | $ 95.00 | $ 285.00 |
| CM1 62201B | Hydraulic Excavator | 56 | hr | $ 100.00 | $ 5,600.00 |
| CM1 62201C | Loader/Backhoe | 20 | hr | $ 75.00 | $ 1,500.00 |
| CM1 62201D | Tractor, crawler (dozer) | 49 | hr | $ 75.00 | $ 3,675.00 |
| CM1 62201E | Truck, highway, dump | 126 | hr | $ 65.00 | $ 8,190.00 |
| CM1 63509 | Flagger | 34 | hr | $ 40.00 | $ 1,360.00 |
| | | | | | |
| | | | | **Total** | **$359,441.50** |

According to the Government's calculations, WBC incurred $378,981.00[34] in costs. If I subtract the legal expenses for McBride and Landmark, the incurred costs on the project would be $374,592.00.[35] This leads to a loss of $15,150.50[36], or a loss rate of 4.0%.[37] According to WB's submission, it incurred $439,045.43[38] in costs, leading to a loss of $79,603.93, or a loss rate of 21.0%[39]. Over the entire project, using either figure, it appears WBC would have incurred a loss. Accordingly, even if bad faith existed WBC would not have been entitled to anticipatory profit.

---

[33] No pay item ticket for Construction Signs, however signs were installed. The pay item unit price was reduced by 50% to reflect remaining work to be performed such as maintenance, removal and disposal following completion of the contract. No measurement notes were provided, so quantity is based on plan quantity of 22 m2.
[34] This amount includes Direct Labor ($127,463.00), Other Direct Job Costs ($101,014.00), Equipment, Vehicle and Fuel Costs ($26,985.00), Other Equipment and Vehicle Costs ($65,808.00), G&A Expenses ($28,183.00) and Subcontractor Claim ($29,528.00) for a total of $378,981.00
[35] $378,981.00 - $3,117.00 - $1,272.00 = $374,592.00
[36] $359,441.50 - 374,592.00 = ($15,150.50)
[37] $15,150.50 / $374,592.00 = 4.0%
[38] This amount includes Direct Labor ($128,478.00), Other Direct Job Costs ($128,598.08), Equipment, Vehicle and Fuel Costs ($26,985.00), Other Equipment and Vehicle Costs ($91,968.00), G&A Expenses ($28,183.00) and Subcontractor Claim ($39,222.35) for a total of $443,434.43 minus McBride Legal Costs ($3,117.00) and Landmark Legal Costs ($1,272.00) for a total incurred cost of $439,045.43
[39] $79,603.93 / $378,981.00 = 21.0%

# Conclusion

Based upon the termination settlement proposal submitted by WBC on June 26, 2007, the DCAA audit of the proposal, and the project records, I conclude, based upon the above analysis of the costs claimed and the bad faith allegation, that WBC is owed $240,178.61.[40]

This is the final decision of the Contracting Officer. You may appeal this decision to the agency board of contract appeals. If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the agency board of contract appeals and provide a copy to the Contracting Officer from whose decision this appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract by number. With regard to appeals to the agency board of contract appeals, you may, solely at your election, proceed under the board's small claim procedure for claims of $50,000 or less or its accelerated procedure for claims of $100,000 or less. Instead of appealing to the agency board of contract appeals, you may bring an action directly in the United States Court of Federal Claims (except as provided in the Contract Disputes Act of 1978, 41 U.S.C. 603, regarding Maritime Contracts) within 12 months of the date you receive this decision.

Executed on August 30, 2007

Elizabeth M. Firestone
Contracting Officer

---

[40] See page 11 for a summary detail of this amount.