**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

WHITE BUFFALO CONSTRUCTION, INC.,
an Oregon corporation,

*Plaintiff*,

v.

THE UNITED STATES,

*Defendant*.

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS CERTAIN CLAIMS FOR LACK OF SUBJECT MATTER JURISDICTION AND FOR JUDGMENT UPON THE PLEADINGS UPON CERTAIN CLAIMS**

**No. 99-961C (Consolidated with Case Nos. 07-738C and 00-415C)**

**Senior Judge Loren A. Smith**

**Electronically Filed May 7, 2008**

## TABLE OF CONTENTS

**Page**


I. INTRODUCTION ........................................................ 1

II. FACTS ........................................................ 2

A. Procedural History ........................................................ 2

B. White Buffalo's CDA Claims ........................................................ 7

C. White Buffalo's Allegations of Bad Faith Involve Matters Either Occurring or Discovered Within the Six-Year CDA Period ........................................................ 8

1. White Buffalo's Second Claim for Relief ........................................................ 8

2. White Buffalo's Claim for Bad-Faith Purported Conversion to Convenience ........................................................ 10

D. Evidence of Government Misconduct Is Abundant ........................................................ 11

1. The Government Made and then Concealed Design Changes for the Completion Contractor ........................................................ 12

2. The Government Paid the Completion Contractor at White Buffalo's Expense in Bad Faith ........................................................ 13

3. There Is Voluminous Evidence of Rettinger's Animus Toward White Buffalo ........................................................ 14

III. ARGUMENT ........................................................ 17

A. The 1999 and 2000 Cases Are Not Moot—as the Court Has Already Held ....... 17

B. White Buffalo's Claims in Its Second Claim for Relief Were Presented to the CO Within the Time Required by the CDA ........................................................ 19

1. White Buffalo Did Not Discover Its Claims Until 2000 or Later ............ 20

2. White Buffalo's Claim Relates Back to Case Nos. 99-961C and 00-415C, and the Claim Is a Continuing One ........................................................ 21

3. Equitable Tolling Applies ........................................................ 22

C. White Buffalo Presented Its Bad-Faith Conversion Claim to the CO ................. 23

D. White Buffalo Alleged and Demonstrated to the CO Facts Showing Specific Intent to Injure White Buffalo ........................................................ 25

IV. CONCLUSION ........................................................ 27

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Appeal of Carmona Industrias Electricas S.A.*,
93-3 BCA ¶ 25,975 (1993) .......... 24

*Appeals of Schleicher Community Corrections Center, Inc.*,
1998 WL 455631 (D.O.T.C.A.B Aug. 6, 1998) .......... 23

*Bannum v. U.S.*,
80 Fed. Cl. 239 (2008) .......... 21, 25, 26

*Bath Iron Works Corp. v. U.S.*,
20 F.3d 1567 (Fed. Cir. 1994) .......... 22

*Bonneville Associates, Ltd. Partnership v. Barram*,
165 F.3d 1360 (Fed. Cir. 1999) .......... 23

*Bowden v. U.S.*,
106 F.3d 433 (D.C. Cir.1997) .......... 22

*Brown Park Estates-Fairfield Dev. Co. v. U.S.*,
127 F.3d 1449 (Fed. Cir. 1997) .......... 22

*Cascade Pacific Intern. v. U.S.*,
773 F.2d 287 (Fed. Cir. 1985) .......... 26

*Clevenger v. U.S.*,
Case No. 99-1615 AS (D. Or.) .......... 9

*Former Employees of Motorola Ceramic Products v. U.S.*,
336 F.3d 1360 (Fed. Cir. 2003) .......... 19

*H.B. Mac, Inc. v. U.S.*,
153 F.3d 1338 (Fed. Cir. 1998) .......... 24

*Hayes v. U.S.*,
73 Fed. Cl. 724 (2006) .......... 20, 22

*Holmberg v. Armbrecht*,
327 U.S. 392, 66 S. Ct. 582, 90 L. Ed. 743 (1946) .......... 22

*Irwin v. Department of Veterans Affairs*,
498 U.S. 89, 111 S. Ct. 453, 112 L. Ed. 2d 435 (1990) .......... 20, 22

*Japanese War Notes Claimants Ass'n of Philippines, Inc. v. U.S.*,
178 Ct. Cl. 630, 373 F.2d 356 (1967) .......... 20

*Kyrgoski Const. Co., Inc. v. U.S.*,
94 F.3d 1537 (Fed. Cir. 1996) .......... 25

*Lockheed Martin v. U.S.*,
70 Fed. Cl. 745 (2006) .......... 21

**Page(s)**

*Ponder v. U.S.*,
117 F.3d 549 (Fed. Cir. 1997) .... 26

*Rice Services, Ltd. v. U.S.*,
405 F.3d 1017 (Fed. Cir. 2005) .... 18

*Slattery v U.S.*,
53 Fed. Cl. 258 (2002) .... 21

*Texas Health Choice, L.C. v. Office of Personnel Management*,
400 F.3d 895 (Fed. Cir. 2005) .... 24

*TS Infosystems, Inc. v. U.S.*,
36 Fed. Cl. 570 (1996) .... 22

*Universal Fidelity LP v. U.S.*,
70 Fed. Cl. 310 (2006) .... 18

*In re White Buffalo Construction*,
1996 WL 179336 (Ag.B.C.A.), 96-2 BCA P 28272 (April 4, 1996) .... 2

**Statutes**

41 U.S.C. § 609 .... 19

**Rules**

RCFC 12 .... 11

RCFC 15 .... 21

## I. INTRODUCTION

Throughout the *nine years* of this litigation, the government has done anything and everything to avoid examination of its conduct on the merits. For example, in early 2004, on the eve of the trial of plaintiff White Buffalo Construction, Inc.'s ("White Buffalo") challenge to the Federal Highway Administration's ("FHA") default termination, the government purported to convert the default termination to convenience and then moved to dismiss on the grounds of mootness. Although the Court rejected the government's ploy to deny White Buffalo certain relief requested and attorneys' fees under the Equal Access to Justice Act ("EAJA"), the government nonetheless attempts the very same tactic by this motion. And it is not only White Buffalo's claims raised in the earlier cases that are at issue. The subtext to the government's motion to dismiss case Nos. 99-961C and 00-415C is the government's concern that the claims it seeks to dismiss as untimely in case No. 07-738C relate back to the 1999 and 2000 filings.

The government's attempt to dismiss White Buffalo's bad faith-claim in case No. 07-738C also demonstrates the government's reluctance to allow examination of its conduct on the merits. Instead, one month before the discovery cutoff, after answering White Buffalo's complaint and beginning discovery, the government moved *on the pleadings* and asserted both that White Buffalo has not pled sufficient facts of the government's bad faith and that the claim is untimely. As shown below, White Buffalo has pled and, ultimately more important, can *prove* the government acted in bad faith. Although White Buffalo did not discover the evidence of the government's bad faith until later, this bad-faith conduct relates back to the government conduct at issue in case Nos. 99-861C and 00-415C and continued through (and including) the purported convenience termination in early 2004. The matters included in White Buffalo's bad-faith claim were presented to the contracting officer ("CO") in 2004 and 2005 at the latest and so were plainly timely.

The government's motions should be denied.

## II. FACTS

### A. Procedural History

The government provides little background to its motion, but this background is significant. The road construction project at issue, FHA Contract No. DTFH70-98-C-00027 on the Siskiyou National Forest (the "Project"), albeit an FHA contract, was on behalf of the U.S. Forest Service (the "Forest Service"). This is significant because in 1998, when the contract was awarded to White Buffalo, White Buffalo was in lengthy and highly contentious litigation with the Forest Service. *E.g.*, *In re White Buffalo Construction*, 1996 WL 179336 (Ag.B.C.A.), 96-2 BCA P 28272 (April 4, 1996) (and related cases). (Declaration of Luther L. Clevenger in Opposition to Defendant's Motion to Dismiss Certain Claims for Lack of Subject Matter Jurisdiction and for Judgment upon the Pleadings upon Certain Claims ("Clevenger Decl.") ¶ 2.) In discovery before the scheduled trial date in case Nos. 99-961C and 00-415C in January 2004, White Buffalo uncovered documents indicating that FHA Area Engineer Paul Rettinger, the primary focus of White Buffalo's bad-faith claim, had been in contact with the Forest Service CO and discussed the prior litigation. (*See* 2000 Rettinger Depo. at 33-34, Declaration of Scott J. Kaplan in Opposition to Defendant's Motion to Dismiss Certain Claims for Lack of Subject Matter Jurisdiction and for Judgment upon the Pleadings upon Certain Claims ("Kaplan Decl.")., Ex. 1 at 4-5 (admitting that during the time he worked on the Project, he was "aware of prior problems with another federal contract, and believe[d] it was the US Forest Service"); 2008 Rettinger Depo. at 21-22, Kaplan Decl., Ex. 2 at 3-4 (Rettinger became aware of White Buffalo's prior dispute with the Forest Service during the project).) It is likely, therefore, that Rettinger saw the Project as an avenue for retaliation. Indeed, Project documents show that Rettinger consulted with the Forest Service on the issue of terminating White Buffalo.

Not surprisingly, the Forest Service recommended termination. (2008 Rettinger Depo. at 22-23, 44, Kaplan Decl., Ex. 2 at 4-5, 14 (Forest Service had negative view of White Buffalo and was consulted about termination).)[1]

Documents received by White Buffalo from the Defense Contract Audit Agency ("DCAA"), only disclosed after the discovery cutoff, confirm White Buffalo's understanding. On May 1, 2008, White Buffalo received for the first time an email between DCAA auditors *dated before their audit even began*.

> Ray and I testified against this guy four years ago and he still is getting Government contracts! I think this is a juicy "false claim" termination that will eventually end up in the Department of Justices [*sic*] hands in a few years. I am curious! If I retire in five years, can I come back as a Government witness at $100/hour plus expenses[?].

(Munro Depo., Ex. 16, Kaplan Decl., Ex. 4.) Fortunately for White Buffalo, those auditors did not perform the audit in this case. The auditor who actually performed the audit and who was more objective confirmed that there was no evidence of a false claim or any fraudulent conduct.

However, the prior dispute with the Forest Service was very much in the minds of FHA personnel. They instructed the DCAA auditor as follows: "In auditor's request to audit WBC sent to Stoel Rives LLP, *take out any reference to knowing about Rim Rock, and for that matter, any link to DCAA court case and prior audit of WBC and RRC.*" (Munro Depo., Ex. 17, Kaplan Decl., Ex. 5.)

Notwithstanding this attempt at concealment, as the Court is aware from prior proceedings, the government initially followed Rettinger and the Forest Service's approach,

---

[1] The fact that Rettinger denied to the CO who was deciding White Buffalo's bad-faith claim in August 2007 that he was aware of the Forest Service dispute, contradicting his sworn deposition testimony, only underlines White Buffalo's point. (Kaplan Decl., Ex. 3 at 8.)

terminating White Buffalo for default and imposing liquidated damages. White Buffalo challenged these decisions in case Nos. 99-861C and 00-415C. From 1999 through 2003, the parties engaged in discovery and prepared for trial. White Buffalo would have shown in the trial set for March 1 through March 13, 2004 that the alleged defaults identified by the government were pretextual and simply an excuse for what appears to be Rettinger's plan to retaliate against a contractor seen as a troublemaker. However, on the eve of trial, on January 14, 2004, the government suddenly changed course and issued a decision in the name of the CO purporting to convert the default termination to one for convenience. (2008 Parsons Depo., Ex. 19, Kaplan Decl., Ex. 6 at 10-11.) However, as the government has admitted, the conversion decision was in fact made and implemented by government lawyers. (Declaration of Timothy J. Binder ("Binder Decl.") dated April 8, 2008 (Docket No. 113-2 at 6) ¶ 6.)

Indeed, the CO who made the decision could not recall why the 2004 conversion was made or find any indication of the government's rationale in the text of decision. (2008 Parsons Depo. at 11-12; Kaplan Decl., Ex. 6 at 3-4.) Four years later, in 2008, the government lawyer involved in the decision, Timothy Binder, submitted a declaration attempting to justify the 2004 conversion on the basis of a "safety concern to opening the road posed by the overburden" in 1998. However, the CO in whose name the decision was issued testified as follows:

> Q. Okay. Do you recall in January of—I'm sorry, January of 2004, the work was completed?
>
> A. I'm sure it was.
>
> Q. Do you recall that the safety concern about opening the road posed by the overburden had been taken care of by January 2004?
>
> A. I would have to assume it had to have been, yes.

> Q. So how did the safety concern to opening the road posed by the overburden factor into your decision to convert from default to convenience?
>
> A. Today I'm not recalling the link there.
>
> Q. Logically, does it seem to you that there could be a link, given that the work had been completed?
>
> A. I'm not seeing it readily here, No.

(2008 Parsons Depo. at 18, Kaplan Decl., Ex. 6 at 5.) Moreover, the CO's 2007 Decision described the alleged 1998 "safety condition" as something that "could be dealt with at a later time" after termination, not as something requiring immediate action. (Scott Depo. at 53, Kaplan Decl., Ex. 7 at 16.)

Alternatively, the CO who denied White Buffalo's bad-faith claim in August 2007 thought that there had been an issue of "concurrent delay" (again nowhere appearing in the text of the conversion decision). (Firestone Depo. at 51, 99, Kaplan Decl., Ex. 8 at 3-4.) However, she could provide no details, and the fact that the government's story continues to change only serves to demonstrate the bad-faith nature of its actions.

In January 2004, after issuing this conversion decision that no government representative has been able to coherently explain, the government moved to dismiss, arguing that White Buffalo's claims were moot but acknowledging the following:

> In addition, plaintiff intends to file a request for cost and attorney fees pursuant to the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412, following the dismissal of these actions. Counsel for plaintiff has also informed counsel for the United States that White Buffalo intends to reserve whatever rights, if any, it has to claim lost profits on uncompleted work and other damages at the time it submits its termination for convenience cost proposal.

(Motion to Dismiss at 3 (Docket No. 63).)

In response, White Buffalo first noted, again in 2004, that "[a]s the government's own motion evidences, White Buffalo consented to foregoing [*sic*] a full trial on the merits *only upon* the Justice Department's reciprocal consent that White Buffalo's [*sic*] was reserving its claims to fees under EAJA and to seek on remand lost profits on uncompleted work." (Response to Government's Motion to Dismiss at 14 (Docket No. 68) (emphasis added).) White Buffalo additionally made clear that its "quantum claim include[es] its claim to profits lost on work not performed as an element of common law damages for breach." (*Id*. at 6.)

The Court then stayed the consolidated cases until early 2007. After additional briefing, the Court denied the government's motion to dismiss in its Order of May 11, 2007 (Docket No. 99) for three reasons:

> First, the Court found that some issues relating to this case clearly remain unripe, and some claims stemming from the same set of facts were still being remedied administratively. In any case, a broader and more fully-informed picture of the case, as a whole, will allow a more efficient application of justice. Therefore, in the interest of judicial economy, the court found it more efficient to allow all matters in this case to ripen before ruling on any of them individually.
>
> Second, the Court found that there is some ambiguity in the law regarding the consequences of the government's converting a termination by default to a termination for convenience. Specifically, there is some question as to attorney fees when one cause of action is subject to the conversion but other causes stemming from the same set of facts are not. It is also possible that a premature decision relating to one part of a case may be detrimental (or even preclusive) to another. It is, therefore, also more judicially efficient to proceed only when the matters may be seen as a whole.
>
> Third, the Court recognized that attorney fees are at issue in this case and such attorney fees will continue to accrue while the Plaintiff pursues its closely-related bad faith claim and the Court found it more judicially efficient to allow all related matters to be heard together.

**B. White Buffalo's CDA Claims**

After the government's January 2004 purported conversion to termination for convenience, White Buffalo submitted termination settlement proposals making clear that it was also making a claim for bad-faith termination. (Scott Depo., Exs. 4, 5, Kaplan Decl., Ex. 7 at 22-28.) Government representatives admitted that White Buffalo was claiming bad-faith termination beginning with its year 2004 certified claims and that the termination at issue after January 2004 was the convenience termination. (Scott Depo. at 15-16, Ex. 5, Kaplan Decl., Ex. 7 at 4-5, 25-28; 2008 Parsons Depo. at 23, 25-26, Kaplan Decl., Ex. 6 at 6-8.) The government, rather than, as it now contends in its motion, failing to understand that White Buffalo was claiming bad-faith conversion to convenience, simply disagreed that there had been bad faith. According to the CO, "the difference being that there was a bad faith termination versus my belief that there was no bad faith termination." (2008 Parsons Depo. at 26, Kaplan Decl., Ex. 6 at 8.)

On January 13, 2005, White Buffalo filed an additional certified claim, designated as a Termination Settlement Proposal and "Request for Profit and Justification for Profit" that detailed White Buffalo's allegations of bad faith. (Scott Depo., Ex. 6, Attachment B, Kaplan Dec., Ex. 7 at 32-39.) Despite the government's contention to the contrary in this motion, this claim included the detailed specifications of bad faith asserted in White Buffalo's Second Claim for Relief in case No. 07-738, discussed further below. On October 16, 2006, White Buffalo filed a Termination for Convenience and Revised Settlement Proposal that included the specification of bad faith set forth in the January 2005 claim and again, as it had insisted repeatedly, a contention that the government's purported conversion was in bad faith. (Scott Depo., Exs. 7, 8, Kaplan Decl., Ex. 7 at 40-81.)

On August 30, 2007 the CO denied White Buffalo's claim for lost profits, denying that the bad faith White Buffalo notified the government about in its 2004 and 2005 claims and specified in detail in its January 2005 claim, existed. The government did not address White Buffalo's claim that the 2004 purported conversion was in bad faith. (Scott Depo. at 21, Kaplan Decl., Ex. 7 at 7.) Indeed, it has never done so on the merits. Rather, by the present motion, the government contends that the claim was not, in fact, actually made.

On October 22, 2007, White Buffalo filed case No. 07-738C, challenging the government's denial of its bad-faith claim for lost profits.

### C. White Buffalo's Allegations of Bad Faith Involve Matters Either Occurring or Discovered Within the Six-Year CDA Period

In case No. 07-738C, White Buffalo asserted two claims challenging the government's conduct as having been in bad faith and seeking lost profits.

#### 1. White Buffalo's Second Claim for Relief

In its Second Claim for Relief, paragraph 50, White Buffalo alleges:

> 50. FHA breached its implied obligations of good faith and fair dealing and duty to cooperate in facilitating WBC's performance of the contract, by:
>
> a. Refusing to make for WBC the changes in plans and specifications subsequently made for TWC, as evidenced by the November 2002 Landmark Survey;
>
> b. Refusing to acknowledge to WBC the differing site conditions recognized through accommodating TWC, as later evidenced by the November 2002 Landmark Survey;
>
> c. Paying TWC and charging WBC for volumes never excavated, as later evidenced by the November 2002 Landmark Survey;
>
> d. Terminating WBC for default where there were defective plans and specifications and differing site conditions, as later evidenced by the November 2002 Landmark Survey; and

> e. Falsely stating to WBC that no design changes had been made and denying that there were no design-change documents, as later evidenced by the January 2000 FOIA disclosure and the November 2002 Landmark Survey.

The 2002 Landmark Surveying, Inc. ("Landmark") report referenced in paragraph 50 was commissioned by White Buffalo to compare as-planned, as-designed and as-built conditions on the Forest Service road at issue in the Project**.** The survey uncovered significant discrepancies and documented that the government made design changes for the completion contractor it had previously denied making and that the government had improperly charged White Buffalo for work not actually performed by the completion contractor. (Clevenger Decl. ¶¶ 6-7; 2008 Rettinger Depo., Ex. 3, Kaplan Decl., Ex. 2 at 17-29.) As FHA engineer Rettinger admitted, "I took it on the face value that, you know, they [Landmark] are an honest, reputable contractor, and that what they measured is what they had, but I couldn't verify or determine whether I agreed with it or not." (2008 Rettinger Depo. at 65, Kaplan Decl., Ex. 2 at 15.) That is, Landmark's conclusions are undisputed.

With regard to the January 2000 FOIA disclosure referenced in paragraph 50 of White Buffalo's complaint, White Buffalo alleged:

> On or about January 6, 2000, WBC received from the FHA documents whose disclosure was compelled by a suit brought by WBC under the FOIA. The documents revealed that, contrary to repeated prior FHA representations, FHA had in fact redesigned the rock cut at MP 46.7.

(Complaint ¶ 34; *accord* Clevenger Decl. ¶ 8.) It should be noted, however, that when FHA actually forced White Buffalo to file suit to obtain the few documents under FOIA, it ended up having to pay White Buffalo's fees and costs as a result of its improper withholding of documents. (Clevenger Decl. ¶ 5 (*accord Clevenger v. U.S.*, Case No. 99-1615 AS (D. Or.), Stipulation for Settlement dated May 1, 2000); 2000 Depo., Ex. 35, Kaplan Decl., Ex. 9.)

As discussed above, White Buffalo's claims in March and November 2004 disclosed to the government that White Buffalo was seeking lost profits for bad faith. Although it is not clear more was necessary, each of the specifications of bad faith set forth in paragraph 50 of White Buffalo's 2007 complaint in this Court was also set forth in White Buffalo's January 13, 2005 claim and reiterated in the October 2006 claim.

- *Making Design Changes for Tidewater but Not for White Buffalo*. January 2005 Claim, Appendix B, Request for Profit and Justification for Profit ("Appendix B"), at 7, 8; October 2006 Claim, Appendix D ("Appendix D") at 15-17, 19,
- *Refusing to Acknowledge Differing Site Conditions*. Appendix B at 3, 6; Appendix D at 13-14.
- *Paying Tidewater for Fictitious Work at White Buffalo's Expense*. Appendix B at 8; Appendix D at 19.
- *Defective Plan and Different Site Conditions*. This is the same issue addressed above.
- *Concealing Differing Site Conditions and Design Changes*. Appendix B at 7; Appendix D at 15-17.

As shown below, the January 2005 claim was timely for the matters discovered or occurring in 2000 through 2002.

**2. White Buffalo's Claim for Bad-Faith Purported Conversion to Convenience**

White Buffalo's Third Claim for Relief challenges the government's eve-of-trial purported convenience termination as having been made in bad faith. White Buffalo alleges:

> 56. Where a convenience termination is the product of bad faith, there is no limit on recovery of lost future profits.

> 57. FHA's January 2004 conversion of the termination from default to convenience was the culmination of a pattern of bad-faith government conduct. Consequently, FHA is not entitled to escape liability for profits shown to have been lost on wrongly terminated future work.
>
> 58. Had WBC been allowed to perform, it would have earned profits in the amount of $558,064.25. WBC is entitled to damages in that amount plus interest under the CDA and its attorneys' fees pursuant to the EAJA.

The government does not challenge the timeliness of this claim but argues that it was not presented to the CO. White Buffalo has pointed out to the government where in its October 16, 2006 claim it asserted that the purported convenience termination was in bad faith, but to no avail. (Kaplan Decl., Ex. 10 at 2-3.) As noted above, in deposition, government representatives repeatedly admitted that beginning in 2004, they understood White Buffalo's certified claims to be challenging the convenience termination as having been made in bad faith. (Scott Depo. at 15-16, Kaplan Decl., Ex. 7 at 4-5; 2008 Parsons Depo. at 23, 25-26, Kaplan Decl., Ex. 6 at 6-8.)

**D. Evidence of Government Misconduct Is Abundant**

Because the government's motion is on the pleadings, it should not be necessary to get into the proof of the government's bad faith. However, because the motion may be construed as one converted to summary judgment pursuant to RCFC 12(d), White Buffalo sets forth below some of the abundant facts constituting bad faith demonstrating that it not only has alleged bad faith, but can prove it. In particular, White Buffalo sets forth the facts on the two most egregious aspects of the government's bad faith: (1) FHA's denial until White Buffalo obtained an independent survey and documents under FOIA that it had made design corrections for the completion contractor it refused to make for White Buffalo and (2) its efforts to charge White Buffalo's surety for work allegedly done by the completion contractor but either not performed or actually performed by White Buffalo. White Buffalo also sets forth the animus expressed by

Rettinger that explains the government's disparate treatment of White Buffalo and the completion contractor, Tidewater, with which Rettinger had a prior relationship. (*See* 2000 Rettinger Depo. at 9, Kaplan Decl., Ex. 1 at 2 (Rettinger's prior relationship with Tidewater).)

**1. The Government Made and then Concealed Design Changes for the Completion Contractor**

FHA personnel, including the CO, told White Buffalo, ICW (its surety) and the completion contract bidders that there would be no redesigns or changes to the contract and that the work would be completed as specified in the White Buffalo contract. (Kaplan Decl., Ex. 3 at 11-13; 2000 Rettinger Depo., Ex. 17, Kaplan Decl., Ex. 1 at 13-22.) However, after terminating White Buffalo, the government admits that it began working on "designing a solution" to fix its initial design errors. (Kaplan Decl., Ex. 3 at 13.) It also paid the completion contractor to correct the changed condition at MP 46.7 (Clevenger Decl. ¶ 7), even though these costs had been included in the completion contractor bid to White Buffalo's surety as a separate bid item based on the CO's letter.

The government then concealed these design fixes from White Buffalo. The government denied repeatedly to White Buffalo's president, Luther Clevenger, that there had been design changes. (Clevenger Decl. ¶ 4.) Similarly, the government admits that when White Buffalo asked for documents about design fixes under FOIA, it withheld some of the documents "based on advice of counsel." (Kaplan Decl., Ex. 3 at 14.) Nonetheless, some of the documents slipped through. (Clevenger Decl. ¶ 5.) However, most of the documents were not discovered until produced in this litigation and subject to sanctions for being withheld. (Kaplan Decl., Ex. 3 at 14.) In 2002, White Buffalo commissioned Landmark to obtain confirmation that the design fixes denied by the government had in fact occurred. (Clevenger Decl. ¶ 6; 2008 Rettinger Depo., Ex. 3, Kaplan Decl., Ex. 2 at 17-29.) Nonetheless, even in deposition two years later and

after his supervisor, Carol Jacoby, admitted there had been design corrections necessitating a contract modification for Tidewater, Rettinger steadfastly continued to deny that the design fixes had occurred. (Rettinger Depo. at 71, 75, Kaplan Decl., Ex. 1 at 6-7.)

However, Rettinger was alone in his insistence. As noted above, the CO admitted in her August 2007 decision that the design corrections had occurred. Indeed, even contemporaneously, as White Buffalo later discovered, the government was well aware what it was doing. For example, while telling White Buffalo's surety that no redesign had occurred at MP 46.7, internally, FHA acknowledged this redesign was necessary. FHA stressed, though, the importance of keeping quiet about the design correction. "We do not want anyone making the interpretation of our actions in getting the additional work corrected to really be the groundwork for [White Buffalo's] T for C." (2000 Rettinger Depo. at 115-117, Ex. 18, Kaplan Decl., Ex. 1 at 9-11, 23-32.) As noted above, consistent with its strategy of concealment, however, the government withheld the documents relating to the design correction in response to White Buffalo's FOIA request, a request upon which the government ultimately had to pay White Buffalo's attorneys' fees. (2000 Rettinger Depo. at 118, Exs. 9, 35, Kaplan Decl., Ex. 1 at 12.)

### 2. The Government Paid the Completion Contractor at White Buffalo's Expense in Bad Faith

FHA paid the completion contractor, Tidewater, for substantial work that was never performed or that was performed by White Buffalo. One example is work certified and paid for at MP 46.7, which the 2002 Landmark survey demonstrated had never been performed, despite the facts that both the completion contractor and FHA personnel certified the work and the quantities for payment. (Clevenger Decl. ¶¶ 6-7.) Similarly, FHA certified and paid Tidewater for work that was performed by White Buffalo before termination. (*Id.*)

The CO's August 2007 decision tried to explain away these facts, arguing that there "may have been a reason to reduce payment to the completion contractor," but because they took place after termination, White Buffalo (despite being backcharged for the fictitious costs) has no basis to complain about them. (Kaplan Decl., Ex. 3 at 15.) The government contends that "following termination, there was no contract between WBC and the Government" and, therefore, White Buffalo cannot complain about the government's bad faith. (*Id*.) However, the government does not explain how it could backcharge White Buffalo through its surety if there was no contractual relationship. Moreover, the government ignores the fact that its post-termination conduct and disparate treatment of White Buffalo and Tidewater *evidences* the government's bad faith prior to termination. Nonetheless, the government failed to even consider that the disparate treatment showed ill-will or malice. (Scott Depo. at 62, Kaplan Decl., Ex. 7 at 17.)

**3. There Is Voluminous Evidence of Rettinger's Animus Toward White Buffalo**

This disparate treatment of White Buffalo and Tidewater can be explained (although not justified) by the voluminous evidence of Rettinger's animus toward White Buffalo. Rettinger admitted that he discussed with Tidewater the possibility of its taking over White Buffalo's work on multiple occasions before White Buffalo's termination. (2000 Rettinger Depo. at 16, Kaplan Decl., Ex. 1 at 3.) From the beginning, he tried to set up White Buffalo for default, for example, by telling White Buffalo that no clearing was allowed at MP 46.2 in September 1998, when, as the CO admitted in her decision on White Buffalo's claim, the contract contained no such restriction. (Kaplan Decl., Ex. 3 at 4; Scott Depo. at 32, Kaplan Decl., Ex. 7 at 10.)

Rettinger also asserted improper pressure on the Project engineer, Sajid Aftab, to make life difficult for White Buffalo. Aftab expressed it:

> I told Paul [Rettinger] my frustrations on this job. I am Project Engineer on this job, I am not making any decisions. I am not informed in which I expected has to come or go. I am only

> signing letters & feel that I am out of loop. I don't know why I am Project Engineer.
>
> Howe Crockett called (COE). I express my great displeasure regarding this job. I told him also that I am not being performing my duties as a P.E.

(Kaplan Decl., Ex. 3 at 5.)

Indeed, the government acknowledges that Aftab has testified, "I don't know why Paul is so strict on the is [*sic*] job, while he is not so strict on other jobs." (Kaplan Decl., Ex. 3 at 6 (citing Aftab Depo. at 76-77).) This testimony alone creates an issue of fact on White Buffalo's bad-faith claim. Similarly, in deposition, Rettinger admitted that he overruled Aftab when Aftab thought that perhaps White Buffalo should be paid for its work. (2000 Rettinger Depo. at 92, Kaplan Decl., Ex. 1 at 8 ("those decisions [not to pay White Buffalo] were mine").)

The CO's decision also cites a file document prepared by a government inspector on the Project, Mike Barber, in which Rettinger became "bizarre[ly]" irrational when he discovered that the inspector had been talking to Clevenger, threatened to fire the inspector, and "maliciously slandered both Clevenger and me." (Kaplan Decl., Ex. 3 at 7.) However, the CO deciding White Buffalo's bad-faith claim neglected to ask Rettinger if this conversation occurred. (Scott Depo. at 34, Kaplan Decl., Ex. 7 at 11.) If the CO had done so, she would have discovered that Rettinger remembers it well and unashamedly admits that he in fact fired the inspector for talking to White Buffalo. (2008 Rettinger Depo. at 32, 34-36, Kaplan Decl., Ex. 2 at 10-13.) Instead, the government simply decided that Barber lacked credibility. (Kaplan Decl., Ex. 3 at 5-6.) However, this lack of credibility really meant that the government preferred what Rettinger had to say. When Rettinger disagreed with Barber's report of another conversation between the two, the government engineer investigating the claim decided to accept Rettinger's side of the

story at face value because "my comfort level, I would say, yes, did fall to Paul's [Rettinger's] position." (Scott Depo. at 41-42, Kaplan Decl., Ex. 7 at 12-13.)

Rettinger's animus toward White Buffalo is also shown in that White Buffalo was not terminated for default until December 3, 1998 and was not sent a cure notice until November 13, 1999. However, as early as October 6, 1998, Rettinger was proposing giving some of White Buffalo's work to another contractor. By October 28, after consulting with the Forest Service, he was openly advocating termination. (Scott Depo. at 51, Kaplan Decl., Ex. 7 at 15; 2008 Rettinger Depo. at 44, Ex. 2 at 14.) However, the government delayed sending a cure notice until November 13, 1999, at which point Rettinger "did not expect them to cure the default." (2008 Rettinger Depo. at 27, Kaplan Decl., Ex. 2 at 8.)

Unfortunately, the only witness the CO and her representatives talked to in deciding White Buffalo's bad-faith claim was Rettinger himself. (Scott Depo. at 14, Kaplan Decl., Ex. 7 at 3.) The government did not talk to Aftab, Barber or even the former CO who made the default and conversion decisions. (*Id.* at 3-4.) As discussed below, in a case where the government advocates an "ill-will or malice" standard for bad faith (Motion at 13), talking only to the individual who most demonstrated those attitudes does not seem a particularly effective way of going about it. (*See* Scott Depo. at 25, Kaplan Decl., Ex. 7 at 8 (admitting that "it may have" been helpful to interview witnesses other than Rettinger).) Whether it was a "comfort level" with Rettinger or, as the government admits Clevenger reported to the original CO, "Government employees are 'afraid of Paul'" (Scott Depo. at 47, Kaplan Decl., Ex. 7 at 14), the CO's decision only to interview Rettinger of all the witnesses simply lacks a rational basis.

Again, White Buffalo must stress that these are only examples of the government's bad faith it discovered within the six-year CDA period. Discovery is continuing, and White Buffalo is confident that these examples are only the tip of the iceberg.

## III. ARGUMENT

### A. The 1999 and 2000 Cases Are Not Moot—as the Court Has Already Held

The government, and as noted above, not for the first time, argues that when the government purported, on the eve of trial of case Nos. 99-961C and 00-415C, to convert its default termination to convenience, those cases became moot. As also noted above, the Court previously denied the government's motion and, although the CO finally decided White Buffalo's January 2005 and October 2006 claims, nothing else has changed, and nothing has changed that would justify reconsideration. For example, as the Court held in May 2007, it is preferable to address the EAJA attorneys' fees issue only once in these consolidated cases, rather than decide attorneys' fees issues piecemeal.

Additionally, the conversion did not address White Buffalo's claim for an equitable adjustment and extensions of time and thus could not moot the 1999 and 2000 cases. In case No. 99-961C, White Buffalo specifically pled entitlement to an equitable adjustment of the contract price and to additional time. (1999 Complaint ¶¶ 29, 75.)[2] These claims are still at issue. For example, the CO, disagreeing with the DCAA experts who audited White Buffalo's costs, determined in her August 2007 CO decision that White Buffalo would not have made a profit on that project. (Scott Depo. at 65-66, Kaplan Decl., Ex. 7 at 18-19; Kaplan Decl., Ex. 3 at 16-17.) However, the government failed to factor into the equation White Buffalo's entitlement to an equitable adjustment based on the changed conditions and design flaws that were the

---

[2] Attached for the convenience of the Court as Exhibit 11 to the Kaplan Decl.

subject of the government's strenuous attempts at concealment. Its representative admitted in deposition:

> Q. . . . In the course of evaluating White Buffalo's lost profits claim, did you consider whether it might be entitled to more time or more money?
>
> A. Under the analysis for the lost profit?
>
> Q. Correct.
>
> A. I believe the finding was that they were operating at a loss at that point in time.
>
> Q. Okay. And operating at a loss without evaluating any entitlement White Buffalo may have had to an increase in the contract price?
>
> A. I don't recall getting into that analysis.

(Scott Depo at 65-66, Kaplan Decl., Ex. 7 at 19-20; *accord* Firestone Depo. at 104, Kaplan Decl., Ex. 8 at 5.) It is precisely this analysis that was at issue in the 1999 and 2000 cases and that is necessary to determine White Buffalo's lost profits. (Clevenger Decl. ¶ 3.)

Similarly, on the issue of attorneys' fees, it still remains the law, as White Buffalo pointed out, that the government's belated convenience declaration does not and cannot moot White Buffalo's eligibility for an award of fees under EAJA. Under *Rice Services, Ltd. v. U.S.*, 405 F.3d 1017, 1025 (Fed. Cir. 2005), "an EAJA applicant must show that it obtained an enforceable judgment on the merits or a court-ordered consent decree that materially altered the legal relationship between the parties, or the equivalent of either of those." The government's belated declaration of convenience here reinforces the concerns recently expressed by this very Court in a bid-protest case. As Judge Hodges explained in *Universal Fidelity LP v. U.S.*, 70 Fed. Cl. 310, 316 (2006):

> We feel strongly that to deny Universal's attorney's fees under the circumstances presented would impart to the defendant

> an undeserved advantage in bid protest litigation. Such a ruling would allow the Government to issue a solicitation that it knows may be subject to legal challenge, deny an agency-level protest, await litigation in the Court of Federal Claims, allow plaintiff to incur substantial costs in arguing its position, and then, at the eleventh-hour cancel the offending solicitation to avoid having to pay plaintiff's expenses arising out of a lawsuit designed to bring the Government's actionable conduct to the court's attention. In short, such a scenario depicts the facts of our case.

(Footnote omitted.) *Accord Former Employees of Motorola Ceramic Products v. U.S.*, 336 F.3d 1360, 1367 (Fed. Cir. 2003) (EAJA fees available when party obtains remand to agency to obtain relief sought).

Here the government's eve-of-trial conversion gave White Buffalo some—and only some—of the relief sought in the 1999 and 2000 cases. But it did make White Buffalo a prevailing party entitled to its EAJA fees. The 1999 and 2000 cases are not moot.

**B. White Buffalo's Claims in Its Second Claim for Relief Were Presented to the CO Within the Time Required by the CDA**

As discussed above, White Buffalo notified the government it was asserting bad faith in its March and November 2004 claims. (Scott Depo., Exs. 4, 5, Kaplan Decl., Ex. 7.) These claims were plainly timely for a contract terminated in December 1998. Moreover, even if the detailed specifications of bad faith in White Buffalo's January 13, 2005 claim, repeated in its Second Claim for Relief, are at issue, they are not barred by the six-year claim requirement of the CDA, which does not begin to run until "accrual of the claim." 41 U.S.C. § 609. The government's argument to the contrary is not well founded for a number of reasons. First, White Buffalo did not discover the pertinent facts until 2000 at the earliest. When it received documents showing the government in fact had made the design changes it had denied occurred and had concealed from White Buffalo (Clevenger Decl. ¶¶ 4-5), White Buffalo could not confirm that the government was in bad faith until it revealed the Landmark survey in November

2002 (*id.* ¶¶ 6-7). Its January 2005 claim was therefore timely. Second, the claim is a continuing one that relates back to timely filed case Nos. 99-961C and 00-415C. Third, the government's conduct, in particular its concealment of the material facts, gives rise to equitable tolling, barring the government from asserting that the claim was untimely.

**1. White Buffalo Did Not Discover Its Claims Until 2000 or Later**

The critical elements of White Buffalo's bad-faith claim, for example, the design correction made for Tidewater but refused for White Buffalo, were concealed by the government and were only discovered after White Buffalo obtained in discovery documents previously withheld and had to hire an independent surveyor to prove the changes were made. (Clevenger Decl. ¶ 6.) Until such time, White Buffalo reasonably relied on the government's repeated representations that there were no design changes and that the replacement contractor had actually performed the work for which it had been paid (which work was charged to White Buffalo). The six-year CDA clock thus did not begin to run until White Buffalo discovered that the government's misrepresentations were in fact just that. *See Irwin v. Department of Veterans Affairs*, 498 U.S. 89, 95, 111 S. Ct. 453, 112 L. Ed. 2d 435 (1990); *Hayes v. U.S.*, 73 Fed. Cl. 724, 727 (2006); *Japanese War Notes Claimants Ass'n of Philippines, Inc. v. U.S.*, 178 Ct. Cl. 630, 373 F.2d 356, 358-59 (1967) (discovery rule and equitable tolling applies to claim against United States).

Under the discovery rule, "the facts of a claim need not be actually known to the plaintiff but must be available to the plaintiff" in order for the claim to accrue and start the CDA clock running. *Hayes*, 73 Fed. Cl. at 727. Here the clock did not begin to run, at the earliest, until the government finally coughed up a few relevant documents in January 2000 under FOIA and later produced additional documents in discovery admitting design changes were made or,

alternatively, when White Buffalo obtained its survey in 2002. Consequently, in addition to its 2004 claims, White Buffalo's January 2005 claim was also timely.

**2. White Buffalo's Claim Relates Back to Case Nos. 99-961C and 00-415C, and the Claim Is a Continuing One**

When a CDA claim arises out of "the same set of operative facts as the claim submitted to the contracting officer," it relates back to the date of the initial claim. *See Lockheed Martin v. U.S.*, 70 Fed. Cl. 745, 756 (2006) (and the cases cited therein). "The same set of operative facts has been found where the contractor submits additional evidence pertaining to damages to support the same factual claim . . . or where the claim merely augments the legal theories underlying the certified claim." *Id.* As the recent case of *Bannum v. U.S.*, 80 Fed. Cl. 239, 248 (2008), held:

> The claim presented to this court must be the same as that which was decided by the Contracting Officer, but the statute "does not require rigid adherence to the exact language or structure of the original administrative . . . claim [when] they arise from the same operative facts, claim essentially the same relief, and merely assert differing legal theories for that recovery." *ACE Constructors*, 499 F.3d at 1361 (quoting *Scott Timber Co. v. United States*, 333 F.3d 1358, 1365 (Fed. Cir. 2003)).

Similarly, this Court has adopted the relation-back doctrine as a general rule. *E.g.*, RCFC 15(c); *Slattery v U.S.*, 53 Fed. Cl. 258, 280 (2002); *Case, Inc. v. U.S.*, 25 Cl. Ct. 379, 383-83 (1992). Here White Buffalo's bad-faith claim arose out of the same contract on the same project and the same continuing course of conduct by the government as was at issue in the 1999 and 2000 cases; therefore, it relates back. Moreover, the same issues that were present in the 1999 and 2000 cases, White Buffalo's entitlement to an equitable adjustment of the contract price and more time, are still at issue in White Buffalo's claim for lost profits.

The continuing-claim doctrine also applies to push out the date when the CDA clock begins to run. "In order for the continuing claim doctrine to apply, the plaintiff's claim must be

inherently susceptible to being broken down into a series of independent and distinct events or wrongs, each having its own associated damages." *Brown Park Estates-Fairfield Dev. Co. v. U.S.*, 127 F.3d 1449, 1456 (Fed. Cir. 1997); *see also Hayes*, 73 Fed. Cl. at 729 (a continuing claim involved "recurring, individual actionable wrongs"). Here White Buffalo's bad-faith claim arose not from the government's improper termination for default in late 1998, but from its continuing series of concealments and actions taken for the benefit of the completion contractor, continuing through the eve-of-trial purported conversion for convenience. As cited above, the government conceded no later than January 2004 that it was aware White Buffalo was seeking lost profits.

Consequently, White Buffalo's bad-faith/lost-profits claim relates back to the 1999 and 2000 cases and was, in any event, continuing until January 2004.

**3. Equitable Tolling Applies**

Additionally, the government's concealment tolled the CDA clock under the doctrine of equitable tolling. The general doctrine of equitable tolling "is read into every federal statute of limitation." *Holmberg v. Armbrecht*, 327 U.S. 392, 397, 66 S. Ct. 582, 90 L. Ed. 743 (1946); *accord TS Infosystems, Inc. v. U.S.*, 36 Fed. Cl. 570, 573 (1996) (applying equitable tolling to False Claims Act); *see also Bowden v. U.S.*, 106 F.3d 433, 438 (D.C. Cir.1997) ("courts have excused parties, particularly those acting pro se, who make diligent but technically defective efforts to act within a limitations period"); *Bath Iron Works Corp. v. U.S.*, 20 F.3d 1567, 1572 n.2 (Fed. Cir. 1994) (tolling is not same as waiving). In particular, "the rule of equitable tolling [is] applicable to suits against the Government, in the same way that it is applicable to private suits." *Irwin*, 498 U.S. at 95. Referring to the *Irwin* case, a Board of Contract Appeals explained that the

> Supreme Court has stated that equitable tolling may be used in a case against the United States to extend a jurisdictional deadline in exceptional circumstances where, for example, a party actively pursued its judicial remedies but filed a defective pleading or where a party was induced or tricked by an adversary's misconduct into allowing a filing deadline to pass.

*Appeals of Schleicher Community Corrections Center, Inc.*, 1998 WL 455631 (D.O.T.C.A.B Aug. 6, 1998).[3]

Here the government waited until 2004, until the eve of trial, to purport to convert the default termination to convenience, under the government's theory of accrual in late 1998, effectively running out most of the CDA clock. It also tried its hardest—as demonstrated by the FOIA litigation for which White Buffalo recovered its attorneys' fees—to conceal the evidence of design changes for the benefit of Tidewater and that it paid Tidewater (and charged White Buffalo) for work Tidewater did not perform. (Clevenger Decl. ¶¶ 6-7.) It also tried to conceal that it was acting in retaliation for White Buffalo's claim on the prior Forest Service project. (Munro Depo., Ex. 17, Kaplan Decl., Ex. 5.) If there was ever a case in which an "adversary's misconduct" justified the application of equitable tolling, this is the one.

**C. White Buffalo Presented Its Bad-Faith Conversion Claim to the CO**

As noted above, the government does not challenge the timeliness of White Buffalo's Third Claim for Relief, for bad-faith purported conversion, but argues that White Buffalo failed to make the claim to the CO. However, White Buffalo's March and November 2004 certified claims made clear that it was seeking lost profits for the wrongful convenience termination. (Scott Depo. at 15-16 & Exs. 4, 5, Kaplan Decl., Ex. 7 at 4-5, 22-28; 2008 Parsons Depo. at 23,

---

[3] In *Bonneville Associates, Ltd. Partnership v. Barram*, 165 F.3d 1360 (Fed. Cir. 1999), the Federal Circuit declined to take a position on whether, as demonstrated by *Schleicher*, equitable tolling applies to CDA claim deadlines, but offered no reason it would not. Consequently, White Buffalo maintains that if squarely presented with the question, the Court would hold that it does so apply.

25-26, Kaplan Decl., Ex. 6 at 6-8.) And again White Buffalo has pointed out to the government where it also asserted in October 2006 that the January 2004 purported convenience termination was in bad faith. (Kaplan Decl., Ex. 10.) Inexcusably, the government simply ignores this and blithely assures the Court that White Buffalo has never done so. However, ignoring the claim will not make it go away.

At this point, given that the government denied White Buffalo's bad-faith claim in its entirety by the CO's August 2007 decision, two or three years after it made the claim, White Buffalo is entitled to assume that the government also denied the claim for bad-faith conversion even though the CO failed to address it. *See Texas Health Choice, L.C. v. Office of Personnel Management*, 400 F.3d 895, 897 (Fed. Cir. 2005); *H.B. Mac, Inc. v. U.S.*, 153 F.3d 1338, 1342 (Fed. Cir. 1998); *Appeal of Carmona Industrias Electricas S.A.*, 93-3 BCA ¶ 25,975 (1993) (claim deemed denied by CO's long delay in deciding). Indeed, the government engineer charged with evaluating White Buffalo's claim that the conversion to a convenience termination was in bad faith admitted that he made no evaluation of the good-faith nature of conversion (Scott Depo. at 21-22, Kaplan Decl., Ex. 7 at 7-8), nor can the government point to any such determination. As discussed above, the government has never come up with a rationale for the conversion other than an alleged "safety condition" or concurrent delay resolved years before. That even the CO in whose name the decision was issued admitted that he could not see the logic of the conversion (2008 Parsons Depo. at 18, Kaplan Decl., Ex. 6 at 5) only emphasizes that the government simply has no good-faith explanation. White Buffalo will have little difficulty showing the conversion was in bad faith.

White Buffalo's claim for bad-faith conversion is properly before the Court, and it is a claim on which White Buffalo will prevail.

**D. White Buffalo Alleged and Demonstrated to the CO Facts Showing Specific Intent to Injure White Buffalo**

White Buffalo does not dispute that, as the government notes, the actions of the government's agents are entitled to a presumption of good faith. Rather, under the proper legal standard, the facts set forth above constitute copious evidence of bad faith, both alleged and proved, more than sufficient to create an issue of fact for trial. As the *Bannum* case relied on by the government provides, the standard for government breach of the duty of good faith and fair dealing is:

> In a government contract, the implied covenant of good faith and fair dealing requires that the [g]overnment not use its unique position as sovereign to target the legitimate expectations of its contracting partners." *Centex*, 49 Fed. Cl. at 708 (citing *Yankee Atomic Elec. Co. v. United States*, 112 F.3d 1569, 1575 (Fed.Cir.1997)). . . . For a plaintiff to successfully assert a claim for breach of the implied covenant of good faith and fair dealing respecting a contract with the government, he or she "must allege and prove facts constituting a specific intent to injure [the] plaintiff on the part of the government[al] official." *Pratt v. United States,* 50 Fed. Cl. 469, 479 (2001) (citing *Texas Instruments, Inc. v. United States*, 991 F.2d 760, 768 (Fed. Cir. 1993)). 80 Fed. Cl. at 246.

*See also Kyrgoski Const. Co., Inc. v. U.S.*, 94 F.3d 1537, 1541 (Fed. Cir. 1996) (government liable for lost profits if termination-for-convenience decision made in bad faith).

Unfortunately, however, the government did not evaluate White Buffalo's claim using the "ill-will or malice" standard (Motion at 13) it now advocates. Instead, the test it used was whether "the Government basically [was] impeding or hampering the contractors' operations." (Scott Depo. at 28, Kaplan Decl., Ex. 7 at 9.) The FHA engineer evaluating White Buffalo's claim admitted that if the test was "ill-will or malice," it "potentially" might have been a good idea to ask the government personnel what their intentions were toward White Buffalo. (Scott Depo. at 63, Kaplan Decl., Ex. 7 at 19.)

However, given that the only witness the FHA CO and her assistants actually talked to was Rettinger, if the government had actually employed the standard it now advocates, given the facts set forth above (in section II.D.3), there would have been no question of Rettinger's ill will or malice. The disparate treatment of White Buffalo and Tidewater also demonstrates an animus toward White Buffalo. White Buffalo's allegations (and showing) that Tidewater was treated more favorably is equivalent to an allegation that *White Buffalo was singled out for unfavorable treatment*—that is, that the government acted maliciously and with ill will toward White Buffalo.

Moreover, the government's motion is on its face one on the pleadings. However, the government appears to confuse White Buffalo's burden of proof on the merits of its claim, a burden the government characterizes as clear and convincing evidence,[4] with the requisite specificity of pleading. (Motion at 13.)[5] Under this Court's rules, the usual pleading standards apply. Federal pleading is notice pleading. Pleadings are liberally construed. *See Ponder v. U.S.*, 117 F.3d 549, 552-53 (Fed. Cir. 1997) (because motion to dismiss on pleadings "summarily terminates the case on its merits, courts broadly construe the complaint, particularly in light of the liberal pleading requirements under the Federal Rules of Civil Procedure"). No magic words need be used so long as the defendant is notified of the gravamen of the claim against it. *Id.* at 553; *Cascade Pacific Intern. v. U.S.*, 773 F.2d 287, 295 (Fed. Cir. 1985). Here White Buffalo specially alleged that the government breached its obligation of "good faith and fair dealing," and the government's purported conversion from default to convenience "was the culmination of

[4] The *Bannum* decision noted that there is some debate on the relevant standard of proof. 80 Fed. Cl. at 246 n.12. However, there is no need to decide the issue on a motion against the pleadings.

[5] The government's confusion might be engendered by *Bannum*, which also seems to have failed to consider under the federal practice the difference between standards of proof and standards of pleading.

a pattern of bad-faith government conduct." (Complaint ¶¶ 50, 57.) There can be no doubt that the government understands the nature of White Buffalo's claim. Moreover, White Buffalo alleged the specific facts demonstrating ill will and malice on the part of the government, including its concealment of design fixes made for the completion contractor and disparate treatment of White Buffalo and Tidewater. (*E.g.*, Complaint ¶ 50(a)-(e).) The government's challenge to White Buffalo's pleadings lack merit.[6]

## IV. CONCLUSION

The government's motions should be denied. The government should be required to defend its conduct on the merits.

DATED: May 7, 2008.

/s/ Scott J. Kaplan
Richard E. Alexander, OSB No. 69002
Scott J. Kaplan, OSB No. 913550
Attorneys of Record for
White Buffalo Construction, Inc.
Stoel Rives LLP
900 SW Fifth Avenue, Suite 2600
Portland, OR 97204-1268
Telephone: (503) 224-3380
Facsimile: (503) 294-9167

[6] As shown by the facts set forth above, White Buffalo certainly *could have* pled the government's malice and ill will with more specificity. If the Court agrees with the government that the current complaint is insufficiently specific, White Buffalo requests leave to amend. The government will suffer no prejudice by amendment, because it obviously understands the claims well enough to conduct discovery and defend on the merits.