# EXHIBIT 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

COPY

WHITE BUFFALO CONSTRUCTION,
INC., AN OREGON CORPORATION,

PLAINTIFF,

VS. 99-961 C

CONTRACT NO. DTFH70-98-C-00027

THE UNITED STATES,

DEFENDANT,

---

DEPOSITION OF PAUL RETTINGER,
JULY 26, 2000

---

BE IT REMEMBERED THAT, pursuant to the OREGON AND WASHINGTON rules of Civil Procedure, the deposition OF PAUL RETTINGER, was taken before Cathy Obertello, a Certified Shorthand Reporter, and a Notary Public for the State of OREGON AND WASHINGTON, on JULY 26, 2000, commencing at the hour of 11:00 A.M. The proceedings being reported AT THE OFFICES OF THE FEDERAL HIGHWAY ADMINISTRATION BUILDING, 610 EAST FIFTH STREET, VANCOUVER, WASHINGTON.

A. Approximately June of 1976, I believe.
Q. All right. You were the Resident Engineer on the White Buffalo project? As a Resident Engineer did you have any responsibilities for any other projects at that time?
A. Yes.
Q. What other projects?
A. We had a contract with Tidewater on a Siskiyou National Forest project.
Q. When did that job start in relationship to the White Buffalo project?
A. I can't remember the exact date, but it would have been early in '98, I believe.
Q. So, it start the prior to the White Buffalo?
A. That is correct.
Q. When did that job end?
A. I would have to -- I can't give you the exact date, but it ended after the White Buffalo job began. I'm going to say approximately September or October. I'm not sure.
Q. But you think it ended before White Buffalo's contract was terminated? That was December 1st?

A. I can't give you a date, but I believe it was when I was talking to Scott Darger about the possibility of were they available to complete this project, or at least buttoning it up for the winter.

Q. Do you remember where you were and where he was when the discussion took place?

A. I'm not sure, but I believe I probably called him from our office.

Q. What did he say?

A. He said -- I can't remember exactly what he said, but we agreed to meet on site, I believe, sometime after that.

Q. Did you meet with him?

A. Yes, we did.

Q. What took place at that site visit?

A. We looked at the status of the project. I was mostly concerned about the siltation going into the river. I was concerned with getting things cleaned up, getting the haul road cleaned up so that we didn't further damage the river. That was my major concern.

So that would have been basically what we were talking about. What would it take? How long were they available?

I was told they hadn't.
Q. Are you aware of any other disputes, terminations or claims that White Buffalo has had on other projects?
A. Am I aware of any.
Q. Yes?
A. Yes, I am.
Q. What others are you aware of?
A. I'm aware of prior problems with another federal contract, and I believe it was the US Forest Service.
Q. Any others than that one?
A. Not that I can recall.
Q. When did you become aware of the Forest Service contract?
A. I can't give you a date, but I believe it was when I was in the Vancouver office. I know it was when I was in the Vancouver office, but we were well into the contract.
Q. The White Buffalo contract?
A. That's correct.
Q. The cure notice is dated November 13th?
A. Yes.
Q. Do you think it was before or after November 13th?

A. I believe it was before November 13th.
Q. What was your understanding at the time the work started on the project as to the window in which White Buffalo had to perform the work allowed for the permit by Fish and Wildlife?
A. Okay. I'm going to ask you to repeat that again, Dick.
Q. By the time the job started what was your understanding of the time in which White Buffalo had to perform the work allowed by the Fish and Wildlife permit?
A. The time allowed was in the contract.
Q. What is your understanding of what those dates are?
A. I could look at the contract and tell you.
Q. But you don't remember? Does October 30 sound right?
A. The October 30 being what?
Q. The date by which the work had to be done initially?
A. Yes. There's a chart in there. There are numerous dates and numerous sites. I could look and I could tell you.
Q. All right. We'll get to that later?

other site were such that he could not proceed with the work.
Q. What other site?
A. I would say, I believe it's Milepost 46.7, which is what we termed as the rock cut site, which had a geogrid wall and extensive work that needed to be done there.
Q. That was the area that was redesigned; wasn't it?
A. There was a contract modification addressing some work out of the contract design.
Q. It was redesigned because of the different site conditions; wasn't it?
A. I'm not going to portray it that way.
Q. Do you know that Carol Jacoby in her analysis of White Buffalo agreed with White Buffalo that there was a change condition?
A. I don't know that. No.
Q. On that area above the rock cut at 46.7, are there any other reasons why you don't think that White Buffalo would have completed the FDR 33 work by November 30th?
A. Well, the other thing I would question would be whether the other two geogrid walls in the 47.07 to Milepost 47.25 area could have been

the additional design or something? Are you familiar with this?

A. Can I look at it?

MR. TRAUTWEIN: It's Exhibit 16.

BY MR. ALEXANDER

Q. Take a look at Exhibit 16.

A. Yes. This appears to be the work at Milepost 46.7.

Q. I'm not sure if it makes any difference, but why are you reluctant to call this a redesign?

A. I'm not sure that I'm reluctant to call it a redesign. I believe I called it work that we did under contract modification.

Q. That a modification to Tidewater's contract?

A. That's correct.

Q. Between December of '98 and March of '99, it was necessary for Federal Highway Administration to conduct a new survey; wasn't it?

A. My response would be yes, I believe that's true.

Q. And there was a different design -- I just use that word generally -- in this area of

only work you refer to is the work at the Milepost at 46.7?
A. I believe the context is "such as," which is not exclusive.
Q. You know that White Buffalo was not paid any amount for work performed on this job; don't you?
A. We never issued a payment invoice. That's correct.
Q. And who was the one that decided not to issue a payment invoice?
A. The contract.
Q. Who decided that, according to the contract, it wasn't appropriate to issue a payment invoice?
A. Myself and the Project Engineer. Predominantly, I would say that those decisions were mine.
Q. Is this one of the issues where the Project Engineer was critical?
MR. TRAUTWEIN: Is that your testimony or your word -- critical?
MR. ALEXANDER: No. He's already testified to that. It is my word. I'll ask it again.

leave that to the geotechnical people.

Q. And then obviously at some point, somebody felt that a different design was appropriate? Didn't they?

A. Yes.

Q. All right. This is dated March 4th of 1999. Now between December, January and February of 1999, was there consideration being given to redesigning that slope?

A. Yes.

Q. Take a look at Exhibit 17. This is a letter from the bonding company of White Buffalo. It says,

"Enclosed is a letter from the Departments of Transportation advising Insurance Company of the West that they are willing to accept a completion contractor, that they are unable to commit at this time to relaxation of the work window restrictions, and their advisement that the Government does not plan on redesigning the slope at Milepost 46.7."?

A. Yes.

Q. It's dated February 3rd?

A. Okay.

Q. And there's a second letter attached

from Parsons?
A. Okay.
Q. Do you have any idea why Parsons was telling White Buffalo's Surety that you did not intend to redesign the slope at 46.7?
A. No. I think you'd have to ask Mr. Parsons.
Q. Wasn't FHA worried that if it got out that you were going to redesign the slope at 46.7, that it could be used by White Buffalo to change this termination by default to a termination by convenience?
A. I didn't make that determination. I don't know if that determination was made.
Q. Do you know if anyone in the Federal Highway Administration being concerned that if it got out that a redesign was being made, that it could be used to convert this for a T for C?
A. I could honestly tell you that I don't remember any conversations to that effect.
Q. Do you remember any e-mails to that effect?
A. Not that I recall.
Q. Take a look at Exhibit 18 -- the 5th page in?

A. Okay.
Q. That's a memo or an e-mail from Carol Jacoby to a number of people, including you?
A. Okay.
Q. Do you see the last sentence in the first paragraph? "We do not want anyone making the interpretation of our actions in getting the additional work corrected to really be the groundwork for a T for C?
A. Yes. I read that.
Q. Do you remember receiving this e-mail?
A. Well, obviously, my name is at the top of the list. Until this moment, I didn't recall it.
Q. Does that refresh your recollection that the Federal Highway Administration was concerned about letting White Buffalo or the Surety know that there has been a redesign of the slope at 46.7?
A. Let me just say, this is dated December 21. As I recall, I was on leave. This is a few days before Christmas. I can't even tell you when I opened it, and if I opened it. I probably did open it sometime in January. The bottom line is I wasn't involved in these

discussions. I can't tell you that I had an opinion or was asked my opinion. Whatever was going on was at a different level than I was at.

Q. Did you know that White Buffalo filed a Freedom of Information Act request?

A. Yes.

Q. Who was responsible within FHA to gather the documents in response to that?

A. The Freedom of Information officer is Dorothy Adesko, I believe.

Q. Who gathered the documents for her on this job?

A. I know I gathered some, and I'm sure there were others. Anybody that was involved in it was probably asked to provide all of those documents.

Q. Did you know that when the documents were produced for White Buffalo that the redesign was not produced?

A. I can't speak to the time frames on that, Dick, I don't know.

Q. Have you ever heard to this day that the redesign at 46.7 was not included?

A. Well, that would not have been addressed

# ICW GROUP

☑ INSURANCE COMPANY OF THE WEST
☐ EXPLORER INSURANCE COMPANY
INDEPENDENCE CASUALTY AND SURETY COMPANY

A Tradition Of Innovation

February 3, 1999

Luther L. Clevenger
White Buffalo Construction Co.
PO Box 1310
Aumsville, OR 97325

| | | |
|---|---|---|
| RE: | Principal: | White Buffalo Construction Co. |
| | Bond No.: | 156 60 32 |
| | Claim No.: | 110-98-08819 |

Dear Mr. Clevenger:

Enclosed is a copy of a letter from the Department of Transportation advising Insurance Company of the West (ICW) that they are willing to accept a completion contractor, that they are unable to commit at this time to relaxation of the work window restrictions, and their advisement that the Government does not plan on redesigning the slope at MP 46.7.

ICW will now evaluate the completion bids and make a determination on the completion contractor that will be tendered to the Government for completion of the project. You'll be advised of this determination when it becomes available.

Cordially,
Insurance Company of the West

Ernie Ulibarri
Surety Claims Consultant
Direct line: (619) 350-2419

EU/ec

Enclosure: US Department of Transportation letter dated February 2, 1999

cc: Jeff Draper, Portland

EXHIBIT 17

EXHIBIT 1
Page 13 of 32

WESTERN FEDERAL LANDS HIGHWAY DIVISION
610 EAST FIFTH STREET
VANCOUVER, WASHINGTON 98661-3893

U.S. Department
of Transportation

Federal Highway
Administration

February 2, 1999
In Reply Refer to:
HPA-17.13

Ernie Ulibarri, Surety Claims Consultant
ICW Group
Insurance Company of the West
P.O. Box 85563
San Diego, CA 92130-2045

Dear Mr. Ulibarri:

FHWA Project No. OR FS ERFO 97-18(2)
FHWA Contract No. DTFH70-98-C-00027
<u>ICW Bond No. & Claim No. 1566032 and 110-98-08819</u>

Your letter of January 15, 1999 advises that the Insurance Company of the West anticipates tendering a completion contractor to complete the above referenced contract. Upon deciding to tender a completion contractor, please do so in writing providing the name of the contractor. We will consider the contractor's ability to perform the work and, if capable, we will advise you of our acceptance.

It is my position that the contract with a completion contractor will be based on the original plans and specifications and provide that the completion contractor will correct any defective work as well as the balance of the uncompleted work in strict accordance with the contract requirements. The contract should incorporate the original contract's items of work and unit prices with the original quantities adjusted due to work previously performed. The contract should be for the balance of the original contract proceeds. New payment and performance bonds will be required on the new completion contract.

Any changes in the original contract requirements will be done by contract modifications to the completion contract after award so that any associated additional costs can be segregated from the cost of the original contract. At this time we are pursuing the possibility of the permitting agencies allowing the in-stream work to begin earlier in 1999 than the current contract allows. This

relaxation of the work window restrictions may or may not occur, and we may not know the final determination until sometime in March or later.

I spoke with Project Engineer Sajid Aftab and Resident Engineer Paul Rettinger regarding your contention that Sajid notified the potential completion contractors that the Government intends to redesign the slope at MP 46.7 and that the window of time during which to perform the work will be 'opened up.' Sajid advised me that he did not notify nor advise the potential completion contractors as noted in your letter. Paul also advised me that he did not. Sajid records in his daily diary the contacts and the significance of discussions he has with contractor and agency representatives on project matters. The diary contains entries for the contacts that occurred on the days potential completion contractors were on the project site. The diary does not include reference to slope redesign at MP 46.7 or that the performance window will be opened up.

Regarding the slope at MP 46.7, it remains the Government's position that White Buffalo is responsible for the current condition of the grading work at this location. The excavation and grading at this location must be performed in accordance with the original contract requirements. If corrective work is required because of the previous efforts by White Buffalo, Inc., the completion contractor may propose a slope redesign under the completion contract.

I hope this provides a better understanding of my expectations regarding a completion contract being contemplated for our original contract DTFH70-98-C-00027 with White Buffalo Construction, Inc.

Sincerely yours,

William Parsons

William L. Parsons
Contracting Officer

ICW GROUP
INSURANCE COMPANY OF THE WEST
'LORER INSURANCE COMPANY
JEPENDENCE CASUALTY AND SURETY COMPANY

A Tradition Of Innovation

*Fax and Mail*

January 13, 1999

U.S. Department of Transportation
Federal Highway Administration
William L. Parsons, Contracting Officer
Western Federal Lands Highway Division
610 E. 5th St.
Vancouver, WA 98661-3893

RE: Principal: White Buffalo Construction
Bond No.: 1566032
Claim No.: 110-98-08819
Contract No.: DTFH70-98-OC-00027

Dear Mr. Parsons:

In response to your December 15, 1998 letter, serialized as HPA-17.13, is to advise you that Insurance Company of the West (ICW) anticipates tendering a completion contractor to the Government for completion of the referenced contract.

To facilitate a complete and thorough bid, it has come to my attention that Mr. Sajid Aftab with the U.S. Department of Transportation has notified the various completion contractors during various site walks that it will be the Government's intention to redesign the slope work at MP46.7 which would include any necessary benching and above slope excavation. Additionally, Mr. Aftab has advised the completion contractors that the scope work (window) will be opened up. This will allow the work to commence in June due to the extra work at the rock slide location. Please advise ICW of the Government's intentions so that appropriate estimates can be completed for the completion work.

This letter, along with our investigation, should not be construed as an admission of liability on the part of ICW. ICW continues to reserve all rights and defenses which may be available to it. If you should have any questions please contact me directly.

Cordially,
Insurance Company of the West

Ernie Ulibarri
Surety Claims Consultant
Direct line: (619) 350-2419

EU/ec

4

EXHIBIT 1
Page 16 of 32

From: Howe Crockett
To: CHJACOBY, TJHILDRETH, HPRETTINGER, SAFTAB, JFZOTTE...
Date: 12/17/98 9:44am
Subject: Latest ICW request

On 12/17 I received a 12/16 phone message from Ernest Ulibarri of ICW. He stated that he was getting bid packages ready to go out to prospective contractors for the completion of 97-18(2) and would like the name and number of someone to show the contractors the project. I arranged for Sajid Aftab to be available on 12/21-23 and 12/28-30 to meet with prospective bidders. This information and Sajid's office number were given to Ernest. He stated that this should be all of the information required as he now understood the project requirements. Sajid will record the names of the parties that he shows the job to, the questions asked, and the answers given. Without saying more than is required, he is to differentiate between project requirements and the additional work that we are now aware of on the project, in that this additional work will not be bid on now, but will be negotiated at a later date after survey and design work are accomplished.

Howe

6

**From:** Howe Crockett
**To:** ESHAMMONTREE
**Date:** 2/4/99 1:36pm
**Subject:** 97-18(2) Quantities

Ed,

In anticipation of a completion contract on this project, we need to refine our assessment of worked performed to date. One item that we need to get better numbers on is excavation. Sajid will be coming by to request assistance at your earliest convenience to obtain new runs based on the new survey that has been completed. He will provide the stationing that he needs. Thanks for your help.

Howe

**CC:** SAFTAB

7

From: Howe Crockett
To: BGALLEN
Date: 1/19/99 8:34am
Subject: OR FS ERFO 97-18(2) -Reply

Thanks Brian,

Additional clearing will be involved at the 47.25 area if the slope is redesigned. As soon as we get the contract back on track, we will address the clearing issue. Survey has obtained new data for the two redesign areas. ERFO will turn out a new design as soon as possible, which will tell us what additional clearing is required.

Howe

CC: SAFTAB, HPRETTINGER, DKHECKMAN

8

**From:** Paul Rettinger
**To:** HCROCKETT
**Date:** 1/15/99 6:57am
**Subject:** Govt incurred costs

Howe, I dont know how this plays, but FHWA has incurred costs of remeasuring excavation (survey crew) to determine the actual quantity of roadway excavation completed by White Buffalo. White Buffalo did not submit any records for computation of amount of work performed. I assume at this point that they are responsible for these costs.

It will not be difficult to separate the work done by the survey crew (that is, the remeasure separated from the slide-extra work). You and Sajid may want to run this by Zotter and get his guidence/opinion on whether they are in fact responsible for these costs.

we have a list of costs that are White Buffalos responsibility, which may also have to be reviewed. Thanks, ....paul

**CC:** JFZOTTER, SAFTAB, JFTRAFFALIS, WLPARSONS

**From:** W.L. Parsons
**To:** FHFL17DO.FHFL17PO(DKHECKMAN, HPRETTINGER, JFZOTTER...
**Date:** 1/20/99 1:54pm
**Subject:** Tidewater call concerning 97-18(2) status -Reply

Howe - yes, you are correct on what we have received from the Surety -- that being their letter on 'intending to provide a completion contractor.' Draft reply by us to ICW's letter is on my list to complete and get to you, Zotter & .... before finalizing and sending.

>>> Howe Crockett 01/20/99 12:35pm >>>
This morning I received a call from Scott Darger of Tidewater. Scott asked if the Surety had provided us with a completion contractor. I told Scott that to my knowledge the only contact we had received was a letter from ICW stating their intentions to do so and containing some other statements that we would have to reply to. Scott stated that the Surety was telling them that they (ICW) could not make a contractor choice until we provided the slope redesign information so that a complete bid could be provided. I told Scott that I did not understand why they were contending such, since we had clearly stated to them that at this time they should depend on the current contract when soliciting bidders. Scott offered some personal opinions on the situation. Scott stated that he and the other bidders were very clear on the fact that they should be considering only the current contract and listed work windows at this time. He said that Sajid had stated such. I suggested to Scott that he might call the CO for exact information.

Howe

**From:** Carol H. Jacoby
**To:** FHFL17DO.FHFL17PO(DKHECKMAN, HPRETTINGER, JFTRAFFA...
**Date:** 12/21/98 10:07am
**Subject:** Latest ICW request -Reply

Just as a follow-up to Howe's note - I agree that we need to be very clear of what work is required by the contract and what is additional work. I don't know the extent of the intermingling of the old and new work - but it may be presumptious to even imply that we will negotiate the costs of the new work at a later date. It may be in everyone's best interest - and be cleaner contractually to have a totally separate contract for the new work. We do not want anyone making the interpretation of our actions in getting the additional work corrected to really be the ground work for a T for C.

>>> Howe Crockett 12/17/98 09:44am >>>
On 12/17 I received a 12/16 phone message from Ernest Ulibarri of ICW. He stated that he was getting bid packages ready to go out to prospective contractors for the completion of 97-18(2) and would like the name and number of someone to show the contractors the project. I arranged for Sajid Aftab to be available on 12/21-23 and 12/28-30 to meet with prospective bidders. This information and Sajid's office number were given to Ernest. He stated that this should be all of the information required as he now understood the project requirements. Sajid will record the names of the parties that he shows the job to, the questions asked, and the answers given. Without saying more than is required, he is to differentiate between project requirements and the additional work that we are now aware of on the project, in that this additional work will not be bid on now, but will be negotiated at a later date after survey and design work are accomplished.

Howe

11

**White Buffalo Construction Inc.**
**P.O. Box 1310**
**Aumsville, Oregon 97325**
**(503)749-1861**
**FAX (503)** 749-1684
luther@whitebuffaloinc.com

March 29, 1999

*Transmitted via fax- 1-619-350-2977*
**10 Pages**

Mr. Ernie Ulibarri
Surety Claims Consultant / I.C.W. Group
P.O. Box 85563
San Diego, CA. 92186-5563

*RE:* ***Documents Obtained In FOIA.***

Dear Mr. Ernie Ulibarri:

Here are some documents that I got from FHA while reviewing their files last week. There are 9 pages and you need to look them over. They are planning to do redesign work at the two slide areas (47.25 & 46.7) and price them as extra work after you tender or under a separate contract. Under these circumstances they are going to have a tough time claiming LD's.

Sincerely,

Luther L. Clevenger
President
White Buffalo Construction Inc.

*pc:* Mr. Richard Alexander

enclosure 9 pages



EXHIBIT 1
Page 23 of 32

EXHIBIT 18

TO: Howe Crockett
Construction Operations Engr.

FROM: Paul Rettinger
Resident Engineer

SUBJECT: Estimated cost to winter-ize OR FS ERFO 97-18(1)

DATE: November 16, 1998

IMMEDIATE CORRECTIVE WORK TO BE PERFORMED (due to WB non-performance):

1. Clean up silt and mud from haul route, pull ditches, erosion control
2. Stabilize the two failures on the haul road, excavate muddy silt, backfill with 3 feet of 12" rock, cap with smaller rock for vehicles and truck haul.
3. Pull back the steep-sloped material at the inlet to the culvert at MP 46.2.
4. Access the top of the rock cut at MP 46.7, clearing, excavation to construct a bench, remove material from top of cut, remove material from face of slope, remove material from roadway bench and haul to disposal area.

WINTER WORK NEEDED, BUT NOT ATTRIBUTED TO WB NON-PERFORMANCE:

1. Corrective work on excavated slope at MP 47.25. Slope is designed at a 1:1, but has started cracking and will fail. Dave Lofgren is scheduled to review on Wednesday 11/18 and make a recommendation(s). USFS Geotechnical representatives will also be present. Probable work required will be to either (1) do additional excavation and install a rock buttress, or (2) to access the top of the cut and re-excavate the slope to a flatter section (2:1?) and bring it down. The slope, untreated, will not last the winter, and we have created a major maintenance problem for the future. The second option to re-access the slope is not preferred at this time, due to extreme wet conditions.

WORK THAT CAN BE PREFORMED THIS WINTER:

1. Install the geogrid walls.
2. Backfill the culvert, with rock, at MP 46.2. (Will provide needed access to upper sites).
3. Haul and stockpile borrow and riprap. Some work may be able to be done, in between rain storms.

WORK NEXT AUGUST (after summer shut down period)

1. Complete in stream work at MP 46.2 and MP 47.07
2. Bridge work at MP 1.18 on 3347 road.
3. Sites on 3347 road, including installing the multi-plate pipe at MP 0.61.
4. Install guardrail and finish 33 road sites, open to traffic.

COSTS ESTIMATES:

A. **For immediate winter work-**

1. Hourly operated equipment rates for

| | |
|---|---|
| • Hyd. Excavator (cat 235 min), w/thumb | $135.00/hr |
| • Front end loader (cat 966 min) | $100.00/hr |
| • Trucks, 12 cy min | $60.00/hr |
| • Dozer, (cat D-6 min) | $100.00/hr |
| • water truck, w/pressure spray (3200 gal min) | $65.00/hr |
| • roadway broom/sweeper truck | $60.00/hr |
| • backhoe, w/front end bucket (Case 520 min) | $75.00/hr |
| • crane, 100 ton (to access top of cut) | $125.00/hr |
| TOTAL HOURLY COST | $720.00 |
| 2. Mob crane: Pilot car, permits, etc ($3,000, one way) | $6,000.00 |
| 3. Mob other equipment | $40,000.00 |
| Estimate work will take 4 weeks= 160 hours x $720.00 | $115,200.00 |
| Plus 2 & 3 | $46,000.00 |
| TOTAL ESTIMATE FOR IMMEDIATE WINTER WORK | $161,200.00 |

B. WINTER WORK NEEDED, BUT NOT ATTRIBUTED TO WB (Assumes rock buttress)

| | |
|---|---|
| 1. Excavator 24 hours | $3,240.00 |
| 2. Truck, haul waste, haul riprap, 72 hours | $4,320.00 |
| 3. FE loader, 24 hours | $2,400.00 |
| erosion control, straw bales, clean up ditches, labor | $3,000.00 |
| materials (riprap, geo-fabric) | $15,000.00 |
| TOTAL RESTORATION AT MP 47.25 | $27,960.00 |
| SAY | $30,000.00 |

Total cost for work that must be done this winter = **$191,200.00**

Once a decision is made as how we will proceed, and if we are able to pick a contractor to do this work, then I will send out a request for pricing, as shown above, to:

1. Tidewater
2. Rudy, Inc. (Steve Hewitt, formerly of Weaver Const)
3. Other (USFS has other contractors they have advised me are competent)

From: Paul Rettinger
To: HCROCKETT, WLPARSONS
Subject: memo on early work next season -Reply -Reply -Reply -Reply

Hi Bill, I did talk this over with Howe yesterday. I have set up the PO to cover the project during our (FHWA staff) absence this winter. This assumes, of course, that the surity will not have another contractor in here to continue work. Should the surity have another contractor in here, then we wont use the PO.

In short, the PO is set up for the USFS to have funding ready to handle any slides or clean up necessary during our absence. I have also set up a reimbursible agreement to pay for the cost of a USFS person to check the job during our absence.

Even if the surity has another contractor come in, this will only be until the end of Feb. Then no work is allowed until next August. We are then covered as well.

My thought process is that we wont have to have FHWA staff down here during the non work period.

If the surity wants to staff the job with equipement and personnel during the off period, then again, we wont need the PO.

Hope this makes sense. I am just trying not to leave the job uncovered and the USFS with our problem.

Any suggestions are welcome.........paul

>>> W.L. Parsons 12/09/98 11:54pm >>>
Paul - I don't have a total handle on all that is involved and pending on site down there, but is the Purchase Order you have already set up with someone other than ICW perhaps? Just thinking we need stay sensitive to the circumstances existing when a Surety is in the process of likely taking over a job. Your bringing in new, independent third parties, can and probably will have the Surety trying to make such actions appear to be us interferring and adversely impacting them and their contract completion efforts.

CC: JFZOTTER, TJHILDRETH, JFTRAFFALIS, ESHAMMONTREE

From: Howe Crockett
To: CHJACOBY, TJHILDRETH, HPRETTINGER, SAFTAB, JFZOTTE...
Date: 12/17/98 9:44am
Subject: Latest ICW request

On 12/17 I received a 12/16 phone message from Ernest Ulibarri of ICW. He stated that he was getting bid packages ready to go out to prospective contractors for the completion of 97-18(2) and would like the name and number of someone to show the contractors the project. I arranged for Sajid Aftab to be available on 12/21-23 and 12/28-30 to meet with prospective bidders. This information and Sajid's office number were given to Ernest. He stated that this should be all of the information required as he now understood the project requirements. Sajid will record the names of the parties that he shows the job to, the questions asked, and the answers given. Without saying more than is required, he is to differentiate between project requirements and the additional work that we are now aware of on the project, in that this additional work will not be bid on now, but will be negotiated at a later date after survey and design work are accomplished.

Howe

From: Carol H. Jacoby
To: FHFL17DO.FHFL17PO(DKHECKMAN, HPRETTINGER, JFTRAFFA...
Date: 12/21/98 10:07am
Subject: Latest ICW request -Reply

Just as a follow-up to Howe's note - I agree that we need to be very clear of what work is required by the contract and what is additional work. I don't know the extent of the intermingling of the old and new work - but it may be presumptious to even imply that we will negotiate the costs of the new work at a later date. It may be in everyone's best interest - and be cleaner contractually to have a totally separate contract for the new work. We do not want anyone making the interpretation of our actions in getting the additional work corrected to really be the ground work for a T for C.

>>> Howe Crockett 12/17/98 09:44am >>>
On 12/17 I received a 12/16 phone message from Ernest Ulibarri of ICW. He stated that he was getting bid packages ready to go out to prospective contractors for the completion of 97-18(2) and would like the name and number of someone to show the contractors the project. I arranged for Sajid Aftab to be available on 12/21-23 and 12/28-30 to meet with prospective bidders. This information and Sajid's office number were given to Ernest. He stated that this should be all of the information required as he now understood the project requirements. Sajid will record the names of the parties that he shows the job to, the questions asked, and the answers given. Without saying more than is required, he is to differentiate between project requirements and the additional work that we are now aware of on the project, in that this additional work will not be bid on now, but will be negotiated at a later date after survey and design work are accomplished.

Howe

**From:** Paul Rettinger
**To:** HCROCKETT
**Date:** 1/15/99 6:57am
**Subject:** Govt incurred costs

Howe, I dont know how this plays, but FHWA has incurred costs of remeasuring excavation ~~(survey crew) to determine the actual quantity of roadway~~ excavation completed by White Buffalo. White Buffalo did not submit any records for computation of amount of work performed. I assume at this point that they are responsible for these costs.

It will not be difficult to separate the work done by the survey crew (that is, the remeasure separated from the slide-extra work). You and Sajid may want to run this by Zotter and get his guidence/opinion on whether they are in fact responsible for these costs.

we have a list of costs that are White Buffalos responsibility, which may also have to be reviewed. Thanks, ....paul

CC: JFZOTTER, SAFTAB, JFTRAFFALIS, WLPARSONS

From: Howe Crockett
To: BGALLEN
Date: 1/19/99 8:34am
Subject: OR FS ERFO 97-18(2) -Reply

Thanks Brian,

Additional clearing will be involved at the 47.25 area if the slope is redesigned. As soon as we get the contract back on track, we will address the clearing issue. Survey has obtained new data for the two redesign areas. ERFO will turn out a new design as soon as possible, which will tell us what additional clearing is required.

Howe

CC: SAFTAB, HPRETTINGER, DKHECKMAN



7

**From:** W.L. Parsons
**To:** FHFL17DO.FHFL17PO(DKHECKMAN, HPRETTINGER, JFZOTTER...
**Date:** 1/20/99 1:54pm
**Subject:** Tidewater call concerning 97-18(2) status -Reply

Howe - yes, you are correct on what we have received from the Surety -- that being their letter on 'intending to provide a completion contractor.' Draft reply by us to ICW's letter is on my list to complete and get to you, Zotter & .... before finalizing and sending.

>>> Howe Crockett 01/20/99 12:35pm >>>
This morning I received a call from Scott Darger of Tidewater. Scott asked if the Surety had provided us with a completion contractor. I told Scott that to my knowledge the only contact we had received was a letter from ICW stating their intentions to do so and containing some other statements that we would have to reply to. Scott stated that the Surety was telling them that they (ICW) could not make a contractor choice until we provided the slope redesign information so that a complete bid could be provided. I told Scott that I did not understand why they were contending such, since we had clearly stated to them that at this time they should depend on the current contract when soliciting bidders. Scott offered some personal opinions on the situation. Scott stated that he and the other bidders were very clear on the fact that they should be considering only the current contract and listed work windows at this time. He said that Sajid had stated such. I suggested to Scott that he might call the CO for exact information.

Howe

**From:** Howe Crockett
**To:** ESHAMMONTREE
**Date:** 2/4/99 1:36pm
**Subject:** 97-18(2) Quantities

Ed,

In anticipation of a completion contract on this project, we need to refine our assessment of worked performed to date. One item that we need to get better numbers on is excavation. Sajid will be coming by to request assistance at your earliest convenience to obtain new runs based on the new survey that has been completed. He will provide the stationing that he needs. Thanks for your help.

Howe

CC: SAFTAB