# EXHIBIT 2

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WHITE BUFFALO CONSTRUCTION, INC., | ) | |
| Plaintiff, | ) | |
| vs. | ) | Case No. 99-961C |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEPOSITION OF HENRY PAUL RETTINGER

Taken in behalf of the Plaintiff

April 25, 2008

* * *

BE IT REMEMBERED THAT, pursuant to Federal Rules of Civil Procedure, the deposition of HENRY PAUL RETTINGER was taken before Tamara Aufdermauer Pearce, OCSR No. 90-0199 and WCCR No. 2141, on Friday, April 25, 2008, commencing at the hour of 9:00 a.m., the proceedings being reported at the Department of Transportation, 610 East Fifth Avenue, Vancouver, Washington.

* * *

APPEARANCES

APPEARING FOR PLAINTIFF:

STOEL RIVES

By Scott Kaplan
900 S.W. Fifth Avenue, Suite 2600
Portland, Oregon 97204
503.224.3380

APPEARING FOR DEFENDANT:

UNITED STATES DEPARTMENT OF JUSTICE - CIVIL DIVISION
COMMERCIAL LITIGATION BRANCH
By Timothy McIlmail
1100 L. Street, NW
Washington, DC 20530
202.616.0342
and
US DOT FEDERAL HIGHWAY ADMINISTRATION
By Rayann Scott
610 East 5th Street
Vancouver, Washington 98660
360.619.7529

ALSO PRESENT: Curtis Scott

discussions with U.S. Forest Service personnel about White Buffalo's work?

A. Yes.

Q. Who did you talk to?

A. I'm not sure I can remember all of the names. I know Robin McAlpine was the local Forest Service liaison, and there were a couple geotechnical engineers.

Q. Do you remember their names?

A. Donna, and I can't remember the gentleman's name.

Q. Is it Donna Mickley?

A. I believe that's correct.

Q. Now, you testified back in 2000 that at the time you were aware that White Buffalo had been in some litigation with the Forest Service. Do you remember that?

A. Yes.

Q. Okay. And, in fact, at the time of the project, you were aware of that prior litigation, right?

MS. SPEAKMAN: Objection, leading. You can answer.

THE WITNESS: Okay.

A. I became aware of it as the project neared the end.

BY MR. KAPLAN: (Continuing)

Q. I forget if I've mentioned it, but your

counsel may object from time to time about the form of a question, but unless she instructs you not to answer, you do need to go ahead and answer it.

A. Okay.

Q. And what were you told about the prior litigation between White Buffalo and the Forest Service?

A. I don't remember the exact conversation, but it was something in the nature of that -- that this company had prior litigation or -- let me correct that. It wasn't prior litigation. I think that this company had been terminated on a Forest Service contract. I don't know anything about the contract. I don't even know when that occurred, I just heard that.

Q. Who did you hear it from?

A. I'm not sure exactly. I believe -- I don't know, I think I might have heard it from Tim Binder. And I'm not even sure of the time frame on this. I apologize; my memory is not that good.

Q. So is Robin McAlpine male or female?

A. Male.

Q. I only ask you that to ask this next question.

Did you discuss with Mr. McAlpine the prior termination by the Forest Service of White Buffalo?

A. No. No, I did not.

Q. Is it fair to say, based on your conversations

with the Forest Service, that they had a negative view of White Buffalo?

A. I'm not sure that I can answer for how the Forest Service viewed the contractor.

Q. All right. The comments they made to you about the contractor, were they negative in tone?

A. Yes.

Q. And those negative comments you were getting were from Mr. McAlpine and the geotechnical engineers?

A. Mr. McAlpine and I discussed the progress of the project on a number of occasions, and neither one of us were satisfied with the progress.

Q. And is it fair to say that Mr. McAlpine led you to understand he had a negative opinion of White Buffalo before the project even started?

MS. SPEAKMAN: Objection, leading.

A. I would say that our conversations were not in terms of a negative opinion of White Buffalo, but the negative opinion was in terms of failure to perform the work. It was a performance issue.

BY MR. KAPLAN: (Continuing)

Q. All right. And you had a number of conversations, let's say through October of 1998, with the Forest Service on the subject of terminating White Buffalo, correct?

BY MR. KAPLAN: (Continuing)

Q. Take a look, please, Mr. Parsons, at what was previously marked as Exhibit 5. Let me know if this refreshes your recollection about any claims that White Buffalo made after your conversion decision.

A. I remember this claim coming in, a long list of what's not been included in the claim.

Q. Do you remember what you did when you got the claim?

A. No, but it would likely have been more to where Elizabeth would have been the actual one that was looking at it in my behalf.

Q. As of November 2004, you were still the Contracting Officer; is that right?

A. Yes.

Q. Do you recall as you sit here today one way or the other whether you did review Exhibit 5 when it came in?

A. I saw it. I wouldn't call it a review. I mean I -- it was received.

Q. Okay. Let's look at the last page of Exhibit 5. Again, you mentioned Mr. Clevenger included a long list of things he hadn't yet included, one of which was lost profits on uncompleted work due to the bad faith termination of the contract.

When you got Exhibit 5 in November 2004, did

have to look at documents, but I believe -- I do know that it was discussed, and it was in my opinion that they could not complete the project.

Q. And you expressed that opinion prior to any cure notice being sent to White Buffalo, correct?

MS. SPEAKMAN: Objection, leading.

A. And I just don't recall the time frames at this point.

BY MR. KAPLAN: (Continuing)

Q. Do you recall that a cure notice was sent to White Buffalo on November 6th, 1998?

A. I know that a cure notice was sent. I don't know the date of it.

Q. Whatever the precise date of the cure notice, do you recall that you stated you felt White Buffalo should be terminated for default before that cure notice going out?

MS. SPEAKMAN: Objection, leading.

A. And again, I -- I honestly can't remember the exact dates of what occurred. I know there were conversations regarding how we were going to handle this contract.

BY MR. KAPLAN: (Continuing)

Q. At the time the cure notice went out, you didn't really expect White Buffalo to cure the default, did



Electronically signed by Tamara Pearce (401-085-214-2770) 5d414cb8-3e64-4ab5-bf01-1aee3dd2d3ce

you?

MS. SPEAKMAN: Objection, leading.

MR. KAPLAN: Counsel, I'm permitted to ask leading question to Mr. Rettinger. He is -- the term "hostile witness" isn't used any more, but he is affiliated with the opposing party, so leading questions are appropriate.

MS. SPEAKMAN: I understand, and I'm going to preserve the record throughout this deposition in terms of form-of-question problems. So I will continue to object to leading questions.

MR. KAPLAN: I guess it's all of our time.

But could you repeat the question back --

Let me ask you first, Mr. Rettinger, do you remember what the question was?

THE WITNESS: No, I don't.

MR. KAPLAN: Could you read back the question, please.

(The reporter read back as follows:

At the time the cure notice went out, you didn't really expect White Buffalo to cure the default, did you?)

A. I would say I did not expect them to cure the default.

BY MR. KAPLAN: (Continuing)

Exhibit 2
Page 8 of 29


Electronically signed by Tamara Pearce (401-085-214-2770) 5d414cb8-3e64-4ab5-bf01-1aee3dd2d3ce

Q. And did you ever hear that he had left because he thought that you were treating White Buffalo too harshly?
A. I heard that later as an allegation, but he never said that to me.
Q. Did you ever discuss it with him?
A. No.
Q. Did you ever discuss with him why he left the job before it was completed?
A. Yes, his wife's health.
Q. Is that what he told you?
A. Yes.
Q. What did he say about his wife's health?
A. Well, she had a heart condition, and it was -- at that elevation, she was having trouble breathing, and there were issues. They were older. He was in his seventies. She is, too.
Q. Was Mike Barber an inspector on the project?
A. Yes.
Q. And did he leave the project as well?
A. Yes, he did.
Q. And did you hear that he left the project because he had some personality conflicts with you?
A. No.
Q. Did you hear any reason why he left the

project?
A. Yes. He was terminated.
Q. Terminated by whom?
A. Myself.
Q. And just so I understand it, was he terminated from the project or from the Federal Highway Administration?
A. Well, he was a consultant inspector.
MS. SPEAKMAN: Objection to form.
BY MR. KAPLAN: (Continuing)
Q. Why did you terminate him?
A. Performance issues.
Q. What kinds of issues were those?
A. Failure to follow directions, stepping outside the bounds of his authority, directing contractor operations.
Q. Anything else?
A. There may have been others. That's what I recall.
Q. Okay. And the directing contractor operations, was that contractor White Buffalo?
A. No.
Q. What contractor was that?
A. We had multiple contracts. There was a somewhat adjacent contract, and I don't remember the name

BY MR. KAPLAN: (Continuing)

Q. Instead of whom should have been directing those operations?

A. The contractor.

Q. What kind of background did Mr. Barber have? Was he an engineer?

A. I don't know. He was vetted through the system. I was not a part of that.

Q. Now, if Mr. Barber had, for example, engineering expertise, do you think it would have been inappropriate for the contractors to consult with him about his views and consider his views about what should be done?

A. I don't believe it would be inappropriate. I don't believe that he should tell them what to do.

Q. Okay. And you said that Mr. Barber had been stepping outside the bounds of his authority. What do you mean by that?

A. What I meant was is under the terms and conditions of our contract with our consultant inspectors, they are not to be directing contractors' operations. They're not to accept or reject materials and workmanship.

Q. And the first reason you gave me for terminating Mr. Barber was that he failed to follow directives, I think it was. What directives did he fail to follow?

Exhibit 2
Page 11 of 29



Electronically signed by Tamara Pearce (401-085-214-2770) 5d414cb8-3e64-4ab5-bf01-1aee3dd2d3ce

A. As I recall, and it's been 10 years, but we had -- I had had conversations with Mr. Barber on the other FDR 26 project regarding him directing the contractors' operations, and I had clearly advised him that that was not his role.

The day of the termination, as I recall, he went up to the project site to pick up some papers from the White Buffalo construction project and, as I recall, Luther -- I think Luther either called me or Sajid on the phone, and there were a number of he questions that came up because he had had conversations with Mike Barber.

And I don't recall the specific issue, but I know that we had indicate -- or my sense was that there had been directions given because Luther was asking questions, and he may have been asking me or Sajid and I don't remember, but when he got back, we discussed it and it got heated, and then I told him we've discussed this before, and at that point he was advised that his -- his work was done.

Q. Do you feel that it was inappropriate for Mr. Barber to be having the kinds of conversations he was with Mr. Clevenger?

A. I'm not sure the -- I wasn't there, so I don't know what the conversations were, and I don't know if they were appropriate. But I do know that, based on the

Exhibit 2
Page 12 of 29

questions that Luther was asking at the time, I didn't feel that -- that we wanted to be giving the contractor any kind of directions, and certainly I didn't want the contract inspectors out there giving him directions.

Q. When you say "we didn't want to be giving the contractor directions," would those directions have been appropriate if they came from you, for example?

A. The contract -- the terms and conditions of the contract are the directions, and I don't have the authority, neither does the inspectors, to go out and in any way change that, and certainly we shouldn't be giving any kind of direction to do anything that's different than what the contract says.

Q. But in some circumstances, it is appropriate for you to give directions. For example, if you see something, some work going on that's not consistent with the contract, you can direct a contractor to stop work. Is that right?

A. There are provisions in the contract that allow that, but that's certainly not an inspector's role.

Q. You mentioned previously you've reviewed Ms. Firestone's decision. Is that right?

A. The Contracting Officer's decision?

Q. Yes.

A. Yes.

Exhibit 2
Page 13 of 29



Electronically signed by Tamara Pearce (401-085-214-2770) 5d414cb8-3e64-4ab5-bf01-1aee3dd2d3ce

A. I'm sure they were. I can't recall exact conversations, but we -- we were in contact with the Forest Service continually, and especially as we neared the -- and this particular period was critical, so yes, they were up to date, I believe.

Q. And you say, "They are aware of the unsatisfactory performance by this contractor"?

A. Yes.

Q. Was unsatisfactory performance something they suggested or something you told them?

A. Unsatisfactory -- are you looking for definition or who said it or what?

Q. No, who said it.

A. I wrote the email.

Q. And then when you say, "They are aware of the unsatisfactory performance," did you mean based on their observations or based on something you told them?

A. No, based on failure to perform the provisions in the contract.

Q. So you made the Forest Service aware of the unsatisfactory performance?

A. Yes, I did.

Q. Now, you say, "Given the choice, the USFS would rather have a delay with the road opening, than have to live with a poor-quality project."

A. And your question is did I recall that?
Q. Right. When you read it, did you form an understanding that Land Mark was saying there were some discrepancies?
A. Yes.
Q. Did you agree with Land Mark?
A. I wouldn't say that I agreed with them, no.
Q. Did you disagree, or, by that point, had it been far enough after the project that you weren't in a position to agree or disagree?
A. I didn't have a survey that I had been involved in to base it on as to whether it was accurate or not. I took it on the face value that, you know, they are an honest, reputable contractor, and that what they measured is what they had, but I couldn't verify or determine whether I agreed with it or not.
Q. Let's go on to the next sentence.
A. Okay.
Q. Are you in a position to disagree with the statement that "The quantity of material that was not removed to accommodate the fallout is approximately 2226 cubic meters"?
A. Do I agree with that statement?
Q. Do you disagree with it?
A. I have no basis to say at this point. I

C E R T I F I C A T E

I, Tamara Aufdermauer Pearce, CSR No. 90-0199, do hereby certify that HENRY PAUL RETTINGER personally appeared before me at the time and place mentioned in the caption herein; that the witness was by me first duly sworn on oath and examined upon oral interrogatories propounded by counsel; that said examination, together with the testimony of said witness, was taken down by me in stenotype and thereafter reduced to typewriting; and that the foregoing transcript, pages 1 to 72, both inclusive, constitutes a full, true and accurate record of said examination of and testimony given by said witness, and of all other proceedings had during the taking of said deposition and of the whole thereof, to the best of my ability.

Witness my hand at Portland, Oregon, this 1st day of May, 2008.

TAMARA AUFDERMAUER PEARCE
OCSR No. 90-0199

# SURVEY REPORT COMPARING DESIGN PLAN TO AS-CONSTRUCTED

FDR 33, (MP 44.5 - MP 47.3, FDR 3347)

Siskiou National Forest
Coos County, Oregon
Intermittent Repairs

FOR: White Buffalo Construction
6653 Shaw Hwy SE
Aumsville, OR 97325-1310

REGISTERED
PROFESSIONAL
LAND SURVEYOR
Mark A. Heimburger
OREGON
JULY 16, 1987
MARK A. HEIMBURGER
2287
Expires 06/30/03

PREPARED BY:

LAND MARK
SURVEYING, INC.

P.O. Box 13 • 3329 NE Stephens • Roseburg, Oregon 97470
Tel (541)677-9400 • Fax (541)677-9401 • Cell (541)430-6082

EXHIBIT: 3
WIT: Rettinger
Bridge City Legal

# TRANSMITTAL COVER SHEET

LAND MARK
SURVEYING, INC.
P.O Box 13 Roseburg, OR. 97470

Date: November 4, 2002
Number of pages including cover sheet:

To Luther Clevenger:
White Buffalo Construction
PO Box 1310
Aumsville, OR 97325-1310
Phone
Fax
CC

From: Mark Helmburger
Land Mark Surveying, Inc.
e-mail mheimburger@mcsi.net
Cell: 430-6082
Phone: 677-9400
Fax: 677-9401
P.O Box 13 Roseburg, OR. 97470

REMARKS: ☐ Urgent ☐ For Your Review ☐ Reply ASAP ☐ Please Reply by FAX

| Quantity | Item | Description |
|---|---|---|
| 1 | Report | Survey Report |
| | | |
| | | |
| | | |
| | | |
| | | |

Comments:

*The above information is confidential information intended only for the viewing and use of LAND MARK Surveying, Inc. and their clients. Any unauthorized review, use, communication, dissemination, distribution or copying of this information is strictly prohibited.*

Exhibit 2
Page 18 of 29

LAND MARK
SURVEYING, INC.

November 4, 2002

PURPOSE:

The purpose of this report is to discuss discrepancies between the Original Design (Design) and the project, as it exists today (As-built). The sites reviewed were as follows:

Forest Road 33, MP 46.2, MP 46.7, MP 46.75 and MP 47.07 to 47.25.
Forest Road 3347, MP 0.43 to 0.46.

METHODS:

Survey data collected during the coarse of the project in 1998 and information gathered in July, 2002 were merged to generate the "As–Constructed" (As-Built) Surface information. The Design Subgrade Information was entered to create the Design surface. The two surfaces were compared and volumes were generated using Average End Area Method. No shrinkage or swell factors were used in these computations.

SUMMARY:

Road 33, Site MP 47.07 – 47.25

Review of the site reveals slide repair and placed riprap from Sta. 0+320 to 0.350. The attached detail shows differences between the design and the final construction in this area. Although there is insufficient information to determine actual amount of material removed to repair the slide and accommodate riprap placement, it is obvious that substantial quantities were moved. The entire area has been laid back to flatten the cut slope. This area also included slope rounding while the remainder of the site did not.

The remainder of the area appears to conform substantially to the construction drawings. Original survey stakes and clearing flagging were found with no evidence of additional surveying.

Road 33, Site MP 46.75

The notable difference is the additional riprap 0+105 to 0+180 right. There is no slope rounding on cut slopes or evidence of additional surveying within the site.

Road 33, Site MP 46.7 (Rock Cut)

Discrepancies include the omission of the fallout area under the rock cut as shown on the construction drawing detail. The quantity of material that was not removed to accommodate the fallout is approximately 2226 cubic meters. The site is substantially larger than the limits on the design. The large rock over hang that appears to be unstable was always intended to be outside the cut.

Road 33, Site MP 46.2 (2250mm Culvert)

Culvert was generally built according to plan with the largest discrepancy being 60mm (2 – 1/2 inches) with some high and some low. Any additional excavation due to the differences in grade is negligible and should average out. The length of culvert exceeds that shown on the construction drawings. The excavation of material to accommodate the additional length cannot be determined due to insufficient data on the original ground prior to construction. Visual inspection of the inside of the culvert reveals large gaps at some of the seams.

P.O. Box 13 • 3329 NE Stephens • Roseburg, Oregon 97470
Tel (541) 677-9400 • Fax (541) 677-9401 • Cell (541) 430-6082

Road 3347, Site 0.43 – 0.46

There are substantial differences between the design drawings and the constructed roadway. The road appears to be in the original location with an asphalt overlay raising the grade. Additional riprap was added on the lower side protecting the roadbed from creek erosion and within the limits of an apparent slide on the uphill side of the road. The quantities of the placed riprap or required excavation to accommodate the riprap were not considered under the scope of this report. Materials not removed in this section include 1118 cubit meters of excavation and approximately 0.23 hectares of clearing. Evidence of the original staking including site stakes and clearing flagging remain. There is no evidence that the revised roadway was surveyed.

ATTACHMENTS:

- Road 33, Site MP 47.07 – 47.25 Plan view station 0+305 to 0+355
- Road 33, Site MP 46.75 Plan view of additional rip rap 0+105 to 0+180 right
- Road 33, Site MP 46.7 (Rock Cut) Plan view
- Road 33, Site MP 46.7 (Rock Cut) Cross Section views
- Road 33, Site MP 46.2 2250mm Culvert Plan view
- Road 3347, Site 0.43 – 0.46 Site Plan
- Road 3347, Site 0.43 – 0.46 Cross Section views

The field procedures, this report and the attachments were made under my direct supervision.

Mark A. Heimburger 11-4-02

Mark A. Heimburger
Professional Land Surveyor
Oregon Registration No. 2287

Date



Exhibit 2
Page 22 of 29





