# EXHIBIT 7

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WHITE BUFFALO CONSTRUCTION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 99-961C |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEPOSITION OF CURTIS SCOTT

Taken in behalf of the Plaintiff

April 25, 2008

* * *

BE IT REMEMBERED THAT, pursuant to Federal Rules of Civil Procedure, the deposition of CURTIS SCOTT was taken before Tamara Aufdermauer Pearce, OCSR No. 90-0199 and WCCR No. 2141, on Friday, April 25, 2008, commencing at the hour of 11:10 a.m., the proceedings being reported at Department of Transportation, 610 East Fifth Avenue, Vancouver, Washington.

* * *

APPEARANCES

APPEARING FOR PLAINTIFF:

STOEL RIVES

By Scott Kaplan
900 S.W. Fifth Avenue, Suite 2600
Portland, Oregon 97204
503.224.3380

APPEARING FOR DEFENDANT:

UNITED STATES DEPARTMENT OF JUSTICE - CIVIL DIVISION
COMMERCIAL LITIGATION BRANCH
By Timothy McIlmail
1100 L. Street, NW
Washington, DC 20530
202.616.0342
and
US DOT FEDERAL HIGHWAY ADMINISTRATION
By Rayann Scott
610 East 5th Street
Vancouver, Washington 98660
360.619.7529

ALSO PRESENT: ---

* * *

to this particular instance, probably five or six.

Q. Can you give me an estimate about how long, total, those five or six conversations were?

A. Generally five minutes apiece, five, maybe 10 minutes.

Q. Did you talk to anyone other than Mr. Rettinger who had been involved in the project back in '98 or '99?

A. I don't believe so.

Q. For example, did you talk to Mr. Aftab?

A. No, I did not.

Q. Did you talk to Mr. Parsons?

A. No, I did not.

Q. Are you aware that White Buffalo was originally terminated for default and in 2004 the Government changed that to termination for convenience?

A. I'm aware of that, yes.

Q. Did you talk to anyone who was involved in that decision to convert the default termination to convenience?

A. No, not -- I guess I'm unsure as far as to what extent. I mean idle passing or discussions with Tim, our counsel.

Q. Tim Binder?

A. Yes, Tim Binder.

EXHIBIT 7
Page 3 of 81

Q. Do you recall whether there were discusses with Tim Binder on that subject?
A. I believe so. They would have been very casual conversations.
Q. Did you ever ask anyone why the default termination had been converted to convenience?
A. No.
Q. Did anyone ever tell you why?
A. No.
MR. McILMAIL: Exclude --
BY MR. KAPLAN: (Continuing)
Q. Did anyone ever tell you who made the decision to convert the default termination to convenience?
A. No.
Q. In the course of helping Ms. Firestone, did you draft any language for her to use in her decision?
A. Yes.
Q. That would have been in the bad faith portion of the claim?
A. Yes.
Q. And did you save any of those drafts?
A. Yes.
Q. Okay. Do you know if those were provided to counsel for production to White Buffalo?
A. They were provided to counsel.

Q. And in what form are those drafts? Was it hard copy or electronic form or both?

A. Both.

Q. The documents in electronic form, were they in emails?

A. Yes, or attachments to emails in Word format.

Q. And when you provided those drafts to Ms. Firestone, did you always copy Mr. Binder with them?

A. Not every time. Typically.

Q. Now, do you know if Mr. Binder rewrote any of the language that you suggested?

A. Possibly, yes. Yeah, portions of it were rewritten.

Q. Did Mr. Binder add any language that was used in the final decision?

A. I believe -- I believe language was added, words, reordering things, cleaning up the document.

Q. By Mr. Binder?

A. And Elizabeth, both.

(Exhibit No. 4, Contract DTFH70-98-C-00027, Termination for Convenience Request for Reimbursement of Surety Costs Associated with Insurance Company of the West, three pages, no Bates, marked.)

BY MR. KAPLAN: (Continuing)

Q. Exhibit 8 is a document entitled Appendix D, and I'll represent to you, at least if our copying went correctly, Appendix D to be the Appendix D to the October 16, 2006, claim that we've marked as Exhibit 7.

Is Exhibit 8 a document that you reviewed in connection with your work on this claim?

A. Yes.

Q. And when you say that you evaluated White Buffalo's bad faith claim, it's the claim that's represented by Appendix D?

A. Correct.

Q. On the first page of Exhibit 8, which is Appendix D, there is a statement, "The limited liability of a convenience termination can, however, evaporate, exposing the Government to liability for common-law breach, including lost profits."

In the course of evaluating White Buffalo's claim, did you evaluate whether the conversion decision itself had been in good faith?

A. I don't think that was within my decision.

Q. Okay. Just so it's clear, in the course of assisting Ms. Firestone, did you evaluate whether or not the convenience termination itself was in bad faith?

A. It was Elizabeth's decision. I compiled information, but it was ultimately her decisions.

Q. Well, let's go back.
Was the decision to convert for convenience made in 2004?
A. I believe so -- I believe that's correct.
Q. That wasn't made by Ms. Firestone, was it?
MR. McILMAIL: Objection, leading.
A. I don't know who made the decision to convert.
BY MR. KAPLAN: (Continuing)
Q. Okay. In the course of your work with Ms. Firestone, did you ever examine whether that decision back in 2004 had been made in bad faith?
A. I guess as it relates to the questions posed in the information provided, or the -- in this Appendix D, because there were parts of it that get back to the termination.
Q. For default?
A. Yes.
Q. Okay. But then the conversion from default to convenience, did you evaluate whether that had been made in bad faith?
A. No.
Q. And, in your view, that would have been for someone else to decide. Is that fair?
MR. McILMAIL: Objection leading.
A. Yes.

EXHIBIT 7
Page 7 of 81

Prior to that, she was our contract administration engineer that helps to review the claims.

Q. Was she Ms. Firestone's supervisor?

A. No.

Q. Was she your supervisor?

A. When she was the acting construction engineer, yes.

Q. And did she explain to you why she assigned you the task of reviewing the bad faith claim?

A. Just I had the lightest workload of the constructions operations engineers, and I had experience with -- with assisting to write CODs, Contracting Officer's Decisions.

Q. Did you have any special expertise or experience in evaluating bad faith claims?

A. No.

Q. Do you think, in the course of evaluating White Buffalo's bad faith claim, it would have been helpful to interview people other than Mr. Rettinger who actually worked on the project?

A. I didn't see -- find it necessary.

Q. Okay. Would it have --

A. It may have.

Q. Was there some discussion of talking to anyone other than Mr. Rettinger who had been involved in the

A. Correct.
Q. And did you assist Ms. Firestone in making those decisions?
A. I provided the factual basis to help aid in the decision making.
Q. Right. And, then, was the meaning of bad faith that you used in helping her with that decision making "impeding or hampering the contractor's operations"?
A. I didn't make the decisions inside the document, so -- but that was what I was looking for when I was trying to ascertain which facts and so forth.
Q. When you say you didn't make the decisions, was that because Ms. Firestone was the final decision maker?
A. Correct.
Q. Did you provide recommendations to her about whether you thought certain actions were or were not in bad faith?
A. Yes. As far as my opinion, yes.
Q. Let's take a look at Exhibit 2, previously marked. We've referred to the August 2007 Contracting Officer's Decision, but take a look at it and let know if that's a copy of that decision.
A. Yes, it is.
Q. All right. The first part of it entitled

it?

MR. McILMAIL: Objection, leading, argumentive.

A. Depending on the work that would -- that was being done, I think it -- I think we'd have to look at all the facts surrounding everything that was going on at that time to see if there was any impact.

BY MR. KAPLAN: (Continuing)

Q. It was true, as you say on page 21, the contract did not restrict work at MP 46.2 during the dates August 6th and September 15th, 1998?

MR. McILMAIL: Objection, leading.

A. Could you repeat the question.

MR. KAPLAN: It might be easier for you to read it.

(The reporter read back as follows:

It was true, as you say on page 21, the contract did not restrict work at MP 46.2 during the dates August 6th and September 15th, 1998?)

A. That's -- that's what it says here.

BY MR. KAPLAN: (Continuing)

Q. That was your conclusion?

A. Yes.

Q. We may have cleared this up before, but just

EXHIBIT 7
Page 10 of 81



Electronically signed by Tamara Pearce (401-085-214-2770) a670d356-14af-42fd-b9a4-7941324c43e9

that conversation.

Q. And that conversation we're discussing is the conversation in the first paragraph of the letter?

A. No.

Q. Okay. What conversation were you referencing?

A. It was in regards to the "vindictively volunteer to be the project engineer on any construction project with a specific contractor."

Q. Okay. And that's the second paragraph?

A. Yes, the second paragraph.

Q. Did you ask Mr. Rettinger whether he recalled the conversation discussed in the first paragraph of Mr. Barber's letter?

A. I did not.

Q. The CO's decision on page 25 goes on to state, "Further, Mr. Rettinger did not know about the litigation between WBC and U.S. Forest Service until after the termination of the contract with WBC."

Where did that information come from?

A. In the discussion that I had with him about that question, I asked if he knew anything, also about the -- that -- yeah, I believe in this, the same conversation, I just -- I asked him what -- what he remembered from that, and he -- he said that he did not.

Q. Do you recall what the specific question was

A. The question.
Q. Okay.
A. Sorry.
Q. When you read through Mr. Barber's letter, did you come to an understanding about why he believed that he had been removed from the project?
A. He -- he provides a lot of information in that letter as far as his position, yes.
Q. Right. And was it your understanding, based on reviewing the letter, that he believed he was removed because of his communications with White Buffalo?
A. Yes.
Q. And when you state that his comments -- "you" being the team of you, Ms. Firestone, and Mr. Binder, state his comments are directed towards his own loss of position, is that what caused you to lack confidence in his statement?
A. I think -- I think that, combined with the testimony from -- or the deposition information.
Q. The deposition of?
A. I believe Sajid and Paul's depositions, and I can't -- I don't recall exactly. I tried to review as much of that information as possible.
Q. Is it fair to say that if, on review of the record, Mr. Barber and Mr. Rettinger differed on a point,

you went with Mr. Rettinger's view of things?

MR. McILMAIL: Objection, leading.

A. We tried to look at it as openly as possible in what was supported by the record or in those discussions. I don't -- I guess I don't know -- I mean in this instance, my -- my comfort level, I would say, yes, did fall to Paul's position.

BY MR. KAPLAN: (Continuing)

Q. Turn to page 29, please, under Miscellaneous Issues, to subsection 2(a), Environmental Restriction Error by Paul Rettinger. There's a statement, "I do not find that the alleged error by Mr. Rettinger in the single phone call as to what work could be done by September 15 rises to the level of bad faith."

Did you assist in drafting that finding?

A. I assisted. I don't recall how much of what I initially had -- I get pretty wordy, so someone cleaned up some of it.

Q. Did you feel that what page 27 refers to as the error rose to the level of bad faith?

A. I did not.

Q. Why not?

A. Because at that point, the contractor couldn't have started before September 15th because of their own failure to provide the other information, so we didn't

analysis. I would have to read through the analysis again to figure it out. There was more to it than just whether our -- or whether we made that comment, yet they were able to get one, get a permit extension.

BY MR. KAPLAN: (Continuing)

Q. Was that part of the analysis?

A. Yeah, it's all detailed in the analysis.

Q. On page 51, there is a finding that at about "2:30 p.m., Mr. Clevenger and Ms. Clevenger met with Mr. Parsons and stated that Mr. Rettinger was a problem and that Government employees are 'afraid of Paul.'"

Do you recall who wrote that section?

A. I believe it was -- I don't recall.

Q. You did determine that this conversation in fact occurred, correct?

A. I don't recall. I -- it's in here from -- and I don't recall whether it was either a letter or notes from somebody's meeting or the deposition from somebody, so if it's in here, hopefully it's accurate.

Q. You wouldn't have put it in here if you didn't think it was accurate, right?

A. Correct.

Q. Turn to page 53, please. The last full paragraph begins, "On October 28th, 1998." And is this paragraph summarizing Mr. Rettinger's letter that we went

stating, "I have found no evidence that Mr. Parsons, on this date, was even contemplating terminating the contract."

What date's being referred to in that sentence?

A. The date of the phone call.

Q. November 2nd?

A. I don't recall exactly which date.

Q. That's being referenced in that sentence?

A. Yeah.

Q. Okay. It's true, is it not, that as of no later than October 28th, Mr. Rettinger was contemplating termination of White Buffalo?

MR. McILMAIL: Objection, leading.

A. Paul's opinion was that -- that their actions, I would say, warranted termination for default, but he -- he's not the deciding faction.

BY MR. KAPLAN: (Continuing)

Q. Did you make any findings whether, as of November 2nd, Mr. Rettinger's opinion had been communicated to Mr. Parsons?

A. I did not find anything to purport that.

Q. And when I say "you" -- well, the sentence, "I have found no evidence that Mr. Parsons, on this date, was even contemplating terminating the contract," who was the

material above the rock cut.

Q. Was that what we talked about this morning in Mr. Rettinger's deposition as the overhang?

A. I think they're two separate things. I think there was a rock outcrop, the safety area, but then there was material above the rock cut that -- I believe it's two separate things.

Q. Then you state, "The Government believed that the situation could be dealt with at a later time."

Did the Government form that belief, in your understanding, before or after White Buffalo's termination?

A. I don't -- I don't know when they formed that, but I believe it was at the point that it was happening, while they were performing the contract.

Q. And at that point, while White Buffalo was doing the work, in your understanding, the Government decided it was going to have another contractor deal with it later?

MR. McILMAIL: Objection, leading.

A. I would have to go back and look at all the facts. I believe so.

BY MR. KAPLAN: (Continuing)

Q. On page 73, and under decision Subpart 5, there is a statement, "The overburden issue arose with significance in this contract only after WBC's dismal

A. It was joint between Tim, Elizabeth, and I.
Q. All right. And in order for that to be a true statement, it would have to be the Government and not White Buffalo paying for the additional and unnecessary work, correct?
MR. McILMAIL: Objection, leading.
A. And I guess it was my understanding that we -- under the termination for convenience, we were going to be paying for all those costs.
BY MR. KAPLAN: (Continuing)
Q. For the costs incurred by the completion contractor?
A. Yes.
Q. And did you evaluate whether the additional and unnecessary cost potentially charged to White Buffalo demonstrated ill will or malice towards White Buffalo at the time that they were charged?
A. I don't remember doing such a thing.
Q. And, if you did, it would be in this decision?
A. Yeah.
Q. And do you discuss anywhere in your decision whether Government personnel acted because of ill will or malice towards White Buffalo?
A. Could you be more specific, or exact --
Q. Well, in your review of the case law, did you

come across the term of, anything to the effect that bad faith requires ill will or malice on behalf of the Government?

A. There may have been some of that discussion in the case laws that I had read. I don't recall exactly.

Q. It's fair to say that you didn't use the ill will or malice standard in evaluating White Buffalo's claims?

MR. McILMAIL: Objection, leading.

A. I don't remember, because I wasn't -- ultimately wasn't the decision maker, so I provided mostly the facts and help with the analysis. I mean the ultimate decision came down to Elizabeth.

Q. And should we look in the decision, then, to determine whether the Government did any analysis of whether its personnel acted with ill will or malice towards White Buffalo?

A. I would -- I believe so.

Q. Now, in order to evaluate whether people acted in ill will -- or with ill will or malice, do you think it would be a good idea to ask them what their intentions were?

A. To the extent that it isn't covered in either depositions or -- or the record itself, potentially.

Q. Beginning on page 109, there is a loss --

about, and I didn't really get that far into the information from the DCA audit. That was mostly Elizabeth's portion.

BY MR. KAPLAN: (Continuing)

Q. All right. And were you involved in any discussions with Ms. Firestone about whether she disagreed with the conclusions of the auditor?

A. Yes.

Q. And did she disagree with the auditor on the lost profit issue?

A. My understanding is yes.

Q. Okay. Do you know if she has any background in Government contract cost auditing?

A. I know -- I don't know.

Q. And just to make sure that we're clear, in the course of those discussions about Ms. Firestone's disagreement with the DCA auditor, was the issue of whether White Buffalo might be entitled to more time or more money discussed?

A. As it relates to the auditor?

Q. As it relates to White Buffalo's lost profits.

A. I guess I don't understand the question.

Q. Okay. I'll ask you a new one then.

In the course of evaluating White Buffalo's lost profits claim, did you consider whether it might be

entitled to more time or more money?
A. Under the analysis for the lost profit?
Q. Correct.
A. I believe the finding was that they were operating at a loss at that point in time.
Q. Okay. And operating at a loss without evaluating any entitlement White Buffalo may have had to an increase in the contract price?
A. I don't recall getting into that analysis.
(Exhibit No. 9, Defendant's Privilege Log 3-7-08, 28 pages, no Bates, marked.)
BY MR. KAPLAN: (Continuing)
Q. What we've marked as Exhibit 9 is a document entitled White Buffalo Construction versus United States, Defendant Privileged Log. Have you seen this document before?
A. No.
Q. Let me ask you about some of the entries on here. On -- there are no page numbers, but entry number 74, about three quarters of the way through. There is an entry for a 7/17/07 email from Elizabeth Firestone to Mr. Binder and you, and a statement that it's an email seeking advice for COD with notes regarding advice provided. Do you recall an email of about that time?
A. I don't. I don't recall. If it's in the log,

C E R T I F I C A T E

I, Tamara Aufdermauer Pearce, CSR No. 90-0199, do hereby certify that CURTIS SCOTT personally appeared before me at the time and place mentioned in the caption herein; that the witness was by me first duly sworn on oath and examined upon oral interrogatories propounded by counsel; that said examination, together with the testimony of said witness, was taken down by me in stenotype and thereafter reduced to typewriting; and that the foregoing transcript, pages 1 to 73, both inclusive, constitutes a full, true and accurate record of said examination of and testimony given by said witness, and of all other proceedings had during the taking of said deposition and of the whole thereof, to the best of my ability.

Witness my hand at Portland, Oregon, this 1st day of May, 2008.

TAMARA AUFDERMAUER PEARCE

OCSR No. 90-0199

CONTRACT # DTFH70-98-C-00027

TERMINATION FOR CONVENIENCE

REQUEST FOR REIMBURSEMENT OF SURETY COSTS
ASSOCIATED WITH INSURANCE COMPANY OF THE WEST

*Submitted By:*

White Buffalo Construction Inc.
P. O. Box 1310
Aumsville, OR 97325
503.749.1861

EXHIBIT: 4
WIT: Scott
Bridge City Legal

**WHITE BUFFALO CONSTRUCTION INC.**
**P.O. BOX 1310**
**6653 SHAW HWY S.E.**
**AUMSVILLE, OR 97325**
**ph# 503-749-1861**
**fax# 503-749-1684**

March 19, 2004

Mr. William Parsons
Terminating Contracting Officer
Western Federal Lands Highway Division
Federal Highway Administration, USDOT
610 East Fifth Street
Vancouver, WA 98661-3801

re: Costs for surety. FHA/Powers project.

The following are our costs related solely to our surety, Insurance Company of the West ( hereinafter ICW), for the termination for convenience of White Buffalo Construction Inc. (hereinafter WBC) for the FHA Powers project contract number DTFH70-98-C-00027.

| | | |
|---|---|---|
| A. | Amount paid to ICW on 9-8-99 for reimbursement of costs and fees, check #16171 (Appendix #1, pg. 3 ) | $ 802.55 |
| B. | Payments made under agreement with ICW to repay $25,000 of indemnity amount plus 10% interest: (Appendix #2, pgs 7 - 62 ) | |
| | Total paid | $ 28,023.04 |
| C. | Amount paid to ICW by indemnitors Luther & Julie Clevenger on 1-21-04 (Appendix #3, pg. 67 ) | $ 85,746.62 |
| D. | Additional interest currently owed to ICW (Appendix #4, pg. 73 ) | $ 12,098.49 |
| E. | Amounts paid by WBC to Kerr Contractors after they invoiced ICW: (Appendix #5, pg.144 and pg. 146 ) | |
| | Check # 15805 | $ 47,480.59 |
| | Check # 15871 | $ 300.00 |
| F. | Proceeds from WBC pay estimate #1 paid directly to ICW by FHA which was contract sums earned by WBC (Appendix #6, pg 149 ) | <u>$102,317.00</u> |
| | Total | $276,768.29 |

The entire sum of $28,023.04 paid by WBC to ICW under our agreement (see Appendix 2, pg 64) to repay $25,000 of principal plus 10% interest was applied by ICW to the principal balance. See Appendix #4, page 73, for the total amount of interest that ICW is demanding.

Appendix #5 refers to Kerr Contractors. White Buffalo Construction supplied Kerr Contractors with certain equipment. The cost of this equipment is not included in the Kerr costs or in any of the costs in this submission. We will include these costs in our overall cost claim to be submitted later.

Appendix # 6 refers to the sum of $102,317.00 which are contract earnings that WBC authorized WFLD to pay directly to ICW to cover costs and expenses that they would incur as a result of the improper default termination. IW applied 100% of this amount to its costs and expenses.

Appendix #7, pages 151 through 188 consists of documentation which we recently received from ICW concerning payments that they have both received and made for our account.

I have enclosed copies of the cancelled checks as well as other documentation in our Appendices #1 through #7 with one exception. We are currently unable to find our cancelled check numbered # 37729 in the amount of $1,000.00 to ICW dated 12-10-01. I have enclosed a copy of our bank statement ( Appendix #2, pg.47 ) which references this check. Also please note that ICW acknowledges receipt of this check and kept a photocopy of its face which I have enclosed in Appendix #7, page168.

Again, we want to emphasize that this claim of $276,768.29 only refers to the ICW costs. We are in the process of preparing the balance of our termination for convenience claim plus the other claims including, without limitation, lost profits on uncompleted work due to the bad faith termination of the contract and attorney fees. We reserve the right to submit these claims at a later time.

If you have any questions please contact either Luther or myself and we will be happy to assist you.

Sincerely,

Luther L. Clevenger
President

*enclosures: appendices #1 thru #7*

# CONTRACT # DTFH70-98-C-00027

# TERMINATION FOR CONVENIENCE

# REQUEST FOR REIMBURSEMENT OF COSTS

*Volume 1 of 2*

*Submitted By:*

**White Buffalo Construction Inc.**
**P. O. Box 1310**
**Aumsville, OR 97325**
**503.749.1861**

EXHIBIT: 5
WIT: Scott
Bridge City Legal

EXHIBIT 7
Page 25 of 81

**WHITE BUFFALO CONSTRUCTION INC.**
**P.O. Box 1310**
**6653 SHAW HWY S.E.**
**AUMSVILLE, OR. 97325**
**ph# 503-749-1861**
**fax# 503-749-1684**

November 2, 2004

Mr. William Parsons
Terminating Contracting Officer
Western Federal Lands Highway Division
Federal Highway Administration, USDOT
610 East Fifth Street
Vancouver, WA 98661-3801

re: Termination for convenience of White Buffalo Construction Inc. FHA Powers project contract number DTFH70-98-C-00027.

The following are our costs which we incurred prior to termination, costs which we incurred demobilizing after our termination and costs that we incurred in assisting the winterization sub contractor (Kerr Contractors) and our surety (Insurance Company of the West) during December 1998.

Amounts paid for payroll and associated payroll taxes from 9-1-1998 through 1-14-1999 for mobilization, construction and demobilization (app. A) ........................................ $ 128,477.64

Amounts paid to Luther Clevenger during current fiscal year for payroll and associated payroll taxes for work actually and personally performed 9-1-1998 through 12-21-1999 for mobilization, construction, assistance to winterization contractor and demobilization on this specific project (app. A) ........................................ $ 39,283.64

Other direct job costs (app. B) ........................................ $ 128,342.91

Apportionment of adjusted general & administrative overhead pool for fiscal year 1998-1999 (app. D) ........................................ $ 47,375.79



EXHIBIT 7
Page 26 of 81

| | |
|---|---|
| Termination claim of subcontractor McBride Construction Inc. We have, as requested by McBride, included its entire claim. We have not reviewed the underlying documents, if any, supporting the claim. (app. C) .................... | $ 105,795.67 |
| Apportionment of unassigned equipment ownership costs for fiscal year 1998-99 (app. E).................... | $ 34,206.52 |
| Other equipment & vehicle costs or losses directly resulting from this contract (app. F) .................... | $ 84,623.24 |
| Subtotal | $568,105.41 |
| Credit for prior payments made by FHA: | |
| Payment to WBC of withheld liquated damages .................... | $100,000.00 |
| Payment to WBC of funds paid to surety (see March 19, 2004 submission) .................... | $102,317.00 |
| Total Requested | $365,788.41 |

I have enclosed our appendices A through F.

Please note that we have apportioned both the overhead cost pool and the pool of unassigned equipment and vehicle ownership costs by dividing the pools by the total adjusted payroll costs and then multiplying the result by the total adjusted payroll cost for contract DTFH70-98-C-00027. This establishes the portion of each pool that should be allocated to contract DTFH70-98-C-00027.

In addition, we have adjusted our payroll and associated payroll costs (see app.A) by including $39,283.64 in payroll and payroll costs paid in calendar year 2004 to Luther Clevenger for his work performed from September through December 1998 on contract number DTFH70-98-C-00027. He had not been previously paid for his work. Also note that our overhead pool calculations and allocation found in appendix D include the amount of $26,923.18 paid to Julie Clevenger in 2004 for work performed in fiscal year 1998-1999 (she also had not been previously paid for her work) as well as the payroll cost amount of $39,283.64 for Luther Clevenger. These additions also adjust our pool of unassigned equipment and vehicle ownership costs found in appendix E as we have added the payroll costs for Luther Clevenger and Julie Clevenger to both the total payroll cost and (in the case of Luther Clevenger) to the total payroll cost for contract number DTFH70-98-C-00027. We chose this approach in order to simplify our settlement proposal and to avoid the complexity of establishing several different years of overhead pool calculations.

This claim is only for costs which we incurred prior to termination, costs which we incurred demobilizing after our termination and costs that we incurred in assisting the winterization sub contractor (Kerr Contractors) and our surety (Insurance Company of the West) during the month of December 1998. It does not include the liquidated damages which were withheld from us or to our surety costs claim which have been previously paid to us. Also, it does not include our other settlement claims which include, without limitation, our costs to prepare our settlement claims, lost profits on uncompleted work due to the bad faith termination of the contract, costs and labor to prepare the proposals, accounting and expert fees and attorney fees and costs. We will forward a separate claim at a later time that includes these claim items and any other items that are recoverable and which have not been previously claimed.

We will be pleased to provide any additional information you require to review the claim.

Sincerely,

Luther L. Clevenger
President

CONTRACT # DTFH70-98-C-00027

TERMINATION FOR CONVENIENCE

FORM 1436 SETTLEMENT PROPOSAL (TOTAL COST METHOD)

REQUEST FOR COSTS TO COMPLETE SETTLEMENT PROPOSAL

REQUEST FOR PROFIT
AND
JUSTIFICATION FOR PROFIT

*Submitted By:*

White Buffalo Construction Inc.
P. O. Box 1310
Aumsville, OR 97325
503.749.1861

EXHIBIT: 6
WIT: Scott
Bridge City Leg

WHITE BUFFALO CONSTRUCTION INC.
P.O. BOX 1310
6653 SHAW HWY S.E.
AUMSVILLE, OR 97325
ph# 503-749-1861
fax# 503-749-1684

January 13, 2005

Mr. William Parsons
Terminating Contracting Officer
Western Federal Lands Highway Division
Federal Highway Administration, USDOT
610 East Fifth Street
Vancouver, WA 98661-3801

re: DTFH70-98-C-00027. Termination for Convenience. Settlement Proposal.

Enclosed please find the following:

1. Contractor's request for profit in the amount of $925,834.91 .(Appendix B)
2. Contractor's justification for profit. (Appendix B)
3. Contractor's Form 1436 (Total Cost Basis) including an attached Subcontractor Statement and a Form 1436 (Total Cost Basis) for Subcontractor McBride Construction Inc.
4. Contractor's request for reimbursement of costs associated with the preparation of its Settlement Proposal in the amount of $41,793.21. (Appendix A)
5. An additional copy of our submission dated November 2, 2004 volumes 1 & 2 for direct job costs in the amount of $365,788.41 which was previously delivered to you and which is included in this Settlement Proposal.
6. An additional copy of our submission dated March 19, 2004 for surety costs in the amount of $276,768.29 which was previously transmitted to you and which is included in this Settlement Proposal.

Our request for reimbursement of costs associated with the preparation of our Settlement Proposal (see #4 above) does not include costs that we will incur in negotiating this settlement. It also does not include costs which have been incurred but may not yet have been invoiced.

If you have any questions please contact me and I will be happy to assist you.

Sincerely,

Luther L. Clevenger
President

*enclosures: appendices A and B, form 1436 (WBC) including Subcontractor Statement, form 1436 (McBride), Nov 2, 2004 submission and March 19, 2004.*

APPENDIX B

**TERMINATION FOR CONVENIENCE**
**CONTRACT # DTFH70-98-C-00027**

**REQUEST FOR PROFIT**
**AND**
**JUSTIFICATION FOR PROFIT**
**January 13, 2005**

REQUEST FOR PROFIT

White Buffalo Construction Inc. is requesting profit in the amount of $925,834.91. This sum is the amount that it would have made and is based on the difference between project costs and revenues on all major projects (over $50,000) commenced during the period of 1996 thru 2000. The average project profit is 47.45%.

We have calculated a total modified contract value of $1,951,180.00. Therefore, when we multiply our total contract value of $1,951,180.00 by our average project profit margin of 47.45% we obtain the sum of $925,834.91.

JUSTIFICATION FOR REQUEST FOR PROFIT

The FHWA failed to cooperate with the Contractor by not allowing the Contractor to commence work until September 15, 1998 and by not providing the required additional contract time due to the Contractor because of the late Notice To Proceed. The FHWA erred in its belief that the Contractor could not commence work on September 1, 1998 due to environmental restrictions.

The Contract states at C-12 in section 52.211-10 that *"the completion date is based on the assumption that the successful offeror will receive the notice to proceed by September 1. The completion date will be extended by the number of calendar days after the above date that the Contractor receives*

*the notice to proceed, except to the extent that the delays in issuance of the notice to proceed results from the failure of the Contractor to execute the contract and give the required performance and payment bonds within the time specified in the offer."*

The contract was executed and the performance and payment bonds were timely tendered to the Contracting Officer (hereinafter CO). The FHWA did not issue a full NTP on September 1, 1998 and did not consider or give the Contractor the required additional time as mandated by the Contract. WBC was entitled to extensions of time that would have altered the interim completion date because of the late NTP. The FHWA erred in both the Cure Notice and the Notice of Termination for Default because the interim completion date of January 23, 1999 would have been extended because of the late NTP.

The contract contains environmental restrictions that prohibit commencement of work until September 15, 1998 for four of the ten sites on FDR 33 because clearing and grubbing was required at these sites. However, work could have started September 1, 1998 on six of the sites on FDR 33 but the FHWA did not allow this.

When he was asked why the NTP had not been issued Area Engineer Rettinger (hereinafter Rettinger) informed Project Superintendent Clevenger (hereinafter Clevenger) that there was no site where work could be performed due to contract environmental restrictions. Clevenger informed Rettinger that the contract allowed work to be performed without any restriction at MP 46.2. After Rettinger confirmed this he then informed Clevenger that he would not receive a NTP because he did not have an approved schedule. Project Engineer Aftab (hereinafter Aftab) told Clevenger to just submit another schedule and that they (the FHWA) would allow WBC to start on September 15. WBC was given a NTP dated September 15, 1998 even though WBC's schedule was still not approved.

Due to the failure of the FHWA to issue the NTP on September 1, 1998 WBC lost 25% of its work window for "wetted perimeter" work at MP 46.2. The days not utilized were dry summer days that were essential to completing the sub-grade work on FDR 33 prior to both the onset of the heavy rain season in late October and the first interim completion date of January 23,

1999. The Contractor had mobilized his equipment to FDR 33 MP 46.2 in anticipation of starting the work at that site on September 1, 1998.

The FHWA concealed from the Contractor the fact that it had discovered that the "excess" material that it had directed the Contractor to remove from MP 46.2 was actually needed at that site to complete the fill as shown in the drawings and as previously argued by the Contractor.

Rettinger informed Clevenger and Mark Heiberger (the survey subcontractor) that native material at MP 46.2 above the culvert inlet was excess material and would have to be excavated and hauled to a disposal site. WBC immediately began hauling the material to the disposal site. Eventually a Modification was agreed to adding another section of culvert at MP 46.2 under the assumption that this would allow on site use of the excess material and speed up the installation.

While this work was being performed Rettinger discovered that he was in error and that the material was actually needed at the same location at MP 46.2 for fill and that it should never have been removed. In fact, additional material would have to be hauled back to MP 46.2 to replace the material that was hauled way and to fill in the section of culvert that had been added.

When Rettinger discovered that the material being hauled away was actually needed at MP 46.2, he failed to inform WBC and he failed to correct his mistake. At the time of termination the FHWA was aware that Rettinger had mistakenly directed material to be hauled away and had entered into a Modification. The FHWA also knew that it was going to cost approximately $50,000 to correct this error but failed to take in into consideration and failed to take corrective action. The FHWA still required this needless and additional work of the Completion Contractor (hereinafter referred to as Tidewater) which was performed at WBC's expense.

The FHWA concealed from the Contractor that it had decided not to seek any extension from the permitting agencies to work in the "wetted perimeter". The FHWA deliberately misled the Contractor by informing it that the permitting agencies had refused to grant any extension. When the Contractor directly approached the permitting agencies and obtained permission from them to continue work the FHWA refused to allow the Contractor to continue

any installation and, instead, directed the Contractor to perform only winterization work and stopped all work at the culvert at MP 46.2.

WBC requested that FHWA obtain a time extension for the permits to work in water. Rettinger said it was too early and to wait until it was closer to the permit expiration date to make the request. When WBC again made the request Rettinger said that WBC had now waited too long. Rettinger's letter to WBC stated that they had consulted with the permitting agencies and an extension would not be granted. This letter was duplicitous and concealed the real truth – prior to the permit expiring FHWA had already decided not to seek any extension to the permit because they did not want WBC to continue on this project.

FHWA stopped WBC from working at the site one day before the permits actually expired thus depriving WBC of one day of time to work. At that time all culvert sections originally specified were installed and only the additional culvert section added under Modification was left uninstalled. Of course, this Modification had been based on the erroneous assumption made by Rettinger that there was an abundance of unneeded and excess material at this site which necessitated adding another culvert section in order to consume more material as fill. The additional culvert section was actually unnecessary and should have been deleted from the contract.

Clevenger decided to try to find a way to continue to work and went ahead and contacted the permitting agencies directly and easily obtained a one week extension to work. The extension was granted because the endangered salmon had not yet started their migration up the rivers. When FHWA was informed of the extension Rettinger chastised Clevenger for seeking an extension to "their" permit. After delaying for several days FHWA informed WBC that it could not perform any contract work during the permit extension and would only be allowed to "winterize" the site.

Several weeks later, on November 13, 1998, FHWA, in its Cure Notice, tasked WBC to obtain an extension to the permit to work in water even though by that time the endangered salmon were in the river and any extension was virtually unobtainable. The Cure Notice states that providing evidence that WBC can obtain a new permit which will allow "in-stream

work" after November 6, 1998 was key to WBC providing an acceptable written plan.

Prior to the permits original expiration date for sites on FDR 33 of November 1, 1998 CO Jacoby e-mailed Rettinger and said that they would not be applying for permit extension because they did not want WBC to complete the job. Also, before the permits expired another FHWA employee contacted Rettinger about obtaining an extension and was told by him in an e-mail that there he did not know why they would seek an extension of time since the Contractor (WBC) was not working and had not even started up his equipment that day. This was untrue and was a blatant fabrication.

The Contractor was highly concerned about the actions of Rettinger which appeared to be counterproductive and hindering the completion of the project. In an attempt to try to improve the situation Clevenger requested a meeting with the CO Parsons. CO Parsons informed Clevenger in this telephone call and in the meeting that he was unaware of any problems with the project and really had not heard much about it. CO Parsons stated that he would see that matters were investigated and straightened out. In fact, CO Parsons and other FHWA personnel had secretly started planning to terminate the Contractor.

The FHWA unnecessarily restricted the Contractor's operations by using the term "wetted perimeter" and defining areas within the "wetted perimeter" as any area which it arbitrarily determined could be reached by high water.

FHWA used the unusual term "wetted perimeter of any stream" to indicate areas which would be subject to the restrictions of the permit even though the permit and the permitting agencies use the term "in-water work". When asked, FHWA was unable to supply WBC with a clear definition of "wetted perimeter". However, in practice FHWA restricted the Contractor's operations in any area which it arbitrarily determined could be reached by high water. In the case of the critical repair at MP 46.2 the Contractor was prohibited after November 1, 1998 from working on installations in areas which were clearly well out of the stream including working on the fill at the top of the culvert. In fact, FHWA stopped <u>all</u> work at MP 46.2 culvert site after November 6. This stopped the Contractor from performing any more work at this location.

FHWA changed the term to "in-water work" in 1999 for the completion contract. This cooperation with the Completion Contractor significantly reduced the work area subject to permit restrictions and was not a benefit available to WBC.

The FHWA refused to address the changed condition at FDR 33 MP 46.7. This failure to act resulted in WBC incurring delays and additional costs due to the unstable overburden at the rock cut at MP 46.7. Multiple failures of the overburden at this site occurred after the first shot when the changed condition was evident. This significantly impeded the course and prosecution of the work and increased the costs to WBC.

Rettinger would not allow WBC to correct the large amount of unstable overburden at the rock cut at MP 46.7 stating that another contractor would do the work later after WBC's contract was over. Rettinger was steadfast despite the protests of Clevenger, USFS Siskiyou National Forest geologist Donna Mickley and a consulting geologist named Frank Toors who was hired by WBC. Both Mickley and Toors warned FHWA that slope failure was imminent and foreseeable and would occur as soon as the rainy season started within days or possibly weeks. There was no way that WBC or any other Contractor could complete the work as designed and yet the FHWA failed to take any action. In fact, the FHWA failed to act the entire time that WBC was on the project. As soon as the seasonal rains commenced multiple large slides occurred at this site which continued throughout the Winter and early Spring.

Rettinger required WBC to continue work at the rock cut despite the deteriorating safety conditions. Material was starting to slide down from the top at intermittent intervals on a daily basis and safety spotters had to be used. Work at MP 46.7 as well as equipment and traffic on FDR 33 servicing other ERFO sites was frequently halted in order to avoid falling dirt, rocks and other debris. Clevenger informed Rettinger that the falling material was a safety hazard and was causing significant delays to the entire project. Rettinger informed Clevenger that in order to prosecute the work without being delayed by the falling material he could excavate the overburden above the rock cut and remove it at his own cost. As the slumping overburden above the rock face extended well above and outside the original clearing

limits for the ERFO repair Rettinger required WBC to have the area surveyed and to submit a plan for removal. WBC finally ceased all work at MP 46.7 and the adjacent work below because of safety concerns just prior to being terminated.

As soon as WBC was terminated FHWA had Kerr Contractors and start removal of the slide. Within a week USFS Geologist Mickley met with FHWA and determined that conditions were unsafe and ordered FHWA to cease work and to prepare a re-design for the site at MP 46.7.

FHWA personnel entered into a conspiracy and told WBC, ICW and the completion contract bidders that there would be no changes or redesigns to the contract and that the work would be completed as per the WBC Contract. FHWA position was that the problems were caused by WBC and that the Completion Contractor would propose corrections or changes but that FHWA would not be providing them. This implied that any costs to make the corrections would have to be included in the completion contractor's bids and they were so informed by WBC's surety. In fact, FHWA had already commenced work on redesigning MP 46.7 as well as several other sites. As soon as the Completion Contractor started Rettinger negotiated a modification which essentially re-designed the entire project. It also paid the Completion Contractor to correct the changed condition at MP 46.7 even though these costs had been included in the Completion Contractor's bid to WBC's surety.

Clevenger made repeated requests for the FHWA re-designs but FHWA claimed that there were none despite evidence that they existed. WBC filed a FOIA action and the redesign for MP 46.7 was eventually provided and FHWA paid WBC's legal costs. Clevenger discovered later in discovery that there were additional redesigns for several other sites that were not provided in the earlier FOIA request. The FOIA Officer, Rettinger and others at FHWA conspired to withhold these documents from WBC despite repeated requests and FHWA's own FOIA policy.

The Contractor was notified in a telephone call from CO Jacoby in November 1998 that it would be terminated on December 1, 1998. CO Jacoby had proclaimed before the permit expiration that they did not want WBC back. True to her word WBC received from CO Parsons the Notice of

Termination for Default dated December 1, 1998. CO Parsons failed to make an independent decision concerning termination.

FHWA refused to address the small slump by the front gate at MP 47.25 which occurred because of the heavy rains and the over steep design. WBC notified FHWA verbally and by a letter and Rettinger wrote back directing WBC not to repair the slump. This inaction resulted in a small slide onto FDR 33. At that time minor work was required at this site so that we could continue to have access to the project. Rettinger directed that no work was to be done on this slide and it continued to enlarge until WBC was terminated approximately 20 days later. Kerr Contractors arrived on the project and immediately after WBC was terminated and was required to start emergency work on this slide. This work was performed at substantial expense to WBC. To finally correct the problem the cut slope at MP 47.25 was eventually laid back and riprap was installed – a major redesign by FHWA.

No payments were made by FHWA to WBC prior to termination. FHWA finally made a single payment to WBC's surety. This payment was calculated for CO Parsons by Rettinger and was less than half the amount of the progress payment previously calculated by Aftab prior to WBC's termination.

Under the Completion Contract FHWA relaxed specifications for Tidewater and sought and obtained relaxed environmental restrictions from other agencies. Under the Completion Contract work previously performed by WBC which had been deemed unacceptable prior to termination was accepted by FHWA without any additional work or modification by Tidewater. FHWA also paid Tidewater for additional quantities of work at several sites that they did not perform. CO Parsons recommended to WBC's surety that Tidewater be paid for work at WBC's expense under Tidewater's contract with the surety despite the fact that FHWA had already paid Tidewater for this same work under a contract modification.

FHWA would not accept the WBC blasting plan and, instead, required WBC to follow a FHWA recommended blasting plan which required multiple shots and resulted in oversize material on the second shot at the rock face. As a result of their actions FHWA bore responsibility for the additional costs.

# CONTRACT #DTFH70-98-C-00027

# TERMINATION FOR CONVENIENCE

# REVISED SETTLEMENT PROPOSAL

# &

# ATTACHMENTS #A, B, C, D, E, F

October 16, 2006

Submitted by:

White Buffalo Construction Inc.
P.O. Box 1310
6653 Shaw Hwy SE
Aumsville, OR 97325
503-749-1861

EXHIBIT: 7
WIT: Scott
Bridge City Legal

# Table of Contents

Contractor's revised settlement proposal....................................page 1 - 19

List of attachments.........................................................................page 20

Prior Settlement Proposal.................................................................Appendix A
*Surety Costs dated March 19, 2004*
*Direct Costs dated November 2, 2004*
*Settlement proposal costs and request for profit dated January 13, 2005*

DCAA Audit Report.........................................................................Appendix B

Estimate for Repairs Link Belt LS- 3400 Excavator.........................Appendix C

Estimate of Value of Link Belt LS- 3400 Excavator.........................Appendix C

Justification for Anticipatory Profit and a Summary
of Facts Supporting Bad Faith..........................................Appendix D

Settlement Related Legal Invoices...................................................Appendix E

Estimate of Cost to Repair 1996 Dodge Pickup...............................Appendix F

**WHITE BUFFALO CONSTRUCTION INC.**
**P.O. Box 1310**
**6653 SHAW HWY S.E.**
**AUMSVILLE, OR. 97325**
**ph# 503-749-1861**
**fax# 503-749-1684**

October 16, 2004

Ms. Elizabeth Firestone
Terminating Contracting Officer
Western Federal Lands Highway Division
Federal Highway Administration, USDOT
610 East Fifth Street
Vancouver, WA 98661-3801

RE: Termination for convenience of White Buffalo Construction Inc. FHA Powers project contract number DTFH70-98-C-00027. Revised Settlement Proposal – Request for Final Decision.

The following is White Buffalo Construction's revised settlement proposal in response to the DCAA audit report dated May 12, 2006. White Buffalo Construction (hereinafter WBC) incorporates by reference and includes as Appendix A its prior settlement proposal submissions:

1. Surety Costs dated March 19, 2004
2. Direct Costs dated November 2, 2004
3. Settlement proposal costs and request for profit dated January 13, 2005

The DCAA Audit Report dated May 12, 2006 is included as Appendix B.

The total net proposed settlement amount in the DCAA Audit Report is $896,596 before credit for $479,085 in prior payments. White Buffalo (hereinafter WBC) believes that there are settlement costs which have been excluded by the auditor and which should fairly be included in this settlement.

Please note that, at WBC's request, all questions, requests and responses during the audit process were required to be in writing. This method was followed by both parties throughout the audit process. Although the audit report includes some of the written correspondence, the auditor failed to include a number of other correspondence documents. There are arguments presented by White Buffalo that have been included in this audit report. However, some arguments have only been presented in part, while other arguments either have been completely mischaracterized in the audit report or are arguments which the auditor is aware that WBC has revised for one reason or another during the course of the process. In the spirit of settlement, WBC will not attempt in this document to correct or challenge every item in the audit record. WBC will instead

present its revised settlement proposal and, wherever it deems necessary at this time, correct misstatements of its positions.

**Direct Labor: Payroll and Taxes**

WBC requested (exclusive of the amount requested for Luther Clevenger which has previously been withdrawn and which we will discuss below) $128,478.00. The DCAA allowed $127,463.00 in pre and post termination payroll and taxes. The difference of $1,015.00 represents the payroll costs for WBC employee Jim Heigh which were not allowed by the auditor due to the fact that he felt that this post termination labor was unnecessary and unproductive. The DCAA did not question that WBC incurred these costs. (DCAA audit report pages 5 and 6, note #2).

The auditor includes WBC's response to Issue Resolution # 2 in the audit report. WBC still believes that the nominal cost for Mr. Heigh to be present on the project site overseeing WBC owned equipment and at the WBC project office in Powers, Oregon during the post termination period was a reasonable and prudent business decision and that the cost of such services should be reimbursed under the settlement.

The auditor comments that "*WBC did not have to leave its equipment onsite nor loan it for use by other contractors, but WBC did so for its own reasons*". In fact, this action by WBC was taken for two reasons. The first reason was cost. WBC was attempting to reduce costs and mitigate damages which continues to benefit both the government and WBC to this day. The cost of another contractor supplying the equipment and trucks for what was, at that time, necessarily a cost reimbursement arrangement, would have been much greater. This is due to the fact that another contractor would not have charged actual book costs for its equipment and trucks as WBC has been required to do under the termination. Rather, the other contractor would have used much higher commercial rates for its equipment and vehicles. Also, another contractor using its own trucks and equipment would have had to charge a considerable sum for additional mobilization and demobilization costs. These additional costs were never incurred in this instance due to the fact that WBC's equipment was already onsite. WBC's action in loaning its own equipment eventually resulted in a substantial savings for the government.

The second reason was time. WBC decided to loan its equipment due to the actions of FHWA that required that Kerr Contractors be present on the project site <u>and ready to work</u> by the very next morning. Although WBC had known for over a week prior to December 1, 1998 that it would be terminated, it did not know that FHWA was planning to bring in Tidewater Construction[1] on a cost plus basis at WBC's expense to perform what FHWA termed winterization work. WBC objected to the use of Tidewater for this work due to the relationship that Tidewater appeared to have with Rettinger. WBC immediately had its surety propose Kerr for this work because WBC had a history of working successfully with Kerr. The use of Kerr was subject to FHWA approval. WBC had only a few hours to establish Kerr onsite after FHWA finally approved Kerr with the FHWA condition that Kerr had to be onsite and present to work the next morning. As

[1] Tidewater later became the completion contractor for this project.

there were already multiple pieces of construction equipment and trucks already on site belonging to WBC and, as there was no time for Kerr to haul equipment to Powers and still meet the FHWA deadline, the obvious decision was for WBC to loan its equipment.

The auditor states that "*it would be unreasonable for an equipment rental company to charge a customer for constant monitoring of its rented equipment*". WBC is not an equipment rental company and it had never loaned almost its full complement of equipment to another contractor. The evening before Kerr was required by FHWA to start, and only minutes after WBC heard that FHWA had agreed that Kerr could go onsite, WBC turned over equipment costing hundreds of thousands of dollars to Kerr with only a handshake agreement between the two contractors. Time was in very short supply and there was no time for rental agreements, insurance certificates, bids or price agreements, or credit checks. It also was a reasonable business decision for WBC to dispatch an employee to assist Kerr and monitor the equipment as the project was in a remote area and Kerr was unaware of the condition of WBC's equipment and the scope of materials, fuel, parts, tools, and supplies onsite.

The termination for default did not stop WBC from incurring additional costs. Other post termination labor costs were supported by the audit. WBC believes that this cost is reimbursable under the settlement agreement and it requests reimbursement in the amount of $128,478.00 for Direct Labor: Payroll and Taxes which includes $1,015.00 it paid to its employee for work on this contract which was not supported by the DCAA audit report.[2]

The settlement proposal requested, and WBC has withdrawn, $39,283.00 for payroll and costs for work performed by Luther Clevenger in the direct labor category. However, in WBC's response to Issue Resolution #1, it is WBC's position that even though it concurs that the amounts disbursed to Luther Clevenger do not qualify as "allowable costs" under FAR 31.205-6, the government has an obligation to compensate it in some manner under this settlement for the efforts of Mr. Clevenger, "whether as payroll under a jury verdict approach or as profit".

**Other Direct Job Costs**

WBC requested $128,343.00 and the DCAA Audit Report supported $94,523.00 in other direct job costs. The total amount questioned by the auditor is $33,820.00. From the amount that the auditor questioned, WBC has withdrawn the following items and is not requesting payment in the total amount of $2,159.56.

| | | |
|---|---|---|
| Liberty Northwest Insurance | withdrawn | $ 384.45[3] |
| Liberty Northwest Insurance | withdrawn | $ 68.28 |
| Liberty Northwest Insurance | withdrawn | ($ 4.29) |

[2] DCAA audit report appendix 1, page 33, WBC response to IR #1

[3] The first four withdrawn items in this section were withdrawn by WBC and reported to the auditor prior to his review.

| | | |
|---|---|---|
| Columbia Pacific | withdrawn | $ 100.00 |
| Landmark Surveying (math error) | withdrawn | $1,100.00 |
| OROSHA (fine) | withdrawn | $ 475.00 |
| Auditor's pre-term "low dollar items" | withdrawn | $ 36.12[4] |
| Total withdrawn items | | $2,159.56 |

WBC feels that the following items were unreasonably excluded by the auditor and should fairly be included in any settlement award:

| | | |
|---|---|---|
| Jed Peterson | Owner Operator | $1,843.25 |
| Burris Backhoe Service | Owner Operator | $5,152.50 |
| Mike McWilliam | 998 dozer rental | $3,753.53 |
| David Montgomery | Owner Operator | $1,921.25 |
| Joe Eisenhart | Owner Operator | $3,442.50 |
| Rick Koser | Owner Operator | $2,000.00[5] |
| | Total | $18,113.03 |

Again, the DCAA does not contest that these payments were made by WBC. However, he does choose to characterize them as unsupported. (DCAA audit report pages 8 thru12, note #4).

Vendors Jed Peterson, Burris Backhoe Service, Mike McWilliam, David Montgomery, Joe Eisenhart, and Rick Koser all provided equipment and or dump trucks and labor on this project and the auditor acknowledges that there is some evidence that supports these costs. (page 11, e(1). The auditor comments in e (1) that only the government log for October 1998 was "present for his review". All government inspection logs covering the entire pre-termination period which were previously turned over to WBC by FHWA were present at the audit site for DCAA review during the entire duration of the audit (3 weeks). Also present for review were the dailies and all other project/contract documentation. WBC offered 19 boxes of documents and 7 boxes of accounting data at audit. Unfortunately, the auditor waited until the last day of the audit to review the contents of most of these boxes. The auditor had the option of making a written request either at the time of the audit or some later date for copies of inspection reports and dailies (as he did for other items) and he failed to do so. A general inventory of the boxes was compiled by Stoel Rives prior to audit review and it lists daily records (dailies) and logs in several boxes.

WBC did respond to the auditor in its response to Issue Resolution No. 11.[6] Cancelled checks were issued to these owner operators by WBC within a month before or after the termination date. Project records compiled by FHWA and WBC which monitored the work include references to these vendors and were available to the auditor for review and

[4] The auditor fails to explain why this small amount has been questioned. However, in order to facilitate the settlement process WBC will agree to withdraw it.
[5] Because the check was dated 12-9-98, the auditor classifies this payment as "post-termination" however the work paid for was performed prior to termination.
[6] DCAA audit report, page 33, WBC response to IR#11.

EXHIBIT 7
Page 45 of 81

request. Additionally, WBC did not have any other business operations other than the subject contract during this period in the geographic area of southwest Oregon. Finally, none of the vendors questioned have ever been engaged by WBC at any other time except on this project. The auditor had access to several years of WBC's general accounting & financial records compiled both before, during and after 1998, and none of these vendors appear in these records in any other context other than for this project.

There is ample evidence that these costs are reimbursable under the settlement agreement. FHWA does have all of the documents and can easily verify that these vendors were working on the project. WBC requests reimbursement in the amount of $18,113.03 for sums it paid to the aforementioned owner operators for work on this contract.

WBC is also requesting reimbursement under the settlement agreement for the following three costs which were not supported by the auditor under the other direct job costs item:

| | | |
|---|---|---|
| Stoel Rives | *McBride Legal Costs* | $3,116.84 |
| Landmark Surveying | *Subcontractor, extra work* | $1,085.00 |
| Landmark Surveying | *Subcontractor, extra work* | $1,017.00 |
| Landmark Surveying | *Subcontractor, legal expenses* | $1,272.24 |
| Landmark Surveying | *Subcontractor, contract work* | $7,056.00 |
| Total | | $13,547.08 |

The cost in legal fees and expenses in the amount of $3,116.84 for Stoel Rives is a reimbursable cost under the settlement. The auditor did not support this cost. In the audit report, Note 4, the auditor indicates that he will discuss the requested McBride legal costs in Note 4, (6). However, when this reference is reviewed it is apparent that he (the auditor) is discussing another item entirely[7]. Therefore, WBC has no clarification as to why the legal fees, in this instance, have not been supported. One of the key arguments that the auditor has employed in questioning all of WBC's legal costs and expenses for settlement in the audit report is rendered moot in this case due to the fact that unredacted copies of these billings were included for review in WBC's direct cost proposal dated 11-2-2004.

WBC incurred this cost in litigation with subcontractor McBride as a direct result of the termination. When the government terminates a contract, the prime contractor not merely "may", but instead must "[s]ettle outstanding liabilities and proposals arising out of terminations of subcontracts". FAR 49.1049(g). See also FAR 49.108(1) ("Upon termination of a prime contract, the prime contractor and each subcontractor are responsible for the prompt settlement of the settlement proposals of their immediate subcontractors"); FAR 49.108-2(a) ("[T]he prime contractor shall***terminate all subcontracts to the extent that they relate to the performance of prime contract work terminated.")

[7] DCAA audit report, page 11, note 4(6)

The termination expenses which a prime contractor may recover include the reasonable cost of terminating subcontracts. FAR 49.108-3. The TCO must, in considering the reasonableness of subcontractor expense, apply the same FAR standards that apply to pricing the settlement amounts for the prime contract. FAR 49.108-3(c). Recoverable costs include fees expended in procuring attorneys' services. FAR 31.205-33.

Prior to termination, Landmark Surveying, a subcontractor on the project, performed extra work above and outside the original scope of work in the amounts of $1,085.00 and $1,017.00 which sums WBC paid to Landmark in two separate payments after termination. The auditor states that, since the "extra work" is for work performed in replacing and re-staking several times at MP 46.2 and 46.7 and "including changes in the design", that this work should not be considered "extra work" due to the fact that MP 46.2 and 46.7 are locations within the original scope of work. He also questioned the amounts requested for extra work because he determined that the subcontract agreement does not require WBC to pay Landmark for work which was outside the original scope of work unless "the owner (i.e., the government) adjusts the contract price". [8]

There is no requirement that there be a specific agreement for the extra work. It is enough if there was, in fact, extra work. In the instance of extra work, FAR subpart 43.2 pervasively, and FAR 52.243-1 in particular for Fixed Price Contracts, require the government to pay through equitable adjustments for changes the government causes in the work. Whether a government change is formal or constructive, increased costs flowing from a change are compensable. *Sauer v. Danzig*, 224 F2d 1340, 1348 (Fed Cir 2000).

Both WBC and FHWA were aware that Landmark performed extra work at MP 46.2 and 46.7. In fact, WBC acted in a fair manner by compensating Landmark for its work.. As stated in much greater length in WBC'S response to Issue Resolution No. 8, the extra work that Landmark performed was outside the original scope of work. This was due to defects in FHWA's design which were ultimately corrected and redesigned by FHWA after termination but before the completion contract was commenced. However, at the time that Landmark performed this extra work, FHWA was still insisting that WBC was responsible and was directing WBC to provide a redesign to FHWA <u>at its own cost</u>. WBC had no other option but to comply and incur this cost. Furthermore, FHWA utilized the extra work that Landmark performed by partially basing its redesign upon Landmark's work. When the FHWA caused such changes and, indeed, benefited from such "extra work", both WBC and Landmark became entitled to an equitable adjustment. Under the settlement WBC is requesting reimbursement for sums paid to Landmark Surveying for extra work in the amount of $2,102.00[9].

The auditor also questioned WBC's request for reimbursement for $1,272.24 in legal fees incurred by subcontractor Landmark Surveying. In a convenience termination, the contractor is obligated to settle with subcontractors. WBC believes that it properly

[8] DCAA audit report page 10, Note 4(4b)

[9] $1085.00 plus $1017.00 questioned by DCAA audit report. (note 4).

EXHIBIT 7
Page 47 of 81

reimbursed Landmark for this expense after the termination was converted and that it, in turn, deserves reimbursement for FHWA under the settlement.

Landmark incurred its legal expenses after termination in its attempts to receive payment. The auditor states that he "*questioned the legal and profession fees because they are for Landmark's collection efforts, and since the government did not cause this expense and does not have privity with the contract between WBC and Landmark, we believe the government should not have to pay for these costs*".[10] *(emphasis added)* In fact, the actions taken by FHWA in terminating WBC as well as by failing to make any attempt whatsoever to compensate WBC for its work for a period of nine months[11], had a direct impact on Landmark and created a situation in which Landmark reasonably chose to seek legal help.

The audit report also questions the difference between what the auditor terms an 85% completion paid by WBC to Landmark for contract work and the arbitrary figure of 50% completion[12] which he (the auditor) supports[13]. The auditor states that he is using a judgmental completion percentage of 50% but that there is "*significant doubt as to the actual percent of completion*". The auditor goes on to state that he was "*unable to identify a February 22, 1999 internal FHA memorandum in our audit file that shows 50 percent completion; however, we used 50 percent to calculate questioned costs*"[14]. After the termination was converted, WBC and Landmark engaged in negotiations and agreed upon a settlement amount. WBC then properly paid Landmark the agreed upon sum. In its response to Issue Resolution No.8, WBC wrote that the "*contract artificially manipulates the amount due for the surveying pay item. It links the percentage to be paid for surveying on any pay estimate to the percentage of the total amount paid to date for the contract*". This was written in response to the auditor's initial conclusion that the surveying was only 25% complete.[15]

Now comes the audit report which arbitrarily supports a 50% (see above) completion percentage to the base subcontract which sum is based upon a document that he seems to be saying that he is now either unable to find or otherwise identify. However, he ignores the relevant issue which is "*following a termination for convenience, the contractual relationship converts to a cost-reimbursement contract. The contractor is entitled to recover the costs if incurred.*"[16] WBC determined that Landmark had installed slope, center line, and clearing limit stakes on all road sections except the Rock Creek Bridge section and had completed the cross sections and staked the majority of the culvert pipes. Volumes using measured cross section data and design criteria had been calculated and

---

[10] DCAA audit report page 10, paragraph (c).
[11] A period of 9 months: September 1998 thru May 1999 when pay estimate 1 was issued. WBC argues that even this pay estimate was defective and was for a grossly reduced amount.
[12] DCAA audit report page 10, 4(c).
[13] DCAA audit report page 12, note 4, paragraph e(4).
[14] DCAA audit report page 12, note 4, paragraph 3(4).
[15] Issue resolution 8, page 2, paragraph 3.
[16] WBC response to Issue resolution 8, page 2, paragraph 3.

notes submitted and accepted by FHWA. WBC requests that $7,056.00 that it paid to Landmark and which was unsupported by the auditor be included in this settlement.[17]

When WBC responded to Issue Resolution #8, it notified the DCAA that Landmark had advised WBC that it should have included interest in its claim and that a request for interest would be made. Under FAR standards, the only interest expense for which recovery is not required is money expended as a cost of the contractor itself borrowing funds. In particular, FAR 31.205-20 limits recovery only of interest on borrowings to raise capital as opposed to interest payments generally. Lockheed v Widnall, 113 F3d 1225, 1227 (Fed Cir 1997). Consequently, since the "interest" requested by White Buffalo for Landmark was not for borrowings to raise capital, those costs are recoverable.

The following is WBC's additional request for interest on the total sum of $19,238.00 paid to Landmark for contract work and extra or additional work for the period beginning December 1, 1998 thru March 9,1999 interest calculated at the published post judgment interest rate. WBC is also requesting interest for Landmark on the balance of $13,113.00 from March 10, 1999 thru January 20, 2004 interest calculated at the published post judgment interest rate. The total amount requested for interest for Landmark is $2,415.00. Rates for interest claimed were obtained by visiting the following web site address: http://www.utd.uscourts.gov/documents/judgpage.html

WBC withdraws its previous request for $128,343 for Other Direct Job Costs and requests $128,598.08 for settlement.

| | |
|---|---|
| Amount supported for ODJC by DCAA audit report | $94,523.00 |
| Amounts paid to owner operators | $18,113.00 |
| Legal costs paid to Stoel Rives LLP for subcontractor McBride | $ 3,116.84 |
| Amounts paid to subcontractor Landmark for extra work | $ 2,102.00 |
| Amounts paid to Landmark for contract work | $ 7,056.00 |
| Amount paid to Landmark to reimburse it for legal expense | $ 1,272.24 |
| Request for interest for Landmark | $ 2,415.00 |
| Total ODJC | $128,598.08 |

## Equipment, Vehicle, Fuel

WBC proposed a total of $34,207.00 in equipment, vehicle and fuel costs and the auditor supported $26,985.00. WBC withdraws its prior request for $34,207 and hereby requests a total of $26,985.00 for Equipment, Vehicle, Fuel settlement.

## Other Equipment/ Vehicle Costs

WBC proposed $84,623 and the audit supported $65,808 for other equipment and vehicle costs. The audit questioned costs for repairs to equipment that have not been performed

[17] There was a math error of $1100.00 in the payment to Landmark which WBC has previously withdrawn from this settlement.

as well as owner labor for repairs that were made on the service truck crane. The auditor does not dispute that the damage to the LS-3400 excavator and the theft of the truck tires occurred.

The audit also does not dispute that Luther Clevenger performed the labor to repair the crane on the service truck which was damaged. However, the auditor does not agree that either WBC or Mr. Clevenger should receive any compensation for this labor under this settlement agreement, either through direct reimbursement or by additional profit. In this instance, due to the fact that Mr. Clevenger was never directly paid payroll by WBC for this crane repair, WBC must reluctantly withdraw its request for $155.00 for crane repair labor. As discussed in the prior section of this document dealing with payroll and taxes, and in WBC's response to Issue Resolution #1, it is WBC's position that the government has an obligation to compensate it in some manner under this settlement for the efforts of Mr. Clevenger, whether as payroll under a jury verdict approach or as profit.[18]

The equipment repairs to the LS-2400 excavator and the 8 stolen truck tires were questioned in the audit report "*because there is no certain evidence that these costs will be incurred*".[19] The audit report ignores the very obvious fact that, as soon as the damage or loss occurred, the costs of such damage or loss were incurred by WBC. The amount of loss or damage experienced by WBC, and the reasonableness of any reimbursement to WBC for its losses, is unaffected by whether or not the damage is ever repaired. The amount of loss is measured in the diminished or lost value of the property or asset and commonly is quantified by the cost to replace the item or repair it to a pre loss condition.

In the course of performing excavation work on this project, White Buffalo employed its LS-3400 Link Belt crawler excavator. When White Buffalo brought the LS-3400 excavator to the project, it had a replacement value of $27,500.00 and a copy of the appraisal is attached in Appendix C. After the LS-3400 excavator was employed on the project, it would have cost $ 32,738.77 to restore the LS-3400 excavator to the condition it was in prior to being used on the project and a copy of the estimate for the repairs is attached in Appendix C. The salvage value of the LS-3400 excavator was $2,500 in 1998 which shows a loss of $25,000 which is the amount that is requested by White Buffalo in the revised settlement proposal. WBC hereby withdraws its previous request for $17,500 for damage to the LS-3400 excavator and, instead requests $25,000.00 under this settlement.

Under the Federal Acquisition Regulation, loss of useful value through use of contractor's equipment is compensable. 1 K. Manos, Government Contract Costs and Pricing, sec. 49:B:3 at 502-03 (West 2004). In particular, loss of useful value is not limited to special tooling, special machinery, or test equipment, but may also include general purpose tooling and equipment. *Southland Manufacturing Corp.*, 75-1 BCA P 11,272 at 53,735 (ASBCA 1975). See also *Metered Laundry Servs., Inc.*, 78-2 BCA P 13,451 at 65-727-28 (ASBCA 1978).

---

[18] WBC response to Issue Resolution #1.
[19] DCAA audit report page 14, note 6 (a).

EXHIBIT 7
Page 50 of 81

There also is no requirement under the FAR that, in order to recover from the government for consumption of equipment's useful life, a contractor must have first expended monies to restore the useful life which has been consumed on the project. In *American Electric, Inc.*, 76-2 BCA P 12,151 at 58,482-83 ( ASBCA 1976), the Board rejected the government's argument that a contractor was entitled to recover loss of useful value only if the costs had been charged directly to the client prior to its termination.

In its prior settlement proposal WBC requested $1,160.00 for used value replacement for 8 stolen truck tires that were stolen after the termination and after WBC's employee Jim Heigh was removed from the project by Rettinger. The auditor failed to support any reimbursement for WBC for the lost tires. As discussed above, the auditor believes that WBC has not actually sustained a loss unless and until it (WBC) replaces the items that were stolen.[20]

Because the tires had sustained some use at the time that they were stolen WBC could not ask for new replacement cost for the tires. In November 2004 WBC consulted Les Schwab Tire Center and established a value for the tires of 85% of new replacement cost. In October 2006 WBC again called Les Schwab and determined that today the cost of 8 new tires ranges from $2,272.00 to $2,644.00. WBC feels that $1,160 is a reasonable request and requests reimbursement for $1,160 for the stolen tires.

WBC hereby withdraws $84,623 that it previously proposed for Other Equipment and Vehicle Costs and, instead, requests reimbursement under the settlement for $91,968.

| | |
|---|---|
| Amount from prior proposal supported by audit report | $65,808 |
| Value of damaged excavator Link Belt LS-3400 | $25,000 |
| Value of 8 stolen truck tires | $ 1,160 |
| Total requested Other Equipment/Vehicle Costs | $91,968 |

**Surety Expense**

WBC requested $276,768.00 for surety expenses and the auditor supported $261,646.00. The difference, $15,122.00, is the interest that the surety has charged WBC. It is the position of WBC that surety interest expense is a cost for which it should legitimately be reimbursed in the settlement.[21] In its response to Issue Resolution #7, WBC states that fair compensation includes reimbursement for amounts it has paid to its surety. In Issue Resolution No. 4, the auditor asserted on July 7, 2005 that he would question "interest expense in its entirety." The auditor also challenged interest due the surety. WBC responded with Federal Circuit authority holding the limitation is only on interest on borrowings to raise capital as opposed to interest payments generally. The auditor has

[20] DCAA audit report page 14, note 6 (a).
[21] DCAA audit report, page 22, WBC response to IR #7

failed to concede his error and has continued to claim that the interest incurred with the surety (ICW) is interest on borrowings[22].

After the termination for default WBC was bound to indemnify its surety (ICW). ICW, an insurance company, insured WBC and indemnified it against any liabilities to third persons. The fact that WBC eventually reimbursed ICW for the bulk of its expenses after the termination for convenience does not make the financial arrangement between WBC and ICW a loan nor do the sums paid constitute "borrowings". Under FAR standards, the only interest expense for which recovery is not required is money expended as a cost of the contractor itself borrowing funds. In particular, FAR 31.205-20 limits recovery only of interest on borrowings to raise capital as opposed to interest payments generally. Lockheed v Widnall, 113 F3d 1225, 1227 (Fed Cir 1997).

Consequently, since the "interest" requested by White Buffalo for its surety was not for borrowings to raise capital, those costs are recoverable. It is the position of WBC that interest expense incurred through its surety relationship is an allowable cost. WBC requests a total of $276,768.00 for surety expense under this settlement and does not concur with the audit report that $15,122.00 for surety interest should be unsupported.

**G&A Expense**

WBC requested $ 47,376.00 for G&A expense and the auditor supported $28,183.00 of this amount. WBC hereby withdraws its request for $47,376.00 and requests $28,183.00.

**Subcontractor[23]**

WBC's subcontractor, McBride, originally requested $105,796.00 as its (McBrides's) share of the settlement. During the audit and after negotiation with WBC, McBride decreased its request from $105,796.00 down to $ 39,222.35. The auditor supported the sum of $29,528.00. The difference between what McBride wants under the settlement and what the auditor supported is $9,694.35.

McBride has requested $29,528.00 for work performed plus $9,694.35 for interest for a total of $39,222.35. WBC's position is that it has an obligation to present McBride's settlement proposal in its entirety. An examination of McBride's stated calculations for interest of 77 months at an annual rate of 4.52% gives a different product of $ 8,564.11. However, the number of months which elapsed from the date of termination to the date of the audit report is actually 89 months. When you recalculate by multiplying the number of 89 months times the requested interest rate, the new product is slightly greater than the amount that has been requested by McBride.

Under FAR standards, the only interest expense for which recovery is not required is money expended as a cost of the contractor itself borrowing funds. In particular, FAR 31.205-20 limits recovery only of interest on borrowings to raise capital as opposed to

[22] DCAA audit report page 18, Note 7(e)
[23] We have ddressed this item out of its original order in the DCAA audit report.

EXHIBIT 7
Page 52 of 81

interest payments generally. Lockheed v Widnall, 113 F3d 1225, 1227 (Fed Cir 1997). Consequently, since the "interest" requested by White Buffalo for McBride was not for borrowings to raise capital, those costs are recoverable.

WBC is requesting $39,222.35 for subcontractor McBride's settlement.

## Prior Payments

WBC agrees that the government should receive full credit under this settlement for all prior payments that it has made. WBC agrees with he auditor that those prior payments total $479,085.00.

## Profit[24]

In its January 2004 settlement proposal, WBC requested $925,835 for profit based upon a modified contract value of $1,951,180 multiplied by its historical job profit margin of 47.45%. This amount represents profit on work (including extra work) that WBC performed as well as the profit on the work the WBC would have performed if not for the termination for default and the bad faith of the government. The audit report supported a profit amount of $253,211.

The FHWA has stated, from the outset, that it would fully consider all information submitted by WBC on all issues including the lost profit issue. WBC has seen no analysis of the facts by FHWA as to whether or not WBC is entitled to lost profits on uncompleted work.

As discussed at our last meeting, WBC has included in more detail its justification for anticipatory profit and a summary of the facts supporting bad faith with this revised settlement proposal. This justification is part of this revised settlement proposal and can be found in Appendix D.

WBC continues to believe that the profit calculation is proper. However, a credit should be given to the government for two items dealing with unallocated costs which WBC requested elsewhere in this revised settlement proposal. Those items are G&A in the amount of $28,183 and Equipment/Vehicle/Fuel in the amount of $26,985. Therefore, WBC is adjusting its request for profit under this revised settlement proposal by deducting the amounts of $28,183 and $26,985 and is hereby requesting the revised sum of $870,667 for profit.

## Settlement Costs

WBC requested $41,793 for settlement expenses through January 13, 2005. However, the auditor supported only $9,249 in settlement expenses. The difference is $32,544 and, of that sum, WBC has withdrawn $1,593.90 for a math error. The auditor refused to support

---

[24] In the DCAA audit report the section "Profit" follows "G&A Expense".



EXHIBIT 7
Page 53 of 81

the requested costs for settlement attorney fees paid to Stoel Rives in the amount of $16,770, first class airfare upgrades for WBC employees in the amount of $200.00, and the cost of payroll in the amount of $13,980 (all settlement payroll was questioned) which was paid to WBC employees Luther and Julie Clevenger for settlement related labor. [25]

The auditor opines that "WBC's job cost records for the proposed payment total up to one number; the claim proposes another number; the altered copies of invoices from WBC's attorneys total up to a third number". [26] In fact, the auditor is aware that WBC has costs in its job cost records which it has not claimed under this settlement. Also, it should be pointed out that WBC's records pertaining to settlement expenses which include its settlement legal expenses have never been kept in the job cost records file. The title of the job cost records file is "FHA, Powers FDR 33". Settlement expenses are maintained, and have been maintained since they started to accrue in January 2004, in a completely separate file in WBC's records titled "FHA, Powers Settlement" and are not co-mingled with the job cost records. In fact, there are numerous and much larger legal expense entries in the "FHA, Powers FDR 33" job cost file dealing with the termination for default and the current case with the Court of Claims which the auditor has reviewed and referenced, but those entries do not relate to this settlement agreement and are not part of this request. Given these circumstances, whether or not these unrelated non-settlement legal expenses total the same as the legal expenses requested in the January 13, 2005 settlement proposal (they do not) is immaterial.

The auditor questioned the entire amount proposed for legal expenses on the basis that he personally was not permitted to inspect the original invoices. He also failed to properly consider the fact that provision of copies redacted to remove confidential matter was endorsed by the Court of Federal Claims in *White Buffalo, Inc. v. United States* , 52 Fed Cl 1, 13 (2002). In its response to Issue Resolution No. 6, WBC states that it feels that the auditor's demands are unreasonable, but that it wishes to cooperate with the TCO in evaluating the proposed legal expenses. WBC also offers, without a waiver of any privilege, to make available to government counsel, Mr. Tim Binder, original unredacted legal invoices.[27] It is the position of WBC that the government is obligated to reimburse it for its settlement related legal expenses under this settlement.

Prior to turning over the legal invoices at audit, WBC determined that it wished to provide the auditor with the additional invoices for settlement legal expenses which were incurred after the January 13, 2005 settlement proposal and which it also claims[28]. WBC realized at that time that there were some costs which needed to be removed from the invoices as well as some billing entries which violated the principles of privileged communication between attorney and client. A few of the invoices were redacted to remove privileged material and non settlement related entries and the invoices were provided to the auditor. These additions and changes obviously changed the total

[25] DCAA audit report page 25, note 10(c).
[26] DCAA audit report page 33, issue Resolution No. 6.
[27] DCAA audit report, page 33, response to Issue Resolution No 6.
[28] WBC is including all of its settlement expenses with this revised settlement proposal.



EXHIBIT 7
Page 54 of 81

amounts requested in the January 13, 2005 settlement proposal. Finally, WBC typically pays its invoices from Stoel Rives with one check that serves as total payment for all legal matters invoiced during that billing period.

In rejecting the entire fee request without allowing review by government counsel, the auditor failed, as required by DCAM ¶ 1-504.5a, to make reasonable efforts to resolve record access problems in a timely manner at the lowest DCAA and contractor management levels. The invoices that had not been redacted were available to the auditor in their entirety. Additionally, WBC expressly offered the unredacted copies of the redacted invoices for review by government counsel. In conclusion, there is nothing reasonable, fair, or objective in the auditor's complete denial of legal costs and fees in these circumstances.

Legal expenses have continued to accrue during and after the audit including a substantial amount for dealing with this very issue. Therefore, in this revised settlement proposal, WBC wishes to request all of its settlement related legal fees as well an estimated amount for anticipated legal expense through and until the TCO has rendered a final decision on the settlement amount. WBC wishes to withdraw its prior request of $16,770.03 and, instead, requests a new total of $79,265.68 for settlement related legal expense. This sum includes $75,765.68 in expenses already invoiced and $3,500 in estimated legal expense through the date of the TCO's final decision. WBC asked Stoel Rives LLP to review all invoices, whether redacted or not, and to make any additional corrections or clarifications so that all parties to this settlement could access the data without violating any privleged communications. Copies of these invoices are included in Appendix E.

The auditor failed to support any portion of the $ 13,980 in payroll costs requested in January 2005 for Luther and Julie Clevenger to prepare and work on this settlement even though it was demonstrated at audit through cancelled checks, pay stubs, and time cards that this payroll had been paid to these employees during 2004 and 2005. In the opinion of the auditor, it was appropriate to question <u>all</u> owner labor costs, wherever found in the settlement proposal, because "*WBC does not pay wages or salary to its owners "so consistently as to imply, in effect, an agreement to make payment" as required by FAR 31.205-6.*"[29] The auditor equates all payroll costs for both Luther and Julie Clevenger that are requested under the settlement proposal with the specific request that WBC initially made, and subsequently withdrew, for payroll earned in 1998 and later paid in 2004. WBC, however, has never withdrawn its request for payroll paid to Luther and Julie Clevenger for work associated with the settlement proposal.

In this case the payroll was paid and time records were kept. For example, in the period commencing January 2004 (the month of conversion) and ending May 15, 1005 (just prior to start of audit) WBC paid Luther Clevenger a total of $153,651.00 in direct payroll exclusive of his benefits such as health insurance and pension. This period was not covered during the audit. The sums paid to Mr. Clevenger included the $ 39,283 paid to Mr. Clevenger in 2004 for work performed on this project in 1998 and discussed elsewhere in this document.

---

[29] DCAA audit report page 6, note 3(a).

EXHIBIT 7
Page 55 of 81

All wages requested under this settlement have been paid to the referenced employees and were incurred in working on the settlement. It is reasonable for WBC to receive reimbursement under this settlement for payroll and costs paid to employees working on the settlement.

In its settlement proposal dated January 13, 2005, WBC requested $8,835.15 for payroll costs for Luther Clevenger and $5,145.11 for payroll costs for Julie Clevenger for a total of 13,980.26. Since that date, WBC has incurred an additional $21,993.82 in payroll expenses for three employees to prepare for audit, respond to auditor's requests, prepare for and attend audit, prepare for and respond to draft audit report and telephone exit interview, review and respond to audit report, attend and conduct meetings with legal counsel, and government personnel and compose this revised audit report. These are payroll costs that have been incurred and paid. Finally, WBC estimates that it will incur another $2,500.00 in settlement related payroll costs through the date of TCO final decision.

The auditor also failed to support the $200.00 requested in first class airfare upgrades stating that airfare in excess of standard or coach airfare is unallowable. [30] It is WBC's position that the auditor's interpretation of FAR 31.205-46(b) is flawed and that, in this instance, this is an allowable cost.

At this time WBC is requesting below other and additional miscellaneous additional settlement costs that either were incurred after January 13, 2005 or which were otherwise not requested in its settlement proposal dated January 13, 2005 and which are primarily associated with the costs of audit. Those costs are:

| | |
|---|---|
| Thompson West (Westlaw) subscription, February 2005 through October 2006 | $3,670.39[31] |
| Parking fees for audit and other appointments | $ 102.26 |
| Mileage, audit, 1,812 x .375 | $ 679.50 |
| Mileage, other, 1452 x .375, (trip to Powers and other appointments) | $ 544.50 |
| Food, audit | $ 258.44 |
| Lodging, audit | $ 147.38 |
| Clerical supplies (blank writable cd disks) | $ 8.45 |
| Photocopy, audit, 1485 x .10 | $ 148.50 |
| Photocopy, audit, 336 x .15 | $ 50.40 |
| Photocopy, audit, color copies | $ 70.08 |
| Photocopy and binding | $ 415.52 |
| Laptop, Hewlett Packard | $1,899.99 |
| Additional licensed copy of accounting program | $ 198.00 |
| Damage to 1996 Dodge pickup | $3.638.55 |
| Rental vehicle replacement for pickup during repairs, 1.5 weeks | $ 600.00 |
| Subtotal additional miscellaneous costs request | 12,431.96 |

[30] DCAA audit report page 25, note 10, C (2).

[31] Monthly charges will continue to accrue at the rate of $192.70 per month until TCO final decision.

WBC purchased a laptop computer and another licensed copy of its accounting software for use in composing its settlement proposal and conducting the audit. This computer and software was used for numerous meetings and throughout the audit.

The requested damage to the 1996 Dodge pickup is for damages to this vehicle which occurred during project work and prior to termination. A copy of the repair estimate has been attached in Appendix F. Since the repairs will necessitate a 1.5 week period where WBC will lose the use of this vehicle, WBC is requesting an amount to pay for a rental replacement. The weekly cost is $400.00 per week from United Rental for a ¾ ton pickup with 4 wheel drive and a towing package.

WBC requests a total of $137,120.46 in settlement costs discussed in this section titled "Settlement Costs" for the following amounts:

| | |
|---|---|
| Amount supported by auditor from January 13, 2005 proposal | $ 9,249.00 |
| All settlement related payroll for WBC employees | $38,473.82 |
| All settlement related legal expense invoiced | $75,765.68 |
| Estimated additional legal expense thru date of TCO final decision | $ 3,500.00 |
| Airfare first class upgrades | $ 200.00 |
| Additional miscellaneous costs (see above) | $12,431.96 |
| Total request section "Settlement Costs" | $139,620.46 |

This sum includes the amount previously requested on January 13, 2005 of $41,793.21 less the math error of $1,593.90. The math error is has been withdrawn by WBC from its proposal.

**Interest**

WBC is entitled to interest under the Prompt Payment Act, 31 USCA 3902, for the amount earned under the pay estimate which was prepared and approved by Project Engineer Aftab in November 1998 but which was never finally approved by FHWA and paid to WBC. As discussed in WBC's justification for anticipatory profit found in Appendix D, this pay estimate was far greater than the pay estimate which was eventually prepared by Rettinger in May 1999 and paid to the surety ICW[32].

At the time that the unpaid November 1998 estimate was prepared, Rettinger first refused to allow payment because he would not allow Aftab to give Clevenger one of the signed Daily Record of Miscellaneous Items[33] which were required and had to accompany the pay request. Rettinger then refused to process the pay estimate because WBC did not have an approved schedule.[34]

---

[32] FHWA retained approximately 50% of this estimate for liquidated damages which it refunded to WBC, along with interest, in January 2004.
[33] Clevenger was forced to later obtain this document through a FOIA request.
[34] Although WBC submitted several schedules and even hired a scheduling consultant, it was unable to get any schedule other than its base line schedule approved by Rettinger.

WBC requests that interest be granted to it under this settlement on the amounts which were earned and approved in November 1998. The interest should start at the date of termination and should run until payment is made to WBC. However, the government should receive a credit and should deduct the interest it previously paid to WBC along with the withheld liquidated damages in January 2004.

**Conclusion**

In general, the audit report is erroneous in several respects and fails to follow applicable law. A threshold problem is the relationship between what the FAR commands be done in settling terminations for convenience and the DCAA Contract Audit Manual ("DCAM") directive in such cost settlements. DCAM ¶ 12-104a states that the "contract cost principles contained in FAR 8 and 31, in effect as of the date of the contract, shall be used in settling terminations for convenience." This directive is qualified by FAR 49.113. which mandates that "the cost principles of part 31 [are] subject to the general principles of 49.201(a)", while FAR 49.201(a) commands that "Fair compensation is a matter of judgment and cannot be measured exactly 'and that [t]he use of business judgment, as distinguished from strict accounting principles, is the heart of a settlement." Additionally, "costs and accounting data may provide guides but are not rigid measures for ascertaining fair compensation." FAR 49.201(c).

Here, the potential for a disconnect between rigid application of cost principles and the "fair compensation" which the FAR commands, is compounded then ultimately realized through the approach taken by this audit. Under Government Auditing Standards 7.39 and 7.41 respectively, an audit report must be "fair, complete, and objective" while the auditor must "objectively evaluate" a contractor's comments. Moreover, "The audit report should be fair and not misleading and should place the audit results in perspective. This means presenting the audit results impartially and guarding against the tendency to exaggerate." GAS 7.57. Finally, every auditor is subject to a standard of due professional care "which requires, among other things, things, that the auditor maintain an "independent and objective mental attitude" with respect to all aspects of his audit work.***[And] he is to approach the audit with "judicial impartiality" and is not to assume the "attitude of a prosecutor."

Based upon both the draft and the final audit findings, WBC is concerned that the auditor has assumed the role of an advocate and has failed to provide the fair, complete and objective assessment which the law compels. WBC requests that the TCO review this revised proposal along with all of the relevant documentation whether directly included with this document or not.

A side by side comparison of all items, including disputed items, is as follows:

EXHIBIT 7
Page 58 of 81

# CONTRACTOR'S TERMINATION SETTLEMENT PROPOSAL
## Contract No. DTFH70-98-C-00027
## October 13, 2006

| | WBC Original Proposal(s) | DCAA Audit Supported | WBC Revised Proposal |
|---|---|---|---|
| Direct Labor | $167,761 | $127,463 | $ 128,478.00[35] |
| Other Direct Job Costs | $128,343 | $ 94,523 | $ 128,598.08[36] |
| Equipment/Vehicle/Fuel | $ 34,207 | $ 26,985 | $ 26,985.00[37] |
| Other Equipment/Vehicle | $ 84,623 | $ 65,808 | $ 91,968.00[38] |
| Surety Expense | $276,768 | $261,646 | $ 276,768.00[39] |
| G&A Expense | $ 47,376 | $ 28,183 | $ 28,183.00[40] |
| Subcontractor McBride | $105,796 | $ 29,528 | $ 39,222.35[41] |
| Profit | $925,835 | $253,211 | $ 870,667.00[42] |
| Settlement Expense | $ 41,793 | $ 9,249 | $ 139,620.46[43] |
| Net Settlement | $1,812,501 | $896,596 | $1,730,489.89[44] |
| Payments Received | (376,768) | ($479,085) | ($ 479,085.00)[45] |
| Net Payment | | $417,511 | $1,251,404.89 |

---

35 Revised Settlement Proposal, pages 2 & 3
36 Revised Settlement Proposal, pages 3, 4, 5, 6, 7, 8
37 Revised Settlement Proposal, page 8
38 Revised Settlement Proposal, pages 8,9,10
39 Revised Settlement Proposal, pages 10, 11
40 Revised Settlement Proposal, pages 11,12
41 Revised Settlement Proposal, pages 11, 12
42 Revised Settlement Proposal, page 12
43 Revised Settlement Proposal, page 12, 13, 14, 15, 16
44 WBC's request for interest under the Prompt Payment Act, discussed on pages 16 & 17 of this document, is an amount in addition to this total and has not been quantified by WBC in this proposal
45 Revised Settlement Proposal, page 12



EXHIBIT 7
Page 59 of 81

Thank you for considering the revised settlement proposal. At this time WBC would like to request a Terminating Contracting Officer's final decision on the settlement.

Luther L. Clevenger
White Buffalo Construction Inc.

## LIST OF ATTACHMENTS


Prior Settlement Proposal..........Appendix A
*Surety Costs dated March 19, 2004*
*Direct Costs dated November 2, 2004*
*Settlement proposal costs and request for profit dated January 13, 2005*

DCAA Audit Report..........Appendix B

Estimate for Repairs Link Belt LS- 3400 Excavator..........Appendix C

Estimate of Value of Link Belt LS- 3400 Excavator..........Appendix C

Justification for Anticipatory Profit and a Summary of Facts Supporting Bad Faith..........Appendix D

Settlement Related Legal invoices..........Appendix E

Estimate of Cost to Repair 1996 Dodge Pickup..........Appendix F




EXHIBIT 7
Page 61 of 81

## APPENDIX D

## INTRODUCTION

WBC has, from the outset, claimed lost profits on uncompleted work. WBC is convinced that if FHA takes the time to review the facts and background, it will conclude this claim has merit. WBC thought it would be helpful if it again summarized its position.

A properly motivated and conducted termination affords to the government a limitation on its liability, even if its declaration of default is later found wanting. Specifically, a default termination that merely is a mistake will be converted to a termination for convenience. Additionally, the government may, in certain circumstances, unilaterally and lawfully terminate for convenience outright. In either circumstance, the measures of recovery under a convenience termination shield the government from the liability it would face if subject to the standard measure of liability for common-law breach of contract.

The limited liability of a convenience termination can, however, evaporate, exposing the government to liability for common-law breach, including lost profits. As set forth below, the evidence here is more than sufficient to obliterate the shield of limited liability.

First, the presumption of good faith in government action, and the requirement of specific intent to harm the particular contractor, does not apply at



EXHIBIT: 8
WIT: Scott
EXHIBIT 7
Page 62 of 81

all when the wrongdoing centers on the government's failure to cooperate with, and to facilitate the performance of, its contractor's performance.

Second, even if a presumption of good faith applied here, and it does not, "well-nigh irrefragable proof" requires only clear and convincing evidence of acts taken with specific intent to harm White Buffalo. Such evidence abounds here.

## DISCUSSION

### A. In Proving Bad-Faith Termination, White Buffalo Is Required Only to Prove that the Government Breached Its Implied Contract Good-Faith Duties to Cooperate and Not Interfere

Until 2002, courts typically began their analysis of "bad faith" by analyzing the issue under a framework that included a "presumption of good faith," and defeating that presumption required "well nigh irrefragable proof" of specific intent to harm the particular contractor. That has changed, beginning with *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234 (Fed. Cir. 2002). There the U.S. Federal Circuit Court of Appeals considered the extent of proof required to demonstrate that the government acted in bad faith. The court modernized the language of the "well-nigh irrefragable proof" standard, and determined that "clear and convincing" most adequately describes the proper standard. *Id.* at 1239.

Following after *Am-Pro,* the Court of Federal Claims then recognized that there are limited circumstances in which the "good faith" presumption even applies. In *Tecom, Inc. v. United States*, 66 Fed. Cl. 736 (2005), the U.S. Court of

Federal Claims further clarified the proper application of "clear and convincing" standard. The court in *Tecom* held:

> When a government official acts under a duty to employ discretion, granted formally by law, regulation, or contract, and a lack of good faith is alleged that does not sink to the level of fraud or quasi-criminal wrongdoing, *clear and convincing evidence is not needed to rebut the presumption*. Instead, this may be inferred from a lack of substantial evidence, gross error, or the like. *Id.* at 769(emphasis added).

As established in *Tecom*, the "clear and convincing" standard does not apply here. The very heart of FHA's wrongful conduct toward White Buffalo, which is detailed below, centers in FHA's pervasive failure to cooperate with, and indeed its actual interference with, White Buffalo's performance. The evidence is substantial that FHA breached its implied contractual duty of good faith and fair dealing, which, among other duties, requires FHA to cooperate in, and not interfere with, White Buffalo's performance. That strips FHA of any right to avoid full liability for common-law breach, including facing liability for lost profits.

*Tecom* is also instructive here with respect to the aggregated conduct that establishes that the government violated its duty of good faith by its pattern of failing to cooperate in, and actively interfering with, White Buffalo's performance. Specifically, "[w]hen it is not a single discrete decision by one official, but a number of acts that are alleged to constitute a lack of good faith, the acts must be judged in the aggregate, and not on the basis of any particular individual's bad

faith. . . . If the aggregate of the actions of all of the agents would, if all done by one individual, fall below the standard of good faith, the entity for whom the various agents acted should be held to have violated that standard." *Id.* (internal quotation marks and citation omitted); see *Struck Constr. Co. v. United States*, 95 Ct. Cl. 186, 221, 1942 WL 4411 (1942).

### B. There Is Clear and Convincing Evidence of Specific Intent to Harm White Buffalo

Even if FHA were here entitled, and it is not, to invoke the presumption that the government is assumed to have acted in good faith, FHA still cannot shield itself behind the liability limits afforded by a lawful termination for convenience. Evidence is "clear and convincing" when it renders highly probable the proposition that the evidence is offered to establish. *Am-Pro*, 281 F.3d at 1240 (citation omitted). Here, as set forth below, the evidence renders it highly probable that, principally through the actions of Area Resident Engineer Rettinger and through FHA's actions in the aggregate, FHA acted with the specific intention of harming White Buffalo.

### C. The Government Prevented the Contractor from Starting Work on Time and Did Not Extend the Contract Completion Date

From the very beginning, the government failed to cooperate with the contractor. Specifically, the government refused to allow the contractor to commence work until *September 15*, 1998, then failed to provide required

EXHIBIT 7
Page 65 of 81

additional contract time due the contractor because of the late notice to proceed. The government additionally erred in its unreasonable belief that the contractor could not commence work on September 1, 1998 due to environmental restrictions.

The contract states at C-12 in section 52.211-10 that "*the completion date is based on the assumption that the successful offeror will receive the notice to proceed by September 1. The completion date will be extended by the number of calendar days after the above date that the Contractor receives the notice to proceed, except to the extent that the delays in issuance of the notice to proceed results from the failure of the Contractor to execute the contract and give the required performance and payment bonds within the time specified in the offer.*"(Emphasis _____.)

The contract was executed and the performance and payment bonds were timely tendered to the Contracting Officer (the "CO") and accepted. The government did not issue a full notice to proceed on September 1, 1998 and did not give the contractor the extension as mandated by the contract. WBC was entitled to extensions of time that would have altered the interim completion date because of the late notice to proceed. The government erred in both the Cure Notice and the Notice of Termination for Default, because the interim completion date of January 23, 1999 should have been extended because of the late notice to proceed.

EXHIBIT 7
Page 66 of 81

The contract contains environmental restrictions that prohibited commencement of work until September 15, 1998 at four of the 10 sites on FDR 33 (because clearing and grubbing were required at these sites). Work could have been started on September 1 at six of the sites on FDR 33, but the government unreasonably refused.

When he was asked why the notice to proceed had not been issued, Area Engineer Rettinger ("Rettinger") informed Project Superintendent Clevenger ("Clevenger") that there was no site where work could be performed due to contract environmental restrictions. Clevenger informed Rettinger that the contract allowed work to be performed without any restriction at MP 46.2. After Rettinger confirmed this, he informed Clevenger that White Buffalo still would not receive a notice to proceed, because it did not have an approved schedule. Project Engineer Aftab ("Aftab") told Clevenger to just submit another schedule and that the government would allow WBC to start on September 15. WBC was given an unrestricted Notice to Proceed dated *September 15*, 1998, even though WBC's schedule was still not approved.

Rettinger's initial unreasonable behavior presaged what proved to be an ongoing pattern of interference or refusals to cooperate—in which Rettinger remained a central figure. Indeed, as set forth below, Rettinger's misconduct continued even into the litigation following the contractor's termination.

Almost from the beginning of the project, WBC received numerous letters signed by Aftab that directly contradicted earlier verbal discussions and agreements. Aftab finally admitted to Clevenger that these letters were, in fact, not written by him, but by Rettinger, and that Aftab had been forced to sign them. Clevenger and Aftab would agree to pay estimates, items of work, and other items demanding attention, only to have Rettinger overrule Aftab later. After only a few weeks on the project under Rettinger, Aftab asked to be assigned to another project away from Rettinger. One of the inspectors working on the project left largely because he had never seen Rettinger treat a contractor so harshly. This inspector had worked on several projects with Rettinger and commented that he had never seen him act in this manner. Another inspector who was fired from the project indicated that Rettinger was deliberately trying to rid the government of what he termed "problem contractors." This comment was made in reference to WBC's ongoing litigation with USFS concerning the Salt Creek Falls Viewpoint project. At that time, litigation had been ongoing for approximately a decade.

Due to the failure of the government to issue the notice to proceed on September 1, 1998, WBC lost 25 percent of its work window for "wetted perimeter" work at MP 46.2. The days not used were dry summer days that were essential to completing the subgrade work on FDR 33 before both the onset of the heavy rain season in late October and the first interim completion date of

EXHIBIT 7
Page 68 of 81

January 23, 1999. The contractor had mobilized his equipment to FDR 33 MP 46.2 and had hired additional personnel in anticipation of starting the work at that site on September 1, 1998.

### D. The Government Improperly Instructed the Contractor to Remove Material at MP 46.2, but the Impropriety Was Not Disclosed to the Contractor or Corrected After Rettinger Discovered His Error

The government, principally through Rettinger, then concealed from the contractor that the government had discovered that the "excess" material it had directed the contractor to remove from MP 46.2 was actually needed at that site to complete the fill as shown in the drawings and as previously argued by the contractor.

Rettinger informed Clevenger and Mark Heiberger (the survey subcontractor) that native material at MP 46.2 above the culvert inlet was excess material and would have to be excavated and hauled to a disposal site. WBC immediately began hauling the material to the disposal site. Eventually Mod #01 was agreed to, adding a section of culvert at MP 46.2 under the assumption that this would allow on-site use of the excess material and speed up the installation.

While this work was being performed, Rettinger discovered that he was wrong, that the material was actually needed at MP 46.2 for fill, and that it should never have been removed. In fact, material had to be hauled back to MP 46.2 to replace what had been hauled away and to fill in the additional section of culvert

that had been added. (Completion Contractor Tidewater claims to have hauled in all material because the fill that WBC placed had become so saturated with moisture that it was unusable.)

Although Rettinger had discovered that the material being hauled away was actually needed at MP 46.2, he failed to inform WBC of that fact, and he failed to correct his mistake. At the time of termination, the government was aware that Rettinger had mistakenly directed that material be hauled away and had entered into Mod #01 with WBC. The government also knew that it was going to cost approximately $50,000 to correct this error, but failed to take this fact into consideration and, additionally, failed to take corrective action. The government still required this needless and additional work of the completion contractor, which work was performed at WBC's expense.

E. The Government Did Not Obtain Proper Environmental Permit Extensions to Allow the Contractor to Continue Work

Next, the government, again through Rettinger, concealed from the contractor that it had decided not to seek any extension from the permitting agencies to work in the "wetted perimeter." The government deliberately misled the contractor by informing it that the permitting agencies had *refused* to grant any extension. The contractor then directly approached the permitting agencies and obtained permission from them to *continue work*. The government nevertheless continued to refuse to allow the contractor to continue any installation. Instead, the

government directed the contractor to perform only winterization work and stopped all work at the culvert at MP 46.2.

WBC requested in a timely manner that FHWA obtain a time extension for the permits to work in water. Rettinger said it was too early and that WBC should wait to make the request until it was closer to the permit expiration date. When WBC again made the request, Rettinger then said that WBC had now waited too long. Rettinger's letter to WBC stated that the government had consulted with the permitting agencies, and an extension would not be granted. This letter was duplicitous and concealed the real truth: before the permit's expiration, FHWA had already decided not to seek any extension for the permit, because it did not want WBC to continue on this project.

FHWA stopped WBC from working at the site one day before the permits actually expired, thus depriving WBC of one day of work. At that time, all culvert sections originally specified were installed, and only the additional culvert section added in Mod #01 was left uninstalled. Of course, Mod #01 was based on Rettinger's erroneous assumption that there was an abundance of unneeded and excess material at the site that necessitated adding another culvert section in order to consume more material as fill. The additional culvert section was actually unnecessary and should have been deleted from the contract.

EXHIBIT 7
Page 71 of 81

Clevenger decided to try to find a way to continue to work. He contacted the permitting agencies directly and easily obtained a one-week extension to work. The extension was granted because the endangered salmon had not yet started their migration up the rivers. When FHWA was informed of the extension, Rettinger chastised Clevenger for seeking an extension to "their" permit. After delaying for several days, and despite the fact that by then FHWA had independently confirmed Clevenger's agreement with the permitting agencies, FHWA then informed WBC that it could not perform any contract work during the permit extension and would only be allowed to "winterize" the site.

Several weeks later, on November 13, 1998, FHWA, in its Cure Notice, asked WBC to obtain a new permit from the permitting agencies to work in water beyond November 6, even though—by that time—the endangered salmon were in the river, and any new permit or extension was virtually unobtainable. The Cure Notice states that providing evidence that WBC could obtain a new permit that would allow "in-stream work" after November 6, 1998 was key to WBC providing an acceptable written plan.

Before the permit's original expiration date for sites on FDR 33, November 1, 1998, CO Jacoby emailed Rettinger and said that they would not be applying for a permit extension because they did not want WBC to complete the job. Also, before the permits expired, another FHWA employee contacted

Rettinger about obtaining an extension. Rettinger responded by email that he did not know why they would seek an extension of time given that WBC was not working and had not even started up any equipment that day. This was completely untrue.

The contractor was highly concerned about Rettinger's counterproductive actions, which were hindering completion of the project. In an attempt to improve the situation, Clevenger requested a meeting with CO Parsons. CO Parsons informed Clevenger in a telephone call and in the meeting that he was unaware of any problems with the project and really had not heard much about it. CO Parsons stated that he would see that matters were investigated and straightened out. In fact, CO Parsons and other FHWA personnel had already started planning to terminate WBC.

## F. Contrary to the Permit's Language and Customary Practice, the Government Restricted the Contractor's Work in the Stream Area

The government unnecessarily restricted the contractor's operations by using the term "wetted perimeter" and defining areas within the "wetted perimeter" as any area that it arbitrarily determined could be reached by high water.

FHWA used the unusual term "wetted perimeter of any stream" to indicate areas that would be subject to the restrictions of the permit in the contract, even though the permit, the permitting agencies, and FHA personnel who worked on obtaining the permits use the term "in-water work." When asked, FHWA was

unable to supply WBC with any clear definition of "wetted perimeter." However, in practice, FHWA (Rettinger) restricted the contractor's operations in any area that it arbitrarily determined could be reached by high water.

In the case of the critical repair at MP 46.2, the contractor was prohibited after November 1, 1998 from working on contract work in areas that were clearly well out of the stream, including working on the fill at the top of the culvert. In fact, FHWA stopped all work at the MP 46.2 culvert site after November 6, 1998. This stopped the contractor from performing any more work at this location.

Cynically, FHWA changed the term to "in-water work" in 1999 for the completion contract. This cooperation with the completion contractor significantly reduced the work area subject to permit restrictions and was not a benefit available to WBC.

## G. The Government Refused to Acknowledge the Changed Condition and Safety Problems at MP 46.7

The government also unreasonably refused to address the changed condition at FDR 33, MP 46.7, again violating its duty of good-faith cooperation. This failure to act resulted in WBC incurring delays and additional costs due to the unstable overburden at the rock cut at MP 46.7. Multiple failures of the overburden at this site occurred after the first shot, when the changed condition was evident. This significantly impeded the course and prosecution of the work and increased the costs to WBC.

Rettinger would not allow WBC to correct the large amount of unstable overburden at the rock cut at MP 46.7, stating that another contractor would do the work after WBC's contract was over. Rettinger was steadfast, despite the protests of Clevenger, USFS Siskiyou National Forest geologist Donna Mickley ("Mickley"), and Frank Toors ("Toors"), a consulting geologist hired by WBC. Both Mickley and Toors warned FHWA that slope failure was imminent and foreseeable and would occur as soon as any rain or the impending rainy season started, within days or possibly weeks. There was no way that WBC or any other contractor could complete the work as designed; yet despite repeated warnings, the government failed, on the advice of Rettinger, to take any action. As soon as the seasonal rains commenced, multiple large slides occurred at this site and continued throughout the winter and early spring.

Rettinger unreasonably required WBC to continue work at the rock cut despite the deteriorating safety conditions. Material was starting to slide down from the top at intermittent intervals on a daily basis, and safety spotters had to be used continuously. Work at MP 46.7, as well as equipment and traffic on FDR 33 servicing other ERFO sites, was frequently halted in order to avoid falling dirt, rocks, and other debris. Clevenger informed Rettinger that the falling material was a safety hazard and was causing significant delays to the entire project. Rettinger informed Clevenger that in order to prosecute the work, without being delayed by

the falling material, WBC could excavate the overburden above the rock cut and remove it at its own cost. As the slumping overburden above the rock face extended well above and outside the original clearing limits for the ERFO repair, Rettinger required WBC to have the area surveyed and to submit a plan for removal. Just before being terminated, WBC ceased all work at MP 46.7 and the adjacent work below because of safety concerns.

As soon as WBC was terminated, FHWA had Kerr Contractors start removal of the slide. *Within a week*, Mickley met with FHWA and determined that conditions were not as assumed in the FHWA design and that the area was unsafe. She requested that FHWA cease work and prepare a redesign for the MP 46.7 site.

## H. The Government Lied About Design Changes

FHWA personnel, including the CO, told WBC, ICW (the surety), and the completion contract bidders that there would be no redesigns or changes to the contract and that the work would be completed as per the WBC contract. FHWA's position was that the problems were caused by WBC and that the completion contractor could propose corrections or changes, but that FHWA would not be providing them. This implied that any costs to make the corrections would have to be included in the completion contractors' bids, and the bidding contractors were so informed by WBC's surety. In fact, FHWA had already commenced work on redesigning MP 46.7 as well as several other sites.

As soon as the completion contractor started, Rettinger negotiated a modification that essentially redesigned the entire project. It also paid the completion contractor to correct the changed condition at MP 46.7, even though these costs had been included in the completion contractor bid to WBC's surety as a separate bid item based on the CO's letter.

Clevenger made repeated requests for the FHWA redesigns, but FHWA claimed that there were none, despite evidence that they existed. After WBC filed an FOIA action, the redesign for MP 46.7 was eventually provided, and FHWA paid WBC's legal costs for the action. Clevenger discovered later (in discovery) that there were additional redesigns for several other sites that were not provided in the earlier FOIA request. The FOIA officer, Rettinger, and others at FHWA deliberately withheld these documents from WBC despite repeated requests and FHWA's own FOIA policy.

It is not simply that FHWA concealed its redesigns from ICW and WBC; FHWA made a conscious decision to withhold this information. ICW informed FHWA that it would increase costs. On February 2, 1999, CO Parsons wrote a letter to ICW stating that none of the completion contractor bidders were informed about any redesigns or openings to the permit window and that WBC was responsible for the current condition at MP 46.7. CO Parsons added that it would be up to the completion contractor to propose a slope redesign if he felt it was

necessary. It is well established in the FHWA record that the CO knew that the original slope design in the contract was defective and that design changes were going to have to be made. In fact, FHWA work on the redesign had already started.

## I. The Government Terminated the Contractor

The contractor was notified in a telephone call from CO Jacoby during the week of November 23, 1998 that WBC would be terminated on December 1, 1998. True to CO Jacoby's word, WBC received from CO Parsons the Notice of Termination for Default dated December 1, 1998. CO Parsons has testified that he made the decision to terminate WBC on his own on December 1, after having returned from a vacation. In fact, CO Parsons not only failed to independently decide to terminate WBC, he was directed to terminate WBC.

Before termination, CO Parsons met with WBC and stated that he did not know anything about the project and that he would look into WBC's concerns. He also stated that Rettinger had a reputation for being "vicious." However, both FHWA and the CO were already considering termination.

## J. The Government Refused to Let the Contractor Fix the Slide at MP 47.25

FHWA refused to address the small slump by the front access gate at MP 47.25, which occurred because of the heavy rains and the oversteep design. WBC notified FHWA verbally and by letter, and Rettinger wrote back directing

WBC not to repair the slump. This inaction resulted in a small slide onto FDR 33. At that time, minor work was required at this site so that WBC could continue to have access to the project. Rettinger directed that no work was to be done on this slide, and it continued to grow until WBC was terminated approximately 20 days later. Kerr Contractors arrived on the project and, immediately after WBC was terminated, was required to start emergency work on this slide. This work was performed at substantial expense to WBC. To finally correct the problem, the cut slope at MP 47.25 was eventually laid back, and riprap was installed, which was a major redesign by FHWA.

## K. The Government Failed to Compensate WBC for Its Work

FHWA failed to make any payments to WBC for its work before termination (a period of four months). The sole payment allowed (approximately six months after termination) was less than half the amount of the payment approved by Aftab before termination. This pay estimate failed to compensate WBC for items of work and quantities of work that were accepted by FHWA before termination. It also failed to properly compensate WBC for significant quantities of extra or additional work, some of which was covered by contract modification. The majority of the extra work performed by WBC, however, was not covered by modification. For example, at the time that pay estimate #1 was issued, FHWA was continuing to claim that it had no responsibility to compensate WBC for

substantial extra work that it had performed at MP 46.7, when, in fact, it had already redesigned the work at the site and had decided to pay the completion contractor for performing this work.

L. The Government Improperly Paid the Completion Contractor

FHWA paid Completion Contractor Tidewater for substantial work that was never performed. One example is work certified and paid for at MP 46.7—a survey commissioned by WBC after project completion showed this work had never been performed. Moreover, both the completion contractor and FHWA personnel certified the work and the quantities for payment. This resulted in substantial additional and unnecessary cost to WBC and its surety. FHWA was previously notified of this, and a copy of the survey report has been provided.

M. The Government Engaged in Disparate Treatment

FHWA relaxed environmental restrictions for the completion contractor, which materially and substantially changed and enlarged the window in which the work could be prosecuted in 1999. In considering termination, FHWA failed to consider how such changes could affect WBC and its prosecution of this contract.

N. The Government Engaged in Additional Actions That Harmed WBC

FHWA certified and paid Completion Contractor Tidewater for work that was performed by WBC before termination. WBC and ICW were deprived of legitimate earnings and incurred illegitimate and unnecessary expenses in the course of the completion contract due to the actions of FHWA.

FHWA encouraged surety ICW to pay Tidewater for work for which FHWA had already paid Tidewater, under modification to the completion contract, thus resulting in additional and unnecessary cost to WBC and ICW. FHWA wrote a letter to ICW strongly supporting Tidewater's claim against ICW for $50,000, even though Tidewater had received payment for the same work directly from FHWA.

## CONCLUSION

The evidence here suffices—indeed is overwhelming—to establish bad faith. That conclusion results whether the standard is (i) the now-outdated test of intent to harm the individual contractor or (ii) the current test of breaching the standards of good-faith cooperation and noninterference. Consequently, the government is no longer shielded by the limits on recovery that apply in a lawful convenience termination. Instead, the government now faces liability for basic common-law damages for breach of contract, including lost profits.

EXHIBIT 7
Page 81 of 81