# EXHIBIT 11

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WHITE BUFFALO CONSTRUCTION, INC., an Oregon corporation, | ) | No. 99-961C |
| Plaintiff, | ) | |
| v. | ) | COMPLAINT<br>Federal Highway Administration<br>Contract No. DTFH70-98-C-00027 |
| THE UNITED STATES, | ) | (Contract Disputes Act - Appeal of Contracting Officer's Termination for Default) |
| Defendant. | ) | |

## PARTIES

1. White Buffalo Construction Inc. ("WBC") is an Oregon corporation in good standing and duly licensed as a contractor.

2. The defendant is the United States acting by and though the Department of Transportation, Federal Highway Administration, Western Federal Lands Highway Division. ("FHA").

## JURISDICTION

3. This Court has jurisdiction of the claims presented here under the Contract Disputes Act, 41 USC § 601 et seq. The Contracting Officer's Notice of Termination for Default is dated December 1, 1998 and became effective December 3, 1998, upon its receipt by WBC.

## STATEMENT OF FACTS

4. On August 20, 1998 the United States awarded to WBC FHA Contract No. DTFH70-98-C-00027 ("Contract") on the Siskiyou National Forest ("SNF").

Exhibit 11
Page 1 of 15

5. At all material times herein, WBC performed all obligations on its part to be performed or was otherwise excused from performance as herein alleged. WBC was ready, willing and able to perform all remaining obligations.

6. On or about November 3, 1998 WBC met with Contracting Officer William Parsons ("CO Parsons") and other FHA officials in Vancouver at the request of WBC to discuss concerns that WBC had about lack of progress and its belief that it was being hindered from completing the project.

7. On or about November 13, 1998 Contracting Officer Carol H. Jacoby ("CO Jacoby") issued a cure notice.

8. On or about December 1, 1998, CO Parsons issued a final decision notifying WBC it was terminated, effective upon WBC's receipt of the notice (December 3, 1998), alleging that WBC was in default.

9. On or about December 3, 1998, FHA required WBC, through its surety, Insurance Company of The West ("ICW"), to retain another contractor to perform what was characterized as emergency work. WBC and ICW retained Kerr Contractors ("Kerr") to perform this work.

10. On or about December 19, 1998 FHA suspended work on the project for the winter to redesign portions of the project as requested by the SNF.

11. On January 24, 1999 FHA began charging WBC interim liquidated damages of $400.00 per day and continued charging through October 3, 1999.

12. WBC was not paid for any work that it performed on the project from September 1, 1998 until it was terminated for default on December 3, 1998.

13. On or about February, 1999 ICW, under a reservation of rights, tendered Tidewater Contractors ("TWC") as the completion contractor for the project and FHA accepted TWC.

14. On or about May 1999 ICW was paid about $102,000.00 for work performed by WBC. FHA retained $100,000.00 to cover liquidated damages for the period of January 24, 1999 through September 30, 1999.

15. FHA issued modifications #1-3 to TWC on May 21, 1999 which added additional work and additional time to complete the project.

16. FHA accepted the project as complete from TWC on or about October 29, 1999.

17. FHA opened FDR 33 to public travel on or about October 29, 1999 along with roads FDR 3347 and FDR 3347020.

18. Liquidated damages were assessed by FHA to WBC from January 24, 1999 until October 3, 1999 and were deducted from sums retained. On or about November 1999 FHA requested that ICW pay to FHA an additional $1,200.00 in liquidated damages.

## THE CURE NOTICE

19. The cure notice of November 13 required that WBC, within 5 days after receipt of the notice, provide a written plan to "**describe and demonstrate that you are able to complete all repairs up to subgrade at FDR33 (MP 46.2 to MP 46.7 and MP 47.07 to MP 47.25) by November 30, 1998**, or the Government may terminate for default under the terms and conditions of FAR Clause 52.249-10, Default (Fixed-Price Construction) (April 1984)." (Emphasis in original.)

20. The cure notice concluded by requiring WBC to show that, within 5 days, it could obtain a new permit allowing in-stream work beyond November 6, 1998 as key to the required plan.

21. On November 20, 1998 WBC filed its timely, complete and justifiable response to the cure notice.

22. FHA knew or should have known and was informed by WBC both at the meeting on November 3, 1998 and in its response to the cure notice that a new permit allowing in-stream work beyond November 6, 1998 would not be issued.

23. In response to a letter request from WBC dated October 27, the FHA issued serial letter number 52 dated October 29, 1998 stating that the FHA had contacted the permitting agencies and no time extension would be granted.

24. On November 2, 1998 WBC contacted the permitting agencies and they agreed to allow work to continue under the permit to complete installation of the culvert by the end of the week of November 6, 1998.

25. FHA was notified of this approval on Monday, November 2, 1998 but FHA personnel would not allow WBC to continue work at the culvert, stating that it was improper for WBC to directly contact the permitting agencies and that all communications had to go through FHA's office.

26. FHA directed WBC not to further contact the permitting agencies because the permit was in the name of FHA.

27. On Wednesday, November 4, 1998 FHA directed WBC to perform on or before Friday, November 6, 1998 winterization and stabilization work at the culvert site at FDR 33, MP 46.2 but specifically prohibited WBC from performing any further culvert installation.

28. The FHA, in its purported subsequent termination for default, was limited to the grounds stated in its cure notice.

29. Under the terms of the Contract, at the time of the cure notice, WBC was not in default because, for the reasons alleged herein, it was entitled to extensions of time, equitable adjustments in the Contract price and the FHA had waived or is otherwise estopped to require compliance with the Contract requirements alleged in the cure notice and notice of termination for default.

## NOTICE OF TERMINATION FOR DEFAULT

30. The notice to terminate dated December 1, 1998 listed 18 reasons for the termination but the cure notice had only requested that WBC describe and demonstrate that WBC could complete all repairs up to subgrade by the date of November 30, 1998 and obtain a new permit to allow in-stream work beyond the date of November 6, 1998.

31. The first item listed in the Notice of Termination for Default was the failure to complete all repairs on FDR 33 up to subgrade by November 30, 1998 and was directly related to both items 2 and 3 which dealt with opening highway FDR 33 to public travel by January 24, 1999.

32. Item 4 lists subitems (a)-(o) with which WBC was in substantial compliance, had already cured, or was pursuing to cure.

33. Prior to the bid date, FHA issued Amendment No. A001 which required that all repairs up to subgrade and the aggregate had to be completed on FDR 33 by January 23, 1999 with the road opening the following day.

Exhibit 11
Page 5 of 15

34. WBC asked for clarification and was told prior to the bid and at the preconstruction conference that FDR 33 had to be open by January 24, 1999 and that the interim date of November 30, 1998 had been negated by Amendment No. A001.

35. FHA waived the Contract requirement that all repairs up to subgrade and at least 100mm of aggregate be complete by January 23, 1999 on FDR 33. FHA agreed that the asphalt designated for replacement in the repair areas on FDR 33 did not have to be removed until the work was required to be done for replacement at the end of the 1999 construction season. This was to provide a better temporary road surface for the traveling public than the removal of the asphalt and installation of the 100 mm aggregate base.

36. WBC was delayed by FHA in starting work on the project. Although FHA issued a notice to proceed on September 1, 1998 as required by the Contract, FHA did not allow WBC to commence any substantive work on the project until September 15, 1998.

37. Page C-13, Clause 52.211-10 of the Contract states that the Contractor will be given additional days to complete the Contract if the Notice to Proceed is not received by September 1, 1998 and is not due to the failure of the Contractor to execute the Contract or to provide the performance and payment bonds within the time specified.

38. WBC provided the executed Contract and the required performance and payment bonds in a timely manner.

39. By letter dated August 31, 1998, FHA severely restricted the ability of WBC to prosecute and perform the work.

40. When WBC called FHA personnel to complain about not being able to start the work, the FHA stated that no work could be commenced until September 15, 1998 because of work restrictions contained in the Contract.

Exhibit 11
Page 6 of 15

41. The FHA was in error because the Contract allows for work to commence at all but four of the sixteen work sites prior to September 15, 1998. The primary restriction to the work at these four sites did not allow any clearing prior to September 15, 1998.

42. WBC was entitled to an additional fourteen days of Contract time because FHA did not allow WBC to proceed with its work on September 1, 1998.

43. WBC met with CO Parsons and other FHA representatives on or about November 3, 1998 and notified CO Parsons that the project was in jeopardy because FHA personnel had caused numerous delays and were impeding WBC's efforts to complete the work to open the road.

44. CO Parsons stated that certain FHA personnel had a reputation for being "vicious" and that he would direct FHA personnel to "straighten things out."

## DIFFERING SITE CONDITIONS

45. The Contract, drawings and geology report indicate and show the area at FDR 33 MP 46.7 as being rock when in reality there was approximately 32 ft of earthen material on top of the rock.

46. The result of having to bench and excavate the earthen material resulted in WBC expending additional time to prepare for the rock blasting and left an unstable face of dirt that continued to ravel off further delaying WBC.

47. The onset of wet weather coupled with the unstable dirt face prevented completion of the work at this site and blocked access to FDR 33 past MP 46.7. This condition eventually caused the entire project to be shut down as the heavy Fall and Winter rainfall washed several thousand cubic yards of dirt, loose rock and large portions of the standing forest down on FDR 33, the lower road FDR 3347 and into the river.

48. During the month of October 1998 while shooting the second blast at FDR 33, MP 46.7 using a blast plan modified to meet FHA requirements, reduction of the rock formation to a suitable size was not achieved. This resulted in large amounts of grossly over sized material being deposited on FDR 33, going over the embankment onto the lower road and falling into the river. The failure of the blast to reduce the rock to size was due to a differing site condition unknown to any of the parties involved and it delayed all work on FDR 33.

49. After the slopes had been cut at FDR 33, MP 47.25 the cut bank failed because of an underlying rock formation. This condition was due to a differing site condition unknown to any of the parties involved and it prevented WBC from being able to complete work in this immediate area. FHA refused to allow WBC to perform corrective work.

## CHANGES

50. The culvert repair at FDR 33, MP 46.2 had a number of changes made by FHA which delayed the installation of the culvert and the critical path for opening FDR 33.

51. FHA directed WBC to perform hourly 622 work at their direction for several days at FDR 33, MP 46.2 after which FHA claimed that it was not 622 work but was, instead, contract work. This delayed WBC for three days.

52. Contract modification #1 purported to pay WBC for the over-run of material that had to be removed from FDR 33, MP 46.2. In reality, an error was made by FHA and the material which had been removed and hauled away was needed to complete the fill at this location. Loading and hauling this material away delayed work at this location for several days and also at FDR 33, MP 46.7 due to the fact that work had to stop to allow passage of the haul trucks on FDR 33 and FDR 3347.

Exhibit 11
Page 8 of 15

53. During the month of October 1998 the culvert at FDR 33, MP 46.2 was surveyed and staked and all survey notes were turned over to FHA. After WBC commenced the culvert installation, FHA decided that it wanted the culvert installed with a camber. This change resulted in a delay of several days due to the fact that the surveyor had to be recalled to the project to re-survey and re-stake the new grades and WBC had to redo the excavation work that had already been completed for the first sections.

54. The FHA stopped installation of the culvert at FDR 33, MP 46.2 after two sections had been installed claiming that the joint between the two sections of culvert pipe did not meet specification. The joint that had been installed did meet specification. This delayed WBC and caused it to incur additional costs.

55. Work at MP 46.2 was further delayed by the FHA when it directed WBC to start installation of the diversion channel at a different location than shown on the submittal provided to FHA by WBC prior to the start of the this work. FHA stated that the way that WBC had designed the diversion channel would cost FHA more money due to the fact that it was longer than necessary. WBC immediately started the work as directed by FHA personnel and after the installation was substantially complete, FHA changed its mind and required WBC to install the diversion channel as originally submitted. This delayed WBC and caused it to incur additional costs.

## OTHER ALLEGATIONS

56. The FHA, through numerous acts and omissions, arbitrarily and in a manner inconsistent with its rights under the Contract, interfered with WBC and its work on this project.

Exhibit 11
Page 9 of 15

57. Under the direction of the FHA, WBC commenced hourly 622 work at MP 46.2 after which FHA declined to pay WBC stating that this work was not hourly 622 work. WBC would not have performed the work in the manner directed by FHA if it had not been told that it was 622 work. Work was performed and time was expended in preparation for 622 work which otherwise would not have been necessary for Contract work.

58. FHA revealed shortly after having WBC sign Modification #1 that it had made a mistake in directing WBC to remove and haul away the material from MP 46.2. Modification #1 contemplates an excess of material when, in reality, material would have to be hauled in to replace the material that FHA had previously directed WBC to haul away. FHA had a duty and a responsibility to inform WBC and correct this error. WBC was delayed and was required to incur unnecessary additional costs.

59. FHA directed a change in the approved diversion channel plan and then decided later to direct WBC to install the diversion channel per the previously approved plan. FHA claimed that it was only a misunderstanding. These acts by the FHA delayed WBC and caused WBC to incur unnecessary additional costs.

60. FHA changed the specifications to the installation of the culvert at MP 46.2 by requiring a camber after installation was in progress. The FHA further delayed the installation by refusing to allow the on-site inspectors to provide the surveyor with the new grades for the camber which had already been calculated and was in their possession. FHA's actions delayed WBC and caused WBC to incur unnecessary additional costs.

61. Without any basis in the Contract, a representative of FHA directed the cessation of installation of the culvert at MP 46.2 insisting that the joints had to be water tight.

Exhibit 11
Page 10 of 15

However, the joints were acceptable to other FHA personnel involved. This delayed WBC and caused it to incur additional costs.

62. FHA claimed that it had consulted with the permitting agencies about an extension to the in-water working permit and that the permitting agencies would not allow the time to be extended. WBC contacted the permitting agencies on November 2, 1998 and the permitting agencies all agreed that they would extend the permit until November 6, 1998 for the purpose of completing the culvert installation.

63. FHA contacted the primary permitting agency and informed it that the work could not be timely completed and would have to be completed the next summer and requested an extension for the sole purpose of stabilizing the site for winter. WBC was notified mid-day on November 4, 1998 that all that it would be allowed to do was to stabilize the site.

64. On November 13, 1998 FHA sent a cure letter to WBC allowing only 5 days after receipt of the notice to prove that WBC could obtain a new permit which would allow in-stream work beyond November 6, 1998. FHA notified WBC on November 3, 1998 that the FHA, and not WBC, was the permit holder and that all communications and contacts had to go through FHA's office. FHA delayed requesting an extension to the permits, allowed several days of allowable extension to the permit expire, specifically limited the work FHA requested under its verification of WBC's extension of the permit, allowed another week to expire from the end of the extension date until the cure notice and then demanded that WBC go back and get an extension when FHA knew that one would not be given at that point.

65. FHA agreed to pay WBC $2,143.35 for extra work in removing additional trees at MP 46.7. After the work was complete, the FHA did not honor this agreement.

66. An FHA representative was showing the project to acquaintances seeking a replacement contractor prior to issuance of the cure letter or any notice whatsoever to WBC that termination was being considered.

67. The USFS notified the FHA that the design of the cut at MP 46.7 was unsafe because it assumed that it would be rock and not have approximately 32 feet of earthen material on the top of the cut. FHA personnel further disregarded the interests of FHA and WBC by directing FHA's own geologist to not disclose information at an on-site meeting to evaluate corrective action needed for this site.

68. FHA personnel refused to recognize and negociate a change order with WBC to correct defects in the plans due to differing site conditions at MP 46.7 and MP 47.25. As soon as a completion contractor was provided, the FHA did recommend those changes.

69. FHA inaccurately stated that WBC took no action to clean up a small hydraulic leak and an instance of silt running into the creek, until the FHA directed WBC to take clean-up action.

70. FHA refused to process a pay estimate prior to the termination for any work performed by WBC.

71. WBC, in addition to the specific allegations herein, is entitled to other extensions of time and adjustments in the Contract price, to be proven at trial.

72. WBC, by and through its representative Luther Clevenger, filed a Freedom of Information Act complaint in the United States District Court for the District of Oregon requesting the FHA to provide documentation on this Contract. The case is captioned *Luther Clevenger v. U.S. Department of Transportation*, case number 99-1615-AS. WBC reserves its

right to amend this Complaint after it receives the documentation pursuant to the Freedom of Information Act complaint.

## THE TERMINATION FOR DEFAULT IS WRONG

73. For the reasons alleged herein, the purported termination for default is wrongful and should be converted to a termination for convenience.

74. WBC should be paid all amounts due.

## PRAYER

75. For the reasons outlined herein, WBC is entitled to extensions of time, equitable adjustments in the Contract price, and a declaration that the FHA waived or is otherwise estopped to require compliance with the Contract provisions alleged in the cure notice and termination for default.

76. WBC is entitled to have the termination for default converted to a termination for convenience because the CO did not assess all the relevant issues and matters of the Contract and acted upon the primary direction of others. CO Parsons also failed to reasonably exercise his discretion in deciding to terminate.

77. WBC is entitled to have the termination for default converted to a termination for convenience because WBC was not in violation of the Contract.

78. WBC is entitled to all amounts due.

79. On all claims, WBC seeks to file within 30 days after entry of final judgment a petition for attorneys' fees, costs and disbursements under the Equal Access to Justice Act, 28 USCA § 2412 and 5 USCA § 504.

80. On all claims, post judgment interest at the rate established under the Contract Disputes Act, dating from the date of entry of judgment until paid.

Exhibit 11
Page 13 of 15

81. On all claims, WBC also seeks such additional and supplemental relief as this Court deems appropriate.

DATED this 29th day of November, 1999.

STOEL RIVES LLP

Richard E. Alexander, OSB No. 69002
Of Attorneys for White Buffalo Construction, Inc.

Richard E. Alexander, Attorney of Record
Charles F. Adams, Of Counsel
Stoel Rives LLP
900 SW Fifth Avenue, Suite 2600
Portland, OR 97204-1268
Phone: (503) 294-9387
Fax: (503) 294-9167

Exhibit 11
Page 14 of 15

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that I filed the original and seven (7) copies of **COMPLAINT**, the original and two (2) copies of the **CIVIL COVER SHEET**, the original and two (2) copies of the **NOTICE OF RELATED CASES**, and a check to cover the filing fee on November 29, 1999, by mailing via Federal Express, an overnight mail service to:

David A. Lampen
Office of the Clerk
United States Court of Federal Claims
717 Madison Place, NW
Washington, D.C. 20005

Richard E. Alexander, Attorney of Record
Charles F. Adams, Of Counsel
Of Attorneys for White Buffalo
Construction, Inc.

Exhibit 11
Page 15 of 15