**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| WHITE BUFFALO CONSTRUCTION, INC., an Oregon corporation,<br><br>*Plaintiff*,<br><br>v.<br><br>THE UNITED STATES,<br><br>*Defendant*. | **PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**<br><br>**No. 99-961C (Consolidated with Case Nos. 07-738C and 00-415C)**<br><br>**Senior Judge Loren A. Smith**<br><br>**Trial Date: August 4, 2008**<br>**Pretrial Conference: July 28, 2008**<br><br>**Electronically Filed June 9, 2008** |

Pursuant to R.C.F.C. Appendix A, section 14, following is plaintiff's Memorandum of Contentions of Fact and Law.

# TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES .......... iv

I. FACTS .......... 1

A. Background Facts .......... 1

B. White Buffalo's CDA Claims .......... 4

C. White Buffalo's Allegations of Bad Faith Involve Matters Either Occurring or Discovered Within the Six-Year CDA Period .......... 5

1. White Buffalo's Second Claim for Relief .......... 5

2. White Buffalo's Claim for Bad-Faith Purported Conversion to Convenience .......... 8

D. Evidence of Government Misconduct Is Abundant .......... 8

1. The Government Made and Then Concealed Design Changes for the Completion Contractor .......... 9

2. The Government Paid the Completion Contractor at White Buffalo's Expense in Bad Faith .......... 10

3. There Is Voluminous Evidence of Rettinger's Animus Toward White Buffalo .......... 11

4. The Government's Conduct in Response to White Buffalo's FOIA Request Confirms Its Bad Faith .......... 14

II. ISSUES OF FACT AND LAW TO BE RESOLVED BY THE COURT .......... 14

A. Issues of Fact .......... 14

1. White Buffalo's Termination Settlement Proposal .......... 14

a. Did White Buffalo Offer Adequate Support for Its Owner/Operator Costs and Other Labor Costs? .......... 14

b. Did White Buffalo Incur Major Equipment Repair Costs as a Result of Its Work on the Project? .......... 14

c. Did White Buffalo Offer Adequate Support for Its Settlement Legal Expenses? .......... 14

2. White Buffalo's Second Claim for Relief—Bad Faith .......... 15

a. Did White Buffalo Offer Sufficient Evidence That the Government's Employees Acted with a Specific Intent to Injure White Buffalo? .......... 15

b. When Did White Buffalo Discover Sufficient Evidence of Bad Faith to Meet Its Standard of Proof of Bad Faith? .......... 15

## TABLE OF CONTENTS

**Page**


3. White Buffalo's Third Claim for Relief—Bad-Faith Conversion ........... 15
   a. Did White Buffalo Submit a CDA Claim for Bad-Faith Conversion to Termination for Convenience? ............................ 15
   b. Has White Buffalo Proven That the Conversion Was in Bad Faith? ........................................................................ 15
4. White Buffalo's Lost Profits on Its Bad-Faith Claims............................ 15
   a. Did White Buffalo Show That It Would Have Made a Profit on the Contract Considering the Equitable Adjustments to Which It Is Entitled? .......................................... 15

B. Issues of Law .......................................................................................... 15
1. White Buffalo's Termination Settlement Proposal................................. 15
   a. Are White Buffalo's Owner/Operator Costs Recoverable? ......... 15
   b. Is White Buffalo Entitled to Recover for Its Reasonable Settlement with Its Surveying Subcontractor? ............................ 15
   c. Is White Buffalo Entitled to Cover the Cost of Major Equipment Repairs Necessitated by the Project Even if Not Made Before Termination? ....................................................... 16
   d. What Is the Proper Method of Calculating White Buffalo's Preconvenience Termination Lost Profits? ................................. 16
   e. Is White Buffalo Entitled to Interest Under the Prompt Payment Act and the CDA? ....................................................... 16
2. White Buffalo's Second Claim for Relief—Bad Faith ........................... 16
   a. Was White Buffalo's Bad-Faith Claim Timely When the Government Concealed Evidence of Design Changes and Its Bad-Faith Conversion from the Initial December 1998 Default Termination Through the January 2004 Conversion to Termination for Convenience? ............................................... 16
   b. Do the Facts Elicited by White Buffalo Meet the Standard for Proof of the Government's Breach of Duty of Good Faith and Fair Dealing, Entitling White Buffalo to Its Lost Profits on the Contract? ........................................................... 16
3. White Buffalo's Third Claim—Bad-Faith Termination for Convenience.......................................................................................... 16
   a. Did White Buffalo Make a CDA Claim for Bad-Faith Termination for Convenience? ................................................. 16




Portlnd3-1629995.1 0079700-00014

**TABLE OF CONTENTS**

**Page**


b. Did White Buffalo Meet the Standard of Proof for Recovery of Lost Profits for Bad-Faith Termination for Convenience? ........ 17

III. LEGAL PRINCIPLES ........ 17

A. White Buffalo Is Entitled to Recover the Disputed Items in Its Termination Settlement ........ 17

1. White Buffalo Is Entitled to Recover Its Owner/Operator Costs, Labor and Equipment ........ 17

a. Owner/Operator Costs ........ 17

b. Equipment Costs ........ 19

2. White Buffalo Is Entitled to Reimbursement for Sums Paid to Its Surety and to Its Surveying Subcontractor ........ 19

a. White Buffalo's Surety ........ 20

b. Settlement with White Buffalo's Surveying Subcontractor ........ 22

3. White Buffalo's Legal Fees Incurred in Connection with the Termination Settlement Proposal Are Recoverable ........ 23

4. White Buffalo Is Entitled to Recover Lost Profits on Pretermination Work ........ 23

5. White Buffalo Is Entitled to Interest Under the Prompt Payment Act and the CDA ........ 25

B. White Buffalo's Claims in Its Second Claim for Relief Were Presented to the CO Within the Time Required by the CDA ........ 25

1. White Buffalo Did Not Discover Its Claims Until 2000 or Later ........ 26

2. White Buffalo's Claim Relates Back to Case Nos. 99-961C and 00-415C, and the Claim Is a Continuing One ........ 27

3. Equitable Tolling Applies ........ 28

C. White Buffalo Presented Its Bad-Faith Conversion Claim to the CO ........ 30

D. White Buffalo Alleged and Demonstrated to the CO Facts Showing Specific Intent to Injure White Buffalo ........ 31

E. White Buffalo Is Entitled to Its Lost Profits as a Result of the Government's Bad Faith ........ 32

IV. CONCLUSION ........ 33

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Alexander v. FBI*,
194 F.R.D. 305 (D. D.C. 2000) ........ 23

*Allfair Dev. Co.*,
05-2 B.C.A. (CCH) ¶ 32,900 (A.S.B.C.A. 2005) ........ 25, 32

*Appeal of Carmona Industrias Electricas, S.A.*,
93-3 B.C.A. (CCH) ¶ 25,975 (A.S.B.C.A. 1993) ........ 30

*Appeals of Schleicher Cmty. Corr. Ctr., Inc.*,
No. J100C-598, 1998 WL 455631 (D.O.T.C.A.B. Aug. 6, 1998) ........ 29

*Bannum, Inc. v. United States*,
80 Fed. Cl. 239 (2008) ........ 27, 31

*Bath Iron Works Corp. v. United States*,
20 F.3d 1567 (Fed. Cir. 1994) ........ 29

*Bonneville Associates, Ltd. Partnership v. Barram*,
165 F.3d 1360 (Fed. Cir. 1999) ........ 29

*Bowden v. United States*,
106 F.3d 433 (D.C. Cir. 1997) ........ 29

*Brown Park Estates-Fairfield Dev. Co. v. United States*,
127 F.3d 1449 (Fed. Cir. 1997) ........ 28

*Bruce Constr. Corp. v. United States*,
324 F.2d 516 (Ct. Cl. 1963) ........ 20

*Case, Inc. v. United States*,
25 Cl. Ct. 379 (1992) ........ 28

*Clevenger v. United States*,
Case No. 99-1615 AS (D. Or.) ........ 7

*H.B. Mac, Inc. v. United States*,
153 F.3d 1338 (Fed. Cir. 1998) ........ 30

*Hayes v. United States*,
73 Fed. Cl. 724 (2006) ........ 27, 28

*Holmberg v. Armbrecht*,
327 U.S. 392 (1946) ........ 29

*In re White Buffalo Constr.*,
96-2 B.C.A. (CCH) ¶ 28,272 (A.G.B.C.A. 1996) ........ 1

*Info. Sys. & Networks Corp.*,
02-2 B.C.A. (CCH) ¶ 31,952 (A.S.B.C.A. 2002) ........ 25

**Page**

*Irwin v. Dep't of Veterans Affairs*,
498 U.S. 89 (1990), *reh'g denied*, 498 U.S. 1075 (1991)........................................... 26, 29

*Japanese War Notes Claimants Ass'n of Phil., Inc. v. United States*,
178 Ct. Cl. 630, 373 F.2d 356 (1967)........................................................................ 27

*Krygoski Constr. Co. v. United States*,
94 F.3d 1537 (Fed. Cir. 1996)................................................................................... 31

*Lockheed Martin Corp. v. United States*,
70 Fed. Cl. 745 (2006).............................................................................................. 27

*M.E. Brown*,
91-1 B.C.A. (CCH) ¶ 23,293 (A.S.B.C.A. 1990)....................................................... 25

*Northrup Grumman Corp. v. United States*,
47 Fed. Cl. 20 (2000)................................................................................................ 19

*Safeco Ins. Co.*,
03-2 B.C.A. (CCH) ¶ 32,341 (A.S.B.C.A. 2003)....................................................... 20

*Slattery v. United States*,
53 Fed. Cl. 258 (2002).............................................................................................. 28

*Solar Turbines, Inc. v. United States*,
16 Cl. Ct. 304 (1989)................................................................................................ 32

*Tex. Health Choice, L.C. v. Office of Pers. Mgmt.*,
400 F.3d 895 (Fed. Cir. 2005)................................................................................... 30

*TS Infosystems, Inc. v. United States*,
36 Fed. Cl. 570 (1996).............................................................................................. 29

*White Buffalo Construction, Inc. v. United States*,
52 Fed. Cl. 1 (2002)......................................................................... 17, 18, 19, 23

*William Green Constr. Co. v. United States*,
477 F.2d 930 (Ct. Cl. 1973)....................................................................................... 20

*William Green Constr. Co.*,
76-2 B.C.A. (CCH) ¶ 12,194 (G.S.B.C.A. 1976)....................................................... 20

*Wolfe Constr. Co.*,
88-3 B.C.A. (CCH) ¶ 21,122 (Eng. B.C.A. 1988)...................................................... 20

**Statutes**

31 U.S.C. § 3901, *et seq*.................................................................................... 25

41 U.S.C. § 609......................................................................................................... 26

**Other Authorities**

2 Karen E. Manos, Government Contracting Costs & Pricing (2004)................................. 21, 22

2 Ralph C. Nash, Jr., & John Cibinic, Jr., Federal Procurement Law (1980)........................ 25

**Page**

Armed Services Procurement Regulations ........................................................................ 22

*Explanation of Principles for Determination of Costs Under Government Contracts* ("*The Principles*") ........................................................................ 21

**Rules**

FAR 31.205-19 ........................................................................ 20

FAR 31.205-20 ........................................................................ 20, 21

FAR 31.205-42 ........................................................................ 22

FAR 31.205-45 ........................................................................ 23

FAR 32.907 ........................................................................ 25

FAR 49.114 ........................................................................ 20

FAR 49.201 ........................................................................ 23, 24

FAR 49.202 ........................................................................ 24

R.C.F.C. 15 ........................................................................ 28

# I. FACTS

## A. Background Facts

Following are the background facts, most of which are contained in prior briefing but repeated here for the convenience of the Court. White Buffalo Construction, Inc. will prove these facts using admissions from Federal Highway Administration ("FHA") personnel, contemporaneous documents, testimony from its principals and testimony from third-party witnesses.

The road construction project at issue, FHA Contract No. DTFH70-98-C-00027 on the Siskiyou National Forest (the "Project"), albeit an FHA contract, was on behalf of the U.S. Forest Service (the "Forest Service"). This is significant because in 1998, when the contract was awarded to White Buffalo, White Buffalo was in lengthy and highly contentious litigation with the Forest Service. *E.g.*, *In re White Buffalo Constr.*, 96-2 B.C.A. (CCH) ¶ 28,272 (A.G.B.C.A. 1996) (and related cases). In discovery before the scheduled trial date in case Nos. 99-961C and 00-415C in January 2004, White Buffalo uncovered documents indicating that FHA Area Engineer Paul Rettinger, the primary focus of White Buffalo's bad-faith claim, had been in contact with the Forest Service contracting officer (the "CO") and discussed the prior litigation. It is likely, therefore, that Rettinger saw the Project as an avenue for retaliation. Indeed, the Project documents show that Rettinger consulted with the Forest Service on the issue of terminating White Buffalo. Not surprisingly, the Forest Service recommended termination.[1]

[1] The fact that Rettinger denied to the CO (who was deciding White Buffalo's bad-faith claim in August 2007) that he was aware of the Forest Service dispute, thus contradicting his sworn deposition testimony, only underlines White Buffalo's point.

Documents received by White Buffalo from the Defense Contract Audit Agency (the "DCAA"), disclosed only after the discovery cutoff, confirm White Buffalo's understanding. On May 1, 2008, White Buffalo received for the first time an email between DCAA auditors *dated before their audit even began*:

> Ray and I testified against this guy four years ago and he still is getting Government contracts! I think this is a juicy "false claim" termination that will eventually end up in the Department of Justices [sic] hands in a few years. I am curious! If I retire in five years, can I come back as a Government witness at $100/hour plus expenses[?].

(Munro Depo., Ex. 16 at 1, Appendix at 1.)[2] Fortunately for White Buffalo, those auditors did not perform the audit in this case. The auditor who performed the audit and who was more objective confirmed that there was no evidence of a false claim or any fraudulent conduct.

However, the prior dispute with the Forest Service was very much in the minds of FHA personnel. They instructed the DCAA auditor as follows: "In auditor's request to audit WBC [White Buffalo] sent to Stoel Rives LLP, *take out any reference to knowing about Rim Rock, and for that matter, any link to DCAA court case and prior audit of WBC and RRC*." (Munro Depo., Ex. 17, Appendix at 3.)

Notwithstanding this attempt at concealment, as the Court is aware from prior proceedings, the government initially followed Rettinger and the Forest Service's approach, terminating White Buffalo for default and imposing liquidated damages. White Buffalo challenged these decisions in case Nos. 99-961C and 00-415C. From 1999 through 2003, the parties engaged in discovery and prepared for trial. White Buffalo would have shown in the trial

[2] Because White Buffalo is working with the government to coordinate trial exhibit lists and avoid duplication, final trial exhibit numbers are not available as of the date of this brief. Instead, White Buffalo includes an appendix with the deposition transcripts and exhibits cited.

set for March 1 through March 13, 2004 that the alleged defaults identified by the government were pretextual and simply an excuse for what appears to be Rettinger's plan to retaliate against a contractor seen as a troublemaker. However, on the eve of trial, on January 14, 2004, the government suddenly changed course and issued a decision in the name of the CO purporting to convert the default termination to one for convenience. (2008 Parsons Depo., Ex. 19, Appendix at 16.) However, as the government has admitted, the conversion decision was in fact made and implemented by government lawyers. (Declaration of Timothy J. Binder ("Binder Decl.") dated Apr. 10, 2008 (Appendix at 4-6).)

Indeed, the CO who made the decision could not recall why the 2004 conversion was made or find any indication of the government's rationale in the text of the decision. (2008 Parsons Depo. at 11-12; Appendix at 9-10.) Four years later, in 2008, the government lawyer involved in the decision, Timothy Binder, submitted a declaration attempting to justify the 2004 conversion on the basis of a "safety concern to opening the road posed by the overburden" in 1998. However, the CO in whose name the decision was issued testified as follows:

> Q. Okay. Do you recall in January of—I'm sorry, January of 2004, the work was completed?
>
> A. I'm sure it was.
>
> Q. Do you recall that the safety concern about opening the road posed by the overburden had been taken care of by January 2004?
>
> A. I would have to assume it had to have been, yes.
>
> Q. So how did the safety concern to opening the road posed by the overburden factor into your decision to convert from default to convenience?
>
> A. Today I'm not recalling the link there.
>
> Q. Logically, does it seem to you that there could be a link, given that the work had been completed?

A. I'm not seeing it readily here, No.

(2008 Parsons Depo. at 18:3-17, Appendix at 11.) Moreover, the CO's 2007 decision described the alleged 1998 "safety condition" as something that "could be dealt with at a later time" after termination, not as something requiring immediate action. (Scott Depo. at 53, Appendix at 32.)

Alternatively, the CO who denied White Buffalo's bad-faith claim in August 2007 thought there had been an issue of "concurrent delay" (again nowhere appearing in the text of the conversion decision). (Firestone Depo. at 51, 99, Appendix at 110-11.) However, she could provide no details, and the fact that the government's story continues to change only serves to demonstrate the bad-faith nature of its actions.

**B. White Buffalo's CDA Claims**

After the government's January 2004 purported conversion to termination for convenience, White Buffalo submitted termination settlement proposals making clear that it was also making a claim for bad-faith termination. (Scott Depo., Exs. 4, 5, Appendix at 36-42.) Government representatives admitted that White Buffalo was claiming bad-faith termination beginning with its 2004 certified claims and that the termination at issue after January 2004 was the convenience termination. (Scott Depo. at 15-16, Ex. 5, Appendix at 21-22, 39-42; 2008 Parsons Depo. at 23, 25-26, Appendix at 12-14.) At that time, the government simply disagreed that there had been bad faith. It now claims it did not understand that White Buffalo was claiming bad-faith conversion to convenience. According to the CO, "the difference being that there was a bad faith termination versus my belief that there was no bad faith termination." (2008 Parsons Depo. at 26, Appendix at 43-65.)

On January 13, 2005, White Buffalo filed an additional certified claim, designated as a Termination Settlement Proposal and "Request for Profit and Justification for Profit" that detailed White Buffalo's allegations of bad faith. (Scott Depo., Ex. 6, Attachment B, Appendix

at 43-65.) This claim included the detailed specifications of bad faith asserted in White Buffalo's Second Claim for Relief in case No. 07-738C, discussed further below. On October 16, 2006, White Buffalo filed a Termination for Convenience and Revised Settlement Proposal that included the specification of bad faith set forth in the January 2005 claim and again, as it had insisted repeatedly, a contention that the government's purported conversion was in bad faith. (Scott Depo., Exs. 7, 8, Appendix at 66-107.)

On August 30, 2007, the CO denied White Buffalo's claim for lost profits, denying the existence of the bad faith White Buffalo notified the government about in its 2004 and 2005 claims and specified in detail in its January 2005 claim. The government did not address White Buffalo's claim that the 2004 purported conversion was in bad faith. (Scott Depo. at 21, Appendix at 23.) Indeed, it has never done so on the merits. Rather, the government contends that the claim was not, in fact, actually made.

On October 22, 2007, White Buffalo filed case No. 07-738C, challenging the government's denial of its bad-faith claim for lost profits.

### C. White Buffalo's Allegations of Bad Faith Involve Matters Either Occurring or Discovered Within the Six-Year CDA Period

In case No. 07-738C, White Buffalo asserted two claims challenging the government's conduct as having been in bad faith and seeking lost profits.

#### 1. White Buffalo's Second Claim for Relief

In its Second Claim for Relief, paragraph 50, White Buffalo alleges:

> 50. FHA breached its implied obligations of good faith and fair dealing and duty to cooperate in facilitating WBC's performance of the contract, by:
>
> a. Refusing to make for WBC the changes in plans and specifications subsequently made for TWC, as evidenced by the November 2002 Landmark Survey;

> b. Refusing to acknowledge to WBC the differing site conditions recognized through accommodating TWC, as later evidenced by the November 2002 Landmark Survey;
>
> c. Paying TWC and charging WBC for volumes never excavated, as later evidenced by the November 2002 Landmark Survey;
>
> d. Terminating WBC for default where there were defective plans and specifications and differing site conditions, as later evidenced by the November 2002 Landmark Survey; and
>
> e. Falsely stating to WBC that no design changes had been made and denying that there were no design-change documents, as later evidenced by the January 2000 FOIA disclosure and the November 2002 Landmark Survey.

The 2002 Landmark Surveying, Inc. ("Landmark") report referenced in paragraph 50 was commissioned by White Buffalo to compare as-planned, as-designed and as-built conditions on the Forest Service road at issue in the Project. The survey uncovered significant discrepancies and documented that the government made design changes for the completion contractor it had previously denied making and that the government had improperly charged White Buffalo for work not actually performed by the completion contractor. (2008 Rettinger Depo., Ex. 3, Appendix at 138-50.) As Rettinger admitted, "I took it on the face value that, you know, they [Landmark] are an honest, reputable contractor, and that what they measured is what they had, but I couldn't verify or determine whether I agreed with it or not." (2008 Rettinger Depo. at 65, Appendix at 136.) That is, Landmark's conclusions are undisputed.

With regard to the January 2000 Freedom of Information Act ("FOIA") disclosure referenced in paragraph 50 of White Buffalo's complaint, White Buffalo alleged:

> On or about January 6, 2000, WBC received from the FHA documents whose disclosure was compelled by a suit brought by WBC under the FOIA. The documents revealed that, contrary to repeated prior FHA representations, FHA had in fact redesigned the rock cut at MP 46.7.

(Complaint ¶ 34.) It should be noted, however, that when FHA forced White Buffalo to file suit to obtain the few documents it could under FOIA, it ended up having to pay White Buffalo's fees and costs because of its improper withholding of documents. (*See Clevenger v. United States*, Case No. 99-1615 AS (D. Or.), Stipulation for Settlement dated May 1, 2000; Adesko Depo., Ex. 35, Appendix at 151-52.)

As discussed above, White Buffalo's claims in March and November 2004 disclosed to the government that White Buffalo was seeking lost profits for bad faith. Although it is not clear whether more was necessary, all of the specifications of bad faith set forth in paragraph 50 of White Buffalo's 2007 complaint in this Court were also set forth in White Buffalo's January 13, 2005 claim and reiterated in its October 2006 claim:

- *Making Design Changes for Tidewater but Not for White Buffalo*. January 2005 Claim, Appendix B, Request for Profit and Justification for Profit ("Appendix B"), at 7, 8; October 2006 Claim, Appendix D ("Appendix D") at 15-17, 19.
- *Refusing to Acknowledge Differing Site Conditions*. Appendix B at 3, 6; Appendix D at 13-14.
- *Paying Tidewater for Fictitious Work at White Buffalo's Expense*. Appendix B at 8; Appendix D at 19.
- *Defective Plan and Differing Site Conditions*. This is the same issue addressed above.
- *Concealing Differing Site Conditions and Design Changes*. Appendix B at 7; Appendix D at 15-17.

As shown below, the January 2005 claim was timely for the matters discovered or occurring in 2000 through 2002.

**2. White Buffalo's Claim for Bad-Faith Purported Conversion to Convenience**

White Buffalo's Third Claim for Relief challenges the government's eve-of-trial purported convenience termination as having been made in bad faith. White Buffalo alleges:

> 56. Where a convenience termination is the product of bad faith, there is no limit on recovery of lost future profits.
>
> 57. FHA's January 2004 conversion of the termination from default to convenience was the culmination of a pattern of bad-faith government conduct. Consequently, FHA is not entitled to escape liability for profits shown to have been lost on wrongly terminated future work.
>
> 58. Had WBC been allowed to perform, it would have earned profits in the amount of $558,064.25. WBC is entitled to damages in that amount plus interest under the CDA and its attorneys' fees pursuant to the EAJA.

The government does not challenge the timeliness of this claim but argues that it was not presented to the CO. White Buffalo has pointed out to the government where in its October 16, 2006 claim it asserted that the purported convenience termination was in bad faith, but to no avail. (Plaintiff's Response to Defendant's Requests for Admissions at 2-3, Appendix at 154-55.) As noted above, in deposition, government representatives repeatedly admitted that beginning in 2004, they understood White Buffalo's certified claims to challenge the convenience termination as having been made in bad faith. (Scott Depo. at 15-16, Appendix at 21-22; 2008 Parsons Depo. at 23, 25-26, Appendix at 12-14.)

**D. Evidence of Government Misconduct Is Abundant**

White Buffalo sets forth below some of the abundant facts constituting bad faith demonstrating that it not only has alleged bad faith, but will prove it at trial. In particular, White Buffalo sets forth the facts on the two most egregious aspects of the government's bad faith:

(1) FHA's denial (until White Buffalo obtained an independent survey and documents under FOIA) that it had made design corrections for the completion contractor that it refused to make for White Buffalo and (2) FHA's efforts to charge White Buffalo's surety, ICW, for work allegedly done by the completion contractor but either performed by White Buffalo or not at all. White Buffalo also sets forth the animus expressed by Rettinger that explains the government's disparate treatment of White Buffalo and the completion contractor, Tidewater, with which Rettinger had a prior relationship. (*See* 2000 Rettinger Depo. at 9, Appendix at 159 (Rettinger's prior relationship with Tidewater).)

### 1. The Government Made and Then Concealed Design Changes for the Completion Contractor

FHA personnel, including the CO, told White Buffalo, its surety and the completion contract bidders that there would be no redesigns or changes to the contract and that the work would be completed as specified in the White Buffalo contract. (Firestone Depo., Ex. 2 at 75-77, Appendix at 120-32; 2000 Rettinger Depo., Ex. 17, Appendix at 168-77.) However, after terminating White Buffalo, the government admits that it began working on "designing a solution" to fix its initial design errors. (Firestone Depo., Ex. 2 at 77, Appendix at 122.) It also paid the completion contractor to correct the changed condition at MP 46.7, even though these costs had been included in the completion contractor bid to White Buffalo's surety as a separate bid item based on the CO's letter.

The government then concealed these design fixes from White Buffalo. The government repeatedly denied to White Buffalo's president, Luther Clevenger, that there had been design changes. Similarly, the government admits that when White Buffalo asked for documents about design fixes under FOIA, it withheld some of the documents "based on advice of counsel." (Firestone Depo., Ex. 2 at 80, Appendix at 123.) Nonetheless, some of the documents slipped

through. However, most of the documents were not discovered until produced in this litigation and subject to sanctions for being withheld. (Firestone Depo., Ex. 2 at 80, Appendix at 123.) In 2002, White Buffalo commissioned Landmark to obtain confirmation that the design fixes denied by the government had in fact occurred. (2008 Rettinger Depo., Ex. 3, Appendix at 138-50.) Nonetheless, even in deposition two years later and after his supervisor, Carol Jacoby, admitted there had been design corrections necessitating a contract modification for Tidewater, Rettinger steadfastly continued to deny that the design fixes had occurred. (2000 Rettinger Depo. at 71, 75, Appendix at 161-62.)

However, Rettinger was alone in his insistence. As noted above, the CO admitted in her August 2007 decision that the design corrections had occurred. Indeed, even contemporaneously, as White Buffalo later discovered, the government was well aware what it was doing. For example, while telling White Buffalo's surety that no redesign had occurred at MP 46.7, internally, FHA acknowledged this redesign was necessary. FHA stressed, though, the importance of keeping quiet about the design correction. "We do not want anyone making the interpretation of our actions in getting the additional work corrected to really be the groundwork for [White Buffalo's] T for C." (2000 Rettinger Depo. at 115-117, Ex. 18, Appendix at 164_66, 178-87.) As noted above, consistent with its strategy of concealment, however, the government withheld the documents relating to the design correction in response to White Buffalo's FOIA request, a request on which the government ultimately had to pay White Buffalo's attorneys' fees. (2000 Rettinger Depo. at 118, Appendix at 167; Adesko Depo., 35, Appendix at 151-52.)

**2. The Government Paid the Completion Contractor at White Buffalo's Expense in Bad Faith**

FHA paid the completion contractor, Tidewater, for substantial work that was never performed or that was performed by White Buffalo. One example is work certified and paid for

at MP 46.7, which the 2002 Landmark survey demonstrated had never been performed, despite the fact that both the completion contractor and FHA personnel certified the work and the quantities for payment. Similarly, FHA certified and paid Tidewater for work that was performed by White Buffalo before termination.

The CO's August 2007 decision tried to explain away these facts, arguing that there "may have been a reason to reduce payment to the completion contractor," but because these actions took place after termination, White Buffalo (despite being backcharged for the fictitious costs) has no basis to complain about them. (Firestone Depo., Ex. 2 at 99, Appendix at 124.) The government contends that "following termination, there was no contract between [White Buffalo] and the Government" and, therefore, White Buffalo cannot complain about the government's bad faith. (*Id.*) However, the government does not explain how it could backcharge White Buffalo through its surety if there was no contractual relationship. Moreover, the government ignores the fact that its post-termination conduct and disparate treatment of White Buffalo and Tidewater *evidences* the government's bad faith before termination. Nonetheless, the government failed to even consider that the disparate treatment showed ill will or malice. (Scott Depo. at 62, Appendix at 33.)

**3. There Is Voluminous Evidence of Rettinger's Animus Toward White Buffalo**

This disparate treatment of White Buffalo and Tidewater can be explained (although not justified) by the voluminous evidence of Rettinger's animus toward White Buffalo. Rettinger admitted that on multiple occasions he discussed with Tidewater the possibility of its taking over White Buffalo's work before White Buffalo's termination. (2000 Rettinger Depo. at 16, Appendix at 160.) From the beginning Rettinger tried to set up White Buffalo for default, for example, by telling White Buffalo that no clearing was allowed at MP 46.7 in September 1998 when, as the CO admitted in her decision on White Buffalo's claim, the contract contained no

such restriction. (Firestone Depo., Ex. 2 at 21, Appendix at 116; Scott Depo. at 32, Appendix at 116.)

Rettinger also asserted improper pressure on the Project engineer, Sajid Aftab, to make life difficult for White Buffalo. Aftab expressed it:

> I told Paul [Rettinger] my frustrations on this job. I am Project Engineer on this job, I am not making any decisions. I am not informed in which I expected has to come or go. I am only signing letters & feel that I am out of loop. I don't know why I am Project Engineer.
>
> Howe Crockett called (COE). I express my great displeasure regarding this job. I told him also that I am not being performing my duties as a P.E.

(Firestone Depo., Ex. 2 at 22, Appendix at 117.)

Indeed, the government acknowledges that Aftab has testified, "I don't know why Paul is so strict on the is [sic] job, while he is not so strict on other jobs." (Firestone Depo., Ex. 2 at 23 (citing Aftab Depo. at 76-77), Appendix at 118.) This testimony alone creates an issue of fact on White Buffalo's bad-faith claim. Similarly, in deposition, Rettinger admitted that he overruled Aftab when Aftab thought that perhaps White Buffalo should be paid for its work. (2000 Rettinger Depo. at 92, Appendix at 163 ("those decisions [not to pay White Buffalo] were mine").)

The CO's decision also cites a file document prepared by a government inspector on the Project, Mike Barber, in which Rettinger became "bizarre[ly] irrational" when he discovered that Barber had been talking to Clevenger, threatened to fire Barber and "maliciously slandered" both Clevenger and Barber. (Firestone Depo., Ex. 2 at 24, Appendix at 119.) However, the CO deciding White Buffalo's bad-faith claim neglected to ask Rettinger if this conversation occurred. (Scott Depo. at 34, Appendix at 27.) If the CO had done so, she would have discovered that Rettinger remembers this well and unashamedly admits that he in fact fired

Barber for talking to White Buffalo. (2008 Rettinger Depo. at 32, 34-36, Appendix at 131-34.) Instead, the government simply decided that Barber lacked credibility. (Firestone Depo., Ex. 2 at 22-23, Appendix at 117-18.) However, the lack of credibility conclusion reflects the government's preference for what Rettinger had to say. When Rettinger disagreed with Barber's report of another conversation between them, the government engineer investigating the claim decided to accept Rettinger's side of the story at face value because "my comfort level, I would say, yes, did fall to Paul's [Rettinger's] position." (Scott Depo. at 41-42, Appendix at 28-29.)

Rettinger's animus toward White Buffalo is also shown in that White Buffalo was not terminated for default until December 3, 1998 and was not sent a cure notice until November 13, 1999. However, as early as October 6, 1998, Rettinger was proposing to give some of White Buffalo's work to another contractor. By October 28, after consulting with the Forest Service, he was openly advocating termination. (Scott Depo. at 51, Appendix at 31; 2008 Rettinger Depo. at 44, Appendix at 135.) However, the government delayed sending a cure notice until November 13, 1999, at which point Rettinger "did not expect them to cure the default." (2008 Rettinger Depo. at 27, Appendix at 128-29.)

Unfortunately, the only witness the CO and her representatives talked to in deciding White Buffalo's bad-faith claim was Rettinger himself. (Scott Depo. at 14, Appendix at 20.) The government did not talk to Aftab, Barber or even the former CO who made the default and conversion decisions. (*Id.* at 20-21.) Whether it was a "comfort level" with Rettinger or, as the government admits Clevenger reported to the original CO, "Government employees are 'afraid of Paul'" (Scott Depo. at 47, Appendix at 30), the CO's to decision interview only Rettinger of all the witnesses simply lacks a rational basis.

Again, White Buffalo must stress that these are only examples of the government's bad faith it discovered within the six-year CDA period. White Buffalo is confident that these examples are only the tip of the iceberg.

**4. The Government's Conduct in Response to White Buffalo's FOIA Request Confirms Its Bad Faith**

As discussed above, the government repeatedly—to White Buffalo at least—denied that there had been design changes. When White Buffalo made a FOIA request for documents relating to the changes, the government at first withheld the documents, again denying they existed. Finally, White Buffalo had to file suit under FOIA, which, presumably because of the involvement of counsel outside of FHA, finally resulted in the production of the documents and payment of White Buffalo's attorneys' fees under FOIA. This course of conduct can be nothing other than confirmation of the government's bad faith and the continuation of a pattern of concealment that, as discussed below, necessitates the application of the doctrine of equitable tolling.

## II. ISSUES OF FACT AND LAW TO BE RESOLVED BY THE COURT

### A. Issues of Fact

#### 1. White Buffalo's Termination Settlement Proposal

**a. Did White Buffalo Offer Adequate Support for Its Owner/Operator Costs and Other Labor Costs?**

Proposed resolution: Yes.

**b. Did White Buffalo Incur Major Equipment Repair Costs as a Result of Its Work on the Project?**

Proposed resolution: Yes.

**c. Did White Buffalo Offer Adequate Support for Its Settlement Legal Expenses?**

Proposed resolution: Yes.

**2. White Buffalo's Second Claim for Relief—Bad Faith**

**a. Did White Buffalo Offer Sufficient Evidence That the Government's Employees Acted with a Specific Intent to Injure White Buffalo?**

Proposed resolution: Yes.

**b. When Did White Buffalo Discover Sufficient Evidence of Bad Faith to Meet Its Standard of Proof of Bad Faith?**

Proposed resolution: 2000-2002.

**3. White Buffalo's Third Claim for Relief—Bad-Faith Conversion**

**a. Did White Buffalo Submit a CDA Claim for Bad-Faith Conversion to Termination for Convenience?**

Proposed resolution: Yes.

**b. Has White Buffalo Proven That the Conversion Was in Bad Faith?**

Proposed resolution: Yes.

**4. White Buffalo's Lost Profits on Its Bad-Faith Claims**

**a. Did White Buffalo Show That It Would Have Made a Profit on the Contract Considering the Equitable Adjustments to Which It Is Entitled?**

Proposed resolution: Yes.

**B. Issues of Law**

**1. White Buffalo's Termination Settlement Proposal**

**a. Are White Buffalo's Owner/Operator Costs Recoverable?**

Proposed resolution: Yes.

**b. Is White Buffalo Entitled to Recover for Its Reasonable Settlement with Its Surveying Subcontractor?**

Proposed resolution: Yes.

**c. Is White Buffalo Entitled to Cover the Cost of Major Equipment Repairs Necessitated by the Project Even if Not Made Before Termination?**

Proposed resolution: Yes.

**d. What Is the Proper Method of Calculating White Buffalo's Preconvenience Termination Lost Profits?**

The method employed by the DCAA auditor of applying a profit margin to the appropriate cost base is proper. However, the DCAA auditor did not include all of White Buffalo's costs in his calculations. What is not permissible is the government's flat denial of pretermination profits based on the theory that White Buffalo would have lost money on the Project without considering White Buffalo's right to an equitable adjustment increasing the contract price.

**e. Is White Buffalo Entitled to Interest Under the Prompt Payment Act and the CDA?**

Proposed resolution: Yes.

**2. White Buffalo's Second Claim for Relief—Bad Faith**

**a. Was White Buffalo's Bad-Faith Claim Timely When the Government Concealed Evidence of Design Changes and Its Bad-Faith Conversion from the Initial December 1998 Default Termination Through the January 2004 Conversion to Termination for Convenience?**

Proposed resolution: Yes.

**b. Do the Facts Elicited by White Buffalo Meet the Standard for Proof of the Government's Breach of Duty of Good Faith and Fair Dealing, Entitling White Buffalo to Its Lost Profits on the Contract?**

Proposed resolution: Yes.

**3. White Buffalo's Third Claim—Bad-Faith Termination for Convenience**

**a. Did White Buffalo Make a CDA Claim for Bad-Faith Termination for Convenience?**

Proposed resolution: Yes.

**b. Did White Buffalo Meet the Standard of Proof for Recovery of Lost Profits for Bad-Faith Termination for Convenience?**

Proposed resolution: Yes.

## III. LEGAL PRINCIPLES

### A. White Buffalo Is Entitled to Recover the Disputed Items in Its Termination Settlement

White Buffalo's claim related to its settlement proposal is set forth at pages 46 to 48 of its complaint.[3] It is unnecessary here to discuss all of the matters in dispute because many of the disputes are largely factual ones. However, White Buffalo sets forth what it expects to be the principal areas of disagreement related to White Buffalo's termination settlement proposal.

#### 1. White Buffalo Is Entitled to Recover Its Owner/Operator Costs, Labor and Equipment

**a. Owner/Operator Costs**

The CO denied White Buffalo recovery for the time its principals, Luther and Julie Clevenger, spent on the Project on the theory that their costs are actually profits. Then, trying to have it both ways, the government denied White Buffalo any recovery of profit. The government was wrong in both respects. First, as the Court has already found, White Buffalo's method of accounting for its owners' time is sufficient for recovery.

In *White Buffalo Construction, Inc. v. United States*, 52 Fed. Cl. 1, 13 (2002) ("*Salt Creek*"), the accounting and budget practices addressed by the Court were—with one notable exception—substantially the same as those followed by White Buffalo on this FHA contract. The court declined award of certain sums paid as payroll because White Buffalo did not submit

[3] In its complaint, White Buffalo inadvertently did not claim the approximately $240,000 of its costs the CO did not dispute. The government exposed this issue in discovery, pointing out the omission. White Buffalo will amend to correct it.

redacted versions of its records to support the payroll claim. The court in *Salt Creek* explained, "The court understands why [White Buffalo] did not provide *un*redacted versions of these records to defendant. The court does not understand, however, why plaintiff did not offer redacted versions to substantiate [its] claim . . . . The court is most concerned that plaintiff claims to have computer records of this work, but it did not proffer said evidence at trial . . . ." *Id.*

Here, on FHA's termination of the contract, White Buffalo has—unlike in *Salt Creek*—offered records to support the Clevengers' work. Consequently, the record here is stronger than in *Salt Creek*. Even on a lesser record in *Salt Creek*, the court recognized that "[it] could *still* award compensation for payroll, based on the jury verdict method . . . if it believed the Clevengers would not be fairly compensated for their work . . . ." *Id.* (emphasis added). The court went on, however, to conclude that fair compensation could be accomplished through an award of profits. The court explained:

> [T]he Clevengers will be adequately paid for their work based on the normal method in which they recover such compensation. As just stated, the Clevengers were not salaried employees of plaintiff and instead took money "when they needed it." Presumably, any money they took from plaintiff for work performed on the Contract *came from its profits*. When plaintiff bid on the Contract, it included "15-percent overhead and a 10-percent profit." Plaintiff can still recover wages from its revenue because the parties have agreed that plaintiff is entitled to 10% profit on all amounts recovered from the court's decision. Plaintiff's request for pre-termination payroll, therefore, is denied. *See McCollum v. United States*, 6 Cl.Ct. 373, 379 (1984) ("because plaintiff, as owner, normally took the company profits as compensation and did not receive a salary, he was not entitled to any compensation for his time.").

*Id.* (citations omitted; emphasis added). Here, however, contrary to the Court's holding, the government wants it both ways: reimbursement neither for labor nor for profits.

If the Court determines that cost reimbursement rather than reimbursement of owner/operator time as a component of profit is appropriate, the jury verdict method will apply. The jury verdict method of awarding compensation is appropriate in government contract cases when damages cannot be ascertained by any reasonable computation from actual figures. The method is suitable when clear proof of injury exists, there is no more reliable method available for computing damages and the evidence is sufficient for the court to make a fair and reasonable approximation of the damages. *Northrup Grumman Corp. v. United States*, 47 Fed. Cl. 20 (2000).

Under this method, White Buffalo is entitled to reimbursement of the Clevengers' costs. Under the same principles, White Buffalo is entitled to recover sums spent on subcontractor truck drivers, proved under the jury verdict method.

**b. Equipment Costs**

The CO denied White Buffalo approximately $26,000 in equipment costs on the theory that even though work on the Project at issue caused the equipment to need major repairs, White Buffalo did not make the repairs because it never received the funds from the government to make them. Thus the government's position would allow it to consume White Buffalo's asset, or a portion of its value, and not pay for it. The FAR does not require the contractor to actually make the repairs before receiving payment by the government. Rather, in *Salt Creek*, the court held that White Buffalo was entitled to prove its repair costs by the jury verdict method. 52 Fed. Cl. at 11.

**2. White Buffalo Is Entitled to Reimbursement for Sums Paid to Its Surety and to Its Surveying Subcontractor**

As a general rule, when the government causes changes to the work under a government contract, the contractor is entitled to an equitable adjustment for its increased costs. In a

convenience termination, the contract price must be adjusted upward to reflect that equitable adjustments are owed to the contractor as a result of government changes. FAR 49.114(a); *Safeco Ins. Co.*, 03-2 B.C.A. (CCH) ¶ 32,341 (A.S.B.C.A. 2003); *Wolfe Constr. Co.*, 88-3 B.C.A. (CCH) ¶ 21,122, at 106,655 (Eng. B.C.A. 1988). Such equitable adjustments must compensate the contractor for its reasonable actual costs. *Bruce Constr. Corp. v. United States*, 324 F.2d 516, 518-19 (Ct. Cl. 1963). This principle covers, at a minimum, White Buffalo's claims for reimbursement for costs relating to its surety and its surveying subcontractor. As shown below, the principle also applies to White Buffalo's overall profit on work performed before termination.

**a. White Buffalo's Surety**

The government erroneously denied White Buffalo recovery for costs incurred in connection with its surety, including late fees and interest paid to the surety as a result of the government's five-year delay in converting to a convenience termination and reimbursing the cost of the completion work. However, FAR 31.205-20, the FAR on which the government relies, which concerns only "[i]nterest on borrowings," does not absolve the government of its duty to reimburse White Buffalo for its surety insurance expense. The "fair compensation" to which a contractor is entitled includes reimbursement for amounts it has paid to its surety. *William Green Constr. Co. v. United States*, 477 F.2d 930, 938 (Ct. Cl. 1973) (government liable for costs incurred by surety when contractor was bound to indemnify surety); *see also William Green Constr. Co.*, 76-2 B.C.A. (CCH) ¶ 12,194 (G.S.B.C.A. 1976) (on remand, awarding specific sum to reimburse for surety costs).

White Buffalo's indemnity obligation to its surety arose as one element of White Buffalo's "purchased insurance cost." Under FAR 31.205-19(d), "[p]urchased insurance costs are allowable, subject to paragraph (e) of this subsection." Under FAR 31.205-19(e)(5), "[t]he

Government is obligated to indemnify the contractor only to the extent authorized by law, as expressly provided for in the contract. . . ." FAR 31.205-19(e)(2), "[c]osts of insurance maintained by the contractor in connection with the general conduct of its business are allowable. . . ." Nothing in FAR 31.205-20 denies authority to compensate White Buffalo fully here.[4]

By its express and unambiguous terms, FAR 31.205-20 deems to be unallowable only "[i]nterest *on borrowings* (however represented). . . ." (Emphasis added.) White Buffalo's relationship to its surety is one of insurance, not of borrowing, as it would be if the relationship were between White Buffalo and its bank. To the extent a sum paid to the surety includes an interest charge, that charge is both a cost of insurance and a liability to a third party resulting from the government contract, not interest on borrowing.

This history of the FAR makes this clear. Today's FAR 31.205-20 is derived from earlier government rules dating from the 1940s. First, on August 9, 1940, the Secretary of the Treasury published Treasury Decision 5000 relating to recoverable costs and profits under federal contracts. *Reprinted in* 2 Karen E. Manos, Government Contracting Costs & Pricing, App. A, at 471 (2004). Concerning interest, the 1940 decision declares, "Allowances for interest *on invested capital* are not allowable as costs of performing a contract or subcontract." *Id.* at 486 (emphasis added).

In April 1942, the War and Navy departments published an *Explanation of Principles for Determination of Costs Under Government Contracts* ("*The Principles*"). *Reprinted in* Manos, *supra*, App. B, at 499. In paragraph 54(a), *The Principles* declared to be an inadmissible cost

[4] Additionally, White Buffalo's liability to its surety is analogous to the liability to other third parties, such as subcontractors, for which the government must reimburse the contractor upon a convenience termination. FAR 31.205-42(b).

"[a]llowances for interest on *invested or borrowed capital*, however represented." *Id.* at 516 (emphasis added).

Section XV of the Armed Services Procurement Regulations ("ASPR"), issued on May 19, 1948, further detailed "Contract Cost Principles." *Reprinted in* Manos, *supra*, App. C, at 535. ASPR 15-305, "Examples of Items of Unallowable Costs," identified "[i]nterest on *borrowings* (however represented), bond discount and expense, and financing charges." *Id.* at 542 (emphasis added).

A revised ASPR issued in 1959 identifies under ASPR 15.205.17 that "[i]nterest on borrowings (however represented) . . . [and] costs of financing and refinancing *operations* . . . are unallowable. . . ." *Reprinted in* Manos, *supra*, App. D, at 572 (emphasis added). Allowable costs were defined in ASPR 15.205-16 to include "costs of insurance" as well as "indemnification," which includes "securing the contractor against liabilities to third persons . . . not compensated by insurance or otherwise." *Id.* at 572.

The government cannot escape liability for the excess surety costs it caused White Buffalo by its lengthy delay in converting to a convenience termination.

**b. Settlement with White Buffalo's Surveying Subcontractor**

The government refused to reimburse White Buffalo in full for its settlement with its surveying subcontractor, Landmark, applying a 25 percent percentage-of-completion estimate and refusing to reimburse White Buffalo for late fees due to Landmark resulting from the government's multiyear delay in converting to a convenience termination. White Buffalo will show that the government's percentage-of-completion figure is wrong as a matter of fact and that it is entitled to all of its costs related to its settlement with Landmark as a result of the termination. FAR 31.205-42(b).

**3. White Buffalo's Legal Fees Incurred in Connection with the Termination Settlement Proposal Are Recoverable**

While acknowledging these legal fees are in principle recoverable under FAR 31.205-45(g)(1)(e), the government also denied White Buffalo reimbursement for most of its legal fees incurred in connection with the termination settlement. The principal reason for the government's position seems to be that White Buffalo redacted its fee statements to protect privileged material. However, information reported in Stoel Rives' original billings to White Buffalo about matters other than the termination settlement is a privileged communication between counsel and client. *See Alexander v. FBI*, 194 F.R.D. 305, 312 (D. D.C. 2000) (privilege applies to billing entries). Moreover, as noted above, the Court held that with regard to records withheld in *Salt Creek*, "The court understands why plaintiff did not provide *un*redacted versions of these records to defendant." 52 Fed. Cl. at 13 (emphasis in original). Thus White Buffalo in fact followed this Court's suggestion to provide redacted records.

Without considering prevailing rates, the government also arbitrarily reduced the billing rate for White Buffalo's counsel. The CO further concluded, without any apparent expertise to do so, that certain tasks performed by White Buffalo's counsel were unnecessary. White Buffalo will show at trial that this was in error.

**4. White Buffalo Is Entitled to Recover Lost Profits on Pretermination Work**

White Buffalo's lost profits recoverable on its bad-faith claim are discussed below. However, the government not only denied White Buffalo recovery on its bad-faith claim, but rejecting the recommendation of the DCAA auditors, the government refused to award White Buffalo its pretermination costs, notwithstanding that the FARs mandate that "fair compensation" must include "a reasonable allowance for profit." FAR 49.201(a). Indeed, "[t]he

TCO *shall* allow profit on preparations made and work done by the contractor for the terminated portion of the contract. . . .” FAR 49.202(a) (emphasis added).

In deciding what profit is reasonable, cost and accounting guides “may provide guid[ance], but are not rigid measures, for ascertaining fair compensation.” FAR 49.201(c). In fact, “[t]he TCO may use any reasonable method to arrive at a fair profit.” FAR 49.202(a). More particularly, the factors to be considered include the rate of profit both expected on the particular job and expected by the contractor on other jobs. FAR 49.202(b) (listing factors). Here the auditor appropriately recommended the approach of using White Buffalo’s profit margin on other jobs and applying that to what the auditor took to be the applicable cost base. However, this approach, though better than the CO’s (bad-faith) complete denial of lost profits to White Buffalo, significantly undercompensates White Buffalo. As discussed above, the auditor and the CO excluded significant components of White Buffalo’s cost base.

The CO refused to follow DCAA’s recommendation, asserting that White Buffalo would not have made a profit on the job. The government thus forgets, however, that in determining the contract price for purposes of termination settlement, consideration must be given to unpriced changes and other modifications of the contract that enhance the price. As the ASBCA has explained:

> [I]t is not appropriate to apply the contract price limit to a termination settlement *without* giving consideration *to unpriced* changes and to other modifications . . . .
>
> The most straightforward method of determining the contract price, of course, is for the parties to negotiate an appropriate price increase or decrease for a change and amend their contract accordingly. Where this does not occur and a contractor is entitled to a price increase, however, the boards *will determine* the amount of the adjustment or ignore the limitation on recovery.

*Info. Sys. & Networks Corp*., 02-2 B.C.A. (CCH) ¶ 31,952 (A.S.B.C.A. 2002) (emphasis added); *Allfair Dev. Co.*, 05-2 B.C.A. (CCH) ¶ 32,900 (A.S.B.C.A. 2005); 2 Ralph C. Nash, Jr., & John Cibinic, Jr., Federal Procurement Law, ch. 16 § 2 at 1161 (1980).

Here the CO improperly failed to adjust the contract price for constructive changes and modifications that materially increased White Buffalo's costs and for which White Buffalo is entitled to compensation. Thus the CO found a loss where there would have been none had the contract price been adjusted as the law requires.

Moreover, the FAR loss-adjustment requirement does not apply when the government substantially contributes to the increased cost, and it is not possible to segregate that loss from contractor-caused losses. *M.E. Brown*, 91-1 B.C.A. (CCH) ¶ 23,293 (A.S.B.C.A. 1990). Here White Buffalo will show at trial that the government substantially contributed to White Buffalo's increased costs. White Buffalo is entitled to profits of approximately $368,000 based on the equitable adjustment to which it is entitled or, failing that, to the lost profits under the method employed by DCAA on the applicable cost base.

#### 5. White Buffalo Is Entitled to Interest Under the Prompt Payment Act and the CDA

At the time of termination, White Buffalo had not been paid for the pretermination work and, to this day, remains unpaid. Under the Prompt Payment Act, 31 U.S.C. § 3901, *et seq.*, and FAR 32.907, White Buffalo is entitled to interest and penalties under the Prompt Payment Act, in addition to its entitlement to prejudgment interest under the CDA from the date of its claim.

### B. White Buffalo's Claims in Its Second Claim for Relief Were Presented to the CO Within the Time Required by the CDA

Turning to White Buffalo's bad-faith claims, as discussed above, White Buffalo notified the government it was asserting bad faith in its March and November 2004 claims. (Scott Depo., Exs. 4, 5, Appendix at 36-42.) These claims were plainly timely for a contract terminated in

December 1998. Moreover, even if the detailed specifications of bad faith in White Buffalo's January 13, 2005 claim, repeated in its Second Claim for Relief, are at issue, they are not barred by the six-year claim requirement of the CDA, which does not begin to run until "accrual of the claim." 41 U.S.C. § 609. The government's argument to the contrary is not well-founded for a number of reasons. First, White Buffalo did not discover the pertinent facts until 2000 at the earliest. When it received documents showing the government in fact had made the design changes it had denied and had concealed them from White Buffalo (Clevenger Decl. ¶¶ 4-5 (Docket No. 122), Appendix at 189), White Buffalo could not confirm that the government was in bad faith until it revealed the Landmark survey in November 2002 (*id.* ¶¶ 6-7, Appendix at 190). Its January 2005 claim was therefore timely. Second, the claim is a continuing one that relates back to timely filed case Nos. 99-961C and 00-415C. Third, the government's conduct, in particular its concealment of the material facts, gives rise to equitable tolling, barring the government from asserting that the claim was untimely.

**1. White Buffalo Did Not Discover Its Claims Until 2000 or Later**

The critical elements of White Buffalo's bad-faith claim, for example, the design correction made for Tidewater but refused for White Buffalo, were concealed by the government and were discovered only after White Buffalo obtained discovery documents previously withheld and hired an independent surveyor to prove the changes were made. (Clevenger Decl. ¶ 6, Appendix at 190.) Until such time, White Buffalo reasonably relied on the government's repeated representations that there were no design changes and that the replacement contractor had actually performed the work for which it had been paid (work that was charged to White Buffalo). The six-year CDA clock thus did not begin to run until White Buffalo discovered that the government's misrepresentations were in fact just that. *See Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 95 (1990), *reh'g denied*, 498 U.S. 1075 (1991); *Hayes v. United States*, 73

Fed. Cl. 724, 727 (2006); *Japanese War Notes Claimants Ass'n of Phil., Inc. v. United States*, 178 Ct. Cl. 630, 373 F.2d 356, 358-59 (1967) (discovery rule and equitable tolling applies to claim against United States).

Under the discovery rule, "[t]he facts of a claim need not be actually known to the plaintiff but must be available to the plaintiff" for the claim to accrue and start the CDA clock running. *Hayes*, 73 Fed. Cl. at 727. Here, at the earliest, the clock did not begin to run until the government finally coughed up a few relevant documents in January 2000 under FOIA and later produced additional documents in discovery admitting design changes were made or, alternatively, when White Buffalo obtained its Landmark survey in 2002. Consequently, in addition to its 2004 claims, White Buffalo's January 2005 claim was also timely.

**2. White Buffalo's Claim Relates Back to Case Nos. 99-961C and 00-415C, and the Claim Is a Continuing One**

When a CDA claim arises out of "the same set of operative facts as the claim submitted to the contracting officer," it relates back to the date of the initial claim. *See Lockheed Martin Corp. v. United States*, 70 Fed. Cl. 745, 756 (2006) (and cases cited therein). "The same set of operative facts has been found where the contractor submits additional evidence pertaining to damages to support the same factual claim . . . or where the claim merely 'augments the legal theories' underlying the certified claim." *Id.* (citation omitted). As the recent case of *Bannum, Inc. v. United States*, 80 Fed. Cl. 239, 248 (2008), held:

> The claim presented to this court must be the same as that which was decided by the Contracting Officer, but the statute "does not require rigid adherence to the exact language or structure of the original administrative . . . claim [when] they arise from the same operative facts, claim essentially the same relief, and merely assert differing legal theories for that recovery." *ACE Constructors*, 499 F.3d at 1361 (quoting *Scott Timber Co. v. United States*, 333 F.3d 1358, 1365 (Fed. Cir. 2003)).

(Ellipsis in original.) Similarly, this Court has adopted the relation-back doctrine as a general rule. *E.g.*, R.C.F.C. 15(c); *Slattery v. United States*, 53 Fed. Cl. 258, 280 (2002); *Case, Inc. v. United States*, 25 Cl. Ct. 379, 383-84 (1992). Here White Buffalo's bad-faith claim arose out of the same contract, on the same project and the same continuing course of conduct by the government as was at issue in the 1999 and 2000 cases; therefore, it relates back. Moreover, the same issues that were present in the 1999 and 2000 cases, White Buffalo's entitlement to an equitable adjustment of the contract price and more time, are still at issue in White Buffalo's claim for lost profits.

The continuing-claim doctrine also applies to push out the date when the CDA clock begins to run. "In order for the continuing claim doctrine to apply, the plaintiff's claim must be inherently susceptible to being broken down into a series of independent and distinct events or wrongs, each having its own associated damages." *Brown Park Estates-Fairfield Dev. Co. v. United States*, 127 F.3d 1449, 1456 (Fed. Cir. 1997); *see also Hayes*, 73 Fed. Cl. at 729 (continuing claim involved "'recurring, individual actionable wrongs'" (citing *Brown*)). Here White Buffalo's bad-faith claim arose not from the government's improper termination for default in late 1998, but from its continuing series of concealments and actions taken for the benefit of the completion contractor, continuing through the eve-of-trial purported conversion for convenience. As cited above, the government conceded no later than January 2004 that it was aware White Buffalo was seeking lost profits.

Consequently, White Buffalo's bad-faith/lost-profits claim relates back to the 1999 and 2000 cases and was, in any event, continuing until January 2004.

**3. Equitable Tolling Applies**

Additionally, the government's concealment tolled the CDA clock under the doctrine of equitable tolling. The general doctrine of equitable tolling "is read into every federal statute of

limitation." *Holmberg v. Armbrecht*, 327 U.S. 392, 397 (1946); *accord TS Infosystems, Inc. v. United States*, 36 Fed. Cl. 570, 573 (1996) (applying equitable tolling to False Claims Act); *see also Bowden v. United States*, 106 F.3d 433, 438 (D.C. Cir. 1997) ("[C]ourts have excused parties, particularly those acting pro se, who make diligent but technically defective efforts to act within a limitations period."); *Bath Iron Works Corp. v. United States*, 20 F.3d 1567, 1572 n.2 (Fed. Cir. 1994) (tolling is not same as waiving). In particular, "the rule of equitable tolling [is] applicable to suits against the Government, in the same way that it is applicable to private suits. . . ." *Irwin*, 498 U.S. at 95. Referring to *Irwin*, a Board of Contract Appeals explained that the

> Supreme Court has stated that equitable tolling may be used in a case against the United States to extend a jurisdictional deadline in exceptional circumstances where, for example, a party actively pursued its judicial remedies but filed a defective pleading or where a party was induced or tricked by an adversary's misconduct into allowing a filing deadline to pass.

*Appeals of Schleicher Cmty. Corr. Ctr., Inc.*, No. J100C-598, 1998 WL 455631 (D.O.T.C.A.B. Aug. 6, 1998).[5]

Here the government waited until 2004, until the eve of trial, to purport to convert the default termination to convenience under the government's theory of accrual in late 1998, effectively running out most of the CDA clock. It also tried its hardest—as demonstrated by the FOIA litigation for which White Buffalo recovered its attorneys' fees—to conceal the evidence of design changes for the benefit of Tidewater and to conceal that it paid Tidewater (and charged White Buffalo) for work Tidewater did not perform. (Clevenger Decl. ¶¶ 6-7, Appendix at 190.)

[5] In *Bonneville Associates, Ltd. Partnership v. Barram*, 165 F.3d 1360 (Fed. Cir. 1999), the Federal Circuit declined to take a position on whether, as demonstrated by *Schleicher*, equitable tolling applies to CDA claim deadlines, but offered no reason it would not. Consequently, White Buffalo maintains that if squarely presented with the question, the Court would hold that it does so apply.

It also tried to conceal that it was acting in retaliation for White Buffalo's claim on the prior Forest Service project. (Munro Depo., Ex. 17, Appendix at 3.) If there was ever a case in which an "adversary's misconduct" justified the application of equitable tolling, this is the one.

**C. White Buffalo Presented Its Bad-Faith Conversion Claim to the CO**

As noted above, the government does not challenge the timeliness of White Buffalo's Third Claim for Relief, for bad-faith purported conversion, but argues that White Buffalo failed to make the claim to the CO. However, White Buffalo's March and November 2004 certified claims made clear that it was seeking lost profits for the wrongful convenience termination. (Scott Depo. at 15-16 & Exs. 4, 5, Appendix at 21-22, 36-42; 2008 Parsons Depo. at 23, 25-26, Appendix at 13-14.) And again, White Buffalo has pointed out to the government where White Buffalo also asserted in October 2006 that the January 2004 purported convenience termination was in bad faith. (Plaintiff's Response to Request for Admissions, Appendix at 154-55.) Inexcusably, the government simply ignores this and blithely assures the Court that White Buffalo has never done so. However, ignoring the claim will not make it go away.

At this point, given that the government denied White Buffalo's bad-faith claim in its entirety by the CO's August 2007 decision, two or three years after it made the claim, White Buffalo is entitled to assume that the government also denied the claim for bad-faith conversion even though the CO failed to address it. *See Tex. Health Choice, L.C. v. Office of Pers. Mgmt.*, 400 F.3d 895, 897 (Fed. Cir. 2005); *H.B. Mac, Inc. v. United States*, 153 F.3d 1338, 1342 (Fed. Cir. 1998); *Appeal of Carmona Industrias Electricas, S.A.*, 93-3 B.C.A. (CCH) ¶ 25,975 (A.S.B.C.A. 1993) (claim deemed denied by CO's long delay in deciding). Indeed, the government engineer charged with evaluating White Buffalo's claim that the conversion to a convenience termination was in bad faith admitted that he made no evaluation of the good-faith nature of conversion (Scott Depo. at 21-22, Appendix at 23-24), nor can the government point to

any such determination. As discussed above, the government has never come up with a rationale for the conversion other than an alleged "safety condition" or concurrent delay resolved years before. That even the CO in whose name the decision was issued admitted that she could not see the logic of the conversion (2008 Parsons Depo. at 18, Appendix at 11) only emphasizes that the government has no good-faith explanation. White Buffalo will have little difficulty showing the conversion was in bad faith.

White Buffalo's claim for bad-faith conversion is properly before the Court, and it is a claim on which White Buffalo will prevail.

### D. White Buffalo Alleged and Demonstrated to the CO Facts Showing Specific Intent to Injure White Buffalo

White Buffalo has elicited copious evidence of bad faith. As the *Bannum* case relied on by the government provides, the standard for government breach of the duty of good faith and fair dealing is:

> "In a government contract, the implied covenant of good faith and fair dealing requires that the [g]overnment not use its unique position as sovereign to target the legitimate expectations of its contracting partners." *Centex*, 49 Fed. Cl. at 708 (citing *Yankee Atomic Elec. Co. v. United States*, 112 F.3d 1569, 1575 (Fed. Cir. 1997)). . . . For a plaintiff to successfully assert a claim for breach of the implied covenant of good faith and fair dealing respecting a contract with the government, he or she "must allege and prove facts constituting a specific intent to injure [the] plaintiff on the part of the government[al] official." *Pratt v. United States*, 50 Fed. Cl. 469, 479 (2001) (citing *Texas Instruments, Inc. v. United States*, 991 F.2d 760, 768 (Fed. Cir. 1993)).

80 Fed. Cl. at 246; *see also Krygoski Constr. Co. v. United States*, 94 F.3d 1537, 1541 (Fed. Cir. 1996) (government liable for lost profits if termination-for-convenience decision made in bad faith).

Unfortunately, however, the government did not evaluate White Buffalo's claim using the "ill-will or malice" standard it now advocates. Instead, the test it used was whether "the

Government basically [was] impeding or hampering the contractors' operations." (Scott Depo. at 28, Appendix at 25.) The FHA engineer evaluating White Buffalo's claim admitted that if the test was "ill-will or malice," it "potentially" might have been a good idea to ask the government personnel what their intentions were toward White Buffalo. (Scott Depo. at 63, Appendix at 34.)

However, given that Rettinger was the only witness the CO and her assistants talked to, if the government had actually employed the standard it now advocates, given the facts set forth in section II.D.3, there would have been no question of Rettinger's ill will or malice. The disparate treatment of White Buffalo and Tidewater also demonstrates an animus toward White Buffalo. White Buffalo's allegations (and showing) that Tidewater was treated more favorably is equivalent to an allegation that *White Buffalo was singled out for unfavorable treatment*—that is, that the government acted maliciously and with ill will toward White Buffalo.

White Buffalo will offer strong and voluminous evidence of government bad faith at trial.

**E. White Buffalo Is Entitled to Its Lost Profits as a Result of the Government's Bad Faith**

If White Buffalo shows that the government acted in bad faith—as it expects it will—White Buffalo is entitled to recovery for its lost profits on the contract. *Solar Turbines, Inc. v. United States*, 16 Cl. Ct. 304, 316 (1989). As with the profit on pretermination costs under White Buffalo's termination settlement proposal, the profit calculation must take into account the equitable adjustments to which White Buffalo is entitled. *Allfair Dev. Co.*, ¶ 32,990. Under this standard, White Buffalo will show that it is entitled to lost profits in the amount of approximately $558,000.

/ / / / /

/ / / / /

/ / / / /

## IV. CONCLUSION

White Buffalo will show at trial that it is entitled to the relief sought in its complaint.

DATED: June 9, 2008.

/s/ Scott J. Kaplan
Richard E. Alexander, OSB No. 69002
Scott J. Kaplan, OSB No. 913350
Attorneys of Record for
White Buffalo Construction, Inc.
Stoel Rives LLP
900 SW Fifth Avenue, Suite 2600
Portland, OR 97204-1268
Telephone: (503) 224-3380
Facsimile: (503) 294-9167