IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WHITE BUFFALO CONSTRUCTION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 99-961C |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEPOSITION OF CURTIS SCOTT

Taken in behalf of the Plaintiff

April 25, 2008

* * *

App. 018



Electronically signed by Tamara Pearce (401-085-214-2770) a670d356-14af-42fd-b9a4-7941324c43e9

BE IT REMEMBERED THAT, pursuant to Federal Rules of Civil Procedure, the deposition of CURTIS SCOTT was taken before Tamara Aufdermauer Pearce, OCSR No. 90-0199 and WCCR No. 2141, on Friday, April 25, 2008, commencing at the hour of 11:10 a.m., the proceedings being reported at Department of Transportation, 610 East Fifth Avenue, Vancouver, Washington.

* * *

APPEARANCES

APPEARING FOR PLAINTIFF:

STOEL RIVES
By Scott Kaplan
900 S.W. Fifth Avenue, Suite 2600
Portland, Oregon 97204
503.224.3380

APPEARING FOR DEFENDANT:

UNITED STATES DEPARTMENT OF JUSTICE - CIVIL DIVISION
COMMERCIAL LITIGATION BRANCH
By Timothy McIlmail
1100 L. Street, NW
Washington, DC 20530
202.616.0342
and
US DOT FEDERAL HIGHWAY ADMINISTRATION
By Rayann Scott
610 East 5th Street
Vancouver, Washington 98660
360.619.7529

App. 019

ALSO PRESENT: Luther Clevenger

* * *

to this particular instance, probably five or six.
Q. Can you give me an estimate about how long, total, those five or six conversations were?
A. Generally five minutes apiece, five, maybe 10 minutes.
Q. Did you talk to anyone other than Mr. Rettinger who had been involved in the project back in '98 or '99?
A. I don't believe so.
Q. For example, did you talk to Mr. Aftab?
A. No, I did not.
Q. Did you talk to Mr. Parsons?
A. No, I did not.
Q. Are you aware that White Buffalo was originally terminated for default and in 2004 the Government changed that to termination for convenience?
A. I'm aware of that, yes.
Q. Did you talk to anyone who was involved in that decision to convert the default termination to convenience?
A. No, not -- I guess I'm unsure as far as to what extent. I mean idle passing or discussions with Tim, our counsel.
Q. Tim Binder?
A. Yes, Tim Binder.

App. 020


Electronically signed by Tamara Pearce (401-085-214-2770) a670d356-14af-42fd-b9a4-7941324c43e9

Q. Do you recall whether there were discusses with Tim Binder on that subject?
A. I believe so. They would have been very casual conversations.
Q. Did you ever ask anyone why the default termination had been converted to convenience?
A. No.
Q. Did anyone ever tell you why?
A. No.
MR. McILMAIL: Exclude --
BY MR. KAPLAN: (Continuing)
Q. Did anyone ever tell you who made the decision to convert the default termination to convenience?
A. No.
Q. In the course of helping Ms. Firestone, did you draft any language for her to use in her decision?
A. Yes.
Q. That would have been in the bad faith portion of the claim?
A. Yes.

App. 021

Q. And did you save any of those drafts?
A. Yes.
Q. Okay. Do you know if those were provided to counsel for production to White Buffalo?
A. They were provided to counsel.

Q. And in what form are those drafts? Was it hard copy or electronic form or both?

A. Both.

Q. The documents in electronic form, were they in emails?

A. Yes, or attachments to emails in Word format.

Q. And when you provided those drafts to Ms. Firestone, did you always copy Mr. Binder with them?

A. Not every time. Typically.

Q. Now, do you know if Mr. Binder rewrote any of the language that you suggested?

A. Possibly, yes. Yeah, portions of it were rewritten.

Q. Did Mr. Binder add any language that was used in the final decision?

A. I believe -- I believe language was added, words, reordering things, cleaning up the document.

Q. By Mr. Binder?

A. And Elizabeth, both.

(Exhibit No. 4, Contract DTFH70-98-C-00027, Termination for Convenience Request for Reimbursement of Surety Costs Associated with Insurance Company of the West, three pages, no Bates, marked.)

BY MR. KAPLAN: (Continuing)

App. 022

Q. Exhibit 8 is a document entitled Appendix D, and I'll represent to you, at least if our copying went correctly, Appendix D to be the Appendix D to the October 16, 2006, claim that we've marked as Exhibit 7.

Is Exhibit 8 a document that you reviewed in connection with your work on this claim?

A. Yes.

Q. And when you say that you evaluated White Buffalo's bad faith claim, it's the claim that's represented by Appendix D?

A. Correct.

Q. On the first page of Exhibit 8, which is Appendix D, there is a statement, "The limited liability of a convenience termination can, however, evaporate, exposing the Government to liability for common-law breach, including lost profits."

In the course of evaluating White Buffalo's claim, did you evaluate whether the conversion decision itself had been in good faith?

A. I don't think that was within my decision.

Q. Okay. Just so it's clear, in the course of assisting Ms. Firestone, did you evaluate whether or not the convenience termination itself was in bad faith?

A. It was Elizabeth's decision. I compiled information, but it was ultimately her decisions.

Q. Well, let's go back.
Was the decision to convert for convenience made in 2004?
A. I believe so -- I believe that's correct.
Q. That wasn't made by Ms. Firestone, was it?
MR. McILMAIL: Objection, leading.
A. I don't know who made the decision to convert.
BY MR. KAPLAN: (Continuing)
Q. Okay. In the course of your work with Ms. Firestone, did you ever examine whether that decision back in 2004 had been made in bad faith?
A. I guess as it relates to the questions posed in the information provided, or the -- in this Appendix D, because there were parts of it that get back to the termination.
Q. For default?
A. Yes.
Q. Okay. But then the conversion from default to convenience, did you evaluate whether that had been made in bad faith?
A. No.
Q. And, in your view, that would have been for someone else to decide. Is that fair?
MR. McILMAIL: Objection leading.
A. Yes.

App. 024

A. Correct.
Q. And did you assist Ms. Firestone in making those decisions?
A. I provided the factual basis to help aid in the decision making.
Q. Right. And, then, was the meaning of bad faith that you used in helping her with that decision making "impeding or hampering the contractor's operations"?
A. I didn't make the decisions inside the document, so -- but that was what I was looking for when I was trying to ascertain which facts and so forth.
Q. When you say you didn't make the decisions, was that because Ms. Firestone was the final decision maker?
A. Correct.
Q. Did you provide recommendations to her about whether you thought certain actions were or were not in bad faith?
A. Yes. As far as my opinion, yes.
Q. Let's take a look at Exhibit 2, previously marked. We've referred to the August 2007 Contracting Officer's Decision, but take a look at it and let know if that's a copy of that decision.
A. Yes, it is.
Q. All right. The first part of it entitled

App. 025


Electronically signed by Tamara Pearce (401-085-214-2770) a670d356-14af-42fd-b9a4-7941324c43e9

it?

MR. McILMAIL: Objection, leading, argumentive.

A. Depending on the work that would -- that was being done, I think it -- I think we'd have to look at all the facts surrounding everything that was going on at that time to see if there was any impact.

BY MR. KAPLAN: (Continuing)

Q. It was true, as you say on page 21, the contract did not restrict work at MP 46.2 during the dates August 6th and September 15th, 1998?

MR. McILMAIL: Objection, leading.

A. Could you repeat the question.

MR. KAPLAN: It might be easier for you to read it.

(The reporter read back as follows:

It was true, as you say on page 21, the contract did not restrict work at MP 46.2 during the dates August 6th and September 15th, 1998?)

A. That's -- that's what it says here.

BY MR. KAPLAN: (Continuing)

Q. That was your conclusion?

A. Yes.

App. 026

Q. We may have cleared this up before, but just

that conversation.

Q. And that conversation we're discussing is the conversation in the first paragraph of the letter?

A. No.

Q. Okay. What conversation were you referencing?

A. It was in regards to the "vindictively volunteer to be the project engineer on any construction project with a specific contractor."

Q. Okay. And that's the second paragraph?

A. Yes, the second paragraph.

Q. Did you ask Mr. Rettinger whether he recalled the conversation discussed in the first paragraph of Mr. Barber's letter?

App. 027

A. I did not.

Q. The CO's decision on page 25 goes on to state, "Further, Mr. Rettinger did not know about the litigation between WBC and U.S. Forest Service until after the termination of the contract with WBC."

Where did that information come from?

A. In the discussion that I had with him about that question, I asked if he knew anything, also about the -- that -- yeah, I believe in this, the same conversation, I just -- I asked him what -- what he remembered from that, and he -- he said that he did not.

Q. Do you recall what the specific question was

A. The question.
Q. Okay.
A. Sorry.
Q. When you read through Mr. Barber's letter, did you come to an understanding about why he believed that he had been removed from the project?
A. He -- he provides a lot of information in that letter as far as his position, yes.
Q. Right. And was it your understanding, based on reviewing the letter, that he believed he was removed because of his communications with White Buffalo?
A. Yes.
Q. And when you state that his comments -- "you" being the team of you, Ms. Firestone, and Mr. Binder, state his comments are directed towards his own loss of position, is that what caused you to lack confidence in his statement?
A. I think -- I think that, combined with the testimony from -- or the deposition information.
Q. The deposition of?
A. I believe Sajid and Paul's depositions, and I can't -- I don't recall exactly. I tried to review as much of that information as possible.
Q. Is it fair to say that if, on review of the record, Mr. Barber and Mr. Rettinger differed on a point,

App. 028


Electronically signed by Tamara Pearce (401-085-214-2770) a670d356-14af-42fd-b9a4-7941324c43e9

you went with Mr. Rettinger's view of things?

MR. McILMAIL: Objection, leading.

A. We tried to look at it as openly as possible in what was supported by the record or in those discussions. I don't -- I guess I don't know -- I mean in this instance, my -- my comfort level, I would say, yes, did fall to Paul's position.

BY MR. KAPLAN: (Continuing)

Q. Turn to page 29, please, under Miscellaneous Issues, to subsection 2(a), Environmental Restriction Error by Paul Rettinger. There's a statement, "I do not find that the alleged error by Mr. Rettinger in the single phone call as to what work could be done by September 15 rises to the level of bad faith."

Did you assist in drafting that finding?

A. I assisted. I don't recall how much of what I initially had -- I get pretty wordy, so someone cleaned up some of it.

Q. Did you feel that what page 27 refers to as the error rose to the level of bad faith?

A. I did not.

Q. Why not?

App. 029

A. Because at that point, the contractor couldn't have started before September 15th because of their own failure to provide the other information, so we didn't

analysis. I would have to read through the analysis again to figure it out. There was more to it than just whether our -- or whether we made that comment, yet they were able to get one, get a permit extension.

BY MR. KAPLAN: (Continuing)

Q. Was that part of the analysis?

A. Yeah, it's all detailed in the analysis.

Q. On page 51, there is a finding that at about "2:30 p.m., Mr. Clevenger and Ms. Clevenger met with Mr. Parsons and stated that Mr. Rettinger was a problem and that Government employees are 'afraid of Paul.'"

Do you recall who wrote that section?

A. I believe it was -- I don't recall.

Q. You did determine that this conversation in fact occurred, correct?

A. I don't recall. I -- it's in here from -- and I don't recall whether it was either a letter or notes from somebody's meeting or the deposition from somebody, so if it's in here, hopefully it's accurate.

Q. You wouldn't have put it in here if you didn't think it was accurate, right?

A. Correct.

App. 030

Q. Turn to page 53, please. The last full paragraph begins, "On October 28th, 1998." And is this paragraph summarizing Mr. Rettinger's letter that we went

stating, "I have found no evidence that Mr. Parsons, on this date, was even contemplating terminating the contract."

What date's being referred to in that sentence?

A. The date of the phone call.

Q. November 2nd?

A. I don't recall exactly which date.

Q. That's being referenced in that sentence?

A. Yeah.

Q. Okay. It's true, is it not, that as of no later than October 28th, Mr. Rettinger was contemplating termination of White Buffalo?

MR. McILMAIL: Objection, leading.

A. Paul's opinion was that -- that their actions, I would say, warranted termination for default, but he -- he's not the deciding faction.

App. 031

BY MR. KAPLAN: (Continuing)

Q. Did you make any findings whether, as of November 2nd, Mr. Rettinger's opinion had been communicated to Mr. Parsons?

A. I did not find anything to purport that.

Q. And when I say "you" -- well, the sentence, "I have found no evidence that Mr. Parsons, on this date, was even contemplating terminating the contract," who was the



Electronically signed by Tamara Pearce (401-085-214-2770) a670d356-14af-42fd-b9a4-7941324c43e9

material above the rock cut.

Q. Was that what we talked about this morning in Mr. Rettinger's deposition as the overhang?

A. I think they're two separate things. I think there was a rock outcrop, the safety area, but then there was material above the rock cut that -- I believe it's two separate things.

Q. Then you state, "The Government believed that the situation could be dealt with at a later time."

Did the Government form that belief, in your understanding, before or after White Buffalo's termination?

A. I don't -- I don't know when they formed that, but I believe it was at the point that it was happening, while they were performing the contract.

Q. And at that point, while White Buffalo was doing the work, in your understanding, the Government decided it was going to have another contractor deal with it later?

MR. McILMAIL: Objection, leading.

A. I would have to go back and look at all the facts. I believe so.

BY MR. KAPLAN: (Continuing)

App. 032

Q. On page 73, and under decision Subpart 5, there is a statement, "The overburden issue arose with significance in this contract only after WBC's dismal

A. It was joint between Tim, Elizabeth, and I.

Q. All right. And in order for that to be a true statement, it would have to be the Government and not White Buffalo paying for the additional and unnecessary work, correct?

MR. McILMAIL: Objection, leading.

A. And I guess it was my understanding that we -- under the termination for convenience, we were going to be paying for all those costs.

BY MR. KAPLAN: (Continuing)

Q. For the costs incurred by the completion contractor?

A. Yes.

Q. And did you evaluate whether the additional and unnecessary cost potentially charged to White Buffalo demonstrated ill will or malice towards White Buffalo at the time that they were charged?

A. I don't remember doing such a thing.

Q. And, if you did, it would be in this decision?

A. Yeah.

Q. And do you discuss anywhere in your decision whether Government personnel acted because of ill will or malice towards White Buffalo?

App. 033

A. Could you be more specific, or exact --

Q. Well, in your review of the case law, did you

come across the term of, anything to the effect that bad faith requires ill will or malice on behalf of the Government?

A. There may have been some of that discussion in the case laws that I had read. I don't recall exactly.

Q. It's fair to say that you didn't use the ill will or malice standard in evaluating White Buffalo's claims?

MR. McILMAIL: Objection, leading.

A. I don't remember, because I wasn't -- ultimately wasn't the decision maker, so I provided mostly the facts and help with the analysis. I mean the ultimate decision came down to Elizabeth.

Q. And should we look in the decision, then, to determine whether the Government did any analysis of whether its personnel acted with ill will or malice towards White Buffalo?

A. I would -- I believe so.

App. 034

Q. Now, in order to evaluate whether people acted in ill will -- or with ill will or malice, do you think it would be a good idea to ask them what their intentions were?

A. To the extent that it isn't covered in either depositions or -- or the record itself, potentially.

Q. Beginning on page 109, there is a loss --



Electronically signed by Tamara Pearce (401-085-214-2770) a670d356-14af-42fd-b9a4-7941324c43e9

CERTIFICATE

I, Tamara Aufdermauer Pearce, CSR No. 90-0199, do hereby certify that CURTIS SCOTT personally appeared before me at the time and place mentioned in the caption herein; that the witness was by me first duly sworn on oath and examined upon oral interrogatories propounded by counsel; that said examination, together with the testimony of said witness, was taken down by me in stenotype and thereafter reduced to typewriting; and that the foregoing transcript, pages 1 to 73, both inclusive, constitutes a full, true and accurate record of said examination of and testimony given by said witness, and of all other proceedings had during the taking of said deposition and of the whole thereof, to the best of my ability.

Witness my hand at Portland, Oregon, this 1st day of May, 2008.

Tamara A Pearce

TAMARA AUFDERMAUER PEARCE
OCSR No. 90-0199

AUTHENTIC COPY
The original certified E-Transcript file was electronically signed using RealLegal technology.

App. 035