# CONTRACT # DTFH70-98-C-00027

## TERMINATION FOR CONVENIENCE

## FORM 1436 SETTLEMENT PROPOSAL (TOTAL COST METHOD)

## REQUEST FOR COSTS TO COMPLETE SETTLEMENT PROPOSAL

## REQUEST FOR PROFIT
## AND
## JUSTIFICATION FOR PROFIT

*Submitted By:*

White Buffalo Construction Inc.
P. O. Box 1310
Aumsville, OR 97325
503.749.1861

App. 043

EXHIBIT: 6
WIT: Scott
Bridge City Legal

WHITE BUFFALO CONSTRUCTION INC.
P.O. BOX 1310
6653 SHAW HWY S.E.
AUMSVILLE, OR 97325
ph# 503-749-1861
fax# 503-749-1684

January 13, 2005

Mr. William Parsons
Terminating Contracting Officer
Western Federal Lands Highway Division
Federal Highway Administration, USDOT
610 East Fifth Street
Vancouver, WA 98661-3801

re: DTFH70-98-C-00027. Termination for Convenience. Settlement Proposal.

Enclosed please find the following:

1. Contractor's request for profit in the amount of $925,834.91 .(Appendix B)
2. Contractor's justification for profit. (Appendix B)
3. Contractor's Form 1436 (Total Cost Basis) including an attached Subcontractor Statement and a Form 1436 (Total Cost Basis) for Subcontractor McBride Construction Inc.
4. Contractor's request for reimbursement of costs associated with the preparation of its Settlement Proposal in the amount of $41,793.21. (Appendix A)
5. An additional copy of our submission dated November 2, 2004 volumes 1 & 2 for direct job costs in the amount of $365,788.41 which was previously delivered to you and which is included in this Settlement Proposal.
6. An additional copy of our submission dated March 19, 2004 for surety costs in the amount of $276,768.29 which was previously transmitted to you and which is included in this Settlement Proposal.

Our request for reimbursement of costs associated with the preparation of our Settlement Proposal (see #4 above) does not include costs that we will incur in negotiating this settlement. It also does not include costs which have been incurred but may not yet have been invoiced.

App. 044

If you have any questions please contact me and I will be happy to assist you.

Sincerely,

Luther L. Clevenger
President

*enclosures: appendices A and B, form 1436 (WBC) including Subcontractor Statement, form 1436 (McBride), Nov 2, 2004 submission and March 19, 2004.*

# SETTLEMENT PROPOSAL (TOTAL COST BASIS)

OMB No.: 9000-0012
Expires: 05/31/98

...lic reporting burden for this collection of information is estimated to average 2.5 hours per response, including the time for reviewing instructions, searching existing data ..., gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other ... of this collection of information, including suggestions for reducing this burden, to the FAR Secretariat (MVR), Federal Acquisition Policy Division, GSA, Washington, ...0405.

## FOR USE BY A FIXED-PRICE PRIME CONTRACTOR OR FIXED-PRICE SUBCONTRACTOR

THIS PROPOSAL APPLIES TO *(Check one)*
[X] A PRIME CONTRACT WITH THE GOVERNMENT
[ ] SUBCONTRACT OR PURCHASE ORDER

SUBCONTRACT OR PURCHASE ORDER NO(S).

COMPANY: WHITE BUFFALO CONSTRUCTION INC.

STREET ADDRESS: 6653 Shaw Hwy S.E.

CITY AND STATE *(Include ZIP Code)*: Aumsville, OR. 97325

### CONTRACTOR WHO SENT NOTICE OF TERMINATION

NAME

ADDRESS *(Include ZIP Code)*

NAME OF GOVERNMENT AGENCY: FHWA/WFLD VANCOUVER, WA.

GOVERNMENT PRIME CONTRACT NO.: DTFH 70-98-C-00027

CONTRACTOR'S REFERENCE NO.

If moneys payable under the contract have been assigned, give the following:

NAME OF ASSIGNEE

EFFECTIVE DATE OF TERMINATION: 12-1-1998

ADDRESS *(Include ZIP Code)*

PROPOSAL NO.

CHECK ONE: [ ] INTERIM [ ] FINAL

SF 1439, SCHEDULE OF ACCOUNTING INFORMATION [X] IS [ ] IS NOT ATTACHED *(If not, explain below)*

## SECTION I - STATUS OF CONTRACT OR ORDER AT EFFECTIVE DATE OF TERMINATION

| PRODUCTS COVERED BY TERMINATED CONTRACT OR PURCHASE ORDER (a) | | FINISHED: PREVIOUSLY SHIPPED AND INVOICED (b) | FINISHED: ON HAND: PAYMENT TO BE RECEIVED THROUGH INVOICING (c) | FINISHED: ON HAND: PAYMENT NOT TO BE RECEIVED THROUGH INVOICING (d) | UNFINISHED OR NOT COMMENCED: SUBSEQUENTLY COMPLETED AND INVOICED* (e) | UNFINISHED OR NOT COMMENCED: NOT TO BE COMPLETED (f) | TOTAL COVERED BY CONTRACT OR ORDER |
|---|---|---|---|---|---|---|---|
| | QUANTITY | | | | | | |
| | $ | | | | | | |
| | QUANTITY | | | | | | |
| | $ | | | | | | |
| | QUANTITY | | | | | | |
| | $ | | | | | | |

## SECTION II - PROPOSED SETTLEMENT

| NO. | ITEM (a) | TOTAL PREVIOUSLY PROPOSED (b) | INCREASE OR DECREASE BY THIS PROPOSAL (c) | TOTAL PROPOSED TO DATE (d) | FOR USE OF CONTRACTING AGENCY ONLY (e) |
|---|---|---|---|---|---|
| | | (Use Columns (b) and (c) only where previous proposal has been filed) | | | |
| 1 | ~~DIRECT MATERIAL~~ JOB COSTS | | | 128,342.91 | |
| 2 | DIRECT LABOR | | | 167,761.28 | |
| 3 | INDIRECT FACTORY EXPENSE *(from Schedule A)* | | | | |
| 4 | SPECIAL TOOLING AND SPECIAL TEST EQUIPMENT *(SF 1432)* | | | | |
| 5 | OTHER COSTS *(from Schedule B)* EQUIP/SURETY | | | 395,598.05 | |
| 6 | GENERAL AND ADMINISTRATIVE EXPENSES *(from Schedule C)* | | | 47,375.79 | |
| 7 | TOTAL COSTS *(Items 1 thru 6)* | | | 739,078.03 | |
| 8 | PROFIT *(Explain in Schedule D)* | | | 925,834.91 | |
| 9 | TOTAL *(Items 7 and 8)* | | | 1,664,912.94 | |
| 10 | DEDUCT FINISHED PRODUCT INVOICED OR TO BE INVOICED* | | | | |
| 11 | TOTAL *(Item 9 less Item 10)* | | | 1,664,912.94 | |
| 12 | SETTLEMENT EXPENSES *(from Schedule E)* | | | 41,793.21 | |
| 13 | TOTAL *(Items 11 and 12)* | | | 1,706,706.15 | |
| 14 | SETTLEMENTS WITH SUBCONTRACTORS *(from Schedule F)* | | | 105,795.67 | |
| 15 | GROSS PROPOSED SETTLEMENT *(Items 13 thru 14)* | | | 1,812,501.82 | |
| 16 | DISPOSAL AND OTHER CREDITS *(from Schedule G)* | | | | |
| 17 | NET PROPOSED SETTLEMENT *(Item 15 less 16)* | | | 1,812,501.82 | |
| 18 | ADVANCE, PROGRESS & PARTIAL PAYMENTS *(from Schedule H)* | | | 376,768.29 | |
| 19 | NET PAYMENT REQUESTED *(Item 17 less 18)* | | | 1,435,733.53 | |

App. 046

*... Section I, should only be used in the event of a partial termination, in which the total cost reported in Section II should be accumulated to date of completion of the continued portion of the contract and the deduction for finished product (Item 10, Section II) should be the contract price of finished product in Column (b), (c), and (e), Section I.

NOTE: File inventory schedules (SF 1426, 1428, 1430, and 1432) for allocable inventories on hand at date of termination. (See 49.206).

(When the space provided for any information is insufficient, continue on a separate sheet.)

AUTHORIZED FOR LOCAL REPRODUCTION

STANDARD FORM 1436 (REV. 9-97)

SCHEDULE A - INDIRECT FACTORY EXPENSE *(Item 3)*

| DETAIL OF EXPENSES | METHOD OF ALLOCATION | AMOUNT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

NOTE: Individual items of small amounts may be grouped into a single entry in Schedules B, C, D, E, and G.

SCHEDULE B - OTHER COSTS *(Item 5)*

| ITEM | EXPLANATION | AMOUNT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|---|
| Surety Expense | See 3-19-04 Submission | 276,768.39 | |
| Apportionment of Equipment & vehicle ownship costs | see 11-2-04 Submission | 34,206.52 | |
| OTHER EQUIPment & vehicle costs | see 11-2-04 Submission | 84,623.24 | |
| | | | |

SCHEDULE C - GENERAL AND ADMINISTRATIVE EXPENSES *(Item 6)*

| DETAIL OF EXPENSES | METHOD OF ALLOCATION | AMOUNT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|---|
| G & A expense | see 11-2-04 Submission | 47,375.79 | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

SCHEDULE D - PROFIT *(Item 8)*

| EXPLANATION | AMOUNT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|
| Profit - please see 1-13-05 Submission (Attached) | 925,834.91 | |
| | | |
| | | |
| | | |
| | | |

App. 047

(Where the space provided for any information is insufficient, continue on a separate sheet.)

SCHEDULE E - SETTLEMENT EXPENSES *(Item 12)*

| ITEM | EXPLANATION | AMOUNT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|---|
| Costs to produce | | 41,793.21 | |
| Settlement proposal | see 1-13-05 submission Attached | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

SCHEDULE F - SETTLEMENTS WITH IMMEDIATE SUBCONTRACTORS AND SUPPLIERS *(Item 14)*

| NAME AND ADDRESS OF SUBCONTRACTOR | BRIEF DESCRIPTION OF PRODUCT CANCELED | AMOUNT OF SETTLEMENT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|---|
| McBride Construction<br>19515 Baker Road<br>Bend, OR. 97702 | Blasting<br>*includes interest claim<br>see 11-2-04 submission | 105,795.67 | |
| | | | |
| | | | |
| | | | |
| | | | |

SCHEDULE G - DISPOSAL AND OTHER CREDITS *(Item 16)*

| DESCRIPTION | AMOUNT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

App. 048

(If practicable, show separately amount of disposal credits applicable to acceptable finished product included on SF 1428.)

(Where the space provided for any information is insufficient, continue on a separate sheet.)

SCHEDULE H - ADVANCE, PROGRESS AND PARTIAL PAYMENTS *(Item 19)*

| DATE | TYPE OF PAYMENT | AMOUNT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|---|
| 1-29-04 | Withheld Liquidated Damages | 400,000.00 | |
| 4-30-04 | Surety Costs | 276,768.23 | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

(Where the space provided for any information is insufficient, continue on a separate sheet.)

CERTIFICATE

**App. 049**

his is to certify that the undersigned, individually, and as an authorized representative of the Contractor, has examined this ermination settlement proposal and that, to the best knowledge and belief of the undersigned:

(a) AS TO THE CONTRACTOR'S OWN CHARGES. The proposed settlement (exclusive of charges set forth in Item 14) and upporting schedules and explanations have been prepared from the books of account and records of the Contractor in accordance ith recognized commercial accounting practices; they include only those charges allocable to the terminated portion of this contract; ey have been prepared with knowledge that they will, or may, be used directly or indirectly as the basis of settlement of a rmination settlement proposal or claim against an agency of the United States; and the charges as stated are fair and reasonable.

(b) AS TO THE SUBCONTRACTORS' CHARGES. (1) The Contractor has examined, or caused to be examined, to an extent it nsidered adequate in the circumstances, the termination settlement proposals of its immediate subcontractors (exclusive of oposals filed against these immediate subcontractors by their subcontractors); (2) The settlements on account of immediate bcontractors own charges are fair and reasonable, the charges are allocable to the terminated portion of this contract, and the ttlements were negotiated in good faith and are not more favorable to its immediate subcontractors than those that the Contractor ould make if reimbursement by the Government were not involved; (3) The Contractor has received from all its immediate bcontractors appropriate certificates with respect to their termination settlement proposals, which certificates are substantially in e form of this certificate; and (4) The Contractor has no information leading it to doubt (i) the reasonableness of the settlements ith more remote subcontractors or (ii) that the charges for them are allocable to this contract. Upon receipt by the Contractor of iounts covering settlements with its immediate subcontractors, the Contractor will pay or credit them promptly with the amounts so ceived, to the extent that it has not previously done so. The term "subcontractors," as used above, includes suppliers. See ttached Subcontractor Statement.

)TE: The Contractor shall, under conditions stated in FAR 15.403, be required to submit a Certificate of Current Cost or Pricing ita (see FAR 15.406-2 and 15.408 Table 15-2).

| ME OF CONTRACTOR | BY *(Signature of authorized official)* | |
|---|---|---|
| White Buffalo Construction Inc. | [signature] | |
| | TITLE: President | DATE: 1-13-2005 |
| ME OF SUPERVISORY ACCOUNTING OFFICIAL: Julie A. Clevenger | TITLE: Secretary | |

Attachment to Total Cost Settlement Proposal Form

SUBCONTRACTOR STATEMENT.

1. Subcontractor McBride Construction (hereinafter McBride) performed blasting on this project.
2. I believe that I have an obligation to McBride to pass through to FHWA all claims of McBride.
3. Attached is the signed Standard Form 1436 of McBride.
4. I have discussed the claim several times with a representative of McBride.
5. Based on the information available, I cannot determine with any certainty whether and to what extent McBride is entitled to payment.

# SETTLEMENT PROPOSAL (TOTAL COST BASIS)

OMB No.: 9000-0012
Expires: 05/31/98

Public reporting burden for this collection of information is estimated to average 2.5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the FAR Secretariat (MVR), Federal Acquisition Policy Division, GSA, Washington, DC 20405.

## FOR USE BY A FIXED-PRICE PRIME CONTRACTOR OR FIXED-PRICE SUBCONTRACTOR

THIS PROPOSAL APPLIES TO *(Check one)*
☐ A PRIME CONTRACT WITH THE GOVERNMENT
☒ SUBCONTRACT OR PURCHASE ORDER

SUBCONTRACT OR PURCHASE ORDER NO(S).

COMPANY: McBrides Construction Inc

STREET ADDRESS: 19545 [illegible] Rd

CITY AND STATE *(Include ZIP Code)*: Bend OR 97702

CONTRACTOR WHO SENT NOTICE OF TERMINATION

NAME: White Buffalo Construction

ADDRESS *(Include ZIP Code)*: P.O. Box [illegible] 10 Aumsville, OR 97325

NAME OF GOVERNMENT AGENCY: Federal Highway

GOVERNMENT PRIME CONTRACT NO.

CONTRACTOR'S REFERENCE NO.

If moneys payable under the contract have been assigned, give the following:

NAME OF ASSIGNEE

ADDRESS *(Include ZIP Code)*

EFFECTIVE DATE OF TERMINATION

PROPOSAL NO.

CHECK ONE: ☐ INTERIM ☐ FINAL

SF 1439, SCHEDULE OF ACCOUNTING INFORMATION ☐ IS ☐ IS NOT ATTACHED *(If not, explain below)*

## SECTION I - STATUS OF CONTRACT OR ORDER AT EFFECTIVE DATE OF TERMINATION

| PRODUCTS COVERED BY TERMINATED CONTRACT OR PURCHASE ORDER (a) | | FINISHED: PREVIOUSLY SHIPPED AND INVOICED (b) | FINISHED: ON HAND: PAYMENT TO BE RECEIVED THROUGH INVOICING (c) | FINISHED: ON HAND: PAYMENT NOT TO BE RECEIVED THROUGH INVOICING (d) | UNFINISHED OR NOT COMMENCED: SUBSEQUENTLY COMPLETED AND INVOICED* (e) | UNFINISHED OR NOT COMMENCED: NOT TO BE COMPLETED (f) | TOTAL COVERED BY CONTRACT OR ORDER |
|---|---|---|---|---|---|---|---|
| Invoices 98058A, 98058B | QUANTITY | | | | | | |
| 98058C, 98058D | $ | 39645.44 | | | | | |
| w/Billed: week 11/A/98 | QUANTITY | | | | | | |
| | $ | 315.99 | | | | | |
| [illegible] Interest (to [illegible]) | QUANTITY | | | | | | |
| | $ | 66218.23 | | | | | |

## SECTION II - PROPOSED SETTLEMENT

| NO. | ITEM (a) | TOTAL PREVIOUSLY PROPOSED (b) | INCREASE OR DECREASE BY THIS PROPOSAL (c) | TOTAL PROPOSED TO DATE (d) | FOR USE OF CONTRACTING AGENCY ONLY (g) |
|---|---|---|---|---|---|
| | | (Use Columns (b) and (c) only where previous proposal has been filed) | | | |
| 1 | DIRECT MATERIAL | | | | |
| 2 | DIRECT LABOR | | | | |
| 3 | INDIRECT FACTORY EXPENSE *(from Schedule A)* | | | | |
| 4 | SPECIAL TOOLING AND SPECIAL TEST EQUIPMENT *(SF 1432)* | | | | |
| 5 | OTHER COSTS *(from Schedule B)* | | | | |
| 6 | GENERAL AND ADMINISTRATIVE EXPENSES *(from Schedule C)* | | | | |
| 7 | TOTAL COSTS *(Items 1 thru 6)* | | | | |
| 8 | PROFIT *(Explain in Schedule D)* | | | | |
| 9 | TOTAL *(Items 7 and 8)* | | | | |
| 10 | DEDUCT FINISHED PRODUCT INVOICED OR TO BE INVOICED* | | | | |
| 11 | TOTAL *(Item 9 less Item 10)* | | | | |
| 12 | SETTLEMENT EXPENSES *(from Schedule E)* | | | | |
| 13 | TOTAL *(Items 11 and 12)* | | | | |
| 14 | SETTLEMENTS WITH SUBCONTRACTORS *(from Schedule F)* | | | | |
| 15 | GROSS PROPOSED SETTLEMENT *(Items 13 thru 14)* | | | | |
| 16 | DISPOSAL AND OTHER CREDITS *(from Schedule G)* | | | | |
| 17 | NET PROPOSED SETTLEMENT *(Item 15 less 16)* | | | | |
| 18 | ADVANCE, PROGRESS & PARTIAL PAYMENTS *(from Schedule H)* | | | | |
| 19 | NET PAYMENT REQUESTED *(Item 17 less 18)* | | | | |

*Column (e), Section I, should only be used in the event of a partial termination, in which the total cost reported in Section II should be accumulated to date of completion of the continued portion of the contract and the deduction for finished product (Item 10, Section II) should be the contract price of finished product in Column (b), (c), and (e), Section I.

File inventory schedules (SF 1428, 1428, 1430, and 1432) for allocable inventories on hand at date of termination. (See 49.206).

(When the space provided for any information is insufficient, continue on a separate sheet.)

## SCHEDULE A - INDIRECT FACTORY EXPENSE *(Item 3)*

| DETAIL OF EXPENSES | METHOD OF ALLOCATION | AMOUNT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

NOTE: Individual items of small amounts may be grouped into a single entry in Schedules B, C, D, E, and G.

## SCHEDULE B - OTHER COSTS *(Item 5)*

| ITEM | EXPLANATION | AMOUNT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

## SCHEDULE C - GENERAL AND ADMINISTRATIVE EXPENSES *(Item 6)*

| DETAIL OF EXPENSES | METHOD OF ALLOCATION | AMOUNT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|---|
| Document Preparation | | $373.00 [uncertain] | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

## SCHEDULE D - PROFIT *(Item 8)*

| EXPLANATION | AMOUNT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

(Where the space provided for any information is insufficient, continue on a separate sheet.)

SCHEDULE E - SETTLEMENT EXPENSES *(Item 12)*

| ITEM | EXPLANATION | AMOUNT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

SCHEDULE F - SETTLEMENTS WITH IMMEDIATE SUBCONTRACTORS AND SUPPLIERS *(Item 14)*

| NAME AND ADDRESS OF SUBCONTRACTOR | BRIEF DESCRIPTION OF PRODUCT CANCELED | AMOUNT OF SETTLEMENT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

SCHEDULE G - DISPOSAL AND OTHER CREDITS *(Item 16)*

| DESCRIPTION | AMOUNT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

(If practicable, show separately amount of disposal credits applicable to acceptable finished product included on SF 1428.)

(Where the space provided for any information is insufficient, continue on a separate sheet.)

SCHEDULE H - ADVANCE, PROGRESS AND PARTIAL PAYMENTS *(Item 19)*

| DATE | TYPE OF PAYMENT | AMOUNT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

(Where the space provided for any information is insufficient, continue on a separate sheet.)

**CERTIFICATE**

This is to certify that the undersigned, individually, and as an authorized representative of the Contractor, has examined this termination settlement proposal and that, to the best knowledge and belief of the undersigned:

(a) AS TO THE CONTRACTOR'S OWN CHARGES. The proposed settlement (exclusive of charges set forth in Item 14) and supporting schedules and explanations have been prepared from the books of account and records of the Contractor in accordance with recognized commercial accounting practices; they include only those charges allocable to the terminated portion of this contract; they have been prepared with knowledge that they will, or may, be used directly or indirectly as the basis of settlement of a termination settlement proposal or claim against an agency of the United States; and the charges as stated are fair and reasonable.

(b) AS TO THE SUBCONTRACTORS' CHARGES. (1) The Contractor has examined, or caused to be examined, to an extent it considered adequate in the circumstances, the termination settlement proposals of its immediate subcontractors (exclusive of proposals filed against these immediate subcontractors by their subcontractors); (2) The settlements on account of immediate subcontractors own charges are fair and reasonable, the charges are allocable to the terminated portion of this contract, and the settlements were negotiated in good faith and are not more favorable to its immediate subcontractors than those that the Contractor would make if reimbursement by the Government were not involved; (3) The Contractor has received from all its immediate subcontractors appropriate certificates with respect to their termination settlement proposals, which certificates are substantially in the form of this certificate; and (4) The Contractor has no information leading it to doubt (i) the reasonableness of the settlements with more remote subcontractors or (ii) that the charges for them are allocable to this contract. Upon receipt by the Contractor of amounts covering settlements with its immediate subcontractors, the Contractor will pay or credit them promptly with the amounts so received, to the extent that it has not previously done so. The term "subcontractors," as used above, includes suppliers.

NOTE: The Contractor shall, under conditions stated in FAR 15.403, be required to submit a Certificate of Current Cost or Pricing Data (see FAR 15.406-2 and 15.408 Table 15-2).

| NAME OF CONTRACTOR | BY *(Signature of authorized official)* | | |
|---|---|---|---|
| McBroos Construction Inc | [signature] | | |
| | TITLE President | DATE 1/11/05 | |
| ... OF SUPERVISORY ACCOUNTING OFFICIAL | TITLE | | |

Appendix A
Settlement Proposal Costs

| | | |
|---|---|---|
| **Legal - Stoel Rives** | | |
| 5/17/04 | 38634 | $ 255.86 |
| 5/17/04 | 38634 | $ 750.00 |
| 5/17/04 | 38634 | $4,175.00 |
| 5/17/04 | 38634 | $2,070.00 |
| 9/17/04 | 38947 | $6,566.17 |
| 9/30/04-11/30 | billed | $2,953.00 |
| **Joe Chapin** | | |
| 5/17/04 | 38632 | $ 854.00 |
| 6/16/04 | 38669 | $2,511.80 |
| 8/31/04 | 38878 | $ 653.15 |
| **Terry Kuenzi, CPA** | | |
| 5/31/04 | | $ 400.00 |
| **Landmark Surveying** | | |
| 4/30/04 | 38596 | $ 300.00 |
| **Trip to Powers jobsite w/ Joe Chapin** | | |
| Jacks Fountain 4/9/04 | | $ 23.00 |
| Fast Stop 4/9/04 | | $ 3.09 |
| Mileage, Dodge 1-ton 2004, diesel 432 miles x $ .375 per mile | | $ 162.00 |
| **Trip to Powers jobsite w/ D. Alexander** | | |
| The Fountain 4/21/04 | | $ 16.10 |
| Mileage, Dodge 1-ton 2004, diesel 432 miles x $ . 375 per mile | | $ 162.00 |
| **Trip to Bend to meet with R. McBride:** | | |
| The Riverhouse 4/3/04 | | $ 97.90 |
| The Riverhouse 4/4/04 | | $ 18.00 |
| The Pine Tavern Restaurant 4/3/04 | | $ 62.00 |
| Mileage 269 miles x $.375 | | $ 100.88 |
| **Trip to San Diego to meet with ICW:** | | |
| Comfort Inn 3/5/04 | | $109.34 |
| Alaska Airlines (coach) | | $476.40 |
| Alaska Airlines (upgrades) | | $200.00 |
| Casa de Pico | | $ 28.93 |
| Thrifty Parking (partial) | | $ 12.30 |
| National (partial) | | $ 38.47 |

| | | |
|---|---|---|
| Chevron (partial) | | $ 9.69 |
| Less cash back bonus from credit card (credit) | | -$ 34.68 |

Other mileage: Trips to FHWA, Stoel Rives, office supply store, ect.)

| | |
|---|---|
| Julie Clevenger 1,195 miles @ $.375 | $448.13 |
| Luther Clevenger 597 miles @ $.375 | $223.88 |

Outside Printing & Binding:

Photocopying

| | | |
|---|---|---|
| 3/26/04 | Office Max | $ 13.96 |
| 11/3/04 | Office Max | $ 559.10 |

Thompson-West

| | | |
|---|---|---|
| 4/30/04 | 38605 | $ 55.32 |
| 5/28/04 | 38652 | $171.50 |
| 7/29/04 | 38770 | $358.80 |
| 9/16/04 | 38929 | $171.50 |
| 10/19/04 | 39023 | $171.50 |
| 11/22/04 | 39089 | $171.50 |
| 12/12/04 | 39122 | $171.50 |

| Postage & Delivery: | Recipient | |
|---|---|---|
| 5/22/04 | Randy McBride | $ 3.95 |
| 3/27/04 | R. Alexander | $4.75 |
| 1/23/04 | Randy McBride | $ 1.65 |
| 1/20/04 | Land Mark Surveying | $3.85 |
| 3/27/04 | William Parsons | $6.30 |
| 9/4/04 | Joe Chapin | $23.38 |

Parking:

| | | |
|---|---|---|
| 5/19/04 | Portland | $1.50 |
| 5/19/04 | Portland | $1.50 |
| 5/24/04 | Portland | $1.50 |
| 3/18/04 | Smart Park | $1.90 |
| 5/18/04 | SmartPark | $6.80 |
| 5/18/04 | SmartPark | $2.85 |
| 5/17/04 | Smart Park | $6.80 |
| 5/17/04 | Smart Park | $12.00 |
| 5/20/04 | Smart Park | $3.80 |

Office Supplies:

| | | |
|---|---|---|
| 3/18/04 | Office Max | $10.67 |
| 3/25/04 | Office Max (credit) | -$ 2.69 |

| | | | |
|---|---|---|---|
| | 3/22/04 | Office Max | $41.94 |
| | 3/25/04 | Office Max (credit) | -$27.96 |
| | 1/12/05 | Office Max | $ 7.99 |
| Food: | | | |
| | 5/17/04 | Paradise Bakery | $20.75 |
| | 5/18/04 | Paradise Bakery | $28.00 |
| | 5/19/04 | Paradise Bakery | $ 8.25 |

Telephone:

$ 4.29

$ 54.29

Photocopying, in-house: ( *the rate of $.10 is the same as the rate charged by FWHA*)

| | | |
|---|---|---|
| January 15 thru February 28: 166x $.10 | | $ 16.60 |
| March 2004. (Includes Surety Costs Proposal.) 1765 pgs x $.10 | | $176.50 |
| April 2004. 157 pgs x $.10 | | $ 15.70 |
| May 2004. 721 pgs x $.10 | | $ 72.10 |
| August 2004. 993 pgs x $.10 | | $ 99.50 |
| November 2004. Direct Costs Proposal. | 205 x $.10 | $ 20.50 |
| Db sided | 660 x $.15 | $ 99.00 |

Payroll: Settlement Proposal.

Julie Clevenger:

285.75 hrs @ $16.00 plus $573.11 in payroll costs $5,145.11

Luther Clevenger:

190. 5 hrs @ $42.00 plus $834.15 in payroll costs $8,835.15

Total $41,793.21

# APPENDIX B

## TERMINATION FOR CONVENIENCE
## CONTRACT # DTFH70-98-C-00027

## REQUEST FOR PROFIT
## AND
## JUSTIFICATION FOR PROFIT
**January 13, 2005**

## REQUEST FOR PROFIT

White Buffalo Construction Inc. is requesting profit in the amount of $925,834.91. This sum is the amount that it would have made and is based on the difference between project costs and revenues on all major projects (over $50,000) commenced during the period of 1996 thru 2000. The average project profit is 47.45%.

We have calculated a total modified contract value of $1,951,180.00. Therefore, when we multiply our total contract value of $1,951,180.00 by our average project profit margin of 47.45% we obtain the sum of $925,834.91.

## JUSTIFICATION FOR REQUEST FOR PROFIT

The FHWA failed to cooperate with the Contractor by not allowing the Contractor to commence work until September 15, 1998 and by not providing the required additional contract time due to the Contractor because of the late Notice To Proceed. The FHWA erred in its belief that the Contractor could not commence work on September 1, 1998 due to environmental restrictions.

The Contract states at C-12 in section 52.211-10 that *"the completion date is based on the assumption that the successful offeror will receive the notice to proceed by September 1. The completion date will be extended by the number of calendar days after the above date that the Contractor receives*

*the notice to proceed, except to the extent that the delays in issuance of the notice to proceed results from the failure of the Contractor to execute the contract and give the required performance and payment bonds within the time specified in the offer."*

The contract was executed and the performance and payment bonds were timely tendered to the Contracting Officer (hereinafter CO). The FHWA did not issue a full NTP on September 1, 1998 and did not consider or give the Contractor the required additional time as mandated by the Contract. WBC was entitled to extensions of time that would have altered the interim completion date because of the late NTP. The FHWA erred in both the Cure Notice and the Notice of Termination for Default because the interim completion date of January 23, 1999 would have been extended because of the late NTP.

The contract contains environmental restrictions that prohibit commencement of work until September 15, 1998 for four of the ten sites on FDR 33 because clearing and grubbing was required at these sites. However, work could have started September 1, 1998 on six of the sites on FDR 33 but the FHWA did not allow this.

When he was asked why the NTP had not been issued Area Engineer Rettinger (hereinafter Rettinger) informed Project Superintendent Clevenger (hereinafter Clevenger) that there was no site where work could be performed due to contract environmental restrictions. Clevenger informed Rettinger that the contract allowed work to be performed without any restriction at MP 46.2. After Rettinger confirmed this he then informed Clevenger that he would not receive a NTP because he did not have an approved schedule. Project Engineer Aftab (hereinafter Aftab) told Clevenger to just submit another schedule and that they (the FHWA) would allow WBC to start on September 15. WBC was given a NTP dated September 15, 1998 even though WBC's schedule was still not approved.

Due to the failure of the FHWA to issue the NTP on September 1, 1998 WBC lost 25% of its work window for "wetted perimeter" work at MP 46.2. The days not utilized were dry summer days that were essential to completing the sub-grade work on FDR 33 prior to both the onset of the heavy rain season in late October and the first interim completion date of January 23,

1999. The Contractor had mobilized his equipment to FDR 33 MP 46.2 in anticipation of starting the work at that site on September 1, 1998.

The FHWA concealed from the Contractor the fact that it had discovered that the "excess" material that it had directed the Contractor to remove from MP 46.2 was actually needed at that site to complete the fill as shown in the drawings and as previously argued by the Contractor.

Rettinger informed Clevenger and Mark Heiberger (the survey subcontractor) that native material at MP 46.2 above the culvert inlet was excess material and would have to be excavated and hauled to a disposal site. WBC immediately began hauling the material to the disposal site. Eventually a Modification was agreed to adding another section of culvert at MP 46.2 under the assumption that this would allow on site use of the excess material and speed up the installation.

While this work was being performed Rettinger discovered that he was in error and that the material was actually needed at the same location at MP 46.2 for fill and that it should never have been removed. In fact, additional material would have to be hauled back to MP 46.2 to replace the material that was hauled way and to fill in the section of culvert that had been added.

When Rettinger discovered that the material being hauled away was actually needed at MP 46.2, he failed to inform WBC and he failed to correct his mistake. At the time of termination the FHWA was aware that Rettinger had mistakenly directed material to be hauled away and had entered into a Modification. The FHWA also knew that it was going to cost approximately $50,000 to correct this error but failed to take in into consideration and failed to take corrective action. The FHWA still required this needless and additional work of the Completion Contractor (hereinafter referred to as Tidewater) which was performed at WBC's expense.

The FHWA concealed from the Contractor that it had decided not to seek any extension from the permitting agencies to work in the "wetted perimeter". The FHWA deliberately misled the Contractor by informing it that the permitting agencies had refused to grant any extension. When the Contractor directly approached the permitting agencies and obtained permission from them to continue work the FHWA refused to allow the Contractor to continue

any installation and, instead, directed the Contractor to perform only winterization work and stopped all work at the culvert at MP 46.2.

WBC requested that FHWA obtain a time extension for the permits to work in water. Rettinger said it was too early and to wait until it was closer to the permit expiration date to make the request. When WBC again made the request Rettinger said that WBC had now waited too long. Rettinger's letter to WBC stated that they had consulted with the permitting agencies and an extension would not be granted. This letter was duplicitous and concealed the real truth – prior to the permit expiring FHWA had already decided not to seek any extension to the permit because they did not want WBC to continue on this project.

FHWA stopped WBC from working at the site one day before the permits actually expired thus depriving WBC of one day of time to work. At that time all culvert sections originally specified were installed and only the additional culvert section added under Modification was left uninstalled. Of course, this Modification had been based on the erroneous assumption made by Rettinger that there was an abundance of unneeded and excess material at this site which necessitated adding another culvert section in order to consume more material as fill. The additional culvert section was actually unnecessary and should have been deleted from the contract.

Clevenger decided to try to find a way to continue to work and went ahead and contacted the permitting agencies directly and easily obtained a one week extension to work. The extension was granted because the endangered salmon had not yet started their migration up the rivers. When FHWA was informed of the extension Rettinger chastised Clevenger for seeking an extension to "their" permit. After delaying for several days FHWA informed WBC that it could not perform any contract work during the permit extension and would only be allowed to "winterize" the site.

Several weeks later, on November 13, 1998, FHWA, in its Cure Notice, tasked WBC to obtain an extension to the permit to work in water even though by that time the endangered salmon were in the river and any extension was virtually unobtainable. The Cure Notice states that providing evidence that WBC can obtain a new permit which will allow "in-stream

work" after November 6, 1998 was key to WBC providing an acceptable written plan.

Prior to the permits original expiration date for sites on FDR 33 of November 1, 1998 CO Jacoby e-mailed Rettinger and said that they would not be applying for permit extension because they did not want WBC to complete the job. Also, before the permits expired another FHWA employee contacted Rettinger about obtaining an extension and was told by him in an e-mail that there he did not know why they would seek an extension of time since the Contractor (WBC) was not working and had not even started up his equipment that day. This was untrue and was a blatant fabrication.

The Contractor was highly concerned about the actions of Rettinger which appeared to be counterproductive and hindering the completion of the project. In an attempt to try to improve the situation Clevenger requested a meeting with the CO Parsons. CO Parsons informed Clevenger in this telephone call and in the meeting that he was unaware of any problems with the project and really had not heard much about it. CO Parsons stated that he would see that matters were investigated and straightened out. In fact, CO Parsons and other FHWA personnel had secretly started planning to terminate the Contractor.

The FHWA unnecessarily restricted the Contractor's operations by using the term "wetted perimeter" and defining areas within the "wetted perimeter" as any area which it arbitrarily determined could be reached by high water.

FHWA used the unusual term "wetted perimeter of any stream" to indicate areas which would be subject to the restrictions of the permit even though the permit and the permitting agencies use the term "in-water work". When asked, FHWA was unable to supply WBC with a clear definition of "wetted perimeter". However, in practice FHWA restricted the Contractor's operations in any area which it arbitrarily determined could be reached by high water. In the case of the critical repair at MP 46.2 the Contractor was prohibited after November 1, 1998 from working on installations in areas which were clearly well out of the stream including working on the fill at the top of the culvert. In fact, FHWA stopped <u>all</u> work at MP 46.2 culvert site after November 6. This stopped the Contractor from performing any more work at this location.

**App. 062**

FHWA changed the term to "in-water work" in 1999 for the completion contract. This cooperation with the Completion Contractor significantly reduced the work area subject to permit restrictions and was not a benefit available to WBC.

The FHWA refused to address the changed condition at FDR 33 MP 46.7. This failure to act resulted in WBC incurring delays and additional costs due to the unstable overburden at the rock cut at MP 46.7. Multiple failures of the overburden at this site occurred after the first shot when the changed condition was evident. This significantly impeded the course and prosecution of the work and increased the costs to WBC.

Rettinger would not allow WBC to correct the large amount of unstable overburden at the rock cut at MP 46.7 stating that another contractor would do the work later after WBC's contract was over. Rettinger was steadfast despite the protests of Clevenger, USFS Siskiyou National Forest geologist Donna Mickley and a consulting geologist named Frank Toors who was hired by WBC. Both Mickley and Toors warned FHWA that slope failure was imminent and foreseeable and would occur as soon as the rainy season started within days or possibly weeks. There was no way that WBC or any other Contractor could complete the work as designed and yet the FHWA failed to take any action. In fact, the FHWA failed to act the entire time that WBC was on the project. As soon as the seasonal rains commenced multiple large slides occurred at this site which continued throughout the Winter and early Spring.

Rettinger required WBC to continue work at the rock cut despite the deteriorating safety conditions. Material was starting to slide down from the top at intermittent intervals on a daily basis and safety spotters had to be used. Work at MP 46.7 as well as equipment and traffic on FDR 33 servicing other ERFO sites was frequently halted in order to avoid falling dirt, rocks and other debris. Clevenger informed Rettinger that the falling material was a safety hazard and was causing significant delays to the entire project. Rettinger informed Clevenger that in order to prosecute the work without being delayed by the falling material he could excavate the overburden above the rock cut and remove it at his own cost. As the slumping overburden above the rock face extended well above and outside the original clearing

limits for the ERFO repair Rettinger required WBC to have the area surveyed and to submit a plan for removal. WBC finally ceased all work at MP 46.7 and the adjacent work below because of safety concerns just prior to being terminated.

As soon as WBC was terminated FHWA had Kerr Contractors and start removal of the slide. Within a week USFS Geologist Mickley met with FHWA and determined that conditions were unsafe and ordered FHWA to cease work and to prepare a re-design for the site at MP 46.7.

FHWA personnel entered into a conspiracy and told WBC, ICW and the completion contract bidders that there would be no changes or redesigns to the contract and that the work would be completed as per the WBC Contract. FHWA position was that the problems were caused by WBC and that the Completion Contractor would propose corrections or changes but that FHWA would not be providing them. This implied that any costs to make the corrections would have to be included in the completion contractor's bids and they were so informed by WBC's surety. In fact, FHWA had already commenced work on redesigning MP 46.7 as well as several other sites. As soon as the Completion Contractor started Rettinger negotiated a modification which essentially re-designed the entire project. It also paid the Completion Contractor to correct the changed condition at MP 46.7 even though these costs had been included in the Completion Contractor's bid to WBC's surety.

Clevenger made repeated requests for the FHWA re-designs but FHWA claimed that there were none despite evidence that they existed. WBC filed a FOIA action and the redesign for MP 46.7 was eventually provided and FHWA paid WBC's legal costs. Clevenger discovered later in discovery that there were additional redesigns for several other sites that were not provided in the earlier FOIA request. The FOIA Officer, Rettinger and others at FHWA conspired to withhold these documents from WBC despite repeated requests and FHWA's own FOIA policy.

The Contractor was notified in a telephone call from CO Jacoby in November 1998 that it would be terminated on December 1, 1998. CO Jacoby had proclaimed before the permit expiration that they did not want WBC back. True to her word WBC received from CO Parsons the Notice of

Termination for Default dated December 1, 1998. CO Parsons failed to make an independent decision concerning termination.

FHWA refused to address the small slump by the front gate at MP 47.25 which occurred because of the heavy rains and the over steep design. WBC notified FHWA verbally and by a letter and Rettinger wrote back directing WBC not to repair the slump. This inaction resulted in a small slide onto FDR 33. At that time minor work was required at this site so that we could continue to have access to the project. Rettinger directed that no work was to be done on this slide and it continued to enlarge until WBC was terminated approximately 20 days later. Kerr Contractors arrived on the project and immediately after WBC was terminated and was required to start emergency work on this slide. This work was performed at substantial expense to WBC. To finally correct the problem the cut slope at MP 47.25 was eventually laid back and riprap was installed – a major redesign by FHWA.

No payments were made by FHWA to WBC prior to termination. FHWA finally made a single payment to WBC's surety. This payment was calculated for CO Parsons by Rettinger and was less than half the amount of the progress payment previously calculated by Aftab prior to WBC's termination.

Under the Completion Contract FHWA relaxed specifications for Tidewater and sought and obtained relaxed environmental restrictions from other agencies. Under the Completion Contract work previously performed by WBC which had been deemed unacceptable prior to termination was accepted by FHWA without any additional work or modification by Tidewater. FHWA also paid Tidewater for additional quantities of work at several sites that they did not perform. CO Parsons recommended to WBC's surety that Tidewater be paid for work at WBC's expense under Tidewater's contract with the surety despite the fact that FHWA had already paid Tidewater for this same work under a contract modification.

FHWA would not accept the WBC blasting plan and, instead, required WBC to follow a FHWA recommended blasting plan which required multiple shots and resulted in oversize material on the second shot at the rock face. As a result of their actions FHWA bore responsibility for the additional costs.

App. 065