# CONTRACT #DTFH70-98-C-00027

# TERMINATION FOR CONVENIENCE

# REVISED SETTLEMENT PROPOSAL

&

ATTACHMENTS #A, B, C, D, E, F

October 16, 2006

Submitted by:

White Buffalo Construction Inc.
P.O. Box 1310
6653 Shaw Hwy SE
Aumsville, OR 97325
503-749-1861

EXHIBIT: 7
WIT: Scott
Bridge City Legal

# Table of Contents


Contractor's revised settlement proposal..........page 1 - 19

List of attachments..........page 20

Prior Settlement Proposal..........Appendix A
*Surety Costs dated March 19, 2004*
*Direct Costs dated November 2, 2004*
*Settlement proposal costs and request for profit dated January 13, 2005*

DCAA Audit Report..........Appendix B

Estimate for Repairs Link Belt LS- 3400 Excavator..........Appendix C

Estimate of Value of Link Belt LS- 3400 Excavator..........Appendix C

Justification for Anticipatory Profit and a Summary of Facts Supporting Bad Faith..........Appendix D

Settlement Related Legal Invoices..........Appendix E

Estimate of Cost to Repair 1996 Dodge Pickup..........Appendix F

**WHITE BUFFALO CONSTRUCTION INC.**
P.O. Box 1310
6653 SHAW HWY S.E.
AUMSVILLE, OR. 97325
ph# 503-749-1861
fax# 503-749-1684

October 16, 2004

Ms. Elizabeth Firestone
Terminating Contracting Officer
Western Federal Lands Highway Division
Federal Highway Administration, USDOT
610 East Fifth Street
Vancouver, WA 98661-3801

RE: Termination for convenience of White Buffalo Construction Inc. FHA Powers project contract number DTFH70-98-C-00027. Revised Settlement Proposal – Request for Final Decision.

The following is White Buffalo Construction's revised settlement proposal in response to the DCAA audit report dated May 12, 2006. White Buffalo Construction (hereinafter WBC) incorporates by reference and includes as Appendix A its prior settlement proposal submissions:

1. Surety Costs dated March 19, 2004
2. Direct Costs dated November 2, 2004
3. Settlement proposal costs and request for profit dated January 13, 2005

The DCAA Audit Report dated May 12, 2006 is included as Appendix B.

The total net proposed settlement amount in the DCAA Audit Report is $896,596 before credit for $479,085 in prior payments. White Buffalo (hereinafter WBC) believes that there are settlement costs which have been excluded by the auditor and which should fairly be included in this settlement.

Please note that, at WBC's request, all questions, requests and responses during the audit process were required to be in writing. This method was followed by both parties throughout the audit process. Although the audit report includes some of the written correspondence, the auditor failed to include a number of other correspondence documents. There are arguments presented by White Buffalo that have been included in this audit report. However, some arguments have only been presented in part, while other arguments either have been completely mischaracterized in the audit report or are arguments which the auditor is aware that WBC has revised for one reason or another during the course of the process. In the spirit of settlement, WBC will not attempt in this document to correct or challenge every item in the audit record. WBC will instead

App. 068

present its revised settlement proposal and, wherever it deems necessary at this time, correct misstatements of its positions.

**Direct Labor: Payroll and Taxes**

WBC requested (exclusive of the amount requested for Luther Clevenger which has previously been withdrawn and which we will discuss below) $128,478.00. The DCAA allowed $127,463.00 in pre and post termination payroll and taxes. The difference of $1,015.00 represents the payroll costs for WBC employee Jim Heigh which were not allowed by the auditor due to the fact that he felt that this post termination labor was unnecessary and unproductive. The DCAA did not question that WBC incurred these costs. (DCAA audit report pages 5 and 6, note #2).

The auditor includes WBC's response to Issue Resolution # 2 in the audit report. WBC still believes that the nominal cost for Mr. Heigh to be present on the project site overseeing WBC owned equipment and at the WBC project office in Powers, Oregon during the post termination period was a reasonable and prudent business decision and that the cost of such services should be reimbursed under the settlement.

The auditor comments that "*WBC did not have to leave its equipment onsite nor loan it for use by other contractors, but WBC did so for its own reasons*". In fact, this action by WBC was taken for two reasons. The first reason was cost. WBC was attempting to reduce costs and mitigate damages which continues to benefit both the government and WBC to this day. The cost of another contractor supplying the equipment and trucks for what was, at that time, necessarily a cost reimbursement arrangement, would have been much greater. This is due to the fact that another contractor would not have charged actual book costs for its equipment and trucks as WBC has been required to do under the termination. Rather, the other contractor would have used much higher commercial rates for its equipment and vehicles. Also, another contractor using its own trucks and equipment would have had to charge a considerable sum for additional mobilization and demobilization costs. These additional costs were never incurred in this instance due to the fact that WBC's equipment was already onsite. WBC's action in loaning its own equipment eventually resulted in a substantial savings for the government.

The second reason was time. WBC decided to loan its equipment due to the actions of FHWA that required that Kerr Contractors be present on the project site and ready to work by the very next morning. Although WBC had known for over a week prior to December 1, 1998 that it would be terminated, it did not know that FHWA was planning to bring in Tidewater Construction[1] on a cost plus basis at WBC's expense to perform what FHWA termed winterization work. WBC objected to the use of Tidewater for this work due to the relationship that Tidewater appeared to have with Rettinger. WBC immediately had its surety propose Kerr for this work because WBC had a history of working successfully with Kerr. The use of Kerr was subject to FHWA approval. WBC had only a few hours to establish Kerr onsite after FHWA finally approved Kerr with the FHWA condition that Kerr had to be onsite and present to work the next morning. As

[1] Tidewater later became the completion contractor for this project.

App. 069

there were already multiple pieces of construction equipment and trucks already on site belonging to WBC and, as there was no time for Kerr to haul equipment to Powers and still meet the FHWA deadline, the obvious decision was for WBC to loan its equipment.

The auditor states that "*it would be unreasonable for an equipment rental company to charge a customer for constant monitoring of its rented equipment*". WBC is not an equipment rental company and it had never loaned almost its full complement of equipment to another contractor. The evening before Kerr was required by FHWA to start, and only minutes after WBC heard that FHWA had agreed that Kerr could go onsite, WBC turned over equipment costing hundreds of thousands of dollars to Kerr with only a handshake agreement between the two contractors. Time was in very short supply and there was no time for rental agreements, insurance certificates, bids or price agreements, or credit checks. It also was a reasonable business decision for WBC to dispatch an employee to assist Kerr and monitor the equipment as the project was in a remote area and Kerr was unaware of the condition of WBC's equipment and the scope of materials, fuel, parts, tools, and supplies onsite.

The termination for default did not stop WBC from incurring additional costs. Other post termination labor costs were supported by the audit. WBC believes that this cost is reimbursable under the settlement agreement and it requests reimbursement in the amount of $128,478.00 for Direct Labor: Payroll and Taxes which includes $1,015.00 it paid to its employee for work on this contract which was not supported by the DCAA audit report.[2]

The settlement proposal requested, and WBC has withdrawn, $39,283.00 for payroll and costs for work performed by Luther Clevenger in the direct labor category. However, in WBC's response to Issue Resolution #1, it is WBC's position that even though it concurs that the amounts disbursed to Luther Clevenger do not qualify as "allowable costs" under FAR 31.205-6, the government has an obligation to compensate it in some manner under this settlement for the efforts of Mr. Clevenger, "whether as payroll under a jury verdict approach or as profit".

**Other Direct Job Costs**

WBC requested $128,343.00 and the DCAA Audit Report supported $94,523.00 in other direct job costs. The total amount questioned by the auditor is $33,820.00. From the amount that the auditor questioned, WBC has withdrawn the following items and is not requesting payment in the total amount of $2,159.56.

| | | |
|---|---|---|
| Liberty Northwest Insurance | withdrawn | $ 384.45[3] |
| Liberty Northwest Insurance | withdrawn | $ 68.28 |
| Liberty Northwest Insurance | withdrawn | ($ 4.29) |

[2] DCAA audit report appendix 1, page 33, WBC response to IR #1

[3] The first four withdrawn items in this section were withdrawn by WBC and reported to the auditor prior to his review.

App. 070

| | | |
|---|---|---|
| Columbia Pacific | withdrawn | $ 100.00 |
| Landmark Surveying (math error) | withdrawn | $1,100.00 |
| OROSHA (fine) | withdrawn | $ 475.00 |
| Auditor's pre-term "low dollar items" | withdrawn | $ 36.12[4] |
| Total withdrawn items | | $2,159.56 |

WBC feels that the following items were unreasonably excluded by the auditor and should fairly be included in any settlement award:

| | | |
|---|---|---|
| Jed Peterson | Owner Operator | $1,843.25 |
| Burris Backhoe Service | Owner Operator | $5,152.50 |
| Mike McWilliam | 998 dozer rental | $3,753.53 |
| David Montgomery | Owner Operator | $1,921.25 |
| Joe Eisenhart | Owner Operator | $3,442.50 |
| Rick Koser | Owner Operator | $2,000.00[5] |
| | Total | $18,113.03 |

Again, the DCAA does not contest that these payments were made by WBC. However, he does choose to characterize them as unsupported. (DCAA audit report pages 8 thru12, note #4).

Vendors Jed Peterson, Burris Backhoe Service, Mike McWilliam, David Montgomery, Joe Eisenhart, and Rick Koser all provided equipment and or dump trucks and labor on this project and the auditor acknowledges that there is some evidence that supports these costs. (page 11, e(1). The auditor comments in e (1) that only the government log for October 1998 was "present for his review". All government inspection logs covering the entire pre-termination period which were previously turned over to WBC by FHWA were present at the audit site for DCAA review during the entire duration of the audit (3 weeks). Also present for review were the dailies and all other project/contract documentation. WBC offered 19 boxes of documents and 7 boxes of accounting data at audit. Unfortunately, the auditor waited until the last day of the audit to review the contents of most of these boxes. The auditor had the option of making a written request either at the time of the audit or some later date for copies of inspection reports and dailies (as he did for other items) and he failed to do so. A general inventory of the boxes was compiled by Stoel Rives prior to audit review and it lists daily records (dailies) and logs in several boxes.

WBC did respond to the auditor in its response to Issue Resolution No. 11.[6] Cancelled checks were issued to these owner operators by WBC within a month before or after the termination date. Project records compiled by FHWA and WBC which monitored the work include references to these vendors and were available to the auditor for review and

[4] The auditor fails to explain why this small amount has been questioned. However, in order to facilitate the settlement process WBC will agree to withdraw it.

[5] Because the check was dated 12-9-98, the auditor classifies this payment as "post-termination" however the work paid for was performed prior to termination.

[6] DCAA audit report, page 33, WBC response to IR#11.

App. 071

request. Additionally, WBC did not have any other business operations other than the subject contract during this period in the geographic area of southwest Oregon. Finally, none of the vendors questioned have ever been engaged by WBC at any other time except on this project. The auditor had access to several years of WBC's general accounting & financial records compiled both before, during and after 1998, and none of these vendors appear in these records in any other context other than for this project.

There is ample evidence that these costs are reimbursable under the settlement agreement. FHWA does have all of the documents and can easily verify that these vendors were working on the project. WBC requests reimbursement in the amount of $18,113.03 for sums it paid to the aforementioned owner operators for work on this contract.

WBC is also requesting reimbursement under the settlement agreement for the following three costs which were not supported by the auditor under the other direct job costs item:

| | | |
|---|---|---|
| Stoel Rives | *McBride Legal Costs* | $3,116.84 |
| Landmark Surveying | *Subcontractor, extra work* | $1,085.00 |
| Landmark Surveying | *Subcontractor, extra work* | $1,017.00 |
| Landmark Surveying | *Subcontractor, legal expenses* | $1,272.24 |
| Landmark Surveying | *Subcontractor, contract work* | $7,056.00 |
| Total | | $13,547.08 |

The cost in legal fees and expenses in the amount of $3,116.84 for Stoel Rives is a reimbursable cost under the settlement. The auditor did not support this cost. In the audit report, Note 4, the auditor indicates that he will discuss the requested McBride legal costs in Note 4, (6). However, when this reference is reviewed it is apparent that he (the auditor) is discussing another item entirely[7]. Therefore, WBC has no clarification as to why the legal fees, in this instance, have not been supported. One of the key arguments that the auditor has employed in questioning all of WBC's legal costs and expenses for settlement in the audit report is rendered moot in this case due to the fact that unredacted copies of these billings were included for review in WBC's direct cost proposal dated 11-2-2004.

WBC incurred this cost in litigation with subcontractor McBride as a direct result of the termination. When the government terminates a contract, the prime contractor not merely "may", but instead must "[s]ettle outstanding liabilities and proposals arising out of terminations of subcontracts". FAR 49.1049(g). See also FAR 49.108(1) ("Upon termination of a prime contract, the prime contractor and each subcontractor are responsible for the prompt settlement of the settlement proposals of their immediate subcontractors"); FAR 49.108-2(a) ("[T]he prime contractor shall***terminate all subcontracts to the extent that they relate to the performance of prime contract work terminated.")

[7] DCAA audit report, page 11, note 4(6)

App. 072

The termination expenses which a prime contractor may recover include the reasonable cost of terminating subcontracts. FAR 49.108-3. The TCO must, in considering the reasonableness of subcontractor expense, apply the same FAR standards that apply to pricing the settlement amounts for the prime contract. FAR 49.108-3(c). Recoverable costs include fees expended in procuring attorneys' services. FAR 31.205-33.

Prior to termination, Landmark Surveying, a subcontractor on the project, performed extra work above and outside the original scope of work in the amounts of $1,085.00 and $1,017.00 which sums WBC paid to Landmark in two separate payments after termination. The auditor states that, since the "extra work" is for work performed in replacing and re-staking several times at MP 46.2 and 46.7 and "including changes in the design", that this work should not be considered "extra work" due to the fact that MP 46.2 and 46.7 are locations within the original scope of work. He also questioned the amounts requested for extra work because he determined that the subcontract agreement does not require WBC to pay Landmark for work which was outside the original scope of work unless "the owner (i.e., the government) adjusts the contract price". [8]

There is no requirement that there be a specific agreement for the extra work. It is enough if there was, in fact, extra work. In the instance of extra work, FAR subpart 43.2 pervasively, and FAR 52.243-1 in particular for Fixed Price Contracts, require the government to pay through equitable adjustments for changes the government causes in the work. Whether a government change is formal or constructive, increased costs flowing from a change are compensable. *Sauer v. Danzig*, 224 F2d 1340, 1348 (Fed Cir 2000).

Both WBC and FHWA were aware that Landmark performed extra work at MP 46.2 and 46.7. In fact, WBC acted in a fair manner by compensating Landmark for its work. As stated in much greater length in WBC'S response to Issue Resolution No. 8, the extra work that Landmark performed was outside the original scope of work. This was due to defects in FHWA's design which were ultimately corrected and redesigned by FHWA after termination but before the completion contract was commenced. However, at the time that Landmark performed this extra work, FHWA was still insisting that WBC was responsible and was directing WBC to provide a redesign to FHWA <u>at its own cost</u>. WBC had no other option but to comply and incur this cost. Furthermore, FHWA utilized the extra work that Landmark performed by partially basing its redesign upon Landmark's work. When the FHWA caused such changes and, indeed, benefited from such "extra work", both WBC and Landmark became entitled to an equitable adjustment. Under the settlement WBC is requesting reimbursement for sums paid to Landmark Surveying for extra work in the amount of $2,102.00[9].

The auditor also questioned WBC's request for reimbursement for $1,272.24 in legal fees incurred by subcontractor Landmark Surveying. In a convenience termination, the contractor is obligated to settle with subcontractors. WBC believes that it properly

**App. 073**

---

[8] DCAA audit report page 10, Note 4(4b)

[9] $1085.00 plus $1017.00 questioned by DCAA audit report. (note 4).

reimbursed Landmark for this expense after the termination was converted and that it, in turn, deserves reimbursement for FHWA under the settlement.

Landmark incurred its legal expenses after termination in its attempts to receive payment. The auditor states that he "*questioned the legal and profession fees because they are for Landmark's collection efforts, and since the government did not cause this expense and does not have privity with the contract between WBC and Landmark, we believe the government should not have to pay for these costs*".[10] *(emphasis added)* In fact, the actions taken by FHWA in terminating WBC as well as by failing to make any attempt whatsoever to compensate WBC for its work for a period of nine months[11], had a direct impact on Landmark and created a situation in which Landmark reasonably chose to seek legal help.

The audit report also questions the difference between what the auditor terms an 85% completion paid by WBC to Landmark for contract work and the arbitrary figure of 50% completion[12] which he (the auditor) supports[13]. The auditor states that he is using a judgmental completion percentage of 50% but that there is "*significant doubt as to the actual percent of completion*". The auditor goes on to state that he was "*unable to identify a February 22, 1999 internal FHA memorandum in our audit file that shows 50 percent completion; however, we used 50 percent to calculate questioned costs*"[14]. After the termination was converted, WBC and Landmark engaged in negotiations and agreed upon a settlement amount. WBC then properly paid Landmark the agreed upon sum. In its response to Issue Resolution No.8, WBC wrote that the "*contract artificially manipulates the amount due for the surveying pay item. It links the percentage to be paid for surveying on any pay estimate to the percentage of the total amount paid to date for the contract*". This was written in response to the auditor's initial conclusion that the surveying was only 25% complete.[15]

Now comes the audit report which arbitrarily supports a 50% (see above) completion percentage to the base subcontract which sum is based upon a document that he seems to be saying that he is now either unable to find or otherwise identify. However, he ignores the relevant issue which is "*following a termination for convenience, the contractual relationship converts to a cost-reimbursement contract. The contractor is entitled to recover the costs if incurred.*"[16] WBC determined that Landmark had installed slope, center line, and clearing limit stakes on all road sections except the Rock Creek Bridge section and had completed the cross sections and staked the majority of the culvert pipes. Volumes using measured cross section data and design criteria had been calculated and

---

[10] DCAA audit report page 10, paragraph (c).

[11] A period of 9 months: September 1998 thru May 1999 when pay estimate 1 was issued. WBC argues that even this pay estimate was defective and was for a grossly reduced amount.

[12] DCAA audit report page 10, 4(c).

[13] DCAA audit report page 12, note 4, paragraph e(4).

[14] DCAA audit report page 12, note 4, paragraph 3(4).

[15] Issue resolution 8, page 2, paragraph 3.

[16] WBC response to Issue resolution 8, page 2, paragraph 3.

App. 074

notes submitted and accepted by FHWA. WBC requests that $7,056.00 that it paid to Landmark and which was unsupported by the auditor be included in this settlement.[17]

When WBC responded to Issue Resolution #8, it notified the DCAA that Landmark had advised WBC that it should have included interest in its claim and that a request for interest would be made. Under FAR standards, the only interest expense for which recovery is not required is money expended as a cost of the contractor itself borrowing funds. In particular, FAR 31.205-20 limits recovery only of interest on borrowings to raise capital as opposed to interest payments generally. Lockheed v Widnall, 113 F3d 1225, 1227 (Fed Cir 1997). Consequently, since the "interest" requested by White Buffalo for Landmark was not for borrowings to raise capital, those costs are recoverable.

The following is WBC's additional request for interest on the total sum of $19,238.00 paid to Landmark for contract work and extra or additional work for the period beginning December 1, 1998 thru March 9, 1999 interest calculated at the published post judgment interest rate. WBC is also requesting interest for Landmark on the balance of $13,113.00 from March 10, 1999 thru January 20, 2004 interest calculated at the published post judgment interest rate. The total amount requested for interest for Landmark is $2,415.00. Rates for interest claimed were obtained by visiting the following web site address: http://www.utd.uscourts.gov/documents/judgpage.html

WBC withdraws its previous request for $128,343 for Other Direct Job Costs and requests $128,598.08 for settlement.

| | |
|---|---|
| Amount supported for ODJC by DCAA audit report | $94,523.00 |
| Amounts paid to owner operators | $18,113.00 |
| Legal costs paid to Stoel Rives LLP for subcontractor McBride | $ 3,116.84 |
| Amounts paid to subcontractor Landmark for extra work | $ 2,102.00 |
| Amounts paid to Landmark for contract work | $ 7,056.00 |
| Amount paid to Landmark to reimburse it for legal expense | $ 1,272.24 |
| Request for interest for Landmark | $ 2,415.00 |
| Total ODJC | $128,598.08 |

**Equipment, Vehicle, Fuel**

WBC proposed a total of $34,207.00 in equipment, vehicle and fuel costs and the auditor supported $26,985.00. WBC withdraws its prior request for $34,207 and hereby requests a total of $26,985.00 for Equipment, Vehicle, Fuel settlement.

**Other Equipment/ Vehicle Costs**

WBC proposed $84,623 and the audit supported $65,808 for other equipment and vehicle costs. The audit questioned costs for repairs to equipment that have not been performed

[17] There was a math error of $1100.00 in the payment to Landmark which WBC has previously withdrawn from this settlement.

App. 075

as well as owner labor for repairs that were made on the service truck crane. The auditor does not dispute that the damage to the LS-3400 excavator and the theft of the truck tires occurred.

The audit also does not dispute that Luther Clevenger performed the labor to repair the crane on the service truck which was damaged. However, the auditor does not agree that either WBC or Mr. Clevenger should receive any compensation for this labor under this settlement agreement, either through direct reimbursement or by additional profit. In this instance, due to the fact that Mr. Clevenger was never directly paid payroll by WBC for this crane repair, WBC must reluctantly withdraw its request for $155.00 for crane repair labor. As discussed in the prior section of this document dealing with payroll and taxes, and in WBC's response to Issue Resolution #1, it is WBC's position that the government has an obligation to compensate it in some manner under this settlement for the efforts of Mr. Clevenger, whether as payroll under a jury verdict approach or as profit.[18]

The equipment repairs to the LS-2400 excavator and the 8 stolen truck tires were questioned in the audit report "*because there is no certain evidence that these costs will be incurred*".[19] The audit report ignores the very obvious fact that, as soon as the damage or loss occurred, the costs of such damage or loss were incurred by WBC. The amount of loss or damage experienced by WBC, and the reasonableness of any reimbursement to WBC for its losses, is unaffected by whether or not the damage is ever repaired. The amount of loss is measured in the diminished or lost value of the property or asset and commonly is quantified by the cost to replace the item or repair it to a pre loss condition.

In the course of performing excavation work on this project, White Buffalo employed its LS-3400 Link Belt crawler excavator. When White Buffalo brought the LS-3400 excavator to the project, it had a replacement value of $27,500.00 and a copy of the appraisal is attached in Appendix C. After the LS-3400 excavator was employed on the project, it would have cost $ 32,738.77 to restore the LS-3400 excavator to the condition it was in prior to being used on the project and a copy of the estimate for the repairs is attached in Appendix C. The salvage value of the LS-3400 excavator was $2,500 in 1998 which shows a loss of $25,000 which is the amount that is requested by White Buffalo in the revised settlement proposal. WBC hereby withdraws its previous request for $17,500 for damage to the LS-3400 excavator and, instead requests $25,000.00 under this settlement.

Under the Federal Acquisition Regulation, loss of useful value through use of contractor's equipment is compensable. 1 K. Manos, Government Contract Costs and Pricing, sec. 49:B:3 at 502-03 (West 2004). In particular, loss of useful value is not limited to special tooling, special machinery, or test equipment, but may also include general purpose tooling and equipment. *Southland Manufacturing Corp.*, 75-1 BCA P 11,272 at 53,735 (ASBCA 1975). See also *Metered Laundry Servs., Inc.*, 78-2 BCA P 13,451 at 65-727-28 (ASBCA 1978).

[18] WBC response to Issue Resolution #1.
[19] DCAA audit report page 14, note 6 (a).

App. 076

There also is no requirement under the FAR that, in order to recover from the government for consumption of equipment's useful life, a contractor must have first expended monies to restore the useful life which has been consumed on the project. In *American Electric, Inc.*, 76-2 BCA P 12,151 at 58,482-83 ( ASBCA 1976), the Board rejected the government's argument that a contractor was entitled to recover loss of useful value only if the costs had been charged directly to the client prior to its termination.

In its prior settlement proposal WBC requested $1,160.00 for used value replacement for 8 stolen truck tires that were stolen after the termination and after WBC's employee Jim Heigh was removed from the project by Rettinger. The auditor failed to support any reimbursement for WBC for the lost tires. As discussed above, the auditor believes that WBC has not actually sustained a loss unless and until it (WBC) replaces the items that were stolen.[20]

Because the tires had sustained some use at the time that they were stolen WBC could not ask for new replacement cost for the tires. In November 2004 WBC consulted Les Schwab Tire Center and established a value for the tires of 85% of new replacement cost. In October 2006 WBC again called Les Schwab and determined that today the cost of 8 new tires ranges from $2,272.00 to $2,644.00. WBC feels that $1,160 is a reasonable request and requests reimbursement for $1,160 for the stolen tires.

WBC hereby withdraws $84,623 that it previously proposed for Other Equipment and Vehicle Costs and, instead, requests reimbursement under the settlement for $91,968.

| | |
|---|---|
| Amount from prior proposal supported by audit report | $65,808 |
| Value of damaged excavator Link Belt LS-3400 | $25,000 |
| Value of 8 stolen truck tires | $ 1,160 |
| Total requested Other Equipment/Vehicle Costs | $91,968 |

**Surety Expense**

WBC requested $276,768.00 for surety expenses and the auditor supported $261,646.00. The difference, $15,122.00, is the interest that the surety has charged WBC. It is the position of WBC that surety interest expense is a cost for which it should legitimately be reimbursed in the settlement.[21] In its response to Issue Resolution #7, WBC states that fair compensation includes reimbursement for amounts it has paid to its surety. In Issue Resolution No. 4, the auditor asserted on July 7, 2005 that he would question "interest expense in its entirety." The auditor also challenged interest due the surety. WBC responded with Federal Circuit authority holding the limitation is only on interest on borrowings to raise capital as opposed to interest payments generally. The auditor has

App. 077

[20] DCAA audit report page 14, note 6 (a).
[21] DCAA audit report, page 22, WBC response to IR #7

failed to concede his error and has continued to claim that the interest incurred with the surety (ICW) is interest on borrowings[22].

After the termination for default WBC was bound to indemnify its surety (ICW). ICW, an insurance company, insured WBC and indemnified it against any liabilities to third persons. The fact that WBC eventually reimbursed ICW for the bulk of its expenses after the termination for convenience does not make the financial arrangement between WBC and ICW a loan nor do the sums paid constitute "borrowings". Under FAR standards, the only interest expense for which recovery is not required is money expended as a cost of the contractor itself borrowing funds. In particular, FAR 31.205-20 limits recovery only of interest on borrowings to raise capital as opposed to interest payments generally. Lockheed v Widnall, 113 F3d 1225, 1227 (Fed Cir 1997).

Consequently, since the "interest" requested by White Buffalo for its surety was not for borrowings to raise capital, those costs are recoverable. It is the position of WBC that interest expense incurred through its surety relationship is an allowable cost. WBC requests a total of $276,768.00 for surety expense under this settlement and does not concur with the audit report that $15,122.00 for surety interest should be unsupported.

**G&A Expense**

WBC requested $ 47,376.00 for G&A expense and the auditor supported $28,183.00 of this amount. WBC hereby withdraws its request for $47,376.00 and requests $28,183.00.

**Subcontractor[23]**

WBC's subcontractor, McBride, originally requested $105,796.00 as its (McBrides's) share of the settlement. During the audit and after negotiation with WBC, McBride decreased its request from $105,796.00 down to $ 39,222.35. The auditor supported the sum of $29,528.00. The difference between what McBride wants under the settlement and what the auditor supported is $9,694.35.

McBride has requested $29,528.00 for work performed plus $9,694.35 for interest for a total of $39,222.35. WBC's position is that it has an obligation to present McBride's settlement proposal in its entirety. An examination of McBride's stated calculations for interest of 77 months at an annual rate of 4.52% gives a different product of $ 8,564.11. However, the number of months which elapsed from the date of termination to the date of the audit report is actually 89 months. When you recalculate by multiplying the number of 89 months times the requested interest rate, the new product is slightly greater than the amount that has been requested by McBride.

Under FAR standards, the only interest expense for which recovery is not required is money expended as a cost of the contractor itself borrowing funds. In particular, FAR 31.205-20 limits recovery only of interest on borrowings to raise capital as opposed to

[22] DCAA audit report page 18, Note 7(e)

[23] We have ddressed this item out of its original order in the DCAA audit report.

interest payments generally. Lockheed v Widnall, 113 F3d 1225, 1227 (Fed Cir 1997). Consequently, since the "interest" requested by White Buffalo for McBride was not for borrowings to raise capital, those costs are recoverable.

WBC is requesting $39,222.35 for subcontractor McBride's settlement.

## Prior Payments

WBC agrees that the government should receive full credit under this settlement for all prior payments that it has made. WBC agrees with he auditor that those prior payments total $479,085.00.

## Profit[24]

In its January 2004 settlement proposal, WBC requested $925,835 for profit based upon a modified contract value of $1,951,180 multiplied by its historical job profit margin of 47.45%. This amount represents profit on work (including extra work) that WBC performed as well as the profit on the work the WBC would have performed if not for the termination for default and the bad faith of the government. The audit report supported a profit amount of $253,211.

The FHWA has stated, from the outset, that it would fully consider all information submitted by WBC on all issues including the lost profit issue. WBC has seen no analysis of the facts by FHWA as to whether or not WBC is entitled to lost profits on uncompleted work.

As discussed at our last meeting, WBC has included in more detail its justification for anticipatory profit and a summary of the facts supporting bad faith with this revised settlement proposal. This justification is part of this revised settlement proposal and can be found in Appendix D.

WBC continues to believe that the profit calculation is proper. However, a credit should be given to the government for two items dealing with unallocated costs which WBC requested elsewhere in this revised settlement proposal. Those items are G&A in the amount of $28,183 and Equipment/Vehicle/Fuel in the amount of $26,985. Therefore, WBC is adjusting its request for profit under this revised settlement proposal by deducting the amounts of $28,183 and $26,985 and is hereby requesting the revised sum of $870,667 for profit.

## Settlement Costs

WBC requested $41,793 for settlement expenses through January 13, 2005. However, the auditor supported only $9,249 in settlement expenses. The difference is $32,544 and, of that sum, WBC has withdrawn $1,593.90 for a math error. The auditor refused to support

[24] In the DCAA audit report the section "Profit" follows "G&A Expense".

the requested costs for settlement attorney fees paid to Stoel Rives in the amount of $16,770, first class airfare upgrades for WBC employees in the amount of $200.00, and the cost of payroll in the amount of $13,980 (all settlement payroll was questioned) which was paid to WBC employees Luther and Julie Clevenger for settlement related labor. [25]

The auditor opines that "WBC's job cost records for the proposed payment total up to one number; the claim proposes another number; the altered copies of invoices from WBC's attorneys total up to a third number". [26] In fact, the auditor is aware that WBC has costs in its job cost records which it has not claimed under this settlement. Also, it should be pointed out that WBC's records pertaining to settlement expenses which include its settlement legal expenses have never been kept in the job cost records file. The title of the job cost records file is "FHA, Powers FDR 33". Settlement expenses are maintained, and have been maintained since they started to accrue in January 2004, in a completely separate file in WBC's records titled "FHA, Powers Settlement" and are not co-mingled with the job cost records. In fact, there are numerous and much larger legal expense entries in the "FHA, Powers FDR 33" job cost file dealing with the termination for default and the current case with the Court of Claims which the auditor has reviewed and referenced, but those entries do not relate to this settlement agreement and are not part of this request. Given these circumstances, whether or not these unrelated non-settlement legal expenses total the same as the legal expenses requested in the January 13, 2005 settlement proposal (they do not) is immaterial.

The auditor questioned the entire amount proposed for legal expenses on the basis that he personally was not permitted to inspect the original invoices. He also failed to properly consider the fact that provision of copies redacted to remove confidential matter was endorsed by the Court of Federal Claims in *White Buffalo, Inc. v. United States* , 52 Fed Cl 1, 13 (2002). In its response to Issue Resolution No. 6, WBC states that it feels that the auditor's demands are unreasonable, but that it wishes to cooperate with the TCO in evaluating the proposed legal expenses. WBC also offers, without a waiver of any privilege, to make available to government counsel, Mr. Tim Binder, original unredacted legal invoices.[27] It is the position of WBC that the government is obligated to reimburse it for its settlement related legal expenses under this settlement.

Prior to turning over the legal invoices at audit, WBC determined that it wished to provide the auditor with the additional invoices for settlement legal expenses which were incurred after the January 13, 2005 settlement proposal and which it also claims[28]. WBC realized at that time that there were some costs which needed to be removed from the invoices as well as some billing entries which violated the principles of privileged communication between attorney and client. A few of the invoices were redacted to remove privileged material and non settlement related entries and the invoices were provided to the auditor. These additions and changes obviously changed the total

[25] DCAA audit report page 25, note 10(c).
[26] DCAA audit report page 33, issue Resolution No. 6.
[27] DCAA audit report, page 33, response to Issue Resolution No 6.
[28] WBC is including all of its settlement expenses with this revised settlement proposal.

amounts requested in the January 13, 2005 settlement proposal. Finally, WBC typically pays its invoices from Stoel Rives with one check that serves as total payment for all legal matters invoiced during that billing period.

In rejecting the entire fee request without allowing review by government counsel, the auditor failed, as required by DCAM ¶ 1-504.5a, to make reasonable efforts to resolve record access problems in a timely manner at the lowest DCAA and contractor management levels. The invoices that had not been redacted were available to the auditor in their entirety. Additionally, WBC expressly offered the unredacted copies of the redacted invoices for review by government counsel. In conclusion, there is nothing reasonable, fair, or objective in the auditor's complete denial of legal costs and fees in these circumstances.

Legal expenses have continued to accrue during and after the audit including a substantial amount for dealing with this very issue. Therefore, in this revised settlement proposal, WBC wishes to request all of its settlement related legal fees as well an estimated amount for anticipated legal expense through and until the TCO has rendered a final decision on the settlement amount. WBC wishes to withdraw its prior request of $16,770.03 and, instead, requests a new total of $79,265.68 for settlement related legal expense. This sum includes $75,765.68 in expenses already invoiced and $3,500 in estimated legal expense through the date of the TCO's final decision. WBC asked Stoel Rives LLP to review all invoices, whether redacted or not, and to make any additional corrections or clarifications so that all parties to this settlement could access the data without violating any privleged communications. Copies of these invoices are included in Appendix E.

The auditor failed to support any portion of the $ 13,980 in payroll costs requested in January 2005 for Luther and Julie Clevenger to prepare and work on this settlement even though it was demonstrated at audit through cancelled checks, pay stubs, and time cards that this payroll had been paid to these employees during 2004 and 2005. In the opinion of the auditor, it was appropriate to question all owner labor costs, wherever found in the settlement proposal, because "*WBC does not pay wages or salary to its owners "so consistently as to imply, in effect, an agreement to make payment" as required by FAR 31.205-6.*"[29] The auditor equates all payroll costs for both Luther and Julie Clevenger that are requested under the settlement proposal with the specific request that WBC initially made, and subsequently withdrew, for payroll earned in 1998 and later paid in 2004. WBC, however, has never withdrawn its request for payroll paid to Luther and Julie Clevenger for work associated with the settlement proposal.

In this case the payroll was paid and time records were kept. For example, in the period commencing January 2004 (the month of conversion) and ending May 15, 1005 (just prior to start of audit) WBC paid Luther Clevenger a total of $153,651.00 in direct payroll exclusive of his benefits such as health insurance and pension. This period was not covered during the audit. The sums paid to Mr. Clevenger included the $ 39,283 paid to Mr. Clevenger in 2004 for work performed on this project in 1998 and discussed elsewhere in this document.

[29] DCAA audit report page 6, note 3(a).

App. 081

All wages requested under this settlement have been paid to the referenced employees and were incurred in working on the settlement. It is reasonable for WBC to receive reimbursement under this settlement for payroll and costs paid to employees working on the settlement.

In its settlement proposal dated January 13, 2005, WBC requested $8,835.15 for payroll costs for Luther Clevenger and $5,145.11 for payroll costs for Julie Clevenger for a total of 13,980.26. Since that date, WBC has incurred an additional $21,993.82 in payroll expenses for three employees to prepare for audit, respond to auditor's requests, prepare for and attend audit, prepare for and respond to draft audit report and telephone exit interview, review and respond to audit report, attend and conduct meetings with legal counsel, and government personnel and compose this revised audit report. These are payroll costs that have been incurred and paid. Finally, WBC estimates that it will incur another $2,500.00 in settlement related payroll costs through the date of TCO final decision.

The auditor also failed to support the $200.00 requested in first class airfare upgrades stating that airfare in excess of standard or coach airfare is unallowable.[30] It is WBC's position that the auditor's interpretation of FAR 31.205-46(b) is flawed and that, in this instance, this is an allowable cost.

At this time WBC is requesting below other and additional miscellaneous additional settlement costs that either were incurred after January 13, 2005 or which were otherwise not requested in its settlement proposal dated January 13, 2005 and which are primarily associated with the costs of audit. Those costs are:

| | |
|---|---|
| Thompson West (Westlaw) subscription, February 2005 through October 2006 | $3,670.39[31] |
| Parking fees for audit and other appointments | $ 102.26 |
| Mileage, audit, 1,812 x .375 | $ 679.50 |
| Mileage, other, 1452 x .375, (trip to Powers and other appointments) | $ 544.50 |
| Food, audit | $ 258.44 |
| Lodging, audit | $ 147.38 |
| Clerical supplies (blank writable cd disks) | $ 8.45 |
| Photocopy, audit, 1485 x .10 | $ 148.50 |
| Photocopy, audit, 336 x .15 | $ 50.40 |
| Photocopy, audit, color copies | $ 70.08 |
| Photocopy and binding | $ 415.52 |
| Laptop, Hewlett Packard | $1,899.99 |
| Additional licensed copy of accounting program | $ 198.00 |
| Damage to 1996 Dodge pickup | $3.638.55 |
| Rental vehicle replacement for pickup during repairs, 1.5 weeks | $ 600.00 |
| Subtotal additional miscellaneous costs request | 12,431.96 |

[30] DCAA audit report page 25, note 10, C (2).
[31] Monthly charges will continue to accrue at the rate of $192.70 per month until TCO final decision.

WBC purchased a laptop computer and another licensed copy of its accounting software for use in composing its settlement proposal and conducting the audit. This computer and software was used for numerous meetings and throughout the audit.

The requested damage to the 1996 Dodge pickup is for damages to this vehicle which occurred during project work and prior to termination. A copy of the repair estimate has been attached in Appendix F. Since the repairs will necessitate a 1.5 week period where WBC will lose the use of this vehicle, WBC is requesting an amount to pay for a rental replacement. The weekly cost is $400.00 per week from United Rental for a ¾ ton pickup with 4 wheel drive and a towing package.

WBC requests a total of $137,120.46 in settlement costs discussed in this section titled "Settlement Costs" for the following amounts:

| | |
|---|---|
| Amount supported by auditor from January 13, 2005 proposal | $ 9,249.00 |
| All settlement related payroll for WBC employees | $38,473.82 |
| All settlement related legal expense invoiced | $75,765.68 |
| Estimated additional legal expense thru date of TCO final decision | $ 3,500.00 |
| Airfare first class upgrades | $ 200.00 |
| Additional miscellaneous costs (see above) | $12,431.96 |
| Total request section "Settlement Costs" | $139,620.46 |

This sum includes the amount previously requested on January 13, 2005 of $41,793.21 less the math error of $1,593.90. The math error is has been withdrawn by WBC from its proposal.

## Interest

WBC is entitled to interest under the Prompt Payment Act, 31 USCA 3902, for the amount earned under the pay estimate which was prepared and approved by Project Engineer Aftab in November 1998 but which was never finally approved by FHWA and paid to WBC. As discussed in WBC's justification for anticipatory profit found in Appendix D, this pay estimate was far greater than the pay estimate which was eventually prepared by Rettinger in May 1999 and paid to the surety ICW[32].

At the time that the unpaid November 1998 estimate was prepared, Rettinger first refused to allow payment because he would not allow Aftab to give Clevenger one of the signed Daily Record of Miscellaneous Items[33] which were required and had to accompany the pay request. Rettinger then refused to process the pay estimate because WBC did not have an approved schedule.[34]

[32] FHWA retained approximately 50% of this estimate for liquidated damages which it refunded to WBC, along with interest, in January 2004.
[33] Clevenger was forced to later obtain this document through a FOIA request.
[34] Although WBC submitted several schedules and even hired a scheduling consultant, it was unable to get any schedule other than its base line schedule approved by Rettinger.

App. 083

WBC requests that interest be granted to it under this settlement on the amounts which were earned and approved in November 1998. The interest should start at the date of termination and should run until payment is made to WBC. However, the government should receive a credit and should deduct the interest it previously paid to WBC along with the withheld liquidated damages in January 2004.

**Conclusion**

In general, the audit report is erroneous in several respects and fails to follow applicable law. A threshold problem is the relationship between what the FAR commands be done in settling terminations for convenience and the DCAA Contract Audit Manual ("DCAM") directive in such cost settlements. DCAM ¶ 12-104a states that the "contract cost principles contained in FAR 8 and 31, in effect as of the date of the contract, shall be used in settling terminations for convenience." This directive is qualified by FAR 49.113. which mandates that "the cost principles of part 31 [are] subject to the general principles of 49.201(a)", while FAR 49.201(a) commands that "Fair compensation is a matter of judgment and cannot be measured exactly 'and that [t]he use of business judgment, as distinguished from strict accounting principles, is the heart of a settlement." Additionally, "costs and accounting data may provide guides but are not rigid measures for ascertaining fair compensation." FAR 49.201(c).

Here, the potential for a disconnect between rigid application of cost principles and the "fair compensation" which the FAR commands, is compounded then ultimately realized through the approach taken by this audit. Under Government Auditing Standards 7.39 and 7.41 respectively, an audit report must be "fair, complete, and objective" while the auditor must "objectively evaluate" a contractor's comments. Moreover, "The audit report should be fair and not misleading and should place the audit results in perspective. This means presenting the audit results impartially and guarding against the tendency to exaggerate." GAS 7.57. Finally, every auditor is subject to a standard of due professional care "which requires, among other things, things, that the auditor maintain an "independent and objective mental attitude" with respect to all aspects of his audit work.***[And] he is to approach the audit with "judicial impartiality" and is not to assume the "attitude of a prosecutor."

Based upon both the draft and the final audit findings, WBC is concerned that the auditor has assumed the role of an advocate and has failed to provide the fair, complete and objective assessment which the law compels. WBC requests that the TCO review this revised proposal along with all of the relevant documentation whether directly included with this document or not.

A side by side comparison of all items, including disputed items, is as follows:

App. 084

# CONTRACTOR'S TERMINATION SETTLEMENT PROPOSAL
## Contract No. DTFH70-98-C-00027
## October 13, 2006

| | WBC Original Proposal(s) | DCAA Audit Supported | WBC Revised Proposal |
|---|---|---|---|
| Direct Labor | $167,761 | $127,463 | **$ 128,478.00**[35] |
| Other Direct Job Costs | $128,343 | $ 94,523 | **$ 128,598.08**[36] |
| Equipment/Vehicle/Fuel | $ 34,207 | $ 26,985 | **$ 26,985.00**[37] |
| Other Equipment/Vehicle | $ 84,623 | $ 65,808 | **$ 91,968.00**[38] |
| Surety Expense | $276,768 | $261,646 | **$ 276,768.00**[39] |
| G&A Expense | $ 47,376 | $ 28,183 | **$ 28,183.00**[40] |
| Subcontractor McBride | $105,796 | $ 29,528 | **$ 39,222.35**[41] |
| Profit | $925,835 | $253,211 | **$ 870,667.00**[42] |
| Settlement Expense | $ 41,793 | $ 9,249 | **$ 139,620.46**[43] |
| Net Settlement | $1,812,501 | $896,596 | **$1,730,489.89**[44] |
| Payments Received | (376,768) | ($479,085) | **($ 479,085.00)**[45] |
| Net Payment | | $417,511 | **$1,251,404.89** |

[35] Revised Settlement Proposal, pages 2 & 3
[36] Revised Settlement Proposal, pages 3, 4, 5, 6, 7, 8
[37] Revised Settlement Proposal, page 8
[38] Revised Settlement Proposal, pages 8,9,10
[39] Revised Settlement Proposal, pages 10, 11
[40] Revised Settlement Proposal, pages 11,12
[41] Revised Settlement Proposal, pages 11, 12
[42] Revised Settlement Proposal, page 12
[43] Revised Settlement Proposal, page 12, 13, 14, 15, 16
[44] WBC's request for interest under the Prompt Payment Act, discussed on pages 16 & 17 of this document, is an amount in addition to this total and has not been quantified by WBC in this proposal
[45] Revised Settlement Proposal, page 12

App. 085

Thank you for considering the revised settlement proposal. At this time WBC would like to request a Terminating Contracting Officer's final decision on the settlement.

Luther L. Clevenger
White Buffalo Construction Inc.

# LIST OF ATTACHMENTS

Prior Settlement Proposal........................................................Appendix A
*Surety Costs dated March 19, 2004*
*Direct Costs dated November 2, 2004*
*Settlement proposal costs and request for profit dated January 13, 2005*

DCAA Audit Report........................................................Appendix B

Estimate for Repairs Link Belt LS- 3400 Excavator..............................Appendix C

Estimate of Value of Link Belt LS- 3400 Excavator..............................Appendix C

Justification for Anticipatory Profit and a Summary of Facts Supporting Bad Faith........................................Appendix D

Settlement Related Legal invoices........................................Appendix E

Estimate of Cost to Repair 1996 Dodge Pickup..............................Appendix F