# APPENDIX D

## INTRODUCTION

WBC has, from the outset, claimed lost profits on uncompleted work. WBC is convinced that if FHA takes the time to review the facts and background, it will conclude this claim has merit. WBC thought it would be helpful if it again summarized its position.

A properly motivated and conducted termination affords to the government a limitation on its liability, even if its declaration of default is later found wanting. Specifically, a default termination that merely is a mistake will be converted to a termination for convenience. Additionally, the government may, in certain circumstances, unilaterally and lawfully terminate for convenience outright. In either circumstance, the measures of recovery under a convenience termination shield the government from the liability it would face if subject to the standard measure of liability for common-law breach of contract.

The limited liability of a convenience termination can, however, evaporate, exposing the government to liability for common-law breach, including lost profits. As set forth below, the evidence here is more than sufficient to obliterate the shield of limited liability.

First, the presumption of good faith in government action, and the requirement of specific intent to harm the particular contractor, does not apply at

App. 088

EXHIBIT: 8
WIT: Scott

all when the wrongdoing centers on the government's failure to cooperate with, and to facilitate the performance of, its contractor's performance.

Second, even if a presumption of good faith applied here, and it does not, "well-nigh irrefragable proof" requires only clear and convincing evidence of acts taken with specific intent to harm White Buffalo. Such evidence abounds here.

## DISCUSSION

### A. In Proving Bad-Faith Termination, White Buffalo Is Required Only to Prove that the Government Breached Its Implied Contract Good-Faith Duties to Cooperate and Not Interfere

Until 2002, courts typically began their analysis of "bad faith" by analyzing the issue under a framework that included a "presumption of good faith," and defeating that presumption required "well nigh irrefragable proof" of specific intent to harm the particular contractor. That has changed, beginning with *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234 (Fed. Cir. 2002). There the U.S. Federal Circuit Court of Appeals considered the extent of proof required to demonstrate that the government acted in bad faith. The court modernized the language of the "well-nigh irrefragable proof" standard, and determined that "clear and convincing" most adequately describes the proper standard. *Id.* at 1239.

Following after *Am-Pro*, the Court of Federal Claims then recognized that there are limited circumstances in which the "good faith" presumption even applies. In *Tecom, Inc. v. United States*, 66 Fed. Cl. 736 (2005), the U.S. Court of

Federal Claims further clarified the proper application of "clear and convincing" standard. The court in *Tecom* held:

> When a government official acts under a duty to employ discretion, granted formally by law, regulation, or contract, and a lack of good faith is alleged that does not sink to the level of fraud or quasi-criminal wrongdoing, *clear and convincing evidence is not needed to rebut the presumption*. Instead, this may be inferred from a lack of substantial evidence, gross error, or the like. *Id.* at 769(emphasis added).

As established in *Tecom*, the "clear and convincing" standard does not apply here. The very heart of FHA's wrongful conduct toward White Buffalo, which is detailed below, centers in FHA's pervasive failure to cooperate with, and indeed its actual interference with, White Buffalo's performance. The evidence is substantial that FHA breached its implied contractual duty of good faith and fair dealing, which, among other duties, requires FHA to cooperate in, and not interfere with, White Buffalo's performance. That strips FHA of any right to avoid full liability for common-law breach, including facing liability for lost profits.

*Tecom* is also instructive here with respect to the aggregated conduct that establishes that the government violated its duty of good faith by its pattern of failing to cooperate in, and actively interfering with, White Buffalo's performance. Specifically, "[w]hen it is not a single discrete decision by one official, but a number of acts that are alleged to constitute a lack of good faith, the acts must be judged in the aggregate, and not on the basis of any particular individual's bad



App. 090

faith. . . . If the aggregate of the actions of all of the agents would, if all done by one individual, fall below the standard of good faith, the entity for whom the various agents acted should be held to have violated that standard." *Id.* (internal quotation marks and citation omitted); see *Struck Constr. Co. v. United States*, 95 Ct. Cl. 186, 221, 1942 WL 4411 (1942).

**B. There Is Clear and Convincing Evidence of Specific Intent to Harm White Buffalo**

Even if FHA were here entitled, and it is not, to invoke the presumption that the government is assumed to have acted in good faith, FHA still cannot shield itself behind the liability limits afforded by a lawful termination for convenience. Evidence is "clear and convincing" when it renders highly probable the proposition that the evidence is offered to establish. *Am-Pro*, 281 F.3d at 1240 (citation omitted). Here, as set forth below, the evidence renders it highly probable that, principally through the actions of Area Resident Engineer Rettinger and through FHA's actions in the aggregate, FHA acted with the specific intention of harming White Buffalo.

**C. The Government Prevented the Contractor from Starting Work on Time and Did Not Extend the Contract Completion Date**

From the very beginning, the government failed to cooperate with the contractor. Specifically, the government refused to allow the contractor to commence work until *September 15*, 1998, then failed to provide required

additional contract time due the contractor because of the late notice to proceed. The government additionally erred in its unreasonable belief that the contractor could not commence work on September 1, 1998 due to environmental restrictions.

The contract states at C-12 in section 52.211-10 that "*the completion date is based on the assumption that the successful offeror will receive the notice to proceed by September 1. The completion date will be extended by the number of calendar days after the above date that the Contractor receives the notice to proceed, except to the extent that the delays in issuance of the notice to proceed results from the failure of the Contractor to execute the contract and give the required performance and payment bonds within the time specified in the offer.*"(Emphasis _____.)

The contract was executed and the performance and payment bonds were timely tendered to the Contracting Officer (the "CO") and accepted. The government did not issue a full notice to proceed on September 1, 1998 and did not give the contractor the extension as mandated by the contract. WBC was entitled to extensions of time that would have altered the interim completion date because of the late notice to proceed. The government erred in both the Cure Notice and the Notice of Termination for Default, because the interim completion date of January 23, 1999 should have been extended because of the late notice to proceed.

The contract contains environmental restrictions that prohibited commencement of work until September 15, 1998 at four of the 10 sites on FDR 33 (because clearing and grubbing were required at these sites). Work could have been started on September 1 at six of the sites on FDR 33, but the government unreasonably refused.

When he was asked why the notice to proceed had not been issued, Area Engineer Rettinger ("Rettinger") informed Project Superintendent Clevenger ("Clevenger") that there was no site where work could be performed due to contract environmental restrictions. Clevenger informed Rettinger that the contract allowed work to be performed without any restriction at MP 46.2. After Rettinger confirmed this, he informed Clevenger that White Buffalo still would not receive a notice to proceed, because it did not have an approved schedule. Project Engineer Aftab ("Aftab") told Clevenger to just submit another schedule and that the government would allow WBC to start on September 15. WBC was given an unrestricted Notice to Proceed dated *September 15*, 1998, even though WBC's schedule was still not approved.

Rettinger's initial unreasonable behavior presaged what proved to be an ongoing pattern of interference or refusals to cooperate—in which Rettinger remained a central figure. Indeed, as set forth below, Rettinger's misconduct continued even into the litigation following the contractor's termination.

**App. 093**

Almost from the beginning of the project, WBC received numerous letters signed by Aftab that directly contradicted earlier verbal discussions and agreements. Aftab finally admitted to Clevenger that these letters were, in fact, not written by him, but by Rettinger, and that Aftab had been forced to sign them. Clevenger and Aftab would agree to pay estimates, items of work, and other items demanding attention, only to have Rettinger overrule Aftab later. After only a few weeks on the project under Rettinger, Aftab asked to be assigned to another project away from Rettinger. One of the inspectors working on the project left largely because he had never seen Rettinger treat a contractor so harshly. This inspector had worked on several projects with Rettinger and commented that he had never seen him act in this manner. Another inspector who was fired from the project indicated that Rettinger was deliberately trying to rid the government of what he termed "problem contractors." This comment was made in reference to WBC's ongoing litigation with USFS concerning the Salt Creek Falls Viewpoint project. At that time, litigation had been ongoing for approximately a decade.

Due to the failure of the government to issue the notice to proceed on September 1, 1998, WBC lost 25 percent of its work window for "wetted perimeter" work at MP 46.2. The days not used were dry summer days that were essential to completing the subgrade work on FDR 33 before both the onset of the heavy rain season in late October and the first interim completion date of

App. 094

January 23, 1999. The contractor had mobilized his equipment to FDR 33 MP 46.2 and had hired additional personnel in anticipation of starting the work at that site on September 1, 1998.

**D. The Government Improperly Instructed the Contractor to Remove Material at MP 46.2, but the Impropriety Was Not Disclosed to the Contractor or Corrected After Rettinger Discovered His Error**

The government, principally through Rettinger, then concealed from the contractor that the government had discovered that the "excess" material it had directed the contractor to remove from MP 46.2 was actually needed at that site to complete the fill as shown in the drawings and as previously argued by the contractor.

Rettinger informed Clevenger and Mark Heiberger (the survey subcontractor) that native material at MP 46.2 above the culvert inlet was excess material and would have to be excavated and hauled to a disposal site. WBC immediately began hauling the material to the disposal site. Eventually Mod #01 was agreed to, adding a section of culvert at MP 46.2 under the assumption that this would allow on-site use of the excess material and speed up the installation.

While this work was being performed, Rettinger discovered that he was wrong, that the material was actually needed at MP 46.2 for fill, and that it should never have been removed. In fact, material had to be hauled back to MP 46.2 to replace what had been hauled away and to fill in the additional section of culvert

that had been added. (Completion Contractor Tidewater claims to have hauled in all material because the fill that WBC placed had become so saturated with moisture that it was unusable.)

Although Rettinger had discovered that the material being hauled away was actually needed at MP 46.2, he failed to inform WBC of that fact, and he failed to correct his mistake. At the time of termination, the government was aware that Rettinger had mistakenly directed that material be hauled away and had entered into Mod #01 with WBC. The government also knew that it was going to cost approximately $50,000 to correct this error, but failed to take this fact into consideration and, additionally, failed to take corrective action. The government still required this needless and additional work of the completion contractor, which work was performed at WBC's expense.

**E. The Government Did Not Obtain Proper Environmental Permit Extensions to Allow the Contractor to Continue Work**

Next, the government, again through Rettinger, concealed from the contractor that it had decided not to seek any extension from the permitting agencies to work in the "wetted perimeter." The government deliberately misled the contractor by informing it that the permitting agencies had *refused* to grant any extension. The contractor then directly approached the permitting agencies and obtained permission from them to *continue work*. The government nevertheless continued to refuse to allow the contractor to continue any installation. Instead, the

government directed the contractor to perform only winterization work and stopped all work at the culvert at MP 46.2.

WBC requested in a timely manner that FHWA obtain a time extension for the permits to work in water. Rettinger said it was too early and that WBC should wait to make the request until it was closer to the permit expiration date. When WBC again made the request, Rettinger then said that WBC had now waited too long. Rettinger's letter to WBC stated that the government had consulted with the permitting agencies, and an extension would not be granted. This letter was duplicitous and concealed the real truth: before the permit's expiration, FHWA had already decided not to seek any extension for the permit, because it did not want WBC to continue on this project.

FHWA stopped WBC from working at the site one day before the permits actually expired, thus depriving WBC of one day of work. At that time, all culvert sections originally specified were installed, and only the additional culvert section added in Mod #01 was left uninstalled. Of course, Mod #01 was based on Rettinger's erroneous assumption that there was an abundance of unneeded and excess material at the site that necessitated adding another culvert section in order to consume more material as fill. The additional culvert section was actually unnecessary and should have been deleted from the contract.

App. 097

Clevenger decided to try to find a way to continue to work. He contacted the permitting agencies directly and easily obtained a one-week extension to work. The extension was granted because the endangered salmon had not yet started their migration up the rivers. When FHWA was informed of the extension, Rettinger chastised Clevenger for seeking an extension to "their" permit. After delaying for several days, and despite the fact that by then FHWA had independently confirmed Clevenger's agreement with the permitting agencies, FHWA then informed WBC that it could not perform any contract work during the permit extension and would only be allowed to "winterize" the site.

Several weeks later, on November 13, 1998, FHWA, in its Cure Notice, asked WBC to obtain a new permit from the permitting agencies to work in water beyond November 6, even though—by that time—the endangered salmon were in the river, and any new permit or extension was virtually unobtainable. The Cure Notice states that providing evidence that WBC could obtain a new permit that would allow "in-stream work" after November 6, 1998 was key to WBC providing an acceptable written plan.

Before the permit's original expiration date for sites on FDR 33, November 1, 1998, CO Jacoby emailed Rettinger and said that they would not be applying for a permit extension because they did not want WBC to complete the job. Also, before the permits expired, another FHWA employee contacted

Rettinger about obtaining an extension. Rettinger responded by email that he did not know why they would seek an extension of time given that WBC was not working and had not even started up any equipment that day. This was completely untrue.

The contractor was highly concerned about Rettinger's counterproductive actions, which were hindering completion of the project. In an attempt to improve the situation, Clevenger requested a meeting with CO Parsons. CO Parsons informed Clevenger in a telephone call and in the meeting that he was unaware of any problems with the project and really had not heard much about it. CO Parsons stated that he would see that matters were investigated and straightened out. In fact, CO Parsons and other FHWA personnel had already started planning to terminate WBC.

### F. Contrary to the Permit's Language and Customary Practice, the Government Restricted the Contractor's Work in the Stream Area

The government unnecessarily restricted the contractor's operations by using the term "wetted perimeter" and defining areas within the "wetted perimeter" as any area that it arbitrarily determined could be reached by high water.

FHWA used the unusual term "wetted perimeter of any stream" to indicate areas that would be subject to the restrictions of the permit in the contract, even though the permit, the permitting agencies, and FHA personnel who worked on obtaining the permits use the term "in-water work." When asked, FHWA was

App. 099

unable to supply WBC with any clear definition of "wetted perimeter." However, in practice, FHWA (Rettinger) restricted the contractor's operations in any area that it arbitrarily determined could be reached by high water.

In the case of the critical repair at MP 46.2, the contractor was prohibited after November 1, 1998 from working on contract work in areas that were clearly well out of the stream, including working on the fill at the top of the culvert. In fact, FHWA stopped all work at the MP 46.2 culvert site after November 6, 1998. This stopped the contractor from performing any more work at this location.

Cynically, FHWA changed the term to "in-water work" in 1999 for the completion contract. This cooperation with the completion contractor significantly reduced the work area subject to permit restrictions and was not a benefit available to WBC.

## G. The Government Refused to Acknowledge the Changed Condition and Safety Problems at MP 46.7

The government also unreasonably refused to address the changed condition at FDR 33, MP 46.7, again violating its duty of good-faith cooperation. This failure to act resulted in WBC incurring delays and additional costs due to the unstable overburden at the rock cut at MP 46.7. Multiple failures of the overburden at this site occurred after the first shot, when the changed condition was evident. This significantly impeded the course and prosecution of the work and increased the costs to WBC.

App. 100

Rettinger would not allow WBC to correct the large amount of unstable overburden at the rock cut at MP 46.7, stating that another contractor would do the work after WBC's contract was over. Rettinger was steadfast, despite the protests of Clevenger, USFS Siskiyou National Forest geologist Donna Mickley ("Mickley"), and Frank Toors ("Toors"), a consulting geologist hired by WBC. Both Mickley and Toors warned FHWA that slope failure was imminent and foreseeable and would occur as soon as any rain or the impending rainy season started, within days or possibly weeks. There was no way that WBC or any other contractor could complete the work as designed; yet despite repeated warnings, the government failed, on the advice of Rettinger, to take any action. As soon as the seasonal rains commenced, multiple large slides occurred at this site and continued throughout the winter and early spring.

Rettinger unreasonably required WBC to continue work at the rock cut despite the deteriorating safety conditions. Material was starting to slide down from the top at intermittent intervals on a daily basis, and safety spotters had to be used continuously. Work at MP 46.7, as well as equipment and traffic on FDR 33 servicing other ERFO sites, was frequently halted in order to avoid falling dirt, rocks, and other debris. Clevenger informed Rettinger that the falling material was a safety hazard and was causing significant delays to the entire project. Rettinger informed Clevenger that in order to prosecute the work, without being delayed by

the falling material, WBC could excavate the overburden above the rock cut and remove it at its own cost. As the slumping overburden above the rock face extended well above and outside the original clearing limits for the ERFO repair, Rettinger required WBC to have the area surveyed and to submit a plan for removal. Just before being terminated, WBC ceased all work at MP 46.7 and the adjacent work below because of safety concerns.

As soon as WBC was terminated, FHWA had Kerr Contractors start removal of the slide. *Within a week*, Mickley met with FHWA and determined that conditions were not as assumed in the FHWA design and that the area was unsafe. She requested that FHWA cease work and prepare a redesign for the MP 46.7 site.

**H. The Government Lied About Design Changes**

FHWA personnel, including the CO, told WBC, ICW (the surety), and the completion contract bidders that there would be no redesigns or changes to the contract and that the work would be completed as per the WBC contract. FHWA's position was that the problems were caused by WBC and that the completion contractor could propose corrections or changes, but that FHWA would not be providing them. This implied that any costs to make the corrections would have to be included in the completion contractors' bids, and the bidding contractors were so informed by WBC's surety. In fact, FHWA had already commenced work on redesigning MP 46.7 as well as several other sites.

As soon as the completion contractor started, Rettinger negotiated a modification that essentially redesigned the entire project. It also paid the completion contractor to correct the changed condition at MP 46.7, even though these costs had been included in the completion contractor bid to WBC's surety as a separate bid item based on the CO's letter.

Clevenger made repeated requests for the FHWA redesigns, but FHWA claimed that there were none, despite evidence that they existed. After WBC filed an FOIA action, the redesign for MP 46.7 was eventually provided, and FHWA paid WBC's legal costs for the action. Clevenger discovered later (in discovery) that there were additional redesigns for several other sites that were not provided in the earlier FOIA request. The FOIA officer, Rettinger, and others at FHWA deliberately withheld these documents from WBC despite repeated requests and FHWA's own FOIA policy.

It is not simply that FHWA concealed its redesigns from ICW and WBC; FHWA made a conscious decision to withhold this information. ICW informed FHWA that it would increase costs. On February 2, 1999, CO Parsons wrote a letter to ICW stating that none of the completion contractor bidders were informed about any redesigns or openings to the permit window and that WBC was responsible for the current condition at MP 46.7. CO Parsons added that it would be up to the completion contractor to propose a slope redesign if he felt it was

App. 103

necessary. It is well established in the FHWA record that the CO knew that the original slope design in the contract was defective and that design changes were going to have to be made. In fact, FHWA work on the redesign had already started.

## I. The Government Terminated the Contractor

The contractor was notified in a telephone call from CO Jacoby during the week of November 23, 1998 that WBC would be terminated on December 1, 1998. True to CO Jacoby's word, WBC received from CO Parsons the Notice of Termination for Default dated December 1, 1998. CO Parsons has testified that he made the decision to terminate WBC on his own on December 1, after having returned from a vacation. In fact, CO Parsons not only failed to independently decide to terminate WBC, he was directed to terminate WBC.

Before termination, CO Parsons met with WBC and stated that he did not know anything about the project and that he would look into WBC's concerns. He also stated that Rettinger had a reputation for being "vicious." However, both FHWA and the CO were already considering termination.

## J. The Government Refused to Let the Contractor Fix the Slide at MP 47.25

FHWA refused to address the small-slump by the front access gate at MP 47.25, which occurred because of the heavy rains and the oversteep design. WBC notified FHWA verbally and by letter, and Rettinger wrote back directing

WBC not to repair the slump. This inaction resulted in a small slide onto FDR 33. At that time, minor work was required at this site so that WBC could continue to have access to the project. Rettinger directed that no work was to be done on this slide, and it continued to grow until WBC was terminated approximately 20 days later. Kerr Contractors arrived on the project and, immediately after WBC was terminated, was required to start emergency work on this slide. This work was performed at substantial expense to WBC. To finally correct the problem, the cut slope at MP 47.25 was eventually laid back, and riprap was installed, which was a major redesign by FHWA.

**K. The Government Failed to Compensate WBC for Its Work**

FHWA failed to make any payments to WBC for its work before termination (a period of four months). The sole payment allowed (approximately six months after termination) was less than half the amount of the payment approved by Aftab before termination. This pay estimate failed to compensate WBC for items of work and quantities of work that were accepted by FHWA before termination. It also failed to properly compensate WBC for significant quantities of extra or additional work, some of which was covered by contract modification. The majority of the extra work performed by WBC, however, was not covered by modification. For example, at the time that pay estimate #1 was issued, FHWA was continuing to claim that it had no responsibility to compensate WBC for

substantial extra work that it had performed at MP 46.7, when, in fact, it had already redesigned the work at the site and had decided to pay the completion contractor for performing this work.

L. **The Government Improperly Paid the Completion Contractor**

FHWA paid Completion Contractor Tidewater for substantial work that was never performed. One example is work certified and paid for at MP 46.7—a survey commissioned by WBC after project completion showed this work had never been performed. Moreover, both the completion contractor and FHWA personnel certified the work and the quantities for payment. This resulted in substantial additional and unnecessary cost to WBC and its surety. FHWA was previously notified of this, and a copy of the survey report has been provided.

M. **The Government Engaged in Disparate Treatment**

FHWA relaxed environmental restrictions for the completion contractor, which materially and substantially changed and enlarged the window in which the work could be prosecuted in 1999. In considering termination, FHWA failed to consider how such changes could affect WBC and its prosecution of this contract.

N. **The Government Engaged in Additional Actions That Harmed WBC**

FHWA certified and paid Completion Contractor Tidewater for work that was performed by WBC before termination. WBC and ICW were deprived of legitimate earnings and incurred illegitimate and unnecessary expenses in the course of the completion contract due to the actions of FHWA:

FHWA encouraged surety ICW to pay Tidewater for work for which FHWA had already paid Tidewater, under modification to the completion contract, thus resulting in additional and unnecessary cost to WBC and ICW. FHWA wrote a letter to ICW strongly supporting Tidewater's claim against ICW for $50,000, even though Tidewater had received payment for the same work directly from FHWA.

## CONCLUSION

The evidence here suffices—indeed is overwhelming—to establish bad faith. That conclusion results whether the standard is (i) the now-outdated test of intent to harm the individual contractor or (ii) the current test of breaching the standards of good-faith cooperation and noninterference. Consequently, the government is no longer shielded by the limits on recovery that apply in a lawful convenience termination. Instead, the government now faces liability for basic common-law damages for breach of contract, including lost profits.

App. 107