U.S. Department of Transportation
**Federal Highway Administration**

Western Federal Lands Highway Division

610 East Fifth Street
Vancouver, WA 98661-3801
(360) 619-7700 FAX: (360) 619-7846

August 30, 2007

In Reply Refer To:
DTFH70-98-C-00027

Mr. Luther Clevenger
White Buffalo Construction, Inc.
6653 Shaw Hwy SE
P.O. Box 1310
Aumsville, OR 97325

Dear Mr. Clevenger:

Enclosed please find a copy of the Contracting Officer's Decision on your Settlement Proposal dated June 26, 2007, which you submitted in response to the Government's January 15, 2004 termination for convenience. I also have reviewed your claim of bad faith and addressed the facts, analysis, and my findings of the same within the Contracting Officer's Decision.

I am willing to make payment of the amounts I found were due White Buffalo because of the Government's termination for convenience. Under FAR 49.112-2(b), before I can make payment, you will need to submit a voucher in the amount set forth in the Contracting Officer's Decision. If you decide to appeal, you may submit a voucher for the amounts that are not directly involved with the portion being appealed.

If you submit a voucher, please direct it to my attention. I currently have funds available to make payment. If I receive a voucher and the requisite banking information on or before September 18, 2007, I should be able to get payment to you 30 days thereafter. After September 18, 2007, the Government's payment system closes down for the end of the fiscal year and any payment consequently may be delayed until the new fiscal year system is operating.

If you have any questions, please contact me.

ORIGINAL SIGNED BY

Elizabeth M. Firestone
Contracting Officer

App. 113

EXHIBIT: 2
WIT: Firestone
Bridge City Legal

MOVING THE AMERICAN ECONOMY

ec: Richard E. Alexander, Stoel Rives, 900 SW 5th Avenue Suite 2600, Portland, OR 97204
Timothy P. McIlmail, United States Department of Justice
Timothy J. Binder, Division Counsel, WFLHD
Elizabeth M. Firestone, Contracting Officer, WFLHD
Clara H. Connor, Division Engineer. WFLHD
Robert B. Lale, III, Director of Project Delivery, WFLHD
Brent L. Coe, Construction Engineer, WFLHD
Jane F. Traffalis, Contract Administration Engineer, WFLHD
Howe T. Crockett, Construction Operations Engineer, WFLHD
H. Paul Rettinger, Project Engineer, WFLHD
Curtis R. Scott, Assistant Claims Analyst, WFLHD
Central Files

# Introduction

On August 20, 1998, the Federal Highway Administration (FHWA or the Government) entered into Contract Number DTFH70-98-C-00027, FS ERFO 97-18(2) - FDR 33 (MP 44.5 – MP 47.3), FDR 3347, FDR 3367020 with White Buffalo Construction, Inc. (WBC) in the amount of $1,370,480.00. The type of construction to be performed consisted of riprap, embankment, surfacing, retaining walls, and drainage for several sites damaged by the 1997 floods.

The Government terminated WBC for default on December 1, 1998, and later converted the termination to a termination for convenience on January 15, 2004, based on overburden at MP 46.7 that appeared to provide an independent reason why the road could not be opened by the contractually required due date.

WBC submitted their first settlement proposal on January 13, 2005. The Government audited the settlement proposal. WBC did not allow the auditor access to its materials at its business, but required the audit to be performed at the office of WBC's attorney. WBC did not provide its records until June 21, 2005. Data and records requested by the Defense Contract Audit Agency (DCAA) months earlier were continuing to be provided by WBC in late October. On January 18, 2006, WBC still had not provided answers to requests from DCAA. Thereafter, WBC asked for additional time to review the draft audit before holding the exit conference. The audit was completed on May 12, 2006 by the DCAA and provided to WBC on May 25, 2006.

On October 16, 2006, WBC submitted a revised settlement proposal. As part of this proposal WBC included an appendix that contained its "Justification for Anticipatory Profit and a Summary of Facts Supporting Bad Faith". This revised settlement proposal was provided to the auditor for review. On March 29, 2007, WBC notified the Government that it would be providing a third settlement proposal by the end of April. It provided its third settlement proposal on June 26, 2007. For purposes of this Contracting Officer's decision the analysis is based on this third settlement proposal.

WBC is asking for its costs on the project and lost profit on the work it was not able to perform. Its lost profit argument is based on an allegation that the Government acted in bad faith in administering and terminating the contract. This analysis will address first the termination settlement proposal and then the bad faith claim.

Section 153, Contractor Quality Control and Quality Assurance, required submission of the quality control plan "before start of the work." By this contract requirement, work contractually could not begin until the quality control plan for that portion of work was provided and accepted. As stated under subsection 153.02, with prior approval, submission of a quality control plan for items of work not immediately scheduled to begin may be deferred.

Nevertheless, in an effort to aid the contractor, the Contractor's Daily Record of Construction Operations (Contractor daily) verify the Government allowed work items such as mobilization, preliminary surveying, and installation of silt fence and straw bales to begin prior to receipt and acceptance of the quality control plan.

**i) Hazardous Spill Plan**
The contract required WBC to submit a Hazardous Spill Plan prior to construction under subsection 107.10 of the Special Contract Requirements. WBC submitted a Hazardous Spill Plan on September 15, 1998.

**j) Contract work performed prior to September 15, 1998**
From the Contractor's Daily Record of Construction Operations, Form WFLHD 465, work was performed prior to September 1, and throughout the period of time in dispute.

- Mobilization of equipment to the project site
  - August 29 thru September 2, 1998
- Laborers installing silt fence and straw bales
  - September 2 thru September 15, 1998
- Survey Subcontractors performing preliminary surveying from
  - August 31 thru September 4, 1998
  - September 9 and September 12, 1998

Starting September 15, 1998, WBC was allowed to begin full construction operations as allowed under the contract.

**2) Environmental Restriction Error by Paul Rettinger**
Mr. Clevenger stated in his deposition that during a call when he complained to Mr. Rettinger about not getting an approved schedule, Mr. Rettinger stated that WBC could not begin work at Milepost (MP) 46.2 prior to September 15 because no clearing was allowed. Tr, Clevenger, 104:12-20. The contract did not allow clearing operations at MP 46.7 or between MP 47.07 and 47.25 on Forest Development Road (FDR) 33 during the time between August 6 and September 15. The contract did not restrict work at MP 46.2 during these dates.

**3) Sajid Aftab was forced to sign letters written by Paul Rettinger**
As identified in Mr. Aftab's daily diary entries, there are several entries where he identifies letters written by Mr. Rettinger; however he indicates in many of the entries that the letters were discussed with him prior to his signature. For instance, on September 24, 1998, his diary states, "Paul wrote & discussed with me serial letter no. 017 & I signed it."

**4) Paul Rettinger overturning agreements between Sajid Aftab and Luther Clevenger**
WBC makes a general allegation that there were verbal agreements made between Mr. Aftab and Mr. Clevenger concerning "pay estimates, items of work, and other items demanding attention," only to have Mr. Rettinger overrule Mr. Aftab later. WBC does not provide any specifics to support this claim. I only found one situation where one of the multitudes of miscellaneous pay item tickets was signed by Mr. Aftab and afterwards rejected by Mr. Rettinger because the ticket was not according to contract specifications. Tr, Aftab, 80:21-81:6.

**5) Sajid Aftab requesting to be assigned to another project away from Rettinger**
In his October 21, 1998 diary entry, Mr. Aftab specifically recounts a conversation between himself and Mr. Crockett, the Government's Construction Operations Engineer. The excerpt from the diary stated the following:

> I told Paul my frustrations on this job. I am Project Engineer on this job, I am not making any decisions. I am not informed in which I expected has to come or go. I am only signing letters & feel that I am out of loop. I don't know why I am Project Engineer.
>
> Howe Crockett called (COE). I express my great displeasure regarding this job. I told him also that I am not being performing my duties as a P.E. Although Contractor's operations & performance is below average but we are also not helping to complete the job. I also asked Howe if he can pull me out of this job as I cannot perform my duties as Project Engineer. Inspectors are frustrated. Wayne told me that he don't agree w/ Paul's attitude towards Contractor & Paul is putting all effort is to stop this job. I told Wayne that's not true. I will talk to Paul but again I cannot promise you anything as I don't have authority on any issue.

On October 30, 1998, Mr. Aftab expressed his frustration again on the project in his diary. His diary states the following:

> Told Paul again I need training in T&A & Estimate.

| Facts | Comments: |
|---|---|
| Arrived at the project around 10:00 am. Contractor is still placing the pipe & preparing bedding material for the last section of the pipe observe contractors operations.<br><br>Bob Gietz told me that Jim told him that tomorrow on Oct. 31, they would be out of wetted perimeter & he is going to use riprap material which hasn't been approved for his energy dissipater. I told bob I will be here at job site tomorrow. | Bob Gietz keep on insisting that he should inform Paul about the situation. I told him I can handle it but he keep insisting. Maybe Paul has given him some specific direction to contact him rather than me. I told him okay go head & tell Paul.<br>Again, I am frustrated as I am not given an opportunity to get involved in project, writing letters, making decisions, scheduling inspectors at the job or even making spreadsheets for my job.<br>When I came to this job as Project Engineer with understanding that Resident Engineer is there to help me not to run my job. Resident Engineer in the starting has given me an opportunity & slowly took over my job.<br>I am not even being consulted regarding scheduling inspectors. If inspectors has any |

| | |
|---|---|
| | problem, they now go to Resident Engineer than I. I have not been trained or helped as a Project Engineer. I was always on the project. Spend very little time in office. So I have not achieved or not been able to get help from Resident Engineer to prepare myself for the future projects. |

In his deposition, Mr. Aftab was questioned if he asked to be transferred because of his problems with WBC, Mr. Clevenger personally, or Mr. Rettinger. Mr. Aftab answered, "There was no personal issue between you and me. All it was, was that you are the Contractor. We are seeing that this Contractor is not going to be done or completed. It was frustration on both sides, which always comes down – and again, this was my first project. That's why I wrote that statement in my diary. It frustrated me why the Contractor was not performing what he is supposed to perform according to the contract. That was my frustration. That's why I asked them to remove me from the project." He was asked specifically what problems he was having with Mr. Rettinger. Mr. Aftab replied, "Paul was not assigning me the assignment of a Project Engineer. That was a big frustration that I can tell you – these are all combinations of all these. The job was not going good. My boss is not giving me those assignments – which he's suppose to give me those assignments. That's how it, you know, happened." Tr, Aftab, 20:3-21:18

**6) Inspectors' statements regarding Paul Rettinger's administration style or comments**
WBC claims that inspectors working on the project for the Government had made disparaging comments regarding Paul Rettinger's actions on the contract.

**a) Wayne Lowell**
WBC claims that one of the inspectors left the project largely because he had never seen Rettinger treat a contractor so harshly. Clarification was sought from WBC regarding the identity of this inspector they claim left under these circumstances, which they replied to identify him as Wayne Lowell.

According to the Inspector Daily Reports, Mr. Lowell was on project from September 18, 1998 to October 29, 1998. The information within the Inspector Daily Reports do not relate to the statements as depicted by WBC. However, as identified by WBC in their email response for clarification, the Deposition for Mr. Aftab discusses Mr. Lowell's reasons for leaving. When asked why Mr. Lowell left the project, Mr. Aftab replied, "His wife was having some problems and she needed an operation." Mr. Aftab also stated, "He was also frustrated on the job and the real reason was because of his wife." When asked if Mr. Lowell said anything about Mr. Rettinger's conduct, Mr. Aftab answered, " He said that, "I don't know why Paul is so strict on the is job, while he was not so strict on other jobs." He has been with Paul for the last four or five years, so that's why." Tr, Aftab, 76:19-77:12

**b) Mike Barber**
WBC also claims another inspector who was fired from the project indicated that Rettinger was deliberately trying to rid the Government of what he termed "problem contractors." This employee was identified by WBC as Mike Barber in a response to a request for clarification.

In response to another request for clarification on this issue, WBC provided information they received from Mr. Barber's employer, CMTS, as Mr. Barber was a consultant inspector on the project, not an employee of the Government. In the information provide by CMTS, there is a letter to the file written by Mr. Barber to reflect his displeasure with his removal from the project, which is included as follows:

> As we discussed on 9-10-98, and in our following discussions, Paul Rettinger, FHWA, unlawfully voided my CMTS contract with the Federal Highway Administration on 9-10-98 without any warning or reason. He oddly asked me to return to the FHWA Office from my field assignment; and he was leaving the Office in his vehicle as I arrived when he suddenly voided the CMTS contract. He asked me to be gone by the end of the day. I asked for an explanation to his bizarre statement, and he said that Luther Clevenger, Construction Contractor, had told him "everything" that I said during our 9-8-98 meeting arranged by Mr. Rettinger. Since I had done nothing wrong during this 9-8-98 meeting, Mr. Rettinger's decision was still irrational. He refused any specific explanation. After Mr. Rettinger had quickly disappeared, I learned that he had maliciously slandered both Mr. Clevenger and I with his fabricated scenario of –He said, I said-. I arranged a meeting with Mr. Rettinger for the following morning to receive documentation of his decision, but the following day Mr. Rettinger only continued his insane behavior. No dismissal documentation from anyone has been delivered to me yet, nearly four months later.
>
> Retrospectively, Mr. Rettinger's comment to the FHWA Office in mid-July, 1998 shortly after I had been assigned to work for him in Nesika Beach, Oregon that he would vindictively volunteer to be the project engineer on any construction project with a specific contractor which the FHWA had not liked in the past; and that he would make sure this contractor would never work for the FHWA again. This typified his inappropriate, hostile attitude towards my CMTS Contract with the FHWA. I am preparing a summary of Mr. Rettinger's unlawful actions from 7-6-98 to 9-11-98 in case the investigators need it per the following paragraph describing the 1998 U.S. Government Crime Case before the Ninth Circuit U.S. Court of Appeals.
>
> I am involved as a key witness in a June, 1996 legal action exposing criminal activity by the U.S. Government. My Fall of 1996, Summer of 1997, and Summer of 1998 Construction Inspection Assignments for the FHWA have been generally unaffected by this multi-million dollar legal action. After I was assigned to Mr. Rettinger in early July, 1998, he prejudicially performed his duties regarding my position in repetitiously malicious efforts to damage us. He has intimate knowledge of this extensive 1996 to 1998 U.S. Government legal action, and he repeatedly used this information in mocking, insulting statements and actions against me. I remained professional, prudent, and positive in my contractual duties throughout the projects minimizing any of his harm to the success of the construction projects. Although Mr. Rettinger's unlawful actions against me may seem to be employment discrimination; he has exposed himself as a criminal accomplice to the aforementioned criminal activity by the U.S. Government. I suspect that our construction contracting's involvement will be minimal, with the Judicial Authorities probably just including Mr. Rettinger's unlawful actions into their crime case investigation.
>
> I respect CMTS's decision of legal action regarding the FHWA contract violation. I don't have the time or money to correct this defamatory action against me; and would agree with you in not pursuing Mr. Rettinger's unlawful activities in a civil case.

extra work?" Mr. Aftab responded, "We have provided all information regarding this site work. I am not gonna tell what % is complete but @ this site we don't consider the work is completed as no rounding of slope were done & yes it will be considered as extra work maybe come up under contract modification."

Later in the discussion, Mr. Garren asked, "What you guys are going to do with big rock cut MP 46.7 & material." Mr. Aftab replied, "We are going to redesign this rock cut & work may be done under different contract modification. 85% of the material on the site is blasted material need to be hauled to disposal area is contract work. 15% of the material haul to disposal area may be done under contact modification."

**c. Discussion with Luther Clevenger, WBC**
During the meeting with Mr. Garren Corporation at the MP 46.2 site, Mr. Clevenger of WBC arrived on site. Events of this exchange are also included in Mr. Aftab's diary entry for December 30, 1998, and subsequently reiterated in an email from Mr. Aftab to Mr. Crockett. Mr. Aftab's diary entry states the following:

> At 46.2 when I was showing project to Mr. Roy Garren & Albert, Luther showed up & start taking pictures of pipe. I asked Luther what he is doing at the project. I told him he don't have equipment or material on the job so he is trespassing. I will advise him to leave. If he has any questions please call my office to take appointment. He told me he came here to pick up all construction signs. I told him I will advise against it & strongly advise him not to do that as all signs belong to Federal Highway Administration. He told me he agree, took some pics, & ask me what we are doing with big rock cut @ 46.7 (as Kerr's Construction told him that) FHWA are going to redesign that Big Rock Cut. I told Luther contact your bonding company & I will not give you any answer. Luther left the job & then I left the job.

**d. Tidewater Contractors, Inc.**
On December 30, 1998, Mr. Aftab's diary depicts a phone discussion he had with a potential completion contractor, Scott Darger of Tidewater Contractors, Inc. after completing the "show-me" tour to Mr.Garren Corporation. According to Mr. Aftab's diary, Mr. Darger called and told him they were also going to bid the job and he is going to go to the project the following day. Mr. Darger asked, "Is there any change in the contract window." Mr. Aftab replied, "No, not to my knowledge." Mr. Aftab then told Mr. Darger, "If he want to come to our office he can. I will be happy to give him any answers to the questions he has." Mr. Darger replied, "Thanks, I already know the job."

## 2. Letter to the Government from ICW regarding potential design changes

In a letter from ICW to the Government dated January 15, 1999, ICW iterates their intent to tender a completion contractor for completion of the contract. This letter continues to ask for clarification regarding discussions between Mr. Aftab and the potential completion contractors regarding the potential for a redesign at MP 46.7 and permit extensions to allow work to commence in June. An excerpt from the letter is included below:

> (Text Omitted)
>
> **App. 120**
>
> To facilitate a complete and thorough bid, it has come to my attention that Mr. Sajid Aftab with the U.S. Department of Transportation has notified the various completion contractors during various site walks that it will be the Government's intention to redesign the slope work at MP

46.7 which would include any necessary benching and above slope excavation. Additionally, Mr. Aftab has advised the completion contractors that the scope work (window) will be opened up. This will allow the work to commence in June due to the extra work at the rock slide location. Please advise ICW of the Government's intentions so that appropriate estimates can be completed for the completion work.

(Text Omitted)

**3. Response Letter to ICW from the Government regarding design changes**
A letter dated February 2, 1999 from the Government to ICW responds to ICW's intent to tender a completion contractor, and the requirements for performing such. It also addresses the work to be performed by the completion contractor. The letter states the following:

Your letter of January 15, 1999 advises that the Insurance Company of the West anticipate tendering a completion contractor to complete the above referenced contract. Upon deciding to tender a completion contractor, please do so in writing providing the name of the contractor. We will consider the contractor's ability to perform the work and, if capable, we will advise you of our acceptance.

It is my position that the contract with a completion contractor will be based on the original plans and specifications and provided that the completion contractor will correct any defective work as well as the balance of the uncompleted work in strict accordance with the contract requirements. The contract should incorporate the original contract's items of work and unit prices with the original quantities adjusted due to work previously performed. The contract should be for the balance of the original contract proceeds. New payment and performance bonds will be required on the new completion contract.

Any changes in the original contract requirements will be done by contract modifications to the completion contract after award so that any associated additional costs can be segregated from the cost of the original contract. At this time we are pursuing the possibility of the permitting agencies allowing the in-stream work to begin earlier in 1999 than the current contract allows. This relaxation of the work window restriction may or may not occur, and we may not know the final determination until sometime in March or later.

App. 121

I spoke with Project Engineer Sajid Aftab and Resident Engineer Paul Rettinger regarding your contention that Sajid notified the potential completion contracts that the Government intends to redesign the slope at MP 46.7 and that the window of time during which to perform the work will be 'opened up.' Sajid advised me that he did not notify nor advise the potential completion contractors as noted in your letter. Paul also advised me that he did not. Sajid records in his daily diary the contacts and the significance of discussions he has with contractor and agency representatives on project matters. The diary contains entries for the contacts that occurred on the days potential completion contractors were on the project site. The diary does not include reference to slope redesign at MP 46.7 or that the performance window will be opened up.

Regarding the slope at MP 46.7, it remains the Government's position that White Buffalo is responsible for the current condition of the grading work at this location. The excavation and grading at this location must be performed in accordance with the original contract requirements. If corrective work is require because of the previous efforts by White Buffalo, Inc., the completion contractor may propose a slope redesign under the completion contract.

I hope this provides a better understanding of my expectations regarding a completion contract being contemplated for our original contract DTFH70-98-C-00027 with White Buffalo Construction, Inc.

As late as March 16, 1999, the Government was still working on designing a solution to the overburden site, coordinating with the United States Forest Service to expand the construction limits.

**4. Depositions relating to the "redesign" of MP 46.7 on FDR 33**

In the depositions, Mr. Aftab was specifically asked about redesigns by the Government. Within the deposition, Mr. Aftab explained that he was not aware of the potential for the redesign at MP 46.7 until about a week before he left the project at the end of December, when he talked to Betty Chon, the Government's designer.

Ms. Chon testified that she did not work on the design until after David Lofgren, the Government's geologist, completed the design analysis. Mr. Lofgren stated in his deposition that he did not perform his analysis for the corrective design until February or March. This timeframe was confirmed by the Deposition of Ms. Chon when she said that she performed the changes to the design at this site in January or February of 1999.

**5. Other "redesigned" sites**

Based on the deposition by Mr. Lofgren, only two other sites were "redesigned" in an effort to address problems. The locations of these two sites were MP 47.25 on FDR 33 and MP 0.43 to 0.46 on FDR 3347.

The failure at MP 47.25 on FDR 33 was explained by Mr. Lofgren in his deposition as a slope that was over-steepened for the type of material that the slope was cut in. There was rock in the lower part of the cut. When asked if the major contributing factors to that failure were the heavy rains, Mr. Lofgren answered, "Yes."

Mr. Lofgren explained that the failure on FDR 3347 was the result of the existing embankment failing, which WBC had not started work at this location, therefore the failure could not have resulted from their actions.

**6. Agreements between ICW and TCI**

**a. Tender Agreement Request from ICW to the Government**

In a letter dated February 8, 1999 from Insurance Company of the West (ICW) to the Government, the surety asked the Government to consider execution of a Tender Agreement to establish a new contract with Tidewater Contractors, Inc. (TCI or Completion Contractor). Attached to the letter was a copy of the Tender Agreement from ICW. Within the Tender Agreement, item number 2 specifically addresses change orders, and states, "Any Change Orders issued under TCI's contract shall be a matter between TCI and the Government and shall not affect Surety." This statement demonstrates an understanding by ICW that Change Orders were possible during the completion contract, and demonstrates that TCI was aware of this possibility.

Lofgren, 108, 4-19. Each of these was done by contract modification and was based on work done by the Government in February or March of 1999. Tr, Lofgren, 112:4-9. The redesign of the MP 47.25 site was due to a slide caused by heavy rains in November, 1998. Tr, Lofgren, 56:18-58:20. The redesign of MP 0.43-0.46 was due to a fill failure. Tr, Lofgren, 109:4-23. And, again, Mr. Lofgren testified that he began working on these sites in February or March of 1999. Tr, Lofgren, 112:4-9. If find no evidence that the Government began work on redesigning these sites prior to the February 2, 1999 letter to the surety.

WBC alleges that the Government paid the completion contract to correct the overburden at MP 46.7 even though the completion contractor had included the costs in its contract with the surety. It is true that the completion contractor included an Alternative bid item for work at MP 46.7 in the amount of $50,000.00. However, it is not true that such item was for work that duplicated work the completion contractor included in his contract. When Mr. Clevenger took the deposition of the completion contractor's personnel, he pressed this very question. Mr. Darger made it clear that the $50,000.00 was for cleaning up the mess left in the road and below the road by the blast. It did not include work for the overburden.

WBC alleges that it made repeated FOIA requests for the Government's redesigns, but the Government claimed that there were none and did not provide them. The Government did not provide the redesigns based upon advice from counsel that the redesigns were not responsive to the wording of the FOIA requests. Tr, Lofgren, 97:11-98:8. Once WBC brought suit on November 16, 1999 to get the documents, the Government decided that there was no reason to fight over what was or was not viewed as being within the terms of the request. Since the documents were not secret, and in fact were part of the Contract Modification 001 to the completion contractor that was finalized on June 25, 1999, the Government resolved the suit by providing the requested documents. What WBC viewed as a deliberate withholding, Government counsel viewed as not requested. This difference in legal views does not support a bad faith claim.

Further, in reviewing these matters, I do not find that the decision by counsel to withhold the documents as non-responsive sheds any light on actions of the Government prior to the default termination. The decision as to which documents are responsive to a FOIA request provides no evidence of the way a contract was administered. The individuals involved in the redesign and the FOIA are different people than those involved in construction and contracts. The FOIA request does not show whether or not the contract was administered in bad faith.

## DECISION – SUBPART 6

Because I do not find that the Government lied, and because the alleged lie was after the default termination, I find no basis for concluding that the Government breached a covenant under the contract or was guilty of bad faith.

Nor have I have not found any evidence that there was substantial work elsewhere on the project that was not performed.

While this issue may have been a reason to reduce payments to the completion contractor, it provides no basis for concluding that there was bad faith in the way the Government administered the WBC contract. The completion contract activities took place after the termination for default. When considering whether one side or the other breached a contract, one must first find that there was a contract in existence. Following the termination, there was no contract between WBC and the Government. Thus, these subsequent activities cannot be the basis for finding a breach of the covenant of good faith and fair dealing, or bad faith in the administering of the contract.

In any event, it appears that much of this problem may have stemmed back to the blasting at MP 46.7 performed by WBC. From pictures of the site, it is clear that the completion contractor took out all of the material that was blasted. According to WBC's blasting plan, the two blasts were supposed to deal with the rock material at the site. In fact, if WBC's survey is correct, its rock blasts came up short of reaching all of the rock material that needed to be removed from the site.

I do not know why the Government did not require the completion contractor to bring in a new blasting company and remove the material that WBC failed to remove. But I cannot see how this failure can be viewed as bad faith, or how it relates back to the way the Government administered WBC's contract.

WBC alleges that this resulted in substantial additional and unnecessary cost to WBC and the surety. I do not find this to be the case. The allegation is not that the Government paid more for the work called for in the contract than it should have, but rather that the Government did not get what it bargained for in the contract. If any party is damaged, it is the Government, not WBC. WBC was required to take out the material at MP 46.7. When it failed to do so, the completion contractor was required to take it out. Both WBC, and later the completion contractor, had a contract quantity pay item for this excavation work. The Government was obligated to pay this price and the contractors were obligated to perform the work. There was no additional expense or cost to WBC. If the survey is correct, the Government simply did not get its bargain. Any correction would be to require the completion contractor to finish the work. It would not be to refund WBC.

Further, in this contracting officer's decision, the Government is covering all of the costs of WBC for work on the project. I do not find any basis for concluding that the Government acted in bad faith towards WBC.

## DECISION – SUBPART 10

Based upon the above analysis, I conclude that the Government did not administer its contract with WBC in bad faith based upon the allegation that the Government improperly paid the completion contractor. Even if the Government did make a mistake in not holding the completion contractor to blast and excavate out the cut at MP 46.7 to the limits required by the contract, I find no evidence that such was in bad faith, and, even if such bad faith existed, it does not change my assessment of the Government's administration of the WBC contract. I do not find bad faith stemming from these allegations.

# Conclusion

Based upon the termination settlement proposal submitted by WBC on June 26, 2007, the DCAA audit of the proposal, and the project records, I conclude, based upon the above analysis of the costs claimed and the bad faith allegation, that WBC is owed $240,178.61.[40]

This is the final decision of the Contracting Officer. You may appeal this decision to the agency board of contract appeals. If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the agency board of contract appeals and provide a copy to the Contracting Officer from whose decision this appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract by number. With regard to appeals to the agency board of contract appeals, you may, solely at your election, proceed under the board's small claim procedure for claims of $50,000 or less or its accelerated procedure for claims of $100,000 or less. Instead of appealing to the agency board of contract appeals, you may bring an action directly in the United States Court of Federal Claims (except as provided in the Contract Disputes Act of 1978, 41 U.S.C. 603, regarding Maritime Contracts) within 12 months of the date you receive this decision.

Executed on August 30, 2007

ORIGINAL SIGNED BY

Elizabeth M. Firestone
Contracting Officer



[40] See page 11 for a summary detail of this amount.