IN THE UNITED STATES COURT OF FEDERAL CLAIMS

WHITE BUFFALO CONSTRUCTION, INC.,

Plaintiff,

vs.

THE UNITED STATES,

Defendant.

Case No. 99-961C

DEPOSITION OF HENRY PAUL RETTINGER

Taken in behalf of the Plaintiff

April 25, 2008

* * *

App. 126



Electronically signed by Tamara Pearce (401-085-214-2770) 5d414cb8-3e64-4ab5-bf01-1aee3dd2d3ce

BE IT REMEMBERED THAT, pursuant to Federal Rules of Civil Procedure, the deposition of HENRY PAUL RETTINGER was taken before Tamara Aufdermauer Pearce, OCSR No. 90-0199 and WCCR No. 2141, on Friday, April 25, 2008, commencing at the hour of 9:00 a.m., the proceedings being reported at the Department of Transportation, 610 East Fifth Avenue, Vancouver, Washington.

* * *

APPEARANCES

APPEARING FOR PLAINTIFF:

STOEL RIVES
By Scott Kaplan
900 S.W. Fifth Avenue, Suite 2600
Portland, Oregon 97204
503.224.3380

APPEARING FOR DEFENDANT:

UNITED STATES DEPARTMENT OF JUSTICE - CIVIL DIVISION
COMMERCIAL LITIGATION BRANCH
By Timothy McIlmail
1100 L. Street, NW
Washington, DC 20530
202.616.0342
and
US DOT FEDERAL HIGHWAY ADMINISTRATION
By Rayann Scott
610 East 5th Street
Vancouver, Washington 98660
360.619.7529

ALSO PRESENT: Curtis Scott
Luther Clevenger

**App. 127**

have to look at documents, but I believe -- I do know that it was discussed, and it was in my opinion that they could not complete the project.

Q. And you expressed that opinion prior to any cure notice being sent to White Buffalo, correct?

MS. SPEAKMAN: Objection, leading.

A. And I just don't recall the time frames at this point.

BY MR. KAPLAN: (Continuing)

Q. Do you recall that a cure notice was sent to White Buffalo on November 6th, 1998?

A. I know that a cure notice was sent. I don't know the date of it.

Q. Whatever the precise date of the cure notice, do you recall that you stated you felt White Buffalo should be terminated for default before that cure notice going out?

MS. SPEAKMAN: Objection, leading.

A. And again, I -- I honestly can't remember the exact dates of what occurred. I know there were conversations regarding how we were going to handle this contract.

BY MR. KAPLAN: (Continuing)

App. 128

Q. At the time the cure notice went out, you didn't really expect White Buffalo to cure the default, did



Electronically signed by Tamara Pearce (401-085-214-2770) 5d414cb8-3e64-4ab5-bf01-1aee3dd2d3ce

you?

MS. SPEAKMAN: Objection, leading.

MR. KAPLAN: Counsel, I'm permitted to ask leading question to Mr. Rettinger. He is -- the term "hostile witness" isn't used any more, but he is affiliated with the opposing party, so leading questions are appropriate.

MS. SPEAKMAN: I understand, and I'm going to preserve the record throughout this deposition in terms of form-of-question problems. So I will continue to object to leading questions.

MR. KAPLAN: I guess it's all of our time.

But could you repeat the question back --

Let me ask you first, Mr. Rettinger, do you remember what the question was?

THE WITNESS: No, I don't.

MR. KAPLAN: Could you read back the question, please.

(The reporter read back as follows:

At the time the cure notice went out, you didn't really expect White Buffalo to cure the default, did you?)

A. I would say I did not expect them to cure the default.

BY MR. KAPLAN: (Continuing)

App. 129

Q. And did you ever hear that he had left because he thought that you were treating White Buffalo too harshly?

A. I heard that later as an allegation, but he never said that to me.

Q. Did you ever discuss it with him?

A. No.

Q. Did you ever discuss with him why he left the job before it was completed?

A. Yes, his wife's health.

Q. Is that what he told you?

A. Yes.

Q. What did he say about his wife's health?

A. Well, she had a heart condition, and it was -- at that elevation, she was having trouble breathing, and there were issues. They were older. He was in his seventies. She is, too.

Q. Was Mike Barber an inspector on the project?

A. Yes.

Q. And did he leave the project as well?

A. Yes, he did.

Q. And did you hear that he left the project because he had some personality conflicts with you?

A. No.

App. 130

Q. Did you hear any reason why he left the



Electronically signed by Tamara Pearce (401-085-214-2770) 5d414cb8-3e64-4ab5-bf01-1aee3dd2d3ce

project?

A. Yes. He was terminated.

Q. Terminated by whom?

A. Myself.

Q. And just so I understand it, was he terminated from the project or from the Federal Highway Administration?

A. Well, he was a consultant inspector.

MS. SPEAKMAN: Objection to form.

BY MR. KAPLAN: (Continuing)

Q. Why did you terminate him?

A. Performance issues.

Q. What kinds of issues were those?

A. Failure to follow directions, stepping outside the bounds of his authority, directing contractor operations.

Q. Anything else?

A. There may have been others. That's what I recall.

Q. Okay. And the directing contractor operations, was that contractor White Buffalo?

A. No.

Q. What contractor was that?

App. 131

A. We had multiple contracts. There was a somewhat adjacent contract, and I don't remember the name

BY MR. KAPLAN: (Continuing)

Q. Instead of whom should have been directing those operations?

A. The contractor.

Q. What kind of background did Mr. Barber have? Was he an engineer?

A. I don't know. He was vetted through the system. I was not a part of that.

Q. Now, if Mr. Barber had, for example, engineering expertise, do you think it would have been inappropriate for the contractors to consult with him about his views and consider his views about what should be done?

A. I don't believe it would be inappropriate. I don't believe that he should tell them what to do.

Q. Okay. And you said that Mr. Barber had been stepping outside the bounds of his authority. What do you mean by that?

A. What I meant was is under the terms and conditions of our contract with our consultant inspectors, they are not to be directing contractors' operations. They're not to accept or reject materials and workmanship.

Q. And the first reason you gave me for terminating Mr. Barber was that he failed to follow directives, I think it was. What directives did he fail to follow?

App. 132

A. As I recall, and it's been 10 years, but we had -- I had had conversations with Mr. Barber on the other FDR 26 project regarding him directing the contractors' operations, and I had clearly advised him that that was not his role.

The day of the termination, as I recall, he went up to the project site to pick up some papers from the White Buffalo construction project and, as I recall, Luther -- I think Luther either called me or Sajid on the phone, and there were a number of he questions that came up because he had had conversations with Mike Barber.

And I don't recall the specific issue, but I know that we had indicate -- or my sense was that there had been directions given because Luther was asking questions, and he may have been asking me or Sajid and I don't remember, but when he got back, we discussed it and it got heated, and then I told him we've discussed this before, and at that point he was advised that his -- his work was done.

Q. Do you feel that it was inappropriate for Mr. Barber to be having the kinds of conversations he was with Mr. Clevenger?

App. 133

A. I'm not sure the -- I wasn't there, so I don't know what the conversations were, and I don't know if they were appropriate. But I do know that, based on the

questions that Luther was asking at the time, I didn't feel that -- that we wanted to be giving the contractor any kind of directions, and certainly I didn't want the contract inspectors out there giving him directions.

Q. When you say "we didn't want to be giving the contractor directions," would those directions have been appropriate if they came from you, for example?

A. The contract -- the terms and conditions of the contract are the directions, and I don't have the authority, neither does the inspectors, to go out and in any way change that, and certainly we shouldn't be giving any kind of direction to do anything that's different than what the contract says.

Q. But in some circumstances, it is appropriate for you to give directions. For example, if you see something, some work going on that's not consistent with the contract, you can direct a contractor to stop work. Is that right?

A. There are provisions in the contract that allow that, but that's certainly not an inspector's role.

Q. You mentioned previously you've reviewed Ms. Firestone's decision. Is that right?

A. The Contracting Officer's decision?

Q. Yes.

A. Yes.

App. 134

A. I'm sure they were. I can't recall exact conversations, but we -- we were in contact with the Forest Service continually, and especially as we neared the -- and this particular period was critical, so yes, they were up to date, I believe.

Q. And you say, "They are aware of the unsatisfactory performance by this contractor"?

A. Yes.

Q. Was unsatisfactory performance something they suggested or something you told them?

A. Unsatisfactory -- are you looking for definition or who said it or what?

Q. No, who said it.

A. I wrote the email.

Q. And then when you say, "They are aware of the unsatisfactory performance," did you mean based on their observations or based on something you told them?

A. No, based on failure to perform the provisions in the contract.

Q. So you made the Forest Service aware of the unsatisfactory performance?

A. Yes, I did.

Q. Now, you say, "Given the choice, the USFS would rather have a delay with the road opening, than have to live with a poor-quality project."

App. 135


Electronically signed by Tamara Pearce (401-085-214-2770) 5d414cb8-3e64-4ab5-bf01-1aee3dd2d3ce

A. And your question is did I recall that?
Q. Right. When you read it, did you form an understanding that Land Mark was saying there were some discrepancies?
A. Yes.
Q. Did you agree with Land Mark?
A. I wouldn't say that I agreed with them, no.
Q. Did you disagree, or, by that point, had it been far enough after the project that you weren't in a position to agree or disagree?
A. I didn't have a survey that I had been involved in to base it on as to whether it was accurate or not. I took it on the face value that, you know, they are an honest, reputable contractor, and that what they measured is what they had, but I couldn't verify or determine whether I agreed with it or not.
Q. Let's go on to the next sentence.
A. Okay.
Q. Are you in a position to disagree with the statement that "The quantity of material that was not removed to accommodate the fallout is approximately 2226 cubic meters"?

App. 136

A. Do I agree with that statement?
Q. Do you disagree with it?
A. I have no basis to say at this point. I


Electronically signed by Tamara Pearce (401-085-214-2770) 5d414cb8-3e64-4ab5-bf01-1aee3dd2d3ce

C E R T I F I C A T E

I, Tamara Aufdermauer Pearce, CSR No. 90-0199, do hereby certify that HENRY PAUL RETTINGER personally appeared before me at the time and place mentioned in the caption herein; that the witness was by me first duly sworn on oath and examined upon oral interrogatories propounded by counsel; that said examination, together with the testimony of said witness, was taken down by me in stenotype and thereafter reduced to typewriting; and that the foregoing transcript, pages 1 to 72, both inclusive, constitutes a full, true and accurate record of said examination of and testimony given by said witness, and of all other proceedings had during the taking of said deposition and of the whole thereof, to the best of my ability.

Witness my hand at Portland, Oregon, this 1st day of May, 2008.

Tamara A Pearce

TAMARA AUFDERMAUER PEARCE
OCSR No. 90-0199

App. 137

AUTHENTIC COPY
The original certified E-Transcript file was electronically signed using RealLegal technology.