IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| WHITE BUFFALO CONSTRUCTION, INC., Plaintiff, | No. 99-961C |
| v. | (Consolidated with Nos. 00-415C and 07-738C) |
| THE UNITED STATES, Defendant. | (Senior Judge Smith) |

DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

GREGORY G. KATSAS
Assistant Attorney General

JEANNE E. DAVIDSON
Director

TODD M. HUGHES
Deputy Director

TIMOTHY P. MCILMAIL
Trial Attorney
Department of Justice
Civil Division
Commercial Litigation Branch
Attn: Classification Unit
1100 L Street, N.W., 8th Floor
Washington, D.C. 20530
Telephone: (202) 616-0342
Facsimile: (202) 514-7965

Attorneys for Defendant

OF COUNSEL:

Rayann L. Speakman
Attorney-Advisor
Western Federal Lands
Highway Division
610 E. Fifth Street
Vancouver, WA 98661

July 11, 2008

TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . ii

DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW.. . . . . . 1

STATEMENT OF THE FACTS. . . . . . . . . . . . . . . . . . . . . . . . 1

I. Background. . . . . . . . . . . . . . . . . . . . . . . . 1

II. Performance Of The Contract.. . . . . . . . . . . . . . . . 2

III. Termination Of The Contract.. . . . . . . . . . . . . . 14

IV. Termination For Convenience Settlement Proposal.. . 14

A. Post-Termination On-Site Work Of Jim Heigh.. . 14

B. Labor Of Luther And Julie Clevenger. . . . . . . 15

C. Owner Operator Costs.. . . . . . . . . . . . . . 15

D. Legal And Professional Fees Related To Subcontractors.. . . . . . . . . . . . . . . . . . 15

E. Interest.. . . . . . . . . . . . . . . . . . . . 16

F. Equipment And Vehicle Costs. . . . . . . . . . . 16

G. Profit Upon Work Performed Prior To Termination.. . . . . . . . . . . . . . . . . . 17

H. Settlement Expenses. . . . . . . . . . . . . . . 17

STATEMENT OF THE ISSUES OF FACT AND LAW TO BE RESOLVED BY THE COURT.. . . . . . . . . . . . . . . . . . . . . 18

DISCUSSION OF APPLICABLE LEGAL PRINCIPLES.. . . . . . . . . . . 19

I. Termination For Convenience Settlement Proposal. . . . . . . . . . . . . . . . . . . . . . . 19

II. Anticipatory Profit.. . . . . . . . . . . . . . . . . . 25

OBJECTIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

# TABLE OF AUTHORITIES

CASES PAGE(S)

Abcon Associates, Inc. v. United States,
49 Fed. Cl. 678 (2001). . . . . . . . . . . . . . . . . . 25-26

Albemarle Bank and Trust Co. v. United States,
12 Cl. Ct. 704 (1987);
aff'd, 845 F.2d 1034 (Fed. Cir. Feb. 18, 1988)
(unpublished table decision).. . . . . . . . . . . . . . . . . 21

Alexander v. United States,
25 Ct. Cl. 329 (1890). . . . . . . . . . . . . . . . . . . . 21

Am-Pro Protective Agency, Inc. v. United States,
281 F.3d 1234 (Fed. Cir. 2002). . . . . . . . . . . . . . . 26

Columbia First Bank, FSB v. United States,
60 Fed. Cl. 97 (2004).. . . . . . . . . . . . . . . . . . . 28

First Federal Lincoln Bank v. United States,
68 Fed. Cl. 602 (2005). . . . . . . . . . . . . . . . . . . 28

Kania v. United States,
650 F.2d 264 (Ct. Cl. 1981).. . . . . . . . . . . . . . . . 21

Krygoski Construction Co., Inc. v. United States,
94 F.3d 1537 (Fed. Cir. 1996).. . . . . . . . . . . . . . . 26

Lisbon Contractors, Inc. v. United States,
828 F.2d 759 (Fed. Cir. 1987).. . . . . . . . . . . . . . . 29

McDonnell Douglas Corp. v. United States,
76 Fed. Cl. 385 (2007). . . . . . . . . . . . . . . . . . . 21

Santa Fe Engineers, Inc. v. United States,
818 F.2d 856 (Fed. Cir. 1987).. . . . . . . . . . . . . . . 29

Servidone Construction Corp. v. United States,
931 F.2d 860 (Fed. Cir. 1991).. . . . . . . . . . . . . . . 29

Voices R Us, Inc., ASBCA Nos. 52307, 1565,
01-1 B.C.A. ¶ 31,328 (Mar. 6, 2001).. . . . . . . . . . . . 29

White Buffalo Construction, Inc. v. United States,
52 Fed. Cl. 1 (2002). . . . . . . . . . . 19, 20, 21, passim

Wilner v. United States,
24 F.3d 1397 (Fed. Cir. 1994). . . . . . . . . . . . . . . . 19

STATUTES, RULES AND REGULATIONS

48 C.F.R. § 31.205-24 (1998). . . . . . . . . . . . . . . . 23, 25

48 C.F.R. § 31.205-6(1). . . . . . . . . . . . . . . . . . . . 24

48 C.F.R. § part 31. . . . . . . . . . . . . . . . . . . . . . 22

48 C.F.R. § 49.108-3(a). . . . . . . . . . . . . . . . . . . . 20

48 C.F.R. § 49.202(a). . . . . . . . . . . . . . . . . . . . . 20

48 C.F.R. 49.203(a). . . . . . . . . . . . . . . . . . 20, 21, 29

48 C.F.R. § 52.211-10. . . . . . . . . . . . . . . . . . . . . 11

48 C.F.R. § 52.249-2(g)(2)(iii). . . . . . . . . . . . . . 18, 20

48 C.F.R. § 52.249-2(g)(2)(3). . . . . . . . . . . . . . . . . 25

RCFC 32(a)(2) and (3). . . . . . . . . . . . . . . . . . . . . 30

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WHITE BUFFALO CONSTRUCTION, INC., Plaintiff, | ) | |
| v. | ) | No. 99-961C (Consolidated with Nos. 00-415C and 07-738C) (Senior Judge Smith) |
| THE UNITED STATES, Defendant. | ) | |

DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

Pursuant to Appendix A ¶ 14 to the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully submits this Memorandum of Contentions of Fact and Law.

STATEMENT OF THE FACTS

I. Background

This is a Contracts Disputes Act ("CDA") case in which the Government terminated a contract for default and withheld liquidated damages, but then converted the termination to a termination for convenience and decided not to withhold any liquidated damages.

On December 1, 1998, a Federal Highway Administration ("FHWA") contracting officer terminated for default the Government's road repair contract with White Buffalo Construction, Inc. ("White Buffalo"). The contacting officer terminated the contract because he determined that White Buffalo failed to perform, including by failing to complete contract work

within the contract completion date for that work, failing to prosecute the work with the diligence that would ensure completion of other contract work within the contract completion date for that work, and failing to comply with other contract requirements. In terminating the contract, the contracting officer directed White Buffalo to stop all work.

On January 15, 2004, the contracting officer converted the termination for default into one for the convenience of the Government. By that date, the Government had paid White Buffalo $479,085.29 for contract work. The contract price was $1,370,480.

White Buffalo submitted a termination for convenience settlement proposal, and a claim for lost profits, which, together, requested payment of an additional $1,274.854. On August 30, 2007, a contracting officer issued a final decision finding that White Buffalo was owed $240,178.61, and invited White Buffalo to submit a voucher for that amount. White Buffalo has not submitted that voucher. White Buffalo is not owed the additional $1,061,576.781, plus interest, that it seeks in this action.

II. Performance Of The Contract

White Buffalo contends that FHWA prevented it from completing the work it contracted to perform. White Buffalo claims that FHWA refused to make changes in the plans and

specifications for White Buffalo that FHWA later made for Tidewater Construction, Inc. ("Tidewater"), the completing contractor. White Buffalo relies upon a survey that it commissioned in November 2002 to show the changes that it claims were responsible for preventing it from performing its work under the contract.

That survey discusses five sites. Of those five sites identified in the report, one of the sites (Road 33, Site MP 46.2) was changed via a contract modification (CM001) executed bilaterally with White Buffalo under the original contract. Of the four remaining sites, two were actual redesigns (Road 33, Site MP ("Mile Post") 47.07-47.25 and Road 3347, Site MP 0.43-0.46). The change at one of these sites (Road 33, Site MP 47.07-47.25) was in response to a slide that occurred during White Buffalo's time on the project. Due to the rainy conditions and saturated material, this site could not be repaired immediately. The repair work was added to the completion contract, and was performed when the soils were suitable for construction.

The change at the other site (Road 3347, Site MP 0.43- 0.46) originally required White Buffalo to fix a slide area on the uphill side of the road. White Buffalo did not perform any work at this site. Over the winter, high water eroded the downhill side of the roadway at the site. As a result, additional repairs

were required. FHWA re-assessed the condition of the uphill side of the roadway and determined that it had stabilized, and that there was less risk of future slope failure if the area was left as-is. Therefore, the work required on the uphill side in the original contract was deleted from the completion contract.

The fourth site (Road 33, Site MP 46.75) was work that was added to the contract. White Buffalo constructed the slope at this site improperly and the added work involved placing riprap to correct the situation.

At the fifth site (Road 33, Site MP 46.7), according to White Buffalo’s survey, Tidewater did not remove as much material as was required by the contract. Neither White Buffalo nor Tidewater built the slope as designed in the contract, and FHWA did not become aware of this until White Buffalo’s survey findings were presented. During the Fall of 1998, White Buffalo drilled, blasted, and excavated material from this site. Tidewater removed material to the backslope constructed (via drilling and blasting) by White Buffalo. At the time, FHWA was not aware that White Buffalo did not construct this backslope according to the design. Therefore, FHWA had no reason to require the completion contractor to go beyond the backslope constructed by White Buffalo.

Accordingly, while there were changes to the completion contract, none of these changes would have improved White

Buffalo's chance at successfully completing the project. Additionally, as explained above, the changes were necessitated by actual conditions at the site and the corrective actions were developed through sound engineering judgment by FHWA, not disparate treatment by the Project Engineer.

White Buffalo claims that FHWA refused to acknowledge the differing site condition recognized through accommodating Tidewater. White Buffalo does not specifically identify the differing site condition to which it is referring. In ¶ 14 of its complaint, White Buffalo alleges that there was an unstable overburden at MP 46.7. If this is the differing site condition that White Buffalo contends prevented it from performing its work under the contract, the evidence will show that FHWA acknowledged that White Buffalo encountered the unanticipated overburden. The overburden was above the bedrock both inside and outside of the construction limits at MP46.7.

FHWA made a reasonable decision as to how to proceed with respect to the overburden material. Although the overburden outside of the cut eventually slid during heavy rain, White Buffalo was able to initially build the portion of the cut that contained the overburden to the design slope. The evidence will show that prior to early November 1998, the overburden material had little to no effect upon White Buffalo's progress. A large slide occurred on November 21-22, 1998; however, by this time

White Buffalo had already failed to install the culverts at MP 46.2 and MP 47.25, making it impossible pursuant to the terms of the contract to open the road ("FR 33") until at least late Summer 1999. This condition did not cause the delays for which White Buffalo was ultimately terminated for default.

White Buffalo also claims that FHWA charged it for work that the completion contractor never performed. Although White Buffalo claims FHWA paid the completion contractor for "substantial work" that was never performed, White Buffalo points to a single example, at MP 46.7. To the extent that the completion contractor failed to complete a portion of the work for which it was paid, it is impossible for this to have prevented White Buffalo from performing its work under the contract.

Finally, White Buffalo claims that FHWA concealed design changes and denied the existence of design change documents after its contract was terminated. This claim stems from a 1999 Freedom Of Information Act ("FOIA") request made by White Buffalo. The FOIA officer determined, after conferring with those individuals in the office responsible for design on the project, that there were no new designs on the contract for which the FOIA request was made, DTFH70-98-C-00027. The decision made in response to White Buffalo's 1999 FOIA request could not have impacted White Buffalo's performance under the contract.

The responsibility for the delays that ultimately prevented White Buffalo from completing the work it contracted to perform rests with White Buffalo. The contract required White Buffalo to complete the wetted-perimeter work at MP 46.2, including culvert piping, by November 1, 1998. White Buffalo did not complete this installation by November 1, 1998. White Buffalo was delayed due to late delivery of the culvert pipe (2250mm), the layout of the culvert with camber as required by the contract, its lack a diversion channel plan and implementation, lack of adequate bedding material and overall resource allocation. As of November 1, 1998, White Buffalo still had to install one section of culvert, backfill two sections, place the concrete headwall, and place rip rap among other items of remaining work. Additionally, White Buffalo had to repair several items of non-conforming work.

The contract also required that White Buffalo complete site repairs at Road 33, MP 46.7 up to subgrade by November 30, 1998. The work at MP 46.7 was delayed by the results of White Buffalo's blasting at this site. White Buffalo failed to remove all of the material from the first blast, and thereby failed to have adequate containment area for the second blast. The results of the second blast were poor. Overhanging rocks were left in the middle of the rock face, creating a safety issue. In addition, the shot produced substantially more large boulders than

originally anticipated and the containment area failed. White Buffalo was unable to remedy these issues expeditiously and through mid-November, White Buffalo continued to delay the base contract work at MP 46.7. As a result, White Buffalo was not in a position to achieve the completion up to subgrade at Road 33, Site MP 46.7 by the end of November, 1998, as required by the contract.

In any case, none of these actions were taken by FHWA with the specific intent to injure White Buffalo. The changes that were made under the completion contract were necessitated by conditions occurring on the project and do not support a claim that FHWA acted with the intent to prevent White Buffalo from performing in a timely fashion. The decision as to how to respond to the overburden material encountered by White Buffalo at MP 46.7 was intended to allow White Buffalo to keep working on the contract in hopes that it might meet the contract requirements and, ultimately, should have helped White Buffalo.

Even if Tidewater was paid for a small portion of the work that it did not perform, that payment was not made with the intent to harm White Buffalo, but, rather, was an administrative oversight by FHWA. Finally, FHWA’s decision that certain design documents were not responsive to White Buffalo’s 1999 FOIA request was made in accordance with the FOIA officer’s routine

practice after careful consideration of whether there were documents responsive to the request.

White Buffalo points to Resident Engineer Paul Rettinger and his actions on the project as evidence of bad faith. White Buffalo claims that Mr. Rettinger acted with animus towards White Buffalo, and that he acted in such a way as to set White Buffalo up for default termination. However, although Mr. Rettinger was extremely concerned over White Buffalo's ability to complete the project, he held no animus towards White Buffalo. On the contrary, Mr. Rettinger wanted the project to be successful so that the road could be opened up and the effects upon the forest and local community could be minimized, as evidenced by the assistance that Mr. Rettinger provided to White Buffalo on numerous occasions.

White Buffalo claims that Mr. Rettinger had discussed the possibility of taking over the contract with Tidewater "on multiple occasions . . . before White Buffalo's termination." However, the timing of Mr. Rettinger's contacts with Tidewater do not reveal any calculated action on the part of Mr. Rettinger to set White Buffalo up for default.

White Buffalo further claims that Mr. Rettinger told White Buffalo that clearing was not allowed "at MP 46.7 in September 1998." Assuming that White Buffalo is referring to MP 46.2, and

not MP 46.7, there is no documentation to support this contention.

White Buffalo also claims that Mr. Rettinger "asserted improper pressure on the Project Engineer, Sajid Aftab, to make life difficult for White Buffalo," and cites a diary entry by Mr. Aftab. This was Mr. Aftab's first assignment as a project engineer, and put in the proper context, this entry reveals Mr. Aftab's frustrations with respect to not being able to make all of the decisions that he thought he should be making as project engineer. White Buffalo claims that Mr. Rettinger admitted in his 2000 deposition that he overruled Mr. Aftab when Mr. Aftab thought that White Buffalo should be paid for its work. However, Mr. Rettinger did not state that he had overruled Mr. Aftab regarding the issuance of a payment invoice.

White Buffalo claims that Mr. Rettinger fired a project inspector for "talking" to White Buffalo. Again, put in the proper context, Mr. Rettinger removed the inspector not for simply talking to White Buffalo, but for attempting to direct the contractor and failing to follow directions.

Finally, White Buffalo cites Mr. Rettinger's recommendation that White Buffalo be terminated. Although Mr. Rettinger advocated for termination for default, he based his recommendation upon his conclusion that White Buffalo could not

complete the contract work within the time allotted under the contract.

White Buffalo also asserts in Appendix D to its October 26, 2006 termination for convenience revised settlement proposal ("Settlement Proposal") that FHWA prevented White Buffalo from starting work on time and did not extend the contract completion date. In accordance with FAR Clause 52.211-10, the Notice to Proceed was issued by the Government with an effective date of September 1, 1998. The contract expressly provided that White Buffalo could not begin construction activities, except for mobilization, traffic control and Section 637 work, without an accepted preliminary construction schedule. White Buffalo, however, failed to submit an acceptable preliminary schedule until September 14, 1998, and, as a result, incurred 14 days of delay from September 1-15, 1998. During this time, FHWA tried to assist White Buffalo by promptly reviewing schedule submittals and providing feedback and assistance.

White Buffalo also claims in Appendix D to its Settlement Proposal that FHWA improperly instructed it to remove material at MP 46.2, and that this impropriety was not disclosed to White Buffalo nor corrected after Mr. Rettinger discovered the error. Contract Modification No. 1 resolved the issues related to the removal of material at MP 46.2. Mr. Rettinger openly discussed the matter with White Buffalo and demonstrated a willingness to

work with White Buffalo to resolve the issue in a mutually acceptable manner.

White Buffalo contends in Appendix D to its Settlement Proposal that FHWA did not obtain proper environmental permit extensions to allow it to continue work within the wetted perimeter outside of the work window. After evaluating the remaining work to be done, FHWA decided that there would be no benefit to the project to seek a further permit extension. White Buffalo had not demonstrated an ability to get the work done in a timely manner, and with the impending rain, there was an urgency to get the project winterized before the fish returned to the stream.

In Appendix D to its Settlement Proposal, White Buffalo claims that contrary to the permit's language and customary practice, FHWA restricted its work in the stream area. White Buffalo asserts that FHWA unnecessarily restricted the contractor's operations by defining "wetted perimeter" as any area that could be reached by high water, which it contends is different than the permit language and customary practice. White Buffalo understood that the culvert, the concrete headwall, some riprap, the energy dissipators, and the removal of the diversion channel were all prohibited after the end of the work window set

forth in the permit. All of this work had yet to be completed by the November 1, 1998 date set forth in the permit.

White Buffalo contends that it was prohibited from working on the fill at the top of the culvert after November 1, 1998. However, the problem with placing the fill on top of the culvert after November 6, 1998, was due to the saturation of the embankment material.

Additionally, in Appendix D to its Settlement Proposal, White Buffalo asserts that FHWA failed to compensate it for its work before it was terminated. FHWA did not make any payment to White Buffalo during the contract duration; however, this was due to White Buffalo's failure to meet the payment terms of the contract. White Buffalo had significant problems with both the invoices it submitted and required schedule updates.

Finally, in Appendix D to its Settlement Proposal, White Buffalo contends that FHWA engaged in disparate treatment by relaxing environmental restrictions for the completion contractor. FHWA sought an extension of the work windows for the wetted perimeter work, and modified the completion contract to allow work to begin on June 14, 1999, rather than the August 6 date that was in the original contract. However, FHWA was also willing to seek an extension of the work window for White Buffalo, and asked the permitting agencies for such an extension on October 5, 1998. The permitting agencies denied the

extension, wanting to wait until the window date was closer so that they could assess the water and the fish.

III. Termination Of The Contract

On December 1, 1998, Contacting Officer William L. Parsons terminated the contract for default, including because (1) White Buffalo failed to complete the work on road FDR 33 to subgrade between MP 46.2 to MP 46.7 and MP 47.07 to MP 47.25 by November 30, 1998, as required by SCR 108.01(b) of the contract; (2) White Buffalo failed to prosecute the work with the diligence that would have ensured the completion of all repairs up to subgrade and placement of at least 100 mm aggregate base by January 23, 1999, as required by SCR 108.01(b) of the contract; and (3) White Buffalo failed to prosecute the work with the diligence that would have ensured opening FDR 33 to public traffic by January 24, 1999, as required by SCR 108.01(b) of the contract.

In terminating the contract, the contracting officer directed White Buffalo to stop all work.

IV. Termination For Convenience Settlement Proposal

A. Post-Termination On-Site Work Of Jim Heigh

In its termination for convenience settlement proposal, White Buffalo requested $1,015 of the contracting officer for the services of Jim Heigh, whom it hired on its own and without any direction by the Government, to supervise the post-termination

use of equipment that White Buffalo decided to loan to a follow-on contractor for use on the project site.

B. Labor Of Luther And Julie Clevenger

White Buffalo requested $39,283 of the contracting officer for the work of Luther Clevenger and Julie Clevenger on the project. However, no contemporaneous timesheets exists, or were created, to record the hours that the Clevengers performed contract work in 1998. White Buffalo paid the Clevengers based upon estimates arrived at in 2004.

C. Owner Operator Costs

White Buffalo requested $18,113 of the contracting officer in "owner operator costs" for which White Buffalo did not provide supporting invoices or other documentary corroboration.

D. Legal And Professional Fees Related To Subcontractors

White Buffalo requested $3,116.84 for legal and professional fees that White Buffalo incurred in a litigation against one of its subcontractors, McBride Construction, Inc., and $1,272.24 for legal and professional fees charged to White Buffalo by one of its subcontractors, Landmark Survey, Inc., for its efforts to collect payment from White Buffalo. (White Buffalo also requested a $2,102 amount for Landmark; that amount, however, is for non-contractual work.)

E. Interest

White Buffalo requested $2,415 in what it claims is interest that it owes to Landmark Surveying, Inc. The invoice that Landmark issued to White Buffalo does not reflect that Landmark charged White Buffalo interest. However, if White Buffalo owes Landmark interest, it is because it failed to pay Landmark in a timely manner.

White Buffalo requested $15,122 in what it claims is interest that it paid to its surety. However, White Buffalo did not pay the surety on time because it had a payment dispute with the surety.

White Buffalo requested $9,694.35 in what it claims is interest that it owes to McBride Construction. The Proposal For Bid that McBride issued to White Buffalo does not reflect that White Buffalo was obligated to pay McBride interest. However, if White Buffalo owes McBride interest, it is because White Buffalo did not pay McBride on time because White Buffalo chose not to pay McBride what McBride claimed White Buffalo owed. White Buffalo was past due on its account with McBride well before the Government terminated White Buffalo's contract.

F. Equipment And Vehicle Costs

White Buffalo requested $25,000 of the contracting officer for repairs to an "excavator Link Belt LS-3400" that was damaged in part by White Buffalo's poor maintenance and improper

operation of the excavator. White Buffalo never had the excavator repaired, but scrapped it for $5,000. Moreover, the excavator had been fully depreciated before the beginning of the fiscal year that ended on March 31, 1999.

White Buffalo requested $1,160 for tires that were stolen off a truck that White Buffalo had loaned to a follow-on contractor between the time that the contract was terminated and when White Buffalo retrieved its equipment from the project site.

White Buffalo requested $3,638.55 for the cost of repair of damage to a 1996 Dodge pickup that was never performed, and $600 for the cost of a rental vehicle that would be needed during the repair of the pickup.

G. Profit Upon Work Performed Prior To Termination

White Buffalo requests $367,870.66 in profit upon work performed prior to termination. However, at the time of termination, White Buffalo was operating at a loss of between four percent and 21 percent. In addition, in its bid for the contract, White Buffalo did not include in its bid estimate any profit rate. White Buffalo incurred no more than $439,045.43 in costs on the project.

H. Settlement Expenses

At least $18,702.85 of the $163,070.28 in "settlement expenses" that White Buffalo sought pursuant to its termination settlement proposal was actually incurred performing work in

furtherance of the "bad faith" claim that White Buffalo presented to the contracting officer.

Of the $163,070.28 in "settlement expenses" that White Buffalo sought pursuant to its termination settlement proposal, $1,200 consists of payroll expenses that White Buffalo had not yet incurred.

The invoices that White Buffalo's attorneys issued to White Buffalo for work on during the termination settlement proposal period do not reflect the attorneys' hourly charges.

STATEMENT OF THE ISSUES OF FACT
AND LAW TO BE RESOLVED BY THE COURT

1. What amount is due to White Buffalo pursuant to 48 C.F.R. § 52.249-2(g)(2)(iii) because of the termination of its contract for the convenience of the Government?

2. Does the Government's administration and termination of White Buffalo's contract entitle White Buffalo to anticipatory profit upon work that it did not perform prior to the termination of the contract?

(We note that, in its pretrial memorandum, White Buffalo does not identify as issues to be resolved by the Court (1) whether the termination for default should be converted to one for convenience, or (2) whether the Government should release the liquidated damages. We also object to White Buffalo presenting at trial any claims or issues that are not addressed in both its complaint and it pretrial memorandum, including the

Prompt Payment Act issue that it raises in its pretrial memorandum.)

DISCUSSION OF APPLICABLE LEGAL PRINCIPLES

With one exception, we do not include any discussion of the jurisdictional legal principles that were the subject of our dispositive motion that the Court denied on July 1, 2008.

I. Termination For Convenience Settlement Proposal

White Buffalo will not prove that it is entitled to more than the $240,178.61 in termination settlement costs that the contracting officer found it was due. Once an action is brought following a contracting officer's decision, the parties start in court with a clean slate. Wilner v. United States, 24 F.3d 1397, 1402 (Fed. Cir. 1994). Thus, the Court will not automatically uphold a contracting officer's calculation of a plaintiff's entitlement. White Buffalo Constr., Inc. v. United States, 52 Fed. Cl. 1, 7 (2002). Rather, an action in this Court challenging a contracting officer's decision upon a claim proceeds de novo; there is no presumption that any part of the contracting officer's decision is correct. Id. (citing Wilner, 24 F.3d at 1401).

Consequently, White Buffalo must prove to this Court every dollar of the termination costs that it claims; it cannot rely upon the findings or conclusion of the contacting officer for any of that demonstration.

A contractor bears the burden in this Court of proving termination for convenience damages. Id. When a fixed-price contract is terminated for convenience, it is essentially converted into a cost reimbursement contract. Id. at 4. A contractor whose contract is terminated for convenience is entitled to recover all allowable costs incurred in the performance of the terminated work, a reasonable profit on the work done, and certain additional costs associated with the termination. Id. However, if it appears that the contractor would have sustained a loss upon the entire contract had it been completed, no profit shall be allowed. 48 C.F.R. § 52.249-2(g)(2)(iii); see 48 C.F.R. 49.203(a). White Buffalo is not entitled to a profit upon the work it performed, because, at the time of termination, White Buffalo was operating at a loss of between four percent and 21 percent.

Anticipatory profit and consequential damages shall not be allowed as part of a termination for convenience settlement proposal. See 48 C.F.R. § 49.202(a). In addition, in no event will the Government, in the context of a termination for convenience settlement proposal, pay the prime contractor any amount for loss of anticipatory profits or consequential damages resulting from the termination of any subcontract. See 48 C.F.R. § 49.108-3(a).

Moreover, the amount due to the contractor shall be reduced to account for the loss that the contractor would have sustained had the entire contract been completed. See 48 C.F.R. § 49.203(a). The Government is entitled to a "credit" for losses the contractor would have incurred had the contractor performed to completion. McDonnell Douglas Corp. v. United States, 76 Fed. Cl. 385, 436 (2007). Based upon the loss at which White Buffalo was operating at the time of termination, the Government is entitled to a credit of at least $50,000.

Consequential damages are defined to be "[t]hose which though directly are not immediately consequential upon the act or default complained of." Alexander v. United States, 25 Ct. Cl. 329, 337 (1890) (citing Bouv. Law Dic. 467)). The term consequential relates more particularly to the point of time, rather than to the relation, with the illegal act complained of, as the cause of the injury. Id. The costs of litigation, for example, are consequential damages. Kania v. United States, 650 F.2d 264, 269 (Ct. Cl. 1981); accord, Albemarle Bank and Trust Co. v. United States, 12 Cl. Ct. 704, 707 (1987); aff'd, 845 F.2d 1034 (Fed. Cir. Feb. 18, 1988) (unpublished table decision). A contractor is not entitled to compensation for attorney fees incurred in matters against third parties or against defendant upon issues not related to termination costs. Cf. White Buffalo, 52 Fed. Cl. at 17 (holding that contractor

whose contract was terminated for convenience "cannot claim compensation for work it performed acting as its own attorney in lawsuits with the replacement contractor or with defendant on other issues not before this court"). Consequently, White Buffalo is not entitled to the any legal and professional fees that it incurred in litigation against its subcontractor, or to legal and professional fees charged to White Buffalo by it subcontractor for the subcontractor's efforts to collect payment from White Buffalo.

Allowable costs are determined by the cost principles set forth in 48 C.F.R. § part 31, "subject to the general principle that the contractor should be compensated fairly for the work terminated." Id. The following factors are considered when determining allowability: (1) reasonableness; (2) allocability to the contract; (3) generally accepted accounting principles and practices; (4) the terms of the contract; and (5) any specific limitations set forth in 48 C.F.R. § part 31. Id. n.7. And without Government authorization, work performed after termination is not compensable. Id. at 18. After a contractor is terminated, it has no contractual right to remain on the job site or complete the contract. Id. The Government is not obligated to compensate a terminated contractor for its unauthorized supervision of or assistance to a follow-on contractor; such a contractor has no right to claim compensation

for assisting in the completion of the contract after it was specifically ordered to cease its involvement with the work. Id.

Along the same lines, White Buffalo does not have a right to compensation for tires stolen off a truck that White Buffalo had loaned to a follow-on contractor after contract termination. In addition, although 48 C.F.R. § 31.205-24 (1998) allows for recovery of maintenance and repair costs, replacing stolen tires is not a cost necessitated by the contract work. Cf. id. at 11 (awarding, as termination costs, compensation for repairs that were necessitated by the contract work).

Consequently, White Buffalo is not entitled to reimbursement for the post-termination services of Jim Heigh, because those services - supervising a follow-on contractor's use of equipment loaned to it by White Buffalo - was not allocable to the contract. Because it is also not allocable to the contract, (and because it would constitute non-recoverable consequential damages), White Buffalo is not entitled to recover interest that it paid or owes to third parties because it failed to pay those parties in a timely manner. Nor can it recover for payments it made to landmark for non-contractual work.

A contractor is not entitled to recovery of pre-termination payroll costs, absent time cards or records indicating amount of hours worked. See id. at 12-13. Because no contemporaneous evidence exists of the hours that the Clevengers performed

contract work in 1998 (for which White Buffalo paid the Clevengers based upon estimates arrived at in 2004), or the $18,113 that White Buffalo claims to have made to owner operators, White Buffalo cannot recover either category as termination "costs." In addition, White Buffalo cannot recover its 2004 payments to the Clevengers because, to be allowable pursuant to 48 C.F.R. § 31.205-6(1), compensation for personal services must be for work performed by the employee in the current year, and must be based upon and conform to the terms and conditions of the contractor's established compensation plan or practice followed so consistently as to imply, in effect, an agreement to make the payment. Cf. id. at 13 (denying recover of "costs" paid to contractor's principal where compensation to principal was drawn from profits).

A contractor terminated for convenience may recover compensation for the reasonable costs related to settlement. Id. Reasonable costs related to settlement include: (1) accounting, legal, clerical, and other expenses reasonably necessary for the preparation of termination settlement proposals and supporting data; (2) the termination and settlement of subcontracts (excluding the amounts of such settlements); and (3) storage, transportation, and other costs incurred, reasonably necessary for the preservation, protection, or disposition of the termination inventory. Id. at 18 (citing 48 C.F.R.

§ 52.249-2(g)(3)). Because the invoices of White Buffalo’s attorneys do not reflect the hourly rates of those attorneys, those invoices do not demonstrate that the fees that the attorneys have invoiced are reasonable.

Although White Buffalo cites White Buffalo, 52 Fed. Cl. at 11, in support of its request for the cost of repairing equipment damaged during performance of the contract work, in that case White Buffalo had incurred the costs of those repairs; here, White Buffalo has not repaired the equipment, and so has not incurred any repairs costs that it could recover. In addition, White Buffalo would only be able to recover the cost of repairs that did not add to the permanent value of the property or appreciably prolong its intended life. 48 C.F.R. § 31.205-24 (1998).

To avoid overcompensating the contractor, the Government must be credited for amounts already paid to the contractor. See id. at 19.

II. Anticipatory Profit

Where the Government has terminated contract for default, and the contractor proves that the Government has breached the implied duty to cooperate in the other party’s performance, the remedy is to convert the termination for default into a termination for the convenience of the Government. See Abcon

Assoc., Inc. v. United States, 49 Fed. Cl. 678, 688, 690-91 (2001).

Although a contractor that proves that a contracting officer acted in bad faith in terminating a contract is entitled to anticipatory profits, the contractor's burden to prove bad faith is very weighty. Cf. Krygoski Constr. Co., Inc. v. United States, 94 F.3d 1537, 1541, 1545 (Fed. Cir. 1996) (discussing allegations of bad faith termination for convenience). The contractor must present clear and convincing evidence that the contracting officer possessed the specific intent to injure the contractor. See Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1240 (Fed. Cir. 2002). The contractor must prove, for example, that the contracting officer terminated the contract simply to acquire a better bargain from another source. See Krygoski Constr., 94 F.3d at 1541.

Here, White Buffalo is not entitled to anticipatory profit. First, many of the issues that White Buffalo raises in support of its anticipatory profits claim, such as a differing site condition, might have been relevant to a claim that the termination for default should be converted to a termination for convenience (which, apparently, White Buffalo no longer requests of the Court), but do not demonstrate that the Government terminated the contract in order to harm White Buffalo.

Second, White Buffalo alleges that the Government prevented it from completing the work, but, in support of that claim, points to actions that the Government allegedly took after the termination of the contract. As a matter of logic, Government action that occurred after the termination of the contract could not have prevented White Buffalo from completing the work, and could not have breached the Government's obligations pursuant to the contract.

Third, the contracting officer terminated the contract because of White Buffalo's poor performance. White Buffalo did not meet a contract deadline, and the contracting officer determined that White Buffalo was not performing the work with the diligence necessary to meet other contract deadlines. The contracting officer did not terminate the contract out of malice toward White Buffalo or an intent to harm White Buffalo. Indeed, prior to termination, the Government attempted to assist White Buffalo in its performance.

Fourth, the Government's conversion of the termination to one for convenience does not entitle White Buffalo to anticipatory profit. That conversion occurred more than five years after the termination of the contract, and so cannot have been a contract breach. Moreover, that conversion was the very relief that White Buffalo requested in Case No. 99-961C (Fed. Cl.), although, from a reading of its pretrial memorandum,

apparently no longer requests of this Court. (Although White Buffalo has characterized the termination as a "purported" termination, it cannot reasonably argue that the conversion did not occur and was, simultaneously, a breach.) Finally, there is no evidence that the contracting officer converted the termination out of malice toward White Buffalo.

In any case, even where a plaintiff seeks "lost profits" as breach damages, the burden is on plaintiff to prove that it incurred such losses as a result of the breach. See Columbia First Bank, FSB v. United States, 60 Fed. Cl. 97, 115 (2004). A plaintiff must be able to prove its lost profits calculation with reasonable certainty. First Federal Lincoln Bank v. United States, 68 Fed. Cl. 602, 605 (2005). Alleged lost profits may not be recovered if they emerge from a lost profits model that is unreliable or speculative. Id.

Regardless of the Government's motivation in terminating the contract and White Buffalo's historic profit rate, White Buffalo is not entitled to anticipatory profit because, in performance of this contract, it was operating at a loss of four to 21 percent. White Buffalo's claim that it would have completed work at any profit rate, much less at the nearly 50 percent rate that we expect White Buffalo will claim, is speculative. Indeed, White Buffalo did not include any profit rate or estimate in its bid estimate for this contract, as it had in at least one other

contract (White Buffalo, 52 Fed. Cl. at 13 ("[w]hen plaintiff bid on the Contract, it included '. . . 10-percent profit.'").

Finally, the Court should not allow White Buffalo to avoid the consequences of its operating at a loss (for purposes of the issue of profit upon work performed or anticipatory profit) by claiming that the contract price should have been adjusted upward to account for unpriced contract "changes" such as a differing site condition. White Buffalo has not presented to the contracting officer any requests for equitable adjustments of the contract price, which is a jurisdictional prerequisite in this CDA action. See Santa Fe Eng'rs, Inc. v. United States, 818 F.2d 856, 858 (Fed. Cir. 1987); cf. Voices R Us, Inc., ASBCA Nos. 52307, 1565, 01-1 B.C.A. ¶ 31,328 (Mar. 6, 2001) (finding no jurisdiction to entertain claim that loss adjustment in 48 C.F.R. § 49.203(a) should not apply where contractor did not present sum-certain price adjustment claim to contracting officer).

In addition, a contractor must prove the basic facts of liability, causation, and resultant injury to obtain an equitable adjustment in the contract price. Servidone Constr. Corp. v. United States, 931 F.2d 860, 861 (Fed. Cir. 1991). Such proof must be sufficiently certain so that a determination of an equitable adjustment will be more than "mere speculation." Lisbon Contractors, Inc. v. United States, 828 F.2d 759, 767 (Fed. Cir. 1987). White Buffalo has never quantified the cost to

it performing any contract changes that it claims entitle it to the contract price adjustments that would have resulted in its operating at a profit.

OBJECTIONS

We object to White Buffalo’s witness list because it fails, as required by Appendix A ¶ 15(a), to separately identify those witnesses whom White Buffalo expects to present and those whom it may call if the need arises, and because it fails, as to each witness, to indicate the time needed for direct examination.

We object to White Buffalo’s intention to present the testimony of Donna Mickey, H. Paul Rettinger, William Parsons, Elizabeth Firestone, Curtis Scott, Sterling Munro, Sajid Aftab, Carol Jacoby, David Lofgren, Dorothy Adesko, Howe Crockett, Brian Allen, Betty Chon, Robert Gietz, Pete Sherhum, and George Strickler by deposition. White Buffalo has not, as required by Appendix A ¶ 15(b), served and filed a separate motion for leave to file the transcript of such testimony that (1) shows cause why the deposition testimony should be admitted (pursuant to RCFC 32(a)(2) and (3)) and (2) identifies specifically the portions of the transcripts that White Buffalo intends to use at trial.

We object to White Buffalo presenting Julie Clevenger or Terrance L. Kuenzi to testify about “profit margin,” because White Buffalo did not list that as a subject of information

possessed by those persons in its Initial Disclosures in Case No. 07-738C (Fed. Cl.).

We object to White Buffalo presenting Wade Coykendall, Jeff Draper, Frank Bobnick, or Elaine Ulibarri, to testify about White Buffalo's surety costs, because White Buffalo did not list that as a subject of information possessed by those persons in its Initial Disclosures in Case No. 07-738C (Fed. Cl.).

We object to White Buffalo presenting Cynthia Vincent, Scott Darger, Graeme Leggatt, Phil Thayer, Kevin Crow, Pete Sherhum, George Strickler, or Jeff Busch as witnesses, because White Buffalo did not list them in its Initial Disclosures in Case No. 07-738C (Fed. Cl.).

We object to White Buffalo presenting James Zotter as a witness because, as page 4 of its witness list reflects, Mr. Zotter was counsel for the agency during contract performance and any relevant information that he has regarding this case is privileged and protected.

We object to White Buffalo's exhibit list because it fails, as required by Appendix A ¶ 16, to separately identify those exhibits that White Buffalo expects to offer and those that it may offer if the need arises.

We object to the following exhibits because they are or contain hearsay: Exhibits 8-10, 12-14, 24, 40, 42, 44, 45, 52-54, 68, 69, 73, 76, 78, 79, 81, 82, 88, 89, 92-94, 99, 103-105,

107, 109-112, 200-216, 218, 237, 238, 240, 383, 384, 386-389, 394, 396-98, 400, 402, 404, 407, 409, 411, 412, 415, 416, 425, 428, 433, 434, 434, 437-447, 449453, 455-457, 462-470, 472-482, 484-487, 489-491, and 495-499.

We object to Exhibits 219-224 because White Buffalo has not, in response to our request, provided the backup to those summaries that it indicated, on its exhibit list, is available upon request.

We object to Exhibits 116-217, 233-234, 248, 253-254, 271, 277, 280-281, 295-296, 315, 317, 343-344, 359, 372-375, 378, 381, 385, 389, 392, 394-395, 397-400, 402, 404-407, 409-412 422, 424, 427, 433, 437, 439, 453, 455, 458, 461, 463, 470, 474, 476, 482, and 492 because White Buffalo has not provided those exhibits to us.

We object to Exhibits 386-424 and 426-427 because those exhibits relate to a Freedom Of Information Act action and, therefore, are not relevant to the contract issues that the Court must resolve in this case.

We reserve the right to object at trial to any exhibits that White Buffalo offers without foundation.

Respectfully submitted,

GREGORY G. KATSAS
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Todd M. Hughes
TODD M. HUGHES
Deputy Director

s/Timothy P. McIlmail
TIMOTHY P. MCILMAIL
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Telephone: (202) 616-0342
Facsimile: (202) 514-7965

OF COUNSEL:
Rayann L. Speakman
Attorney-Advisor
Western Federal Lands Highway Division
610 E. Fifth Street
Vancouver, WA 98661

July 11, 2008

Attorneys for Defendant

Certificate of Filing

I hereby certify that on July 11, 2008, a copy of the foregoing Defendant's Memorandum of Contentions of Fact and Law was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Timothy P. McIlmail