# In the United States Court of Federal Claims

Case Nos. 99-961C, 00-415C, 07-738C (Consolidated)
Filed Under Seal:  September 7, 2011
Reissued for Publication:  September 22, 2011

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

|  |  |
|---|---|
| **WHITE BUFFALO CONSTRUCTION, INC.,** | \* |
| | \* |
| *Plaintiff,* | \* |
| | \* |
| v. | \* |
| | \* |
| **THE UNITED STATES**, | \* |
| | \* |
| *Defendant.* | \* |
| | \* |

Liability, Damages, Bad Faith,
Contract, Recoverable Costs,
Termination for Convenience,
Termination for Default, Conversion,
Profit, Contract Dispute Act Interest,
Prompt Payment Act Interest, Equal
Access to Justice Act Interest

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

*Richard E. Alexander* and *Scott J. Kaplan*, Stoel Rives LLP, Portland, OR, for Plaintiffs.

*Timothy P. McIlmail* and *Leslie C. Ohta*, Trial Attorneys, with whom were *Tony West*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Todd M. Hughes*, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant.

*Rayann L. Speakman*, Attorney Advisor, Western Federal Lands Highway Division, Vancouver, WA, Of Counsel for Defendant.

---

## OPINION AND ORDER

---

**SMITH**, Senior Judge.

This case, in the simplest of terms, arises out of the performance, and subsequent termination, of Contract No. DTFH70-98-C-00027 ("Contract") between While Buffalo Construction, Inc. ("Plaintiff" or "White Buffalo") and the U.S. Department of Transportation, Federal Highway Administration, Western Federal Lands Division ("FHWA") to repair damaged roads in the Siskiyou National Forest.

For the reasons set forth below, the Court hereby concludes that the Government neither breached the implied duty of good faith and fair dealing, nor acted in bad faith in terminating White Buffalo's contract. Instead, the Court finds that, although the Contract was originally terminated for default, the FHWA properly converted the termination into a termination for convenience of the Government. As a result, White Buffalo is not entitled to recover anticipated profits arising out of the terminated contract. Nevertheless, the Court finds that White Buffalo is entitled to fair compensation for the work done and preparations made for the terminated portion of the contract, including a reasonable allowance for profit and reasonable settlement costs. Therefore, the Court hereby **AWARDS** White Buffalo damages in the amount of $352,237.36, plus interest.

## I.   PROCEDURAL BACKGROUND

In this consolidated case, litigation arising out of the performance and termination of contract number DTFH70-98-C-00027 has resulted in three Complaints filed in this Court by White Buffalo Construction, Inc. On November 30, 1999, White Buffalo filed its first Complaint in this Court, alleging that White Buffalo was wrongly terminated for default by the FHWA. As a result, White Buffalo sought to convert the termination for default into a termination for convenience of the Government.

On July 14, 2000, White Buffalo filed its second Complaint in this Court.[1] In its Complaint, White Buffalo claimed that it was entitled to $101,200.00 in liquidated damages withheld by the FHWA, plus any interest which may have accrued as a result of the withholding.

On October 22, 2007, White Buffalo filed its third and final Complaint in this Court.[2] In its Complaint, White Buffalo seeks compensation for pre-termination costs and profits, alleges a breach of the duty of good faith and fair dealing by employees of the Government, and alleges bad faith by the Government in performing the contract. In Count One, White Buffalo is seeking $504,512.53 for pre-termination costs and reasonable profits, interest and attorney's fees. In Counts Two and Three, White Buffalo is seeking an additional $558,064.25 in lost profits, plus interest and attorneys' fees for the work that White Buffalo alleges was wrongfully terminated through bad faith.[3]

---

[1] / Plaintiff's Complaint was designated as Case No. 00-415C and assigned to the undersigned as a related case. On April 18, 2000, the Court entered an Order consolidating this case with Plaintiff's previously filed case, designating Case No. 99-961C as the lead case.

[2] / Plaintiff's Complaint was designated as Case No. 07-738C and assigned to the undersigned as a related case. On December 7, 2007, the Court entered an Order consolidating this case with Plaintiff's previous two cases, with Case No. 99-961C remaining the lead case.

[3] / As explained below, the Court finds that White Buffalo failed to demonstrate that the Government acted in bad faith. As such, the Court dismisses the Government's arguments alleging a lack of jurisdiction on counts two and three of case 07-738C as moot.

Pursuant to the reasoning set forth below, as well as the conversion of the termination for default to one of convenience, the Court hereby dismisses cases 99-961C and 00-415C as moot.[4]

## II.   THE TRIAL TESTIMONY

In June and August of 2009, trial was held in Portland to determine both liability and potential damages as alleged by White Buffalo.  The trial record consists of the testimony of seventeen witnesses.

Plaintiff presented the testimony of the following seven witnesses, three of which were also called as rebuttal witnesses to the Government's case in chief:

- *Luther Clevenger*, President of White Buffalo Construction, Inc.;
- *Mark Heimburger*, President of Land Mark Surveying, Inc.;
- *Brent Kerr*, President of Kerr Contractors, Inc.;
- *Graeme Leggatt*, Principal of Leggatt & Leggatt;
- *Julie Clevenger*, Secretary/Treasurer for White Buffalo Construction, Inc.;
- *Jeff Draper*, Underwriter for the Insurance Company of the West; and
- *Terrance Kuenzi*, CPA and Accountant for White Buffalo Construction, Inc.

Defendant presented the testimony of the following ten witnesses:

- *Scott Darger*, Project Manager, Tidewater Contractors, Inc.;
- *Tom Hildreth*, Division Construction Engineer, FHWA, Western Federal Lands Division;
- *Timothy Binder*, Division Counsel, FHWA, Western Federal Lands Division;
- *Mike Palanuk*, former Quality Control Inspector, White Buffalo Construction, Inc.;
- *Colleen Schragg*, former Grade Checker, White Buffalo Construction, Inc.;
- *Richard Youngs*, Construction Inspector, Construction Management Technical Services;
- *Nancy MacDonald*, former Office Clerk, White Buffalo Construction, Inc.;
- *Howe Crockett*, Construction Operations Engineer, FHWA, Western Federal Lands Division; and
- *Paul Rettinger*, Resident Engineer, FHWA, Western Federal Lands Division.

At trial, the parties presented testimony to the Court describing the nature of the contract between White Buffalo and the FHWA, the circumstances which gave rise to White Buffalo's termination for default, and the Government's decision to convert White Buffalo's default termination into a termination for convenience of the Government.

The record before the Court consists of the testimony of the aforementioned seventeen witnesses, 3,248 trial transcript pages, and more than 800 exhibits.  Each party simultaneously

---

[4] / Consequently, the Government's arguments alleging that the Court does not have the jurisdiction to entertain these cases are dismissed as moot.

filed post-trial opening briefs, as well as post-trial reply briefs.  As such, the Court shall now turn its attention to its findings of fact.

## III.     FINDINGS OF FACT

### A.  The Contract

#### 1.  The Solicitation, Bid, and Award of the Contract

During the winter of 1996, extreme flooding in southwestern Oregon damaged several roads within the Siskiyou National Forest, located between the towns of Agnes and Powers (referred to as "Agnes Project" and "Powers Project" respectively).  In response to the flood damage, the FHWA issued Solicitation No. DTFH70-98-B-00024 on July 6, 1998, requesting bids to repair the damaged roads in the Siskiyou National Forest.  PX 0001.[5]  Within the Solicitation, the FHWA provided a brief description of the work to be performed under the section, "NOTICE TO BIDDERS," stating, "The project consists of flood damage repairs of the Siskiyou National Forest, south of Powers, Oregon.  Work is located between Mile Post ("MP") 44.5 and MP 47.3 on Federal Development Road ("FDR") 33, between MP 0.3 and MP 1.18 on FDR 3347, and at MP 0.1 on FDR 3347020." PX 0001 at 4.

On August 5, 1998, the Contracting Officer, William L. Parsons ("CO"), issued a "Tabulation of Bids" report, breaking down the final bids submitted for the FHWA Project.  On August 20, 1998, the FHWA send a Letter of Award to White Buffalo, awarding Contract No. DTFH70-98-C-00027 for a fixed price of $1,370,480.00.  PX 0032 at 1.  The Letter of Award also called for a contract completion date of October 29, 1999.  PX 0032 at 2.  Immediately after the bid was accepted, the CO requested that White Buffalo submit executed copies of its Performance Bond, Payment Bond and Insurance Certificates within five calendar days.  PX 0032 at 1.  On August 24, 1998, White Buffalo submitted its fully executed Performance and Payment Bonds, as well as Insurance Certificates to the contracting officer, which were "cleared" on August 27, 1998.  PX 0433 at 1; PX 0714 at 1.

#### 2.  Description of the Construction Work and Construction Deadlines

Although the Powers Project consisted of sixteen independent work sites along FDR 33 and FDR 3347, there was a particular focus at trial on two specific work areas: (1) the "culvert area" at FDR 33 MP 46.2; and (2) the "slide area" at FDR 33 MP 46.7.  Within the "culvert area" at MP 46.2, White Buffalo was contracted to install a new culvert to replace the old system,

---

[5] / For consistency throughout this Opinion, the Court shall refer to Plaintiff's trial exhibits at "PX ___" and Defendant's trial exhibits as "DX ___."  For particularly lengthy exhibits, the Court shall include a pinpoint citation where possible.  In addition, the Court shall refer to the Trial Transcript as "Tr. _____ ([Witness])."

which lacked the necessary capacity to prevent rain water from eroding the highway.  Tr. 73:2-73:5 (Clevenger).  White Buffalo was further tasked with rebuilding a section of FDR 33 that had been "washed out" when the defective culvert "plugged."  Tr. 73:1-73:2 (Clevenger).

The MP 46.7 "slide area" required White Buffalo to use explosives to demolish a rock slope composed of sandstone.  Tr. 72:13-72:15 (Clevenger).  After heavy rains in the area, large portions of sandstone were falling from the cliff and blocking passage along FDR 33.  72:13-72:20 (Clevenger).  The contract also required White Buffalo to install a retaining wall to prevent further sandstone slides from blocking passage along the road.  Tr. 72:16-72:20 (Clevenger).

The reality of performing construction work in the Pacific Northwest necessarily requires contractors, such as White Buffalo, to take weather patterns into consideration.  As Brent Kerr testified, "We all know it starts to rain in October, and it doesn't quit until June, especially in the coast range of Oregon."  Tr. 3137:23-3137:25.  The Pacific Northwest's rainy season presented two significant impediments to White Buffalo:  (1) construction activities became increasingly more difficult to perform after the rainy season begins (Tr. 3137:25-38:1 (Kerr)); and (2) runoff from the construction activities could have an adverse effect on the local habitats and environment.  (Tr. 2455:19-2456:1 (Rettinger)).

With this in mind, the FHWA incorporated aggressive completion deadlines for the work White Buffalo was to perform under the contract.  The contract incorporated a chart under "Section 108.01-Commencement, Prosecution, and Completion of Work," which detailed White Buffalo's completion deadlines for the project:

| Location | Work/time Limitations | Date |
|---|---|---|
| FDR 33:<br>MP 46.2 to MP 46.7 and MP 47.07 to 47.25 | Complete all repairs up to subgrade | By<br>November 30, 1998 |
| FDR 33:<br>MP 46.7 | Complete rock slope stabilization work | Prior to beginning<br>Construction of the geogrid wall |
| FDR 33 | Complete all repairs up to subgrade and place at least 100 mm aggregate base | By<br>January 23, 1999 |
| FDR 33 | Open FDR 33 to public traffic | By<br>January 24, 1999 |
| FDR 3347:    MP 0.3 | Complete all repairs up to subgrade | By December 31, 1998 or after August 6, 1999 and before October 29, 1999* |

PX 0001 at 142 (internal note omitted).

### 3.  The Environmental Permits Requirements

In addition to the Contract's construction deadlines, much of the construction work to be completed by White Buffalo was subject to three environmental permits obtained by the

Government:  (1) 404 Permit – U.S. Corp of Engineers ("404 Permit"), Permit No. 98-370, issued in accordance with Nationwide Permit 3; (2) Oregon Storm water Discharge Permit, Permit No. 1200-CA; and (3) Oregon's Removal/Fill Permit, Permit No. RF-15114.  PX 0001 at 207, 225, 231, 241.

At trial, there was a particular focus on the terms of the 404 Permit relating to the scope of construction work allowed within the "wetted perimeter."  Pursuant to the Clean Water Act, a contractor is obligated to obtain a 404 Permit before commencing any construction activities that may remove or fill material below the "ordinary high water mark" of any waters within the United States.  *See* 33. U.S.C. § 1344 (1998); PX 0288 at 1.   At trial, Scott Darger testified about the meaning of work within the "wetted perimeter," describing it as "work that occurs in and under the ordinary high water mark that would have been established by the agency.  That would basically be in the direct creek itself or under the ordinary high water mark of the creek."  Tr. 1126:5-1126:10.

The primary purpose of the 404 Permit obtained for the Powers Project was to "avoid detrimental impacts and to provide protection" to fish-bearing streams located within the "wetted perimeter" of the South Fork Key Watershed.  PX 0001 at 213, 247, 249.  As such, the 404 Permit restricted construction activities within the "wetted perimeter" during the following periods:

> Work Period.  All in-water work for Site FDR 3347 shall occur between July 1 and October 1, Site FR 33 [MP] 46.2 & 47.07 shall occur between June 15 and November 1, and Site 33 no in-water timing restrictions in accordance with Oregon Department of Fish and Wildlife's recommended in-water work period.

PX 0001 at 263 (amending the permit schedule set forth at PX 0001 at 239).[6]  The limitations imposed by the 404 Permits were also detailed in a separate chart under the contract "Section 108.01-Commencement, Prosecution, and Completion of Work":

| Location | Work/time Limitations | Date |
|---|---|---|
| FDR 33:<br>MP 46.2 to MP 46.7 and MP 47.07 to 47.25 | Work allowed with **wetted perimeter** of any stream (Emphasis Added) | August 6 to November 1 |
| FDR 3347:<br>MP 0.61 and MP 1.18 | Work allowed with **wetted perimeter** of any stream (Emphasis Added) | August 6 to October 1 |
| FDR 33:   MP 44.5 and MP 46.2<br>FDR 3347:  MP 1.18 | Only work allowed is staking, striping, and signing | March 1 to March 31 |
| All sites | No work allowed | April 1 to July 4 |
| All sites | Only work allowed is staking, striping, and signing | July 5 to August 5 |
| All sites | Perform work during time from 2 hours after sunrise to 2 hours before sunset | August 6 to September 15 |

---

[6] / The term "in-water work," as mentioned in the text of the 404 Permit, is synonymous with the term "wetted perimeter" referenced in the contract.  Tr. 80:20-80:25 (J. Clevenger).

-6-

| All sites | No blasting is allowed | April 1 to September 15 |
|---|---|---|
| FDR 33:<br>MP 46.7 and MP 47.07 to MP 47.25 | No clearing is allowed | April 1 to September 15 |

PX 0001 at 142 (emphasis in original).

## B. Performance of the Contract

### 1. Preconstruction Conference and Schedule Submissions by White Buffalo

On August 27, 1998, a pre-construction conference was convened by Howe Crockett, a Construction Operations Engineer for the FHWA. PX 0034 at 1. Key project personnel, such as Luther Clevenger, Julie Clevenger, Paul Rettinger, Howe Crockett, and Sajid Aftab, attended the pre-construction conference. PX 0106 at 22.[7] At the pre-construction conference, Paul Rettinger, Resident Engineer for the project, discussed the contract schedule with Mr. Clevenger and explained the consequences of failing to adhere to the milestone dates of the contract. PX 0255 at 3. Moreover, Mr. Rettinger expressed concern over the appearance of White Buffalo's disorganization and reminded Mr. Clevenger that the "time windows [for the project] were very narrow and there was serious pressure from environmental agencies." PX 0255 at 3.

Immediately following the pre-construction conference, Mr. Crockett issued a Notice to Proceed, effectively allowing White Buffalo to commence pre-construction mobilization on September 1, 1998, as long as "[t]he Contractor's CPM schedule and Quality Control Plan are submitted to the Project Engineer by August 31, 1998, and approved by him." PX 0035 at 1. Additionally, the Notice to Proceed included a fixed project completion date of October 29, 1999. PX 0035 at 1; PX 0001 at 49-50 (referencing FAR 52.211-10 (Apr. 1984)).

In accordance with the Notice to Proceed, White Buffalo submitted a faxed copy of its "Preliminary Critical Path Schedule for the first 45 days of contract performance" to Sajid Aftab, Project Engineer for the FHWA, on August 31, 1998. PX 0036 at 1-2. The submitted construction schedule consisted of a one-page roughly drawn schematic and did not contain a written narrative. PX 0036 at 2; PX 0106 at 23. White Buffalo's schedule was summarily rejected by the FHWA. In its rejection letter, dated August 31, 1998, Mr. Aftab noted, "I cannot accept this schedule in this format. For your information, I am sending you a copy of an example. Please read Section 155, 155.04 and 155.05 of FP 96 to understand the type of format we need including the written narrative portion." PX 0037 at 1. Despite rejecting the schedule

---

[7] / The Court references the contracting officer's final decision, dated August 30, 2007, solely for the concise factual background contained therein. The contracting officer's final report may be found at PX 0106 and was admitted to the record pursuant to the parties' joint stipulation. Tr. 10:22-11:8 (Plaintiff's Opening Argument). Furthermore, pursuant to 41 U.S.C. § 7104, this Court shall review the Contracting Officer's final decision, issued on August 30, 2007 *de novo*. *See* 41 U.S.C. § 7104: "An action . . . shall proceed de novo in accordance with the rules of the appropriate court."

format, Mr. Aftab allowed White Buffalo to "start your silt fence and straw bale operations, however no other work will be allowed until [the] schedule is re-submitted in a proper format." PX 0037 at 1; Tr. 84:4-84:9 (Clevenger).

On September 8, 1998, White Buffalo resubmitted, via facsimile, a reformatted preliminary construction schedule, detailing White Buffalo's "[w]ork plan [for the] first 45 days." PX 0038.  In reviewing White Buffalo's second submission, Mr. Aftab noted in his diary:

> @ 6:45 am I arrived at the office.  Contractor (White Buffalo) schedules was sent to me thru (sic) fax.  After initial reviewing the schedule & discussing with Paul Rettinger, we decided not to accept this schedule in the format as it does not include [a] narrative/written with a detailed breakdown of all contract activities for the first 45 days.

DX 1140 at 23; PX 0106 at 24.  The FHWA memorialized its rejection of White Buffalo's second proposed schedule by letter, signed by Mr. Aftab, on September 8, 1998.  PX 0039 at 1.  Additionally, Mr. Aftab prohibited White Buffalo from beginning construction work until a proper construction schedule was accepted, meanwhile recognizing "that this contract is very tight on time and is constrained by many permit restriction."  PX 0039 at 1; Tr. 81:1-81:16 (Clevenger).

On September 10, 1998, White Buffalo submitted its third preliminary construction schedule, which included a proposed written narrative.  PX 0040.  This submission was subsequently rejected by the FHWA, however, on the grounds that the written narrative lacked four of the nine requirements under the contract pursuant to FP-96, section 155.05 of the Standard Specifications for Construction of Roads and Bridges on Federal Highway Projects. PX 0001 at 99.  The specific deficiencies under FP-96, section 155.05 were identified in a rejection letter from the FHWA to White Buffalo, dated September 10, 1998.  PX 0106 at 25.

On September 11, 1998, White Buffalo submitted its fourth preliminary construction schedule, which the FWHA received on September 14, 1998.  DX 1020 at 1.  This schedule remedied the deficiencies that rendered White Buffalo's previous submission unacceptable.  As a result, the preliminary construction scheduled was verbally accepted on September 14, 1998 by Howe Crockett and White Buffalo was allowed to begin all construction work on September 15, 1998.  PX 0106 at 25; Tr. 88:9-88:16 (Clevenger).

### 2.  White Buffalo's Construction Activities

After two weeks of delay, White Buffalo satisfactorily completed each of its preconstruction duties under the contract and was allowed to commence construction activities on the Powers Project on September 15, 1998.  Tr. 2179:10-2179:14 (Crockett); PX 0035 at 1.

However, from the very beginning, White Buffalo encountered substantial delays in its

construction schedule.  On September 16, 1998, the FWHA sent White Buffalo a Serial Letter raising several concerns regarding White Buffalo's compliance with the contract.  DX 1021 at 1-2.  The letter concluded by noting that White Buffalo's "[f]ailure to comply with the contract requirements will be cause for suspension on the work."  DX 1021 at 2.

On September 23, 1998, the FHWA inspected the project site located along FDR 33.  While inspecting the area, the FHWA "discovered that a vehicle had struck the gate on the north end of the FDR 33 road."  PX 0719 at 1; Tr: 93:23-94:25 (Clevenger).  Moreover, the FHWA found that White Buffalo failed to install proper project signs along FDR 33 in accordance with the terms of the contract.  PX 0719 at 1.  The Serial Letter concluded by stating, "Your operations are suspended, in accordance with Subsection 108.05 of the FP-96.  This suspension will be lifted once you have corrected these deficiencies and the signing is in compliance with the contract and FHWA staff has accepted the work."  PX 0719 at 1.

Meanwhile, on September 23, 1998, the FHWA sent a letter rejecting White Buffalo's blasting plan for the project.  PX 0721 at 1; DX 1008.  In reviewing White Buffalo's blasting plan, the FHWA hired a consultant, Mr. Peter Sheeran, to conduct an independent analysis of the plan.  In relying on Mr. Sheeran's report, the FHWA issued a Serial Letter to White Buffalo noting, "FHWA can not [sic] approve your blasting plan as submitted.  Based on Mr. Sheeran's report, control of the [blast] material can not [sic] be assured by the methods which you propose. . . . FHWA is agreeable to a submittal blasting plan that incorporates the recommendations from Mr. Sheeran's report."  PX 0721 at 1.  The following day, September 24, 1998, White Buffalo submitted a revised blast plan to the FHWA, which was approved on September 27, 1998.  PX 0723 1-3; DX 1031 at 1.

Soon after the FHWA accepted the blast plan, White Buffalo commenced its first rock blast at FDR 33 – MP 46.2 on October 2, 1998.  PX 0379 at 125.  On October 9, 1998, the FHWA instructed White Buffalo to cease blasting operations after observing silt minerals flowing from the blast site, down a culvert, and into the Rock Creek.  PX 0379 at 103-104.  To prevent further run off, the FHWA directed White Buffalo to place several hay bales around culvert.  PX 0369 at 104.  After setting up a perimeter of hay bales, White Buffalo was authorized to perform a second rock blast.

On the afternoon of October 9, 1998, White Buffalo conducted a second rock blast at FDR 33 – MP 46.2.  PX 0369 at 104.  However, the results of the rock blast were deemed defective by the FHWA.  In a Serial Letter dated October 9, 1998, the FHWA noted White Buffalo's rock blast resulted in numerous deficiencies:

> Your rock blast resulted in material not being contained within the roadway prism, but carrying over the edge of the road, and many large boulders coming to rest in Rock Creek.  Damage was done to the tress adjacent to the site, due to flying rock.  Damage was done to the 3347 road, directly below the site. . . . Many large blocks did not break, and will now require secondary blasting.

DX 1044 at 1.  As a result, the FHWA instructed White Buffalo to cease blasting operations until a revised blast proposal was accepted.  DX 1044 at 2.  In response, White Buffalo submitted a revised blast plan on October 14, 1998, which the FHWA accepted on October 16, 1998.  PX 0572 at 2-3; DX 1055 at 1.

With regard to other deficiencies, on October 9, 1998, the FHWA inspected the culvert delivered for installation at FDR 33 – MP 46.2 and noticed rust on the coil of the pipe.  On October 11, 1998, the FHWA sent White Buffalo a Serial Letter[8] detailing a number of deficiencies in White Buffalo's operations, including the rust on the culvert surface.  DX 1045 at 2.  The letter noted that the "culvert section is not acceptable" and the "FHWA will not allow installation of the culvert pipe."  DX 1054 at 2.  Moreover, the FHWA drew attention to White Buffalo's late submissions of certain documents required by the contract.  DX 1045 at 2.  As a result, White Buffalo's operations were suspended pending documentation curing the deficiencies listed in the letter.  DX 1045 at 1.  The Serial Letter further expressed the FHWA's frustration with White Buffalo by stating, "Your lack of a schedule and planning has resulted in untold delays and loss of valuable good construction weather."  DX 1045 at 1.  The FHWA sent two subsequent Serial Letters to White Buffalo addressing the concerns noted in the October 11, 1998 Serial Letter.  *See* DX 1047; DX 1048.  In the latter letter, dated October 13, 1998, the FHWA expressed to White Buffalo that "[y]ou were advised . . . that continued failure to perform the work under this contract would result in [your operations being suspended]."  DX 1048 at 1.

On October 20, 1998, Mr. Rettinger prepared a "Performance Evaluation (Construction)" to analyze White Buffalo's performance of the contract to date.  DX 1059.  The evaluation contained thirty-three performance factors to be rated on a scale of "Not Applicable," "Outstanding," "Above Average," "Satisfactory," "Marginal," and "Unsatisfactory."  DX 1059 at 2.  Of the thirty-three performance elements, Mr. Rettinger assigned White Buffalo a rating of "Not Applicable" to five factors, a rating of "Satisfactory" to one factor, a rating of "Marginal" to three factors, and a rating of "Unsatisfactory" to twenty-five factors.  DX 1059 at 2.  Thus, in consideration of all thirty-three factors, Mr. Rettinger assigned White Buffalo's "Overall Rating" of "Unsatisfactory."  DX 1059 at 1.  Similarly, on October 20, 1998, the FHWA convened a meeting, which Mr. Crockett, Mr. Rettinger, Mr. Aftab and Mr. Clevenger attended, to resolve several pending issues between the FHWA and White Buffalo.  DX 1060 at 1.  At the meeting, Mr. Rettinger expressed to White Buffalo that their performance thus far under the contract had been "very unsatisfactory."  DX 1060 at 1.

On October 21, 1998, the FHWA received a revised construction schedule from White Buffalo.  DX 1058 at 1.  The construction schedule submitted was White Buffalo's proposed "written narrative for our CPM . . . running thru [sic] October 29, 1999."  DX 1058 at 1.  The written narrative focused on each of the construction sites and noted critical completion dates for each site.  DX 1058 at 1-9.  On October 23, 1998, the FHWA accepted White Buffalo's latest

---

[8] A form letter which states deficiencies.

construction schedule, but noted, "FHWA does not agree with the logical sequence of your schedule, and has doubts regarding the durations shown . . . ." DX 1068 at 1.

As construction deadlines approached, pressure mounted on White Buffalo and its crew to complete certain aspects of the contract. On October 26, 1998, Michael Palanuk, White Buffalo's Quality Control inspector, suddenly resigned from the project. Tr. 1378:2-1379:7 (Palanuk) In a letter detailing his reasons for resigning, Mr. Palanuk complained that "[t]here [was] no schedule or linear program as to priorities of which sites are to be started or finished." DX 1072 at 1. Mr. Palanuk goes on to state, "I believe White Buffalo Construction appears not to have signed the same contract I was given, or isn't interpreting it correctly, or possibly is ignoring the contract!" DX 1072 at 2. Mr. Palanuk concluded his letter by noting, "I wish to thank the inspectors on the Powers project. They are the most competent, courteous and helpful [group] that I have encountered in my entire construction career." DX 1072 at 3.

On October 29, 1998, the FHWA issued a Serial Letter informing White Buffalo that they are not approved to proceed with blasting work. DX 1081 at 1. The FHWA noted that White Buffalo had not furnished a "valid blaster's license" in conformity with "Subsection 205.05 Blaster-in Charge" under the contract. DX 1081 at 1. This resulted in a delay in White Buffalo's blasting work along the project.

### 3. White Buffalo Requests an Extension of the Environmental Permits

In accordance with the Environmental Permits obtained by the FHWA, all construction activity within the wetted perimeter located at FDR 33 – MP 46.2 to MP 46.7 was to be completed by November 1, 1998. PX 0001 at 142. As White Buffalo had difficulties keeping the project on schedule, the FHWA became increasingly more concerned that the culvert installation at MP 46.2 would not be completed prior to the November 1, 1998 deadline.

On October 5, 1998, the FHWA's environmental consultant, Kris Reichenbach, contacted the permit agencies to inquire about the possibility of obtaining a permit extension for the project. PX 0106 at 47. In response to the e-mail, the permit agencies informed Ms. Reichenbach that any extension would be determined later in October of 1998 to better assess the weather and fish activity within the project area. PX 0106 at 47.

On October 21, 1998, Brian Allen, an environmental specialist for the Government, e-mailed Mr. Rettinger informing him, "[W]e [are] planning to ask for an extension closer to the end of the month so that the permit agencies could better assess the weather and what the fish are doing." PX 0269 at 1. Mr. Allen further explained, "I really doubt an extension will be granted. However, we will ask for an extension and will emphasize the importance of opening the road to traffic next spring." PX 0269 at 1. In responding to Mr. Allen's e-mail, Mr. Rettinger stated, "It doesn't look good for being even marginally close to completion by the end date 10/31. The last two days have been absolutely perfect weather, but the contractor hasn't [sic] even started the equipment to do any work." PX 0272 at 1.

As the deadline for work in the wetted perimeter approached, White Buffalo faxed a letter to the FHWA requesting a permit extension on September 27, 1998.  PX 0589 at 1.  In his request, Mr. Clevenger noted, "I would like for you to consider extending our time to get out of the [wetted perimeter] so that we can install the culvert and related work items on this site.  If we do not get this culvert in, we have no chance of getting FDR 33 open this year."  PX 0589 at 1.

Although the FHWA was exploring the possibility of a permit extension, there was concern about White Buffalo's ability to complete the required work in the wetted perimeter at FDR 33 – MP 46.2 even with a limited permit extension.  In an e-mail sent to Mr. Allen on October 28, 1998, Mr. Rettinger expanded upon this concern:

> Bottom Line: this contractor cant [sic] complete the work within the permit window (already extended from Sept 30 to Oct 31 under our contract).  Not that it couldnt [sic] have been done, but this company has failed.  If an extension is granted, it should take another 4 weeks [to complete the culvert installation], but again, that time frame is unlikely with the performance by this contractor to date. . . .  The USFS has been kept up to date on the project status.  They are aware of the unsatisfactory performance by this contractor.

> \* \* \*

> Resident Engineer Opinion: An extension should not be granted to this contractor.  Once the stream flow increases, extensions will be futile.

DX 1077 at 2.

A day after receiving Mr. Rettinger's recommendation, the FHWA notified White Buffalo that it "has consulted with the permitting agencies on the current status of the work at MP 46.2, and [White Buffalo's] letter, dated October 29, 1998, requesting an extension to [the] permit.  The permit closing date will not be extended."  PX 0051 at 2.  Despite the FHWA's position, however, Mr. Clevenger contacted the permitting agencies directly on behalf of White Buffalo.  On November 2, 1998, Mr. Clevenger sent a letter to the FHWA stating, "I am aware that you have denied my requests, however, on my own I have contacted all four permitting agencies listed on page H-55 of the contract and they have all given me verbal permission to complete the culvert installation."  PX 0054 at 2.  According to Mr. Clevenger, the permitting agencies had agreed to give White Buffalo an extension until November 6, 1998 to complete all construction activities in the wetted perimeter.  PX 0054 at 3.

The following day, on November 3, 1998, the FHWA responded to White Buffalo's letter regarding the permit extensions.  In the letter, the FHWA reminded White Buffalo that any communication to the permitting agencies should be conducted through the FHWA, not White Buffalo.  DX 1088 at 2.  On November 4, 1998, Ms. Reichenbach notified the FHWA that the permitting agencies agreed to allow "work to continue at MP 46.2 until November 6, 1998 in order to stabilize the site to protect the stream from sediment delivery."  DX 1090 at 1.  That

afternoon, the FHWA sent a letter to inform White Buffalo that the permit extensions had been formally approved. DX 1091 at 1.

## C. Termination

### 1. Cure Notice and Termination for Default

Despite the permitting agencies extending the permit extension to November 6, 1998, the FHWA was concerned about White Buffalo's ability to perform the construction activities within the deadlines set forth by the contract. On November 9, 1998, several members of the FHWA met to discuss the possibility of terminating White Buffalo's contract under the Termination for Default Clause of the contract. PX 0285 at 5; PX 0001 at 110 (citing FAR 52.249-10, Default (Fixed-Price Construction) (April 1984)).

On November 16, 1998, Carol Jacoby, the contracting officer overseeing the Powers Project contract, issued a cure notice to White Buffalo. PX 0066. The cure notice warned White Buffalo that the FHWA considered its failures in contract progress to be conditions endangering the performance of the contract. PX 0066 at 1.

Five days later, Mr. Clevenger submitted a letter to the FHWA in response to the cure notice. PX 0068. In the response letter, Mr. Clevenger highlighted several instances in which he believed the FHWA impeded White Buffalo's ability to complete the construction work on time. PX 0068 at 1 ("Despite your denials it is obvious and apparent to all involved with the project that there are problems and conflicts between your staff and between your staff and our staff."). The response letter then outlined Mr. Clevenger's proposal detailing how White Buffalo intended to complete the work along FDR 33. PX 0068 at 5-6.

Three days later, on November 23, 1998, Mr. Rettinger addressed a memorandum to Mr. Crockett analyzing White Buffalo's response to the cure notice. DX 1185 at 1. By analyzing each component of White Buffalo's response, Mr. Rettinger noted, "It is the opinion of the project staff that White Buffalo has failed to meet its contractual obligations under this contract." DX 1185 at 8. Therefore, Mr. Rettinger recommended that the FHWA terminate White Buffalo's contract for default immediately. DX 1185 at 8. The following day, Julie Clevenger, Secretary/Treasurer for White Buffalo, added a memorandum to the company's file noting that the contracting officer contacted her office and indicated that White Buffalo's response to the cure notice was inadequate. PX 0434 at 1; Tr. 795:25-797:24 (J. Clevenger).

On December 1, 1998, White Buffalo was notified by the contracting officer of the FHWA's decision to terminate the contract for default. DX 0005. At that time, White Buffalo was instructed to stop all work on the contract immediately. DX 0005 at 3. Shortly after the termination for default was issued, the FHWA immediately arranged for Kerr Contractors to stabilize the project site for the upcoming winter. Tr: 306:5-306:17 (Clevenger). Kerr Contractors began working on the site on December 2, 1998. PX 0803. The project was completely shut-down on December 15, 1998 due to safety concerns. PX 0235 at 2; Tr: 308:2-

-13-

308:13 (Clevenger).

After the termination for default, the FHWA contacted White Buffalo's surety, Insurance Company of the West ("ICW"), to discuss the award of a completion contract for the project. After receiving bids for the completion contract, the ICW selected Tidewater Contractors as the company with the lowest responsible bid.  DX 1148 at 1.  On May 21, 1999, Tidewater Contractors was awarded the completion contract under Contract No. DTFH70-98-C-00027.  PX 0684 at 1.  Tidewater Contractors subsequently completed all construction activities under the Contract on October 28, 1999.  PX 0481 at 4.

**D.  After Termination**

**1.  White Buffalo's Freedom of Information Act Requests**

Several months after White Buffalo's contract was terminated for default, Mr. Clevenger contacted the FHWA with a request to view documents under the Freedom of Information Act ("FOIA").  On November 17, 1998, Mr. Clevenger submitted his first FOIA request to Mr. Aftab of the FHWA, seeking a "specific document shown to me on November 12, 1998 . . . .  The document I am requesting is on your form 17-348, DAILY RECORD OF MISCELLANEOUS ITEMS for project OR FS ERFO 97-18(2)."  PX 0386 at 1.

On February 19, 1999, Mr. Clevenger faxed a second FOIA request to Dorthy Adesko, FOIA/PA Unit of the FHWA, "requesting a complete and thorough search of all filing systems and all locations for all records maintained by your agency permitting to Contract No. DTFH70-98-C-0027, OR FS ERFO 97-18(2)."  PX 0389 at 1; Tr. 333:12-333:17 (Clevenger).  On March 1, 1999, the FHWA responded to Mr. Clevenger's request, noting that the agency was in the process of gathering all the documents sought by the FOIA request.  PX 0391 at 1.  Approximately two weeks later, Ms. Adesko e-mailed Mr. Clevenger to notify him that all documents requested from the FHWA were available for review.  PX 0392 at 1.  The following day, Mr. Clevenger replied to Ms. Adesko's e-mail and agreed to visit the FHWA office on March 19, 1999 to inspect the documents.  PX 0393 at 1.

After his initial inspection of the documents, Mr. Clevenger e-mailed Ms. Adesko stating, "This is a continuing request under the Freedom of Information Act to look at an mark for copying or copy all of your documents for Contract No. DTFH70-98-C-0027."  PX 0396 at 1.  Mr. Clevenger sent this continuing request on March 26, 1999 because he felt that the FHWA withheld certain documents from him during his initial review on March 19, 1999.  Tr. 334:5-334:21 (Clevenger).

Several months later, on November 16, 1999, Mr. Clevenger filed an action for injunctive relief pursuant to the Freedom of Information Act in the United States District Court for the District of Oregon.  PX 0420 at 1; Tr: 336:9-336:11 (Clevenger).  Shortly after the suit was filed, the FHWA turned over several documents to Mr. Clevenger, which resulted in the dismissal of the litigation.  Tr: 336:12-336:16 (Clevenger).

-14-

**2.  Conversion of the Termination for Default into a Termination for Convenience**

On January 5, 2004, Timothy Binder, legal counsel for the FHWA, requested authority from the United States Department of Justice to convert the termination for default into a termination for convenience of the Government.  DX 1176 at 1.  Tr. 1357:7-1357:21 (Binder).  In justifying his conversion request, Mr. Binder noted that trial preparation had uncovered a substantial question as to whether the project could have been completed on time by White Buffalo due to differing site conditions.  DX 1176 at 1.

The United States Department of Justice approved the termination conversion on January 6, 2004.  On January 15, 2004, William Parsons, the FHWA's contracting officer, issued a Final Contracting Officer's Decision converting the termination for default into a termination for convenience of the Government.  PX 0090 at 1.  The termination for convenience of the Government effectively replaced the prior termination for default and, thus, the operative date for the termination for convenience would remain December 3, 1998.  PX 0090 at 1.  As a result of the conversion, the Government released the $100,000.00 it had previously withheld as liquidated damages resulting from the original default termination.   PX 0090 at 1-2.  Additionally, White Buffalo was invited to submit a termination settlement proposal, in accordance with FAR 52.249-2 and FAR Subpart 49.2.  PX 0090 at 1.


**DISCUSSION**

**I.     White Buffalo's Allegation of Bad Faith Conduct by Members of the FHWA**

**A.  Legal Standards**

Generally, every contract includes an implied duty of good faith and fair dealing.  *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 828 (Fed. Cir. 2010) (quoting Restatement (Second) of Contracts § 205); *Bannum, Inc.* v. *United States*, 80 Fed. Cl. 239, 246 (Fed. Cl. 2008)).  The covenant of good faith and fair dealing is an implied duty that imposes obligations on both contracting parties that include the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract.  *See Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005).

When the Government's conduct is called into question, "government officials are presumed to act conscientiously and in good faith in the discharge of their duties." *Bannum*, 80 Fed. Cl. at 249 (citing *Spezzaferro* v. *Fed. Aviation Admin.*, 807 F.2d 169, 173 (Fed. Cir. 1986)); *Kalvar Corp.* v. *United States*, 543 F.2d 1298, 1301 (Ct. Cl. 1976)).  Thus, in order to overcome the presumption of good faith, "a plaintiff must present clear and convincing evidence of bad faith."  *Bannum*, 80 Fed. Cl. at 249 (citing *Am-Pro Protective Agency* v. *United States*, 281 F.3d 1234, 1238-39 (Fed. Cir. 2002)) (internal quotation omitted).  Further, to demonstrate that the

Government has acted in bad faith, "a plaintiff must allege and prove facts constituting a specific intent to injure [the] plaintiff on the part of a government official." *Pratt* v. *United States*, 50 Fed. Cl. 469, 479 (Fed. Cl. 2001) (citing *Texas Instruments*, *Inc*. v. *United States*, 991 F.2d 760, 768 (Fed. Cir. 1993)).

The Government, as an entity, may violate the implied duty of good faith and fair dealing through the aggregate actions of its agents. *Keeter Trading Co*. v. *United States*, 85 Fed. Cl. 613, 625 (Fed. Cl. 2009) (citing *Struck Construction Co*. v. *United States*, 96 Ct. Cl. 186 (1942)). Moreover, "[i]f the aggregate of the actions of all the agents would, if done by one individual, fall below the standard of good faith, the entity for whom the various agents acted should be held to have violated that standard." *Keeter Trading Co.*, 85 Fed. Cl. at 625 (citing *Struck Construction Co*. v. *United States*, 96 Ct. Cl. 186 (1942)).

White Buffalo claims that "'[t]he presumption of good faith conduct of government officials has no relevance'" with respect to "'claims that the duties to cooperate and not hinder performance of a contract have been breached,'" and in such cases, proof of a violation need not be by clear and convincing evidence. *Moreland Corp. v. United States*, 76 Fed. Cl. 268, 291 (2007) (brackets in original) (*quoting Tecom, Inc. v. United States*, 66 Fed. Cl. 736, 771 (2005))." Pl.'s Post Trial Rep. Br. at 9. The Court finds it unnecessary to address this question as under either the heightened presumption standard or under a lesser standard, White Buffalo has failed to establish that the Government intended to harm White Buffalo, and, thus, acted in bad faith.

## B. Specific Allegations of Bad Faith Presented at Trial

During trial, the evidence and testimony presented focused primarily on White Buffalo's allegations that the Government acted in bad faith throughout the performance of the Contract. As such, the Court will review each of these allegations individually below.

### 1. FHWA's Rejection of White Buffalo's Construction Schedules

White Buffalo begins it assertions of bad faith by claiming that the Government "did everything possible to delay White Buffalo's start," and, thus, acted in bad faith, when it continually refused to accept White Buffalo's schedule. Pl.'s Post Trial Rep. Br. at 6. Further, White Buffalo alleges that the Government's refusal to accept the construction schedule was unjustified and unnecessary, as in the past, other projects had been allowed to continue without requiring the proper submittal of the CPM schedule. *Id.* at 6-7.

In addressing White Buffalo's allegations, the Court notes that some required documents, such as preconstruction schedules, are of such importance that refusal to comply with contractual requirements regarding submission constitutes a material breach of the contract. *Takota Corp. v. United States*, 90 Fed. Cl. 11, 21 (2009); *see also Universal Fiberglass Corp.,* 210 Ct. Cl. at 211-13. For example, in *Takota*, a contractor was terminated for default after it failed to submit proper construction plans for a Marina. *Id.* at 16. The court found that because the documents

were so central to the contract, the contractor had failed to comply with the contract specifications. *Id.* at 19-20.

In reviewing the evidence presented at trial, the Court finds that the Government's insistence in requiring White Buffalo to submit a proper preconstruction schedule prior to beginning construction activities was justified. Moreover, any delay in commencing construction activities was not the primary cause in White Buffalo missing important contractual milestones. Similar to *Takota*, the incorrectly submitted construction schedules in this case were so fundamental that the Government would have been remiss had it allowed White Buffalo to proceed on the project without approved documentation. *See Id.* As a result, the Court finds that the Government's conduct was in accordance with the specifications of the contract and was hardly in bad faith. Requiring a contractor to comply with the contract can only be bad faith in the rarest circumstances. These include contradictory clauses that would cause serious damage or create impossible conditions. None of that occurred here.

Moreover, White Buffalo's allegation that the Government caused the delay and, thus, prevented White Buffalo from finishing the project by the completion date is unfounded in that it omits mention of White Buffalo's hand in causing said delay. In fact, Mr. Aftab's letter to White Buffalo on August 27, 1998, noted that the Notice to Proceed was explicitly conditioned on approval of White Buffalo's CPM schedule and quality control plan by August 31, 1998. PX 0035. However, White Buffalo repeatedly submitted construction schedules that did not comply with federal regulations and contract specifications. PX 0037; PX 0039. They were, therefore, the underlying reason why White Buffalo could proceed only on a limited basis.

Further, the Court agrees with the Government that the refusals to accept White Buffalo's proposed schedule was done in accordance with the FAR Suspension of Work clause. In accordance with the Contract, the Contracting Officer may "order the Contractor, in writing, to suspend, delay, or interrupt all or any part of the work of this contract for the period of time that the Contracting Officer determines appropriate for the convenience of the Government." PX 0001 at 101 citing FAR 52.242-14. Thus, this clause allows the Government to exercise broad discretion to delay or suspend a contractor's work for the Government's convenience, but allows contractors to receive an adjustment for contractual milestones if the Government delays work on the contract. *Id.* However, contractors are specifically barred from receiving adjustments if the delay is due in any part to the fault of the contractor. *Id.* In this case, the delay of the contractor's work was due entirely to White Buffalo's failure to submit an acceptable schedule. Thus, the Government was entirely within its rights to delay White Buffalo's contract pending the approval of an adequate schedule, which the Government ultimately never received.

### 2. *Paul Rettinger's Personal Bias Against White Buffalo*

Secondly, White Buffalo alleges that Mr. Rettinger, as an agent of the Government, was biased against White Buffalo, and, accordingly acted in bad faith. Pl.'s Post Trial Br. at 8-10. More specifically, White Buffalo claims that Mr. Rettinger had an interest in the outcome of another litigation, in which White Buffalo was a party. *Id.* at 8. Guided by this bias, White

Buffalo claims that Mr. Rettinger actively advocated to stop the work, sought for reasons to refuse to pay White Buffalo, pushed for a criminal investigation, and provided a negative "performance evaluation." *Id.* at 8-10; PX 1059.

From the evidence presented at trial, the Court finds that the delay in the commencement of the work was not due to personal bias but instead arose out of legitimate concerns that White Buffalo would be unable to complete the job according to contract specifications. As mentioned above, Mr. Rettinger's delay in allowing White Buffalo to proceed was due primarily to White Buffalo's unwillingness or inability to submit an acceptable schedule, lack of an approved materials source, and repeated errors in administrative tasks such as record-keeping and payroll submissions. Each of these, by itself, would have been an acceptable reason for the Government to prevent White Buffalo from beginning work; taken together, they constitute serious failures on the part of White Buffalo to fulfill its obligations as a contractor. Thus, White Buffalo's failures left the Government with little choice except to delay the work.

Further, the Government acted in accordance with FAR 46.407, which specifies that the "contracting officer should reject supplies or services not conforming in all respects to contract requirements." Accordingly, the Government acted in conformance with the statutory provisions governing the contract, and the delay in allowing the White Buffalo to begin work was due to White Buffalo's own failure to make progress on the contract, rather than any personal bias on the part of Mr. Rettinger.

Moreover, the Court finds that White Buffalo has not presented evidence of any specific intent to injure the contractor, which is required for a showing of bad faith. *Holt v. U.S.*, 1980 U.S. WL 20813, *8 (Ct. Cl. 1980). Without specific proof of bad faith, "a showing that no reasonable basis existed for the contracting officer's decision would be indicative of arbitrariness or bad faith on his part. On the other hand, proof that a reasonable basis for the contracting officer's decision did exist would tend to show that his decision was made in good faith." *Id.* at 9. Here, the Court finds from the evidence that numerous reasonable bases existed that warranted delays in allowing contractor to begin work. Without any specific showing of bad faith, the Court finds that White Buffalo has failed to establish bad faith on the part of Mr. Rettinger. The Court found Mr. Rettinger a credible witness and an effective public servant trying to do a good job fairly.

### 3. Paul Rettinger Created a Hostile Work Environment

As further evidence of bad faith, White Buffalo asserts that Mr. Rettinger bullied Mr. Aftab and Mr. Barber when they attempted to assist White Buffalo in completion of the project. Pl.'s Post Trial Br. at 10-12. Specifically, Mr. Clevenger testified that his understanding was that Mr. Barber had been fired for talking to him at the construction site, although he could not give any specifics about the content of their conversation. Tr. 355:23 – 357:13. With regard to Mr. Aftab, Mr. Clevenger testified that it was his belief that Mr. Rettinger essentially directed Mr. Aftab in the course of his job, including such strict oversight as writing letters under Mr. Aftab's signature and overruling Mr. Aftab's approval of a pay note for installation of an energy

dissipator, a project valued at approximately $200,000.  Tr. 87:22 – 91:24.

While Mr. Rettinger's testimony confirms that Mr. Barber's conversations with Mr. Clevenger did in fact form a basis for his dismissal from his position as a consultant inspector, they do not address the underlying reason for the dismissal.  Mr. Rettinger testified that Mr. Barber essentially overstepped his authority by directing operations at the construction site and authorizing White Buffalo to begin work that had not been authorized by the FHA.  Tr. 2719:12 – 2719:19.   According to Mr. Rettinger's testimony, the contractor needed to plan the construction in accordance with environmental restrictions, and having Mr. Barber direct operations was wholly inappropriate.  Tr. 2720:4 – 2720:10.  Further, Mr. Barber's dismissal from the White Buffalo project does not appear to be targeted at impacting White Buffalo's work; Mr. Barber had worked on a previous project with Tidewater and had exhibited similar problems with getting too involved in the project.  Tr. 2719:20 – 2720:10 (Rettinger).  As a result, the Court finds from the evidence that Mr. Rettinger's firing of Mr. Barber from the White Buffalo contract was not due to bad faith on the part of Mr. Rettinger, but instead was done to prevent Mr. Barber from authorizing work that had not actually been approved by the FHA.

With regard to Mr. Aftab, Mr. Rettinger testified that his oversight of Mr. Aftab arose from Mr. Aftab's inexperience as a new engineer within the FHA division. Tr. 2691:14 – 2691:20.  Mr. Rettinger denied that his instructions to Mr. Aftab constituted "undue pressure;" rather, he asserted that his guidance was designed to allow Mr. Aftab to "understand and learn the contract provisions."  Tr. 2691:22 – 2692:5 (Rettinger).  As for the allegation that he wrote letters under Mr. Aftab's name, Mr. Rettinger testified that he did in fact edit and draft letters since English was not Mr. Aftab's first language.  Tr. 2692:18 – 2693:1. However, this appears to have been done with Mr. Aftab's consent and, as such, is not indicative of bad faith toward White Buffalo.  It is also part of Mr. Rettinger's responsibility to supervise employees under his direction.

In fact, the only issue where Mr. Rettinger's dealings with Mr. Aftab could be construed as animus toward the contractor involve the denial of the pay ticket for riprap in the energy dissipator.  PX 0627.  According to testimony from both Mr. Clevenger and Mr. Rettinger, Mr. Aftab did in fact sign the pay note for work done toward installing an energy dissipator in the culvert.  Tr. 91:14 (Clevenger), 2693:9 (Rettinger).  Immediately after Mr. Aftab signed the note, Mr. Rettinger countermanded the signature since the material used in the dissipator had not been tested to ensure that it met contract specifications.  Tr. 2693:4 – 2693:8 (Rettinger).  Mr. Clevenger admits that although the work had already been completed, it was a "deviation from . . . normal work . . . in the spec" and was done under oral agreement with Mr. Lowell and Mr. Aftab.  Tr. 91:18 – 91:24.  However, the contract clearly called for testing of materials to ensure that all components met quality control standards.

While the FAR does allow the contracting officer to accept supplies that are otherwise nonconforming, the contracting officer must make this determination based upon 5 criteria, including "advice of the technical activity that the item is safe to use and will perform its intended purpose."  FAR 46.407.  Without any testing of the material, there was simply no way

anyone, including Mr. Aftab who was the project engineer, not the CO, to know that the riprap was safe for use in the dissipator.  Mr. Rettinger's countermanding of the pay ticket approval was based on his knowledge of local rock sources, which, in his opinion, "would not hold up to future water events."  Tr. 2693:9 – 2693:20.  This testimony indicates that Mr. Rettinger was merely acting to preserve the longevity of the project, rather than to specifically target White Buffalo for non-payment.   Therefore, the Court finds from the evidence presented at trial that Mr. Rettinger was simply acting in accordance with both contractual and FAR provisions in countermanding Mr. Aftab's signature of the pay note for work done on the energy dissipator.

Accordingly, from the evidence presented at trial, the Court finds that White Buffalo has failed to establish that Mr. Rettinger created a hostile working environment that hindered White Buffalo's performance of the contract.

### 4.   Concealment of the Differing Site Condition at MP 46.7

White Buffalo also asserts that it was unable to complete the work under the contract due to differing site conditions at MP 46.7.  Pl.'s Post Tr. Br. at 12-15.  Specifically, White Buffalo alleges that the FHA's failure to address the changed conditions resulted in White Buffalo incurring additional costs and delays, which impeded the completion of the entire project.  *Id.*

As is clear from the evidence presented at trial, the FHA had designated the big slope area at 46.7 as sandstone, when in fact it was actually a heterogenous mixture of clay, dirt, and sandstone.  Tr. 573:2 – 573;8 (Kerr).  As a result, the driller would have to either take off the overburden on the slope above the sandstone or redesign blasting operations to account for the differing composition.  Tr. 573:25 -574:8 (Kerr). FAR provisions grant additional time and money to a contractor who discovers a differing site condition and promptly informs the contracting officer of those conditions.   FAR 52.236-2.   The full text of the relevant FAR provision designates several scenarios under which contractors may receive contractual adjustments to account for the differing site condition, but all require prompt notice from the contractor to the contracting officer.[9]

---

[9]FAR 52.236-2 provides:
(a) The Contractor shall promptly, and before the conditions are disturbed, give a written notice to the Contracting Officer of
(1) subsurface or latent physical conditions at the site which differ materially from those indicated in this contract, or
(2) unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract.
(b) The Contracting Officer shall investigate the site conditions promptly after receiving the notice. If the conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performing any part of the work under this contract, whether or not changed as a result of the conditions, an equitable adjustment shall be made under this clause and the contract modified in writing accordingly.

The Court finds from the evidence presented at trial and from relevant FAR provisions that the contractor should have been entitled to a contract modification reflecting the increased cost of clearing overburden on the slope.  In fact, when the Government awarded the contract to Tidewater after terminating White Buffalo, the contract was modified to reflect the differing site condition at MP 46.7.  However, White Buffalo's claim that the differing site condition caused delays warranting an adjustment in time allowed for the project is unsupported by the evidence.  The evidence shows that White Buffalo had encountered other issues on the project that would have prevented their completion of the project by the expected contract date.

Specifically, the contractor had not completed haul work in the wetted perimeter at MP 47.07 and 46.2 in a timely manner, did not install the culvert at 46.2, or put in place the geotextile wall at 46.2, all of which were key components of the project as a whole.  Tr. 2195:1-2195:6, 2207:9 – 2207:21 (Crokett).  All work at MP 46.2, the culvert site, had to be completed by November 1, 1998 due to environmental restrictions.  Tr. 2215:2 – 2215:3 (Crokett).  However, the contractor had not met critical milestones for MP 46.2 at the time of the failed blast at 46.7.  According to PX 77, "the overburden slope failure at 46.7 did not prevent... completion of the road to subgrade at the MP 46.2, 46.6, 47.07, 47.14, and 47.25 work sites by November 30, 1998, as required by the contract."  Although it is unfortunate that the contractor did not receive correct information about the material composition of the slope at MP 46.7, it is clear from the evidence that White Buffalo's inability to complete the project by the contract date stemmed from a variety of events, and the slope failure at MP 46.7 was an event independent from other missteps by the contractor.

The Court, thus, finds from the evidence that the differing site condition did not have a significant impact on the contractor's ability to complete the project within the deadlines of the contract.

### 5.  The FHWA's Refusal to Request the Environmental Permit Extensions

White Buffalo also alleges that the Government acted in bad faith by lying and failing to request environmental permit extensions for work on the vicinity of MP 46.2.  White Buffalo claims that Mr. Rettinger acted to make sure that "there would be no extensions."  Post Trial Br. at 16.  Further, White Buffalo states that Mr. Rettinger lied and stated that the agencies had denied any such extension.  *Id.*  Unable to receive any assistance from the Government, White Buffalo claims that it personally contacted the agencies and was granted the much needed extension.  *Id.*  White Buffalo also asserts that the fact that the Government aided Tidewater in obtaining an extension is further proof of bad faith.  *Id.* at 17.

---

(c) No request by the Contractor for an equitable adjustment to the contract under this clause shall be allowed, unless the Contractor has given the written notice required; provided, that the time prescribed in (a) above for giving written notice may be extended by the Contracting Officer.

(d) No request by the Contractor for an equitable adjustment to the contract for differing site conditions shall be allowed if made after final payment under this contract.

The Court finds from the evidence presented that the Government's refusal to ask for a permit extension to allow White Buffalo to continue work in the wetted perimeter does not constitute bad faith. Multiple government representatives made the decision that White Buffalo was not entitled to an extension, and their decision is rooted in strong evidence that there were no major changes to the project that would have warranted granting an extension. Tr. 2280: 18 - 2281 – 20 (Crokett). Specifically, Mr. Crockett testified that because the Government did not cause delay, the contractor was not entitled to an extension. Tr. 2284:8 – 2284:11 (Crokett). As mentioned above, because the delays in this project arose out of the White Buffalo's own failures, the Government's refusal to allow White Buffalo to begin work cannot be construed as causing a delay meriting an extension. Furthermore, White Buffalo also failed to submit formal requests for an extension as required under FAR. Such FAR regulations call for certain justifications to be provided before an extension can be granted. Tr. 2453:19 – 2453:22 (Rettinger).

Additionally, environmental regulations would have prevented an extension of the permit to allow White Buffalo to continue work in the wetted perimeter. Tr. 2456:13 – 2456:17 (Rettinger). Mr. Rettinger did in fact consult with environmental engineers and headquarters in an effort to determine whether an extension to allow the contractor to continue working would have been prudent. Upon determining that no extension would in fact be advisable, Mr. Rettinger instead requested permission to winterize the culvert area to prevent damage due to cold weather. Tr. 2456:23 – 2457:3 (Rettinger). By the time White Buffalo requested the extension, their contract had already been granted a month's extra working time beyond what was normally permitted by the authorizing agencies. Tr. 2456:2 – 2456:5 (Rettinger). Therefore, had any extension been granted, it would have run afoul not just of environmental regulations, but also risked damage to the culvert from heavy seasonal rains. Tr. 2455:18 – 2455:22 (Rettinger).

Accordingly, the Court finds that the Government acted in compliance with environmental regulations and safety conditions when refusing to request a permit for an extension to work in the wetted perimeter.

### 6. The FHWA's Conduct During White Buffalo's FOIA Requests

White Buffalo asserts that Mr. Rettinger acted in bad faith when he tried "to cover up the redesign . . . to support the default termination." Pl.'s Post Trial Br. at 24. Among its allegations, White Buffalo claims that after it made a FOIA request, Mr. Rettinger concealed the requested documents. Id. at 23. Some of the requested documents were later provided to White Buffalo in settlement of a FOIA lawsuit and discovery of this litigation. Id. at 24.

This Court finds that the evidence presented does not support White Buffalo's allegations, and, therefore, this Court cannot find that the Government acted in bad faith. White Buffalo's claims that the Government actively acted to conceal the requested information is merely speculative. There is nothing on the record to show that such cover up in fact occurred.

On the contrary, the record demonstrates that the Government tried to comply with the FOIA request by providing the requested documents for White Buffalo's inspection. White Buffalo has only presented conjectures and has failed to show that Mr. Rettinger intended to conceal the documents or harm White Buffalo. Accordingly, the Court cannot find that the Government acted in bad faith.

### 7.   *The Termination Conversion to a Termination for Convenience*

Lastly, White Buffalo asserts that the Government changed the termination for default to one of convenience in an attempt to avoid liability for lost profits, and that this change is further proof that the Government acted in bad faith. Pl.'s Post Trial Br. at 28-29. In making its allegations, White Buffalo relies on Mr. Parsons' lack of recall for the reasons of the conversion, and on Mr. Binder's testimony stating that he did not believe the conversion was necessary. *Id.* at 25-28.

The Court disagrees. White Buffalo's actions provided the underlying bases for either termination for default or termination for convenience. The mere fact that the Government changed the type of termination is not necessarily indicative of bad faith. All this demonstrates is that the conversion may have reasonably been made because there were questions as to whether the differing site conditions prevented White Buffalo from completing the project on time. There is no indication in the record or in the evidence presented at trial that the Government intended to harm White Buffalo. The most logical inference from the facts is that government officials were divided on the complex fact issue on this project and opted to give White Buffalo the benefit of the doubt. Accordingly, White Buffalo has failed to demonstrate bad faith on the part of the Government.

## II.   <u>Recoverable Costs</u>

### A.  **Legal Standards**

When a contract is terminated for convenience, pursuant to 48 C.F. R. § 52.249-2(g)(2), a party may recover the total of (1) "[t]he costs incurred in the performance of the work terminated, including initial costs and preparatory expense allocable thereto," (2) [t]he cost of settling and paying termination settlement proposals under terminated subcontract that are properly chargeable to the terminated portion of the contract," and (3) a fair and reasonable profit on the costs incurred in the performance of the terminated work. *Id.* As the contract is being terminated at the convenience of the government, costs are allowable and recoverable. Factors to be considered by the Court in its determination of allowable costs include: (1) reasonableness; (2) allocability to the contract; (3) generally accepted accounting principles and practices; (4) the terms of the contract; and (5) any specific limitations set forth in FAR part 31. *White Buffalo Constr.* 52 Fed. Cl. at 4 & n.7. The Court will take each cost in turn.

### B. Allowable Costs

#### 1. Direct Job Costs

White Buffalo has offered testimony that it incurred $128,478 in payroll and taxes. Tr. 809:19 (Clevenger). The Government agrees to the amount determined by the Defense Contract Audit Agency ("DCAA") which was $127,463. Def.'s Post Trial Br. at 10. The difference between the parties is the costs attributable to Jim Heigh, a supervisor on the Powers Project. The amount claimed by White Buffalo is $1,015. Pl. Br. at 32. As the testimony revealed, Jim Heigh remained on the project after White Buffalo had been terminated to supervise Kerr Construction's use of White Buffalo's equipment. Tr. 420:16 – 422:10 (Clevenger). The Government asserts that these costs relate to post-supervision of White Buffalo's equipment and were not incurred in the performance of the contract work. *Id.* Therefore, under FAR 52.249-2(g)(2), White Buffalo may not claim these costs. *Id.*

The Court agrees with the Government. It is clear that under FAR 52.249-2(g)(2), the only costs that may be recovered are costs that were incurred in the performance of the contract. Supervision of its equipment after the contract has been terminated is therefore not recoverable. Furthermore, there was no testimony that White Buffalo had an agreement with the Government that the Government would reimburse White Buffalo for Mr. Heigh's supervision work. Therefore, the Court **awards $127,463** to White Buffalo for payroll and taxes incurred in the performance of the contract.

#### 2. Other Direct Job Costs

White Buffalo asserts that it is entitled to $128,598 for other direct job costs. Pl.'s Post Trial Br. at 33. Of the $128, 598, the Government has agreed to $121,794. Def.'s Post Trial Br. at 11. The costs in dispute are the legal fees Landmark incurred in its efforts to obtain payment from White Buffalo, legal fees that White Buffalo incurred in its suit against subcontractor McBride, and the interests White Buffalo paid to Landmark. *Id.* at 11-12. These costs are $1,272, $3,117, and $ 2,415, respectively. *Id.*

With Regard to the legal fees, the Court cannot agree with White Buffalo's allegations. The fees that White Buffalo is asking for are not costs associated with the performance of the work and are not allowed under the termination for convenience settlement clause. As this Court has previously stated, "[the Government] is not obligated to compensate Plaintiff for attorney work performed in a cause of action in which it was not even a party." *White Buffalo Constr. Co. v. United States* 52 Fed. Cl. 1, 17 (2002).

The Court also disagrees with White Buffalo in regards to the payment for interest. The evidence and testimony presented at trial show that the invoice White Buffalo received from Landmark did not include interest. *See* PX. 0223; Tr. 407: 17-407:23 (Heimburger). As this amount was not part of the agreement between White Buffalo and Landmark, the Government is

not obligated to pay for White Buffalo's overpayment.

Accordingly, accounting for the contested costs, the Court **awards $121,794** for other direct job costs.

### 3. Equipment, Vehicle, and Fuel Expenses

The Court will allow the uncontested amount of **$26,985** for equipment, fuel, and vehicle costs.  *See* Pl.'s Post Trial Br. at 36; Def.'s Post Trial Br. at 13.

### 4. Other Equipment, Vehicle, and Fuel Expenses

With regards to other equipment expenses, the Government, consistent with the DCAA calculation, has conceded $65,808. Def's Post Trial Br. at 13. The main expense in contention[10] is the cost for a LS34000 excavator that was allegedly damaged during performance of the contract.  *Id.*  During trial, White Buffalo proved that it owned the excavator.  S*ee* Tr. 474:25-475:4 (Clevenger). The Court, however, cannot award the value of the excavator because White Buffalo failed to prove that the damage to the excavator occurred during the performance of the contract.

At trial, Mr. Clevenger testified that at the termination of the contract, White Buffalo was not aware that there was any damage to the hydraulic lift.  Tr. 484:24-485:10.  In fact, White Buffalo used the equipment on another job site after termination.  Tr. 485:16 – 485:24 (Clevenger).  White Buffalo failed to provide any evidence that the excavator had been damaged during performance of the contract and not at the subsequent job.  Accordingly, the Court cannot allow White Buffalo to recover the cost of the excavator.  The Court, therefore, **awards** White Buffalo **$65,808** for other equipment, fuel, and vehicle expenses.

### 5. Surety

White Buffalo states that it incurred $276,768 in surety expenses.  Pl.'s Post Trial Br. at 37.  The Government does not dispute that amount.  Def.'s Post Trial Br. at 15.  White Buffalo, however, seems to have misunderstood the Government's arguments for refusing to pay this amount.  White Buffalo contends that the Government has conceded to $261,646, but that it is disputing $15,000 in interest.  Pl.'s Post Trial Br. at 37.  This is not the case.  The Government has conceded the amount that White Buffalo claims, but refuses to pay the amount because the

---

[10] White Buffalo has asked for $91,968, however, the conceded amount plus the value of the excavator that White Buffalo seeks comes to a total of $90,808.  *See*  Pl.'s Post Trial Br. at 36.  White Buffalo merely notes in a footnote the other expense that it is asking for is for the cost of tires that were stolen.  *Id.* at n. 19.  The Court assumes that the value of the tires make up the $ 1,160 difference.  As White Buffalo has not presented any evidence regarding the costs incurred for the tires, the Court will only consider the cost of the excavator.

FHA has already paid White Buffalo for the surety expenses.  Def.'s Post Trial Br. at 15.  The Court agrees with the Government as White Buffalo has explicitly admitted that "[t]he Government also paid plaintiff $276,768 for surety costs and expenses."  DX 1198 at 16.  For this reason, the Court will not award any payment for surety expenses.

### 6.  G & A Expenses

The Court will allow the uncontested **$28,183** general and administrative ("G&A") expenses.  Pl.'s Post Trial Br. at 39; Def.'s Post Trial Br. at 15.

For the aforementioned reasons, the Court concludes that White Buffalo is entitled to **$370,233** in recoverable costs.

### 7.  Profit

#### i.  Pre-Termination

The parties do not dispute that White Buffalo is entitled to compensation for costs incurred prior to the termination of the contract.  Pl.'s Post Trial Br. at 40; Def.'s Post Trial Br. at 15-16.  The issue in contention is the applicable profit rate that is applicable to the cost of performance.  *See* Pl.'s Post Trial Br. at 40; Def.'s Post Trial Br. at 22.  White Buffalo argues that it is entitled to a margin of 44 percent, while the Government states that a rate of 19 percent is more appropriate.  Pl.'s Post Trial Br. at 40; Def.'s Post Trial Br. at 22.

The Court agrees with the Government and finds that a rate of 19 percent is applicable in this case.  In reaching this determination, the Court has considered the rate of profit that the contractor would have earned had the contract been performed to completion and the rate the parties contemplated at the time they negotiated the contract.  *See* 48 C.F.R. § 49.202(b).

Here, White Buffalo stated that it performed contract work in the amount of $626,185, and that, in doing so, it incurred $680,980 in costs.  Tr. 556:1 – Tr. 526:25 (Clevenger); PX 0801A.  Therefore, assuming that White Buffalo's calculations are accurate, White Buffalo was operating at a loss at the time of termination.  *See* PX 0106 at 10.  Furthermore, the Government disputes, and the Court agrees, that White Buffalo's cost of performance is elevated.

By line item, White Buffalo completed the following:

| Pay Item | Performance Amount[11] |
|---|---|
| 15101 (Mobilization) | $175,000.00 |
| 15201 (Construction survey and staking) | $19,550.00 |

---

[11] *See generally* PX 0001 at 9-19; PX 0063 at 4; PX 0223 at 3; DX 1004 at 104, 110, 656-666; DX 1033 at 21-23;  DX 1139 at 35-232

| | |
|---|---|
| 15401 (Contractor testing) | $12,000.00 |
| 15501 (Construction Schedule) | $2,500.00 |
| 15703 (Silt fence) | $6,324.44 |
| 15708 (Straw bales) | $910.00 |
| 15718 (Diversion channel) | $2,960.00 |
| 20101 (Clearing and Grubbing) | $900.00 |
| 20301 (Removal of pipe culvert) | $400.00 |
| 20401A (Roadway excavation) | $83,568.00 |
| 20401B (Roadway excavation at MP 46.7) | $63,616.00 |
| 25109 (Energy dissipater) | $2,000.00 |
| 30802 (Roadway aggregate method) | $100.00 |
| 60201C (Pipe culvert) | $34,500.00 |
| 60201D (Pipe culvert) | $1,500.00 |
| 61902 (Gate) | $800.00 |
| 62201A (Grader, motor) | $285.00 |
| 62201B (Hydraulic excavator) | $6,550.00 |
| 62201C (Loader/backhoe) | $3,300.00 |
| 62201D (Tractor, crawler dozer) | $6,281.25 |
| 62201E (Truck) | $8,450.00 |
| 62301 (General labor) | $1,080.00 |
| 63507 (Construction signs) | $1,093.50 |
| 63509 (Flagger) | $2,320.00 |
| 63521A (Warning light type A) | $150.00 |
| 63521B (Warning light type C) | $800.00 |
| CM 2 Shooting Boulders | $750.00 |
| CM 3 Tree Removal | $2,328.92 |
| **Total** | **$440,017.11** |

There is nothing on the record or the evidence presented at trial to justify the $186,167.89 difference.[12]  Consequently, the 44 percent that White Buffalo claims it is entitled to is not credible as it is not supported by the evidence.

Taking the $440,017.11 of contract work that White Buffalo performed and comparing it to the $370,233 cost of performance that the Court has awarded, a 19 percent profit rate is appropriate.[13]  Accordingly, the Court finds that White Buffalo is entitled to a total of **$440,577.27** in costs.[14]

---

[12] / $626,185 – $440,017.11 = $186,167.89
[13] /$440,017.11 - $370,233) / $370,233 = 0.19
[14] / $370,233 x 1.19 = $440,577.27

### ii.  Post-Termination

Because this Court finds that the Government did not act in bad faith, White Buffalo is not entitled to recover for post-termination lost profits.  *See Keeter Trading Co. v. United States,* 79 Fed. Cl. 234, 263 (2007).  Accordingly, there is no need to discuss the post-termination profits that White Buffalo may have gained, and the Court does not award any damages for post-termination lost profits.

### 8.  Settlement Expenses

With regards to settlement expenses, the parties only seem to disagree on whether White Buffalo incurred the costs associated with a Westlaw subscription and the purchase of a laptop used for the settlement proposal.  Pl.'s Post Trial Rep. Br. at 28.  White Buffalo asks for a total of $ 131,020 for settlement expenses.  *Id.* at 29.  This Court, however, disagrees with White Buffalo and finds that it is not entitled to the costs of the Westlaw subscription or the laptop. White Buffalo has failed to present evidence at trial to justify or to show that it in fact incurred these costs.  Accordingly, consistent with the Government's calculations, the Court finds that White Buffalo is entitled **to $113,977.09** in settlement expenses.

### 9.  Subcontractor Claims

White Buffalo also asserts that it is entitled to $39,222 in settlement expenses related to a claim with subcontractor McBride.  Pl.'s Post Trial Br. at 42; PX 0106 at 10.  The Court, however, disagrees.  White Buffalo has shown that it is entitled to $29,528 in subcontractor claim costs.  *See* Tr. 434 – 437 (Clevenger).  White Buffalo has, however, failed to demonstrate that it in fact owes McBride $9,694 in interest.  Accordingly, due to the lack of evidentiary support, the Court finds that White Buffalo is not entitled to interest, but does award **$29,528** in subcontractor claim costs.

## C.  Prompt Payment Act Interest

Generally, a contractor is entitled to an interest penalty if the Government fails to pay the contractor's invoice in accordance with the Prompt Payment Act ("PPA"). 31 U.S.C. § 3901, et seq.  However, a contractor is entitled to an interest penalty only if "there was no disagreement over quantity, quality, Contractor compliance with any contract term or condition, or requested progress payment amount."  FAR 52.232-27(a)(3)(ii) (Jun 1997); FAR 52.232-27(a)(4)(iv); FAR 32.907-1(a)(2); FAR 32.905(c)(1)(i).

Here, White Buffalo is not entitled to PPA interest because there was disagreement over the quantity, quality, and compliance contained in the payment applications.  On November 17, 1998, Mr. Rettinger notified White Buffalo that there was a disagreement regarding the request for payment submitted on November 11, 1998.  DX 1109.  Most notably, Mr. Rettinger informed White Buffalo that it had not complied with the terms of the contract and that the invoices that

had been submitted were not acceptable.  *Id.*  Accordingly, the disagreement between the parties bars any recovery under the PPA.

### D.  Contract Disputes Act Interest

The parties do not dispute that White Buffalo is entitled to interest under the Contract Disputes Act Interest ("CDA") running from April 19, 2007.  Pl.'s Post Trial Br. at 43; Def.'s Post Trial Br. at 44.  The parties have not, however, provided the Court with the appropriate interest rate.  The Court, therefore, asks that the parties reach an agreement as to the applicable CDA interest rate applied and the amount due and submit it to the Court for an order.

### E.  Equal Access to Justice Act

Generally, a party that prevails against the Government may be awarded certain costs under the Equal Access to Justice Act ("EAJA").  28 U.S.C. § 2412(d)(1).  However, award of these costs is contingent upon, inter alia, which party prevails in court.  Therefore, a request for costs under the Equal Access to Justice Act is premature if made prior to final judgment in the case, and the appropriate action by the Court is to dismiss the request, without prejudice.  *M.A. DeAtley Constr., Inc. v. United States*, 71 Fed. Cl. 370, 372 n.1 (2006).  As this is not a final order, the Court dismisses White Buffalo's claim for EAJA fees and costs without prejudice.

### CONCLUSION

For the reasons set forth above, the Court finds that the Government did not act in bad faith when it terminated the contract with White Buffalo.  Further, the Court awards $440,577.27 in total costs plus $113,977.09 in settlement expenses, minus the $202,317 previously received, DX 1198 at 16, for an **AWARD of $352,237.36**, plus interest from April 19, 2007.

In light of this decision, the parties are further **ORDERED** to file a joint stipulation, if possible, within sixty (60) days of this opinion regarding the applicable CDA interest rate and amount of interest to be awarded.

**It is so ORDERED.**

s/ Loren A. Smith
LOREN A. SMITH
Senior Judge